## UNITED STATES DISTRICT COURT
### District of Massachusetts

FILED
IN CLERKS OFFICE

2024 JUN 21  PM 3: 04

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| **ROBERT PAUL WEINBERG**<br>**Plaintiff**<br><br>v.<br><br>**NAGINA MANGAL**<br>M.I.T. Postdoctoral Fellow<br><br>**ANN GRAYBIEL**<br>Institute Professor, M.I.T.<br><br>**SALLY KORNBLUTH, MASSACHUSETTS**<br>**INSTITUTE OF TECHNOLOGY**<br>Private University in Massachusetts<br><br>**BOOKER BUSH, CHAIRMAN, BOARD OF**<br>**REGISTRATION IN MEDICINE**<br>*in both his Official Capacity & Personal Capacity*<br><br>**ALICE OLIFF**<br>*in both her Official Capacity & Personal Capacity*<br><br>**KIMBERLY BUDD, CHIEF JUSTICE**<br>**MASSACHUSETTS SUPREME JUDICIAL**<br>**COURT**<br>*in both her Official Capacity & Personal Capacity*<br><br>**SARAH LUICK, MAGISTRATE**<br>**MASSACHUSETTS DIVISION OF**<br>**ADMINISTRATIVE LAW APPEALS**<br>*in both her Official Capacity & Personal Capacity*<br><br>**VINCENT DICIANNI**<br>Licensed Attorney in Massachusetts<br><br>**CLAUDIA HUNTER**<br>Licensed Attorney in Massachusetts<br><br>**PROMUTUAL MEDICAL MALPRACTICE**<br>**INSURER**<br>Medical malpractice insurer | Civil Action No.<br><br><br>**JURY TRIAL DEMANDED**<br>Fed.R.Civ.P. 38(b)<br><br><br><br>**EQUITABLE RELIEF SOUGHT** |

1

**ROBERT STOLZBERG**               )
    Licensed Attorney in Massachusetts    )

**VALERIE STANFILL, CHIEF JUSTICE,**    )
**MAINE SUPREME JUDICIAL COURT**    )
*in both her Official Capacity & Personal Capacity*    )

**ELLEN GORMAN, JUSTICE, MAINE**    )
**SUPREME JUDICIAL COURT**    )
*in both her Official Capacity and Personal Capacity*    )

**WILLIAM FISHER, ASSISTANT MAINE AG,**    )
*in both his Official Capacity and Personal Capacity*    )

**AARON FREY, MAINE ATTORNEY**    )
**GENERAL'S OFFICE**    )
*in both his Official Capacity & Personal Capacity*    )

**CHRISTOPHER MACLEAN, CHAIRMAN,**    )
**MAINE BOARD OF BAR EXAMINERS**    )
*in both his Official Capacity & Personal Capacity*    )

**LOURDES COLON**    )
    a.k.a. "Patient A" in BORIM pleadings    )

**LISA WOLFE**    )
    Licensed psychologist in Massachusetts    )

**KRISHNASWAMY GAJARAJ ,**    )
**HUMAN RESOURCE INSTITUTE**    )
*in both his Official Capacity & Personal Capacity*    )

**PAULA LAZAR**    )
    Licensed clinician in Massachusetts    )

**STEN LOFGREN**    )
    Licensed psychiatrist in Massachusetts    )

**STANLEY SPERO**    )
    Licensed attorney in Massachusetts    )

**SPERO AND JORGENSON, P.C.**    )
    Massachusetts law firm    )

**JAMES C. BECK**    )
    Expert Witness for BORIM/DALA    )

**PRISCILLA ALMODOVAR, FEDERAL**    )
**NATIONAL MORTGAGE ASSOCIATION**    )
    Federally-sponsored financial institution    )

2

**MRCOOPER**                                      )
    Mortgage servicing agent/corporation    )

**JOHN NEY**                                      )
    Attorney representing FNMA                )
                                             )

**SHECHTMAN, HALPERIN AND SAVAGE**                )
    Rhode Island law firm                     )

**JAMIE DIMON, CEO, JP MORGAN CHASE BANK**        )
*in both his Official Capacity & Personal Capacity*  )

**SETERUS INC.**                                  )
    Mortgage servicing agent/corporation    )

**ENAN DEL RIO**                                  )
    Employee/agent/contractor to Seterus    )

**RIGHTPATH SERVICING**                           )
    Mortgage servicing agent                  )

**DANNY WERFEL, COMMISSIONER OF**                 )
**INTERNAL REVENUE**                              )
*in both his Official Capacity & Personal Capacity*  )

**LEXI BARRETT, COMMISSIONER OF U.S.**            )
**DEPARTMENT OF EDUCATION**                       )
*in both her Official Capacity & Personal Capacity*  )

**LAURIE GLIMCHER, DANA-FARBER**                  )
**CANCER INSTITUTE**                              )
    Private Cancer hospital in Boston       )

**DICK ARGYS, BOSTON CHILDREN'S**                 )
**HOSPITAL MEDICAL CENTER**                       )
    Private medical hospital in Boston      )
                                             )

**SHERIFF CHRISTOPHER WAINWRIGHT,**               )
**OXFORD COUNTY SHERIFFS DEPARTMENT**             )
*in both his Official Capacity & Personal Capacity*  )

**ROBERT MULLEN, CHIEF JUSTICE, OXFORD**          )
**COUNTY SUPERIOR COURT**                         )
*in both his Official Capacity & Personal Capacity*  )

**DANA MCKEEN**                                   )
    Maine-convicted felon, burglar, vandal  )

**GARY STEADMAN**                                 )
    Convicted Felon, former tenant of Plaintiff  )

**DAVID LOEWENSTEIN, NATIONAL** )
**PRACTITIONER DATA BANK** )
*in both his Official Capacity & Personal Capacity* )

**CHIEF, CENTERS FOR MEDICARE AND** )
**MEDICAID SERVICES** )
*in both his Official Capacity & Personal Capacity* )

**NAVIENT** )
    Student Loan Servicing entity )

**AMERICAN EDUCATIONAL SERVICES** )
    Student Loan Servicing entity )

**RUSHMORE SERVICING** )
    Mortgage Servicing company )

**ANDREA CAMPBELL, ATTORNEY GENERAL** )
Representing the Commonwealth of Massachusetts, )
*in both her official capacity and Personal capactiy* )
)
**JPMORGAN CHASE BANK** )
    National commercial Bank )

**FEDERAL NATIONAL MORTGAGE ASSOCIATION** )
    Congressionally-created financial entity )

**FERRITER SCOBBO** )
    Boston law firm )

**UNITED HEALTHCARE INSURANCE CO.** )
    Health Insurance entity )

**AARON FREY, ATTORNEY GENERAL** )
    Representing the **STATE OF MAINE** )
    *in both his Official Capactiy and his Personal capacity* )

**HARVARD UNIVERSITY DENTAL CENTER** )
    Public community dental center )

**NORTHEASTERN UNIVERSITY SCHOOL OF LAW** )
    Private university law school in Massachusetts )

)

*Defendants Acting Jointly and Severally,* )

        **Defendants** )

4

## COMPLAINT FOR EQUITABLE RELIF (DECLARATORY, INJUNCTIVE) ALONG WITH PUNITIVE DAMAGES WHERE APPLICABLE AGAINST NON-STATE ACTOR DEFENDANTS

## <u>DEMAND FOR TRIAL BY JURY</u>    [Fed.R.Civ.P. 38(b)]

*"When the system fails, righteous men will rise up ... "*
                                        *-- Hieronymus*

        *"Lex injusta non est lex. "* -  "An unjust law is no law at all."
                                            -- Natural Law
            *"Veritas liberabit vos"* -  "The truth will set you free"
                                                -- Bible - John 8:32

### *Synopsis of Case*

1.      This complex civil litigation involves questions/issues of federal law (28 U.S.C. §1331):

including [a] civil rights, [b] civil liberties including fundamental civil liberties; [c] fundamental

right to freedom of expression under the First Amendment; [d] Constitutionality of state statutes

and state action, which are preempted by the U.S. Constitution and federal laws on Civil Rights

and civil liberties; [e] federal tax law – Internal Revenue Code; [f] Americans with Disabilities

Act;  [g] 42 U.S.C. 1983; [h] the Civil Rights Act of 1964; [i] Title IX of the Civil Rights Act of

1964; [j] Title VII of the Civil Rights Act of 1964; [k] *Due Process of Law guarantees* under the

Fifth and Fourteenth Amendments to the U.S. Constitution; [l] *Equal Protection clause* under the

Fifth and its selective incorporation through the Fourteenth Amendment; [m] *contracts* clause of

Section 10 Article I of the U.S. Constitution and the fundamental liberty to contract; [n] *Bills of*

*Attainder* clause of Section 10, Article I of the U.S. Constitution; [o] *ex post facto* clause of

Section 10, Article I of the U.S. Constitution; [p] *involuntary servitude* clause of the Thirteenth

Amendment; [q] unconstitutional judicial abuse of discretion by state actors; [r] prosecutorial

misconduct by state officials; [s] state actor violations of substantive rights and privileges

granted to the Plaintiff under international treaties to which the United States is a signatory; [t] fundamental liberties including the fundamental liberty to marry and [u] the fundamental freedom of expression and freedom of speech; and [v] unconstitutional interpretation of statutes as applied to the Plaintiff; [w] violation of civil liberties 42 U.S.C. § 1983 where the Defendants have violated the Plaintiff's civil rights while acting under the color of law - NOTARIZED AFFIDAVIT: THIS COMPLAINT IS SUPPORTED BY THE PLAINTIFF'S NOTARIZED AFFIDAVIT (Appendix A).

### *Introduction - Federal Issues and Subject Matter Jurisdiction*

2.      State Actor defendants have violated and/or deprived the Plaintiff of his fundamental civil liberties and civil rights while acting under the color of law (42 U.S.C. § 1983) including but not limited to the fundamental right to privacy, fundamental freedom of expression under the First Amendment, fundamental liberty to contract, liberty to engage in gainful employment, fundamental right to marriage, fundamental right to Due Process of Law, and Equal Protection of the Law.; these violations and deprivations are subject to judicial review under the Strict Scrutiny standard.

3.      The state actor violation of the Plaintiff's fundamental civil rights and liberties, by State statutes and/or state agency regulations, must be judicially reviewed under the Strict scrutiny standard, whereby the government must show that there is a compelling, or very strong, interest in the law, and that the law is either very narrowly tailored or is the least restrictive means available to the government; these fundamental rights are "implicit in the concept of ordered liberty" or "deeply rooted in this Nation's history and tradition." *Lutz v. City of York, Pa.,* 899 F.2d 255 (U.S. Ct.App. 1990).

4.      Furthermore specific Defendants have deprived the Plaintiff of specific rights from the Bill of Rights, which have been selectively incorporated against the States through the Equal Protection and Due Process clauses of the Fourteenth Amendment; the judicial standard of review for these fundamental constitutional rights impaired or burdened by state law is strict scrutiny analysis; these fundamental rights include the liberty to contract, the liberty to marry, the liberty to engage in gainful employment, the fundamental right of privacy in one's own home and private residence, and the fundamental right to Equal Protection under the law as well as Due Process of Law..

5.      Some Defendants have deprived the Plaintiff of specific rights from the Bill of Rights, which have been selectively incorporated against the States through the Equal Protection and Due Process clauses of the Fourteenth Amendment, while acting under the color of law in violation of federal law (42 U.S.C. § 1983).

6.      Regarding Injunctive Relief, this honorable Court can enjoin state agencies and state officials from ongoing and continuing violation of federal law and the U.S. Constitution, without offending sovereign immunity, Qualified Immunity or the Eleventh Amendment. *Ex Parte Young,* 209 U.S. 123 (1908).

7.      "The attempt of a State officer to enforce an unconstitutional statute is a proceeding without authority of, and does not affect, the State in its sovereign or governmental capacity, and is an illegal act, and the officer is stripped of his official character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to its officer immunity from responsibility to the supreme authority of the United States." *Ex Parte Young,* 209 U.S. 123 (1908).

7

8.      "When the question of the validity of a State statute with reference to the Federal Constitution has been first raised in a Federal court, that court has the right to decide it to the exclusion of all other courts." *Ex Parte Young,* 209 U.S. 123 (1908).

9.      "While making a state officer who has no connection with the enforcement of an act alleged to be unconstitutional a party defendant is merely making him a party as a representative of the State, and thereby amounts to making the State a party within the prohibition of the Eleventh Amendment, individuals, who, as officers of the State, are clothed with some duty in regard to the enforcement of the laws of the State, and who threaten and are about to commence an action, either civil or criminal, to enforce an unconstitutional state statute, may be enjoined from so doing by a Federal court." *Ex Parte Young,* 209 U.S. 123 (1908).

10.     "Under such conditions as are involved in this case [*Ex parte Young*], the Federal court may enjoin an individual or a state officer from enforcing a state statute on account of its unconstitutionality, but it may not restrain the state court from acting in any case brought before it either of a civil or criminal nature, or prevent any investigation or action by a grand jury." *Ex Parte Young,* 209 U.S. 123 (1908).

11.     This instant action *Weinberg v. Mangal et al.* is brought, in part, to prospectively enjoin state agencies and state officials from continuing and ongoing violation of federal law and the U.S. Constitution. *Ex Parte Young,* 209 U.S. 123 (1908).

12.     The Plaintiff also brings this action to obtain, among other forms of equitable relief, declaratory judgments under the Declaratory Judgment Act, 28 U.S.C. § 2201, that some of the relevant Defendants have employed and are employing discriminatory policies and procedures which discriminate on the basis of sexual conduct, preferences and acts between two groups of licensed physicians, who are similarly situated, in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000 et seq. ("Title VII") whereby such discriminatory treatment has injured and continues to injure the Plaintiff, and other persons similarly situated, by intentionally and improperly discriminating against him on the basis of sexual conduct, preferences and acts in violation of Title VII and also thereby violates Equal Protection of the law.

13.     The Plaintiff also brings this action to obtain, among other forms of equitable relief, declaratory judgments under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the relevant Defendants have employed and are employing discriminatory policies and procedures which discriminate on the basis of sexual conduct, preferences and acts between two groups of licensed physicians, who are similarly situated, in violation of Title IX of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. ("Title IX") whereby such discriminatory treatment has injured and continues to injure the Plaintiff, and other persons similarly situated, by intentionally and improperly discriminating against him on the basis of sexual conduct, preferences and acts in violation of Title IX and also thereby violates Equal Protection of the law.

14.     The Plaintiff also brings this action to obtain, among other forms of equitable relief, declaratory judgments under the Declaratory Judgment Act, 28 U.S.C. § 2201, which define the rights, privileges, duties and obligations of the named defendant Parties relative to each other.

# *PARTIES*

**15.**    Robert Paul Weinberg – Plaintiff, permanent resident residing at 9 Hall Hill Road, Dixfield, Maine 04224

---

************    <u>PLAINTIFF RECEIVES ALL CORRESPONDENCE AT:</u>

************    <u>P.O. BOX 15334, BOSTON, MA 02215</u>

---

Email:  LawDocBob@gmail.com    Fax:  (617) 977-0902

16.    Nagina Mangal - Defendant, Afghanistan national with VISA as Postdoctoral Fellow in Graybiel Lab, MIT, principal place of business at 77 Massachusetts Avenue, Cambridge, Massachusetts 02139 (https://yangtan.mit.edu/supported-researchers/)

17.    Ann Graybiel - Defendant, Institute Professor, MIT, Dept of Brain and Cognitive Sciences, principal place of business at 77 Massachusetts Avenue, Cambridge, MA 02139 (MIT GRAYBIEL LAB - Home (graybiel-lab.com)

18.    Sally Kornbluth, President, Massachusetts Institute of Technology ("MIT") - Defendant, private U.S. research university, principal place of business at 77 Massachusetts Avenue, Cambridge, Massachusetts 02139 ( https://web.mit.edu )

19.    Booker Bush, Chairman, Board of Registration in Medicine ("BORIM") – Defendant (*in both his personal and official capacity*), Massachusetts state agency which licenses of Physicians in the Commonwealth of Massachusetts, with a principal place of business at 178 Albion Street, Suite 330, Wakefield, Massachusetts 01880    (https://www.mass.gov/orgs/board-of-registration-in-medicine).

20.    Alice Oliff – Defendant (*in both her personal capacity and official capacity*), late board counsel for BORIM with a principal place of business at 178 Albion Street, Suite 330, Wakefield, Massachusetts 01880

(https://www.dignitymemorial.com/obituaries/brookline-ma/alice-oliff-11029692 )

21.    Kimberly Budd, Chief Justice, Massachusetts Supreme Judicial Court ("Mass SJC") – Defendant (*in both her personal and official capacity*), highest appellate court in the Commonwealth of Massachusetts, with a principal place of business at the John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, Massachusetts 02108

(https://www.mass.gov/orgs/massachusetts-supreme-judicial-court).

22.    Sarah Luick – Defendant (*in both her personal capacity and official capacity*),  former magistrate, Division of Administrative Law Appeals ("DALA"), working at the independent Massachusetts agency which conducts adjudicatory hearings for other Massachusetts state agencies, principal place of business at 14 Summer Street, 4th Floor, Malden, Massachusetts 02148  (https://www.mass.gov/orgs/division-of-administrative-law-appeals).

23.    Vincent DiCianni - Defendant, licensed attorney in Massachusetts, principal place of business at P.O. Box 961791, Boston, MA 02196

(https://www.affiliatedmonitors.com/contact/)

(https://www.linkedin.com/in/vincent-dicianni-53b9bb5)

24.    Claudia Hunter - Defendant, licensed attorney in Massachusetts, principal place of business at Hunter & Bobit, P.C., principal place of business at 83 Atlantic Ave, Boston, MA 02110  (https://www.linkedin.com/in/claudia-hunter-8274847)

25.    Mr. Houghton, ProMutual Group Inc. - Defendant, medical malpractice insurer with principal place of business at Coverys, One Financial Center, Boston, MA

[dhoughton@coverys.com]

(https://www.bloomberg.com/profile/company/3314598Z:US)

26.    Robert Stolzberg - Defendant, licensed attorney in Massachusetts, principal place of business at 105 Willard Road, Brookline, MA 02445

(https://www.bigonlaw.com/)

27.    Valerie Stanfill, Chief Justice, Maine Supreme Judicial Court ("Maine SJC") – Defendant (*in both her Official capacity and personal capacity*), Maine State's highest appellate court and the court of last resort in the State of Maine, principal place of business at 205 Newbury Street, Room 139, Portland, Maine 04101-3125 (https://www.courts.maine.gov/courts/sjc/index.html)

28.    Ellen Gorman – Defendant (*in both her personal and official capacity*), former justice of Maine Supreme Judicial Court, principal place of business at Independent Commission to Investigate the Facts of the Tragedy in Lewiston, Cross Building, Room 209, (Health and Human Services Committee Room), Augusta, ME

(https://en.wikipedia.org/wiki/Ellen_Gorman ) ( https://www.maine.gov/icl/members)

29.    William Fisher – Defendant (*in both his personal and official capacity*), Assistant Maine Attorney General, 6 State House Station, Augusta, ME 04333  (https://www.maine.gov/ag/)

30.    Aaron Frey – Defendant (*in both his personal and official capacity*), Maine Attorney General's Office, 6 State House Station, Augusta, ME 04333  (https://www.maine.gov/ag/)

31.    Christopher Maclean, Chairman, Maine Board of Bar Examiners – Defendant (*in both his personal and official capacity*), state agency which licenses/certifies attorneys in Maine,

principal place of business at 135 Maine Street, Suite A, Box 305, Brunswick, ME 04011

(https://mainebarexaminers.org/)

32.    Lourdes Colon (a.k.a. "Patient A" in BORIM pleadings) - Defendant, citizen of

Massachusetts, former patient of the Plaintiff at the Boston Evening Medical Center, 388

Commonwealth Avenue, Boston, MA, represented by counsel Stanley Spero, 175 Federal Street,

Suite 1425, Boston, MA 02110 (https://www.sjsperoandassociates.com/Attorneys/Stanley-J-

Spero.html )

33.    Lisa Wolf - Defendant, psychologist licensed in the Commonwealth of Massachusetts,

principal place of business at 173 Mount Auburn Street, Watertown, MA 02472 with Clinical

privileges at the Human Resource Institute, Brookline, MA 02472

(https://npiprofile.com/?s=Lisa%20Wolfe ) (https://www.linkedin.com/in/lisa-wolfe-9480b5a0/)

34.    Krishnaswamy Gajaraj, Chief, Human Resource Institute ("HRI") - Defendant,  (*in both

his Official capacity and personal capacity*), psychiatric hospital with principal place of business

at  227 Babcock Street, Brookline, Massachusetts 02446  (https://hrihospital.com)

35.    Paula Lazar – Defendant, licensed clinician with principal place of business at 15

Boylston Street, #3, Jamaica Plain, MA 02130 (https://npiprofile.com/npi/1962977512)

36.    Sten Lofgren – Defendant, licensed psychiatrist with principal place of business at

1264 Main Street, #12, Concord, MA 01742  (https://npiprofile.com/?s=Sten%20Lofgren )

37.    Stanley Spero – Defendant, licensed attorney with principal place of business at

175 Federal Street, Suite 1425, Boston, MA 02110

(https://www.sjsperoandassociates.com/Attorneys/Stanley-J-Spero.html )

38.    Spero and Jorgenson, P.C. – Defendant, law firm with principal place of business at 175

Federal Street, Suite 1425, Boston, MA 02110

(https://www.sjsperoandassociates.com/Attorneys/index.html )

39.    James C. Beck – Defendant (*in both his personal and official capacity*), prior Expert

Witness for BORIM & DALA, with principal place of business at 34 Bates Street, Cambridge,

MA 02140 (https://www.linkedin.com/in/james-c-beck-md-phd-561a0715/)

40.    Priscilla Almodovar, Federal National Mortgage Association ("FNMA") – Defendant,

(*in both her Official capacity and personal capacity*), federally sponsored corporation created

by U.S. Congressional enactment, which alleges ownership of the promissory note and

mortgage on Plaintiff's home and real property located at 9 Hall Hill Road, Dixfield, ME 04224,

with principal place of business at 1100 15th Street, NW, Washington, D.C. 20005

(https://www.fanniemae.com)

41.    MrCooper – Defendant, mortgage servicing company, with a principal place of business

at 800 State Highway 121 Bypass, Lewisville, TX 75067;Web site: (https://www.mrcooper.com)

42.    John Ney – Defendant, attorney of record for Federal National Mortgage Association,

employee, partner, contractor and/or "of counsel" for the former law firm Shechtman, Halperin

and Savage LLP, 1080 Main Street, Pawtucket, RI  02860 and now at Brock & Scott, PLLC,

1315 Westbrook Plaza Drive, Suite 100, Winston Salem, NC 27103

(https://www.brockandscott.com/Personnel/john-m-ney-jr/)

43.    Shechtman, Halperin and Savage LLP –  Defendant, law firm with a former principal

place of business at 1080 Main Street, Pawtucket, RI  02860 prior to its acquisition by Brock &

Scott PLLC with principal place of business at 1315 Westbrook Plaza Drive, Suite 100, Winston

Salem, NC 27103    (https://www.brockandscott.com/Newsroom/brock-scott-acquires-shechtman-halperin-savage-default-practice-group-and-expands-into-the-northeast/)

44.    Jamie Dimon, Officer, JPMorgan Chase Bank –  Defendant,  (*in both his Official capacity and personal capacity*), alleges prior ownership of the promissory note and mortgage on the Plaintiff's home and real property located at 9 Hall Hill Rd, Dixfield, ME 04224;   Principal place of business: JPMorgan Chase Bank, Mail Code OH1-0333, 340 S. Cleveland Ave, Building 370, Westerville, OH 43081        (https://www.jpmorganchase.com)

45.    Seterus, Inc. – Defendant, mortgage servicing firm, Delaware corporation with a principal place of business at 3039 W Cornwallis Road, Building 203, Durham, NC 27709 which was purchased by Nationstar Mortgage LLC d/b/a MrCooper (https://www.mrcooper.com) with mortgage servicing by defendant RightPath Servicing with principal place of business at Lake Vista 4, 800 State Highway, 121 Bypass, Lewisville, TX 75067 (https://www.consumerfinance.gov/enforcement/actions/seterus-inc/)  ( https://www.linkedin.com/company/nationstar-mortgage/ )

46.    Enan del Rio – Defendant, former employee, agent and/or contractor for Defendant Seterus, Inc., purchased by Nationstar Mortgage LLC d/b/a MrCooper, principal place of business at 33.RightPath Servicing with principal place of business at Lake Vista 4, 800 State Highway, 121 Bypass, Lewisville, TX 75067 ( https://www.linkedin.com/in/enandelrio) ( https://www.linkedin.com/company/nationstar-mortgage/ )

47.    RightPath Servicing - Defendant, mortgage servicing company with a principal place of business at RightPath Servicing, Lake Vista 4, 800 State Highway 121 Bypass, Lewisville, Texas 75067 (https://www.rightpathservicing.com/welcome)

48.     Danny Werfel, Commissioner of the Internal Revenue Service ("IRS") (*in both his personal and official capacity*) - Defendant, federal agency of U.S. government, enabling statute authorizes the agency to administer and enforce U.S. federal tax laws, principal place of business at  1111 Constitution Avenue, NW, Washington, DC 20224    (https://www.irs.gov)

49.     Lexi Barrett, Commissioner of the US Dept of Education ("USDOE") (*in both her personal and official capacity*) – Defendant, Head of a federal agency -  U.S. Department of Education, (https://www.ed.gov), administers and oversees the granting federal student loans, has a principal place of business at 400 Maryland Avenue, SW, Washington, DC 20202

50.     Laurie Glimcher, Dana-Farber Cancer Institute ("DFCI") - Defendant,  (*in both her personal and official capacity*), cancer hospital in Boston, MA, principal place of business at 450 Brookline Avenue, Boston, MA 02215 ( https://www.dana-farber.org/ )

51.     Dick Argys, Boston Children's Hospital Medical Center ("BCHMC") - Defendant,  (*in both his personal and official capacity*), pediatric hospital in Boston, MA, principal place of business at 300 Longwood Ave, Boston, MA 02115 (https://www.childrenshospital.org/)

52.     John Doe - defendant whose identity will be elaborated with Discovery

53.     Jane Doe - defendant whose identity will be elaborated with Discovery

54.     Christopher Wainwright, Oxford County Sheriff's Department – Defendant (*in both his personal and official capacity*), public employee- Oxford County Sheriff's Dept, PO Box 179, 26 Western Ave, South Paris, ME (https://www.oxfordcountysheriff.com/)

55.      Robert Mullen, Chief Justice, Oxford County Superior Court – Defendant (*in both his personal and official capacity*), court of general jurisdiction in the Maine Judicial Branch, located at 26 Western Avenue, South Paris, Maine, 04281

(https://www.courts.maine.gov/courts/superior/oxford-sc.html)

56.    Dana McKeen  - Defendant, convicted burglary felon in Maine with the MDOC of #102569, Maine State Prison, 907 Cushing Road, Warren, Maine 04864 (https://www.sunjournal.com/2015/08/05/mexico-police-arrest-one-seek-2nd-resident-connection-middle-ave-burglary/)

57.    Gary Steadman -  Defendant, Maine convicted felon, Independent Contractor, prior tenant/squatter (2019 – 2023) in the Plaintiff's Dixfield home, current address to be determined from Maine Probation Department (https://www.fastpeoplesearch.com/gary-steadman_id_G118148847790107462)

58.    David Loewenstein, National Practitioner Data Bank ("NPDB") - Defendant,  (*in both his personal and official capacity*), congressionally-created confidential information clearinghouse with a principal place of business at P.O. Box 10832, Chantilly, VA 20153-0832 (https://www.npdb.hrsa.gov/)

59.    Director/Chief, U.S. Centers for Medicare and Medicaid Services ("CMCS") – Defendant Defendant (*in his personal and official capacity*), U.S. federal agency with principal place of business at 7500 Security Boulevard, Baltimore, MD 21244 (https://www.medicaid.gov/)

60.    Navient Solutions, LLC – Defendant, Servicer of Student Loans, with principal place of business at PO Box 9500, Wilkes Barre, PA 18773-9500

61.    American Educational Services ("AES") – Defendant, Servicer of Student Loans, with principal place of business at P.O. Box 61047, Harrisburg, PA 17106-1047

62.    Rushmore Servicing - Defendant, mortgage servicing company, recently acquired by MrCooper mortgage servicing company (https://nationalmortgageprofessional.com/news/mr-cooper-acquire-rushmore-residential-loan-servicing-platform)

64.    Andrea Campbell - Defendant (*in both her personal and official capacity*), Attorney General for the Commonwealth of Massachusetts, One Ashburton Place, Boston, MA 02108

65.    JPMorgan Chase Bank - Defendant, with principal place of business at 270 Park Avenue, New York, NY 10017

66.    Ferriter Scobbo and Rodophele, P.C. - Defendant, 125 High Street, Suite 2611, Boston, MA 02110

67.    UnitedHealth Insurance Company - Defendant, with a principal place of business at P.O. Box 1459, Minneapolis, MN 55440-1459

68.    Harvard University Dental Center - Defendant, with a principal place of business at 188 Longwood Avenue, Boston, MA 02115

69.    Northeastern University School of Law - Defendant, with a principal place of business at 416 Huntington Avenue, Boston, MA 02115

70.    Marriott International Hotel chain - Defendant, with a principal place of business located at 7750 Wisconsin Avenue, Bethesda, MD 20814

71.    John Doe 2, defendant whose identity and address will be elaborated with Discovery

72.    John Doe 3, defendant whose identity and address will be elaborated with Discovery

73    Jane Doe 2, defendant whose identity and address will be elaborated with Discovery

74.    Jane Doe 3, defendant whose identity and address will be elaborated with Discovery

### FACTUAL ALLEGATIONS WITH APPLIED RELEVANT LAW

*Subject Matter Jurisdiction:  42 U.S.C. § 1983*  [in part]
*Violation of Plaintiff's Civil Rights: 42 U.S.C. § 1983 while acting under Color of Law*

75.    Several of the Plaintiff's claims are made under 42 U.S.C. 1983 against Defendants who have deprived the Plaintiff of rights and privileges guaranteed by the U.S. Constitution and have

violated the civil rights and fundamental civil liberties of the Plaintiff while acting under the color of law.

*Absolute immunity versus Relative Immunity*

76.    Some of the named defendants may be statutorily protected by absolute immunity, qualified immunity, relative immunity, judicial immunity or prosecutorial immunity, and the claims made herein do not violate nor infringe upon these immunities.

77.    The relevant statutory immunities of the defendants may protect them against suit for money damages, but do not protect them from Declaratory Judgments which may define their rights, privileges, duties or obligations under the law as well as their official status in relation to each other and to the Plaintiff.

78.    The state actor defendants, including the Commonwealth of Massachusetts and the State of Maine, are protected under sovereign immunity with absolute immunity from money damages under the Eleventh Amendment, but this does not prevent the Plaintiff from obtaining equitable relief in the form of Declaratory Judgments which does not incur any monetary damages.

79.    There may be some qualified immunity for such state actor defendants as state agency commissioners, chairpersons and chiefs, and judicial officers such as the named  defendants who are magistrates or chief justices, while acting in their official capacity and acting in good faith, , but this does not prevent the Plaintiff from obtaining equitable relief in the form of Declaratory Judgments which does not incur any monetary damages.

80.    Absolute immunity protects government officials who "make reasonable but mistaken judgments about open legal questions" (*Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)) extending

to "all [officials] but the plainly incompetent or those who knowingly violate the law" (*Malley v. Briggs,* 475 U.S. 335, 341 (1986)), , but this does not prevent the Plaintiff from obtaining equitable relief in the form of Declaratory Judgments which does not incur any monetary damages.

81.    The doctrine of qualified immunity is a legal principle of federal constitutional law which grants government officials performing discretionary functions immunity from lawsuits for money damages, unless the Plaintiff can show that the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pierson v. Ray,* 386 U.S. 547 (1967).

82.    Seeking equitable relief, the Plaintiff may obtain Declaratory Judgments, which state that the final judgment which issued from a state court or tribunal may be null and void or voidable or may be vacated because it was based on an unconstitutional law or egregiously false factual record which deprived the Plaintiff of rights, privileges or immunities granted by the U.S. Constitution or federal law while such entities were "acting under the color of law" 42 U.S.C. § 1983; these Declaratory Judgments may open the door for the Plaintiff to file a *Writ of Error Coram Nobis* by which legal and factual errors within such judgments based on the spoliation of exculpatory evidence by Defendants Lourdes Colon, Stanley Spero and Lisa Wolfe, which led to egregiously unjust final judgments, may be rectified and corrected on the record.

83.    Seeking equitable relief, the Plaintiff may obtain Declaratory Judgments, stating that the final judgment which issued from a state court or tribunal may be null and void, voidable or may be vacated because it was based on a false factual record, resulting from the intentional and criminal spoliation of exculpatory evidence by Defendants Lourdes Colon, Lisa Wolfe and

Stanley Spero, or an unconstitutional law or deprived the Plaintiff of rights, privileges or immunities granted by the U.S. Constitution or federal law while such entities were "acting under the color of law." 42 U.S.C. § 1983.

84.     Seeking equitable relief, the Plaintiff may obtain Declaratory Judgments, stating that the final judgment which issued from a state court or tribunal may be null and void because it was based on a false factual record created, in part, by the spoliation of evidence by defendants Lourdes Colon, Lisa Wolfe and Stanley Spero, who intentionally, purposefully and willfully concealed exculpatory evidence of the 1992 handwritten memorialized Express Bilateral Contract terminating the doctor-patient relationship, thereby depriving the Plaintiff of rights, privileges or immunities granted by the U.S. Constitution or federal law while such defendants were "acting under the color of law" (42 U.S.C. § 1983) and where such judgments resulted from the criminal activity of defendants concealing evidence from those tribunals and where such spoliation of evidence deprived the Plaintiff of his right to Due Process of Law; this 1992 termination contract is not mentioned nor addressed in the final judgments of the Massachusetts Division of Administrative Law Appeals, Massachusetts Suffolk Superior Court, Massachusetts Supreme Judicial Court, or the Maine Supreme Judicial Court revealing the effective spoliation of this exculpatory evidence by Defendants Lourdes Colon, Lisa Wolfe and Stanley Spero.

85.     Seeking equitable relief, the Plaintiff may obtain Declaratory Judgments, stating that the final judgment which issued from a state court or tribunal may be null and void because it was based on a false factual record created, in part, by the spoliation of evidence by defendants Lourdes Colon, Lisa Wolfe and Stanley Spero, who concealed exculpatory material evidence [1992 hand-written memorialized Express Bilateral Contract terminating the doctor-patient

21

relationship], essential for the fact-finder's accurate and truthful determination of liability of the Plaintiff, from the tribunal thereby depriving the Plaintiff of rights, privileges or immunities granted by the U.S. Constitution or federal law while such defendants were "acting under the color of law" (42 U.S.C. § 1983) and where such spoliation of evidence deprived the Plaintiff of his right to Due Process of Law; state actor defendants have deprived the Plaintiff of his fundamental constitutional right to Procedural Due Process of Law by denying the Plaintiff his right to a fair trial and the opportunity to be heard on the merits of the case.

86.     Seeking equitable relief, the Plaintiff may obtain Declaratory Judgments, stating that the final judgment which issued from a state court or tribunal may be null and void because it was based on a false factual record created, in part, by the spoliation of evidence by defendants Lourdes Colon, Lisa Wolfe and Stanley Spero, who concealed material exculpatory evidence comprising the 1992 memorialized hand-written Express Bilateral Contract which initially terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon and subsequently was modified to classify time and place into the clinical and nonclinical worlds, essential for the fact-finder's accurate and truthful determination of liability of the Plaintiff, from the tribunal thereby depriving the Plaintiff of rights, privileges or immunities granted by the U.S. Constitution or federal law while such defendants were "acting under the color of law" (42 U.S.C. § 1983) and where such spoliation of evidence deprived the Plaintiff of his right to Due Process of Law, where such exculpatory evidence exonerates the Plaintiff of all wrongdoing.

*Deprivation of Plaintiff's Procedural Due Process rights*

87.     Pursuant to M.G.L.c.112, s.5(c), 243 CMR 1.03(5)(a)3, 243 CMR 1.03(5)(a)18 and Raymond v. Board of Registration in Medicine, 387 Mass. 708 (1982), the Board of Registration

in Medicine brought proceedings against the Plaintiff in the Massachusetts Division of
Administrative Law Appeals, "Board of Registration in Medicine, Petitioner v. Robert P.
Weinberg, D.O., Respondent" Docket No. BR-99-074.

88.     Proceedings under M.G.L.c.112, s.5(c), 243 CMR 1.03(5)(a)3, 243 CMR 1.03(5)(a)18
comprise Formal Adjudication on the Record regulated by the M.G.L. c.30A, the State
Administrative Procedures Act (

https://malegislature.gov/Laws/GeneralLaws/PartI/TitleIII/Chapter30A) which specifies the
procedures required by Administrative Law for the conduct of state agency proceedings
involving alleged non-criminal infractions or violations by Massachusetts citizens; failure to
comply with these procedures may result in a void or voidable judgment against the citizen.

89.     M.G.L. c.30A provides that the Plaintiff be provided with procedural Due Process which
requires Notice and a Fair Hearing, and these procedures are also guaranteed to the Plaintiff
under the Massachusetts Constitution and the U.S. Constitution whenever the state seeks to
deprive a citizen of his "right to life, liberty and property."

90.     Several state actor defendants have violated the Plaintiff's right to Due Process of Law
and Equal Protection under the law, as guaranteed by the Fifth Amendment and its selective
incorporation to the states by the Due Process clause of the Fourteenth Amendment to the U.S.
Constitution;

91.     State actor defendants have deprived the Plaintiff of his constitutional right to procedural
Due Process as guaranteed by both the federal U.S. Constitution and by the Massachusetts
Constitution; Plaintiff was deprived of his right to a Fair Hearing in the adjudicatory proceedings

before BORIM and DALA, where the Plaintiff could have presented exculpatory evidence which exonerates the Plaintiff of all wrongdoing.

92.    Magistrate Sarah Luick deprived the Plaintiff of his right to a Fair Hearing because defendant Lourdes Colon (a.k.a. "Patient A" in BORIM pleadings and records) refused to testify, was unable to testify, or was unavailable to testify, at the tribunal for reasons unknown to the Plaintiff and the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony and without seeing the exculpatory evidence which exonerates the Plaintiff, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal.

93.    In the 1996 action filed in Middlesex Superior Court, *Colon v. Weinberg, Wesselhoeft, Boston Evening Medical Center,* defendant Lourdes Colon (a.k.a. "Patient A" in BORIM pleadings and records), through her counsel Stanley Spero, refused to comply with a discovery request, refused to testify, was unable to testify, or was unavailable to testify, for a scheduled deposition for reasons unknown to the Plaintiff and and the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inaccurate and untruthful inferences or conclusions without the benefit of such testimony where Colon also concealed exculpatory evidence of the 1992 termination contract which exonerates the Plaintiff, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal.

94.    In the 1996 action filed in Middlesex Superior Court, *Colon v. Weinberg, Wesselhoeft,*

*Boston Evening Medical Center,* defendant Lourdes Colon (a.k.a. "Patient A" in BORIM

pleadings and records), through her counsel Stanley Spero, opposed a motion to the Court filed

by Plaintiff's counsel Claudia Hunter to take Colon's deposition, whereby Colon refused to

testify, was unable to testify, or was unavailable to testify, for reasons unknown to the Plaintiff

and the absence of this testimony substantially injured the Plaintiff because it resulted in false

and inaccurate conclusions by the fact-finder who was biased and compromised because she was

forced to make inferences or conclusions without the benefit of such testimony also exacerbated

by the defendants' spoliation and concealment of exculpatory evidence which exonerates the

Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such

false conclusions, which may have resulted in a void or voidable judgment by that tribunal.

*Defendant Lourdes Colon's repeated refusals to orally testify in multiple proceedings*

95.    In the 1998 action filed by Plaintiff's counsel Vincent DiCianni in Suffolk Superior Court,

*Weinberg v. Colon,* defendant Lourdes Colon (a.k.a. "Patient A" in BORIM pleadings and

records), through her counsel Stanley Spero, again refused to comply with a discovery request

for a deposition, refused to testify, was unable to testify, or was unavailable to testify, for reasons

unknown to the Plaintiff and the absence of this testimony substantially injured the Plaintiff

because it resulted in false and inaccurate conclusions by the fact-finder who was biased and

compromised because she was forced to make inferences or conclusions without the benefit of

such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory

evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of

the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal.

96.     In the 1998 action filed by Plaintiff's counsel Vincent DiCianni in Suffolk Superior Court, *Weinberg v. Colon,* defendant Lourdes Colon (a.k.a. "Patient A" in BORIM pleadings and records), through her counsel Stanley Spero, opposed a motion to the Court filed by Plaintiff's counsel Vincent DiCianni to take Colon's deposition, refused to testify, was unable to testify, or was unavailable to testify, for reasons unknown to the Plaintiff and Court denied Plaintiff's counsel's motion to take Colon's deposition and the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony  also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal. .

97.     In the 1998 action filed by Plaintiff's counsel Vincent DiCianni in Suffolk Superior Court, *Weinberg v. Colon,* defendant Lourdes Colon (a.k.a. "Patient A" in BORIM pleadings and records), through her counsel Stanley Spero, filed motion to dismiss under the anti-SLAPP statute and the Court dismissed the case; Colon refused to testify, was unable to testify, or was unavailable to testify for reasons unknown to the Plaintiff and the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation

and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing,

wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may

have resulted in a void or voidable judgment by that tribunal. .

98.    In the 2000-2002 BORIM adjudicatory proceeding *Massachusetts Board of Registration*

*in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, defendant Lourdes Colon

(a.k.a. "Patient A" in BORIM pleadings and records), through her counsel Stanley Spero,

opposed a motion to the Court filed by Plaintiff's counsel Vincent DiCianni to take Colon's

deposition for reasons unknown to the Plaintiff and the tribunal denied Plaintiff's counsel's

motion to take Colon's deposition and the absence of this testimony substantially injured the

Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased

and compromised because she was forced to make inferences or conclusions without the benefit

of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory

evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of

the opportunity to rebut such false conclusions, which may have resulted in a void or voidable

judgment by that tribunal. .

99.    In the 2000 – 2002 DALA adjudicatory proceeding *Massachusetts Board of Registration*

*in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and

re-scheduled on multiple occasions because defendant Lourdes Colon (a.k.a. "Patient A" in

BORIM pleadings and records) refused to appear at a hearing to orally testify against the

Plaintiff, refused to testify, was unable to testify, or was unavailable to testify, for reasons

unknown to the Plaintiff and the absence of this testimony substantially injured the Plaintiff

because it resulted in false and inaccurate conclusions by the fact-finder who was biased and

compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing , wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal.

100.    In the 2000 – 2002 DALA adjudicatory proceeding *Massachusetts Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and re-scheduled on multiple occasions, and the Plaintiff was never provided with an opportunity to orally present exonerating evidence of his innocence because of defendant Lourdes Colon's (a.k.a. "Patient A" in BORIM pleadings and records) refusal to testify at any hearing, trial, tribunal or deposition for reasons unknown to the Plaintiff and the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal.

101.    In the 2000 – 2002 DALA adjudicatory proceeding *Massachusetts Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and re-scheduled on multiple occasions, and the Plaintiff was never provided with the opportunity to confront the adverse witness Lourdes Colon (a.k.a. "Patient A" in BORIM pleadings and records) about her allegations against the Plaintiff, and the absence of this testimony substantially injured

the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was

biased and compromised because she was forced to make inferences or conclusions without the

benefit of such testimony also exacerbated by the defendants' spoliation and concealment of

exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was

deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or

voidable judgment by that tribunal, thus depriving the Plaintiff of his right to Due Process of

Law.

102.    In the 2000 – 2002 DALA adjudicatory proceeding *Massachusetts Board of Registration

*in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and

re-scheduled on multiple occasions, and the Plaintiff was never provided with the opportunity to

cross-examine the adverse witness Lourdes Colon (a.k.a. "Patient A") about her allegations

against the Plaintiff, thus depriving the Plaintiff of his right to Due Process of Law because and

the absence of this testimony substantially injured the Plaintiff because it resulted in false and

inaccurate conclusions by the fact-finder who was biased and compromised because she was

forced to make inferences or conclusions without the benefit of such testimony also exacerbated

by the defendants' spoliation and concealment of exculpatory evidence which exonerates the

Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such

false conclusions, which may have resulted in a void or voidable judgment by that tribunal.

103.    In the 2000 – 2002 DALA adjudicatory proceeding *Massachusetts Board of Registration

*in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and

re-scheduled on multiple occasions, and the Plaintiff was never provided with the opportunity to

subpoena the psychologist Lisa Wolfe about her role in conceiving, formulating, drafting and

dictating the 1992 handwritten memorialized Express Bilateral Contract which terminated the doctor-patient relationship, thus depriving the Plaintiff of his right to Due Process of Law because the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal.

104.    In the 2000 – 2002 DALA adjudicatory proceedings *Massachusetts Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and re-scheduled on multiple occasions, and the Plaintiff was never provided with the opportunity to present exonerating evidence of the 1992 termination of the doctor-patient relationship which was effected by an Express Bilateral Contract between himself and Lourdes Colon which was memorialized in a handwritten document signed by both parties, thus depriving the Plaintiff of his right to Due Process of Law because the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal

105.    In the 2000 – 2002 DALA adjudicatory proceeding *Massachusetts Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and re-scheduled on multiple occasions, and the Plaintiff was never provided with the opportunity to present exonerating evidence of the 1992 termination of the doctor-patient relationship which was effected by an Express Bilateral Contract between himself and Lourdes Colon which was formed and executed in September 1992 in a first-floor consultation room at the Arbour Human Resources Institute ("HRI") on Babcock Street in Brookline, Massachusetts, thus depriving the Plaintiff of his right to Due Process of Law because the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal.

106.    In the 2000 – 2002 DALA adjudicatory proceeding *Massachusetts Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and re-scheduled on multiple occasions, and the Plaintiff was never provided with the opportunity to present exonerating evidence of the 1992 termination of the doctor-patient relationship which was effected by an Express Bilateral Contract between himself and Lourdes Colon which was formed and executed in a first-floor consultation room at the Arbour Human Resources Institute in Brookline, Massachusetts, in a medical consultation meeting which was attended by three (3) persons: Dr. Lisa Wolfe, the Plaintiff and defendant Lourdes Colon, thus depriving the Plaintiff of his right to Due Process of Law because the absence of this testimony substantially injured the

Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal.

107.    In the 2000 – 2002 DALA adjudicatory proceeding *Massachusetts Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and re-scheduled on multiple occasions, and the Plaintiff was never provided with the opportunity to present exonerating evidence of the mutual modification of the 1992 Express Bilateral Contract which provided for the clinical-nonclinical classification of time and location, thus depriving the Plaintiff of his right to Due Process of Law because the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal.

108.    In the 2000 – 2002 DALA adjudicatory proceeding *Massachusetts Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and re-scheduled on multiple occasions, and the Plaintiff was never provided with the opportunity to obtain testimony from Lourdes Colon about her admission of surreptitiously tearing out portions

of her medical record created by the Plaintiff while Colon was a patient at the Boston Evening Medical Center and thereby permanently altering the medical record without any evidence of which pages or content were removed from the medical record, and the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal, thus depriving the Plaintiff of his right to Due Process of Law.

109.    In the 2000 – 2002 DALA adjudicatory proceedings *Massachusetts Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and re-scheduled on multiple occasions, and the Plaintiff was never provided with the opportunity to obtain testimony from the medical director Robert Wesselhoeft, III, about his conversations with the Plaintiff and Colon about the termination of the doctor-patient relationship, and the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal, thus depriving the Plaintiff of his right to Due Process of Law.

110.    In the 2000 – 2002 DALA adjudicatory proceedings *Massachusetts Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and re-scheduled on multiple occasions, , and the Plaintiff was never provided with the opportunity to obtain testimony from the executive director Ruth Taylor, about her conversations with the Plaintiff and Colon about the termination of the doctor-patient relationship,  and the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal, thus depriving the Plaintiff of his right to Due Process of Law.

111.    In the 2000 – 2002 DALA adjudicatory proceedings *Massachusetts Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and re-scheduled on multiple occasions, but finally cancelled permanently and unilaterally by Magistrate Sarah Luick because of Lourdes Colon's refusal to testify, inability to testify, and/or unavailability to testify for reasons unknown to the Plaintiff  and the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may

have resulted in a void or voidable judgment by that tribunal, thus depriving the Plaintiff of his right to Due Process of Law.

112.    In the 2000 – 2002 DALA adjudicatory proceedings *Massachusetts Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and re-scheduled on multiple occasions, resulting in NO HEARING ever taking place before Magistrate Sarah Luick proceeded to make findings of fact based solely on a portion of the written documentary record without any oral testimony from the Plaintiff, BORIM's primary adverse witness Lourdes Colon, or other percipient witnesses such as psychologist Dr. Lisa Wolfe, Medical Director Robert Wesselhoeft, III, Executive Director Ruth Taylor, or the Expert Witnesses because the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal.

113.    In the 2000 – 2002 DALA adjudicatory proceedings *Massachusetts Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent*, a hearing was scheduled and re-scheduled on multiple occasions due to Lourdes Colon's refusal to testify, inability to testify and/or unavailability to testify, resulting in NO HEARING ever taking place before Magistrate Sarah Luick proceeded to make findings of fact based solely on the written documentary record without any oral testimony in violation of the Plaintiff's procedural due process right to a FAIR

HEARING because the absence of this testimony substantially injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who was biased and compromised because she was forced to make inferences or conclusions without the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or voidable judgment by that tribunal.

114.    Based on the unilateral refusal/inability/unavailability of the adverse witness Lourdes Colon (a.k.a. "Patient A" in BORIM pleadings and records) to testify at any proceeding, deposition, hearing, or trial, and in violation of the Plaintiff's procedural Due Process rights under both the U.S. Constitution and the Massachusetts Constitution, as well as under M.G.L. c. 30A, M.G.L. c.112, s.5(c), 243 C.M.R. 1.03(5)(a)3, and 243 C.M.R. 103(5)(a)(18), Magistrate Sarah Luick proceeded to make final findings of fact **WITHOUT** providing the Plaintiff with a Fair Hearing because it became evident to Luick that a Hearing could **NEVER** take place because of defendant Lourdes Colon's refusal/inability/unavailability to testify also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing.

115.    The final findings of fact made by Magistrate Sarah Luick, in the absence of a hearing or any oral testimony, included multiple **FALSE statements of material fact** as documented here in this Complaint and also admitted by Magistrate Luick in her Recommended Decision where she admits the distinct and biased nature of her factual findings in the absence of essential oral testimony, without the confrontation or cross-examination of witnesses, without the benefit of

determining the credibility of the witnesses and without the benefit of hearing the Plaintiff's

exonerating evidence in oral testimony because the absence of this testimony substantially

injured the Plaintiff because it resulted in false and inaccurate conclusions by the fact-finder who

was biased and compromised because she was forced to make inferences or conclusions without

the benefit of such testimony also exacerbated by the defendants' spoliation and concealment of

exculpatory evidence which exonerates the Plaintiff of all wrongdoing, wherein the Plaintiff was

deprived of the opportunity to rebut such false conclusions, which may have resulted in a void or

voidable judgment by that tribunal.

116.    These false statements of material fact, which are incorporated into the text of Magistrate

Sarah Luick's Recommended Decision, were essential to all fact-finders in multiple state

tribunals in their accurate determination of the Plaintiff's rights, duties and obligations under the

law and thus generated a false factual record which was subsequently used, referred to and

incorporated into the final judgments of several tribunals and also formed the basis of a false

factual record which was judicially reviewed by appellate courts, Maine Board of Bar Examiners,

Massachusetts Board of Registration in Medicine, Massachusetts Superior Courts, the

Massachusetts Supreme Judicial Court and the Maine Supreme Judicial Court; based on a false

factual record in the lower courts, in part due to the concealment and spoliation of material

exculpatory evidence of the 1992 handwritten memorialized Express Bilateral contract

terminating the doctor-patient relationship and in part due to the intentional refusal of Lourdes

Colon to testify, or Lisa Wolfe to testify, or Dr Wesselhoeft to testify, or Vincent DiCianni to

testify, the final judgments to issue from all these state courts, including Middlesex Superior

Court, Suffolk Superior Court, Division of Administrative Law Appeals, Massachusetts Supreme

Judicial Court, and the Maine Supreme Judicial Court, may be void or voidable because those

judgments are substantially based on a false factual record, generated in part by the criminal

wrongdoing of defendants Lourdes Colon, Lisa Wolfe and Stanley Spero who willfully and

purposefully concealed the material evidence of the 1992 handwritten memorialized Express

Bilateral Contract which terminated the doctor-patient relationship.

117.    The multiple false statements of material fact which resulted, in part, from the spoliation

of evidence by defendants Lourdes Colon, Lisa Wolfe and Stanley Spero, will be fully described

and enumerated in this complaint which will also serve as the basis for the Plaintiff seeking to set

aside those judgments because of the fraud committed upon those courts also exacerbated by the

defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff

of all wrongdoing.

118.    The Plaintiff will also seek Declaratory Judgments for each false statement of material

fact which were incorporated and used by several tribunals including, but not limited to appellate

courts, Maine Board of Bar Examiners, Massachusetts Board of Registration in Medicine,

Massachusetts Superior Courts, the Massachusetts Supreme Judicial Court and the Maine

Supreme Judicial Court, and the Declaratory Judgments will assert that each false statement of

material fact is false, inaccurate, not truthful and not corroborated by any substantial evidence,

and furthermore comprised fraud upon those Courts also exacerbated by the defendants'

spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all

wrongdoing.

119.    These false statements of material fact relevant to the termination of the doctor-patient

relationship led to substantial, biased and seriously flawed conclusions of law based on those

false factual findings, and the false factual record incorporated into the decisions and final

judgments of those courts, also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, render those decisions and judgments to be void or voidable.

120.    An accurate, fair and unbiased determination of the liability or culpability of the Plaintiff could not be made in the absence of a Fair Hearing as required by Procedural Due Process, and the spoliation of evidence by defendants Lourdes Colon, Lisa Wolfe and Stanley Spero comprised fraud upon those tribunals and rendered any final decisions or judgments to be void or voidable.

121.    An accurate, fair and unbiased determination of the liability or culpability of the Plaintiff could not be made without hearing the Plaintiff's oral testimony presenting the relevant exonerating evidence, concerning the 1992 handwritten memorialized Express Bilateral Contract which terminated the doctor-patient relationship, in the absence of a Fair Hearing as required by Procedural Due Process and the spoliation of evidence by defendants Lourdes Colon, Lisa Wolfe and Stanley Spero comprised fraud upon those tribunals and rendered any final decisions or judgments to be void or voidable.

122.    Unjust and unfair conclusions of law will issue forth when the relevant law is applied to FALSE statements of material fact, also exacerbated by the defendants' spoliation and concealment of exculpatory evidence which exonerates the Plaintiff of all wrongdoing, and that false factual record will render any issuing decision or judgment to be void or voidable.

123.    The false statements of material fact also resulted from the spoliation of evidence by defendants Lourdes Colon, Stanley Spero and Lisa Wolfe; the conduct of these defendants comprised: (a) spoliation of evidence, (b) obstruction of justice, (c) interfering with the fair

administration of the law, (d) tampering with evidence, (e) fraudulent concealment of evidence,

(f) falsification of business records, (g) falsification of official state judicial records, (h) filing a

false insurance claim, (i) insurance fraud, (j) perjury, (k) bribery of a witness, (l) judicial

misconduct, (m) malicious prosecution, (n) witness coaching, (o) fabricating evidence, (p)

subornation of perjury, (q) suppression of evidence, (r) mocking the court, (s) impeding service

of process, (t) creating a false judicial record in a court of law, and (u) deprivation of the

Plaintiff's civil rights and civil liberties while acting under the color of law in violation of 42

U.S.C. 1983.

124.    The defendants Lourdes Colon, Stanley Spero and Lisa Wolfe withheld material evidence

from the tribunal through their concealment of exculpatory evidence comprising the 1992

handwritten memorialized Express Bilateral Contract which terminated the doctor-patient

relationship, which was formed and executed on the premises of HRI in September 1992, at a

medical meeting involving the Plaintiff, Dr. Lisa Wolfe and Lourdes Colon, in which Dr Wolfe

transitioned into the treating psychologist for both the Plaintiff and Lourdes Colon after the

Plaintiff's role as a doctor was terminated..

125.    The concealment of the exculpatory evidence comprising the 1992 handwritten

memorialized Express Bilateral Contract which terminated the doctor-patient relationship, which

was formed and executed on the premises of HRI in September 1992, at a medical meeting

involving the Plaintiff, Dr. Lisa Wolfe and Lourdes Colon, by defendants Lourdes Colon,

Stanley Spero and Lisa Wolfe did comprise spoliation of evidence.

126.    The concealment of the exculpatory evidence comprising the 1992 handwritten

memorialized Express Bilateral Contract which terminated the doctor-patient relationship, which

was formed and executed on the premises of HRI in September 1992, at a medical meeting

involving the Plaintiff, Dr. Lisa Wolfe and Lourdes Colon, by defendants Lourdes Colon,

Stanley Spero and Lisa Wolfe did comprise obstruction of justice.

127.    The concealment of the exculpatory evidence comprising the 1992 handwritten

memorialized Express Bilateral Contract which terminated the doctor-patient relationship, which

was formed and executed on the premises of HRI in September 1992, at a medical meeting

involving the Plaintiff, Dr. Lisa Wolfe and Lourdes Colon, by defendants Lourdes Colon,

Stanley Spero and Lisa Wolfe did comprise tampering with evidence.

128.    The concealment of the exculpatory evidence comprising the 1992 memorialized Express

Bilateral Contract which terminated the doctor-patient relationship, which was formed and

executed on the premises of HRI in September 1992, at a medical meeting involving the Plaintiff,

Dr. Lisa Wolfe and Lourdes Colon, by defendants Lourdes Colon, Stanley Spero and Lisa Wolfe

did comprise interference with the fair administration of the law and of justice.

129.    The willful and intentional concealment of the exculpatory evidence comprising the 1992

memorialized Express Bilateral Contract which terminated the doctor-patient relationship, which

was formed and executed on the premises of HRI in September 1992, at a medical meeting

involving the Plaintiff, Dr. Lisa Wolfe and Lourdes Colon, by defendants Lourdes Colon,

Stanley Spero and Lisa Wolfe did comprise the felony of tampering with the evidence.

130.    The revocation of the Plaintiff's medical license by BORIM was directly and proximately

caused by the false factual findings made by Magistrate Sarah Luick because the Plaintiff was

denied and deprived of his constitutional right to a Fair Hearing as mandated by procedural due

process in formal adjudication where the defendants Colon, Wolfe and Spero intentionally and

purposefully concealed the exculpatory evidence comprising the 1992 Express Bilateral Contract

terminating the doctor-patient relationship between the Plaintiff and Lourdes Colon.

131.    The revocation of the Plaintiff's medical license by BORIM was directly and proximately

caused by the false factual findings made by Magistrate Sarah Luick because the Plaintiff was

denied and deprived of his constitutional right to a Fair Hearing because the defendant Lourdes

Colon unilaterally refused/was unable/was unavailable to appear at a tribunal to testify against

the Plaintiff where the defendants Colon, Wolfe and Spero intentionally and purposefully

concealed the exculpatory evidence comprising the 1992 Express Bilateral Contract terminating

the doctor-patient relationship between the Plaintiff and Lourdes Colon.

132.    The revocation of the Plaintiff's medical license by BORIM was directly and proximately

caused by the false factual findings made by Magistrate Sarah Luick because the Plaintiff was

denied and deprived of his constitutional right to a Fair Hearing, where the Plaintiff could have

orally presented exonerating evidence of the termination of the doctor-patient relationship, orally

confronted and cross-examined Lourdes Colon about her allegations against the Plaintiff,

subpoenaed and confronted Dr. Lisa Wolfe about the 1992 memorialized Express Bilateral

Contract which terminated the doctor-patient relationship where the defendants Colon, Wolfe

and Spero intentionally and purposefully concealed the exculpatory evidence comprising the

1992 Express Bilateral Contract terminating the doctor-patient relationship between the Plaintiff

and Lourdes Colon.

133.    All hearings, depositions, and trials in the above four (4) judicial proceedings were

opposed by defendants Lourdes Colon, Stanley Spero and Lisa Wolfe, in part, due to their

conspiratorial desire to conceal their unlawful spoliation of exculpatory evidence concerning the

1992 memorialized Express Bilateral Contract which terminated the doctor-patient relationship which would have exonerated the Plaintiff of all wrongdoing and the three (3) defendants' attempts to conceal their civil and criminal liability for such spoliation of material evidence from the tribunal.

134.    State actor defendants, and/or their employees or agents, have deprived the Plaintiff of his constitutionally guaranteed fundamental liberty rights, including the deprivation of the Plaintiff's property rights and his liberty to practice his profession and work gainful employment and deprivation of Plaintiff's property rights to his medical license, without Due Process of Law guaranteed by the Fifth Amendment selectively incorporated through the Due Process clause of the Fourteenth Amendment and also in violation of Equal Protection under the law guaranteed by the Fifth and Fourteenth Amendments.

*Plaintiff was Denied Due Process of Law*

135.    "At its core, the right to due process reflects a fundamental value in our American constitutional system. ... Perhaps no characteristic of an organized and cohesive society is more fundamental than its erection and enforcement of a system of rules defining the various rights and duties of its members, enabling them to govern their affairs and definitively settle their differences in an orderly, predictable manner." *Boddie v. Connecticut*, 401 U.S. 371 (1971); See *Goldberg v. Kelly*, 397 U. S. 254 (1970); *Sniadach v. Family Finance Corp.*, 395 U. S. 337 (1969); *Armstrong v. Manzo*, 380 U. S. 545 (1965); *Schroeder v. New York*, 371 U. S. 208, 212 (1962); *Best v. Humboldt Placer Mining Co.*, 371 U. S. 334, 338 (1963); *Covey v. Town of Somers*, 351 U. S. 141 (1956); *Mullane v. Central Hanover Tr. Co.*, 339 U. S. 306 (1950); *Anderson Nat. Bank v. Luckett*, 321 U. S. 233, 246 (1944); *Opp Cotton Mills v. Administrator,*

43

312 U. S. 126, 152-153 (1941); *Morgan v. United States,* 304 U. S. 1 (1938); *United States v. Illinois Central R. Co.*, 291 U. S. 457, 463 (1934); *Brinkerhoff-Fairs Trust & Savings Co. v. Hil*l, 281 U. S. 673 (1930); *Coe v. Armour Fertilizer Works,* 237 U. S. 413, 423 (1915); *Londoner v. Denver*, 210 U. S. 373, 385-386 (1908); *Louisville & Nashville R. Co. v. Schmidt,* 177 U. S. 230, 236 (1900).

136.    "Without such a "legal system," social organization and cohesion are virtually impossible; with the ability to seek regularized resolution of conflicts individuals are capable of interdependent action that enables them to strive for achievements without the anxieties that would beset them in a disorganized society. Put more succinctly, it is this injection of the rule of law that allows society to reap the benefits of rejecting what political theorists call the "state of nature."" *Boddie v. Connecticut*, 401 U.S. 371 (1971);  See *Goldberg v. Kelly*, 397 U. S. 254 (1970); *Sniadach v. Family Finance Corp.,* 395 U. S. 337 (1969); *Armstrong v. Manzo*, 380 U. S. 545 (1965); *Schroeder v. New York,* 371 U. S. 208, 212 (1962); *Best v. Humboldt Placer Mining Co.*, 371 U. S. 334, 338 (1963); *Covey v. Town of Somers*, 351 U. S. 141 (1956); *Mullane v. Central Hanover Tr. Co.*, 339 U. S. 306 (1950); *Anderson Nat. Bank v. Luckett,* 321 U. S. 233, 246 (1944); *Opp Cotton Mills v. Administrator,* 312 U. S. 126, 152-153 (1941); *Morgan v. United States,* 304 U. S. 1 (1938); *United States v. Illinois Central R. Co.*, 291 U. S. 457, 463 (1934); *Brinkerhoff-Fairs Trust & Savings Co. v. Hill,* 281 U. S. 673 (1930); *Coe v. Armour Fertilizer Works,* 237 U. S. 413, 423 (1915); *Londoner v. Denver*, 210 U. S. 373, 385-386 (1908); Louisville & Nashville R. Co. v. Schmidt, 177 U. S. 230, 236 (1900).

137.    "American society, of course, bottoms its systematic definition of individual rights and duties, as well as its machinery for dispute settlement, not on custom or the will of strategically

placed individuals, but on the common-law model. It is to courts, or other quasi-judicial official bodies, that we ultimately look for the implementation of a regularized, orderly process of dispute settlement. Within this framework, those who wrote our original Constitution, in the Fifth Amendment, and later those who drafted the Fourteenth Amendment, recognized the centrality of the concept of due process in the operation of this system. Without this guarantee that one may not be deprived of his rights, neither liberty nor property, without due process of law, the State's monopoly over techniques for binding conflict resolution could hardly be said to be acceptable under our scheme of things. Only by providing that the social enforcement mechanism must function strictly within these bounds can we hope to maintain an ordered society that is also just. It is upon this premise that this Court has through years of adjudication put flesh upon the due process principle." *Boddie v. Connecticut*, 401 U.S. 371 (1971);  See Goldberg v. Kelly, 397 U. S. 254 (1970); Sniadach v. Family Finance Corp., 395 U. S. 337 (1969); Armstrong v. Manzo, 380 U. S. 545 (1965); Schroeder v. New York, 371 U. S. 208, 212 (1962); Best v. Humboldt Placer Mining Co., 371 U. S. 334, 338 (1963); Covey v. Town of Somers, 351 U. S. 141 (1956); Mullane v. Central Hanover Tr. Co., 339 U. S. 306 (1950); Anderson Nat. Bank v. Luckett, 321 U. S. 233, 246 (1944); Opp Cotton Mills v. Administrator, 312 U. S. 126, 152-153 (1941); Morgan v. United States, 304 U. S. 1 (1938); United States v. Illinois Central R. Co., 291 U. S. 457, 463 (1934); Brinkerhoff-Fairs Trust & Savings Co. v. Hill, 281 U. S. 673 (1930); Coe v. Armour Fertilizer Works, 237 U. S. 413, 423 (1915); Londoner v. Denver, 210 U. S. 373, 385-386 (1908); Louisville & Nashville R. Co. v. Schmidt, 177 U. S. 230, 236 (1900).

138.    "Prior cases establish, first, that due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of

right and duty through the judicial process must be given a meaningful opportunity to be heard. Early in our jurisprudence, this Court voiced the doctrine that "[w]herever one is assailed in his person or his property, there he may defend," Windsor v. McVeigh, 93 U. S. 274, 277 (1876). See Baldwin v. Hale, 1 Wall. 223 (1864); Hovey v. Elliott, 167 U. S. 409 (1897). The theme that "due process of law signifies a right to be heard in one's defense," Hovey v. Elliott, supra, at 417, has continually recurred in the years since Baldwin, Windsor, and Hovey.[3] Although "[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause," as Mr. Justice Jackson wrote for the Court in Mullane v. Central Hanover Tr. Co., 339 U. S. 306 (1950), "there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." Id., at 313." See Goldberg v. Kelly, 397 U. S. 254 (1970); Sniadach v. Family Finance Corp., 395 U. S. 337 (1969); Armstrong v. Manzo, 380 U. S. 545 (1965); Schroeder v. New York, 371 U. S. 208, 212 (1962); Best v. Humboldt Placer Mining Co., 371 U. S. 334, 338 (1963); Covey v. Town of Somers, 351 U. S. 141 (1956); Mullane v. Central Hanover Tr. Co., 339 U. S. 306 (1950); Anderson Nat. Bank v. Luckett, 321 U. S. 233, 246 (1944); Opp Cotton Mills v. Administrator, 312 U. S. 126, 152-153 (1941); Morgan v. United States, 304 U. S. 1 (1938); United States v. Illinois Central R. Co., 291 U. S. 457, 463 (1934); Brinkerhoff-Fairs Trust & Savings Co. v. Hill, 281 U. S. 673 (1930); Coe v. Armour Fertilizer Works, 237 U. S. 413, 423 (1915); Londoner v. Denver, 210 U. S. 373, 385-386 (1908); Louisville & Nashville R. Co. v. Schmidt, 177 U. S. 230, 236 (1900).

139.    "What the Constitution does require is "an opportunity . . . granted at a meaningful time and in a meaningful manner," Armstrong v. Manzo, 380 U. S. 545, 552 (1965) (emphasis added), "for [a] hearing appropriate to the nature of the case," Mullane v. Central Hanover Tr. Co., supra,

at 313."  See Goldberg v. Kelly, 397 U. S. 254 (1970); Sniadach v. Family Finance Corp., 395 U.

S. 337 (1969); Armstrong v. Manzo, 380 U. S. 545 (1965); Schroeder v. New York, 371 U. S.

208, 212 (1962); Best v. Humboldt Placer Mining Co., 371 U. S. 334, 338 (1963); Covey v.

Town of Somers, 351 U. S. 141 (1956); Mullane v. Central Hanover Tr. Co., 339 U. S. 306

(1950); Anderson Nat. Bank v. Luckett, 321 U. S. 233, 246 (1944); Opp Cotton Mills v.

Administrator, 312 U. S. 126, 152-153 (1941); Morgan v. United States, 304 U. S. 1 (1938);

United States v. Illinois Central R. Co., 291 U. S. 457, 463 (1934); Brinkerhoff-Fairs Trust &

Savings Co. v. Hill, 281 U. S. 673 (1930); Coe v. Armour Fertilizer Works, 237 U. S. 413, 423

(1915); Londoner v. Denver, 210 U. S. 373, 385-386 (1908); Louisville & Nashville R. Co. v.

Schmidt, 177 U. S. 230, 236 (1900).

140.    "Our cases further establish that a statute or a rule may be held constitutionally invalid as

applied when it operates to deprive an individual of a protected right although its general validity

as a measure enacted in the legitimate exercise of state power is beyond question. Thus, in cases

involving religious freedom, free speech or assembly, this Court has often held that a valid

statute was unconstitutionally applied in particular circumstances because it interfered with an

individual's exercise of those rights."  See Goldberg v. Kelly, 397 U. S. 254 (1970); Sniadach v.

Family Finance Corp., 395 U. S. 337 (1969); Armstrong v. Manzo, 380 U. S. 545 (1965);

Schroeder v. New York, 371 U. S. 208, 212 (1962); Best v. Humboldt Placer Mining Co., 371 U.

S. 334, 338 (1963); Covey v. Town of Somers, 351 U. S. 141 (1956); Mullane v. Central

Hanover Tr. Co., 339 U. S. 306 (1950); Anderson Nat. Bank v. Luckett, 321 U. S. 233, 246

(1944); Opp Cotton Mills v. Administrator, 312 U. S. 126, 152-153 (1941); Morgan v. United

States, 304 U. S. 1 (1938); United States v. Illinois Central R. Co., 291 U. S. 457, 463 (1934);

Brinkerhoff-Fairs Trust & Savings Co. v. Hill, 281 U. S. 673 (1930); Coe v. Armour Fertilizer

Works, 237 U. S. 413, 423 (1915); Londoner v. Denver, 210 U. S. 373, 385-386 (1908);

Louisville & Nashville R. Co. v. Schmidt, 177 U. S. 230, 236 (1900).

141.    "No less than these rights, the right to a meaningful opportunity to be heard within the

limits of practicality, must be protected against denial by particular laws 380*380 that operate to

jeopardize it for particular individuals." See Mullane v. Central Hanover Tr. Co., supra; Covey v.

Town of Somers, 351 U. S. 141 (1956);  See Goldberg v. Kelly, 397 U. S. 254 (1970); Sniadach

v. Family Finance Corp., 395 U. S. 337 (1969); Armstrong v. Manzo, 380 U. S. 545 (1965);

Schroeder v. New York, 371 U. S. 208, 212 (1962); Best v. Humboldt Placer Mining Co., 371 U.

S. 334, 338 (1963); Covey v. Town of Somers, 351 U. S. 141 (1956); Mullane v. Central

Hanover Tr. Co., 339 U. S. 306 (1950); Anderson Nat. Bank v. Luckett, 321 U. S. 233, 246

(1944); Opp Cotton Mills v. Administrator, 312 U. S. 126, 152-153 (1941); Morgan v. United

States, 304 U. S. 1 (1938); United States v. Illinois Central R. Co., 291 U. S. 457, 463 (1934);

Brinkerhoff-Fairs Trust & Savings Co. v. Hill, 281 U. S. 673 (1930); Coe v. Armour Fertilizer

Works, 237 U. S. 413, 423 (1915); Londoner v. Denver, 210 U. S. 373, 385-386 (1908);

Louisville & Nashville R. Co. v. Schmidt, 177 U. S. 230, 236 (1900).

142.    "The Due Process Clause on which the Court relies has proven very elastic in the hands

of judges. "The doctrine that prevailed in Lochner [v. New York, 198 U. S. 45], Coppage [v.

Kansas, 236 U. S. 1], Adkins [v. Children's Hospital, 261 U. S. 525], [Jay] Burns [Baking Co. v.

Bryan, 264 U. S. 504], and like cases—that due process authorizes courts to hold laws

unconstitutional when they believe the legislature has acted unwisely— has long since been

discarded." Ferguson v. Skrupa, 372 U. S. 726, 730;  See Goldberg v. Kelly, 397 U. S. 254

(1970); Sniadach v. Family Finance Corp., 395 U. S. 337 (1969); Armstrong v. Manzo, 380 U. S.

545 (1965); Schroeder v. New York, 371 U. S. 208, 212 (1962); Best v. Humboldt Placer Mining

Co., 371 U. S. 334, 338 (1963); Covey v. Town of Somers, 351 U. S. 141 (1956); Mullane v.

Central Hanover Tr. Co., 339 U. S. 306 (1950); Anderson Nat. Bank v. Luckett, 321 U. S. 233,

246 (1944); Opp Cotton Mills v. Administrator, 312 U. S. 126, 152-153 (1941); Morgan v.

United States, 304 U. S. 1 (1938); United States v. Illinois Central R. Co., 291 U. S. 457, 463

(1934); Brinkerhoff-Fairs Trust & Savings Co. v. Hill, 281 U. S. 673 (1930); Coe v. Armour

Fertilizer Works, 237 U. S. 413, 423 (1915); Londoner v. Denver, 210 U. S. 373, 385-386 (1908);

Louisville & Nashville R. Co. v. Schmidt, 177 U. S. 230, 236 (1900).

143.    "Whatever residual element of substantive law the Due Process Clause may still have

(Thompson v. Louisville, 362 U. S. 199), it essentially regulates procedure." Sniadach v. Family

Finance Corp., 395 U. S. 337; Wisconsin v. Constantineau, 400 U. S. 433;  See Goldberg v.

Kelly, 397 U. S. 254 (1970); Sniadach v. Family Finance Corp., 395 U. S. 337 (1969);

Armstrong v. Manzo, 380 U. S. 545 (1965); Schroeder v. New York, 371 U. S. 208, 212 (1962);

Best v. Humboldt Placer Mining Co., 371 U. S. 334, 338 (1963); Covey v. Town of Somers, 351

U. S. 141 (1956); Mullane v. Central Hanover Tr. Co., 339 U. S. 306 (1950); Anderson Nat.

Bank v. Luckett, 321 U. S. 233, 246 (1944); Opp Cotton Mills v. Administrator, 312 U. S. 126,

152-153 (1941); Morgan v. United States, 304 U. S. 1 (1938); United States v. Illinois Central R.

Co., 291 U. S. 457, 463 (1934); Brinkerhoff-Fairs Trust & Savings Co. v. Hill, 281 U. S. 673

(1930); Coe v. Armour Fertilizer Works, 237 U. S. 413, 423 (1915); Londoner v. Denver, 210 U.

S. 373, 385-386 (1908); Louisville & Nashville R. Co. v. Schmidt, 177 U. S. 230, 236 (1900).

144.    "The question historically has been whether the right claimed is "of the very essence of a

scheme of ordered liberty." Palko v. Connecticut, 302 U. S. 319, 325. That makes the test highly

subjective and dependent on the idiosyncrasies of individual judges as Lochner, Coppage, and

Adkins illustrate. … The reach of the Equal Protection Clause is not definable with mathematical

precision. But in spite of doubts by some,[*] as it has been construed, rather definite guidelines

have been developed: race is one (Strauder v. West Virginia, 100 U. S. 303; McLaughlin v.

Florida, 379 U. S. 184); alienage is another (Takahashi v. Fish & Game Comm'n, 334 U. S. 410);

religion is another (Sherbert v. Verner, 374 U. S. 398); poverty is still another (Griffin v. Illinois,

supra); and class or caste yet another (Skinner v. Oklahoma, 316 U. S. 535)." See Goldberg v.

Kelly, 397 U. S. 254 (1970); Sniadach v. Family Finance Corp., 395 U. S. 337 (1969);

Armstrong v. Manzo, 380 U. S. 545 (1965); Schroeder v. New York, 371 U. S. 208, 212 (1962);

Best v. Humboldt Placer Mining Co., 371 U. S. 334, 338 (1963); Covey v. Town of Somers, 351

U. S. 141 (1956); Mullane v. Central Hanover Tr. Co., 339 U. S. 306 (1950); Anderson Nat.

Bank v. Luckett, 321 U. S. 233, 246 (1944); Opp Cotton Mills v. Administrator, 312 U. S. 126,

152-153 (1941); Morgan v. United States, 304 U. S. 1 (1938); United States v. Illinois Central R.

Co., 291 U. S. 457, 463 (1934); Brinkerhoff-Fairs Trust & Savings Co. v. Hill, 281 U. S. 673

(1930); Coe v. Armour Fertilizer Works, 237 U. S. 413, 423 (1915); Londoner v. Denver, 210 U.

S. 373, 385-386 (1908); Louisville & Nashville R. Co. v. Schmidt, 177 U. S. 230, 236 (1900).

145.    "In addition, this case presents a classic problem of equal protection of the laws. The

question that the Court treats exclusively as one of due process inevitably implicates

considerations of both due process and equal protection. Certainly, there is at issue the denial of

a hearing, a matter for analysis under the Due Process Clause. But Connecticut does not deny a

hearing to everyone in these circumstances; it denies it only to people who fail to pay certain fees.

The validity of this partial denial, or differentiation in treatment, can be tested as well under the

Equal Protection Clause." See Goldberg v. Kelly, 397 U. S. 254 (1970); Sniadach v. Family

Finance Corp., 395 U. S. 337 (1969); Armstrong v. Manzo, 380 U. S. 545 (1965); Schroeder v.

New York, 371 U. S. 208, 212 (1962); Best v. Humboldt Placer Mining Co., 371 U. S. 334, 338

(1963); Covey v. Town of Somers, 351 U. S. 141 (1956); Mullane v. Central Hanover Tr. Co.,

339 U. S. 306 (1950); Anderson Nat. Bank v. Luckett, 321 U. S. 233, 246 (1944); Opp Cotton

Mills v. Administrator, 312 U. S. 126, 152-153 (1941); Morgan v. United States, 304 U. S. 1

(1938); United States v. Illinois Central R. Co., 291 U. S. 457, 463 (1934); Brinkerhoff-Fairs

Trust & Savings Co. v. Hill, 281 U. S. 673 (1930); Coe v. Armour Fertilizer Works, 237 U. S.

413, 423 (1915); Londoner v. Denver, 210 U. S. 373, 385-386 (1908); Louisville & Nashville R.

Co. v. Schmidt, 177 U. S. 230, 236 (1900).

146.    "In Griffin v. Illinois, 351 U. S. 12 (1956), we held under the Equal Protection Clause as

well as the Due Process Clause that a State may not deny a free transcript to an indigent, where

the transcript is necessary for a direct appeal from his conviction. Subsequently, we have applied

and extended that principle in numerous criminal cases. See, e. g., Eskridge v. Washington State

Board of Prison Terms & Paroles, 357 U. S. 214 (1958); Burns v. Ohio, 360 U. S. 252 (1959);

Smith v. Bennett, 365 U. S. 708 (1961); Coppedge v. United States, 369 U. S. 438 (1962); Lane

v. Brown, 372 U. S. 477 (1963); Draper v. Washington, 372 U. S. 487 (1963); Rinaldi v. Yeager,

384 U. S. 305 (1966); Long v. District Court of Iowa, 385 U. S. 192 (1966); Roberts v. LaVallee,

389 U. S. 40 (1967); Gardner v. California, 393 U. S. 367 (1969)." See Goldberg v. Kelly, 397

U. S. 254 (1970); Sniadach v. Family Finance Corp., 395 U. S. 337 (1969); Armstrong v. Manzo,

380 U. S. 545 (1965); Schroeder v. New York, 371 U. S. 208, 212 (1962); Best v. Humboldt

Placer Mining Co., 371 U. S. 334, 338 (1963); Covey v. Town of Somers, 351 U. S. 141 (1956);

Mullane v. Central Hanover Tr. Co., 339 U. S. 306 (1950); Anderson Nat. Bank v. Luckett, 321

U. S. 233, 246 (1944); Opp Cotton Mills v. Administrator, 312 U. S. 126, 152-153 (1941);

Morgan v. United States, 304 U. S. 1 (1938); United States v. Illinois Central R. Co., 291 U. S.

457, 463 (1934); Brinkerhoff-Fairs Trust & Savings Co. v. Hill, 281 U. S. 673 (1930); Coe v.

Armour Fertilizer Works, 237 U. S. 413, 423 (1915); Londoner v. Denver, 210 U. S. 373, 385-

386 (1908); Louisville & Nashville R. Co. v. Schmidt, 177 U. S. 230, 236 (1900); See Goldberg

v. Kelly, 397 U. S. 254 (1970); Sniadach v. Family Finance Corp., 395 U. S. 337 (1969);

Armstrong v. Manzo, 380 U. S. 545 (1965); Schroeder v. New York, 371 U. S. 208, 212 (1962);

Best v. Humboldt Placer Mining Co., 371 U. S. 334, 338 (1963); Covey v. Town of Somers, 351

U. S. 141 (1956); Mullane v. Central Hanover Tr. Co., 339 U. S. 306 (1950); Anderson Nat.

Bank v. Luckett, 321 U. S. 233, 246 (1944); Opp Cotton Mills v. Administrator, 312 U. S. 126,

152-153 (1941); Morgan v. United States, 304 U. S. 1 (1938); United States v. Illinois Central R.

Co., 291 U. S. 457, 463 (1934); Brinkerhoff-Fairs Trust & Savings Co. v. Hill, 281 U. S. 673

(1930); Coe v. Armour Fertilizer Works, 237 U. S. 413, 423 (1915); Londoner v. Denver, 210 U.

S. 373, 385-386 (1908); Louisville & Nashville R. Co. v. Schmidt, 177 U. S. 230, 236 (1900).

*Subject Matter Jurisdiction*

147.    This Court has original subject matter jurisdiction over those federal questions of law

arising under the U.S. Constitution and/or federal statutes (28 U.S.C. §1331).

148.    These federal questions addressed in the instant suit include, but are not limited to 42

U.S.C. § 1983; U.S.C. Title 31, Subtitle III, Chapter 37, Subchapter III; 28 U.S.C. § 1345; 42

U.S.C. § 14141; Civil Rights Act including Title VI of the 1964 Civil Rights Act; 42 U.S.C. §§

1345 12131 – 12134; U.S.C. Title II of the Americans with Disabilities Act of 1990; Procedural

Due Process clauses of the Fifth and Fourteenth Amendments to the United States Constitution;

5 U.S.C. § 706; Freedom of Speech Clause of the First Amendment; Equal Protection Clause of

the Fourteenth Amendment; Title VI of the Civil Rights Act of 1964; 28 U.S.C § 1331; 28 U.S.C.

§ 1346; and 28 U.S.C. § 1361; unconstitutional state action by the Commonwealth of

Massachusetts and the State of Maine; regulations of the United States Department of Education;

United States Internal Revenue Code; violations of the Due Process and Equal Protection clauses

by state actor defendants including but not limited to including defendants' violations of the

Plaintiff's rights under Title IX and Title VII of the Civil Rights Act of 1964; as well as

defendant State actor violations of the Contracts clause, Bills of Attainder clause, ex post facto

clauses, Equal Protection of the Law, and Due Process of Law guarantees of the U.S.

Constitution.

149.    This suit seeks equitable relief through Declaratory Judgments and Injunctive relief

against state actor defendants, in part, and does not seek monetary damages from those state

actor defendants immune by sovereign immunity and protected from same by the Eleventh

Amendment, but Plaintiff does seek monetary and compensatory damages from those non-state

actor defendants who are not protected from suit by the Eleventh Amendment and who caused

substantial economic and non-economic injuries to the Plaintiff which may have remedies under

the law.

150.    Some of the state actors named as defendants in this instant action, including but not

limited to agencies/departments of the Commonwealth of Massachusetts and the State of Maine,

have violated the Plaintiff's constitutional rights under the Contracts Clause of the U.S.

Constitution and thus deprived him of his constitutional rights under Section 10 of Article I of

the U.S. Constitution which prohibits states from impairing the obligations of contract between

private parties (the "contracts clause").

151.    Furthermore the Plaintiff has exhausted all available state remedies up through the highest appellate court of the Commonwealth of Massachusetts, the Supreme Judicial Court ("Mass SJC"), and the Mass SJC is a named defendant in the instant action because its decisions have violated and deprived the Plaintiff of his constitutional rights through its mis-interpretation of the Constitution, adoption of a false factual record and through 42 U.S.C. § 1983, and thus the federal U.S. District Court for Massachusetts is the appropriate forum for obtaining equitable relief for the injuries caused by the Mass SJC wherein the Plaintiff is seeking declaratory judgments affirming his rights and those constitutional injuries, and the Plaintiff is challenging the interpretation of federal laws and the Constitution by the Massachusetts SJC.

*Ripeness, Comity and Justiciability of Plaintiff's Claims*

152.    The prosecution of the Plaintiff's claims and these issues of law does not violate the principles of federal abstention, neither the Pullman nor the Younger abstention doctrines, nor comity of the separate and distinct branches of government; the Plaintiff's claims are ripe and not moot, are justiciable and do not comprise any political questions; the Plaintiff's case is a live case and controversy involving multiple defendants and the Plaintiff has standing, also having suffered injury in fact in the amount in excess of six million dollars ($6,000,000.00).

153.    As the Plaintiff has exhausted all available state remedies up through the highest appellate court of Maine, the Supreme Judicial Court ("Maine SJC"), and the Maine SJC is a named defendant in the instant action because its decisions have violated and deprived the Plaintiff of his constitutional rights through its mis-interpretation of the Constitution, adoption of a false factual record, generated while depriving the Plaintiff of his right to Due Process of Law, and through 42 U.S.C. § 1983, so that the federal U.S. District Court for Massachusetts is the

appropriate forum for obtaining equitable relief for the injuries proximately caused by the Maine

SJC wherein the Plaintiff is seeking declaratory judgments affirming his rights and affirming

those constitutional injuries and the Plaintiff is challenging the interpretation of federal laws and

the Constitution by the Maine SJC.

154.    Furthermore, in a *de novo* judicial proceeding on or about 2011 before a single justice of

the Maine SJC, Ellen Gorman, Gorman denied the Plaintiff's motion to admit relevant and

substantial material evidence of his good character under Rule 201 of the Maine Rules of

Evidence, when Plaintiff was attempting to prove his good character in part through the use of a

U.S. Congressional Letter of Commendation issued to the Plaintiff along with the U.S. Personnel

records showing the Plaintiff's appointment as a Medical Officer in the National Disaster

Medical System of the U.S. Department of Health where the Plaintiff served his country in times

of need along with journalistic documentation of the Plaintiff's humanitarian and charitable

contributions to society.

155.    All legal issues addressed by the Plaintiff are ripe and justiciable with ongoing and

annually occurring continuously-repeating injuries (injuries repeated annually for the past 23

years) - most recent injuries and damages occurred in July 2023 - proximately caused by the

unconstitutional actions of state actor defendants, with no political questions involved; the

Plaintiff is not seeking any money damages against the State actors consistent with the

restrictions of the Eleventh Amendment.

156.    These ongoing and continuing injuries often result from the serendipitous discovery of

the false and shameful judicial records which has caused the Plaintiff to be dismissed from

numerous job positions as well as his being passed over for numerous other economic

opportunities because of stigma and ostracism which is associated with those false judicial records.

*Issues not Moot because they are capable of Repetition yet Evading Review*

157.    These legal issues and claims are not moot because they are capable of repetition yet evading review, and where applicable, all possible state remedies have been exhausted, especially where the scope of discovery and legal issues raised may have been limited by the Defendants' unconstitutional state action. *Capable of repetition yet evading Review:* Each year the Plaintiff suffers repetitive injuries and damages, including loss of jobs and job opportunities, and personal attacks on his reputation with social isolation and ostracism because of the unconstitutional state actions against him – so like *Roe v. Wade*, the Plaintiff's case is not moot because his injuries have been repeated annually and are capable of repetition yet evading review.

*Original federal Jurisdiction under 28 U.S.C.§ 1333 along with Supplemental Jurisdiction under 28 U.S.C. § 1367*

158.    This Court has general original jurisdiction over live cases and controversies arising under federal law involving active disputes between the party defendants (28 U.S.C. § 1333), furthermore where the Plaintiff has suffered injury-in-fact, in the approximate amount exceeding US$6,250,000.00 (Six million two hundred fifty thousand U.S. dollars).

159.    In the instant suit, Subject matter jurisdiction arises under these federal laws and the U.S. Constitution as well as the relevant supplemental jurisdiction under 28 U.S.C. § 1367 (1994) for those injuries arising from a common core nucleus of operative facts. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966); *See* L. TEPLY AND R. WHITTEN, CIVIL PROCEDURE 115-16 (1994).

160.    Additional jurisdiction arises from claims involving international treaties - Human Rights

treaties - to which the U.S. is a signatory and the defendant state actors have violated the

Plaintiff's substantive rights and privileges granted to U.S. citizens under those international

treaties.

161.    Additional related causes of action arise under the Supplemental Jurisdiction of the

federal Court based on a common core nucleus of operative facts concerning the unlawful and

unconstitutional actions and/or unlawful omissions by the Defendants, which generated the

original causes of action in the instant case involving questions of federal law and the mis-

interpretation of the United States Constitution by the state actor defendants. *United Mine*

*Workers v. Gibbs,* 383 U.S. 715, 725 (1966); *See* L. TEPLY AND R. WHITTEN, CIVIL

PROCEDURE 115-16 (1994).

162.    Under this Supplemental Jurisdiction, multiple alleged injuries and damages caused to the

Plaintiff were proximately caused by the defendants' unconstitutional and unlawful actions under

the original federal jurisdiction of the Court, and but for those unconstitutional and unlawful

actions, the Plaintiff would not have suffered those damages and injuries which monetarily

exceed US$6,250,000.00 (Six million two hundred fifty thousand U.S. dollars) in addition to

substantial non-monetary damages.

163.    The Plaintiff has been denied and/or deprived of those rights and privileges which are

secured for him under the U.S. Constitution, including but not limited to fundamental liberties,

civil rights and civil liberties, and constitutional rights through state action by specific state actor

Defendants who were acting under the color of law, and therefore the Plaintiff is seeking redress,

in part under 42 U.S.C. § 1983 for those deprivations of the Plaintiff's civil rights and civil liberties by the relevant state actor defendants.

## Supplemental Subject Matter Jurisdiction 28 U.S.C. § 1367

164.    For those causes of action which are not usually subsumed under federal questions arising under the United States Constitution or the laws of the United States under the original jurisdiction of this Court, federal subject matter jurisdiction arises from the supplemental jurisdiction under 28 U.S.C. § 1367 arising from those transactions, actions and/or omissions which arise from a common core nucleus of operative facts over which this Court does have original jurisdiction.

## Personal Jurisdiction

165.    All defendants, including state and federal actors, are citizens of the United States as defined by federal law and the alleged unlawful and injurious actions and/or omissions by the defendants were committed within the states or territories of the United States, primarily involving the Commonwealth of Massachusetts and the State of Maine.

## Civil Rights Actions

166.    The Plaintiff files this civil rights complaint bringing claims that seek relief for the violation of the Plaintiff's fundamental federal civil and/or constitutional rights as protected by federal statutes and/or the United States Constitution.

167.    Although Title 42 U.S.C. § 1983 does not confer specific rights, it does allow the Plaintiff to enforce rights guaranteed/contained in the United States Constitution and defined by

federal law, including the rights and privileges guaranteed to U.S. citizens under the U.S. Constitution.

168.    The Plaintiff also seeks relief under 42 U.S.C. §1983, and herein alleges (1) a violation of rights protected by the Constitution or created by federal statute (2) proximately caused by conduct of (3) a person (4) acting under color of state law. *Crumpton v. Gates,* 947 F.2d 1418, 1420 (9th Cir. 1991).

169.    Under 42 U.S.C. §1983, a person or state actor who acts under color of law to violate another's  civil rights and/or constitutional rights may be liable for money damages, declaratory relief and/or injunctive relief. Multiple defendants of the instant action have deprived the Plaintiff of his civil rights while acting under the color of law.

170.    For some causes of action stated in the instant case, the relevant statutes of limitations do not apply as the actions and/or wrongdoings committed by the defendants are ongoing and continuous and/or subject to recurrence and habitual commission – capable of repetition yet evading review - *Roe v. Wade.*

## THE PLAINTIFF SEEKS TRIAL BY JURY FOR ALL SUCH QUESTIONS OF FACT OR ISSUES OF LAW SO TRIABLE.

*Constitutional Authority & Jurisdiction*

171.    "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." *Article III, Section 1, United States Constitution*

172.    "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; …. To Controversies to which the United States shall be a party; -- between a State and Citizens of another State; -- between Citizens of different States; -- between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." *Article III, Section 2, United States Constitution*

*Statute of Limitations*

173.    This complaint sets forth the dates on which each alleged constitutional rights violation occurred. A statute of limitations is a law that sets a particular period of time within which a suit must be filed. It begins to run when the injury occurs or the constitutional right is violated. The statute of limitations period for filing a civil rights suit is two years from the most recent civil rights violation. See *Wilson v. Garcia*, 471 U.S. 261 (1985); I.C. § 5-219(4).

*Legal Scholars providing assistance to the Plaintiff*

174.    The following legal scholars have provided assistance to the Plaintiff in the preparation and drafting of these legal pleadings:

a)    Professor Martha Field, Langdell Professor of Law, Harvard Law School, Cambridge
https://hls.harvard.edu/faculty/martha-a-field/

b)    Professor James Rowan, Professor of Law, Northeastern University School of Law
https://law.northeastern.edu/faculty/rowan/

c) Professor Anthony Baker, Professor of Law, John Marshall Law School, Atlanta
https://www.johnmarshall.edu/ajmls-announces-the-retirement-of-professor-anthony-baker/

d) The late Professor John Flym, Professor of Law, Northeastern University School of Law
https://law.northeastern.edu/multimedia/remembering-professor-john-flym/

https://www.thecrimson.com/article/1969/5/28/john-gs-flym-pbtbhe-president-and/

e) Professor Jay Hook, Professor of Law, Student Legal Clinic, Harvard Law School
https://view.officeapps.live.com/op/view.aspx?src=http%3A%2F%2Fwww.law.harvard.edu%2Fprograms%2Fhistory-project%2Fresumes%2Fhook.doc

175.   Additional legal assistance, at times comprising ineffective assistance of counsel, was provided by the following attorneys (who are also co-defendants in the instant action):

a) Robert Stolzberg, Esq.   https://www.linkedin.com/in/robertstolzbergbigonlaw

b) Vincent DiCianni, Esq. https://www.affiliatedmonitors.com/vin-dicianni/

c) Claudia Hunter, Esq. https://www.lawyerdb.org/lawyer/claudia-adams-hunter/

176.   The injuries which were proximately caused to the Plaintiff by Defendants Federal National Mortgage Association, MrCooper, John Ney, Schechtman, Halperin and Savage, the Commissioner for the Internal Revenue Service and the United States Department of Education are ongoing and continuing, which tolls the Statute of Limitations.

177.   The Plaintiff has been a party to litigation in: Middlesex Superior Court, Suffolk Superior Court, Division of Administrative Law Appeals, Massachusetts Supreme Judicial Court, Maine Supreme Judicial Court, Maine Board of Bar Overseers; there are related litigation cases

involving the Plaintiff in the Oxford County Superior Court  (Defendants Federal National

Mortgage Association, MrCooper, John Ney, Schechtman, Halperin and Savage) and in the U.S.

Tax Court (Defendants Internal Revenue Service and the United States Department of

Education).

### Constitutional Authority & Jurisdiction & Limitations

178.    Eleventh Amendment to the United States Constitution generally prohibits litigants from

bringing suits against states and state agencies, a protection called "sovereign immunity." *Puerto*

*Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993).

179.    To obtain declaratory relief or injunctive relief from a state or state entity, the Plaintiff

may lawfully use an official capacity claim against an individual employee or official.

180.    Regarding the Plaintiff's asserting claims under a federal statute other than the civil rights

statute, state entities may be proper defendants. (*see* RLUIPA and ADA claims.)

### Local Governmental Entities and Private Entities Performing State Functions

181.    A county, municipality (city), or other local governmental entity, or a private entity

performing a state function, may be considered a "person" that can be sued under § 1983 if the

claim alleges that a government policy or custom inflicted the injury. *Monell v. Dept. of Soc.*

*Serv. of New York*, 436 U.S. 658, 694 (1978).

182.    The Plaintiff asserts the following facts in the complaint alleging the following: (1) the

plaintiff was deprived of a constitutional right; (2) the county had a policy or custom; (3) the

policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4)

the policy or custom was the moving force behind the constitutional violation. *Mabe v. San*

*Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

183.    In *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Court clarified that a complaint must

state plausible facts suggesting not simply that Defendants had a policy, but that the policy was

adopted for an unconstitutional purpose, for example, discriminating against someone on the

basis of their race, religion, or national origin. Id. at 1951- 52.

> *State Actor defendants have deprived Plaintiff of Procedural Due Process*
>
> *in deprivation of constitutionally protected Property and Liberty Interests*

184.    The disciplinary proceedings before the Massachusetts Board of Registration in Medicine

("BORIM") regarding the revocation of the Plaintiff's medical license are "formal adjudication"

under the rules and procedures of the Division of Administrative Law Appeals ("DALA") in the

Commonwealth of Massachusetts.

185.    These proceedings comprising formal adjudication are regulated by the following statutes

and regulations: M.G.L. c.30A, M.G.L. c.112, s.5(c), 243 C.M.R. 1.03(5)(a)3, and 243 C.M.R.

103(5)(a)(18).

186.    These formal adjudicatory proceedings mandate procedural due process of law under the

above-stated statutes and regulations.

187.    Procedural Due Process in the state BORIM and DALA proceedings is also guaranteed

for the Plaintiff by the U.S. Constitution and the Massachusetts Constitution.

188.    This procedural due process of law, regulated by the above-stated statutes and regulations,

requires (a) Notice and (b) a fair hearing before an impartial fact-finder; the requirements of

Procedural Due Process have been delineated by the U.S. Supreme Court in the case *Goldberg v.*

*Kelly.*

189.    BORIM and DALA did provide partial notice of the proceedings against the Plaintiff of

allegations of sexual misconduct, but did not provide notice of a fair hearing which was due the

Plaintiff, where the Plaintiff could have provided evidence of his innocence, confront and cross-examine adverse witnesses, and challenge the alleged evidence of the Commonwealth.

*Requirements of Procedural Due Process laid out in "Goldberg v. Kelly"*

190.    The Supreme Court has laid out the requirements for Due Process in *Goldberg v. Kelly*, 397 U.S. 254 (1970):

[a]… "the **statutory "fair hearing"** will provide the recipient with a full administrative review; …

[b] … hearing has one function only: to produce an initial determination of the validity of the welfare department's grounds … to **protect a recipient against an erroneous termination of his benefits**. Cf. *Sniadach v. Family Finance Corp.*, 395 U. S. 337, 343 (1969) (HARLAN, J., concurring); …

[c] … a **complete record and a comprehensive opinion**, which would serve primarily to facilitate judicial review and to guide future decisions, need not be provided at the pre-termination stage; …

[d] … an interest in **relatively speedy resolut**ion of questions of eligibility;

[e] … "The **fundamental requisite of due process of law is the opportunity to be heard**." *Grannis v. Ordean*, 234 U. S. 385, 394 (1914);

[f] … **hearing must be "at a meaningful time and in a meaningful manner**." *Armstrong v. Manzo*, 380 U. S. 545, 552 (1965);

[g] …the **opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard**;

[h] … afford the **flexibility of oral presentations** … permit the recipient to mold his argument to the issues the decision maker appears to regard as important … therefore a recipient **must be allowed to state his position orally**;

[i] …due process requires **an opportunity to confront and cross-examine adverse witnesses**. E. g., *ICC v. Louisville & N. R. Co.*, 227 U. S. 88, 93-94 (1913); *Willner v. Committee on Character & Fitness,* 373 U.S. 96, 103-104 (1963);   )

[j] … What we said in *Greene v. McElroy*, 360 U. S. 474, 496-497 (1959), is particularly pertinent here:

"Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the **evidence used to prove the Government's case must be disclosed to the individual** so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy.

[k] …We have formalized these protections in the **requirements of confrontation and cross-examination.** They have ancient roots. They find expression in the Sixth Amendment . . . . This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, . . . but also in all types of cases where administrative. . . actions were under scrutiny."

[l] ..."The right to be heard would be, in many cases, of little avail if it did not comprehend the **right to be heard by counsel**." *Powell v. Alabama*, 287 U. S. 45, 68-69 (1932).

Counsel can help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of the recipient... Evidently HEW has reached the same conclusion. See 45 CFR § 205.10, 34 Fed. Reg. 1144 (1969); 45 CFR § 220.25, 34 Fed. Reg. 13595 (1969).

[m] ...Finally, the **decisionmaker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing.** *Ohio Bell Tel. Co. v. PUC*, 301 U. S. 292 (1937); *United States v. Abilene & S. R. Co.*, 265 U. S. 274, 288-289 (1924) ...

[n]...the **decision maker should state the reasons for his determination and indicate the evidence he relied on**, cf. *Wichita R. & Light Co. v. PUC*, 260 U. S. 48, 57-59 (1922), ...

[o]... **an impartial decision maker is essential.** Cf. *In re Murchison*, 349 U. S. 133 (1955); *Wong Yang Sung v. McGrath*, 339 U. S. 33, 45-46 (1950).

[p]**... decision maker... should not, however, have participated in making the determination under review**.

[q] ...permit recipients **to appear personally with or without counsel** before the official who finally determines continued eligibility ...

[r]... **permitted to present evidence to that official orally, or to confront or cross-examine adverse witnesses. ..**"

191.    Thus, there are ten (10) requirements for procedural Due Process established by the U.S. Supreme Court in *Goldberg v. Kelly*, 397 U.S. 254 (1970):

[i] right to notice of hearing at meaningful time and manner;

[ii] right to fair hearing at meaningful time and in meaningful manner;

[iii] right to appear personally with or without counsel;

[iv] right to appear with counsel;

[v] right to orally present evidence;

[vi] right to confront adverse witnesses;

[vii] right to cross-examine adverse witnesses;

[viii] right to impartial decisionmaker – not involved with initial allegations;

[ix] decisionmaker's conclusions must rest solely on legal rules and evidence;

[x] decisionmaker must state reasons for determination and the evidence relied on.

192.    At least nine (9) of these requirements for procedural due process, which require a FAIR HEARING, were deprived from the Plaintiff by the actions and conduct of defendants Magistrate Sarah Luick, Justice Ellen Gorman, BORIM and DALA, for which the Plaintiff is seeking Declaratory Judgments regarding the conduct of these defendants.

193.    Early in the adjudicatory proceedings (ca. 2000-2001), Plaintiff's counsel John Flym agreed with BORIM counsel Alice Oliff to mutually-agreed upon Stipulations of undisputed issues of material fact relevant to the proceedings; these Stipulations were not for the purpose of resolving disputed issues of material fact where they were silent on those issues.

194.    Neither the Plaintiff nor his counsel ever waived the right to orally present evidence on Disputed issues of material fact relevant to the proceedings.

195.    Neither Plaintiff nor his counsel ever agreed to waive a hearing on the substantial issues

of material fact such as the Plaintiff's status as to whether he was or was not the physician to

Lourdes Colon at the relevant times in question and for the Plaintiff to present exculpatory

evidence of the 1992 Express Bilateral Contract which terminated the doctor-patient relationship.

196.    Neither the Plaintiff nor his counsel John Flym ever agreed to a waiver of the Procedural

Due Process right to a fair hearing, which is guaranteed to the Plaintiff by the U.S. Constitution

and the Massachusetts Constitution.

197.    The state's deprivation of the Plaintiff of his right to a fair hearing, substantially

prejudiced the Plaintiff's case, with substantial infirmity to the fact-finding process, the infirmity

of which was admitted by Magistrate Sarah Luick in her Recommended Decision, and resulted in

harsh, unfair and unjust findings and conclusions which were severely lacking in substantial

evidentiary support without the relevant hearing wherein essential and material exculpatory

evidence could have been presented.

198.    With only the Stipulations, the medical records and Expert Witness testimony, there was

substantial infirmity to the Magistrate's fact-finding and resultant conclusions which Magistrate

Luick admits to such infirmity in her Recommended Decision, where the record does not

disclose the exculpatory evidence which was intentionally and purposefully concealed by

defendants Colon, Wolfe and Spero.

*Evidence which the Plaintiff was not allowed to present without a Fair Hearing*

199.    These **disputed** substantial genuine issues of material fact include:

a)    1992 Express Bilateral Contract terminating the doctor-patient relationship which was

memorialized in a handwritten writing;

b)    Termination of the doctor-patient relationship;

c) Dr. Lisa Wolfe's role in conceiving, formulating, drafting and dictating that 1992 memorialized express bilateral contract terminating the doctor-patient relationship;

d) Mutually agreed upon modification of the 1992 memorialized express bilateral contract which provided a clinical-nonclinical binary classification of time and location;

e) Spoliation of material exculpatory evidence by defendants Lourdes Colon, Lisa Wolfe and Stanley Spero who concealed all evidence and knowledge of the 1992 memorialized express bilateral contract, terminating the doctor-patient relationship, from the tribunal;

f) Obstruction of justice and interference with the fair administration of justice through their concealment and spoliation of material exculpatory evidence by defendants Lourdes Colon, Lisa Wolfe and Stanley Spero;

g) Professional ethical violations by defendants Lisa Wolfe and Stanley Spero because of their active engagement in spoliation of exculpatory evidence;

h) Sexual activity between the Plaintiff and Lourdes Colon while in the nonclinical world (intimate sexual activity between consenting adults is constitutionally protected in the privacy of one's home *Lawrence v. Texas*, 539 U.S. 558 (2003), 41 S.W.3d 349, reversed and remanded);

i) Substantial bias and deficient expert opinions of the Expert Witnesses who did not have access to the concealed 1992 memorialized express bilateral contract terminating the doctor-patient relationship, which concealment had a substantial negative effect on their expert opinion concerning the Plaintiff;

j) Constitutional protections - Plaintiff's 1992 memorialized handwritten Express Bilateral Contract terminating the doctor-patient relationship is constitutionally protected under the Contracts clause of the U.S. Constitution;

k)  BORIM's imposition of "forced labor" upon the Plaintiff, forcing him to practice medicine against his will in the nonclinical world, comprises Involuntary Servitude, similar to slavery where persons are forced to work against their will;

l)  Furthermore, BORIM's invasion of the Plaintiff's home and private residence where private sexual activity between consenting adults was taking place is protected under the fundamental constitutional right to Privacy as enunciated by the Supreme Court in *Lawrence v. Texas,* 539 U.S. 558 (2003);

m)  BORIM's regulations violate the Plaintiff's right to Equal Protection under the law because of its discriminatory nature burdening the Plaintiff's fundamental right to marry because BORIM regulations permit licensed physicians to engage in sexual relations with their patients if they subsequently marry the patient but these regulations punish those physicians who engage in sexual relations with their patients but do not subsequently marry the patient, by revoking their medical licenses;

n)  BORIM's imposition of a retroactive Rule voiding the Plaintiff's 1992 memorialized Express Bilateral Contract terminating the doctor-patient relationship is tantamount to an *ex post facto* application of new law to conduct in the past for the purpose of punishment without a fair hearing and also comprises a *Bill of Attainder;*

o)  BORIM's punishment of the Plaintiff by revocation of his medical license without prior notice that physicians cannot enter contracts to limit the time and location of their clinical activities comprises criminal punishment, requires a complete criminal trial, and comprises BORIM acting *ultra vires* because administrative agencies do not have the authority to deprive a citizen of their constitutionally protected rights of life, liberty or property without a trial in a competent court of law. The criminal nature of the

Plaintiff's punishment by BORIM is evident in the 5-year period of adjudicatory

proceedings when the Plaintiff treated over 40,000 patients, when BORIM had

Emergency Powers to immediately revoke or suspend the Plaintiff's medical license

were there a real concern about protecting the health and welfare of the citizens, but

BORIM chose NOT TO ACT for 5 years after they already had knowledge of the

Plaintiff's sexual conduct. Thus the decision to revoke the Plaintiff's medical license

was PUNITIVE and not acting to protect health, safety or welfare. Criminal

punishments such as the Plaintiff's license revocation demand the protections of

criminal procedure and the right to a jury trial.

200.    These disputed issues of material fact, essential for the fact-finder to make conclusions

regarding the Plaintiff's conduct, were avoided and evaded in the Stipulations which were

submitted, which was also silent on the exculpatory evidence of the 1992 Express Bilateral

contract terminating the doctor-patient relationship.

201.    These substantial issues of material fact demanded that the Plaintiff receive a fair hearing

before the tribunal to present his evidence, cross-examine the witnesses against him and have the

full panoply of legal resources which were his due under Administrative Law, to fairly determine

the true and accurate findings of fact which were relevant to this case, but the Plaintiff never was

provided with the opportunity for a fair hearing.

202.    BORIM and DALA refused to provide the Plaintiff with a fair hearing because defendant

Lourdes Colon did not want to testify in court nor did she want to testify at a deposition, or

Colon was unable to testify or not accessible to testify at any of these official tribunal processes

where a witness usually provides testimony under oath.

203.    Without that fair hearing, Magistrate Sarah Luick admitted in the text of her

Recommended Decision being critically limited and restricted without the benefit of the relevant

testimony and further documentation - such as the concealed 1992 memorialized express

bilateral contract terminating the doctor-patient relationship and led Magistrate Luick to make

multiple FALSE findings of fact without that testimony or documentation.

204.    The Plaintiff was unfairly and unjustly punished by the revocation of his medical license,

loss of constitutionally-protected property and liberty rights, loss of the liberty to engage in

gainful employment because of the FALSE findings of fact made by Magistrate Luick in the

absence of a fair hearing without the presentation of exculpatory evidence.

205.    The Plaintiff had demanded a fair hearing before an impartial fact-finder and only agreed

to a Stipulation of facts regarding the undisputed facts and the Plaintiff never waived his right to

a fair hearing as required by Due Process of Law.

206.    Defendants Massachusetts Board of Registration in Medicine ("BORIM") and the

Massachusetts Division of Administrative Law Appeals ("DALA") have denied the Plaintiff the

right to a fair hearing before an impartial fact-finder in proceedings to revoke his medical license.

207.    The state proceedings were regulated by M.G.L. c. 30A, the State Administrative

Procedures Act, which guaranteed the Plaintiff the right to a fair hearing, but the Plaintiff was

never provided with an opportunity for a fair hearing.

208.    Early in the the adjudicatory proceedings, Plaintiff's counsel John Flym agreed to

Stipulations of undisputed genuine issues of material fact relevant to the proceedings.

209.    Neither Plaintiff nor his counsel ever agreed to waive a hearing on the substantial issues

of material fact such as the Plaintiff's status as to whether he was or was not the physician to

Lourdes Colon at the relevant times in question.

210.    Without a fair hearing, the Plaintiff was never provided with the opportunity to orally present evidence of:

a)    Memorialized Express Bilateral Contract terminating the doctor-patient relationship in September 1992;

b)    Dr. Lisa Wolfe's role in formulating, drafting and dictating that 1992 memorialized express bilateral contract terminating the doctor-patient relationship;

c)    Lourdes Colon's state of mind and psychiatric diagnosis of Dissociative Identity Disorder and Multiple Personality Disorder;

d)    Mutually agreed upon modification of the 1992 memorialized express bilateral contract which provided a clinical-nonclinical binary classification of time and location;

e)    Spoliation of material evidence by defendants Lourdes Colon, Lisa Wolfe and Stanley Spero who concealed all exculpatory evidence and knowledge of the memorialized express bilateral contract, terminating the doctor-patient relationship, from the tribunal;

f)    Obstruction of justice and interference with the fair administration of justice by defendants Lourdes Colon, Lisa Wolfe and Stanley Spero;

g)    Professional ethical violations by defendants Lisa Wolfe and Stanley Spero because of their active engagement in spoliation of evidence and concealment of exculpatory evidence;

h)    Sexual activity between the Plaintiff and Lourdes Colon while in the nonclinical world (intimate sexual activity between consenting adults is constitutionally protected in the privacy of one's home *Lawrence v. Texas,* 539 U.S. 558 (2003), 41 S.W.3d 349, reversed and remanded);

   i)   Substantial bias and deficient expert opinions of the Expert Witnesses who did not have access to the concealed 1992 memorialized express bilateral contract terminating the doctor-patient relationship, which concealment had a substantial negative effect on their expert opinion concerning the Plaintiff;

   j)   Plaintiff's 1992 memorialized Express Bilateral Contract terminating the doctor-patient relationship is constitutionally protected under the Contracts clause of the U.S. Constitution;

   k)   BORIM's imposition of "forced labor" upon the Plaintiff, forcing him to practice medicine against his will in the nonclinical world, comprises Involuntary Servitude;

   l)   BORIM's imposition of a retroactive Rule voiding the Plaintiff's 1992 memorialized Express Bilateral Contract terminating the doctor-patient relationship is tantamount to an *ex post facto* application of new law to conduct in the past for the purpose of punishment without a fair hearing and also comprises a *Bill of Attainder;*

   m)   BORIM's punishment of the Plaintiff by revocation of his medical license without prior notice that physicians cannot enter contracts to limit the time and location of their clinical activities comprises criminal punishment, requires a complete criminal trial, and comprises BORIM acting *ultra vires* because administrative agencies do not have the authority to deprive a citizen of their constitutionally protected rights of life, liberty or property without a trial in a competent court of law.

211.   These substantial issues of material fact demanded that the Plaintiff receive a fair hearing before the tribunal to present his evidence, cross-examine the witnesses against him and have the full panoply of legal resources which were his due under Administrative Law, to fairly determine the true and accurate findings of fact which were relevant to this case.

212.    Without that fair hearing, Magistrate Sarah Luick admitted in the text of her

Recommended Decision being critically limited and restricted without the benefit of the relevant

testimony and further documentation - such as the concealed 1992 memorialized express

bilateral contract terminating the doctor-patient relationship and led Magistrate Luick to make

multiple FALSE findings of fact without that testimony or documentation.

213.    Defendants Massachusetts Board of Registration in Medicine ("BORIM") and the

Massachusetts Division of Administrative Law Appeals ("DALA") have denied the Plaintiff the

right to a fair hearing before an impartial fact-finder in proceedings to revoke his medical license.

214.    BORIM and DALA never provided any Notice of the fair hearing at which the Plaintiff

would have been entitled to: (a) present evidence supporting his position, evidence of the

termination of the doctor-patient regulated by Massachusetts statutes including M.G.L. c.30A

and C.M.R.

215.    The Plaintiff was unfairly and unjustly punished by the revocation of his medical license,

loss of constitutionally-protected property and liberty rights, loss of the liberty to engage in

gainful employment because of the FALSE findings of fact made by Magistrate Luick in the

absence of a fair hearing.

216.    The Plaintiff had demanded a fair hearing before an impartial fact-finder and only agreed

to a Stipulation of facts regarding the undisputed facts and the Plaintiff never waived his right to

a fair hearing as required by Due Process of Law.

217.    Multiple tribunals including the Massachusetts Middlesex Superior Court, Massachusetts

Suffolk Superior Court, Massachusetts Supreme Judicial Court and the Maine Supreme Judicial

Court have relied upon the FALSE findings of material fact which were made by Magistrate

Luick in the absence of the fair hearing which the Plaintiff demanded.

218.    The FALSE findings of fact made by Magistrate Sarah Luick have resulted in severe,

harsh and substantial injuries to the Plaintiff including but not limited to: (a) loss of his medical

license; (b) over $250,000 of legal payments to attorneys to represent him; (c) loss of over

$3,125,000.00 (three million one hundred twenty-five thousand U.S. dollars) of lost salary and

compensation as a Physician over a 22-year period of time; (d) bankruptcy; (e) divorce from his

wife; (f) foreclosure of his home; (g) severe community ostracism and humiliation; (h) refusal of

the Maine Board of Bar Examiners to admit him after passing the Bar exam in Maine; (h) severe

medical complications from the intentional infliction of extreme emotional distress resulting in

cardiac dysrhythmias requiring a pacemaker, ulcer, severe depression with suicidal ideation; and

(i) loss of multiple clinical jobs and research jobs in hospitals and medical centers because of

Medicare exclusion of the Plaintiff.

219.    Plaintiff seeks equitable relief in the form of declaratory judgments and injunctive relief

from those state actor defendants immune from money damages by the Eleventh Amendment;

Plaintiff seeks compensatory, monetary and punitive damages from the private non-state

defendants whose torts and possibly criminal spoliation of evidence have been the direct and

proximate cause of his damages and injuries in the amount of over $6,250,000.00 (six million

two hundred fifty thousand U.S. dollars), especially defendants Lisa Wolfe, Stanley Spero and

Lourdes Colon.

*Defendant State actors acting in their personal capacity under the Color of Law causing*
*deprivation of Plaintiff's civil rights in violation of 42 U.S.C § 1983*

220.    The Eleventh Amendment prevents claims against the state Actors acting in their official

capacity, but does not prevent claims against State Actors acting in their personal capacity, for

which the individual state actor would be liable for money damages and relief personally, and

not the State. *Hafer v. Malo*, 502 U.S. 21, 2658, 362 (1991).

221.    Regarding the injunctive relief sought, the Plaintiff seeks a court order requiring specific

state actor defendants to act or stop acting in a particular manner, and is an exception to Eleventh

Amendment immunity. In the instant case, the named state actor defendants are the state actors

directly in charge of such acts, sued in their official capacity, not the governmental entity itself.

*Ex parte Young*, 209 U.S. 123 (1908).

*Personal Capacity Claims against Individual Officers or Employees*

222.    The Plaintiff alleges claims seeking monetary damages against several state actor

Defendants acting in his or her "personal capacity." These claims allege that the state actor is

personally liable for action taken while acting for the government. *Kentucky v. Graham*, 473 U.S.

159, 165 (1985).

223.    "Acting under color of state law generally means that a "person," was working for or

acting on behalf of a governmental entity when they violated the Plaintiff's civil rights.

224.    Regarding his civil rights claim, the Plaintiff is thus seeking equitable relief, in terms of

injunctive or declaratory relief, when some of the state actor defendants were acting in their

official capacity under the color of law when they violated the Plaintiff's civil rights.

225.    Also regarding his civil rights claim, the Plaintiff is seeking monetary damages against

those state actor defendants who were acting in their personal capacity under the color of law at

the time that they violated the Plaintiff's civil rights.

226.    As part of the U.S. District Court cover-sheet, the Plaintiff has completed the civil rights

complaint form, wherein section C(1) covers these essential elements.

227.    For those state actor defendants, who violated the Plaintiff's civil rights while acting under the color of law, the Plaintiff has designated each person's job title along with the governmental entity for which that person is or was working at the time of the alleged violation.

228.    Under the quasi-governmental doctrine, private entities may be liable for injuries to the Plaintiff when those private entities were acting or performing a government function which is usually and normally performed by government actors.

229.    The Plaintiff alleges with specificity the defendant actors' conduct which were the direct and proximate cause of the violation of the Plaintiff's civil rights and deprivation of the Plaintiff's constitutional rights. 42 U.S.C. § 1983; *Arnold v. International Business Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981).

230.    Under established law, there are two theories under which a state official may be held liable for civil rights violations: (1) personal involvement in the act that caused the injury; or (2) sufficient causal connection between the official's act and the injury. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

231.    Regarding the violations of the Plaintiff's Constitutional rights, the Plaintiff herein alleges material facts which satisfy the essential elements for those civil rights and Constitutional claims, from which the jury can determine that the defendant acted intentionally, deliberately and purposefully at the time of those violations See *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1953-54 (2009).

232.    As a U.S. citizen, the Plaintiff has a First Amendment right to access the courts. *Bounds v. Smith*, 430 U.S. 817 (1977).

*Justiciable and non-political Issues of Law*

233.   The issues of law, addressed in this Complaint by the Plaintiff, are justiciable and are not

political questions nor issues, and these injuries caused to the Plaintiff are ripe for adjudication,

and where state actors are defendants, all possible state remedies have been exhausted in the

highest courts of the Commonwealth of Massachusetts and the State of Maine.

234.   The Plaintiff seeks equitable relief, declaratory and injunctive, against the state actor

defendants where monetary damages would otherwise be prohibited by the Eleventh Amendment.

235.   Where agents and/or employees of state actors, were acting within their personal capacity

and not that of the state, and their actions and/or omissions did cause substantial economic injury

to the Plaintiff when those agents and/or employees violated the Plaintiff's civil rights while

acting under the color of law, the Plaintiff seeks the relevant monetary and punitive damages as

authorized by 42 U.S.C. s.1983.

*Constitutional Right to a Trial by Jury*

236.   Three separate provisions of the U.S. Constitution provide for the right to a trial by jury.

Article III, Sec. 2 provides: "The trial of all crimes shall be by jury and such trial shall be held in

the state where the said crimes have been committed." The Sixth Amendment says: "In all

criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an

impartial jury of the state where the said crimes shall have been committed." Finally, for civil

matters, the Seventh Amendment provides: "In all suits at common law, where the value in

controversy shall exceed twenty dollars, the right of trial by jury shall be preserved and no fact

tried by a jury shall be othePlaintiff Robert Weinbergise reexamined by an court of the United

States."

237.    This United States District Court for the District of Massachusetts is one of those inferior courts vested with judicial Power granted by the United States Supreme Court and is authorized and empowered to try Cases and Controversies arising under the Constitution or the Laws of the United States.

238.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 2201.

239.    This court has original jurisdiction over this case because the complaint includes disputes governed by the United States Constitution and the laws of the United States, including violation of the Plaintiff's civil rights guaranteed by the United States Constitution by persons acting under the color of law. 28 U.S.C. § 1331, 28 U.S.C. § 1343, 42 U.S.C. § 1983, 18 U.S.C. § 1961(3), 18 U.S.C. § 1962I, 18 U.S.C. § 1962(d) and 42 U.S.C. § 1985.

240.    This action also involves federal issues of law which arise under the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments, U.S. Const. amend. V; and the Administrative Procedures Act, 5 U.S.C. § 550 et seq.

241.    This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331,  28 U.S.C. §1346(a)(2), 28 U.S.C. §1361, 28 U.S.C. § 2201, 28 U.S.C. § 2202, 42 U.S.C. 2000bb-1(c), provisions of 28 U.S.C. § 1391(e)(1)(A), § 1361, and § 2201–2202.

242.    Venue is proper as most of the defendants either do business, have a principal place of business or reside within the Commonwealth of Massachusetts

243.    In the instant case, there exists an actual and justiciable live controversy between the Plaintiff and Defendants requiring resolution by this Court. The Plaintiff has no other adequate remedy at law, and any state available remedies have been exhausted or are otherwise excused.

244.    The Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and

1343 as this action involves, in part, federal questions regarding the deprivation of Plaintiff's

rights under 42 U.S.C. § 1981.

245.    The Court has supplemental jurisdiction over Plaintiff's related state and local law

claims/causes of action pursuant to 28 U.S.C. § 1367(a).

246.    This Court has authority to adjudicate issues under Title VII of the Civil Rights Act.

247.    This Court has authority to adjudicate issues under Title IX of the Civil Rights Act.

248.    The United States District Court is authorized to enforce Title II, which requires

reasonable modifications and accommodations to avoid discrimination or discriminatory actions

against individuals with disabilities.

249.    The Plaintiff also seeks Declaratory and injunctive relief as authorized by § 14141, Title

II, Title VI.

250.    This Court has authority to adjudicate issues under the Americans with Disabilities Act, a

federal law presenting issues of law in the instant case..

251.    This Court has the authority to grant Plaintiff the relief he requests as granted by multiple

federal statutes including, but not limited to the Administrative Procedures Act, 5 U.S.C. §§ 705-

06; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; and 28 U.S.C. § 1361; and the United

States Constitution.

252.    Where the Eleventh Amendment, statutes, relative or absolute immunity otherwise may

prohibit suits for money damages, the Plaintiff may still be entitled to Equitable Relief in the

form of Declaratory Judgments and/or Injunctive Relief.

### **Proper Subject Matter Jurisdiction: Disputes/issues arising under Federal Law**

253.    Some of the relevant causes of action in the instant litigation arise under the following

federal statutes and sections/clauses of the U.S. Constitution, and include several Fundamental

civil Liberty interests and civil rights:

[a]  42 U.S.C. § 1983

[b]  U.S.C. Title 31, Subtitle III, Chapter 37, Subchapter III

[c]  28 U.S.C. § 1345

[d]  42 U.S.C. § 14141, Title VI of the 1964 Civil Rights Act

[e]  42 U.S.C. §§ 1345 12131 – 12134

[f]  U.S.C. Title II of the Americans with Disabilities Act of 1990

[g]  Procedural Due Process clauses of the Fifth and Fourteenth Amendments

[h]  5 U.S.C. §706

[i] Freedom of Speech Clause of the First Amendment

[j] Equal Protection Clause of the Fourteenth Amendment

[k] Title VII of the Civil Rights Act of 1964

[l]  Title IX of the Civil Rights Act of 1964

[m] Contracts clause of section 10, Article I, U.S. Constitution

[n] Ex post facto clause of section 10, Article I, U.S. Constitution

[o] Bill of Attainders clause of section 10, Article I, U.S. Constitution

[p] additional federal statutes not previously enumerated, including but not limited to the

Internal Revenue Code

[q] international treaties to which the United States is a signatory which grant specific rights to its citizens

254.   The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." Historically, this guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property. *Davidson v. New Orleans*, 96 U. S. 97 (1878); *Rochin v. California*, 342 U. S. 165 (1952); *Bell v. Burson*, 402 U. S. 535(1971); Ingraham v. Wright, 430 U. S. 651 (1977); *Hudson v. Palmer*, 468U. S. 517 (1984).

255.   "Negligent conduct by a state official, when it proximately causes injury to the Plaintiff, may constitute a deprivation under the Due Process Clause." This history reflects the traditional and common-sense notion that the Due Process Clause, like its forebear in the *Magna Carta*, see Coin, *The Doctrine of Due Process of Law Before the Civil War*, 24 Harv. L. Rev. 366, 368 (1911), was" `intended to secure the individual from the arbitrary exercise of the powers of government,' " *Hurtado v. California*, 110 U.S. 516, 527 (1884) (quoting *Bank of Columbia v. Okely,* 4 Wheat. 235, 244 (1819)). See also *Wolff v. McDonnell*, 418 U. S.539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government, *Dent v. West Virginia*, 129 U. S. 114, 123 (1889)").

256.   By requiring the government and state actor Defendants to follow appropriate procedures when its agents decide to "deprive any person of life, liberty, or property," the Due Process Clause promotes fairness in such decisions.

257.   Furthermore the Due Process Clause bars certain government actions regardless of the fairness of the procedures used to implement them, e. g., *Rochin*, supra, it serves to prevent

governmental power from being "used for purposes of oppression," *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 277 (1856).

258.    "The Fourteenth Amendment is a part of a Constitution which is generally designed to allocate governing authority among the Branches of the Federal Government and between that Government and the States, and to secure certain individual rights against both State and Federal Government." State action which infringes upon or violates the individual's Fundamental Liberty interests is subject to Strict Scrutiny upon Judicial Review.

259.    "The United States Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Paul v. Davis*, 424 U. S. 693, 701 (1976).

260.    Civil rights actions lie within the federal court's jurisdiction to hear matters arising under the United States Constitution and federal laws. 42 U.S.C. § 1983 prohibits entities from denying a citizen's civil rights while acting under the color of law.

261.    The federal issues of law raised in this litigation have not been fully litigated in any prior proceeding in any competent court of law and are thus not subject to res judicata nor are they subject to collateral estoppel.

*Plaintiff's medical and neurological disabilities*

262.    Plaintiff's mother, Isabelle Weinberg, went into labor on October 26, 1953 at Crown Heights Hospital (https://en.wikipedia.org/wiki/Lefferts_General_Hospital)  in Brooklyn, New York.

263.    As a G1P0 primigravid mother (https://www.dictionary.com/browse/primigravida), the

Plaintiff's mother's labor was abnormally long and protracted

(https://my.clevelandclinic.org/health/diseases/24752-prolonged-labor).

264.    On October 27, 1953, during birth, the Plaintiff suffered significant cerebral ischemia,

with low Apgar scores (https://fn.bmj.com/content/93/2/F115), and appeared as a "blue baby" to

the doctor and nurses (https://www.frontiersin.org/articles/10.3389/fncel.2017.00078/full).

265.    Following these neonatal birth injuries, the Plaintiff suffered from persistent life-long

neurologic impairments and significant neuro-developmental delays which would affect the

Plaintiff's academic performance for many years

(https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10255042/).

266.    The Plaintiff had substantial language difficulties and did not begin to speak until the age

of four years

(https://journals.lww.com/jrnldbp/Abstract/1987/02000/Early_Language_Development_in_Infan

ts_with.2.aspx).

267.    For most of his elementary school years at the Birch Lane Elementary School

(https://www.msd.k12.ny.us/BirchLane) in Massapequa, New York

(https://en.wikipedia.org/wiki/Massapequa,_New_York), the Plaintiff was seen by a Speech

Therapist for language therapy (https://www.asha.org/policy/pi2010-00317/)  on a weekly basis

through the sixth grade.

268.    In June 1964, the Plaintiff had a bicycle accident where he suffered significant closed

head trauma including a fractured skull and a subdural hematoma

(https://www.ncbi.nlm.nih.gov/books/NBK532970/), which manifested itself initially as

headache, diplopia and papilledema of the retina due to the increased intracranial pressure of the expanding bleeding within the Plaintiff's skull.

269.    With indications for the urgent need for neurosurgery to minimize brain damage from the increasing intracranial pressure from the continuous intracranial bleeding, the Plaintiff was hospitalized at Flower and Fifth Avenue Hospital (https://www.nymc.edu/about-nymc/history/flower-fifth-avenue-hospital/)  in New York City , under the service of the neurosurgeon Dr. Tarlov (https://en.wikipedia.org/wiki/Isadore_Tarlov).

270.    Dr. Tarlov performed a skull craniotomy (https://nspc.com/treatments/craniotomy-for-subdural-hematoma/) and evacuation of the subdural hematoma from the Plaintiff's brain in the Operating Room at the Flower and Fifth Avenue Hospital in New York City.

271.    Following this head trauma, subdural hematoma and neurosurgery, the Plaintiff was afflicted with Post-concussion syndrome (https://www.ncbi.nlm.nih.gov/books/NBK534786/) and Traumatic Brain Injury (TBI) (https://www.ninds.nih.gov/health-information/disorders/traumatic-brain-injury-tbi) with its concomitant behavioral impairments.

272.    In 1967, the Plaintiff was also diagnosed with hypothyroidism (https://www.niddk.nih.gov/health-information/endocrine-diseases/hypothyroidism), necessitating daily thyroid hormone supplementation – this thyroid disorder may have resulted from damage to his pituitary gland from the prior head injuries.

273.    On or about 1990, the Plaintiff was examined and tested at the Hallowell Center (https://drhallowell.com/) in Concord, Massachusetts, where he was diagnosed with Attention Deficit Disorder (ADD) (https://www.nimh.nih.gov/health/topics/attention-deficit-hyperactivity-disorder-adhd) requiring life-long treatment with CNS stimulants and the Plaintiff is currently on Adderall daily.

274.    The Plaintiff is a member of a statutorily-protected group under the Americans with

Disabilities Act ("ADA") (https://www.ada.gov/) due to his combined medical-neurologic

disability from neonatal anoxia, head trauma, intracranial hemorrhage, post-concussion

syndrome, traumatic brain injury, chronic hypothyroidism and Attention Deficit Disorder.

*Overcoming disability & academic challenges*

275.    During the years 1953 – 1968, the Plaintiff received intensive therapy including speech

therapy and additional school interventions because of the neurologic delays from birth anoxia in

addition to the head trauma with subdural hematoma.

276.    During his academic years in second grade (elementary school) through ninth grades

(high school), the Plaintiff was forced to change classes and undergo remedial learning due to

mistakes and errors in his schoolwork caused by his disabilities.

277.    During subsequent years, at Massapequa High School

(https://www.msd.k12.ny.us/domain/123) the Plaintiff became a National Merit Scholarship

semi-finalist (https://en.wikipedia.org/wiki/National_Merit_Scholarship_Program ); also was

awarded a New York State Regents Scholarship for the study of medicine

(https://www.hesc.ny.gov/partner-access/financial-aid-professionals/programs-policies-and-

procedures-guide-to-grants-and-scholarship-programs/appendix-i-certification-of-regents-health-

care-scholarships-in-medicine-and-dentistry-rosters.html ); and was awarded research funding by

Harvard Medical School (https://hms.harvard.edu) to perform summer research with Professor W.

Eugene Knox, III, MD, a professor of Biochemistry

(https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiZ9sv
I-
LSEAxVJhYkEHZ3dCHEQFnoECBYQAQ&url=https%3A%2F%2Fwww.ncbi.nlm.nih.gov%2
Fpmc%2Farticles%2FPMC1931864%2Fpdf%2Fajhg00572-
0010.pdf&usg=AOvVaw2Ms4piqdT4qBSrWkmb5n1q&opi=89978449 ).

278.    Many of the academic years between 1958 - 1968 (Kindergarten - Ninth Grade) were
difficult and the Plaintiff's neurologic disabilities caused him to perform substantially below
average academically with frequent poor grades (Ds, Fs).

279.    In 1968, a BMR (basal metabolic rate) test
(https://en.wikipedia.org/wiki/Basal_metabolic_rate) was performed which showed that the
Plaintiff suffered from marked hypothyroidism, along with abnormal PBI (protein-bound iodine)
(https://www.britannica.com/science/protein-bound-iodine-test) and BEI (butanol-extractable
iodine) levels. The Plaintiff has been on daily oral thyroid supplementation for the past 52 years.

280.    These neurologic and medical disabilities caused the Plaintiff to take numerous medical
leaves of absence during his academic career, receive numerous incomplete "I" grades which
required remediation and completion at later than the regular deadlines.

281.    The Plaintiff attended two (2) medical schools before finally graduating with his medical
degree; attended four (4) law schools before obtaining his law degree and passing the Bar exam;
the Plaintiff also left over four (4) PhD graduate degree programs without completion; and
prematurely resigned from two (2) graduate residency programs before becoming a licensed
physician

282.    Since 1968, in spite of these disabilities, the Plaintiff has successfully overcome these
disabilities and challenges and managed to succeed at: earning his B.S. in Biology from M.I.T. in

1976 (https://web.mit.edu); earning his D.O. degree from the New York College of Osteopathic

Medicine in 1986 (https://www.nyit.edu/medicine); earning his J.D. degree cum laude from the

New England School of Law in 2006 (https://nesl.edu/) ; earning his M.M.Sc. degree in

Immunology from the Harvard Medical School in 2017 (https://hms.harvard.edu/); and then

earning an M.S. in Pharmacology at the Massachusetts College of Pharmacy and Health Sciences

in 2024 (https://www.mcphs.edu/).

283.    Following his medical school graduation from N.Y.C.O.M. in 1986, the Plaintiff did one

year of post-graduate residency training in Anatomic Pathology at Brown University, Providence,

RI (https://www.brown.edu/academics/biomed/departments/pathology/education/residency-

program) and also one year of post-graduate residency training in Internal Medicine at St.

Vincent Hospital in Worcester, MA (https://www.stvincenthospital.com/health-

professionals/graduate-medical-education-programs/internal-medicine-residency-

program/residencies-fellowships).

284.    In 1988, the Plaintiff passed the Federation Licensing Examination (F.L.E.X.) for

physicians (https://jamanetwork.com/journals/jama/article-abstract/346499) which was required

to obtain licensure as a physician.

285.    In 1988, the Massachusetts Board of Registration in Medicine ("BORIM") issued two (2)

medical licenses to the Plaintiff; one license was No. 60232; license No. 60232 was revoked by

BORIM in October 2002, but the second medical license was never revoked nor suspended.

286.    The Plaintiff's first job as a physician was working for Goldberg Medical Associates as a

Medical Officer running the medical clinic at M.C.I. Bridgewater.

287.    The Plaintiff's second job as a physician was as Medical Director of C.B.C. Medical Clinic on Middlesex Avenue in Lowell, MA, where he provided medical care to a large refugee community of over 35,000 Cambodians who fled the persecution and torture in their homeland.

288.    From 1990 through 2002, the Plaintiff worked as an Emergency Medicine Attending Physician in over fifteen (15) Emergency Medicine departments at hospitals including: Malden Hospital, Lawrence Memorial Hospital, Melrose-Wakefield Hospital, Winthrop Hospital, Lawrence General Hospital, Baystate Medical Center, Whidden Memorial Hospital, Nantucket Cottage Hospital, Jones Memorial Hospital, Hale Haverhill Municipal Hospital, Anna Jacques Hospital, as well as performing Locum Tenens work for such contracting agencies as Spectrum Medical Staffing, and the Plaintiff also worked as a Surgical First Assistant at Martha's Vineyard Hospital.

289.    The Plaintiff was provided with several awards of appreciation for exceptional service at several of the above hospitals.

290.    In 1989, the Plaintiff obtained employment as a Primary Care Provider at the Boston Evening Medical Center ("BEMC") (https://bostoneveningclinicfoundation.org/) on Commonwealth Avenue in Boston, MA.

291.    BEMC was a neighborhood community health center (https://www.nachc.org/community-health-centers/what-is-a-health-center/) which had multiple medical professionals on staff including primary care physicians and also multiple specialists including dermatologists, allergists, OB/GYNs, internists, ophthalmologists, urologists, cardiologists, geriatricians, endocrinologists, rheumatologists, orthopedic surgeons and family physicians.

*Medical care of Lourdes Colon at the Boston Evening Medical Center*

292.    Defendant Lourdes Colon came to the Boston Evening Medical Center ("BEMC") in 1989 (https://bostoneveningclinicfoundation.org/) for general medical care.

293.    Colon was randomly assigned to the Plaintiff, who worked as a Primary Care Provider specializing in Family Medicine at BEMC from 1989 through 1997.

294.    At one of her medical visits to the Plaintiff at BEMC on or about July 1992, Colon appeared upset and began to discuss some suicidal ideation.

295.    Colon had discussed how she became upset after learning that her sister Yvonne was diagnosed with AIDS.

*Admission to HRI under care of Psychologist Dr. Lisa Wolfe*

296.    The Plaintiff became concerned and arranged for her immediate hospitalization at the Arbour Human Resource Institute ("HRI") (https://massachusetts.networkofcare.org/mh/services/medicare-hospital-detail.aspx?pn=224018) a psychiatric hospital located in Brookline, MA.

297.    The defendant Dr. Lisa Wolfe (https://www.linkedin.com/in/lisa-wolfe-9480b5a0), was a licensed psychologist on the staff of HRI at that time.

298.    Dr. Wolfe began to provide diagnostic and therapeutic services for Lourdes Colon while she was hospitalized at HRI, and continued to provide psychological services to Colon for several months from July – September 1992.

299.    Dr. Lisa Wolfe had written an admission note on Colon on the day of her admission to

HRI which included, among other diagnoses listed in the differential, major depression

(https://www.ncbi.nlm.nih.gov/books/NBK559078/#:~:text=It%20is%20diagnosed%20when%2

0an,sleep%20disturbances%2C%20or%20suicidal%20thoughts) as well as rule out eating

disorder NOS (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2785872/) and dissociative

disorder NOS (https://en.wikipedia.org/wiki/Dissociative_disorder_not_otherwise_specified);

the Plaintiff did not know of these notes nor Wolfe's diagnoses until after 1997, when the HRI

records were delivered to Attorney Claudia Hunter (https://www.linkedin.com/in/claudia-hunter-

8274847/) as part of discovery during the lawsuit *Colon v. Weinberg, Wesselhoeft, Boston*

*Evening Medical Center et al.* filed in Middlesex Superior Court – for Middlesex County, MA -

(https://www.mass.gov/locations/middlesex-county-superior-court) in November 1996.

300.    Lourdes Colon had seen a pamphlet in the patient's waiting area at BEMC, which

described profiles of all the primary care doctors at the Boston Evening Medical Center.

301.    This pamphlet with the doctors' profiles described some of the Plaintiff's research

activities at MIT.

302.    As an Advanced Study Program fellow (https://professional.mit.edu/advanced-study-

program) at MIT in 1992-93, the Plaintiff was working on developing an acoustic medical

instrument for the automated diagnosis of multiple pulmonary and respiratory conditions.

303.    Defendant Colon was working as an EMT, for several ambulance services e.g. Cataldo

(https://en.wikipedia.org/wiki/Emergency_medical_technician) at that time, and she had an

interest in going to medical school.

304.    Colon thought that if she were to engage in some research it would improve her chances of getting into medical school.

305.    So Colon decided that she would like to assist the Plaintiff with his research at MIT after reading about it in the waiting room pamphlet.

306.    Colon had not discussed this desire or interest with the Plaintiff before she first discussed it with defendant Dr Wolfe at the HRI during the summer of 1992.

307.    At HRI, Colon had been talking to Dr Wolfe about the possibility of assisting the Plaintiff with his research.

308.    During Lourdes Colon's psychotherapy sessions with Dr. Lisa Wolfe at HRI, (https://www.nimh.nih.gov/health/topics/psychotherapies), Dr Wolfe advised Colon that if she wanted to assist the Plaintiff, it would be best to terminate the doctor-patient relationship first so as not to have a dual relationship.

309.    On or about August 1992, the Plaintiff was working at the BEMC, when the front-desk receptionist put an outside phone call through to him from HRI.

310.    The phone call was from defendant Lourdes Colon, phoning from her psychotherapist  Dr. Lisa Wolfe's clinical office at HRI, during a psychotherapy session with Dr Wolfe.

311.    Colon asked the Plaintiff if she might be able to assist him with the research which he was doing at MIT.

312.    Colon also informed the Plaintiff that her psychologist Dr Lisa Wolfe wanted to meet with him and Colon to further discuss the possibility of becoming the Plaintiff's research assistant.

313.    At the time, the Plaintiff thought that he could use an assistant to help with literature searches at the library.

314.    So the Plaintiff agreed to a meeting the following week with Colon and Dr Wolfe at HRI.

315.    This request by defendant Lourdes Colon was somewhat unusual for the Plaintiff, so prior to this meeting at HRI, the Plaintiff discussed this situation – concerning a patient who wanted to assist with the Plaintiff's research - with the medical director, Robert Wesselhoeft, III (https://www.researchgate.net/publication/286373274_The_Wesselhoefts_A_medical_dynasty_from_the_age_of_Goethe_to_the_era_of_nuclear_medicine) , and also with the administrative director, Ruth Taylor (https://bostoneveningclinicfoundation.org/board.html) of BEMC.

316.    Both Dr Wesselhoeft and Ruth Taylor approved of this plan, so the Plaintiff proceeded with the meeting with Colon and her psychologist Dr. Lisa Wolfe to discuss the question of research and asked the Plaintiff to keep them updated.

317.    Lourdes Colon had also met with the Medical Director Dr Wesselhoeft, III, M.D. and informed him of her wishes and her desire to become a Research Assistant for the Plaintiff.

*1992 Express Bilateral Contract terminating the doctor-patient relationship*

318.    So the following week, the Plaintiff came to HRI to meet with Dr Wolfe and Colon at approximately 9:00 or 10:00 am in the morning in a carpeted consultation office on the first floor of HRI which measured approximately 15 feet x 15 feet, with one large desk behind which sat Dr Wolfe and a couple of armchairs in front of that desk where the Plaintiff and Lourdes Colon sat.

319.    This meeting lasted approximately one hour in length; the meeting was run by Dr. Lisa Wolfe who set the agenda for the meeting and ran the meeting from start to finish.

320.    Dr. Wolfe controlled the agenda and conduct of the meeting, which lasted an hour, and began with Dr Wolfe bringing up the conversations she had with Colon and Colon's interest in becoming the Plaintiff's research assistant (https://en.wikipedia.org/wiki/Research_assistant).

321.    Dr. Wolfe asked the Plaintiff if he were interested in having Colon come assist him with the research at MIT.

322.    The Plaintiff explained that he could use the extra help, especially with doing background literature searches for the research.

323.    Dr Wolfe recommended that the Plaintiff and Colon formally terminate the doctor-patient relationship before Colon could transition into becoming a research assistant.

324.    Dr. Wolfe also suggested that the Plaintiff assist with finding a new primary care doctor who could take care of Colon's medical problems at BEMC.

325.    The Plaintiff found that Dr. William Reichel could immediately take over the complete medical care of Lourdes Colon at BEMC (https://www.baltimoresun.com/2021/05/28/dr-william-reichel-an-internist-and-practitioner-of-family-medicine-who-had-a-special-interest-in-geriatrics-dies/).

326.    The Plaintiff did not see any obstacles or problems to terminating the doctor-patient relationship based on Dr. Wolfe's reassurances and encouragement in pursuing such a course.

327.    After the Plaintiff agreed to these terms so that Colon could become his research assistant, Dr. Wolfe explained that she would dictate the words of the agreement terminating the doctor-patient relationship to cover all the bases.

328.   The Plaintiff agreed to this, and Dr. Wolfe explained that she would dictate the terms of the agreement terminating the doctor-patient relationship which Colon and the Plaintiff would each write out in their own handwriting the agreement verbatim that Dr Wolfe dictated and then each would sign each other's copy; as the Plaintiff transitioned out of his role as a physician, Dr. Lisa Wolfe concomitantly transitioned into the treating psychologist for both the Plaintiff (no longer a physician) and Lourdes Colon.

329.   During the hour-long discussion of this transition, Dr. Wolfe never advised the Plaintiff of any emotional, mental or psychological vulnerabilities of defendant Colon.

330.   Dr Wolfe never shared any of the psychological or medical issues which she had documented in Colon's medical record.

331.   Dr Wolfe never informed the Plaintiff of any of Colon's diagnoses, such as depression, or Rule/out eating disorder, dissociative disorder, nor did Dr. Wolfe ever discuss with the Plaintiff the dangers and risks of becoming involved with a patient with Dissociative Identity Disorder, who also suffered from Multiple Personality Syndrome.

332.   Dr. Wolfe never advised the Plaintiff at any time to avoid romantic or sexual interactions or relationships with Colon.

333.   Dr. Wolfe made no attempt in any way to suggest to the Plaintiff that he should circumscribe the limits or boundaries of the potential relationships which might ensue following the termination of the doctor-patient relationship.

334.   Dr. Wolfe never indicated to the Plaintiff that he should be careful in any way interacting with Colon or that she may be more vulnerable to stress than the average person.

335.    Dr. Wolfe had fiduciary and clinical duties and obligations to inform the Plaintiff if

(https://law.justia.com/codes/massachusetts/2022/part-i/title-xvi/chapter-112/section-128/): she

thought or believed that defendant Colon were vulnerable or if Wolfe perceived or thought that

there might be any risk of harm or injury to Colon following the termination of the doctor-patient

relationship, then defendant Dr Lisa Wolfe would have had a duty to warn the Plaintiff of those

risks of harm or injury as one professional advising the specific actions of another professional –

prior to the termination of the doctor-patient relationship - whom they are advising to undertake

a new role with patient with whom they are clinically familiar. *Tarasoff v. Regents of the*

*University of California* (1976).

336.    Although Massachusetts statutes have eliminated the duty of mental health professionals

to warn potential victims of violent acts, this does not obviate the professional duties and

obligations of Dr Wolfe in these unique circumstances where she advised the Plaintiff to

terminate the doctor-patient relationship and she had intimate knowledge of Colon's mental state

of mind and any psychological vulnerabilities, such as Colon's Dissociative Identity Disorder

and Multiple Personality Syndrome.

337.    These Massachusetts statutes do not protect Dr. Wolfe from the potential sanctions and

disciplinary actions by the Board of Registration for Psychologists or from the American

Psychological Association.

338.    These clinical duties and obligations of Dr Lisa Wolfe toward both the Plaintiff and to

Lourdes Colon arose from her extensive knowledge of Lourdes Colon (American Psychological

Association discussion of duties of psychologist: https://www.apa.org/education-

career/guide/careers; ethical duties and obligations of clinical psychologists:

https://www.apa.org/ethics/code).

339.    This 1992 memorialized handwritten mutual express bilateral contract

(https://www.law.cornell.edu/wex/express_contract) to terminate the doctor-patient relationship

between the Plaintiff and Lourdes Colon was dictated by Defendant Lisa Wolfe in September

1992 at HRI in Brookline, Massachusetts (Contract Law:

https://biz.libretexts.org/Bookshelves/Civil_Law/Fundamentals_of_Business_Law_(Randall_et_

al.)/10%3A_Contracts/10.03%3A_Types_of_Contracts).

340.    This memorialized handwritten mutual express bilateral contract terminating the doctor-

patient relationship between the Plaintiff and Lourdes Colon was a lawful, valid and enforceable

contract as defined by Contract Law and did not violate any law.

341.    The memorialized handwritten mutual express bilateral contract terminating the doctor-

patient relationship between the Plaintiff and Lourdes Colon was memorialized with ballpoint

black-ink pen on white paper by both the Plaintiff and Defendant Lourdes Colon in writing at the

time of dictation (Contract Law basics for Litigators in the Massachusetts

https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwjG473

gn7aEAxXqlokEHdbcCXwQFnoECCQQAQ&url=https%3A%2F%2Fwww.davismalm.com%2

Fwp-content%2Fuploads%2F2021%2F07%2FContract-Basics-for-Litigators-

Massachusetts_Practical-Law_June-2021.pdf&usg=AOvVaw137n8sl2EpZ-

I63rfssXVd&opi=89978449).

342.    Using ballpoint pens with black ink, both the Plaintiff and Lourdes Colon did handwrite down on white lined paper the mutual express bilateral contract terminating the doctor-patient relationship verbatim as each word was dictated by Dr. Lisa Wolfe.

343.    The memorialized writing of the mutual Express Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon in September 1992 was then signed by both parties – the Plaintiff and Defendant Lourdes Colon; by mutual agreement the Express Bilateral Contract was modified to classify time and locations into the clinical and nonclinical worlds.

344.    This memorialized agreement comprising an Express Bilateral Contract to terminate the doctor-patient relationship between the Plaintiff and Lourdes Colon followed an hour-long discussion by Dr Wolfe on the ramifications and significance of such a termination.

345.    It was the Plaintiff's understanding and belief that Dr Wolfe was a highly qualified and competent psychologist whose direction, guidance, approval and dictation of the express bilateral contract terminating the doctor-patient relationship provided warranties and guarantees of the safety and security of such a transition for both the Plaintiff and Colon.

346.    In view of the totality of the circumstances, it was reasonable for the Plaintiff to rely on the specific advice given by defendant Dr Wolfe and also believe that defendant Colon was psychologically stable and not in any danger from any relationship which might ensue following the termination of the doctor-patient relationship.

347.    In summary, Dr Wolfe invited the Plaintiff to come to HRI to meet with Wolfe and Colon; Dr Wolfe advised the Plaintiff of her recommendations on the termination of the doctor-patient relationship; Dr. Wolfe dictated the words of the bilateral express contract unconditionally

terminating the doctor-patient relationship verbatim; Dr Wolfe supported and encouraged the termination of the doctor-patient relationship; and Dr Wolfe approved of and condoned a different relationship other than the doctor-patient relationship without providing any caveats or warnings to the Plaintiff; Dr Wolfe dictated the terms of the express bilateral contract word by word as the Plaintiff and Lourdes Colon wrote out the words using ballpoint pens on white paper; the Plaintiff and Lourdes Colon wrote out the exact words which were dictated by Dr. Wolfe as Dr Wolfe painstakingly dictated slowly to allow the Plaintiff and Colon to handwrite out the words verbatim as orally dictated by Dr Wolfe; finally both the Plaintiff and Lourdes Colon signed each others' copies of the memorialized handwritten express bilateral contract which unconditionally terminated the doctor-patient relationship in September 1992.

348.    Subsequently the Plaintiff and Lourdes Colon mutually agreed to modify the 1992 Express Bilateral Contract terminating the doctor-patient relationship so that the modified contract provided a clinical-nonclinical binary classification scheme for time and place, which allowed specific activities to take place in the nonclinical world and other activities to take place in the clinical world; it was agreed that no medical care would be provided in the nonclinical world and no sex would take place in the clinical world.

349.    Three (3) years later, in 1995-96 Dr. Wolfe learned about the personal/romantic involvement which had developed between the Plaintiff and Colon following the termination of the doctor-patient relationship in 1992, and Dr. Wolfe invited the Plaintiff to come to her outpatient practice in Lexington, MA to meet with both Lourdes Colon and Dr. Wolfe.

*Beginning of Couples Therapy for Plaintiff and Lourdes Colon with Dr. Wolfe*

350.    At this subsequent meeting in 1995 – 1996 in her Lexington, MA outpatient private practice office, defendant Dr Lisa Wolfe specifically informed the Plaintiff that he would become a patient of hers as Dr. Wolfe was planning to do couples therapy with the Plaintiff and Colon.

351.    Dr. Wolfe explained that she would be providing couples therapy for the Plaintiff and Lourdes Colon because of problems that Colon was having with her relationship with the Plaintiff at that time.

352.    Dr. Wolfe also explained that the Plaintiff would be financially responsible for this couples therapy conducted in the out-patient setting of her Lexington office.

353.    Dr. Wolfe expected the Plaintiff to make payments for professional services which might be rendered as part of couples therapy of Colon with the Plaintiff.

*Breach of Dr. Lisa Wolfe's fiduciary duty to Plaintiff*

354.    Based on the statements made by defendant Lisa Wolfe to the Plaintiff, which seemed reasonable concerning potential couples-therapy with Colon and the Plaintiff, the Plaintiff had a reasonable expectation that he then became a patient under Wolfe's psychotherapeutic care as a member of the couple – Plaintiff – Lourdes Colon – undergoing couples therapy.

355.    Having then taken over the role of couples' therapist, Defendant Wolfe owed a professional and medical duty toward the Plaintiff to maintain confidentiality of their interactions and verbal exchanges after informing the Plaintiff that he would also be her patient.

356.    Defendant Wolfe did breach her professional and fiduciary responsibilities and duty of confidentiality toward the Plaintiff when she did disclose confidential information to BORIM without the consent of the Plaintiff.

357.    The breach of confidentiality and voluntary disclosures about confidential discussions in the counseling sessions with Wolfe to BORIM without the consent of the Plaintiff did comprise a tortious breach of confidentiality owed to the Plaintiff by Wolfe and also comprised an ethical breach of her duties as the Plaintiff's psychotherapist and also was the direct and proximate cause of substantial injuries and damages involved with the Plaintiff losing his medical license.

358.    This breach also violated Dr. Wolfe's fiduciary duty to the Plaintiff, as his psychologist as well as part of the couple undergoing couples therapy.

*1992 Express bilateral contract terminating the doctor-patient relationship*

359.    The 1992 mutual agreement entered into by the Plaintiff and defendant Lourdes Colon comprised a traditional memorialized handwritten express bilateral contract terminating the doctor-patient relationship, with all the elements of offer, acceptance and consideration - the basic elements in contract law.

360.    Based on his reliance upon the express bilateral contract terminating the doctor-patient relationship, dictated by Dr Wolfe, endorsed by Dr. Wolfe, supported by Dr. Wolfe, these assurances guaranteed the Plaintiff's freedom to explore non-clinical relationships with defendant Lourdes Colon and also reassured the Plaintiff about the legitimacy and validity of transitioning from the doctor-patient relationship.

361.    The Reliance interest is at the foundation of contract law, and is one of the most strongly

protected legal principles for the contracting parties.

362.    The actions and conduct of defendant Dr. Lisa Wolfe will be proved by the Plaintiff by a

preponderance of the evidence comprising medical records, insurance records, deposition

witness testimony, and enforced by the relevant subpoenas of the relevant witnesses and

defendants.

363.    With the encouragement of his attorney John Flym, at the beginning of the formation of

the Joint Stipulations between the Plaintiff and BORIM to create a factual record for the

undisputed issues of material fact for the Division of Administrative Law Appeals ("DALA"),

the Plaintiff had signed a waiver/release of legal claims against Dr. Wolfe in 2000.

364.    That 2000 signed document only released some claims for the injuries and tortious

damages that Dr. Wolfe directly and proximately caused to the Plaintiff, which claims were for

injuries and damages proximately caused by Dr. Wolfe prior to the signing of the release; this

waiver did not release Dr. Wolfe from any injuries she might cause the Plaintiff chronologically

following the signing of the release.

365.    The release covered the tortious actions and omissions of Dr. Wolfe which took place

PRIOR to its signing in 2000; it would not cover the new tortious injuries or damages which Dr.

Wolfe would cause after the release was signed in 2000.

*Supremacy and Supercession doctrines of the U.S. Constitution*

366.    All fifty states and territories of the United States are governed by the supreme law of the

land – the U.S. Constitution.

367.    Where state law/action conflicts with the U.S. Constitution, the U.S. Constitution is pre-eminent and supercedes all laws, statutes, regulations and state actions of the fifty states under the Supremacy doctrine.

368.    When a conflict of laws exists, the rule of law follows an established succession - the preeminence of laws follows this succession: at the top is the [1] U.S. Constitution, followed by [2] Acts of Congress and International Treaties along with [3] Presidential executive decrees, then there are [4] state statutes and state agency regulations, followed by [5] local laws, regulations and ordinances at the bottom of the pyramid.

369.    When there is a conflict of law between a state law and the U.S. Constitution, the U.S. Constitution is supreme and preeminent and will supercede the state law.

370.    Thus Constitutional Law is pre-eminent over the statutes of the Commonwealth of Massachusetts and the regulations and policies of BORIM.

371.    Any state law or action which violates the mandates of the U.S. Constitution, comprises a federal issue of law, and falls under the jurisdiction of the federal court – U.S. District Court for Massachusetts – which has the authority to invalidate or void such state law or state action.

*Abstention Doctrines do not Impair the Instant Action "Weinberg v. Mangal et al."*

372.    State statutes, regulations or ordinances which are deemed to be unconstitutional may be struck down in federal court, as long as they do not encroach upon the abstention doctrines.

373.    Regarding this instant action *Weinberg v. Mangal et al.*, the abstention doctrines do not apply to the claims stated herein regarding unconstitutional state action involving BORIM's interpretation of the Plaintiff's memorialized handwritten bilateral express contract terminating

the doctor-patient relationship and those abstention doctrines are not an impediment to the instant suit; the Plaintiff alleges claims under federal law which arise from disputes between the Plaintiff and the Commonwealth of Massachusetts and the State of Maine involving the *Contracts* clause, *Bill of Attainder* clause, *ex post facto* clause, and the *involuntary servitude* clauses of the U.S. Constitution as well as state impediments and violations of the Plaintiff's fundamental constitutional rights such as the right to marry, freedom of expression under the First Amendment, right to Due Process of Law and right to Equal Protection of the law.

374.    The Commonwealth of Massachusetts has violated the constitutional guarantees of the contracts clause for which the Plaintiff is a protected class member who relied on the contracts clause in his conduct, believing that the doctor-patient relationship was lawfully and properly terminated by the express bilateral contract between himself and the defendant Lourdes Colon formed and executed in 1992.

375.    The State of Maine has violated the constitutional guarantees of the contract clause for which the Plaintiff is a protected class member who relied on the contract clause in his conduct, believing that the doctor-patient relationship was lawfully and properly terminated by the express bilateral contract between himself and the defendant Lourdes Colon.

376.    Under the mandates of the U.S. Constitution, the state of Massachusetts is prohibited from and lacks the authority to invalidate, void, rescind, revoke or otherwise alter the specific duties and obligations contained in the express bilateral contract between the Plaintiff and defendant Lourdes Colon – which is a contract between two private parties.

377.    Under the mandates of the U.S. Constitution, the state of Maine is prohibited from and lacks the authority to invalidate, void, rescind, revoke or otherwise alter the specific duties and

obligations contained in the express bilateral contract between the Plaintiff and defendant Lourdes Colon, and any affirmation or corroboration of state action by Massachusetts which attempts to invalidate, void, rescind, revoke or alter the terms of such express bilateral contract terminating the doctor-patient relationship is also prohibited by the U.S. Constitution.

378.    State action by the Massachusetts Board of Registration in Medicine comprises state interference with a contract between two private parties, an area of private law – not public law, which is  prohibited by Section 10 of Article I of the U.S. Constitution: " ...**Section 10: Powers Denied to the States:** No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contract, or grant any Title of Nobility." *United States Constitution*

379.    State action by the Maine Board of Bar Examiners comprises state interference with a contract between two private parties, an area of private law – not public law, which is prohibited by Section 10 of Article I of the U.S. Constitution: " ...**Section 10: Powers Denied to the States:** No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contract, or grant any Title of Nobility." *United States Constitution*

380.    The Plaintiff seeks Equitable Relief for the unconstitutional actions by the State of Massachusetts in the form of a Declaratory Judgment that the revocation of the Plaintiff's medical license did violate the mandates of the U.S. Constitution.

381.    The Plaintiff seeks Equitable Relief for the unconstitutional actions by the State of Maine in the form of a Declaratory Judgment that its reliance on the action by Massachusetts in revoking the Plaintiff's medical license, as evidence of the Plaintiff's lack of fitness to practice law, did violate the mandates of the U.S. Constitution.

*Defendants' Concealment of 1992 Express Bilateral Contract terminating the doctor-patient relationship between the Plaintiff and Lourdes Colon*

382.    Lourdes Colon concealed from the tribunal the memorialized writing, dictated by Lisa Wolfe in a consultation room at HRI in Brookline, MA, in September 1992, which memorialized the Express Bilateral Contract terminating the doctor-patient relationship, which was manually transcribed/handwritten by both the Plaintiff and Colon using ballpoint-pens and white paper, in which both signed the other's transcribed writing, following an hour-long discussion and consultation about the full ramifications of terminating the doctor-patient relationship and final agreement of both the Plaintiff and Lourdes Colon to the full and complete terms of this Express Bilateral Contract terminating the doctor-patient relationship.

383.    Defendant Stanley Spero knew, or should have known, about this 1992 Express Bilateral Contract memorialized in writing, and possibly had possession and control of a hardcopy of that agreement, handwritten in ballpoint-pen ink on white paper, which comprised the formation and execution of that Express Bilateral Contract whose primary purpose was to terminate the doctor-patient relationship.

384.    During the DALA proceedings, when BORIM asked Lisa Wolfe about that Express Bilateral Agreement terminating the doctor-patient relationship which she dictated in September 1992 and was memorialized verbatim in writing by the Plaintiff and Lourdes Colon and signed by both, Wolfe deceptively answered "It is not the sort of thing which I usually do" in order to conceal possible gross negligence and professional malpractice for encouraging, advising, formulating, drafting and dictating that Express Bilateral Contract (to cover her ass).

385.    For more than ten (10) years, from 1992 through 2002, the defendants Lourdes Colon, Stanley Spero and Lisa Wolfe concealed their knowledge, possession and control of this memorialized 1992 Express Bilateral Contract terminating the doctor-patient relationship from

the tribunals of four (4) courts: Massachusetts Suffolk Superior Court, Massachusetts Division of Administrative Law Appeals, Massachusetts Supreme Judicial Court and the Maine Supreme Judicial Court; concealing the contract was advantageous for the defendants' lawsuit in Middlesex Superior Court *Colon v. Weinberg, Wesselhoeft, Boston Evening Medical Center, et al.* because the insurer would be less likely to settle the suit had they known about the contract terminating the doctor-patient relationship; the concealment of this material evidence pushed the Plaintiff into a corner making him feel desperate to prove the existence of this exonerating Express Bilateral Contract terminating the doctor-patient relationship, which is vital to proving that Colon was not his patient at the time of the alleged conduct.

386.    Defendant Lourdes Colon concealed this material evidence from the tribunal, where the Express Bilateral Contract was material to the fact-finding and substantial evidence concerning the determination of whether Colon was a patient of the Plaintiff's at the relevant times under dispute and such concealment comprises spoliation of evidence and fraud upon the court and seriously calls into question the foundation upon which the fact-finder made conclusions of law leading to the revocation of the Plaintiff's medical license.

387.    Defendant Stanley Spero concealed this material evidence from the tribunal, where the Express Bilateral Contract was relevant and material to the fact-finding and comprised substantial exonerating evidence concerning the determination of whether Colon was a patient of the Plaintiff's at the relevant times under dispute and such concealment comprises fraud upon the court and seriously calls into question the foundation upon which the fact-finder made conclusions of law leading to the revocation of the Plaintiff's medical license.

388.    Defendant Lisa Wolfe concealed this material evidence from the tribunal, where the Express Bilateral Contract was relevant and material evidence to the fact-finder and substantial exonerating evidence concerning the determination of whether Colon was a patient of the Plaintiff's at the relevant times under dispute and such concealment comprises spoliation of evidence and fraud upon the court and seriously calls into question the foundation upon which the fact-finder made conclusions of law leading to the revocation of the Plaintiff's medical license.

389.    This was an epic day in September 1992, when the Plaintiff for the first and last time in his life terminated a doctor-patient relationship with a memorialized handwritten Express Bilateral Contract which was drafted and dictated by a licensed psychologist; this was also a first case in 250 years of American Jurisprudence that any physician terminated the doctor-patient relationship with an Express Bilateral Contract engineered and dictated by a licensed psychologist, as similar caselaw could not be found during intensive searches on multiple legal databases including but not limited to Westlaw, Lexis-Nexis or Google Scholar; thus making this a **case of First Impression** because it is without precedent in American Jurisprudence nor are there any federal, state or local statutes/regulations which specifically regulate/control this fact pattern concerning the contractual termination of a fiduciary doctor-patient relationship; and the Plaintiff relied to his detriment on this Express Bilateral Contract terminating the doctor-patient relationship.

390.    Concealment of this Express Bilateral Contract terminating the doctor-patient relationship, along with its subsequent modification which generated a clinical-nonclinical binary classification of time and place – which classified all places and times into the "clinical

world" and the "non-clinical world" [more fully described below and corroborated

independently by Stipulation No. 35 in the DALA Recommended Decision of Magistrate Sarah

Luick along with deposition testimony] – was the proximate cause of: (a) substantial economic

damages and injuries to the Plaintiff in lost salaries and income exceeding $3,000,000.00 (three

million dollars) [$175K annually x 23 years]; (b) sabotaging the fact-finding by three (3)

tribunals: Massachusetts Suffolk Superior Court, DALA and BORIM leading to the declaration

of multiple substantial FALSE statements of material fact in the texts of those judgments which

issued from those tribunals; (c) severe and irreparable damage to the Plaintiff's reputation; (d)

exclusion from the Medicare program for over eight years preventing the Plaintiff from obtaining

employment from any hospital, laboratory, research center, clinic which receives Medicare

funding; (e) termination from research positions at the Dana-Farber Cancer Institute ("DFCI"),

Boston Children's Hospital Medical Center ("BHMC"), Newton-Wellesley Hospital ("NWH"),

Massachusetts Institute of Technology ("MIT"); substantial health problems including the

development of an ulcer, severe depression and PTSD, cardiac arrhythmias, syncopal episodes

requiring pacemaker placement; (f) sexual discrimination and harassment in academic programs

in violation of Title IX of the Civil Rights Act; (g) sexual discrimination and harassment in the

workplace in violation of Title VII of the Civil Rights Act; (h) severe and extreme emotional

distress which was intentionally inflicted on the Plaintiff by these defendants, where Stanley

Spero left a copy of the initial complaint detailing the Plaintiff's sexual activities at the doorstep

of his marital home which was first discovered by Plaintiff's ex-wife; (i) severe marital discord

and strife ending in divorce; (j) loss of the Plaintiff's medical license, and only occupation which

the Plaintiff knew to earn money, leading to joblessness and homelessness; (k) financial

insolvency leading to bankruptcy; (l) foreclosure on the Plaintiff's home; and (m) severe,

extreme continuous and ongoing social ostracism, humiliation and community shaming with the

loss of most of the Plaintiff's friends who have since seen the Plaintiff as a social pariah, to be

shunned and avoided by all persons, imposing extreme social isolation upon the Plaintiff,

including a written ban emailed by defendant Graybiel to the entire McGovern Institute lab at

MIT that no person in the lab should speak with or have any contact with the Plaintiff.

391.    All of the above tortious injuries and damages were proximately caused by the

defendants and co-conspirators Stanley Spero, Lourdes Colon and Lisa Wolfe through their

spoliation of evidence and fraudulent concealment of their knowledge and roles in the formation

and execution of the 1992 memorialized handwritten Express Bilateral Contract terminating the

doctor-patient relationship with its foreseeable consequences and as such comprise tortious

causes of action by which the Plaintiff intends to seek economic, compensatory and punitive

damages from these non-state actor defendants.

392.    The Plaintiff intends to prove that the final judicial judgments which issued from the

three tribunals, each containing an average of ten substantial false statements of material fact in

the text of the judgments which are substantially relevant and material to the relevant law and

conclusions thereof, rendering those judgments to be void or voidable because those judgments

are *non sequitur,* invalid, lacking foundation based on a false factual record, and the conclusions

of law were improperly based on those false statements of material fact, and the Plaintiff will

prove these claims by a preponderance of the evidence in the instant suit.

393.    The key factual issue in these records is: was defendant Lourdes Colon a patient of the

Plaintiff's at the time of the alleged sexual encounters? The corrected factual record will show

that she was not - the 1992 memorialized handwritten Express Bilateral Contract terminating the

doctor-patient relationship and its subsequent modification, with its clinical-nonclinical binary classification of time and place, terminated that relationship.

394.    For relief in the instant suit, the Plaintiff seeks Equitable Relief in the form of declaratory judgments which declare that each of these false statements of material fact within the Tribunal factual record to be false, inaccurate and lacking substantial evidence, false because those conclusions and inferences were made without the benefit of the concealed material evidence comprising the 1992 memorialized handwritten Express Bilateral Contract terminating the doctor-patient relationship and the Plaintiff also seeks Declaratory Judgments which define the rights, duties, obligations and relationships among the defendants and those relationships with the Plaintiff along with their alleged unlawful or tortious conduct which give rise to actionable causes of action in the instant suit.

395.    Once the factual record is corrected, the prior conclusions of law will become *non sequitur* (because they are based on false statements of material fact), because the true factual record will not support nor corroborate those conclusions of law, because most of the falsehoods presuppose that the doctor-patient relationship between the Plaintiff and Lourdes Colon was not terminated.

396.    The Plaintiff will also seek a Declaratory Judgment that each of the defendants – Stanley Spero, Lourdes Colon and Lisa Wolfe – did engage in spoliation of evidence by withholding material evidence - comprising the 1992 memorialized handwritten Express Bilateral contract - from the tribunal and therefore did commit fraud upon the tribunal.

397.    Pursuant to Rule 60 of the Fed.R.Civ.P. the Plaintiff is seeking declaratory judgments to render the judgments which issued from that fraud to be declared null and void on the basis of

false statements of material fact stated within the text of those judgments resulting from the defendants' spoliation of evidence and that fraudulent concealment of the contract and subsequently the Plaintiff will seek to overturn and vacate those fraud-based judgments in the respective state courts.

### U.S. Constitution is the Supreme Law of the land

398.    Under the Supremacy Clause and the supercession doctrines, the U.S. Constitution is the supreme law of the land and it is pre-eminent over Acts of Congress, International Treaties, Executive Orders, state statutes, ordinances and regulations of state agencies including, but not limited to the Massachusetts Board of Registration in Medicine ("BORIM") and the Maine Board of Bar Examiners ("MBBE").

399.    State actor defendants, including but not limited to BORIM, MBBE, DALA, Mass SJC Maine SJC, Sarah Luick, Ellen Gorman, and Alice Oliff, have violated the Plaintiff's rights as guaranteed by the Contracts clause, Bills of Attainder clause, Ex post facto clause, Due Process of Law clause, Equal Protection clause, Fundamental Right to Privacy clauses under the Fifth Amendment as selectively incorporated through the Due Process clause of the Fourteenth Amendment, as well as violating the Plaintiff's rights as guaranteed by the Involuntary Servitude clause of the Thirteenth Amendment and the Plaintiff's right to freedom of expression under the First Amendment as well as the fundamental constitutional right to marry.

400.    These violations and deprivations of the Plaintiff's rights as guaranteed by the U.S. Constitution caused by the state actor defendants have been committed while acting under the color of law, so the Plaintiff is also seeking redress through  42 U.S.C. § 1983.

### Contract clause: the mandates of Section 10 of Article I of the U.S. Constitution

401.    Under the mandate of Section 10 of Article I of the U.S. Constitution: "…**Section 10:**

**Powers Denied to the States:** No State shall … pass any Bill of Attainder, ex post facto Law,

or Law impairing the Obligation of Contract, or grant any Title of Nobility." *United States*

*Constitution*

402.    The contract clause of Section 10, Article I of the U.S. Constitution specifically prohibits

the states from passing any law which impairs the obligation of contract, and also prohibits the

states from passing any Bill of Attainder or ex post facto law.

403.    As described herein, in 1992 the Plaintiff entered into a mutual bilateral express contract

which terminated the doctor-patient relationship with the guidance and dictation by defendant

Lisa Wolfe, PhD, psychologist for the defendant Lourdes Colon, and upon which contract the

Plaintiff relied to his detriment; where the reliance interest is one of the most important and

imperative interests protected in contract law.

*BORIM regulations/decisions may comprise Bills of Attainder*

404.    Historically, when the U.S. Constitution was drafted in the mid-1700s, Administrative

Law – "the fourth branch of government" – was non-existent and all Rules of Law for the state

were embodied in statutes or common law.

405.    Thus although the Framers of the Constitution may have used explicit words such as

"bill," it is because at the time all the Rules of Law comprised bills, Acts or statutes, but as the

Plaintiff will prove, by a preponderance of the evidence, that the Framers intended to prohibit all

legislative non-judicial penal rules enacted with individualized focus on one person for the

purpose of punishing that individual without a fair trial or Due Process of Law – such as the

quasi-legislative regulations of state agencies, including but not limited to BORIM.

406.    The intent and purpose of the Framers of the Constitution will be proved by the

**Federalist papers,** *Alexander Hamilton,* by a preponderance of the evidence standard.

407.    Over the past 250 years, Administrative Law has flourished and blossomed in the

American Republic, so that approximately 95% of the police power of the state to protect the

health, safety and welfare of the people is now implemented and effected through the regulations

of administrative agencies, such as the medical and law licensing boards, which have quasi-

legislative, quasi-judicial (adjudicatory) and executive-enforcement powers and these regulations

have the same force and power of law as the state's legislated enacted statutes.

408.    It is clear historically, from the Federalist papers and other recorded documents, that the

framers of the Constitution intended the prohibition against Bills of Attainder to prevent any

legislative or quasi-legislative state action which is specifically directed toward one person, often

retroactively, and legislative or quasi-legislative state action, [whereas it is not policy-driven

proactively generally directed toward the populace, as part of the state policy/police power

generally for the protection of the health, safety and welfare], wherein that particularized state

action is penal in nature, punishing the targeted individual - often retroactively - for conduct in

the past and depriving the targeted person from a fair trial or Due Process of Law which would

otherwise be provided under the Rules of Criminal Procedure or Rules of Civil Procedure.

409.    These agency-driven quasi-legislated regulations comprise the classic triad of a Bill of

Attainder – individualized action, penal in nature imposing punishment without trial.

410.    A frequent distinguishing feature between the unconstitutional exercise of police power

versus the legitimate exercise of police power is whether the questionable rule of law is applied

retroactively (without prior notice of the prohibited conduct and thus *ex post facto*) or proactively

(providing the beforehand the Notice of conduct prohibited – which is required by Due Process of Law).

*De Facto enactment of the "Weinberg law" by BORIM in 2002*

411.    The **"Weinberg law"** more fully described below comprises some <u>forty-three (43)</u> <u>distinct and independent criteria/elements</u> which were retroactively applied to punish the Plaintiff through the revocation of his medical license without Due Process of Law, without a fair trial or other elements of civil procedure/criminal procedure necessary to ensure the fair administration of the law.

412.    Although prior American jurisprudence and caselaw precedents, reviewed by the Supreme Court, has addressed questions on whether legislatively-enacted bills and statutes comprise a Bill of Attainder, the clear intent of the framers of the Constitution was to prohibit legislative non-judicial individualized state action directed toward one person denying her/him the Due Process of Law and a fair trial; the original intent of the Framers of the Constitution may be inferred from the Federalist papers and other historical documents.

413.    The Plaintiff intends to *set a new precedent* by proving that any state agency regulation enacted quasi-legislatively which specifically focuses on a single citizen (individualized action) with punitive action (penal in nature) without a trial, would likewise comprise a Bill of Attainder prohibited by the Constitution – thereby making new substantive law through the precedent of the instant action.

414.    The *"Weinberg law,"* thoroughly discussed and addressed herein (below), is defined by forty-three (43) distinct and separate criteria and elements, which was "enacted" quasi-legislatively in 2002  in the Commonwealth of Massachusetts by defendant BORIM for the

specific purpose of retroactively punishing the Plaintiff in individualized action through the revocation of his medical license without a trial or Due Process of Law, is such a Bill of Attainder meant to apply uniquely to the Plaintiff – and the Plaintiff alone.

415.    The Weinberg law has only one legal target – the Plaintiff, and there are no other physicians in any of the fifty states or U.S. territories in the history of American jurisprudence where there is  another case or physician against whom the "*Weinberg law*" has been applied or would apply because the Plaintiff's case is a Case of First Impression without precedent.

416.    Therefore the Weinberg law also violates the Equal Protection of the laws clause of the Fourteenth Amendment to the Constitution because it applies only to the Plaintiff and does not apply equally to other physicians similarly situated where not one of them has ever been punished in a similar way by the revocation of their medical license because they had formed and executed an Express Bilateral contract terminating the doctor-patient relationship under the guidance of a licensed clinician; BORIM has also violated several fundamental constitutional rights of the Plaintiff as described in more detail below.

417.    In the 250-year history of the American Republic the *Weinberg* law has only been applied once in American jurisprudence in the Commonwealth of Massachusetts in 2002, when it was quasi-legislated by the defendant BORIM for the purpose of punishing the Plaintiff through the revocation of his medical license without a fair trial or Due Process of Law, for conduct which BORIM knew about for more than five (5) years (1997 – 2002).

418.    In spite of the fact that BORIM had emergency police powers to immediately revoke the Plaintiff's medical license when it first learned about the Plaintiff's sexual relations with Lourdes Colon in 1997 if BORIM truly believed that the Plaintiff presented a danger to the public,

BORIM did not take action for more than five years, allowing the Plaintiff to continue to provide medical care to over 20,000 patient-visits, until it finally revoked the Plaintiff's medical license in October 2002 – would BORIM have waited over five years to take action if there were any bona fide issue concerning the Plaintiff's competency to practice medicine when they always had the emergency power to revoke a medical license within hours.

419.    In addition, BORIM offered the Plaintiff a voluntary one-year suspension of his medical license in 1998 through its counsel Richard Waring, which it would not have done had BORIM truly believed that the Plaintiff's continued practice of medicine presented any danger to the public health, safety or welfare; although such pre-trial negotiations or offers are not usually admissible evidence under the Fed.R.Civ.P., the State Administrative Procedures Act is more flexible about the admissibility of evidence.

420.    Given (1) its offer of a voluntary one-year suspension and (2) its five-year delay in making any dispositive decision (1997 – 2002), the Conclusions of Law for DALA Adjudicatory Case No. 99-01-DALA (RM-99-074) *In the Matter of Robert P. Weinberg, D.O.*, appear to be a pretext, stating that "A. The Respondent is guilty of conduct which places into question his competence to practice medicine, in violation of G.L. c.112, §5(c) and 243 CMR 1.03(5)(a)(3); B. The Respondent is guilty of misconduct in the practice of medicine, in violation of 243 CMR 1.03(5)(a)(18); and C. By virtue of having engaged in sexual activity with a current patient, the Respondent is guilty of conduct which undermines public confidence in the integrity of the medical profession and conduct which shows lack of good moral character" were obviously stated as a pretext to cover up the true purpose of BORIM's decision to revoke the Plaintiff's medical license in an individualized penal action comprising a Bill of Attainder to deprive the

Plaintiff of his property rights in his medical license without Due Process of Law in violation of the Plaintiff's constitutional rights.

421.    The Plaintiff seeks equitable relief in the instant action through the judicial issuance of a Declaratory Judgments that: (1) the factual record underlying the DALA and BORIM decisions consists of numerous false assertions of material fact substantially relevant to the applicable law and therefore that false conclusions follow from the false statements of material fact; (2) defendants Stanley Spero, Lisa Wolfe and Lourdes Colon committed fraud upon the tribunal by withholding their knowledge about the Express Bilateral Contract terminating the doctor-patient relationship; and (3) the "*Weinberg law*" is a Bill of Attainder quasi-legislated retroactively by BORIM in 2002 for the purpose of punishing the Plaintiff through the revocation of his medical license without Due Process of Law and in violation of the *contract clause, Bills of Attainder clause, Ex post facto clause, and Equal Protection of the Laws clause,* without providing fair Notice or a fair trial, and prohibited as such by the U.S. Constitution.

422.    The Plaintiff subsequently seeks to strike down the BORIM order revoking his medical license because such action was: (1) unlawful violating the Plaintiff's constitutional rights, (2) based on a false factual record, (3) based on the fraudulent concealment of material evidence of the express bilateral contract by defendants Lisa Wolfe and Stanley Spero, (4) based on the *ex post facto* application of not-yet-established-precedents of BORIM's decisions in 1998 (6 years following the Plaintiff's alleged conduct), and (5) comprised the unconstitutional application of a Bill of Attainder prohibited by the Constitution, and once the Plaintiff proves by a preponderance of the evidence that the 1992 and subsequent modified express bilateral contract terminated the doctor-patient relationship, and that such contract are valid, lawful and enforceable contract – the

BORIM license revocation will be found to be legally invalid, lack foundation, be groundless and will be ruled to be null and void because the Plaintiff's conduct at the time was lawful when he was no longer the doctor for defendant Lourdes Colon following the formation and execution of the Express Bilateral contract terminating the doctor-patient relationship in 1992-93.

423.    The BORIM judgment issued by Magistrate Sarah Luick in the Division of Administrative Law Appeals in *In the matter of Robert P. Weinberg, D.O.* will also be found to violate Fed.R.Civ.P. Rule 60 because of the fraud upon the court committed by defendants Stanley Spero and Lisa Wolfe, as will be described with particularity and detailed specificity in this Complaint, in part due to their fraudulent concealment of material evidence from the tribunal (Federal Rules of Civil Procedure, "Fed.R.Civ.P."); this material evidence, which defendants concealed from the tribunal, comprises the 1992 memorialized handwritten Express Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon.

424.    Likewise, the Plaintiff also seeks to strike down the Mass SJC decision affirming the BORIM decision to revoke the Plaintiff's medical license because: (1) it was based on the false assumption that the Plaintiff and defendant Lourdes Colon were in a doctor-patient relationship at the time of the alleged conduct; (2) it is groundless, without foundation, with conclusions that are null and void, which issued forth from: (a) fraud committed on DALA and Suffolk Superior Court by defendants Stanley Spero and Lisa Wolfe and (b) based on a Bill of Attainder which was unlawful and un-constitutional, and (3) it was based on a false factual record which the Plaintiff will prove by a preponderance of the evidence contained multiple false statements of material fact.

425.    Likewise, the Plaintiff also seeks to strike down the Maine SJC decision affirming the decision of the Maine Board of Bar Examiners to deny the Plaintiff admission to the Maine Bar because: (1) it is groundless, without foundation, whose conclusions are null and void, issuing forth from the unlawful fruit of a Bill of Attainder which was unlawful and unconstitutional, and (2) it was based upon fraud upon the court committed by defendants Stanley Spero and Lisa Wolfe; (3) the foundation of that Maine SJC decision is based on a false factual record which the Plaintiff will prove by a preponderance of the evidence contains multiple false statements of material fact substantially relevant to the issues of law under consideration.

*New Testimony to be obtained during Discovery in the instant action*

426.    The Plaintiff intends to seek new testimony from the relevant witnesses through the discovery phase of the instant suit which will prove the Plaintiff's claims by a preponderance of the evidence standard (sworn testimony under oath during Depositions).

427.    The Plaintiff intends to seek Equitable Relief through a Declaratory Judgments that the BORIM decision to revoke the Plaintiff's medical license is null and void because: (1) it was based on a false factual record; (2) it comprised the enactment of an unlawful Bill of Attainder by BORIM in 2002; (3) it was based upon fraud upon the court committed by defendants Stanley Spero, Lourdes Colon and Lisa Wolfe, in part due to their concealment of material evidence from 2 tribunals which the Plaintiff will prove by a preponderance of the evidence.

*Personal Jurisdiction*

428.    Personal Jurisdiction is a requirement that the court must also have jurisdiction over the

persons or entities being sued. The basic due process requirement for personal jurisdiction is

whether each defendant has minimum contacts with the relevant forum – which involve the

States of Maine and Massachusetts along with agencies of the United States government  in the

instant litigation -- "such that maintenance of the suit does not offend traditional notions of fair

play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

*Justiciability of the Plaintiff's Claims and Issues of Law*

429.    "As a preliminary matter, the court must determine whether ... claims present a

justiciable case or controversy properly subject to judicial resolution. The legal concept of

justiciability blends the constitutional limitations placed upon the federal courts by Article III

with prudential considerations cautioning the exercise of judicial restraint. *Flast v. Cohen*,  392

U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). This fusion of constitutional

prohibitions and policy considerations has made the justiciability doctrine "one of uncertain and

shifting contours," id., without "fixed content" nor "susceptible of scientific verification." *Poe v.*

*Ullman*,  367 U.S. 497, 508,  81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961).

430.    The fine line separating an abstract question from a "case or controversy" is often

difficult to define, and the justiciability of a claim "is not discernible by any precise test." *Babbitt*

*v. United Farm Workers National Union*,  442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d

895 (1979). In an oft-quoted passage, Chief Justice Hughes defined a justiciable controversy as

'one that is appropriate for judicial determination.... A justiciable controversy is thus

distinguished from a difference or dispute of a hypothetical or abstract character; from one that is

academic or moot.... The controversy must be definite and concrete, touching the legal relations

of parties having adverse legal interests.... It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (citations omitted). In sum, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality" to justify judicial resolution." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

431.    Under the facts as alleged in the instant case and the relevant circumstances, there is a substantial controversy between the Plaintiff and several state actor defendants as well as private party defendants having adverse legal interests of sufficient immediacy and reality to justify judicial resolution.

*Ripeness of the Plaintiff's Claims*

432.    "Among them is the ripeness doctrine, which is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements" over governmental policies that have not yet been implemented nor have had a palpable impact upon the parties before the court. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); see also *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985); *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n*, 461 U.S. 190, 200, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983).

433.    "[R]ipeness is peculiarly a question of timing," *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140, 95 S.Ct. 335, 357, 42 L.Ed.2d 320 (1974), that must be assessed within the context of the legal and factual posture of the parties' claims at the time a judicial pronouncement is sought. See Nichol, Ripeness and the Constitution, 54 U.Chi.L.Rev. 153, 167 (1984). … Whether a dispute is ripe for decision turns on a twofold inquiry into the "fitness" of the issues presented for a judicial disposition on the merits and the hardship to the parties that would result if court review was withheld. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The first factor addresses essentially prudential concerns regarding the propriety of judicial intervention before a fuller factual record has been developed. The second factor focuses on the "hardships" on the parties, an inquiry inescapably intertwined with the concept of a "distinct and palpable injury," the essence of the case or controversy requirement of Article III. See *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

434.    The prudential concerns of the instant case indicate a need for a more complete and truthful factual record relevant to the propriety of judicial intervention because, in part, false statements of material fact have been incorporated into the Massachusetts and Maine records, in part due to fraud committed by defendants Stanley Spero, Lourdes Colon and Lisa Wolfe, which has caused severe hardship on the Plaintiff with distinct and palpable injuries. The relevant fraud will be further detailed below with particularity and will be corroborated by the relevant testimony from those defendants.

*Federal Abstention doctrines*

435.    "The abstention "doctrines" actually consist of a series of equitable doctrines inspired by

the interests of comity and federalism. These doctrines carve out "an extraordinary and narrow

exception to the duty of a [d]istrict [c]ourt to adjudicate a controversy properly before it," *County*

*of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163

(1959), and the general rule remains that "[w]ith whatever doubts, with whatever difficulties, a

case may be attended, [the federal courts] must decide it, if it be brought before us. We have no

more right to decline the exercise of jurisdiction which is given, than to usurp that which is not

given." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821) (Marshall, C.J.).

436.    The various categories of abstention "are not watertight" or amenable to mechanical

application. *Law Enforcement Ins. Co., Ltd. v. Corcoran*, 807 F.2d 38, 40 (2d Cir.1986). In

assessing the appropriateness of abstention, a federal court must identify the factors material to

the most closely applicable categories and conduct "a careful balancing of the important factors

as they apply in a given case, with the balance heavily weighted in favor of the exercise of

jurisdiction." *Moses H. Cone Memorial Hopital v. Mercury Construction Corp.*, 460 U.S. 1, 16,

103 S.Ct. 927, 937, 74 L.Ed.2d 765 (1983). ... the leading cases of *Burford v. Sun Oil Co.*, 319

U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) ("Burford abstention"); *County of Allegheny v.*

*Frank Mashuda Co.*, 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959), and *Louisiana Power*

*& Light Co. v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058

(1959) ("Allegheny-Thibodaux abstention," a conceptual subset of Burford abstention);

and *Railroad Comm'n of Texas v. Pullman Co.*,  312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)

("Pullman abstention").

437.    "Burford abstention is properly invoked when (1) the order, regulation, or provision

attacked in federal court relates to a sophisticated state regulatory scheme 399*399 involving

complex subject matter of special state interest in which judicial review of administrative

decisions by state courts is considered an integral part of that scheme because it promotes

uniformity by minimizing the potential for multiple inconsistent adjudications and helps assure

that the tribunal of choice possesses a certain degree of expertise in the complex subject matter

involved; (2) the exercise of jurisdiction by the federal courts threatens to disrupt the state's

regulatory scheme; and (3) the action brought in federal court largely involves issues of state

law. *Corcoran*,  807 F.2d at 43; see also *Colorado River Water Conservation District v. United

States*,  424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

438.    The Plaintiff's action against state agencies of Massachusetts and Maine does not violate

either the Pullman or the Younger abstention doctrines.

*Violation of Plaintiff's Right to Due Process and State deprivation of Plaintiff's property*

439.    "The Fourteenth Amendment prohibits state deprivations of life, liberty, or property

without due process of law." *Thomas v. Independence Tp.*,  463 F.3d 285, 297 (3rd Cir. 2006).

As alleged here, the liberty and property clauses of the Fourteenth Amendment, made applicable

to the federal government through the Fifth Amendment, protects the "right to hold specific

private employment and to follow a chosen profession free from unreasonable governmental

interference...." *Piecknick v. Commonwealth of Pa.*,  36 F.3d 1250, 1259 (9th Cir. 1994). "It is

the liberty to pursue a particular calling or occupation and not the right to a specific job that is protected by the Fourteenth Amendment." Id. at 1261.

440.    "[T]he Constitution only protects this liberty from state actions that threaten to deprive persons of the right to pursue their chosen occupation. State actions that exclude a person from one particular job are not actionable in suits ... brought directly under the due process clause." Id. (citing *Bernard v. United Township High Sch. Dist. No. 30*, 5 F.3d 1090, 1092 (7th Cir. 1993)).

441.    "'It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment.'" ... These cases discussing the liberty interest to pursue a particular "calling or occupation," however, have all applied to individuals and claims brought pursuant to § 1983." *Black Dog Outfitters, Inc. v. State of Idaho Outfitters and Guides Licensing Board,* Dist. Court, D. Idaho (2011).

442.    State actor defendants have seized/deprived the Plaintiff of his property rights in his medical license without Due Process of Law, which demands a fair trial, in violation of the Plaintiff's rights under the Fourteenth Amendment. The Plaintiff has also been deprived of his liberty interest in his right to gainful employment, a fundamental constitutional right, as guaranteed by the Constitution.

*2002 Massachusetts Bill of Attainder was quasi-legislated de facto by BORIM*

443.    A Bill of Attainder was quasi-legislatively enacted *de facto* by the Commonwealth of Massachusetts BORIM in 2002 *de novo*, wherein a law was quasi-legislatively fashioned *de*

*facto* to apply to the Plaintiff and to the Plaintiff alone – which will be called the "Weinberg law" hereafter ((discussed more fully below).

444.    The 2002 Weinberg law is penal in nature and punished the Plaintiff retroactively for conduct in 1992-94 through the revocation of his medical license without Due Process of Law or a fair trial depriving the Plaintiff of his property rights in his medical license and BORIM incorporated and based the Weinberg law on false statements of fact as documented in the record.

445.    Bills of Attainder are generally prohibited by Section 10 of Article 1 of the U.S. Constitution.

446.    This Bill of Attainder "Weinberg law" was enacted quasi-legislatively *de facto* by the Massachusetts Board of Registration in Medicine ("BORIM") and violated the civil rights and civil liberties of the Plaintiff acting under the color of law, and this Bill of Attainder was subsequently enforced by the Massachusetts Supreme Judicial Court ("Mass SJC") in spite of its unconstitutionality in violation of the *contract clause, Bills of Attainder clause, ex post facto clause* and *involuntary servitude clause* with their selective incorporation through the Due Process clause of the Fourteenth Amendment to the states, as well as violating Equal Protection of the laws, violating the Plaintiff's First Amendment right to freedom of expression, and violating 42 U.S.C. § 1983 while Defendants were acting under the color of law.

447.    There is only one Massachusetts citizen-physician in the 250-year history of the Commonwealth of Massachusetts to whom this 2002 Bill of Attainder – the "Weinberg law" - was uniquely applied *de facto* – and that citizen is the Plaintiff; its action was penal in nature punishing the Plaintiff retroactively for conduct in 1992-94 through the revocation of his medical

license without Due Process of Law or a fair trial, and thus also deprived the Plaintiff of his property rights in his medical license without due process of law or a fair trial.

448.    The *de facto* Weinberg law– a Bill of Attainder which was enacted *de facto* by the Commonwealth of Massachusetts BORIM in 2002 – was applied to the Plaintiff *ex post facto* to punish the Plaintiff for his conduct and actions in 1992 – 1996, which comprised lawful and ethical sexual activities with the Defendant Lourdes Colon following the formation and execution of the Bilateral Express contract in 1992 terminating the doctor-patient relationship under the guidance of defendant Lisa Wolfe.

*1992 Express Bilateral Contract terminating doctor-patient relationship*

449.    In 1993 the Plaintiff engaged in sexual relations with defendant Lourdes Colon which was lawfully permissible without violating any professional code of conduct and authorized by Express bilateral contract, memorialized in a writing manually transcribed with pen and paper – while Dr Wolfe dictated verbatim the words of the agreement which was formed and executed in September 1992 in a consultation room of the Human Resource Institute ("HRI"), Brookline, MA, where defendant Lisa Wolfe had clinical privileges and where she dictated the Bilateral Express contract verbatim for the Plaintiff and Lourdes Colon to memorialize in that writing.

450.    This Express Bilateral contract, memorialized in writing, was dictated verbatim by Dr Wolfe, in September 1992 at the Human Resource Institute ("HRI") in Brookline, MA, and comprises substantial material evidence which was concealed from the tribunals by defendants Lisa Wolfe, Lourdes Colon and Stanley Spero.

451.    This Express Bilateral contract instituted dramatic changes in the relationship between the Plaintiff and Lourdes Colon, terminating the doctor-patient relationship and created a

Clinical-nonclinical binary classification of time and place classification schema of the world, classifying and dividing the world into non-clinical and clinical divisions [corroborated independently by Stipulation No. 35 along with deposition sworn testimony], as will be discussed in greater details below.

452.    This clinical-nonclinical binary classification of time and place division was acknowledged and adopted as a Stipulation No. 35 by Magistrate Sarah Luick in her May 2002 Recommended Decision.

453.    The formation and execution of that Express Bilateral contract took place in a meeting at HRI in September 1992 in a medical consultation room which was attended by the Plaintiff, Dr Wolfe and Lourdes Colon.

454.    The Express Bilateral contract, terminating the doctor-patient relationship, along with its subsequent modification, were formed, drafted, executed and modified in 1992-93 under the guidance of Defendant psychologist Lisa Wolfe, who was attending psychologist for the defendant Lourdes Colon at HRI and Wolfe was also the inventor/drafter of the Express Bilateral contract.

455.    Dr Lisa Wolfe's concealment and deceptions concerning the Express Bilateral contract terminating the doctor-patient relationship was a substantial factor in comprising fraud upon the tribunals, which caused substantial economic and non-economic injuries to the Plaintiff exceeding US$6,250,000.00 (Six million two hundred fifty thousand U.S. dollars).

456.    Defendant attorney Stanley Spero also participated in the concealment and deceptions concerning the Express Bilateral contract terminating the doctor-patient relationship which was a substantial factor in comprising fraud upon the tribunals, which caused substantial economic and

non-economic injuries to the Plaintiff exceeding US$6,250,000.00 (Six million two hundred fifty thousand U.S. dollars).

457.    The details of the 2002 *de facto* Weinberg law, a Bill of Attainder, enacted quasi-legislatively by BORIM, with its forty-three (43) defining elements and criteria are described in detail below.

459.    The Plaintiff will prove by a preponderance of the evidence that the 2002 *de facto* Weinberg law comprised the type of particularized state action which the framers of the U.S. Constitution intended to prohibit in its Bill of Attainder clause and along with the mis-interpretation of that clause by the U.S. Supreme Court over the past two and one-half centuries in its prior application of that clause only to legislated statutes which represented a misconstrued interpretation of the Bill of Attainder clause which has been perpetrated *ad nauseum* through American jurisprudence, as will be proved by examining the Federalist papers and other historical documents.

*Forty-three (43) criteria and elements comprising the "Weinberg law"*

460.    The 2002 *de facto* "Weinberg law" was enacted quasi-legislatively *de novo* by BORIM and it states implicitly that:

All physicians licensed in the Commonwealth of Massachusetts who meet the following forty-three (43) criteria shall be subject to revocation of their medical license:

(a) the physician practices medicine in the Commonwealth of Massachusetts under a full medical license issued by the Massachusetts Board of Registration in Medicine ("BORIM");

(b) the physician provides medical care to patients in a clinical setting such as a clinic, hospital, doctor's office, neighborhood/community health center, Emergency Department, where he holds himself out to the public as a medically-qualified physician able to diagnose and treat their ailments or medical conditions;

(c) the physician terminates the doctor-patient relationship via a written express bilateral contract mutually agreed upon by the doctor and the patient, which is an otherwise lawful and enforceable contract which is conceived, approved, engineered and dictated by a licensed clinician;

(d) the express bilateral contract terminating the doctor-patient relationship is conceived of, engineered, drafted and dictated for manual transcription by a licensed psychologist or other licensed clinician, and the memorialized contract in writing is signed by both the doctor and the patient following an appropriate counseling session with the psychologist or clinician;

(e) the bilateral express contract terminating the doctor-patient relationship meets all the traditional requirements of contract law: (i) offer, (ii) acceptance, and (iii) consideration where consideration may be provided through detrimental reliance on such contract;

(f) the bilateral express contract terminating the doctor-patient relationship is entered into through the mutual agreement of the physician and patient, who are not minors, who are legally competent to enter into such a legally binding and enforceable contract and who do not have any impediments to contract formation such as intoxication;

(g) the bilateral express contract terminating the doctor-patient relationship is not otherwise prohibited by local, state or federal law or regulations nor prohibited by any professional ethics or ethical code of conduct;

(h) the bilateral express contract terminating the doctor-patient relationship does not violate or conflict with the terms of any other preexisting contract or agreements but may be modified by mutual agreement of the parties;

(i) the bilateral express contract is not formed through the improper use of coercion or force, nor as the result of any threats or intimidation, but is freely entered into by both the physician and the patient of their own free will and consent;

(j) the bilateral express contract is modeled after other U.S. business and commercial contract which have been found to be valid, lawful and enforceable contract by the   U.S. Supreme Court or other competent federal or state courts;

(k) the bilateral express contract terminating the doctor-patient relationship conforms in substance and form with the "contract clause" of Section 10 of Article I of the U.S. Constitution and comprises a bilateral express contract between two private parties;

(l) the bilateral express contract terminating the doctor-patient relationship does not violate any court order or decree, nor does it attempt to circumvent any criminal laws or attempt to escape liability for crimes nor does it involve the parties engaging in any otherwise criminal activities;

(m) the bilateral express contract is entered into through the mutual volitional agreement of the physician and the patient;

(n) the bilateral express contract terminating the doctor-patient relationship is otherwise a valid, proper and enforceable contract under the law;

(o) it is understood by both parties that such an initial bilateral express contract dissolves and terminates the duties and obligations of the physician towards the patient and thus frees the physician and former patient to engage in relationships, conduct or activity which may otherwise be prohibited or unethical for active physician-patient relationships, and frees the patient from the normal constraints of the physician-patient relationship such as allowing the patient to engage in business activities with the physician or to engage in sexual relations with the former physician ;

(p) the initial bilateral express contract terminating the doctor-patient relationship re-defines the boundaries of the two parties – so that multiple and varied activities or conduct between those two parties are authorized and allowed as long as such activities or conduct do not comprise any criminal activity or criminal enterprise;

(q) the initial bilateral express contract terminating the doctor-patient relationship otherwise complies with the AMA Code of Ethics opinion 9.1.1 ( https://code-medical-ethics.ama-assn.org/ethics-opinions/romantic-or-sexual-relationships-patients ) stating that before entering into a sexual relationship, the physician must first terminate the doctor-patient relationship;

(r) the initial bilateral express contract terminating the doctor-patient relationship authorizes the physician to engage in a consensual sexual relationship with the former patient, because all his ethical duties as a physician were lawfully terminated by the express bilateral termination contract and wherein such sexual relations are lawful, proper

and ethical because the doctor-patient relationship had been properly and lawfully terminated, as required by the AMA Code of Ethics opinion 9.1.1;

(s) prior to the contractual termination, there were no improper, sexual or unethical contacts between the physician and the patient prior to the formation and execution of the express bilateral termination contract;

(t) a qualified clinician, such as a psychologist or psychiatrist, assesses and ascertains the mental health and safety for the patient to enter into such a bilateral express termination contract and conducts a counseling session with both the doctor and patient to discuss the implications and ramifications of such a doctor-patient relationship termination;

(u) in a clinical setting the qualified clinician described in paragraph (t) above drafts and dictates the words of the express bilateral contract terminating the doctor-patient relationship which are hand-written and memorialized in writing in two separate writings by the doctor and the patient (each party hand-writes down verbatim the terms of the contract dictated by the clinician), and thus this qualified clinician impliedly warranties to both parties that such licensed clinician has approved and endorsed such a termination contract as safe and non-injurious to both parties and subsequently both the physician and the patient sign each other's memorialized writing;

(v) if such qualified clinician, who has previously approved and endorsed the termination of the doctor-patient relationship by a bilateral express termination contract, has any reservations or doubts about the termination of the doctor-patient relationship, such doubts or reservations shall be immediately communicated to both the physician and patient and it is incumbent upon that qualified clinician to advise against the termination

of the doctor-patient relationship and not move forward with the dictation of the termination express bilateral contract; some of the more serious conditions which should motivate the clinician not to move forward with the formation/execution of such a contract would include such conditions as: schizophrenia, psychosis, bipolar disorder, dissociative disorders, Multiple Personality Disorder, autism spectrum disorder, severe substance abuse disorders, severe personality disorders, etc. - the qualified clinician's recommendation to move forward with such a doctor-patient relationship termination is an implied warranty that the clinician believes that such a termination is in the best interests of both the patient and the doctor;

(w) the doctor and the patient, of their own free will, must both sign these written memorialized express bilateral contract terminating the doctor-patient relationship along with any limitations or restrictions made by the qualified clinician;

(x) the doctor must also assist with the transfer of medical care to another doctor following the termination of the doctor-patient relationship;

(y) *detrimental reliance:* the doctor then relies upon the termination contract under the belief that the doctor-patient relationship had been properly terminated and dissolved, and based on her/his reliance on the termination bilateral express contract the physician engages in conduct which might otherwise be unethical or improper had the doctor-patient relationship not been terminated;

(z) contract modification – the physician and former patient who have entered into this express bilateral contract freely with mutual agreement to terminate the doctor-patient relationship, and where there is no contractual clause limiting or preventing modification

of the contract, are permitted to modify the terms of the contract by the mutual agreement of both parties;

*Modified Express Bilateral Contract provides for clinical-nonclinical binary classification of time and place*

Contractual Creation of the clinical-nonclinical binary classification of time and place: "clinical world" and the "non-clinical world" via modification of the Bilateral Expresss Contract terminating the doctor-patient relationship

*Contractually-created "Clinical World" and "Nonclinical World" is lawful*

The modified contract classified time and place into two categories: (i) **CLINICAL WORLD**: for example, when the parties, Plaintiff and Colon, would meet in a clinical setting such as the clinic, for the purpose of addressing some medical need, diagnosis or

treatment, then the Plaintiff would be expected to provide the necessary diagnosis or treatment of Colon [when the Plaintiff was wearing his white doctor coat – wearing his "physician hat" and was subjectively expected to act like a physician] (hereafter the "clinical world"); and  (ii) **NON-CLINICAL WORLD**: when the Parties would meet outside of the clinical setting, where there was no purpose of providing diagnosis or treatment and the Plaintiff was not wearing his "physician hat" and there was no subjective expectation that the Plaintiff would act like a physician, then the two parties would be free to engage in their personal, romantic or sexual relationship (hereafter the "non-clinical world") as long as there was no confusion that outside of the clinical setting, the Plaintiff would not act in conformity with the usual subjective expectations of performing clinical duties of examination, laboratory testing, diagnostic procedures, or

treatments; thus the defining features or criteria of the 1993 contract modification of paragraph (z) were: (i) the location of the meeting of the Plaintiff and defendant Lourdes Colon [clinical setting or not] (ii) the subjective expectations of a reasonable person when meeting at that location and time; and (iii) the purpose of the meeting [was the purpose to treat some medical condition or not].

This subsequent 1993 contract modification of the 1992 Express Bilateral Contract, terminating the doctor-patient relationship, provided a classification of time and place into two categories – the "clinical world" and the "non-clinical world" – with some relevant examples described below:

**Clinical World (created contractually) attributes and features:**

(1) Plaintiff was working in clinic, ED, hospital, medical office, health center

(2) Plaintiff usually wore white clinical coat, often carried a stethoscope, and made notes in the medical record regarding signs, symptoms, differential diagnosis, planned diagnostic procedures and treatment plan

(3) Patients would come to be seen for diagnosis and treatment and knew that the Plaintiff was qualified and licensed as a physician to practice medicine

(4) Patients had subjective expectation of receiving medical treatment

(5) Plaintiff would receive payment, salary or compensation for treating patients

(6) Patients knew that the Plaintiff was a physician and expected Plaintiff to act and conduct himself as a physician

**Non-clinical World (created contractually) attributes and features:**

(1) Plaintiff was not working in setting where Patients normally seek MDs

such as beach, forest, mall, shopping center, golf course, lake, streets, diners

(2) Plaintiff would usually wear casual street-clothes often worn by laymen

(3) Patients usually did not know that the Plaintiff was a physician

(4) Patients would not normally be seen by Plaintiff in this non-clinical world

(5) Plaintiff had no expectation of payment, salary or compensation

(6) Patients did not know that the Plaintiff was a physician because he was not

wearing his "doctor hat" nor wearing a clinical white exam coat

(aa) In the clinical world (hospitals, clinics, etc), any patient would have a reasonable subjective expectation that they could be seen for evaluation of a medical condition and were seeking medical treatment and diagnosis because Plaintiff had appropriate education and training. In clinical world, Plaintiff appeared to be a physician, usually wearing a white coat and carrying a stethoscope, and provided these services.

(bb) In non-clinical world, most persons did not know that the Plaintiff was a physician, most persons would not seek any medical treatment or diagnosis not knowing that Plaintiff had any relevant expertise, and Plaintiff appeared as any other person in casual clothes not wearing a white coat or carrying a stethoscope – just your every-day "Joe American" – the plaintiff did not hold himself out to the public as a physician.

(cc) *To force the Plaintiff to provide medical treatment or to examine persons when he was in the non-clinical world, when he had no expectations of acting like or conducting himself as a physician, would be tantamount to "**involuntary servitude**" prohibited by*

*the Thirteenth Amendment to the U.S. Constitution. Forcing physician-like activities on*
*the Plaintiff in the non-clinical world would be "**enslaving him" and re-vitalizing the***
***state-run Slavery of the Confederate South pre-Civil War** where persons are*
*involuntarily forced to do things that they do not want to do against their will,*
*convictions and beliefs;*

(dd) *The boundaries between the clinical and non-clinical worlds are well-demarcated,*
*and understood by all relevant parties thus affected;*

 (ee) *The "Weinberg law" enacted de facto in 2002 by BORIM attempts to consolidate*
*both worlds into one – **enslaving the Plaintiff and forcing upon him a state of***
***involuntary servitude** which forces the Plaintiff into performing medical duties and tasks
involuntarily against his will at a time and place when the Plaintiff did not want to be a
doctor, nor did he want to examine or treat patients because the Plaintiff believed himself
to be in the non-clinical world where he would be free to engage in recreational and
relaxing activities; involuntary servitude or slavery is the process by which human beings
are forced to do things that they do not want to do, robbing them of their free will to
make decisions about how they want to live their lives, restricting their liberty to pursue
happiness or engage in tasks of their own choosing, and restricting their liberty to make
choices of their own free will;

(ff) The two worlds – clinical world and non-clinical world – were lawfully created in
1993 by the mutually agreed-upon modification of the 1992 Express Bilateral contract
between Plaintiff and Defendant Colon terminating the doctor-patient relationship, and
this modification was formed and executed between 1992 – 1993 and is an otherwise

lawful modification of the agreement under contract law which is not otherwise prohibited by law;

(gg) When the Plaintiff was in the Clinical World, wearing his "doctor" hat, he conducted himself as a physician in all his interactions with his patients, who came to a clinical setting to obtain some medical treatment or assessment. While in the Clinical World, the Plaintiff complied with all the regulations of BORIM and also the canons of medical ethics by the AMA – with the self-expectation that he was engaged in the practice of medicine.

Through a sequence of precedents, the U.S. Supreme Court has defined the criteria and elements for determining when statutes and state action comprise a Bill of Attainder. As a case of first impression, this would be the first time (to the best of the Plaintiff's knowledge and belief) that a *de facto* quasi-legislatively law, such as the "Weinberg law" enacted by BORIM for the purpose of individualized action against the Plaintiff to effect punishment through license revocation without a trial or Due Process of Law, would be ascertained to comprise a Bill of Attainder. The Plaintiff intends to pursue all available appeals to the highest courts up to the U.S. Supreme Court if *certiorari* is granted in order to assure that justice is done with vindication of his name – even if this takes some ten to fifteen years of legal action and the necessity of thousands of hours of pleadings and hearings.

In spite of prior jurisprudence and caselaw, the Plaintiff intends to prove, through the Federalist papers and other historical documents and writings, that the framers of the U.S. Constitution intended for all state action, whether legislated by statute or quasi-legislated

by a state agency, which is individualized state action particularized to a single person which is penal in nature and punishes the targeted citizen without a trial, comprise a Bill of Attainder, and that the framers of the Constitution did not anticipate that the growth of the Administrative Fourth branch of government would supplant legislated statutes with agency regulations which would implement the police powers of the state with the full force of the law.

Likewise numerous precedents have led the U.S. Supreme Court to define the criteria and elements of state or private action which comprise involuntary servitude prohibited by the U.S. Constitution, first enforced following the U.S. Civil War, in order to define and protect the rights of the freed slaves. Private or public parties may create involuntary servitude. Whether or not a Bill of Attainder can be proved by the Plaintiff, the actions of BORIM can still be adjudicated to enforce a state of involuntary servitude.

In Magistrate Sarah Luick's Decision (attached as Appendix A) issued in May 2002, DALA recognized these two distinct worlds – the clinical world and the non-clinical world - when Magistrate Sarah Luick approved and adopted Stipulation No. 35. "During the fall of 1992, Respondent and Patient A [Lourdes Colon] began a personal and sexual relationship which lasted 3 years until September 1995. During that time, no sexual contact ever took place in any professional setting, whether hospital, clinic or medical office." [Appendix A, "*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 10* ]

(hh) When in the Non-Clinical World, the Plaintiff was not a doctor, did not wear his "doctor" hat, was not expected to behave or conduct himself as a doctor, and had no obligation to comply with the regulations of BORIM nor any ethical codes. While in the Non-Clinical World, the Plaintiff was authorized to engage in sexual relations with defendant Lourdes Colon by authority of the modified bilateral express contract terminating the doctor-patient relationship and these sexual relations were proper, ethical and lawful and not subject to the jurisdiction or authority of BORIM because those regulations and authority only applied to the Clinical World.

(ii) The Clinical and Non-Clinical Worlds were created through the operation of and instrumentality of the 1993 mutually-agreed upon modified express bilateral contract between the Plaintiff and the defendant Lourdes Colon, which is governed by and protected by the Contract clause of the U.S. Constitution and such contract modification is otherwise not prohibited;

(jj) the express bilateral contractual termination of the doctor-patient relationship would be discussed and approved by the institutional officials – such as the Medical Director and/or Administrative Director – as was done in 1992 when Dr. Robert Wesselhoeft, III (Medical Director) and Ruth Taylor (Executive Director) authorized and approved the Plaintiff's actions with the termination of the doctor-patient relationship prior to the formation of the bilateral express contract terminating the doctor-patient relationship;

(kk) express bilateral contract terminating the doctor-patient relationship, entered into freely without coercion, intimidation or force, is not otherwise prohibited by the explicit regulations of the Massachusetts Board of Registration in Medicine;

(ll) under the Code of Massachusetts Regulations (CMR), BORIM shall have the authority to apply the Weinberg law, the Division of Administrative Law Appeals shall have the authority to adjudicate the Weinberg law, and the Massachusetts Supreme Judicial Court shall have the authority to affirm or negate judgments or state action carried out under the Weinberg law;

(mm) the Weinberg law must comply with the requirements, mandates and authority of the Massachusetts Constitution and the U.S. Constitution;

(nn) the Weinberg law applied only to a single citizen physician in the Commonwealth of Massachusetts – the Plaintiff – and no other citizen physician of Massachusetts has ever been found to meet criteria (a) – (nn) and the Weinberg law is penal in nature, uniquely punishing the Plaintiff by revocation of his medical license without Due Process of law or a fair trial, thus violating the Equal Protection of the law because no other physician, who was similarly situated, was ever punished by the Weinberg law (see *Korper v. Weinstein* discussed more thoroughly below);

(oo) in its unique relevance and application – individualized - to a single physician citizen of Massachusetts since the founding of the American Republic which is penal in nature and deprived the Plaintiff of a fair trial or Due Process of Law, the Weinberg law comprises a Bill of Attainder;

(pp) the Weinberg law is applied *ex post facto* to punish citizen physicians; and the Weinberg law also permissively allowed *involuntary servitude* of physicians, who would be enslaved by involuntary and forced conduct if it were mandated that they conduct themselves as physicians in the non-clinical world. If a physician wants to engage in

some recreational activity and does not want to practice medicine at that time in that place, forcing that physician to engage in the practice of medicine by BORIM comprises involuntary servitude and slavery. Ethical codes are not license to engage in involuntary servitude.

(qq) Since the founding of the Commonwealth of Massachusetts approximately 250 years ago, **only one physician has been subject to license revocation under the application of the Weinberg law** – namely the Plaintiff

*Plaintiff's case is a Case of First Impression in the United States*

461.    To the best of the Plaintiff's knowledge and belief, there are no other precedents or caselaw in any of the fifty states or the territories of the U.S. reported in the legal databases of Westlaw, Lexis-Nexis, or Google Scholar which meet the 43 criteria listed above, making this case and application of the Weinberg law a **case of First Impression**, which also comprises a **Bill of Attainder** applied **ex post facto** to the Plaintiff.

*Plaintiff will prove claims herein by preponderance of evidence*

462.    Evidence corroborating all forty-three criteria above can be found in: the medical records of (a) Dr. Lisa Wolfe, (b) HRI, (c) the Plaintiff, (d) the Boston Evening Medical Center (then "BEMC", but since purchased by the Massachusetts General Hospital and re-named MGH Back Bay Medical Center), (e) Massachusetts General Hospital, (f) the Stipulation of Findings of Fact incorporated within Magistrate Sarah Luick's Recommended Decision issued by DALA in May 2002 (attached as Appendix A at the end), (g) medical and psychological records of additional clinicians consulted by Defendant Lourdes Colon between 1989 through the present time, state records of (h) BORIM, (i) DALA, (j) Mass SJC, (k) Maine SJC, and the law records of

Defendant Attorneys (l) Stanley Spero, (m) Claudia Hunter, (n) Vincent DiCianni, (o) Robert
Stolzberg and (p) John Flym, as well as the judicial pleadings and discovery documents from   (q)
*Lourdes Colon v. Robert Weinberg, Robert Wesselhoeft, Boston Evening Medical Center, et al.*,
and (r) *Robert Weinberg v. Lourdes Colon,* the (s) Bankrutpcy Adversarial Proceedings from
*Robert Weinberg v. Attorney Defendants* and Plaintiff will obtain new testimony from the
relevant percipient witnesses at deposition of the relevant defendants in the instant action.

463.    The Plaintiff will prove the existence and terms of the Express Bilateral Contract
terminating the doctor-patient relationship, along with its subsequent modification along with all
forty-three criteria of the "Weinberg law" by a preponderance of the evidence in the instant
action.

464.    Plaintiff plans to subpoena all the records listed in paragraph (20) here as well as obtain
new testimony through the deposition of all relevant witnesses with knowledge of the material
facts.

465.    State action and state laws and regulations involving fundamental liberty interests, civil
liberties and civil rights are subject to judicial review under the Strict Scrutiny standard.

466.    Plaintiff seeks equitable relief through Declaratory Judgments and Injunctive Relief, and
does not seek monetary damages from state actors who are otherwise protected under the
Eleventh Amendment.

467.    "In a case of actual controversy within its jurisdiction …any court of the United States,
upon the filing of an appropriate pleading, may declare the rights and other legal relations of any
interested party seeking such declaration, whether or not further relief is or could be sought. Any

such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Federal Declaratory Judgment Act;* Rule 57, *Fed.R.Civ.P.*

*Modified 1992 Contract Created a Clinical-nonclinical binary classification of time and place*

468.    The modified Express Bilateral Contract between the Plaintiff and Lourdes Colon created a clinical-nonclinical binary classification of time and place.

469.    Every location on planet Earth could be classified at every time of the day according to this Clinical-nonclinical binary classification of time and place scheme.

470.    Any location on planet Earth at any time of the day could be classified under this scheme as either the "clinical world" or the "non-clinical world" according to the criteria listed above.

471.    The distinguishing feature between the clinical world and the non-clinical world, is the subjective expectation of the Plaintiff and those other persons at that location at that time.

472.    While in the clinical world, the Plaintiff believed himself to be acting as a Physician and holding himself out to the world as a physician – he was wearing his "doctor hat."

473.    While in the non-clinical world, the Plaintiff did not believe that he was a physician and those around him did not believe him to be a physician – he was not wearing his "doctor hat."

474.    The clinical world generally included the majority of the time when the Plaintiff was working as a physician in a clinic, ED, neighborhood health center, hospital, in most clinical settings where patients would come to seek treatment of their ailments or amelioration from physical pain and suffering.

475.   While in the clinical world, most persons perceived and understood that the Plaintiff was there to assist with their diagnosis and treatment – often the Plaintiff would wear a white clinical coat, often carry a stethoscope with him, and occasionally his coat pockets were stuffed with tourniquets, vacutainer tubes with needles, caliper to measure intervals on an EKG, reflex hammer, and other tools of the trade that physicians usually employ during the practice of medicine.

476.   The Plaintiff would only engage in the practice of medicine in the clinical world, where the Plaintiff would usually receive compensation for his work either through insurance companies or through a salary provided by the hospital or clinic.

477.   Usually the Plaintiff was advertised to the public as a doctor/physician in the clinical world – such as a placard on his door "Dr. Robert Weinberg" or a name placard on his desk, and often his name "Dr. Robert Weinberg" would appear on a directory mounted on the wall near the entrance to the clinic or hospital, and the receptionist/nurse who would greet the patients arriving would often have access to a computer terminal with a database which included the Plaintiff in the clinical directory of physicians.

478.   When coming to the clinical world, or while present in the clinical world, the Plaintiff had the subjective expectation that he would be working as a physician, meeting with patients, obtaining their medical histories including the chief complaint why they were coming to the clinic/ED/hospital at that time, performing clinical examinations and clinical procedures

479.    The Plaintiff was expected to be well-rested from a good night's sleep and function well cognitively to properly assess and manage patients, and the possibility of any medical emergency which might arise.

480.    Furthermore it was understood that the Plaintiff would not have consumed alcoholic beverages or other intoxicating substances within 6 – 8 hours of arriving in the clinical world because such intoxicants might impair his functioning as a physician.

481.    In the clinical world, the Plaintiff would either represent himself to others and the patients as either a Family Physician or an Emergency Medicine Attending Physician, which are the two types of specialties which the Plaintiff usually worked as.

482.    While in the clinical world, the Plaintiff was bound by the AMA Code of Ethics and the Hippocratic Oath which he had taken while in medical school, and these ethical codes substantially restricted his activities accordingly.

483.    While in the non-clinical world, the Plaintiff did not have any subjective expectation of meeting with patients to engage in the practice of medicine, nor did any patients come to the non-clinical world for medical treatment or diagnosis.

484.    While in the non-clinical world, the Plaintiff would engage in his hobbies such as reading the medical literature, recent legal cases, or interesting new biotechnology or medical devices which may have been invented.

485.    It was acceptable to imbibe an alcoholic beverage while in the non-clinical world, as long as the Plaintiff was not scheduled to come to the clinical world within 6 – 8 hours of imbibing such as beverage.

486.    There was a wide range of activities which the Plaintiff could engage in while in the non-clinical world – the only restriction was (1) that the activity not involve the practice of medicine; and (2) that the activity not be unlawful or criminal.

487.    This modified 1992 express bilateral contract which classified time and location into the Clinical or Nonclinical worlds is a valid, lawful and enforceable contract.

488.    This modified 1992 express bilateral contract which classified time and location into the Clinical or Nonclinical worlds does not violate any federal or state law.

489.    This modified 1992 express bilateral contract which classified time and location into the Clinical or Nonclinical worlds provides details concerning the times and places where the Plaintiff would be working as a physician, not unlike many other business contracts which provide time and place details.

490.    This modified 1992 express bilateral contract which classified time and location into the Clinical or Nonclinical worlds is a contract which separates the Plaintiff's activities and conduct into either the professional (clinical world) or personal time (non-clinical world).

491.    This modified 1992 express bilateral contract which classified time and location into the Clinical or Nonclinical worlds is a contract which allows the Plaintiff to "get off work", take off his "doctor hat" and relax and engage in recreational activities (non-clinical world).

492.    Without This modified 1992 express bilateral contract which classified time and location into the Clinical or Nonclinical worlds, the regulations of BORIM may be interpreted as "forcing" the Plaintiff to work as a doctor at all times of the day in all places on the earth.

493.    Forcing the Plaintiff to work as a doctor, when he has "left the clinical setting" and against the Plaintiff's wishes is tantamount to Involuntary Servitude.

494.    Slavery comprises the forced labor of persons against their will to do specific work activities and BORIM believes that it may force the Plaintiff to do labor as a physician at any time of the day and at any location – not much difference from slavery.

*Fraud committed upon the Tribunal by defendants Spero, Wolfe and Ney*

495.    Withholding material evidence which proves or disproves a substantial issue of material fact during a Tribunal comprises spoliation of evidence and fraud upon the Tribunal; this fraud will be described in great detail and particularity within this Complaint – which the Plaintiff will prove by a preponderance of the evidence.

496.    A substantial issue of fact in these proceedings is the question whether the Plaintiff was in a doctor-patient relationship with defendant Lourdes Colon at the relevant times in question, to help determine whether the Plaintiff violated any laws, regulations or ethics concerning sexual relations between doctors and their patients.

497.    Thus, the existence, knowledge and paper copies of a handwritten Express Bilateral Contract, written in ball-point pen with black ink, which terminated the doctor-patient relationship in September 1992, is relevant and material to these proceedings and is material evidence in proving substantial facts and in determining important issues of fact.

498.    Thus, the existence, knowledge and paper copies of a handwritten Express Bilateral Contract which terminated the doctor-patient relationship in September 1992 is material evidence in these proceedings and comprises a substantial factor in determining or ascertaining whether a doctor-patient relationship existed between the Plaintiff and Lourdes Colon at the relevant times in question.

499.    Concealing from the Tribunal the existence, knowledge and paper copies, hand-written with black ball-point pen, of an Express Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon in September 1992, which was dictated by defendant Lisa Wolfe and written down verbatim by the Plaintiff and Lourdes Colon, subsequently signed by both parties, at HRI in Brookline, MA, comprises spoliation of evidence and concealing material evidence from the Tribunal; there exists a duty to preserve evidence relevant to a dispute, or potential dispute, which is an ancient and well-documented common law principle - The doctrine likely goes back as far as Roman law: *Contra Spoliaterem Omnia Praesumuntur* is a Latin phrase meaning everything most to his disadvantage is to be presumed against the destroyer; essentially, the doctrine requires a party to preserve evidence when they know, *or should know*, that the evidence is likely to be relevant to pending or future litigation.

500.    Concealing from the Tribunal the existence, knowledge and paper copies of a ballpoint-pen-handwritten Express Bilateral Contract, dictated by defendant Lisa Wolfe, which terminated the doctor-patient relationship in 1992 comprised spoliation of exculpatory evidence and fraud upon the Tribunal, and such spoliation of evidence and concealment of material evidence and deception of the tribunals was committed by the defendants Stanley Spero, Lourdes Colon and Lisa Wolfe.

501.    "Evidence tampering is an act in which a person alters, conceals, falsifies, or destroys evidence with the intent to interfere with an investigation by a law-enforcement, governmental or regulatory authority;" spoliation of evidence, which includes concealing material exculpatory evidence from the tribunal, is a form of evidence tampering, which is a criminal offense in some jurisdictions.

502.    The actions and omissions of defendants Stanley Spero, Lisa Wolfe and Lourdes Colon in concealing the exculpatory evidence of the handwritten Bilateral Express Contract, which terminated the doctor-patient relationship in 1992, does comprise spoliation of evidence and the crime of tampering with evidence; this handwritten contract is exonerating evidence for the Plaintiff because it is proof that the doctor-patient relationship was intentionally and purposefully terminated between the Plaintiff and Lourdes Colon in September 1992.

503.    Such actions and omissions of defendants Stanley Spero, Lisa Wolfe and Lourdes Colon in concealing the exculpatory evidence of the handwritten Bilateral Express Contract, which terminated the doctor-patient relationship in 1992, does also comprise spoliation of evidence, obstruction of justice and perverting the course of justice for the purpose of covering up their liability and also to conceal the primary exculpatory evidence which exonerates the Plaintiff; concealing the contract was advantageous to defendants Lourdes Colon and Stanley Spero, who filed suit in Middlesex Superior Court against the Plaintiff in 1996: *Colon v. Weinberg, Wesselhoeft, Boston Evening Medical Center et al.*, alleging that the Plaintiff engaged in medical malpractice and misconduct which settled circa. 1998-99 for $150,000, fraudulently obtained from the insurer through their concealment of the handwritten contract which would have destroyed their legal case.

504.    Spoliation of evidence is the intentional, reckless, or negligent withholding, hiding, fabricating, or destroying evidence relevant to a legal proceeding.

505.    Defendants Stanley Spero, Lisa Wolfe and Lourdes Colon are all guilty of spoliation of exculpatory evidence by their actions in concealing the handwritten Bilateral Express Contract which terminated the doctor-patient relationship in 1992, and exonerates the Plaintiff of all wrongdoing.

506.    Spoliation of evidence is a frequent tactic of amoral litigants and has been seen in such American scandals as the Enron scandal, Arthur Andersen LLP v. United States, Iran-Contra affair, Conrad Black's actions during his trial, and CIA Director Richard Helm's order to destroy MKUltra files.

507.    Furthermore, this fraud has been committed on three courts (Suffolk Superior Court [Massachusetts], Division of Administrative Law Appeals [Massachusetts], Oxford County Superior Court [Maine]) by two attorney defendants (Stanley Spero, John Ney) and their law firms (Spero and Jorgenson, P.C., Shechtman, Halperin and Savage, LLC) along with their accomplices/accessories/co-conspirators as well as by the defendant psychologist Lisa Wolfe, wherein that fraud is detailed with particularity in this Complaint.

508.    The 1992 Express Bilateral Contract terminating the doctor-patient relationship was essential, relevant and material exculpatory evidence for the fact-finder in the Tribunals for: [1] *Colon v. Weinberg, Wesselhoeft, et al.* (Suffolk Superior Court); [2] *Weinberg v. Colon* (Suffolk Superior Court); [3] *In Re Robert P. Weinberg, D.O.* (Division of Administrative Law Appeals; [4] *In the matter of Robert Weinberg* (Massachusetts Supreme Judicial Court); [4] *Robert P. Weinberg v. Board of Bar Examiners* (Maine Supreme Judicial Court); [5] *Robert P. Weinberg,*

*D.O. v. Massachusetts Board of Registration in Medicine* (Massachusetts Supreme Judicial Court), where the handwritten contract would have assisted the fact-finder in determining when the Plaintiff was and was not an active doctor to Lourdes Colon, thus answering an essential question of fact relevant and material to important issues of fact for the tribunal; the 1992 Express Bilateral Contract exonerates the Plaintiff of wrongdoing.

509.    Concealment of the 1992 Express Bilateral Contract terminating the doctor-patient relationship by defendants Stanley Spero, Lourdes Colon and Lisa Wolfe led the fact-finder in these Tribunals to make Findings of Fact which were FALSE statements of material fact, due to the absence of such exonerating and exculpatory evidence for assessment by the fact-finder, which exonerates the Plaintiff of all wrongdoing.

510.    These false statements of material fact, which resulted from the concealment of material evidence and deception of the tribunals, comprised fraud upon multiple Massachusetts and Maine tribunals (and also comprises a crime of omission), which proceeded to make conclusions of law based on those false statements of material fact; those false statements of material fact were disadvantageous to the Plaintiff, causing multiple severe legal and economic injuries, eventually leading to the revocation of the Plaintiff's medical license; these factual and legal errors may be remedied by a *Writ of Error Coram Nobis.*

511.    In the instant suit, the Plaintiff will obtain discovery (admissions, interrogatories, depositions, requests for production of documents) including but not limited to Request for Production of Documents and depositions of the relevant witnesses sworn under oath, which will yield testimony and additional documentary evidence which will prove the existence, content and purpose of the 1992 Express Bilateral Contract terminating the doctor-patient relationship by

a preponderance of the evidence; this additional discovery will provide the evidentiary

foundation for a *Writ of Error Coram Nobis* which is still issued by federal courts to remedy

egregious factual and legal errors wherein there is a miscarriage of justice.

512.    Because of the narrow and restrictive nature and rules of the DALA proceedings in 2000

– 2002, and the desire of the parties to make Stipulations as the basis for the fact-finding process

(because defendant Lourdes Colon did not want to testify at a trial) without providing the

Plaintiff with the ability to complete discovery (interrogatories, admissions, production of

documents and depositions), the Plaintiff was unable to obtain the requisite discovery yielding

the exculpatory evidence to prove this 1992 handwritten Express Bilateral Contract terminating

the doctor-patient relationship, along with its subsequent modification, in the prior DALA

proceedings.

513.    Full discovery procedures allowed by the Federal Rules of Civil Procedure in the instant

suit in federal court will provide the Plaintiff with necessary evidence to prove the existence,

content and purpose of the 1992 memorialized handwritten Express Bilateral Contract

terminating the doctor-patient relationship by a preponderance of the evidence, which exonerates

the Plaintiff of all wrongdoing and will serve as the evidentiary foundation for obtaining a *Writ

of Error Coram Nobis.*

514.    Furthermore the Expert Witnesses in the prior DALA proceedings did not have the

knowledge of, access to nor handwritten paper copies of that Express Bilateral Contract

terminating the doctor-patient relationship in 1992 and this substantial deficiency which resulted

from the defendants' intentional and purposeful concealment and deception regarding that

contract was a substantial factor in Colon's Expert Witness opinion not in the Plaintiff's favor

because Dr. Beck never knew that the doctor-patient relationship had been terminated in September 1992 and had the Expert Witnesses had this information and those paper copies of the handwritten Express Bilateral Contract, which was formed and executed at HRI under the guidance and dictation of Dr Wolfe in September 1992, the Expert Witnesses would have come to substantially and dramatically different conclusions and Expert Witness opinions more favorable to the Plaintiff.

515.    The Expert Witnesses called to testify in these Tribunals also did not have access to the 1992 Express Bilateral Contract and its subsequent modification which terminated the doctor-patient relationship, which exonerates the Plaintiff of all wrongdoing and will serve as the evidentiary foundation for obtaining a *Writ of Error Coram Nobis,* because this material evidence was concealed from the Tribunals by defendants Lourdes Colon, Stanley Spero and Lisa Wolfe, so this relevant and material evidence was not assessed by those Expert Witnesses nor was it assessed by the justices/magistrates/judges in the respective tribunals.

516.    The Expert Witnesses in these Tribunals, without access to the relevant and material evidence comprising the 1992-93 Express Bilateral Contract terminating the doctor-patient relationship, formed substantially deficient and false expert opinions because they did not have access to nor knowledge of substantial relevant and material evidence comprising the 1992 termination of the doctor-patient relationship; the handwritten Bilateral Express contract formed and executed in 1992 which exonerates the Plaintiff of all wrongdoing and will serve as the evidentiary foundation for obtaining a *Writ of Error Coram Nobis,*  will render those Expert Opinions null, void and false.

517.    Had those Expert Witnesses had knowledge of the 1992-93 Express Bilateral Contract which terminated the doctor-patient relationship, the conclusions and expert opinions of those witnesses would have been substantially different and therefore those expert opinions were tainted by the defendants' concealment of the 1992 Express Bilateral Contract terminating the doctor-patient relationship, which exonerates the Plaintiff of all wrongdoing, comprising Fraud upon the Court.

518.    The intentional and purposeful fraudulent concealment of that 1992 Express Bilateral Contract which terminated the doctor-patient relationship caused much consternation, distress and desperation in the Plaintiff and caused the Plaintiff to feel like he was backed into a corner without the truth of that exonerating contract which was deceptively concealed from the tribunals by defendants Stanley Spero, Lourdes Colon and Lisa Wolfe.

519.    The Plaintiff has been waiting over thirty-two (32) years to be able to obtain this discovery permitted by the Federal Rules of Civil Procedure to obtain the relevant and material evidence, both testimonial and documentary, to prove the fraudulent concealment and deception concerning the 1992 Express Bilateral Contract, terminating the doctor-patient relationship, by the defendants Stanley Spero, Lisa Wolfe and Lourdes Colon, where the defendant was greatly restricted and impaired by the procedural rules of the DALA proceedings which progressed without a trial, without the testimony of the relevant witnesses or the right to cross-examine them, progressing with only Stipulations which did not include records from Paula Lazar, Amy Banks, Vincent DiCianni, Robert Stolzberg, nor the sworn testimony of Lourdes Colon or Lisa Wolfe and without the material evidence of the 1992 handwritten Bilateral Express Contract.

520.    "In December 1999, Respondent sent a Memorandum to Richard Waring, former Complaint Counsel in the above-captioned matter, and Deirdre Manning, former investigator in the above-captioned matter. In this Memorandum Respondent asserted that false testimony was being used against him, and he warned that anyone who knowingly participated in the use of such false testimony against him might be participating in a 'criminal conspiracy'. He stated, 'This is an opportunity for you and the board to withdraw from the conspiracy, and diminish collectively your criminal responsibility for all foreseeable crimes engendered by the conspiracy'". [Stipulation No. 56., Stipulations – attachment "A" to "Recommended Decision" of Magistrate Sarah Luick, *Board of Registration in Medicine v. Robert P. Weinberg,* Adjudicatory Case No. RM-99-074, DALA, signed on April 9, 2001 by Respondent's Counsel John Flym, Respondent Robert Weinberg D.O. and signed on April 12, 2001 by Complaint Counsel Alice Oliff]. This 1999 Memorandum referred to the concealment of the material exculpatory evidence comprising the 1992 handwritten Express Bilateral Contract, concealed by defendants Lourdes Colon, Stanley Spero and Lisa Wolfe, potentially as part of a criminal conspiracy to conceal such material evidence from the tribunal in order to defraud the respective courts and evade their own liability.

521.    "In February 2000, Respondent filed a letter and affidavit with the Board of Registration of Psychologists, the Attorney General's Office, the Suffolk County District Attorney's Office, and the Board of Bar Overseers alleging unlawful acts by: Lisa Wolfe, Ph.D. (Patient A's current therapist), Stanley Spero, Esq. (Patient A's attorney), and Richard Waring, Esq. (former Complaint Counsel in the above-captioned matter). The alleged unlawful acts included: perjury, larceny, theft by misrepresentation and insurance fraud. Respondent accused Mr. Waring of acting 'in a criminally negligent and/or criminally reckless manner in issuing the Complaint in

January 1999.'" [Stipulation No. 57., Stipulations – attachment "A" to "Recommended Decision" of Magistrate Sarah Luick, *Board of Registration in Medicine v. Robert P. Weinberg*, Adjudicatory Case No. RM-99-074, DALA, signed on April 9, 2001 by Respondent's Counsel John Flym, Respondent Robert Weinberg D.O. and signed on April 12, 2001 by Complaint Counsel Alice Oliff].

522.    The perjury comprised telling falsehoods that the doctor-patient relationship had not ended abetted by their concealment of the contract; the larceny comprised obtaining the insurance settlement defrauding the insurance company through the concealment of the contract; the theft by misrepresentation and insurance fraud comprised inducing the insurer ProMutual to pay $150,000 without informing the insurance company about the 1992 contract terminating the doctor-patient relationship.

523.    Criminals, transgressors, perpetrators and wrongdoers do not write, phone or contact the police, law enforcement, or state agencies about their activities and conduct; they must conduct themselves secretly to avoid detection and capture; such persons would only contact state officials or law enforcement if they are either morons or crazy.

524.    The fact alone that: "In February 2000, Respondent filed a letter and affidavit with the Board of Registration of Psychologists, the Attorney General's Office, the Suffolk County District Attorney's Office, and the Board of Bar Overseers alleging unlawful acts by: Lisa Wolfe, Ph.D., Stanley Spero, Esq., and Richard Waring, Esq." is *prima facie evidence* of the Plaintiff's innocence of wrongdoing - unless the defendants can prove that the Plaintiff is either a moron or crazy because transgressors do not contact the authorities or law enforcement.

525.    The Plaintiff [Respondent] was desperately hoping that these state officials and authorities would initiate investigations and uncover the spoliation of exculpatory evidence by defendants Lourdes Colon, Lisa Wolfe and Stanley Spero.

526.    Apparently the state officials and authorities that the Plaintiff contacted did not take the Plaintiff seriously nor did they attempt to ask the Plaintiff for more information concerning the Plaintiff's prior allegations of those defendants including "The alleged unlawful acts included: perjury, larceny, theft by misrepresentation and insurance fraud. Respondent accused Mr. Waring of acting 'in a criminally negligent and/or criminally reckless manner in issuing the Complaint in January 1999.'"

527.    The truth has not changed in the past 30 years, but now the Plaintiff is ready for a fierce and prolonged battle to bring that truth to light; whatever the outcome of the instant litigation, the Plaintiff is prepared to bring these battles inside the courtroom and outside the courtroom to the forum of "public opinion" if necessary, and to bring these battles online to Social Media, to traditional media including the newspapers, radio and television, because the Plaintiff has nothing to hide or conceal - unlike some of the defendants named in the instant suit.

528.    The final judgments issued by the five (5) tribunals listed in paragraph # 75 above include multiple FALSE statements of material fact within the text of the judgments – based on the taint of concealed material evidence and deceptive conduct of defendants Lourdes Colon, Lisa Wolfe and Stanley Spero - as will be fully described below; incorporating multiple false statements of material fact within the text of those judgments renders those judgments null and void.

529.   It is purely logical that the application of the relevant law to FALSE statements of

material fact will result in FALSE conclusions of law thereof; court judgments which are directly

based on false statements of material fact wherein such false statements of material fact are

directly stated within the text of those judgments, must be declared null and void on the basis of

those false statements of material fact relevant to the issues of fact and issues of law being

adjudged.

530.   It follows, without the necessity of proof, that the final judgments which issue forth from

any Court based on false conclusions of law, which were based on false statements of material

fact are necessarily invalid, null and void.

531.   Once the Plaintiff has proven these false statements of material fact, which are expressly

stated in the text of the final judgments of those Courts, are indeed false by a preponderance of

the evidence, "the house of cards will fall down" and the Plaintiff may petition for overturning

and vacating those judgments under Rule 60(b) of the Federal Rules of Civil Procedure –


**Rule 60. Relief from a Judgment or Order …**

**(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:**

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

(c) Timing and Effect of the Motion.

(1) *Timing.* A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

(2) *Effect on Finality.* The motion does not affect the judgment's finality or suspend its operation.

(d) Other Powers to Grant Relief. This rule does not limit a court's power to:

(1) entertain an independent action to relieve a party from a judgment, order, or proceeding;

(2) grant relief under 28 U.S.C. §1655 to a defendant who was not personally notified of the action; or

(3) set aside a judgment for fraud on the court.

(e) Bills and Writs Abolished. The following are abolished: bills of review, bills in the nature of bills of review, and writs of coram nobis, coram vobis, and audita querela.

532.    A reasonable person may conclude that the conclusions of law which issued forth from these five tribunals would likewise be as false as the FALSE statements of material fact on which those conclusions of law were based.

533.    The Plaintiff is seeking Declaratory Judgments for each of the false statements of material fact which are expressed in the Final Judgments of these five tribunals – declaring those FALSE statements of material fact to be false as will be proved by the Plaintiff by a preponderance of the evidence.

534.    The Plaintiff is also seeking Declaratory Judgments for each of the five tribunals which

declare that the Conclusions of Law made by those tribunals were based on FALSE statements

of material fact as proven by the Plaintiff by a preponderance of the evidence.

535.    The Plaintiff is also seeking Declaratory Judgments that the Final Judgment of those five

tribunals are null and void because they issue forth from conclusions of law based on FALSE

statements of material fact as proven by the Plaintiff by a preponderance of the evidence.

536.    Following the judicial issuance of the Plaintiff's requested Declaratory Judgments, the

Plaintiff will seek Injunctive Relief through having the Final Judgments of those five tribunals to

be overturned and vacated on the basis of Rule 60(b)(3) and 60(b)(4):

> **"Fed.R.Civ.P. Rule 60— Relief From Judgment or Order**
> ...
>> **(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud,
>> etc.** On motion and upon such terms as are just, the court may relieve a party or a party's
>> legal representative from a final judgment, order, or proceeding for the following reasons:
>
> ...
>> **(3)** fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or
>> other misconduct of an adverse party;
>> **(4)** the judgment is void "        (Fed.R.Civ.P.)

537.    The defendants Lourdes Colon, Stanley Spero and Lisa Wolfe have concealed relevant

and material exculpatory evidence from the tribunals which are substantially relevant to the laws

applied by the tribunal, thus rendering the judgments rendered by the tribunal based on false

statements of material fact which formed the foundation of those judgments.

*BORIM acted Ultra Vires with Criminal Punishment of the Plaintiff*

538.    Under established Administrative Law doctrines and dogma, Administrative agencies do

not have the authority to provide criminal punishment of licensees.

539.    Criminal punishment must be processed through Criminal Law procedures with the protections and guarantees of Due Process of Law, requiring Notice, a fair trial, the right to subpoena witnesses and obtain discovery, the right to confront any witnesses with cross-examination, the right to present evidence on my behalf, and the procedures followed must comply with the Rules of Criminal Procedure and the Rules of Evidence.

540.    It is clear that BORIM intended to punish the Plaintiff for his conduct because: (a) it waited over 5 years to revoke the Plaintiff's license in spite of its emergency powers to revoke; (b) it offered the Plaintiff a voluntary one-year suspension of his medical license in 1998 which it would not have done were there any question of the Plaintiff's competence to practice medicine.

541.    Plaintiff will prove by a preponderance of the evidence that BORIM exceeded its statutory authority by imposing a criminal sanction through the revocation of the Plaintiff's medical license when its prior actions and conduct showed that BORIM did not suspect nor doubt the Plaintiff's competency or ability to practice medicine, and that it intentionally and purposefully sanctioned the Plaintiff through license revocation without a fair trial or Due Process of Law thus pursuing criminal punishment of the Plaintiff without Due Process of Law.

*DALA. Adjudicatory Proceedings in Massachusetts 1998-2002*

542.    In complying with M.G.L.A. 30A, § 10, and 801 CMR 1.01, disciplinary proceedings against physicians are adjudicated in the Division of Administrative Law Appeals ("DALA") in the Commonwealth of Massachusetts.

543.    Below is the caption of the DALA adjudicatory proceeding # RM-99-074 against the Plaintiff: [Copied and pasted from the 14-page DALA Decision, Appendix A attached]

BOARD OF REGISTRATION IN MEDICINE
Board of Registration in Medicine, Petitioner

*Case No.:*  Docket No. BR-99-074
*Parties:*    Board of Registration in Medicine, Petitioner v.  Robert P.
       Weinberg, D.O., Respondent

*Appearing:*  **Appearance for Petitioner:**   Alice Cole Oliff, Esq.

     Board of Registration in Medicine

     10 West Street

     Boston, MA 02111
Appearance for Respondent:   John G.S. Flym, Esq.
     Northeastern University School of Law    400 Huntington Avenue
     62 Cargill

     Boston, MA 02115
Administrative Magistrate: Sarah H. Luick, Esq.
*Date:*     May 16, 2002

RECOMMENDED DECISION

544.    This DALA decision will be cited below as [*"Magistrate Sarah H. Luick, DALA*

*Recommended Decision, Docket No. BR-99-074, Petitioner Board of Registration in Medicine,*

*Respondent Robert P. Weinberg, Issued on May 16, 2002, page X"]*

545.    "This Stipulation is entered into, in order to resolve questions of material fact as set forth

by the Statement of Allegations, and the Amended Statement of Allegations in the above matter,

pursuant to M.G.L.A. 30A § 10, and 801 CMR 1.01 (10)(b) which states in part, 'In the

discretion of the Presiding Officer, the Parties may, by written stipulation filed with the Presiding

Officer at any stage of the proceeding … agree as to the truth of any fact pertinent to the

proceeding.'" [*"Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations  of Respondent's*

*counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner*

*Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 1, paragraph 1, lines 1 - 7"*]

546.    Below is the caption copied from the 25-page Joint Stipulations of Board Counsel Alice Oliff and Plaintiff's counsel John Flym, officially attached to the Recommended Decision as Appendix "A" and adopted by Magistrate Luick as part of the Official Record as described in the Recommended Decision, which will be cited as *"Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page X"*

547.    The Stipulation attached to the Magistrate Sarah Luick's Decision was signed by all parties, incorporated into and adopted by Magistrate Sarah Luick in her Decision which issued in May 2002 [attached to DALA decision in Appendix A at the end].

548.    Attachment "A" to the DALA Recommended Decision comprises the Stipulated Findings of Fact ("STIPULATION") which are incorporated into the Recommended Decision and were adopted by Magistrate Sarah Luick as proposed by the BORIM counsel Alice Oliff, the Plaintiff's counsel John Flym and the Plaintiff. These Stipulations were submitted in order to resolve questions of material fact and the parties agreed that Conclusions of Law may be made upon these Stipulated Findings of Fact. The DALA Recommended Decision by Magistrate Sarah Luick with the Stipulation (Attachment "A") can be found in Appendix A to this Complaint.

549.    All writings, pleadings, and documents which are copied and pasted into this Complaint are incorporated by reference into the instant action.

550.    The image below is copied and pasted portions of the Stipulated Findings of Fact submitted to DALA.

551.    The entire Recommended Decision, along with its factual findings, and Stipulations

along with its conclusions, are ALL TAINTED by Magistrate Sarah Luick's lack of the 1992

memorialized handwritten Express Bilateral Contract which terminated the doctor-patient

relationship because of its fraudulent concealment by defendants Lourdes Colon, Stanley Spero

and Lisa Wolfe; this concealment by the defendants comprise spoliation of evidence and

substantially affect all the proceedings of the tribunal as well as its concealment substantially

handicapping and impairing the validity of the Expert Witnesses' opinions which would have

been substantially different had they known that the doctor-patient relationship ended in

September 1992.

552.    Once the Plaintiff has proved the fact of this termination of the doctor-patient relationship

by a preponderance of the evidence, all tribunals subsequent to these BORIM proceedings will

need to overturn and vacate their judgments because they are based on substantial FALSE

statements of material fact relevant to the tribunals' proceedings.

" A "

## COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                Board of Registration in Medicine

```
_____   )
                                )
In the Matter of                )
                                )   Adjudicatory Case # RM-99-074
Robert P. Weinberg, D.O.        )
                                )
_____   )
```

### STIPULATION

This Stipulation is entered into, in order to resolve questions of material fact as set forth by the Statement of Allegations, and the Amended Statement of Allegations in the above matter, pursuant M.G.L.A 30A, § 10, and 801 CMR 1.01 (10)(b) which states in part, "In the discretion of the Presiding Officer, the Parties may, by written stipulation filed with the Presiding Officer at any stage of the proceeding . . . agree as to the truth of any fact pertinent to the proceeding."    Robert P. Weinberg, D.O. (the Respondent), acting through his attorney John G.S. Flym, and Complaint Counsel for the Board of Registration in Medicine,, agree that this Stipulation shall be filed with the Administrative Magistrate for the Division of Administrative Law Appeals (DALA). The parties stipulate to the Findings of Fact described below and agree

1 of 25

.

that the Administrative Magistrate and the Board may make Conclusions of Law based upon said facts.

The parties agree that Exhibits 1 through 66 as listed in Attachment A to this Stipulation, shall be admitted into evidence and shall become a part of the record in the above-captioned matter. The parties further agree that additional documents may be submitted, and that a hearing may be held at DALA in order to create a further record on which the Board may rely in determining sanctions.

### FINDINGS OF FACT

553.    Selected stipulations are stated below to be incorporated as part of this Complaint.

554.    On or about November 2000, John Flym, Professor of Law at Northeastern University, entered his appearance as Counsel of Record for the Plaintiff.

555.    In November 2000, the counsel for the Board of Registration in Medicine, Alice Oliff, and Plaintiff's counsel John Flym, mutually agreed and made a motion to Magistrate Sarah Luick to draft a Joint Stipulation of Findings of Fact to create the judicial record and assist in the adjudication at DALA.

556.    In these stipulations, the Magistrate's Decision, and other pleadings filed in the DALA adjudicatory proceedings, the Defendant Lourdes Colon is assigned the alias "Patient A".

557.    The Stipulation begins with:

"Robert P. Weinberg, D.O. (the Respondent), acting through his attorney John G.S. Flym, and Complaint Counsel for the Board of Registration in Medicine, agree that this Stipulation shall be filed with the Administrative Magistrate for the Division of Administrative Law Appeals (DALA)." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel*

*John Flym and Petitioner's Counsel Alice Oliff, DALA Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 1].*

558.     "The parties stipulate to the Findings of Fact described below and agree that the Administrative Magistrate and the Board may make Conclusions of Law based upon said facts." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, pages 1-2*"]

STIPULATIONS  (Adopted by Magistrate Sarah Luick – as conclusive)

559.     "Stipulation No. 1. "Robert P. Weinberg, D.O. was born on October 27, 1953. He is a 1986 graduate of the New York College of Osteopathic Medicine of the New York Institute of Technology. He has been licensed to practice medicine in Massachusetts since September 7, 1988, under registration number 60232. He is also licensed to practice medicine in New York. His specialty is Family Practice and Emergency Medicine and he is certified by the American Board of Certification in Family Practice. He has hospital privileges at Baystate Health Systems, Springfield, MA, and Jones Memorial Hospital, Wellsville, NY. He currently has a private practice in Littleton, Massachusetts, known as House Call Docs." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 2* ]

*1988-89 - BORIM ISSUED TWO (2) MEDICAL LICENSES TO PLAINTFF*

560.     In 1988-89 BORIM issued two distinct medical licenses to the Plaintiff.

561.     Each of these two medical licenses had a different number.

562.     One of those medical licenses was License No. 60232.

563.   The second license had a different number.

564.   In 2002, License No. 60232 was revoked by order of BORIM on or about October 30, 2002.

565.   However, the second medical license was never revoked nor suspended and is presumably still active.

566.   In the absence of any active revocation or suspension, the Plaintiff presumably has the right to practice medicine in the Commonwealth of Massachusetts under the second medical license which was issued to the Plaintiff in 1988-89.

*DALA proceedings 2000 – 2002 Stipulations reiterated below (Appendix A)*

567.   The DALA document has two distinct sections: the first section appears as:

## COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                          Division of Administrative Law Appeals

Board of Registration in Medicine,
      Petitioner
              v.                                      Docket No. BR-99-074
Robert P. Weinberg, D.O.
      Respondent

Appearance for Petitioner:                Alice Cole Oliff, Esq
Appearance for Respondent:             John G.S. Flym, Esq.
Administrative Magistrate:                Sarah H. Luick, Esq.

## RECOMMENDED DECISION

568.   The first section of the DALA "Recommended Decision" is twenty-four (24) pages in length and the twenty-fourth (24th) page is dated May 16, 2002 and signed by Sarah Luick, Administrative Judge.

569.    The second section begins with a Title page entitled "STIPULATION" with an "A" in the upper right corner designating it as attachment "A" to the Recommended Decision, has twenty-five (25) numbered pages followed by three (3) pages of numbered Exhibits with the Exhibits numbered from # 1 – # 66 for a total of twenty-eight (28) pages in length for the second section.

570.    In the "Recommended Decision" of Magistrate Sarah Luick, she states that the sixty-six (66) numbered exhibits at the end of "STIPULATION - Attachment "A" – are part of the official record in the case.

571.    In January 2024, the Plaintiff made a request to BORIM and DALA for copies of these official records, and he only received the "Recommended Decision" along with attachment "A", but finally after several weeks of delay, he received the sixty-six (66) exhibits which are part of the official record.

572.    Stipulations below are copied and pasted herein to allow for comments and annotations. A copy of the full document can be found in Appendix A attached.

573.    Stipulation Nos. 2 – 5 (copied and pasted):

2.    Respondent was on the staff at Boston Evening Medical Center (BEMC) from February 1989 until February 1997, at which time Respondent took a

2 of 25

173

leave of absence.

3.   Patient A is a thirty-seven year old female who went to BEMC in July 1989 in order to obtain a primary care doctor, and Respondent was randomly assigned to be her doctor.

4.   Patient A had her first appointment with the Respondent at BEMC in July 1989.

5.   Between July 12, 1989 and July 30, 1992, Patient A had approximately sixty-one (61) visits with Respondent at BEMC. During that period, Patient A visited other BEMC personnel on a total of three (3) occasions and she had (3) telephone conversations with BEMC personnel other than Respondent, with notations in her chart stating that Respondent would be notified.

574.   Prior to August 1, 1992, Lourdes Colon had 61/64 BEMC visits with the Plaintiff, representing 95% of all BEMC visits with the Plaintiff.

575.   Stipulation No. 11:

11. On July 6, 1992, Respondent had an extensive thirty (30) minute counseling session with Patient A at BEMC. They discussed her suicide attempts. Respondent noted in Patient A's medical record that Patient A was in psychotherapy with a therapist who specialized in Post Traumatic Stress Disorder (PTSD).

576.    This July 6, 1992 note in Stipulation No. 11 documents the Plaintiff's knowledge that Patient A [Lourdes Colon] had a psychotherapist, was receiving psychological treatment, and that this psychologist specialized in Post Traumatic Stress Disorder.

577.    There were at least three (3) psychologists/psychotherapists involved with the treatment of Lourdes Colon during the time period 1989 – 1997:  Paula Lazar, Lisa Wolfe and Amy Banks.

578.    In the August 9, 1992 Admission Note in HRI, Dr Lisa Wolfe noted in the medical records of Lourdes Colon the potential of a Dissociative Personality Disorder as part of her differential diagnosis:  Rule out (R/O) Dissociative Disorder NOS (Stipulation No. 15)

["*Magistrate  Sarah H. Luick, Exhibit A, Joint Stipulations  of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 5* ]

579.    Subsequent psychiatric expert witness opined that defendant Lourdes Colon did suffer from Dissociative Identity Disorder with Multiple Personality Syndrome.

580.    Stipulation No. 11 contradicts a substantial statement of material fact in Magistrate Sarah Luick's Recommended Decision on page 4 of her Recommended Decision, under the heading of "Additional Findings," Luick wrote:

> **"81. By August 1992 and Pt. A's hospitalization, Dr. Weinberg, who was aware Pt. A had significant mental health issues, had not referred Pt. A to a psychiatrist for an assessment."**

581.    Additional Finding No. 81 **contradicts** Stipulation Nos. 11, 14, 15, 16, 17, 18, 19, 20, 24, 26, 33, 37, 39, 40, 46, 53 57, 59, contradicts the medical record and contradicts other Stipulations which Luick had adopted as true and conclusive. Luick wrote "The parties Stipulations and list of exhibits in the documentary record are attached as "A". I have adopted the Stipulations and accepted the agreed upon Exhibits." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations*

*of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074,*

*Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16,*

*2002, page 2* ].

582.    Stipulation No. 20: "Between 1988 and August 1994, patient A's regular psychotherapist

was Dr. Paula Lazar." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of*

*Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074,*

*Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16,*

*2002, page 6*].

583.    Multiple stipulations and the medical record show that the Plaintiff knew that Colon was

under the psychological care of Dr Paula Lazar, Dr. Amy Banks and Dr. Lisa Wolfe from 1988 –

1994 [Stipulation Nos. 11, 14, 15, 16, 17, 18, 19, 20, 24, 26, 33, 37, 39, 40, 46, 53 57, 59].

584.    **Plaintiff will seek injunctive relief to have this false finding No. 81 stricken from the**
**record as FALSE, INACCURATE, CONTRARY TO ALL EVIDENCE AND CONTRARY**
**TO THE STIPULATIONS, GROUNDLESS, WITHOUT FOUNDATION, AND**
**LACKING SUBSTANTIAL EVIDENTIARY SUPPORT.**

585.    While the Plaintiff had to presume that Drs. Lazar, Banks and Wolfe were competent

psychologists, there was no need to refer Colon to a psychiatrist. In fact, the Plaintiff's Expert

Witnesses will testify that such a referral had the potential to undermine the psychological

treatment plans of Lazar and Wolfe.

586.    Furthermore, Luick wrote in her Recommended Decision:

> **"At the outset, I reviewed the Stipulations made by the parties, and find**
> **they are supported by the documentary record."**

["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 11* ]

THUS THE STIPULATIONS ARE PRE-EMINENT OVER AND SUPERCEDE CONTRADICTORY STATEMENTS OF FACT IN THE RECOMMENDED DECISION which may be false inferences or false conclusions based on false assumptions

587.    Luick also wrote:

> **"... They do show his conduct following the adverse ruling on his lawsuit, as alleged, involved making threats of seeking criminal complaints against the Board of Registration in Medicine Complaint Counsel; all before the DALA hearing commenced, and in an effort to block Pt. A and others from testifying against his interests."**

["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 12* ]

588.    AS EXPLAINED HEREIN, THE DEFENDANTS COLON, SPERO AND WOLFE CONCEALED EXCULPATORY EVIDENCE OF THE 1992 CONTRACT WHICH EXPLAINS THE "THREATS" OF SEEKING   CRIMINAL COMPLAINTS AND CONTRADICTS ALLEGATION THAT PLAINTIFF MADE ANY "EFFORT TO BLOCK PT. A AND OTHERS FROM TESTIFYING AGAINST HIS INTERESTS"

589.    One can only arrive at a conclusion of "efforts to block Pt. A and others from testifying against his interests" if one does not know that those defendants engaged in criminal spoliation of exculpatory evidence and concealed material evidence from the tribunal.

590.    The Plaintiff intends to prove his prior assertions that defendants Stanley Spero, Lourdes

Colon and Lisa Wolfe did conceal material evidence from the tribunal, did commit fraud upon

the court, and did commit crimes as previously asserted, by a preponderance of the evidence.

591.    Appendix B has a copy of the letter sent by Plaintiff to the Board, but not sent to Colon,

in which the Plaintiff was attempting to emphasize the truth about the express bilateral contract

terminating the doctor-patient relationship which he felt was exonerating of his situation and

vital that such contract be included in the evidence for assessing whether he had committed any wrong or not. The concealment of that material evidence did comprise fraud upon the court and also comprised a crime.

592.    Because of defendants' misconduct and deception in the concealment of material evidence of the two express bilateral contract, which terminated the doctor-patient relationship, the Plaintiff had been forced into a corner for 5 years because defendant Colon and defendant Wolfe were both denying the existence of the Express Bilateral contract which was formed and executed in September 1992. (Stipulation Nos. 18, 19 and sworn testimony under oath on the record).

593.    The Stipulations indicate clearly that Dr Lisa Wolfe, Lourdes Colon and Magistrate Sarah Luick knew and understood that there was a termination of the doctor-patient relationship:

594.    Stipulation No. 19:  "The Discharge Plan in a Psychiatric Summary dated November 11, 1991 states, **'It was recommended that Dr. Weinberg** step out of his role as her (Patient A's) prescribing physician since he and the patient had become so close that they change their relationship so that he **would no longer be functioning as her doctor**. Dr. Weinberg was, however, able to refer the patient to someone who could prescribe her medications at Boston Evening Medical Center." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 6*].

595.    \*\*\* There is an obvious clerical error in Stipulation No. 19 – because the date should be November 11, 1992 – not November 11, 1991 – because Lourdes Colon was hospitalized at HRI in 1992 and not in 1991.

596.    Stipulation No. 24: "Patient A saw Dr. Reichel at BEMC ... A telephone message on

11/5/92 from Patient A for prescription medications was originally directed to Respondent, but

this was crossed out and replaced with a reference to Dr. Reichel, with a notation on 11/6/92

stating: **'She is now WR's pat.'** ... Dr. Lisa Wolfe's out-patient psychotherapy records note that

on 8/24/94, 9/19/24, 9/27/94, 10/4/94, 10/14/94, 12/8/94, 12/13/94, 12/16/94, & 12/29/94 patient

A **used the expression "former physician" or "former M.D."** when referring to her then-

current relationship with the Respondent." ["*Magistrate Sarah H. Luick, Exhibit A, Joint*

*Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No.*

*BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg,*

*Issued on May 16, 2002, page 7*].

597.    Stipulation Nos. 19 and 24 corroborate the termination of the doctor-patient relationship

between the Plaintiff and Lourdes Colon.

598.    Stipulation No. 28: "It was noted in Patient A's medical record on January 14, 1993, that

Patient A had removed sections from her record that included entries from the spring and

summer of 1992." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's*

*counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner*

*Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002,*

*page 9*].

599.    Sections removed from the medical record by Lourdes Colon in 1992-93 included

exposition and description of the 1992 Express Bilateral Contract terminating the doctor-patient

relationship as well as the modification of the contract providing for the clinical-nonclinical

binary classification of time and place.

600.    Random sections of the medical record were removed by Lourdes Colon, which were not consecutively nor chronologically ordered.

601.    It is not known whether defendant Lourdes Colon removed these sections of the paper-based medical record on one, two or more different occasions.

602.    The bottom line in her Recommended Decision, Magistrate Luick made the factual finding that the doctor-patient relationship was terminated in September 1992.

603.    Apparently, when removing sections of the medical record, defendant Lourdes Colon appeared to target removing clinical notes which described the 1992 Express Bilateral Contract which terminated the doctor-patient relationship as well as its modification which provided for the clinical-nonclinical binary classification of time and place.

604.    The sections of the medical record which were removed by Lourdes Colon were never recovered.

605.    It is not known whether Lourdes Colon has kept those sections of the medical record which she removed or whether she may have destroyed them.

606.    Without recovering those sections of the medical record which were removed, which may or may not still exist, the only remaining knowledge of the content in those records would persist in the memory of the Plaintiff and defendant Lourdes Colon; there was no back-up of those records.

607.    As previously stated, due to the intentional and purposeful concealment of the material evidence of the 1992 Express Bilateral Contract terminating the doctor-patient relationship by defendants Spero, Colon and Wolfe, the Plaintiff felt backed into a corner because that essential material evidence of the contract exonerated him and to testify otherwise would comprise perjury and fraud upon the Court.

*December 1999 – February 2000 "threatening letters" from Plaintiff*

608.    Stipulation No. 56

**56. In December 1999, Respondent sent a Memorandum to Richard Waring, former Complaint Counsel in the above-captioned matter, and Deirdre Manning, former investigator in the above-captioned matter. In this memorandum Respondent asserted that false testimony was being used against him, and he warned that anyone who knowingly participated in the use of such false testimony against him might be participating in a "criminal conspiracy". He stated, "This is an opportunity for you and the board to withdraw from the**

**16 of 25**

**conspiracy, and diminish collectively your criminal responsibility for all foreseeable crimes engendered by the conspiracy."**

609.    In December 1999, when the defendants Lourdes Colon, Stanley Spero and Lisa Wolfe were intentionally and purposefully concealing the material evidence of the 1992 handwritten Express Bilateral contract terminating the doctor-patient relationship, the Plaintiff sent this letter to Richard Waring and Deirdre Manning because he was concerned that the defendants would lie

about the contract thus perjuring themselves at trial, and if this were a common shared

conspiratorial plan of the three defendants, it would comprise a criminal conspiracy of the three

defendants and the Plaintiff was providing them with an option to escape criminal liability for

said conspiracy – "This is an opportunity for you and the board to withdraw from the conspiracy,

and diminish collectively your criminal responsibility for all foreseeable crimes engendered by

the conspiracy."

610.    The Plaintiff's greatest concern up to this point was to get the truth out about the 1992

Express Bilateral contract which terminated the doctor-patient relationship, which the defendants

Lourdes Colon, Lisa Wolfe and Stanley Spero were attempting to conceal from the court.

611.    This 1992 Express Bilateral contract, which terminated the doctor-patient relationship,

was the Plaintiff's strongest defense to exonerate himself from the allegations of sexual

misconduct.

612.    The defendants' willful, intentional and purposeful attempts to conceal this material

evidence from the tribunal was extremely disconcerting to the Plaintiff so he mailed this letter to

warn against potential perjury by the three defendants Lourdes Colon, Lisa Wolfe and Stanley

Spero.

613.    The 1992 Express Bilateral contract, engineered and dictated by Dr. Lisa Wolfe, was also

evidence of Wolfe's gross negligence and medical malpractice, which were strong reasons for

her to keep silent about it.

614.    In view of subsequent events following the termination of the doctor-patient relationship,

the details of the 1992 Express Bilateral contract terminating the doctor-patient relationship

could have very serious consequences for Dr. Wolfe whose license might be in jeopardy.

615.    Dr. Wolfe had much to gain by concealing her role in approving and dictating the terms of the termination agreement.

616.    Only three (3) persons were percipient witnesses to the dictation, writing, formation and execution of the 1992 termination contract: the Plaintiff, defendant Lisa Wolfe, and defendant Lourdes Colon.

617.    In several legal proceedings – [1] *Colon v. Weinberg, Wesselhoeft, Boston Evening Medical Center et al.,* [2] *Weinberg v. Colon,* and [3] *BORIM v. Weinberg*  - paper copies of the 1992 termination contract would have been detrimental to Colon and BORIM but its concealment was substantially advantageous to Colon and BORIM.

618.    During the drafting of the Stipulations, BORIM refused to stipulate to the 1992 termination agreement because Colon and Wolfe adamantly resisted telling the truth, in their persistent attempts to conceal that agreement.

619.    Finally, after 32 years, the Plaintiff will have the ability to complete discovery and obtain depositions of Lisa Wolfe and Lourdes Colon, so that the truth about the 1992 Express Bilateral contract which terminated the doctor-patient relationship will finally be officially on the record.

620.    Stipulation No. 57:

57. In February 2000, Respondent filed a letter and affidavit with the Board of Registration of Psychologists, the Attorney General's Office, the Suffolk County District Attorney's Office, and the Board of Bar Overseers alleging unlawful acts by: Lisa Wolfe, Ph.D.(Patient A's current therapist), Stanley Spero, Esq. (Patient A's attorney), and Richard Waring, Esq. (former complaint Counsel in the above-captioned matter). The alleged unlawful acts included: perjury, larceny, theft by misrepresentation and insurance fraud. Respondent accused Mr. Waring of acting "in a criminally negligent and/or criminally reckless manner in issuing the Complaint in January 1999."

621.    Here again, the letters and affidavit, all emphasize and corroborate the Plaintiff's desire that the truth about the 1992 termination agreement be made official and public, that the 1992 termination agreement was the Plaintiff's exoneration of committing sexual misconduct, and the Plaintiff's fears that defendants Colon and Wolfe would lie and commit perjury on the stand by denying the existence of, formation and execution of that 1992 Express Bilateral contract which terminated the doctor-patient relationship.

622.    In an attempt to evade liability and avoid telling the truth about the 1992 memorialized handwritten Express Bilateral Contract terminating the doctor-patient relationship between the Plaintiff and Lourdes Colon, defendant Lisa Wolfe told BORIM "It is not the kind of thing that I normally do" thus evasively avoiding telling the truth about her role in conceiving, drafting and dictating the Express Bilateral Contractl

623.    The other crimes mentioned in the letter and affidavit – insurance fraud, theft by misrepresentation and larceny – all refer to the settlement of the case *Colon v. Weinberg,*

*Wesselhoeft, BEMC et al.* for $150,000 by ProMutual Medical group, the Plaintiff's medical malpractice insurance carrier, while defendants Colon and Wolfe had continued to conceal the material evidence of the 1992 termination contract from the insurer, who might have refused to settle Out-Of-Court had they known about the termination contract.

624.    The "threatening letter" written by the Plaintiff specifically states that if any person commits perjury (by denying the truth of the contract) or suborns perjury by another, then the Plaintiff would seek their prosecution.

625.    This letter was mailed to BORIM and prosecuting attorney Alice Oliff, but never sent to Lourdes Colon; thus it is hard to conceive how it might intimidate Colon because she never received a copy of the letter from the Plaintiff and if she were to tell the truth and not perjure herself, there would be nothing to fear.

626.    The Plaintiff was attempting to assert his right to the truth in these proceedings, and felt desperate because Colon and Wolfe were concealing the truth, interfering with the fair administration of justice and obstructing justice through their concealment of the contract terminating the doctor-patient relationship.

627.    The Plaintiff NEVER intended to block any testimony – unless that testimony would be FALSE and untruthful, comprising perjury by denying knowledge or existence of the 1992 Express Bilateral Contract which terminated the doctor-patient relationship.

628.    The Plaintiff only wanted the witnesses to tell the truth.

629.    The whole point of the Plaintiff's letter was to impress upon the relevant witnesses the importance of telling the truth and if they did not, the Plaintiff would seek criminal complaints regarding any perjury committed.

630.    Plaintiff will seek injunctive relief by having all references to any attempt to block testimony or to intimidate witnesses stricken from the record of:  DALA record, BORIM record, Mass SJC record, Maine SJC record - **stricken from the record as FALSE, INACCURATE, CONTRARY TO ALL EVIDENCE AND STIPULATIONS, GROUNDLESS, WITHOUT FOUNDATION, AND LACKING SUBSTANTIAL EVIDENTIARY SUPPORT.**

631.    Magistrate Luick <u>admits the limitations to her findings and conclusions</u>:
"Both parties also made detailed requests for additional findings of fact which they each argued the documentary evidence and Stipulations support. I find, after careful review of the record, including considering hearsay accounts as corroborated or not, and examining each of the proposed findings of the parties, that some of each side's proposed additional findings relied to too large an extent on **credibility determinations I was unable to make due to a lack of testimony**. By **not having Pt. A's testimony of how Dr. Weinberg's conduct had an impact on her, subject to cross-examination,** I am left with no way to adopt all of the proposed findings that principally rely on believing  just her account. The same analysis was employed with Dr. Weinberg's proposed findings as to those that principally relied on believing just his accounts. … **Another significant factor impacting credibility determinations was the lack of any testimony from  Dr. Paula Lazar, or inclusion of her treatment records, or testimony from Dr. Wolfe, or        testimony from Dr. Reichel.** … Likewise, **without testimony from Attorney DiCianni**, findings proposed by Dr. Weinberg concerning his actions once his case was before DALA, could not be made as he proposed them." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations  of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, pages 12-13*].

632.    The Plaintiff, in the instant actions, plans to rectify and correct all the limitations stated by Luick in her Recommended Decision, which was substantially limited by Luick's lack of direct testimony and cross-examination of the relevant witnesses. The Plaintiff has named the following important, material and relevant percipient witnesses as defendants in this action:

> Lourdes Colon ("Patient A")
>
> Dr. Lisa Wolfe
>
> Dr. Paula Lazar
>
> Dr. Amy Banks
>
> Attorney Vincent DiCianni
>
> Attorney Robert Stolzberg
>
> Attorney Stanley Spero

633.    The Plaintiff also intends to depose the Expert Witness James Beck to obtain his answer on how his Expert Opinion would have changed had he known about the 1992 memorialized handwritten Express Bilateral Contract which terminated the doctor-patient relationship.

634.    Unfortunately, at least four material percipient witnesses, (1) William Reichel, (2) Robert Wesselhoeft, III, (3) Alice Oliff, (4) John Flym, have passed away and are thus not available to testify.

635.    These other seven (7) witness-defendants will provide the answers, which Magistrate Luick was unable to ascertain without their testimony or cross-examination, through discovery by the Plaintiff with their testimony via depositions in the instant suit.

636.    However, under the Federal Rules of Evidence, Rule 804 provides for Hearsay Exceptions when the Declarant is unavailable because of death. *FRE Rule 804(a)(4)* – (a) Criteria for being unavailable. A declarant is considered to be unavailable as a witness if the

declarant: (4) cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness; or … " *FRE Rule 804*

637.    Expert Witnesses  James Beck had no knowledge of the 1992 memorialized Express Bilateral Contract terminating the doctor-patient relationship which is a substantial and material fact relevant to the issue of fact whether the Plaintiff was a doctor to Colon at specific relevant times to determine if the Plaintiff should be disciplined for improper and unethical sexual conduct with a patient.

638.    James Beck's Expert Opinion will undoubtedly change once he is provided with this material evidence and that change will undoubtedly be in the Plaintiff's favor of having not engaged in misconduct after properly and lawfully terminating the doctor-patient relationship.

639.    The Plaintiff expects full and complete disclosure of the 1992 memorialized Express Bilateral Contract terminating the doctor-patient relationship through the discovery process in the instant suit including, but not limited to depositions, interrogatories, requests for admission and requests for production of documents to the relevant defendants in this suit.

640.    Although Stipulation No. 11 describes a 30-minute counseling session with Loudes Colon ("Patient A"), this does not indicate that the Plaintiff is a psychologist or psychotherapist, nor that he was trained to understand or to use transference or counter-transference. Most physicians will provide some counseling to their patients regardless of their specialty.

641.    The following stipulations about counseling attempt to suggest that the Plaintiff was acting as a psychiatrist, psychologist or psychotherapist, but it is usual and the Standard of Care for Family Physicians to do such counseling:  [Stipulation Nos. 6, 7, 9, 10, 11, 12, 13].

642.    "Family physicians spend substantial time counseling patients with psychiatric conditions, unhealthy behaviors, and medical adherence issues. Maintaining efficiency while providing counseling is a major challenge. There are several effective, structured counseling strategies developed for use in primary care settings. The transtheoretical (stages of change) model assesses patients' motivation for change so that the physician can select the optimal counseling approach. Structured sequential strategies such as the five A's (ask, advise, assess, assist, arrange) and FRAMES (feedback, responsibility of patient, advice to change, menu of options, empathy, self-efficacy enhancement) are effective for patients who are responsive to education about health risk behavior. For patients ambivalent about change, motivational interviewing is more likely to be successful. Capitalizing on a teachable moment may enhance the effectiveness of health behavior change counseling. The BATHE (background, affect, troubles, handling, and empathy) strategy is useful for patients with psychiatric conditions and psychosocial issues." H. Russell Searight, "Counseling patients in Primary Care: Evidence-based strategies" (2018) *Am. Fam. Physician*, **98**(12):719-728.  American Academy of Family Physicians.

643.    "…counseling as the process of assisting people to overcome obstacles in their personal growth and in their interpersonal relationships. It helps clear away such obstacles so that one's personal potential can be developed and realistic life goals achieved. Since the efficacy of counseling has been proven, it has become an important aspect of family doctors' work. Doctors must assist patients and family members as they suffer from illnesses, as well as help them handle their emotions during various life crises. Furthermore, a family physician will often intentionally guide patients to move forward in their maturation process and personal

development." Vincent H.K. Poon, "Model of counseling for Family Doctors" (2007) *Canadian Family Physician,* **53**:1013-14.

644.    Stipulation No. 73: "It is Dr. Beck's opinion that Respondent's boundary violations were 'especially egregious' because Respondent 'functioned not only as a primary care physician but also as a psychotherapist for much of the time when he was meeting with Patient A."

645.    Plaintiff's Expert Witness will testify that Dr Beck's opinion was deficient and incorrect for the following reasons:

(a) as stated above in paragraphs 277 and 278, the American Academy of Family Physicians has several policy statements which assert that Family Physicians have an important role in counseling and this does not make them function as "psychotherapists" as stated in Dr. Beck's opinion;

(b) Stipulation No. 66 lists the materials that Dr Beck reviewed which were provided to him by BORIM, and no where in this list is any document or medical record which describes the 1992 Express Bilateral Contract terminating the doctor-patient relationship;

(c) as stated in Stipulation No. 28 and also in paragraphs 254 – 261 above, sections of the medical record were removed by Colon which could not have been reviewed by Dr. Beck;

(d) Dr. Beck's expert opinion is especially deficient because material evidence of the 1992 Express Bilateral Contract terminating the doctor-patient relationship was intentionally and purposefully concealed by defendants Spero, Colon and Wolfe.

646.    The Plaintiff's expert witness will opine that Dr. Beck's analysis and conclusions would be substantially different had he known about the 1992 termination of the doctor-patient relationship.

647.    At trial, following a subpoena to appear, Dr Beck will testify to the truth of the paragraphs above.

648.    The Plaintiff's credentials, education and training as well as the type of specialty which he held himself out to the public, are vital elements for any medical malpractice case because the Standard of Care, used to evaluate negligence or misconduct, greatly depends on the physician's specialty, education and training.

649.    During the years 1988 – 2003, the Plaintiff had only held himself out to the public as an Emergency Department physician and a Family Physician.

650.    The Plaintiff had never represented himself to be any type of psychologist, psychiatrist, psychotherapist or other type of mental health provider, although Defendant Stanley Spero repeatedly attempted to portray the Plaintiff as a mental health provider because he asked Lourdes Colon about issues which were upsetting to her.

651.    As an Emergency Department physician and a Family Practice physician, the Plaintiff never had any training on transference, counter-transference nor boundary violations.

652.    The Plaintiff's expert witness will opine that Family Physicians do not routinely receive training in psychotherapy, transference, counter-transference and boundary violations. They receive limited training in counseling patients about emotional and behavioral problems.

653.    Stipulation No. 14:

14. On July 30, 1992, Respondent met with Patient A at BEMC. Respondent determined that Patient A needed to be hospitalized and he committed her to the Human Resource Institute (HRI), a psychiatric hospital, noting in her medical record that she was decompensating.

654.    Stipulation No. 15:

15. In an Admission Note dated August 9, 1992, Dr. Wolfe noted that Patient A was sent from BEMC after reporting suicidal ideation and worsening depression to her internist. Dr. Wolfe indicated that the diagnostic impression of Patient A was:

> Axis I:  Major Depression; rule out: dysthymia, PTSD,
> Dissociative disorder NOS, eating disorder NOS, and organic
> mood disorder
> Axis II  Deferred
> Axis III  Syncopal episodes and history of seizures, recent
> back surgery, history of anorexia

Patient A was hospitalized at HRI from July 30, 1992 until September 11, 1992.

655.    In Stipulation No. 15, it states that Dr. Wolfe made a diagnostic impression in her Admission Note dated August 9, 1992, and includes under Axis I:  rule out Dissociative disorder NOS.

*Defendant Lourdes Colon suffers/suffered from Dissociative Identity Disorder*

656.    Subsequent medical records, from multiple clinical providers, and notes show that Lourdes Colon did suffer from Dissociative Identity Disorder including Multiple Personality Disorder.

*Colon diagnosed with Multiple Personality Disorder - Dissociative Identity Disorder*

657.    At one point in time, Lourdes Colon informed the Plaintiff that she would sometimes black-out for days to weeks at a time, have no memory or recollection of what took place during those blacked-out periods of time – could not remember where she was, what she was doing, what she saw or heard, or what happened, and that following some of these days-long or weeks-long black-outs, she would "awaken" and find herself in other cities such as New York, Chicago, Baltimore, Houston, sometimes even finding herself in another country such as Italy, England, Brazil, Hong Kong, and Colon would have no memory or recollection of how she traveled to those cities or countries nor when or where she may have gone.

658.    The Plaintiff's expert witness will opine that Lourdes Colon most probably suffers or suffered from Dissociative Identity Disorder ("DID") and Multiple Personality Disorder ("MPD").

659.    These black-outs are typical occurrences for Multiple Personality Disorder where, for example, the personality of Sally may take over and decide to travel to London, and several days later, the personality of Susan would take over, not remember anything about Sally, or what Sally did, saw, heard, or anything about Sally's decision and actions in traveling to London.

660.    Patients with Multiple Personality Disorder often have no memories or recollections of what the other personalities did, thought or perceived when they transition to another of their personalities.

661.    The Plaintiff has a psychologist Expert Witness opinion which diagnoses defendant Lourdes Colon as most probably having a Dissociative Identity Disorder with Multiple Personality predominance, which is concordant with Dr. Wolfe's initial diagnostic opinion.

662.    **Dissociative identity disorder** (**DID**), also known as **multiple personality disorder**, **split personality disorder** or **dissociative personality disorder**, is a member of the family of dissociative disorders classified by the DSM-5, DSM-5-TR, ICD-10, ICD-11, and Merck Manual for diagnosis. It remains a controversial diagnosis.

663.    Dissociative identity disorder is characterized by the presence of at least two distinct and relatively enduring personality states.

664.    The disorder is accompanied by memory gaps more severe than could be explained by ordinary forgetfulness.

665.    The personality states alternately show in a person's behavior; however, presentations of the disorder vary.

666.    According to the DSM-5-TR, early childhood trauma, typically before the age of ~10 years, can place someone at risk of developing dissociative identity disorder.

667.    Across diverse geographic regions, 90% of individuals diagnosed with dissociative identity disorder report experiencing multiple forms of childhood abuse, such as rape, violence, neglect or severe bullying.

668.    Other traumatic childhood experiences that have been reported include painful medical or surgical procedures, war, terrorism, attachment disturbance, natural disaster, cult, and occult abuse, loss of a loved one or loved ones, human trafficking, and dysfunctional family dynamics.

669.    There is no medication to treat DID directly. Medications can be used for comorbid

disorders or targeted symptom relief, for example antidepressants or treatments to improve sleep,

however.

670.    Treatment generally involves supportive care and psychotherapy.

671.    The condition usually persists without treatment.

672.    It is believed to affect 1.1–1.5% of the general population (based on multiple

epidemiological studies) and 3% of those admitted to hospitals with mental health issues in

Europe and North America.

673.    DID is diagnosed about six times more often in women than in men.

674.    The number of recorded cases increased significantly in the latter half of the 20th century,

along with the number of identities reported by those affected.

675.    It is unclear whether increased rates of the disorder are due to better recognition or

sociocultural factors such as mass media portrayals.

676.    The typical presenting symptoms in different regions of the world may also vary

depending on culture, such as alter identities taking the form of possessing spirits, deities, ghosts,

or mythical creatures and figures in cultures where normative possession states are common.

677.    Dissociation, the term that underlies dissociative disorders including DID, lacks a precise,

empirical, and generally agreed upon definition.

678.    A large number of diverse experiences have been termed dissociative, ranging from

normal failures in attention to the breakdowns in memory processes characterized by the

dissociative disorders.

679.    It is therefore unknown if there is a commonality between all dissociative experiences, or

if the range of mild to severe symptoms is a result of different etiologies and biological structures.

680.    Other terms used in the literature, including personality, personality state, identity, ego state, and amnesia, also have no agreed upon definitions.

681.    Multiple competing models exist that incorporate some non-dissociative symptoms while excluding dissociative ones.

682.    Due to the lack of consensus regarding terminology in the study of DID, several terms have been proposed - One is ego state (behaviors and experiences possessing permeable boundaries with other such states but united by a common sense of self), while the other term is alters (each of which may have a separate autobiographical memory, independent initiative and a sense of ownership over individual behavior).

683.    Ellert Nijenhuis and colleagues suggest a distinction between personalities responsible for day-to-day functioning (associated with blunted physiological responses and reduced emotional reactivity, referred to as the "apparently normal part of the personality" or ANP) and those emerging in survival situations (involving fight-or-flight responses, vivid traumatic memories and strong, painful emotions – the "emotional part of the personality" or EP).

684.    "Structural dissociation of the personality" is used by Onno van der Hart and colleagues to distinguish dissociation they attribute to traumatic or pathological causes, which in turn is divided into primary, secondary and tertiary dissociation.

685.    According to this theory, primary dissociation prototypically involves one ANP and one EP, while secondary dissociation prototypically involves an ANP and at least two EPs, and tertiary dissociation, typically characterized in DID, is described as having at least two ANPs and at least two EPs.

686.    Efforts to psychometrically distinguish between normal and pathological dissociation have been made.

687.    The full presentation of dissociative identity disorder can onset at any age,[26] although symptoms typically begin at ages 5–10.

688.    According to the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), symptoms of DID include "the presence of two or more distinct personality states" accompanied by the inability to recall personal information beyond what is expected through normal memory issues.

689.    Other DSM-5 symptoms include a loss of identity as related to individual distinct personality states, loss of one's subjective experience of the passage of time, and degradation of a sense of self and consciousness.

690.    In each individual, the clinical presentation varies and the level of functioning can change from severe impairment to minimal impairment.

691.    The symptoms of dissociative amnesia are subsumed under a DID diagnosis, and thus should not be diagnosed separately if DID criteria are met.

692.    Individuals with DID may experience distress from both the symptoms of DID (intrusive thoughts or emotions) and the consequences of the accompanying symptoms (dissociation rendering them unable to remember specific information).

693.    The large majority of patients with DID report childhood sexual and/or physical abuse.

694.    Amnesia between identities may be asymmetrical; identities may or may not be aware of what is known by another.

695.    Individuals with DID may be reluctant to discuss symptoms due to associations with abuse, shame, and fear.

696.    DID patients may also frequently and intensely experience time disturbances.

697.    Around half of people with DID have fewer than 10 identities and most have fewer than 100; although as many as 4,500 have been reported.

698.    The average number of identities has increased over the past few decades, from two or three to now an average of approximately.

699.    However, it is unclear whether this is due to an actual increase in identities, or simply that the psychiatric community has become more accepting of a high number of compartmentalized memory components.

700.    The psychiatric history frequently contains multiple previous diagnoses of various disorders and treatment failures.

701.    The most common presenting complaint of DID is depression, with headaches being a common neurological symptom. Comorbid disorders can include substance use disorders, eating disorders, anxiety disorders, bipolar disorder, personality disorders, and autism spectrum disorder.

702.    A significant percentage of those diagnosed with DID have histories of borderline personality disorder and post-traumatic stress disorder (PTSD).

703.    Presentations of dissociation in people with schizophrenia differ from those with DID as not being rooted in trauma, and this distinction can be effectively tested, although both conditions share a high rate of dissociative auditory hallucinations.

704.    Other disorders that have been found to be comorbid with DID are somatization disorders, major depressive disorder, as well as history of a past suicide attempt, in comparison to those without a DID diagnosis.

705.   Disturbed and altered sleep has also been suggested as having a role in dissociative disorders in general and specifically in DID, alterations in environments also largely affecting the DID patient.

706.   Individuals diagnosed with DID demonstrate the highest hypnotizability of any clinical population.

707.   Although DID has high comorbidity and its development is related to trauma, there exists evidence to suggest that DID merits a separate diagnosis from other conditions like PTSD.

708.   There are two competing theories on what causes dissociative identity disorder to develop.

709.   The trauma-related model suggests that trauma or severe adversity in childhood, also known as developmental trauma, increases the risk of someone developing dissociative identity disorder.

710.   The non-trauma related model, also referred to as the Sociocognitive model or the fantasy model, suggests that dissociative identity disorder is developed through high fantasy-proneness or suggestibility, roleplaying, or sociocultural influences.

711.   The DSM-5-TR states that "early life trauma (e.g., neglect and physical, sexual, and emotional abuse, usually before ages 5-6 years) represents a risk factor for dissociative identity disorder."

712.   Other risk factors reported include painful medical procedures, war, terrorism, or being trafficked in childhood.

713.   Dissociative disorders frequently occur after trauma.

714.   DSM-5-TR places them after the trauma- and stressor-related disorders to reflect this close relationship.

715.    Dissociative identity disorder is often conceptualized as "the most severe form of a childhood onset post-traumatic stress disorder."

716.    According to many researchers, the etiology of dissociative identity is multifactorial, involving a complex interaction between developmental trauma, sociocultural influences, and biological factors.

717.    People diagnosed with dissociative identity disorder often report that they have experienced physical or sexual abuse during childhood (although the accuracy of these reports has been disputed); others report overwhelming stress, serious medical illness, or other traumatic events during childhood.

718.    They also report more historical psychological trauma than those diagnosed with any other mental illness.

719.    Severe sexual, physical, or psychological trauma in childhood has been proposed as an explanation for its development; awareness, memories, and emotions of harmful actions or events caused by the trauma are removed from consciousness, and alternate personalities or subpersonalities form with differing memories, emotions and behavior.

720.    Dissociative identity disorder is attributed to extremes of stress or disorders of attachment. What may be expressed as post-traumatic stress disorder (PTSD) in adults may become dissociative identity disorder when occurring in children, possibly due to their greater use of imagination as a form of coping.

721.    Possibly due to developmental changes and a more coherent sense of self past the age of six, the experience of extreme trauma may result in different, though also complex, dissociative symptoms and identity disturbances.

722.    A specific relationship between childhood abuse, disorganized attachment, and lack of social support are thought to be a necessary component of dissociative identity disorder.

723.    Although what role a child's biological capacity to dissociate to an extreme level remains unclear, some evidence indicates a neurobiological impact of developmental stress.

724.    Delinking early trauma from the etiology of dissociation has been explicitly rejected by those supporting the early trauma model.

725.    However, a 2012 review article supports the hypothesis that current or recent trauma may affect an individual's assessment of the more distant past, changing the experience of the past and resulting in dissociative states.

726.    Giesbrecht et al. have suggested there is no actual empirical evidence linking early trauma to dissociation, and instead suggest that problems with neuropsychological functioning, such as increased distractibility in response to certain emotions and contexts, account for dissociative features.

727.    A middle position hypothesizes that trauma, in some situations, alters neuronal mechanisms related to memory. Evidence is increasing that dissociative disorders are related both to a trauma history and to "specific neural mechanisms".

728.    It has also been suggested that there may be a genuine but more modest link between trauma and dissociative identity disorder, with early trauma causing increased fantasy-proneness, which may in turn render individuals more vulnerable to socio-cognitive influences surrounding the development of dissociative identity disorder.

729.    Another suggestion made by Hart indicates that there are triggers in the brain that can be the catalyst for different self-states, and that victims of trauma are more susceptible to these

triggers than non-victims of trauma; these triggers are said to be related to dissociative identity disorder.

730.    Paris states that the trauma model of dissociative identity disorder increased the appeal of the diagnosis among health care providers, patients and the public as it validated the idea that child abuse had lifelong, serious effects.

731.    Neuroimaging studies have reported a consistently smaller volume of the hippocampus in DID patients, supporting the trauma model.

732.    In addition, presentations can vary across cultures, such as Indian patients who only switch alters after a period of sleep – which is commonly how dissociative identity disorder is presented by the media within that country.

733.    Lower rates in other countries may be due to artificially low recognition of the diagnosis.

734.    As of 2011, approximately 250 cases of dissociative identity disorder in children have been identified, though the data does not offer unequivocal support for either theory.

735.    An analysis of diagnosis of children reported in scientific publications, 44 case studies of single patients were found to be evenly distributed (i.e., each case study was reported by a different author) but in articles regarding groups of patients, four researchers were responsible for the majority of the reports.

736.    The initial theoretical description of dissociative identity disorder was that dissociative symptoms were a means of coping with extreme stress (particularly childhood sexual and physical abuse), but this belief has been challenged by the data of multiple research studies.

737.    Proponents of the trauma-related model claim the high correlation of child sexual and physical abuse reported by adults with dissociative identity disorder corroborates the link between trauma and dissociative identity disorder.

738.    However, the link between dissociative identity disorder and maltreatment has been questioned for several reasons.

739.    The studies reporting the links often rely on self-report rather than independent corroborations, and these results may be worsened by selection and referral bias.

740.    Most studies of trauma and dissociation are cross-sectional rather than longitudinal, which means researchers can not attribute causation, and studies avoiding recall bias have failed to corroborate such a causal link.

741.    In addition, studies rarely control for the many disorders comorbid with dissociative identity disorder, or family maladjustment (which is itself highly correlated with dissociative identity disorder).

742.    The popular association of dissociative identity disorder with childhood abuse is relatively recent, occurring only after the publication of Sybil in 1973.

743.    Most previous examples of "multiples" such as Chris Costner Sizemore, whose life was depicted in the book and film The Three Faces of Eve, disclosed no history of childhood abuse.

744.    Despite research on DID including structural and functional magnetic resonance imaging, positron emission tomography, single-photon emission computed tomography, event-related potentials, and electroencephalography, no convergent neuroimaging findings have been identified regarding DID, with the exception of smaller hippocampal volume in DID patients.

745.    In addition, many of the studies that do exist were performed from an explicitly trauma-based position.

746.    There is no research to date regarding the neuroimaging and introduction of false memories in DID patients, though there is evidence of changes in visual parameters[81] and support for amnesia between alters.

747.    DID patients also appear to show deficiencies in tests of conscious control of attention

and memorization (which also showed signs of compartmentalization for implicit memory

between alters but no such compartmentalization for verbal memory) and increased and

persistent vigilance and startle responses to sound. DID patients may also demonstrate altered

neuroanatomy.

748.    Neuroimaging studies have reported a consistently smaller volume of the hippocampus in

DID patients.

749.    The fifth, revised edition of the American Psychiatric Association's Diagnostic and

Statistical Manual of Mental Disorders (DSM-5) diagnoses DID according to the diagnostic

criteria found under code 300.14 (dissociative disorders).

750.    DID is often initially misdiagnosed because clinicians receive little training about

dissociative disorders or DID, and often use standard diagnostic interviews that do not include

questions about trauma, dissociation, or post-traumatic symptoms.

751.    This contributes to difficulties diagnosing the disorder, and clinician bias.

752.    DID is rarely diagnosed in children, despite the average age of appearance of the first

alter being three years old.

753.    The criteria require that an individual be recurrently controlled by two or more discrete

identities or personality states, accompanied by memory lapses for important information that is

not caused by alcohol, drugs or medications and other medical conditions such as complex

partial seizures.

754.    In children the symptoms must not be better explained by "imaginary playmates or other

fantasy play".

755.    Diagnosis is normally performed by a clinically trained mental health professional such as a psychiatrist or psychologist through clinical evaluation, interviews with family and friends, and consideration of other ancillary material. Specially designed interviews (such as the SCID-D) and personality assessment tools may be used in the evaluation as well.

756.    Since most of the symptoms depend on self-report and are not concrete and observable, there is a degree of subjectivity in making the diagnosis.

757.    People are often disinclined to seek treatment, especially since their symptoms may not be taken seriously; thus dissociative disorders have been referred to as "diseases of hiddenness".

758.    The existence of the condition and its inclusion in the DSM is supported by multiple lines of reliable evidence, with diagnostic criteria allowing it to be clearly discriminated from conditions it is often mistaken for (schizophrenia, borderline personality disorder, and seizure disorder).

759.    Patients with DID are diagnosed with 5-7 comorbid disorders on average – much higher than other mental illnesses.

760.    Due to overlapping symptoms, the differential diagnosis includes schizophrenia, normal and rapid-cycling bipolar disorder, epilepsy, borderline personality disorder, and autism spectrum disorder.

761.    Delusions or auditory hallucinations can be mistaken for speech by other personalities.

762.    Persistence and consistency of identities and behavior, amnesia, measures of dissociation or hypnotizability and reports from family members or other associates indicating a history of such changes can help distinguish DID from other conditions.

763.    A diagnosis of DID takes precedence over any other dissociative disorders.

764.    Most individuals who enter an emergency department and are unaware of their names are generally in a psychotic state.

765.    Although auditory hallucinations are common in DID, complex visual hallucinations may also occur.

766.    Those with DID generally have adequate reality testing; they may have positive Schneiderian symptoms of schizophrenia but lack the negative symptoms.

767.    They perceive any voices heard as coming from inside their heads (patients with schizophrenia experience them as external).

768.    In addition, individuals with psychosis are much less susceptible to hypnosis than those with DID.

769.    DID must be distinguished from, or determined if comorbid with, a variety of disorders including mood disorders, psychosis, anxiety disorders, PTSD, personality disorders, cognitive disorders, neurological disorders, epilepsy, somatoform disorder, factitious disorder, malingering, other dissociative disorders, and trance states.

770.    An additional aspect of the controversy of diagnosis is that there are many forms of dissociation and memory lapses, which can be common in both stressful and non-stressful situations and can be attributed to much less controversial diagnoses.

771.    A relationship between DID and borderline personality disorder has been posited, with various clinicians noting overlap between symptoms and behaviors and it has been suggested that some cases of DID may arise "from a substrate of borderline traits".

772.    Reviews of DID patients and their medical records concluded that the majority of those diagnosed with DID would also meet the criteria for either borderline personality disorder or more generally borderline personality.

773.    The DSM-5 elaborates on cultural background as an influence for some presentations of DID.

774.    Many features of dissociative identity disorder can be influenced by the individual's cultural background. Individuals with this disorder may present with prominent medically unexplained neurological symptoms, such as non-epileptic seizures, paralyses, or sensory loss, in cultural settings where such symptoms are common.

775.    Similarly, in settings where normative possession is common (e.g., rural areas in the developing world, among certain religious groups in the United States and Europe), the fragmented identities may take the form of possessing spirits, deities, demons, animals, or mythical figures.

776.    Acculturation or prolonged intercultural contact may shape the characteristics of other identities (e.g., identities in India may speak English exclusively and wear Western clothes).

777.    Possession-form dissociative identity disorder can be distinguished from culturally accepted possession states in that the former is involuntary, distressing, uncontrollable, and often recurrent or persistent; involves conflict between the individual and his or her surrounding family, social, or work milieu; and is manifested at times and in places that violate the norms of the culture or religion.

778.    RE: Forensic issues with Dissociative Identity Disorder: Medico-legal Cases -Below is more extensive references and discussion about Multiple Personality Disorder, including the extensive forensic and legal caselaw on how Courts have managed the disposition of, for example, if Sally is sitting in the courtroom and has no recollection nor memory of how Susan murdered John, and Sally may have no memory of John nor could Sally recognize John if shown photographs of him.

779.    Multiple Personality Disorder frequently arises in persons who have had substantial

childhood trauma, such as the repeated rapes of Lourdes Colon by her father at gun-point during

her childhood and adolescence.

*Gross negligence and medical malpractice by defendant Lisa Wolfe*

780.    By her education, training and specialization, the defendant Lisa Wolfe should have

known that there might be great peril and would be very precarious for a person with

Dissociative Identity Disorder – or Multiple Personality Disorder – like the defendant Lourdes

Colon to terminate the doctor-patient relationship with her primary care doctor in order to

transition to   another type of relationship.

781.    Dr Lisa Wolfe's providing the advice, approval and dictation of the 1992 Express

Bilateral Contract terminating the doctor-patient relationship between the Plaintiff and Lourdes

Colon comprises gross negligence and medical malpractice, and may be the proximate cause of

any mental distress or emotional injuries suffered by Lourdes Colon.

782.    After recognizing the risk for allegations of gross negligence and medical malpractice,

the defendant Lisa Wolfe went to great lengths to conceal the material evidence of her

participation in the termination contract in order to "protect her ass."

783.    The failure of defendant Lisa Wolfe to share this diagnostic information with the Plaintiff

comprised gross negligence and medical malpractice and was a substantial factor in the course of

events leading to the revocation of the Plaintiff's medical license.

784.    The information contained in this Complaint and subsequent discovery will be shared

with the Psychology licensing board to be considered grounds for revocation of Dr Wolfe's

license and certification.

*Plaintiff's caring and supportive role according to HRI medical records*

785.   Stipulation No. 16:

16. During her hospitalization, Respondent attended a family meeting with

Patient A and her sister. Dr. Wolfe's notes for 8/14/92 state as follows:

"Met with the patient, her sister Yvette, and her internist, Dr. Weinberg. The patient revealed her plan to commit suicide after her discharge ... Her sister and Dr. Weinberg ... were also very instrumental in helping her to move from her suicidal mindest ...."

Respondent visited Patient A at HRI approximately 5 or 6 occasions.

786.   Stipulation 16 notes the Plaintiff's referral of Lourdes Colon to HRI in July 1992, a

psychiatric hospital, where she was under the care of Defendant Lisa Wolfe - who later was to

play an instrumental role in encouraging, the formation of and verbatim dictation of the express

bilateral contract terminating the doctor-patient relationship, which was formed and executed in

August 1992 – "… and Dr Weinberg …were also very instrumental in helping her to move from

her suicidal mindset …"

787.   Stipulation No. 16 corroborates the caring and protective steps that the Plaintiff took to

ensure that Lourdes Colon's health and safety took precedence.

788.   From 1989 – 1994 when the Plaintiff was last taking care of Lourdes Colon, he always

exercised the greatest care in protecting Colon's best interests and helping to stabilize her mental

health as much as was possible.

789.   From 1989 through 1995, the Plaintiff observed that Lourdes Colon was relatively stable

from a mental health point of view.

790.   In 1994 – 1995, the Plaintiff was training in a Family Medicine residency program in

Lawrence, MA, and was quite busy with nights and weekends on-call; during this time the

Plaintiff was meeting with Lourdes Colon much less frequently – maybe once every 4 – 6 weeks.

791.    During 1996, enormous pressures and stress was exerted on Lourdes Colon in coercing her to separate and distance herself from the Plaintiff, leading up to the lawsuit which she filed at Stanley Spero's urging and coercing.

792.    The Plaintiff ran into Lourdes Colon while she was driving her car in Lexington, MA, and Colon became hysterical and crying profusely that "they are making me do things I don't want to do" and "they are forcing me to go to the medical board."

793.    The Plaintiff believes that these enormous pressures and stresses coercing Colon to file the lawsuit and report him to BORIM were substantial factors in any deterioration of her mental health.

794.    Stipulation No. 15 below includes within the Axis I psychiatric diagnoses:  Major depression; rule out dysthymia, PTSD, Dissociative disorder NOS, eating disorder NOS, and organic mood disorder in addition to the Axis III disorders including seizures, syncopal episodes, and anorexia.

*Serious psychiatric diagnoses of Colon and Gross negligence by Dr. Wolfe*

795.    Stipulation No. 15:

15. In an Admission Note dated August 9, 1992, Dr. Wolfe noted that Patient A was sent from BEMC after reporting suicidal ideation and worsening depression to her internist. Dr. Wolfe indicated that the diagnostic impression of Patient A was:

> Axis I:  Major Depression; rule out: dysthymia, PTSD,
> Dissociative disorder NOS, eating disorder NOS, and organic
> mood disorder
> Axis II  Deferred
> Axis III  Syncopal episodes and history of seizures, recent
> back surgery, history of anorexia

Patient A was hospitalized at HRI from July 30, 1992 until September 11, 1992.

796.    The actions and decisions of defendant Lisa Wolfe, considering these serious psychiatric disorders (which were not known at the time to the Plaintiff), in recommending, advising, encouraging the Plaintiff to terminate the doctor-patient relationship comprises gross medical negligence, medical malpractice, gross psychiatric misconduct, violation of the ethical rules of the American Psychological Association, were the proximate cause of multiple injuries and damages to both the Plaintiff and the defendant Lourdes Colon.

797.    These egregious actions and conduct by defendant Lisa Wolfe will be reported to the appropriate mental health boards and licensing authorities.

*Evidence of Dr. Wolfe's gross negligence and medical misconduct*

211

798.    Stipulation No.15:    [Axis I notes very serious psychopathology which was never shared by Dr. Wolfe with the Plaintiff]

15. In an Admission Note dated August 9, 1992, Dr. Wolfe noted that Patient

A was sent from BEMC after reporting suicidal ideation and worsening

depression to her internist. Dr. Wolfe indicated that the diagnostic impression of

Patient A was:

Axis I:  Major Depression; rule out: dysthymia, PTSD,
Dissociative disorder NOS, eating disorder NOS, and organic
mood disorder
Axis II  Deferred
Axis III Syncopal episodes and history of seizures, recent
back surgery, history of anorexia

Patient A was hospitalized at HRI from July 30, 1992 until September 11,

1992.

*Psychologist gross negligence and medical malpractice*

799.    Although defendant Lisa Wolfe never shared these notes with the Plaintiff prior to the

lawsuit and disciplinary actions by the medical board, it became obvious that her

recommendations and formation/dicatation of the termination contract was a blatant case of gross

negligence and psychological/medical malpractice as a psychologist - the PTSD and Dissociative

Disorders noted in Wolfe's note portends tragedy in the making.

800.    Based on her differential diagnosis of dissociative disorder NOS, not known to the

Plaintiff at the time, it was foreseeable that Colon was at risk for disintegration of her personality

into a Multiple Personality Disorder, which indeed did occur during 1995 – 1996 when

defendants Stanley Spero and Lisa Wolfe exerted tremendous psychological and emotional

pressures on Colon to separate herself from the stabilizing effects that the Plaintiff provided

while forcing her to file legal actions against the Plaintiff – which resulted in her rapid spiraling

deterioration of her mental health during the years 1995 – 1996.

801.    Given these Axis I diagnoses of Major Depression and rule out PTSD, Dissociative

disorder and organic mood disorder, most psychologists would not have recommended nor

encouraged a physician to terminate the doctor-patient relationship. Such action by Wolfe were

grossly negligent and were a substantial factor in the deterioration of Colon's mental health.

802.    Had the Plaintiff known of these Axis I diagnoses, the Plaintiff would never have agreed

to terminate the doctor-patient relationship. It was grossly negligent for Wolfe not to have shared

this information with the Plaintiff, which could have allowed him to make different decisions

and different choices.

803.    Stipulation No. 16:

16. During her hospitalization, Respondent attended a family meeting with

Patient A and her sister. Dr. Wolfe's notes for 8/14/92 state as follows:

"Met with the patient, her sister Yvette, and her internist, Dr. Weinberg.
The patient revealed her plan to commit suicide after her discharge ... Her
sister and Dr. Weinberg ... were also very instrumental in helping her to
move from her suicidal mindest ...."

804.    Stipulation No. 16 further corroborates the supportive and protective motivations of the

Plaintive that " ... and Dr. Weinberg ... were also very instrumental in helping her to move from

her suicidal mindset ... "

805.    From 1989 – 1994 when the Plaintiff was last taking care of Lourdes Colon, he always

exercised the greatest care in protecting Colon's best interests and helping to stabilize her mental

health as much as was possible.

806.    The evidence will show that from 1992 – 1994, the Plaintiff provided a supportive and

protective resource to Loudes Colon stabilizing her mental health and allowing her to live and

work a normal life.

807.    However, extreme stresses induced by the pressures from defendants Lisa Wolfe and

Stanely Spero forcing the separation and splitting of the Plaintiff from his relationship with

Lourdes Colon between 1995 – 1996 (leading up to Colon's legal actions in 1996) were

instrumental in causing the deterioration of her mental health, exacerbating her dissociative

disorder, culminating in the explosive disintegration of Colon's personality into a Multiple

Personality Disorder, without the stabilizing effects of the Plaintiff's support.

808.    From 1989 – 1994 when the Plaintiff was last taking care of Lourdes Colon, he always

exercised the greatest care in protecting Colon's best interests and helping to stabilize her mental

health as much as was possible.

809.    Stipulation Nos. 18 - 19:

18. On September 1, 1992, Patient A discussed her relationship with

Respondent with her therapist Lisa Wolfe, Ph.D. who wrote:

"The patient and I also discussed her relationship with Dr. Weinberg, her

5 of 25

internist, who seems to be more of a friend than a doctor to her right now. The patient and I called him and the patient was able to state to him her need to transfer her medical care to a different doctor so that her developing friendship with Dr. Weinberg does not present a dual relationship any longer."

19. The Discharge Plan in a Psychiatric Summary dated November 11, 1991, states, "It was recommended that Dr. Weinberg step out of his role as her (Patient A's) prescribing physician since he and the patient had become so close that they change their relationship so that he would no longer be functioning as her doctor. Dr. Weinberg was, however, able to refer the patient to someone who could prescribe her medications at Boston Evening Medical Center."

810.     There is no evidence in the record that the Plaintiff acted or conducted himself as "more of a friend than a doctor to her right now ..." , but these are the impressions and thoughts of defendant Lisa Wolfe which are uncorroborated hearsay evidence and more personal thoughts without any supporting evidence. Such a statement lacks substantial evidentiary support in the record.

811.     Stipulation No. 20:

20. Between 1988 and August 1994, patient A's regular psychotherapist was Dr. Paula Lazar.

812.     Stipulation No. 20 is further evidence and corroboration that Lourdes Colon [Patient A] had been receiving regular psychological treatment and therapy by Dr. Paula Lazar between

1988 and 1994 so that there would be no need for the Plaintiff to refer her for psychological help or treatment as Magistrate Luick suggested in her final Recommended Decision.

813.    This stipulated finding of fact proves that the statements of material fact – in the decisions of the Mass SJC and Maine SJC - that the Plaintiff did not provide adequate or needed mental health referrals were unfounded, false and incorrect.

814.    Stipulation No. 20 contradicts several false statements of material fact stated in both the published decision and opinion from the Massachusetts Supreme Judicial Court and from Ellen Gorman's published decision from the Maine Supreme Judicial Court.

815.    **PLAINTIFF WILL SEEK INJUNCTIVE RELIEF TO STRIKE FROM THE RECORD ALL SUCH STATEMENTS OF MATERIAL FACT AS FALSE, INACCURATE, CONTRARY TO ALL EVIDENCE AND CONTRARY TO THE STIPULATIONS, GROUNDLESS, WITHOUT FOUNDATION, AND LACKING SUBSTANTIAL EVIDENTIARY SUPPORT.**

816.    Such blatantly false statements of material fact greatly undermine the validity of the conclusions reached by the Mass SJC and the Maine SJC as well as undermining the validity of the punishment imposed on the Plaintiff in light of those egregiously false statements of material fact in those opinions and decisions.

817.    **PLAINTIFF WILL SEEK INJUNCTIVE RELIEF TO STRIKE FROM THE RECORD ALL SUCH STATEMENTS OF MATERIAL FACT AS FALSE, INACCURATE, CONTRARY TO ALL EVIDENCE AND CONTRARY TO THE STIPULATIONS, GROUNDLESS, WITHOUT FOUNDATION, AND LACKING SUBSTANTIAL EVIDENTIARY SUPPORT.**

818.    Stipulation No. 24:

24. Patient A saw Dr. Reichel at BEMC on 9/28/92, 10/6/92, 11/17/92, 11/24/92, 12/21/92, 1/4/93, and 1/25/93. Some of these visits concerned Patient A's mental health. A telephone message on 11/5/92 from Patient A for prescription medications was originally directed to Respondent, but this was crossed out and replaced with a reference to Dr. Reichel, with a notation on 11/6/92 stating: "She is now WR's pat," and another on 11/7/92 adding that the prescriptions had been called in by Dr. Fringer.

Dr. Lisa Wolfe's out-patient psychotherapy records note that on 8/24/94, 9/19/94, 9/27/94, 10/4/94, 10/14/94, 12/8/94, 12/13/94, 12/16/94, & 12/29/94 patient A used the expression "former physician" or "former M.D." when referring to her then-current relationship with the Respondent.

819.    Stipulation No. 24 shows that the BEMC records show the Plaintiff's name being crossed out in a request for prescription medicines and replaced with a **notation on 11/6/92 stating "She is not WR's pat"** and another notation on 11/7/92 adding that the prescriptions were called in by Dr. Fringer.

820.    Furthermore Stipulation No. 24 indicates that:

"Dr. Lisa Wolfe's **out-patient psychotherapy records** note that on 8/24/94, 9/19/94, 9/27/94, 10/4/94, 10/14/94, 12/8/94, 12/13/94, 12/16/94, & 12/29/94 **patient A used the expression**

**"former physician" or "former M.D."** when referring to her then-current relationship with the Respondent."

821.    Stipulation No. 24 is corroboration of the express bilateral contract terminating the doctor-patient relationship which the Plaintiff greatly relied upon during his subsequent treatment and conduct with Lourdes Colon, and also corroborates the establishment of clinical-nonclinical binary classification of time and place – the clinical world and the non-clinical world – which were established by the modified bilateral express contract terminating the doctor-patient relationship.

822.    Stipulation No. 24 is further evidence of the bilateral express contract terminating the doctor-patient relationship is seen in Dr . Lisa Wolfe's out-patient psychotherapy records noting that Lourdes Colon referred to the Plaintiff as her "former physician" or "former M.D." when referring to her then-current relationship with the Plaintiff in notes made on 8/24/94, 9/19/94, 10/4/94, 10/14/94, 12/8/94, 12/13/94, 12/16/94 and 12/29/94.

823.    Stipulation No. 24 corroborates the formation and execution of the Express Bilateral Contract between the Plaintiff and Lourdes Colon which terminated the doctor-patient relationship.

824.    Stipulation No. 24 also corroborates the modified contract providing the clinical-nonclinical binary classification of place and time with the establishment of the two different worlds which the Plaintiff was acting/behaving within – the clinical world and the non-clinical world.

825.    Stipulation No. 6. "On March 19, 1991, Patient A [defendant Lourdes Colon] first discussed her mental health problems with Respondent. She indicated that she was upset because she learned that her sister had AIDS. Respondent noted that she needed counseling."

["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 3*].

826.    The counseling recommended by the Plaintiff is a usual and typical recommendation made by most Family Medicine physicians, and does not show or prove that the Plaintiff is or was acting as a psychologist or a psychotherapist, nor that he was trained or educated about transference, counter-transference, and boundary violations.

827.    Stipulation No. 11. "On July 6, 1992, Respondent had an extensive thirty (30) minute counseling session with Patient A at BEMC. They discussed her suicide attempts. Respondent noted in Patient A's medical record that Patient A was in psychotherapy with a therapist who specialized in Post Traumatic Stress Disorder (PTSD)." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 4*"]

828.    Stipulation No. 11 reveals that the Plaintiff knew that Lourdes Colon was in psycho-therapy with a therapist who specialized in Post Traumatic Stress Disorder (PTSD), and the Plaintiff acted reasonably upon that information, that Lourdes Colon was receiving the psychological care which she needed, and no further action was needed by the Plaintiff. Notations in the medical records reveal that Colon was receiving psychological/psychotherapy/psychiatric care from Dr. Lisa Wolfe, Dr. Paula Lazar and Dr. Amy Banks.

829.    The Plaintiff's knowledge of the therapists and psychological treatment which was being rendered contradicts false statements of material fact made by Magistrate Luick in her DALA decision and by Justice Ellen Gorman in her opinion and decision in the Maine SJC.

830.    **PLAINTIFF WILL SEEK INJUNCTIVE RELIEF TO STRIKE FROM THE RECORD ALL SUCH STATEMENTS OF MATERIAL FACT AS FALSE, INACCURATE, CONTRARY TO ALL EVIDENCE AND CONTRARY TO THE STIPULATIONS, GROUNDLESS, WITHOUT FOUNDATION, AND LACKING SUBSTANTIAL EVIDENTIARY SUPPORT.**

831.    Those false statements of material fact in the Mass SJC decision and Maine SJC decision, as stated within the texts of those decisions, substantially undermine the validity and logic of the conclusions reached in those courts and also undermine the actions taken by those courts to punish the Plaintiff – by affirming the revocation of his medical license and affirming the Board of Bar Examiners' decision not to admit the Plaintiff to the Bar – if the relevant law is applied to false statements of material fact, the resulting conclusions will also be false and *non sequitur.*

832.    Stipulation No. 15. "In an Admission Note dated August 9, 1992, Dr. Wolfe noted that Patient A was sent from BEMC after reporting suicidal ideation and worsening depression to her Internist. Dr. Wolfe indicated that the diagnostic impression of Patient A was:

Axis I: Major Depression; rule out: dysthymia, PTSD, Dissociative Disorder NOS, eating disorder NOS, and organic mood disorder

Axis II  Deferred

Axis III  Syncopal episodes and history of seizures, recent back surgery, history of anorexia

833.    Defendant Lisa Wolfe had a duty to inform the Plaintiff of the Axis I diagnoses on Lourdes Colon so that he would be able to act reasonably upon that information which he did not know nor have, and would probably have been a substantial factor in the Plaintiff's decision to terminate or not to terminate the doctor-patient relationship under an Express Bilateral contract which was drafted and dictated by the defendant Lisa Wolfe.

834.    The breach of that duty which Dr Wolfe owed to the Plaintiff, with the proximate injuries which it caused, comprise the prima facie case for tortious activity which is actionable.

835.    Patient A was hospitalized at HRI from July 30, 1992 until September 11, 1992." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 5* ]

836.    Stipulation No. 14. "On July 30, 1992, Respondent met with Patient A at BEMC. Respondent determined that Patient A needed to be hospitalized and he committed her to the Human Resource Institute (HRI), a psychiatric hospital, noting in her medical record that she was decompensating." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 4* ]

837.    Stipulation No. 16. "During her hospitalization, Respondent attended a family meeting with Patient A and her sister. Dr. Wolfe's notes for 8/14/92 state as follows:

"Met with the patient, her sister Yvette, and her internist, Dr. Weinberg. The patient revealed her plan to commit suicide after her discharge ... Her sister and Dr. Weinberg ... were also very instrumental in helping her to move from her suicidal mindset ... "

["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 5* ]

838    Stipulation No. 17. "On August 31, 1992, Patient A left HRI without authorization, and went to Respondent's office at BEMC. Responded re-committed Patient A to HRI." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 5*"]

839.    Again the factual record reveals that the Plaintiff hospitalized defendant Lourdes Colon on multiple occasions when he believed that she needed that mental health treatment. These stipulations and the medical record corroborate the supportive and protective roles which the Plaintiff provided in stabilizing Lourdes Colon's mental health.

840.    Stipulation 18. "On September 1, 1992, Patient A discussed her relationship with Respondent with her therapist Lisa Wolfe, Ph.D. who wrote: 'The patient and I also discussed her relationship with Dr. Weinberg, her internist, who seems to be more of a friend than a doctor to her right now. The patient and I called him and the patient was able to state to him her need to transfer her medical care to a different doctor so that her developing friendship with Dr. Weinberg does not present a dual relationship any longer." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, pages 5-6*]

841.    The Plaintiff has never stated that at that time he believed or felt himself to be more of a friend than a doctor. Stipulation no. 18 only states the thoughts and words of Dr. Wolfe and what

she wrote in the medical record. It is false and incorrect to state that the Plaintiff felt like a friend, or that they were friends, because this record only reflects the thoughts of Dr Wolfe and her observations of defendant Lourdes Colon.

842.    Likewise stipulation no. 19 only states what Dr Wolfe wrote in her medical record and any conclusion that the Plaintiff did feel that way or believe that way is unfounded and without substantial evidentiary support.

843.    There is no stipulation about the Plaintiff's feelings, beliefs or thoughts; the stipulations only apply to Dr. Wolfe's thoughts and observations of defendant Lourdes Colon.

844.    In the absence of specific speech or writing by the Plaintiff, there is no factual evidence that what Dr Wolfe was writing in the medical record reflects any of the Plaintiff's feelings or thoughts – these only represent Dr Wolfe's thoughts and impressions.

845.    These medical records only hold truths which may have been held or believed by Defendant Dr Wolfe and defendant Lourdes Colon, and the statement that the Plaintiff and Lourdes Colon seemed more like friends lacks substantial evidentiary support.

846.    Thus any conclusions about whether the Plaintiff acted in any way to foster or induce the belief that he was a "friend" is uncorroborated, without foundation and lacking evidentiary support – except possibly by hearsay evidence from the other defendants.

847.    Stipulation No. 19. "The Discharge Plan in a Psychiatric Summary dated November 11, 1991, states, 'It was recommended that Dr. Weinberg step out of his role as her (Patient A's) prescribing physician since he and the patient had become so close that they change their relationship so that he would no longer be functioning as her doctor. Dr. Weinberg was, however, able to refer the patient to someone who could prescribe her medications at Boston Evening Medical Center." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's*

*counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner*

*Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002,*

*page 6* ]

848.    Stipulation No. 20. "Between 1988 and August 1994, patient A's regular psychotherapist

was Dr. Paula Lazar." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of*

*Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074,*

*Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16,*

*2002, page 6* ]

849.    Stipulation No. 20. "Between 1988 and August 1994, patient A's regular psychotherapist

was Dr. Paula Lazar." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of*

*Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074,*

*Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16,*

*2002, page 7* ]

850.    Stipulation No. 20 along with testimony under oath show that Lourdes Colon ("patient

A") was receiving regular and ongoing mental health care during the years 1988 – 2006 with

either Paula Lazar or with Lisa Wolfe, proving that the statements of material fact in the Mass

SJC decision and the Maine SJC decisions that the Plaintiff did not refer Lourdes Colon for

mental health consultation are false, incorrect, without foundation, lacking evidentiary support

and groundless and those conclusions reached in the Mass SJC and Maine SJC decisions are

therefore false and non-sequitur.

851.    **PLAINTIFF WILL SEEK INJUNCTIVE RELIEF TO STRIKE FROM THE**

**RECORD ALL SUCH STATEMENTS OF MATERIAL FACT AS FALSE,**

**INACCURATE, CONTRARY TO ALL EVIDENCE AND CONTRARY TO THE**

**STIPULATIONS, GROUNDLESS, WITHOUT FOUNDATION, AND LACKING**

**SUBSTANTIAL EVIDENTIARY SUPPORT.**

852.    Stipulation No. 24. "… this was crossed out and replaced with a reference to Dr. Reichel, with a notation on 11/6/92 stating: 'She is now WR's pat, ….. patient A used the expression 'former physician' or 'former M.D.' when referring to her then current relationship with the Respondent' " ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 7* ]

853.    Stipulation No. 24 along with sworn testimony under oath corroborate the 1992 Bilateral Express contract terminating the doctor-patient relationship between the Plaintiff and Lourdes Colon along with its subsequent modification providing a clinical-nonclinical binary classification for time and place.

854.    This is continuing corroboration that both Dr. Wolfe and Lourdes Colon believed that the termination express bilateral contract did terminate the Plaintiff's role as a physician and he had transitioned to "former physician" or "former M.D."

855.    Stipulation No. 24. "Patient A saw Dr. Reichel at BEMC on 9/28/92, 10/6/92, 11/17/92, 11/24/92, 12/21/92, 1/4/93, and 1/25/93. Some of these visits concerned Patient A's mental health. " ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002* ]

856.    Stipulation No. 27. "On August 11, 1994, Respondent indicated in Patient A's medical record that she intended to change doctors." ["*Magistrate Sarah H. Luick, Exhibit A, Joint*

*Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No.*

*BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg,*

*Issued on May 16, 2002, page 9* ]

857.     Stipulation No. 26 identifies the following doctors/clinicians as providing medical care to

Lourdes Colon: Dr Lee, Dr. Grevelink, Dr. Beretta, Dr. Awbrey, Dr. Banks, Dr. Berkowitz, Dr.

Richard Brodie, Dr. Sidney Brodie, Dr. Finlayson, Dr. Friedensohn, Dr. Ghavami, Dr. Grossman,

Dr. Hernandez, Dr. Karlson, Dr. Khatri, Dr. Leet, Dr. Pham, Dr. Rees, Dr. Reichel, Dr. Reilly,

Dr. Ryan, Dr. Tedlow, Dr. Thaler, Dr. David Weinberg, and Dr. Robert Weinberg. Some of these

clinicians had provided counseling to Lourdes Colon.

858.     Dr. Amy Banks is a certified licensed psychiatrist who worked at BEMC during the 1989

to 1995 period of time.

859.     Stipulation No. 28. "It was noted in Patient A's medical record on January 14, 1993, that

Patient A had removed sections from her record that included entries from the spring and

summer of 1992." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's*

*counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner*

*Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002,*

*page 9* ]

860.     Stipulation No. 29. "Respondent's last visit with Patient A at BEMC was in September

1994." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John*

*Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of*

*Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 9* ]

861.    Stipulation 29, which provides the date of the Plaintiff's last clinical visit with Lourdes

Colon ("Patient A") at BEMC in September 1994, documents the last month that the Plaintiff

was able to provide supportive and protective care in stabilizing Lourde Colon's mental health,

and marks the beginning of Colon's deterioration of her mental health which spiraled downhill

during 1995 – 1996, as defendants Lisa Wolfe and Stanley Spero exercised extreme pressures

and stresses on Lourdes Colon forcing her separation from the Plaintiff – as they coerced her into

filing legal proceedings against the Plaintiff -  causing her to decompensate, lose touch with

reality, develop a psychotic break and plunge into the dissociative processes forming her

Multiple Personalities.

862.    The Plaintiff had begun his Lawrence residency training in July 1994, and had cut back

significantly on the number of hours which he worked at BEMC and with the evening/weekend

duties imposed by the residency, greatly reduced the number of times that the Plaintiff was able

to meet with Colon in 1995 – 1996.

863.    Stipulation No. 30 "Patient A's last visit to BEMC was on November 5, 1996."

[*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations  of Respondent's counsel John Flym

and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in

Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 9* ]

864.    November 1996 was approximately 1 month before defendant Lourdes Colon filed her

lawsuit against BEMC and the Plaintiff  *Colon v. Weinberg, Wesselhoeft, Boston Evening

Medical Center, et al.* in Middlesex Superior Court.

   *Pressures to force separation and isolation of Plaintiff from Lourdes Colon*

227

865.   1996: Enormous pressures on Lourdes Colon - by family, Lisa Wolfe and Stanley Spero to separate and distance herself from the Plaintiff, file lawsuit in Middlesex Superior Court and report the Plaintiff to the medical board.

866.   There are no stipulations in the record showing either that Lourdes Colon was experiencing significantly greater mental distress, depression, anxiety, or any type of deterioration.

867.   In 1996, Lourdes Colon began spiral downspin leading to her nervous breakdown and psychotic break from reality, which occurred after her last visit to BEMC while she was being super stressed by family, Lisa Wolfe and Stanley Spero.

868.   After a careful review of the BEMC medical records, BORIM did not find any notations from Dr. Reichel or from the other twenty (20) physicians regarding any worsening or serious psychological problems during 1993 – 1996 nor were any noted in the Stipulations.

869.   Stipulation No. 33. "On or about September 3, 1992, while she was still hospitalized at HRI, Respondent brought Patient A to Countway Library, in order to open a user account for her so that she could do medical research for him. The HRI notes for 9/7/92 indicate that Patient A was, "…looking forward to research project she plans to begin working on come Tues. " ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations  of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 10* ]

870.   Stipulation No. 34. "From September 1992 until 1994, Patient A served as a research assistant for Respondent. Patient A met with Respondent at his office at MIT, usually weekly after 9:00 PM, in order to discuss the research she had collected." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations  of Respondent's counsel John Flym and Petitioner's Counsel Alice*

*Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 10* ]

871.    Stipulation No. 35. "During the fall of 1992, Respondent and Patient A began a personal and sexual relationship which lasted 3 years until September 1995. **During that time, no sexual contact ever took place in any professional setting, whether hospital, clinic or medical office.**" ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 10* ]

872.    Stipulation No. 35 provides direct corroboration of the clinical-nonclinical binary classification of time and place effected by the modification of the 1992 Express Bilateral Contract which terminated the doctor-patient relationship.

873.    Stipulation No. 40. "On October 10, 1995, Dr. Wolfe and Patient A met with the Respondent. Respondent admitted to having sex with Patient A. He agreed that it was his responsibility as the former doctor for Patient A to keep boundaries intact and that he had crossed the line by having sex with Patient A. Respondent apologized for his actions, but indicated that he did not want to end his friendship with Patient A. He agreed to a three-month moratorium on contact with Patient A." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 11* ]

*Plaintiff begins couples psychotherapy with Lourdes Colon & Dr. Wolfe*

874.    The meeting on October 10, 1995 took place in the Lexington, MA office of Dr. Lisa Wolfe.

875.    On October 10, 1995, Dr Wolfe informed the Plaintiff that she was treating him as part of couples therapy with her existing patient Lourdes Colon.

876.    Dr Wolfe also informed the Plaintiff that he would be responsible for paying the fees for that couples therapy – of him and Lourdes Colon together.

877.    Based on these statements by Dr Wolfe, the Plaintiff believed that he had become her patient as well as part of the couples therapy recommended by Dr Wolfe.

878.    Statements made by the Plaintiff during the October 10, 1995 session are protected by patient-therapist privilege and require the Plaintiff's consent to release such information.

879.    Stipulation No. 41. "Respondent kept the three-month moratorium on contact with Patient A. Telephone contact then resumed between them. Respondent continued to have telephone contact with Patient A until November 1996." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 11* ]

880.    Stipulation No. 42. "In November 1996, Patient A filed a civil suit in Middlesex Superior Court against Respondent alleging in part, negligent treatment of Patient A by the Respondent, and further alleging negligent infliction of emotional distress by the Respondent, by his engagement in unprofessional conduct with Patient A." ["*Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations  of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 12* ]

881.    Stipulation No. 43. "… On May 13, 1998, the civil suit was settled, with payment of $150,000 made by Respondent's malpractice insurer on his behalf." ["*Magistrate Sarah H. Luick,*

*Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice*

*Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P.*

*Weinberg, Issued on May 16, 2002, page 12* ]

882.    Stipulation No. 45. "Respondent was represented by the insurance company's lawyer,

Claudia A. Hunter, Esq. Respondent played no role in the drafting or approval of the release

executed by  Patient A in return for her settlement with the insurance company." ["*Magistrate*

*Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and*

*Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in*

*Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 13* ]

883.    Stipulation No. 46. "Before reaching this settlement, Attorney Hunter obtained an

opinion letter from John T. Maltsberger, M.D., Associate Professor of Psychiatry at Harvard

Medical School, Attending Psychiatrist at McLean Hospital, and Clinical Associate in Psychiatry

at Massachusetts General Hospital. Dr. Maltsberger's letter, dated February 17, 1998, stated that

he had reviewed the following documents: Affidavit of Patient A, dated December 16, 1997,

Affidavit of James Beck, M.D., dated December 17, 1997, Patient A's responses to

interrogatories, Medical Records of Patient A from Massachusetts General Hospital from 1980-

81, BEMC Medical Records from 1987-1993, HRI Medical Records from 1992-1995, Case

Notes of Lisa Wolfe, psychologist from 1994-1996, and Medical Records of Dr. Amy Banks

dated 1995-1997. Based upon his review of said materials, Dr. Maltsberger concluded:

> … It is my considered professional opinion that though [Patient A] was no doubt upset by
>
> her experience with [Respondent], I see no evidence that she suffered significant lasting
>
> emotional injury as a result of her experiences with him. Virtually every symptom of
>
> which she has complained since her experiences with [Respondent] was documented in

hospital records antedating her first meeting with him. While it is just possible her

admissions to Human Resource Institute (hereinafter, HRI) in 1992, 1993 and 1995 might

have been avoided had not she been entangled with [Respondent] at the time, it is well

to note that the patient was under very significant stresses independent of [Respondent] at

the those times in her life. Further it is well understood that persons who suffer from

major depressive disorders, as would appear to be the case here, are subject to

periodic relapses, sometimes with, and sometimes without, significant triggers ..."

[*"Magistrate Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym*

*and Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in*

*Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 14* ]

884.    Stipulation No. 47. "In December 1997, the Board of Registration in Medicine received

notice of the civil suit from the Middlesex Superior Court" [*"Magistrate Sarah H. Luick, Exhibit*

*A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff,*

*Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P.*

*Weinberg, Issued on May 16, 2002, page 14* ]

885.    Stipulation No. 48. "In December 1997, the Board of Registration in Medicine received

notice of the civil suit from the Middlesex Superior Court." [*"Magistrate Sarah H. Luick, Exhibit*

*A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel Alice Oliff,*

*Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent Robert P.*

*Weinberg, Issued on May 16, 2002, page 14* ]

886.    Stipulation No. 48. "On June 11, 1998, the Chairman of the Board of Registration in

Medicine issued a subpoena *ad testificandum/subpoena duces tecum* to Patient A." [*"Magistrate*

*Sarah H. Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and*

*Petitioner's Counsel Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in*

*Medicine, Respondent Robert P. Weinberg, Issued on May 16, 2002, page 14* ]

887.    Stipulation No. 49. "Pursuant to this subpoena, in July 1998, Patient A came to the Board

to give information concerning Respondent's professional conduct." ["*Magistrate Sarah H.*

*Luick, Exhibit A, Joint Stipulations of Respondent's counsel John Flym and Petitioner's Counsel*

*Alice Oliff, Docket No. BR-99-074, Petitioner Board of Registration in Medicine, Respondent*

*Robert P. Weinberg, Issued on May 16, 2002, page 14* ]

*Fraud committed upon the Tribunal by defendants Colon, Spero and Wolfe*

*through their spoliation of evidence and concealment of the Express Bilateral Contract*

888.    Withholding material evidence which proves or disproves a substantial issue of material

fact during a Tribunal comprises spoliation of evidence and fraud upon the Tribunal; this fraud

will be described in great detail and particularity within this Complaint – which the Plaintiff will

prove by a preponderance of the evidence.

889.    A substantial issue of fact in these proceedings is the question whether the Plaintiff was

in a doctor-patient relationship with defendant Lourdes Colon at the relevant times in question,

to help determine whether the Plaintiff violated any laws, regulations or ethics concerning sexual

relations between doctors and their patients.

890.    Thus, the existence, knowledge and paper copies of a handwritten Express Bilateral

Contract, written in ball-point pen with black ink, which terminated the doctor-patient

relationship in September 1992, is relevant and material to these proceedings and is material

evidence in proving substantial facts and in determining important issues of fact.

891.   Thus, the existence, knowledge and paper copies of a handwritten Express Bilateral Contract which terminated the doctor-patient relationship in September 1992 is material evidence in these proceedings and comprises a substantial factor in determining or ascertaining whether a doctor-patient relationship existed between the Plaintiff and Lourdes Colon at the relevant times in question.

892.   Concealing from the Tribunal the existence, knowledge and paper copies, hand-written with black ball-point pen, of an Express Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon in September 1992, which was dictated by defendant Lisa Wolfe and written down verbatim by the Plaintiff and Lourdes Colon, subsequently signed by both parties, at HRI in Brookline, MA, comprises spoliation of evidence and concealing material evidence from the Tribunal; there exists a duty to preserve evidence relevant to a dispute, or potential dispute, which is an ancient and well-documented common law principle - The doctrine likely goes back as far as Roman law: *Contra Spoliaterem Omnia Praesumuntur* is a Latin phrase meaning everything most to his disadvantage is to be presumed against the destroyer; essentially, the doctrine requires a party to preserve evidence when they know, *or should know*, that the evidence is likely to be relevant to pending or future litigation.

893.   Concealing from the Tribunal the existence, knowledge and paper copies of a ballpoint-pen-handwritten Express Bilateral Contract, dictated by defendant Lisa Wolfe, which terminated the doctor-patient relationship in 1992 comprised spoliation of evidence and fraud upon the Tribunal, and such spoliation of evidence and concealment of material evidence and deception of the tribunals was committed by the defendants Stanley Spero, Lourdes Colon and Lisa Wolfe.

894.    "Evidence tampering is an act in which a person alters, conceals, falsifies, or destroys evidence with the intent to interfere with an investigation by a law-enforcement, governmental or regulatory authority;" spoliation of evidence, which includes concealing material evidence from the tribunal, is a form of evidence tampering, which is a criminal offense in some jurisdictions.

895.    The actions and omissions of defendants Stanley Spero, Lisa Wolfe and Lourdes Colon in concealing the evidence of the handwritten Bilateral Express Contract, which terminated the doctor-patient relationship in 1992, does comprise spoliation of evidence and the crime of tampering with evidence; this handwritten contract is exonerating evidence for the Plaintiff because it is proof that the doctor-patient relationship was intentionally and purposefully terminated between the Plaintiff and Lourdes Colon in September 1992.

896.    Such actions and omissions of defendants Stanley Spero, Lisa Wolfe and Lourdes Colon in concealing the evidence of the handwritten Bilateral Express Contract, which terminated the doctor-patient relationship in 1992, does also comprise spoliation of evidence, obstruction of justice and perverting the course of justice for the purpose of covering up their liability and also to conceal the primary evidence which exonerates the Plaintiff; concealing the contract was advantageous to defendants Lourdes Colon and Stanley Spero, who filed suit in Middlesex Superior Court against the Plaintiff in 1996: *Colon v. Weinberg, Wesselhoeft, Boston Evening Medical Center et al.*, alleging that the Plaintiff engaged in medical malpractice and misconduct which settled circa. 1998-99 for $150,000, fraudulently obtained from the insurer through their concealment of the handwritten contract which would have destroyed their legal case.

897.    Spoliation of evidence is the intentional, reckless, or negligent withholding, hiding, fabricating, or destroying evidence relevant to a legal proceeding.

898.    Defendants Stanley Spero, Lisa Wolfe and Lourdes Colon are all guilty of spoliation of evidence by their actions in concealing the handwritten Bilateral Express Contract which terminated the doctor-patient relationship in 1992.

899.    Spoliation of evidence is a frequent tactic of amoral litigants and has been seen in such American scandals as the Enron scandal, Arthur Andersen LLP v. United States, Iran-Contra affair, Conrad Black's actions during his trial, and CIA Director Richard Helm's order to destroy MKUltra files.

900.    Furthermore, this fraud has been committed on three courts (Suffolk Superior Court [Massachusetts], Division of Administrative Law Appeals [Massachusetts], Oxford County Superior Court [Maine]) by two attorney defendants (Stanley Spero, John Ney) and their law firms (Spero and Jorgenson, P.C., Shechtman, Halperin and Savage, LLC) along with their accomplices/accessories/co-conspirators as well as by the defendant psychologist Lisa Wolfe, wherein that fraud is detailed with particularity in this Complaint.

901.    The 1992 Express Bilateral Contract terminating the doctor-patient relationship was essential, relevant and material evidence for the fact-finder in the Tribunals for: [1] *Colon v. Weinberg, Wesselhoeft, et al.* (Suffolk Superior Court); [2] *Weinberg v. Colon* (Suffolk Superior Court); [3] *In Re Robert P. Weinberg, D.O.* (Division of Administrative Law Appeals; [4] *In the matter of Robert Weinberg* (Massachusetts Supreme Judicial Court); [4] *Robert P. Weinberg v. Board of Bar Examiners* (Maine Supreme Judicial Court); [5] *Robert P. Weinberg, D.O. v. Massachusetts Board of Registration in Medicine* (Massachusetts Supreme Judicial Court), where the handwritten contract would have assisted the fact-finder in determining when

the Plaintiff was and was not an active doctor to Lourdes Colon, thus answering an essential question of fact relevant and material to important issues of fact for the tribunal.

902.    Concealment of the 1992 Express Bilateral Contract terminating the doctor-patient relationship by defendants Stanley Spero, Lourdes Colon and Lisa Wolfe led the fact-finder in these Tribunals to make Findings of Fact which were FALSE statements of material fact, due to the absence of such exonerating evidence for assessment by the fact-finder.

903.    These false statements of material fact, which resulted from the concealment of material evidence and deception of the tribunals, comprised fraud upon multiple Massachusetts and Maine tribunals (and also comprises a crime of omission), which proceeded to make conclusions of law based on those false statements of material fact; those false statements of material fact were disadvantageous to the Plaintiff, causing multiple severe legal and economic injuries, eventually leading to the revocation of the Plaintiff's medical license.

904.    In the instant suit, the Plaintiff will obtain discovery (admissions, interrogatories, depositions, requests for production of documents) including but not limited to Request for Production of Documents and depositions of the relevant witnesses sworn under oath, which will yield testimony and additional documentary evidence which will prove the existence, content and purpose of the 1992 Express Bilateral Contract terminating the doctor-patient relationship by a preponderance of the evidence.

905.    Because of the narrow and restrictive nature and rules of the DALA proceedings in 2000 – 2002, and the desire of the parties to make Stipulations as the basis for the fact-finding process (because defendant Lourdes Colon did not want to testify at a trial) without providing the Plaintiff with the ability to complete discovery (interrogatories, admissions, production of

documents and depositions), the Plaintiff was unable to obtain the requisite discovery yielding the evidence to prove this 1992 handwritten Express Bilateral Contract terminating the doctor-patient relationship, along with its subsequent modification, in the prior DALA proceedings.

906.   Full discovery procedures allowed by the Federal Rules of Civil Procedure in the instant suit in federal court will provide the Plaintiff with necessary evidence to prove the existence, content and purpose of the 1992 handwritten Express Bilateral Contract terminating the doctor-patient relationship by a preponderance of the evidence.

907.   Furthermore the Expert Witnesses in the prior DALA proceedings did not have the knowledge of, access to nor handwritten paper copies of that Express Bilateral Contract terminating the doctor-patient relationship in 1992 and this substantial deficiency which resulted from the defendants' intentional and purposeful concealment and deception regarding that contract was a substantial factor in Colon's Expert Witness opinion not in the Plaintiff's favor because Dr. Beck never knew that the doctor-patient relationship had been terminated in September 1992 and had the Expert Witnesses had this information and those paper copies of the handwritten Express Bilateral Contract, which was formed and executed at HRI under the guidance and dictation of Dr Wolfe in September 1992, the Expert Witnesses would have come to substantially and dramatically different conclusions and Expert Witness opinions more favorable to the Plaintiff.

908.   The Expert Witnesses called to testify in these Tribunals also did not have access to the 1992-93 Express Bilateral Contract which terminated the doctor-patient relationship because this material evidence was concealed from the Tribunals by defendants Lourdes Colon, Stanley

Spero and Lisa Wolfe, so this relevant and material evidence was not assessed by those Expert

Witnesses nor was it assessed by the justices/magistrates/judges in the respective tribunals.

909.    The Expert Witnesses in these Tribunals, without access to the relevant and material

evidence comprising the 1992-93 Express Bilateral Contract terminating the doctor-patient

relationship, formed substantially deficient and false expert opinions because they did not have

access to nor knowledge of substantial relevant and material evidence comprising the 1992

termination of the doctor-patient relationship; the handwritten Bilateral Express contract formed

and executed in 1992 will render those Expert Opinions null, void and false.

910.    Had those Expert Witnesses had knowledge of the 1992-93 Express Bilateral Contract

which terminated the doctor-patient relationship, the conclusions and expert opinions of those

witnesses would have been substantially different and therefore those expert opinions were

tainted by the defendants' concealment of the 1992 Express Bilateral Contract terminating the

doctor-patient relationship, comprising Fraud upon the Court.

911.    The intentional and purposeful fraudulent concealment of that 1992 Express Bilateral

Contract which terminated the doctor-patient relationship caused much consternation, distress

and desperation in the Plaintiff and caused the Plaintiff to feel like he was backed into a corner

without the truth of that exonerating contract which was deceptively concealed from the tribunals

by defendants Stanley Spero, Lourdes Colon and Lisa Wolfe.

912.    The Plaintiff has been waiting over thirty-two (32) years to be able to obtain this

discovery permitted by the Federal Rules of Civil Procedure to obtain the relevant and material

evidence, both testimonial and documentary, to prove the fraudulent concealment and deception

concerning the 1992 Express Bilateral Contract, terminating the doctor-patient relationship, by

the defendants Stanley Spero, Lisa Wolfe and Lourdes Colon, where the defendant was greatly

restricted and impaired by the procedural rules of the DALA proceedings which progressed

without a trial, without the testimony of the relevant witnesses or the right to cross-examine them,

progressing with only Stipulations which did not include records from Paula Lazar, Amy Banks,

Vincent DiCianni, Robert Stolzberg, nor the sworn testimony of Lourdes Colon or Lisa Wolfe

and without the material evidence of the 1992 handwritten Bilateral Express Contract.

913.    "In December 1999, Respondent sent a Memorandum to Richard Waring, former

Complaint Counsel in the above-captioned matter, and Deirdre Manning, former investigator in

the above-captioned matter. In this Memorandum Respondent asserted that false testimony was

being used against him, and he warned that anyone who knowingly participated in the use of

such false testimony against him might be participating in a 'criminal conspiracy'. He stated,

'This is an opportunity for you and the board to withdraw from the conspiracy, and diminish

collectively your criminal responsibility for all foreseeable crimes engendered by the

conspiracy'". [Stipulation No. 56., Stipulations – attachment "A" to "Recommended Decision"

of Magistrate Sarah Luick, *Board of Registration in Medicine v. Robert P. Weinberg,*

Adjudicatory Case No. RM-99-074, DALA, signed on April 9, 2001 by Respondent's Counsel

John Flym, Respondent Robert Weinberg D.O. and signed on April 12, 2001 by Complaint

Counsel Alice Oliff].

914.    This 1999 Memorandum referred to the concealment of the material evidence comprising

the 1992 handwritten Express Bilateral Contract, concealed by defendants Lourdes Colon,

Stanley Spero and Lisa Wolfe, spoliation of material evidence relevant to the tribunal

proceedings, potentially as part of a criminal conspiracy to conceal such material evidence from the tribunal in order to defraud the respective courts and evade their own liability.

915.    "In February 2000, Respondent filed a letter and affidavit with the Board of Registration of Psychologists, the Attorney General's Office, the Suffolk County District Attorney's Office, and the Board of Bar Overseers alleging unlawful acts by: Lisa Wolfe, Ph.D. (Patient A's current therapist), Stanley Spero, Esq. (Patient A's attorney), and Richard Waring, Esq. (former Complaint Counsel in the above-captioned matter). The alleged unlawful acts included: perjury, larceny, theft by misrepresentation and insurance fraud. Respondent accused Mr. Waring of acting 'in a criminally negligent and/or criminally reckless manner in issuing the Complaint in January 1999.'" [Stipulation No. 57., Stipulations – attachment "A" to "Recommended Decision" of Magistrate Sarah Luick, *Board of Registration in Medicine v. Robert P. Weinberg,* Adjudicatory Case No. RM-99-074, DALA, signed on April 9, 2001 by Respondent's Counsel John Flym, Respondent Robert Weinberg D.O. and signed on April 12, 2001 by Complaint Counsel Alice Oliff].

916.    The perjury, addressed in these February 2000 letters and affidavits, comprised [a] telling falsehoods that the doctor-patient relationship had not ended [b] abetted by their concealment of the contract; the larceny comprised obtaining the insurance settlement defrauding the insurance company through the concealment of the contract; the theft by misrepresentation and insurance fraud comprised inducing the insurer ProMutual to pay $150,000 without informing the insurance company about the 1992 contract terminating the doctor-patient relationship.

917.    The final judgments issued by the five (5) tribunals listed above include **multiple FALSE statements of material fact** within the text of the judgments – based on the **taint of**

concealed material evidence and **deceptive conduct and spoliation of evidence** by defendants Lourdes Colon, Lisa Wolfe and Stanley Spero - as will be fully described below.

918.    **Final court judgments which incorporate multiple false statements of material fact** within the text of those judgments, and applies the relevant law to the false statements of material fact, **will result in FALSE conclusions of law** which **renders those judgments null and void.**

919.    It is purely logical that the **application of the relevant law to FALSE statements of material fact will result in FALSE conclusions of law** thereof; **court judgments which are directly based on false statements of material fact** wherein such **false statements of material fact are directly stated within the text of those judgments, must be declared null and void** on the basis of those false statements of material fact relevant to the issues of fact and issues of law being adjudged.

920.    It follows, without the necessity of proof, that the final judgments which issue forth from any Court based on false conclusions of law, which were based on false statements of material fact are necessarily invalid, null and void.

921.    Once the Plaintiff has proven these false statements of material fact, which are expressly stated in the text of the final judgments of those Courts, are indeed false by a preponderance of the evidence, "the house of cards will fall down" and the Plaintiff may petition for overturning and vacating those judgments under Rule 60(b) of the Federal Rules of Civil Procedure –

> **Rule 60. Relief from a Judgment or Order ...**
>
> > **(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal**

**representative from a final judgment, order, or proceeding for the following reasons:**

> (1) mistake, inadvertence, surprise, or excusable neglect;

> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

> (4) the judgment is void;

> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

> (6) any other reason that justifies relief.

(c) Timing and Effect of the Motion.

> (1) *Timing.* A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

> (2) *Effect on Finality.* The motion does not affect the judgment's finality or suspend its operation.

(d) Other Powers to Grant Relief. This rule does not limit a court's power to:

> (1) entertain an independent action to relieve a party from a judgment, order, or proceeding;

> (2) grant relief under 28 U.S.C. §1655 to a defendant who was not personally notified of the action; or

> (3) set aside a judgment for fraud on the court.

(e) Bills and Writs Abolished. The following are abolished: bills of review, bills in the nature of bills of review, and writs of coram nobis, coram vobis, and audita querela.

922.    A reasonable person may conclude that the conclusions of law which issued forth from these five tribunals would likewise be as false as the FALSE statements of material fact on which those conclusions of law were based.

923.    The Plaintiff is seeking Declaratory Judgments for each of the false statements of material fact which are expressed in the Final Judgments of these five tribunals – declaring those FALSE statements of material fact to be false as will be proved by the Plaintiff by a preponderance of the evidence.

924.    The Plaintiff is also seeking Declaratory Judgments for each of the five tribunals which declare that the Conclusions of Law made by those tribunals were based on FALSE statements of material fact as proven by the Plaintiff by a preponderance of the evidence.

925.    The Plaintiff is also seeking Declaratory Judgments that the Final Judgment of those five tribunals are null and void because they issue forth from conclusions of law based on FALSE statements of material fact as proven by the Plaintiff by a preponderance of the evidence.

926.    Following the judicial issuance of the Plaintiff's requested Declaratory Judgments, the Plaintiff will seek Injunctive Relief through having the Final Judgments of those five tribunals to be overturned and vacated on the basis of Rule 60(b)(3) and 60(b)(4):

> **"Fed.R.Civ.P. Rule 60— Relief From Judgment or Order**
> ...
> > **(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.** On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:
>
> ...
> > > **(3)** fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;
> > > **(4)** the judgment is void "      (Fed.R.Civ.P.)

*Spoliation of material evidence by defendants Lourdes Colon, Stanley Spero, Lisa Wolfe*

927.    The defendants Lourdes Colon, Stanley Spero and Lisa Wolfe have concealed relevant and material evidence from the tribunals which are substantially relevant to the laws applied by the tribunal, thus rendering the judgments rendered by the tribunal based on false statements of material fact which formed the foundation of those judgments.

*Sexual relations between Physicians and Patients*
*Korper v. Weinstein,* 57 Mass. App.Ct. 433 (2003); 783 N.E.2d 877

928.    **"It is settled that consensual sexual conduct between a medical practitioner and a patient does not constitute medical malpractice."** *Roe v. Federal Ins. Co.*, 412 Mass. 43, 49-51 (1992) (sexual contact by dentist during treatment, whether consensual or not, was not rendering of professional services so as to be covered by malpractice insurance).

929.    **There are two exceptions to this rule: mishandling of the "transference phenomenon" by a psychiatrist with a patient; and sexual conduct purporting to be medical treatment.** See ibid.; *Palermo v. Brennan*, 41 Mass. App. Ct. 503, 509 n.10 (1996). See also *Atienza v. Taub*, 194 Cal. App. 3d 388, 393-394 (1987); *Mindt v. Winchester*, 151 Or. App. 340, 343-345 (1997). *Korper v.Weinstein* 57 Mass. Ct. 433, 783 NE 2d 877 (2003)"

930.    In the instant case, although Stanley Spero attempted to prove that the Plaintiff's providing counseling to defendant Lourdes Colon - which is routinely done by Family Practice physicians, that such counseling rendered the Plaintiff into being a psychiatrist, nor did the Plaintiff ever purport that any sexual contacts were a type of medical treatment.

931.    The Plaintiff has never held himself out to be a psychologist, psychotherapist or psychiatrist, and the Plaintiff has never engaged in psychotherapy.

932.    *Korper v. Weinstein*: "…**The plaintiff argues that a kind of transference phenomenon occurs in the ordinary patient-physician relationship by virtue of the relationship.** This view has been identified and rejected. *Roe v. Federal Ins. Co.*, 412 Mass. at 50-51. The plaintiff's proposed exception would swallow the rule. Nor is the plaintiff aided by the affidavits supplied by her experts, which are based on an erroneous view of the law. These affidavits state that, in the expert view of the affiants, the defendant's actions were injurious to her because of the possibility for corroding the trust between physician and patient, and fell below the standard of care for physicians. **An expert opinion is required and permitted in medical malpractice cases to inform the question whether the professional services rendered by the physician deviated from the standard of care owed by the physician to the patient, thereby causing damage to the patient.** See, e.g., *Collins v. Baron*, 392 Mass. 565, 569 (1984). Such opinions are received only on the topic of professional services." *Korper v. Weinstein* 57 Mass. App. Ct. 433, 783 NE 2d 877 (2003).

933.    "… **On the facts of this case, the law does not regard consensual sexual conduct between the plaintiff and the defendant as a species of medical professional services.** The opinion of medical experts to the contrary is foreclosed." *Korper v. Weinstein* 57 Mass. App. Ct. 433, 783 NE 2d 877 (2003).

934.    "Further, the record does not support any inference that the defendant was providing any postoperative care once the sexual relationship began. Rather, the record shows that he ensured that other physicians took over the plaintiff's care. Thus, to the extent the plaintiff's experts base their opinions on the view that the affair took place while the plaintiff was the patient of the defendant, such opinions lack foundation. *Korper v. Weinstein* 57 Mass. App. Ct. 433, 783 NE 2d 877 (2003).

935.    "The plaintiff makes the broader claim that the defendant had a fiduciary duty to avoid a sexual relationship with her since they became acquainted in a doctor-patient relationship, even though that professional relationship was terminated once the sexual relationship began.There is support for the argument that the defendant breached his ethical obligations by engaging in a sexual affair with a patient even though it was consensual and even though the professional relationship was terminated as soon as the affair began." See *Levy v. Board of Registration & Discipline in Med.*, 378 Mass. 519, 522-525 (1979); *Mancini v. Board of Registration in Med.*, 390 Mass. 1002, 1003 (1983). *Korper v.Weinstein,* 57 Mass. App. Ct. 433, 783 NE 2d 877 (2003).

936.    "Violations of medical ethics do not, however, without more, establish legal liability for damages. Cf. *Doe v. Nutter, McClennen & Fish,* 41 Mass. App. Ct. 137, 141 (1996). Here, the plaintiff's broad claim of breach of fiduciary duty reaches past a claim of breach of medical ethics. Thus, we address the question whether, under the facts of this case, the defendant stood in a fiduciary relationship toward the plaintiff and, if so, whether the defendant breached that duty so as to warrant an award of damages. *Korper v.Weinstein* 57 Mass. App. Ct. 433, 783 NE 2d 877 (2003).

937.    "[T]he circumstances [that] may create a fiduciary relationship are so varied that it would be unwise to attempt the formulation of any comprehensive definition that could be uniformly applied in every case.... The existence of the relationship in any particular case is to be determined by the facts established." *Warsofsky v. Sherman*, 326 Mass. 290, 292-293 (1950). See Restatement (Second) of Torts § 874 (1979). *Korper v. Weinstein* 57 Mass. App. Ct. 433, 783 NE 2d 877 (2003).

938.    "In addition to the obvious obligation to make medical decisions in the patient's best interest, a physician has a fiduciary duty to maintain the confidentiality of a plaintiff's medical records." *Alberts v. Devine*, 395 Mass. 59, 69, cert. denied sub nom. *Carroll v. Alberts*, 474 U.S. 1013 (1985).

939.    "However, the existence of a fiduciary relationship does not mean that all interaction between the parties to that relationship is measured by the standards applicable to fiduciaries; the fiduciary is held to a higher standard of conduct only as to matters within the scope of the fiduciary relationship. Even though the physician-patient relationship is one of many "familiar and well recognized forms of fiduciary relationships," *Warsofsky v. Sherman*, 326 Mass. at 292, the scope of the fiduciary duty is defined by the incidents and undertakings of the defendant as a physician. See *Fowles v. Lingo*s, 30 Mass. App. Ct. 435, 441 (1991). The conduct here complained of was outside that scope. *Korper v.Weinstein*  57 Mass. App. Ct. 433, 783 NE 2d 877 (2003).

940.    "There appears no question that the trust and confidence that the plaintiff put in the defendant in this case went beyond that related to the professional services he rendered. Any trust and confidence she placed in the defendant as a person, however, even augmented by circumstances that made her emotionally dependent on him, did not create a fiduciary duty in the defendant to prevent the personal relationship that developed consensually between them, especially where he terminated the physician-patient relationship as soon as the personal relationship began. The plaintiff has no recourse in the law for emotional harm caused by breaches of "trust" of this kind. Rules of law based on such considerations have been discarded. See *Quinn v. Walsh*, 49 Mass. App. Ct. 696, 707 (2000) (amatory actions abolished by G. L. c. 207, § 47B.)" *Korper v.Weinstein*  57 Mass. App. Ct. 433, 783 NE 2d 877 (2003).

941.    In the instant case, a handwritten Bilateral Express Contract was formed and executed in 1992, which terminated the doctor-patient relationship after Dr. Lisa Wolfe advised, encouraged and dictated verbatim this course of action.

942.    The subsequent modification of that contract provided the clinical-nonclinical binary classification of time and place so that at no time did the Plaintiff ever have any sexual contact with Lourdes Colon while he was acting as her physician in the Clinical World; any sexual contacts only took place in the nonclinical world when the Plaintiff was not acting as her physician (he had taken off his "doctor hat" while in the nonclinical world).

943.    "Contrary to the plaintiff's contention, a professional who violates a professional ethical rule does not become liable under G. L. c. 93A in all circumstances. For example, the "disciplinary rules [for lawyers] provide standards of professional conduct ... and do not in and of themselves create independent causes of action." Doe v. Nutter, McClennen & Fish, 41 Mass. App. Ct. at 141. That principle must apply to physicians as well. The absence of a right of the plaintiff to recover damages for violations of ethical norms by the defendant does not leave the public unprotected. See *Levy v. Board of Registration & Discipline in Med.*, 378 Mass. at 522-523. *Korper v.Weinstein* 57 Mass. App. Ct. 433, 783 NE 2d 877 (2003).

944.    "During their first sexual encounter, the defendant ripped off the dressings from the plaintiff's breast. At this point, more than five weeks had passed since the biopsy and nearly three weeks since the defendant removed the sutures in his office. The plaintiff alleges that the defendant's action of removing her bandage during sex resulted in aggravated scarring, but has presented no evidence — medical expert or otherwise — to support this allegation. They would speak on the phone while the defendant was at UHS or at a hospital, and they occasionally met at UHS during the relationship. **There is no specific evidence showing that these contacts were**

**for the purpose of seeking or rendering medical services**. Although the defendant 'groped' the plaintiff in empty examination rooms during these subsequent non-treatment visits, they never had intercourse in his office — only in her apartment. The plaintiff insisted on a written settlement agreement, and the defendant signed what she drafted. In exchange for the plaintiff's promise not to pursue civil, criminal, or administrative remedies against him, the defendant agreed to pay for the plaintiff's therapy, to give her money for maintenance, and to amend his will to instruct his executor to provide for her. Additionally, this agreement prohibited the defendant from reporting the relationship either to the board of registration of medicine or to his wife. The defendant gave more than $41,000 toward the plaintiff's living expenses during their relationship. No contract claims have been asserted based upon the agreement. Contrary to the plaintiff's argument, the recitals in the document cannot be taken as an admission creating legal liability. Compare *Morea v. Cosco, Inc.*, 422 Mass. 601, 603 (1996); *Zucco v. Kane*, 55 Mass. App. Ct. 76, 81-83 (2002), further appellate review granted, 438 Mass. 1106 (2003).

This rule is supported by the great weight of authority in other jurisdictions. See *Gunter v. Huddle*, 724 So. 2d 544, 546 (Ala. Civ. App. 1998); *Atienza v. Taub*, 194 Cal. App. 3d 388, 393-394 (1987); *Mindt v. Winchester*, 151 Or. App. 340, 343-345 (1997). "[C]ourts do not routinely impose liability upon physicians in general for sexual contact with patients." *Simmons v. United States,* 805 F.2d 1363, 1366 (9th Cir. 1986). *Korper v. Weinstein* 57 Mass. App. Ct. 433, 783 NE 2d 877 (2003).

945.    "The affidavits do not state that a transference phenomenon was present in this case. They only state that, assuming, as alleged by the plaintiff, that there was such a phenomenon, the defendant's conduct would constitute a violation of the standard of care." *Korper v. Weinstein* 57

Mass. App. Ct. 433, 783 NE 2d 877 (2003); likewise in the Plaintiff's case, there was no factual

finding that a transference phenomenon was present between the Plaintiff and Lourdes Colon.

946.    "The American Medical Association Council on Ethical and Judicial Affairs has

concluded that (1) sexual contact or a romantic relationship with a patient concurrent with the

physician-patient relationship is unethical; and (2) sexual or romantic relationships with former

patients are unethical if the physician uses or exploits trust, knowledge, or emotions or influence

derived from the previous professional relationship. Sexual Misconduct in the Practice of

Medicine, 266 JAMA 2741, 2743-2744 (1991). *Korper v. Weinstein* 57 Mass. App. Ct. 433, 783

NE 2d 877 (2003).

947.    In the Plaintiff's case with BORIM, no factual finding was ever made that the Plaintiff

used or exploited trust, knowledge, or emotions or influence derived from the previous

professional relationship.

948.    "A fiduciary relation exists between two persons when one of them is under a duty to act

for or to give advice for the benefit of another upon matters within the scope of the relation."

Restatement (Second) of Torts § 874 comment a (1979). See, e.g., United States v. Neufeld, 908

F. Supp. 491, 500 (S.D. Ohio 1995) (patients deserve medical opinions and referrals unsullied by

conflicts of interest where physician was receiving kickbacks). *Korper v. Weinstein* 57 Mass.

App. Ct. 433, 783 NE 2d 877 (2003).

949.    "We decline the plaintiff's invitation to expand the scope of the fiduciary duty a doctor

owes a patient to include conduct beyond the context of medical treatment, as the Nevada

Supreme Court did in *Hoopes v. Hammargren*, 102 Nev. 425, 431-432 (1986). The Hoopes court

permitted recovery for a patient who can prove that (1) the physician held a superior

authoritative position in the professional relationship, (2) the patient was vulnerable as a result of

illness, (3) the physician exploited the vulnerability, and (4) the exploitation was the proximate

cause of provable harm. Id. at 432. The Nevada approach appears to stand alone in imposing

liability for breach of fiduciary duty for physician sexual misconduct occurring outside the realm

of medical treatment." *Korper v. Weinstein* 57 Mass. App. Ct. 433, 783 NE 2d 877 (2003).

950.    "The expert opinion supplied in the two affidavits discussed above is also mistakenly

addressed to legal and not medical professional issues when it concludes that the defendant's

actions breached the fiduciary relationship inherent in a professional medical relationship. See

discussion supra." *Korper v. Weinstein* 57 Mass. App. Ct. 433, 783 NE 2d 877 (2003).

951.    "To prevail on her claim for intentional infliction of emotional distress, the plaintiff must

establish that "(1) the defendant intended to inflict emotional distress, or knew or should have

known that emotional distress was the likely result of his conduct, ... (2) the defendant's conduct

was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a

civilized community, (3) the actions of the defendant were the cause of the plaintiff's distress,

and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no

reasonable person could be expected to endure it." *Payton v. Abbott Labs,* 386 Mass. 540, 555

(1982), citing *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145 (1976). *Korper v. Weinstein* 57

Mass. App. Ct. 433, 783 NE 2d 877 (2003).

952.    It is clearly established law that in order to establish sexual misconduct, or other

punishable offense, when a physician is involved in sexual relations with a patient or a former

patient, one of the following conditions must be true:

(a) the physician must be a psychiatrist, psychologist or psychotherapist [*Korper v.
    Weinstein*]; or

(b) the physician misuses the transference or counter-transference processes established between the physician and the patient during psychotherapy [*Korper v. Weinstein*]; or

(c) the sexual relations must begin before the physician-patient relationship is terminated [AMA Code of Ethics Opinion 9.1.1]; or

(d) the physician must mis-represent sexual relations as a form of medical treatment; or

(e) sexual relations must occur with deception in the course of medical examination, diagnosis or other medical treatment; or

(f) sexual relations takes place while the patient is incompetent to consent (anesthesia, unconscious, drugged, intoxicated, comatose, asleep, obtunded, dead); or

(g) sexual relations occurs as part of some deception or fraudulent misrepresentation made by the physician; or

(h) the patient is a minor or otherwise incompetent to give consent; or

(i) the sexual relations comprises a criminal act such as rape, sexual assault, incest, sodomy, prostitution or other criminal sexual offense; or

(j) the patient lacks the capacity to consent to sexual relations; or

(k) the sexual relations is accomplished by the use of coercion, threat, force, intimidation, extortion; or

(l) the physician engages in *quid pro quo* exchanging sexual relations for drugs or other pecuniary benefits.

953. None of the above 12 conditions were present when the Plaintiff engaged in sexual relations with defendant Lourdes Colon, thus the Plaintiff was not liable for sexual misconduct nor for medical malpractice.

954.    It is established law that sexual relations with a person cannot comprise physician sexual misconduct unless that person was a patient of the physician's at the time of sexual relations.

955.    Following the termination of the doctor-patient relationship by the Express Bilateral contract formed and executed in September 1992 under the guidance of defendant psychologist Lisa Wolfe, defendant Lourdes Colon was no longer a patient of the Plaintiff's and when the Plaintiff was in the contractually-created non-clinical world, the defendant Lourdes Colon was not a patient of the Plaintiff's.

956.    Since none of the twelve (12) conditions listed above existed at the time of sexual relations between the Plaintiff and defendant Lourdes Colon (a.k.a. "Patient A"), the Plaintiff did not commit sexual misconduct and the sexual relations were lawful, proper, ethical and permissible under the law while the Plaintiff had the *bono fide* belief that he was not acting as her physician.

### Scope of clinical services provided by Family Physicians:
### Family Physicians are neither trained nor educated to perform psychotherapy

957.    Family Physicians routinely discuss the patient's issues such as functioning in school or work, family relations, moods and feelings of happiness, frustration, sadness    and the discussion of these issues do not comprise holding oneself out as a psychiatrist, psychologist or psychotherapist.

958.    Sexual misconduct cannot be the basis for the revocation of the Plaintiff's medical license because the Plaintiff never engaged in sexual misconduct with Lourdes Colon following the termination of the doctor-patient relationship by an Express Bilateral Contract.

*Gross negligence by defendant Lisa Wolfe*

959.    As an educated, trained and licensed psychologist, defendant Lisa Wolfe presented herself to the Plaintiff and the world as a competent mental health professional.

960.    In September 1992, Lisa Wolfe reassured the Plaintiff in an hour-long meeting with the Plaintiff, Lourdes Colon and Dr Wolfe, that Dr Wolfe recommended and advised the formation and execution of the express bilateral contract terminating the doctor-patient relationship between the Plaintiff and Lourdes Colon.

961.    Lisa Wolfe did not provide any reservations, doubts or expressed restrictions on the Plaintiff's subsequent relationship with Lourdes Colon, and reassured the Plaintiff of the safety of such a course of action; defendant Wolfe had a duty to warn the Plaintiff about defendant Colon's vulnerability due, in part to her Dissociative Identity Disorder (Multiple Personality Disorder), and the inadvisability of developing any sexual entanglements.

962.    After approximately one hour of counseling and discussion, Lisa Wolfe dictated verbatim the terms of the express bilateral contract terminating the doctor-patient relationship.

963.    At no point did Lisa Wolfe inform the Plaintiff of her differential diagnosis or clinical notes on Lourdes Colon such as major depression, dissociative disorder, PTSD; Dr. Wolfe had a pressing duty to warn the Plaintiff about the perilous course which might result from becoming personally sexually involved with a patient suffering from Dissociative Identity Disorder.

*Dissociative Identity Disorder / Multiple Personality Disorder*

964.    Defendant Lourdes Colon (a.k.a. "Patient A") suffers from a Dissociative Identity Disorder ("DID"), unknown to the Plaintiff in 1992 – 1997.

965.    The Plaintiff's Psychiatric Expert Witness has opined that Lourdes Colon suffers from or did suffer from Dissociative Identity Disorder ("DID") which was also corroborated by the Axis I diagnoses listed by defendant Dr Wolfe in her Admission Note for Colon to HRI in August 1992 – "… Dr Wolfe indicated that the diagnostic impression of Patient A was:

> Axis I: Major Depression; rule out: dysthymia, PTSD, Dissociative Disorder NOS, eating disorder NOS, and organic mood disorder"

[Stipulation No. 15., Stipulations – attachment "A" to "Recommended Decision" of Magistrate Sarah Luick, *Board of Registration in Medicine v. Robert P. Weinberg,* Adjudicatory Case No. RM-99-074, DALA, signed on April 9, 2001 by Respondent's Counsel John Flym, Respondent Robert Weinberg D.O. and signed on April 12, 2001 by Complaint Counsel Alice Oliff].

966.    This DID causes defendant Colon to have a Multiple Personality Disorder. This is corroborated by multiple medical records on Lourdes Colon.

967.    The Multiple Personality Disorder in defendant Colon causes her to have multiple and distinct personalities, often with each personality not knowing what the other personalities have done, perceived, seen or heard, agreed or disagreed to, acted upon, etc.; it is not unusual for one personality not to know what another personality did, said, saw, perceived, heard, knew or acted. [https://repository.up.ac.za/bitstream/handle/2263/43470/Dorahy_Dissociative_2014.pdf?sequence=1 ].

968.     There is substantial medico-legal literature on Dissociative Identity Disorder ("DID") and

Multiple Personality Disorder ("MPD"). Numerous U.S. courts have encountered criminal

defendants with a history of DID/MPD and there have been judicial determinations of the

liability of these defendants versus the question of whether they were Not Guilty by reason of

insanity.

969.     There is a growing scientific literature on the outcomes of criminal trials involved

defendants with DID or Multiple Personality Disorder and whether such criminal defendants are

liable for their criminal actions or not guilty by reason of insanity.                         [1]

https://www.psychiatry.org/patients-families/dissociative-disorders/what-are-dissociative-

disorders ; https://www.ncbi.nlm.nih.gov/books/NBK568768/ ;                                     [2]

https://en.wikipedia.org/wiki/Dissociative_identity_disorder ;                                 [3]

https://www.mayoclinic.org/diseases-conditions/dissociative-disorders/symptoms-causes/syc-

20355215 ; https://www.webmd.com/mental-health/dissociative-identity-disorder-multiple-

personality-disorder ].

970.     Although it appears to the Plaintiff that defendant Lourdes Colon was intentionally and

purposefully concealing material evidence of the 1992 Express Bilateral Contract terminating the

doctor-patient relationship from the tribunals, it is possible that some of the distinct multiple

personalities comprising the defendant Colon may not have known or perceived that other

separate personalities did agree to, memorialize in writing, and complete the formation and

execution of that contract in September 1992; as the forensic caselaw below point out, there is

controversy over the criminal liability of alter selves for the criminal acts which they may

commit.

971.    In the case of the ignorance of other separate personalities not knowing or remembering of the Express Bilateral Contract terminating the doctor-patient relationship, the apparent concealment and fraudulent actions may be beyond the knowledge or consciousness of her other personalities and may not represent criminal actions or fraud of the non-knowing personality. [1]https://citeseerx.ist.psu.edu/document?repid=rep1&type=pdf&doi=55a6c4b6c4b4a286de552d2f0b6114d5eba8a137 ; [2] A. Steven Frankel, PhD, JD and Constance Dalenberg, PhD "The Forensic evaluation of dissociation and Persons diagnosed with Dissociative Identity Disorder: Searching for Convergence" (2006) *Psychiatr Clin N Am* 29:169-184.

972.    Multiple criminal caselaw shows controversy over whether DID sufferers are criminally liable for the various crimes such as assaults, murders or rapes that may be committed by one of their separate personalities (alters):

[https://scholar.google.com/scholar?hl=en&as_sdt=40000006&q=%22Dissociative+Identity+Disorder%22&oq= ;  State v. Greene  984 P. 2d 1024, 139 Wash. 2d 64 - Wash: Supreme Court, 1999 (… Greene, 92 Wash.App. 80, 960 P.2d 980. The State sought and we granted review); Greene v. Lambert  288 F. 3d 1081 - Court of Appeals, 9th Circuit, 2002 - (… interpretation of state rules of evidence and its conclusion that the mental disease about which the defendant and the victim would testify) ; State v. Lockhart  542 SE 2d 443, 208 W. Va. 622 - W Va: Supreme Court of Appeals, 2000 ( … We address each of these questions in turn. 449 A. Expert Opinion Testimony on Dissociative Identity Disorder as a Basis for an Insanity Defense. Mr … ) ;  US v. Denny-Shaffer  2 F. 3d 999 (1993) - Court of Appeals, 10th Circuit, 1993; Odum v. Com.   301 SE 2d 145, 225 Va. 123 - Va: Supreme Court, 1983;  People v. McSwain  676 NW 2d 236, 259 Mich. App. 654 - Mich: Court of Appeals, 2003 (". Much of the testimony at the evidentiary

hearing concerned dissociative identity disorder, formerly known as multiple personality

disorder ... ); State v. Fosnow 624 NW 2d 883, 240 Wis. 2d 699, 2001 WI ... - Wis: Court of ...,

2000 - (... In December 1998, Fosnow moved to withdraw his no contest pleas based on "newly

discovered evidence" that he suffered from Dissociative Identity Disorder (DID) at the time of

the ... ); Davis v. University of North Carolina  263 F. 3d 95 - Court of Appeals, 4th Circuit,

2001 - (... appeals. We affirm. I. Davis was diagnosed in 1993 as suffering from dissociative

identity disorder ("DID"), also known as multiple personality disorder. She ... ); Orndorff v.

Com.  628 SE 2d 344, 271 Va. 486 - Va: Supreme Court, 2006 - (... She contended that this new

evidence would show that at the time of the murder she suffered from dissociative identity

disorder (DID), [1] which she alleged would support an insanity ... );   State v. Atkins  505 SE

2d 97, 349 NC 62 - NC: Supreme Court, 1998 - Google Scholar  (... In support of the (f)(7)

mitigating circumstance, defendant elicited the testimony of Dr. Horacek, who stated that

defendant suffered from a dissociative identity disorder, as well as an ... );  Goodermote v.

Secretary of Health & Human Services 690 F. 2d 5 - Court of Appeals, 1st Circuit, 1982; State v.

Lockhart 490 SE 2d 298, 200 W. Va. 479 - W Va: Supreme Court of Appeals, 1997 - (...

defense to the jury based upon a theory that, at the time of the events in question, he was

suffering from a mental impairment known as "Dissociative Identity Disorder" (also known

as ... ); Estes v. Barnhart 275 F. 3d 722 - Court of Appeals, 8th Circuit, 2002 - (... She claimed

disabling conditions consisting of personality disorder, dissociative identity disorder (also known

as multiple personality disorder), panic attacks with agoraphobia, and ...); Doe v. Smith  105 F.

Supp. 2d 40 - Dist. Court, ED New York, 1999 - (... In particular, plaintiff offers the opinion of

Dr. Richard Kluft, a psychiatric specialist in Dissociative Identity Disorder, from which the

plaintiff suffers, that proceeding publicly would "cause ...);  State v. Greene  960 P. 2d 980, 92

Wash. App. 80, 74 Cal ... - Wash: Court of ..., 1998 - (... capacity. Dissociative Identity Disorder. Dissociative Identity Disorder reflects a failure to integrate various aspects of identity, memory, and consciousness ... ); State v. Boyd 280 SE 2d 669, 167 W. Va. 385 - W Va: Supreme Court of Appeals, 1981; Orndorff v. Com. 691 SE 2d 177, 279 Va. 597 - Va: Supreme Court, 2010 - (... Orndorff maintains that this evidence would demonstrate to a new jury that she suffers from dissociative identity disorder ("DID"), a mental illness she contends would serve as the basis ... ); State v. Harden 679 SE 2d 628, 223 W. Va. 796 - W Va: Supreme Court of Appeals, 2009; Olson v. General Elec. Astrospace 966 F. Supp. 312 - Dist. Court, D. New Jersey, 1997 (... Mr. Olson's diagnosed condition is Multiple Personality Disorder (also known as Dissociative Identity Disorder), DSM-IIIR 300.14, with depressive episodes secondary to dissociative ... ); US v. Hammer 25 F. Supp. 2d 518 - Dist. Court, MD Pennsylvania, 1998 - (... Robert M. Sadoff, MD, the defense forensic psychiatrist testified that Mr. Hammer suffered from multiple personality disorder or as it is now designated dissociative identity disorder ... ); United States v. Vamos 797 F. 2d 1146 - Court of Appeals, 2nd Circuit, 1986; State v. Bakalov 979 P. 2d 799, 1999 UT 45 - Utah: Supreme Court, 1999 (... She told the reporter that she had been diagnosed by her therapist, Dr. Judith Brady, with multiple personality disorder, now known as dissociative identity disorder (DID), [1] and ... ); In re CAB 289 SW 3d 874 - Tex: Court of Appeals, 2009 (... The report continued by stating that [Aja] informed hospital staff that she had three alter [sic] personalities as part of her dissociative identity disorder ... ); Doe v. Del Rio 241 FRD 154 – 2006; Frye v. United States 293 F. 1013 - Court of Appeals, Dist. of Columbia, 1923; Kocaker v. State 119 So. 3d 1214 - Fla: Supreme Court, 2013 (... [9] Dr. Eisenstein concluded that Kocaker has brain and neuropsychological abnormalities, diagnosed him with dissociative identity disorder, noted that Kocaker presents multiple ... ); Harbot v. Berryhill 335

F. Supp. 3d 382 - Dist. Court, WD New York, 2018 - Google Scholar  (... psychogenic non-epileptic attacks, obesity, mild neurocognitive disorder, depressive disorder, posttraumatic stress disorder ("PTSD"), dissociative identity disorder (commonly known as ... ); O'connor v. Donaldson  422 US 563, 95 S. Ct. 2486, 45 L. Ed. 2d 396 - Supreme Court, 1975; Johnson v. Com.  591 SE 2d 47, 267 Va. 53 - Va: Supreme Court, 2004 (... the circuit court impose a life sentence based on his alleged "mental illness." Johnson asserted that he had been diagnosed as suffering from "Dissociative Identity Disorder" (DID), a ... ); Purvis v. Commissioner of Social Sec. Admin.  57 F. Supp. 2d 1088 - Dist. Court, D. Oregon, 1999 (... Diagnostically, the symptoms of alcohol and methamphetamine abuse, bipolar disorder, and dissociative identity disorder * * * are difficult to unravel ... ).

973.    Through her efforts and recommendations, Lisa Wolfe did commit gross negligence and medical malpractice when she recommended, advised, approved, drafted, dictated and oversaw the termination of the doctor-patient relationship between the Plaintiff and Lourdes Colon in September 1992.

974.    Plaintiff's Psychologist Expert Witness will opine that Dr Wolfe deviated from the standard of care through her recommendation to terminate the doctor-patient relationship when Lourdes Colon suffered from such serious psychopathology and that deviation was the direct and proximate cause of substantial injuries and damages to both Colon and to the Plaintiff.

975.    Plaintiff's Psychologist Expert Witness will also opine that Dr Wolfe's concealment of her role in dictating the 1992 memorialized handwritten Express Bilateral Contract terminating

the doctor-patient relationship also violated the Code of Ethics for psychologists as presented by the American Psychological Association and represents gross negligence and misconduct.

*State actors' violation of Contract clause of U.S. Constitution*

976.    The September 1992 agreement between the Plaintiff and Lourdes Colon was an Express Bilateral Contract, which terminated the doctor-patient relationship and was engineered, drafted and dictated by the defendant Lisa Wolfe.

977.    Express Bilateral Contracts between private parties are protected by the Contracts clause of the U.S. Constitution.

978.    As such, the contracts clause of the U.S. Constitution is governed by the Supremacy and Supercession doctrines, which make the contracts clause pre-eminent over state law.

979.    "Article I, section 10, clause 1 of the Constitution states that "States cannot, inter alia, "grant Letters of Marque and Reprisal," "pass any Bill of Attainder," or "grant any Title of Nobility, No State shall . . . pass any . . . Law impairing the Obligation of Contract" *U.S. Constitution; [Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130 ; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

*Contracts - the Revival of Lochnerism & Economic Substantive Due Process*

980.    "In the early twentieth century, the Supreme Court interpreted the Due Process Clause of the Fourteenth Amendment to "routinely invalidate state social and economic legislation" based on "notions of liberty and property characteristic of laissez-faire economics." Reviving a literalist interpretation of the Contract Clause would permit the irony of a textually grounded

Lochnerism — broad judicial control of "economic liberty," but without the anticanonical, extraconstitutional reasoning of the Supreme Court in *Lochner v. New York*." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130 ; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

981.    "Contract Clause claims may be actionable under 42 U.S.C. § 1983. While § 1983 is not the sole cause of action through which Contract Clause claims are asserted, its presumed availability for Contract Clause claim has allowed for resurgent doctrinal development." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

982.    "… Contract Clause jurisprudence at its height in the early nineteenth century, with attention to how the Framers and early American courts distilled a natural right to contract from the broad framing of the clause." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

983.    "… the twentieth century, identifying how the *Lochner*-era doctrine of economic due process developed and departed alongside the Contract Clause's protections of economic liberty." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

984.    "… of such a broad constitutional clause requires an examination of its … recorded history … for the Contract Clause … rife with references to a natural right to contract, one that early state courts and the Marshall Court embraced. That natural right presaged a more aggressive invocation of a "right to contract" made famous in *Lochner* … " *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19", 136 Harv. L. Rev. 2130;* https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container ]

985.    "… recorded discussion from the Constitutional Convention pertained to the clause. On August 28, 1787, Rufus King proposed including "a prohibition on the States to interfere in private contract." James Madison responded that the proposed prohibition on ex post facto laws would already forbid such interferences … five-member Committee of Style and Arrangement refurbished and reinserted the clause, which now barred states from "altering or impairing the obligation of contract." … and the Contract Clause as we know it today was enshrined in Article I …" *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19", 136 Harv. L. Rev. 2130;* https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container ]

986.    "… the clause became a vehicle for natural economic rights as the Framers championed the principle of the right to contract. Amid a depressed economy, many viewed the clause as a cure to retrospective debtor-relief state laws of the time. Roger Sherman and future Chief Justice Oliver Ellsworth expressed that the clause was "thought necessary as a security to commerce, in which the interests of foreigners, as well as of the citizens of different states, may be affected." … Madison declared in the *Federalist Papers* that "laws impairing the obligation of

contract are contrary to the first principles of the social compact and to every principle of sound legislation." Likewise, Alexander Hamilton viewed "[l]aws in violation of private contract" as a potential source of interstate conflict that a strong federal government would remedy, "as they amount to aggressions on the rights of those States whose citizens are injured by them." And Charles Pinckney celebrated the rights of citizens to "trade with each other without fear of tender-laws or laws impairing the nature of contract." Already the language of rights, counterbalanced against states' legislative power, was prevalent in discourse surrounding the Contract Clause, presaging its intersection with the "freedom of contract" championed in *Lochner*." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

987.    "… Patrick Henry likewise noted that the Contract Clause would leave states powerless to intervene against speculators and debt collectors. Yet most Antifederalists focused their attention on other limitations on state power in Article I, conceding that "the states had often acted irresponsibly regarding contract." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

988.    " … The context of state debt-relief laws suggests that the primary intent of the clause was to prevent debt forgiveness, rather than to bar any regulation touching on contract, as the Marshall Court would later recognize. …Yet the word "alter," rejected from the Contract Clause's text, would have broadened this understanding to any change: "[T]o make otherwise

than it is." While some scholars have elided this distinction by reference to the Northwest

Ordinance's broad language, from which the Contract Clause was likely patterned, the clause's

text explicitly departed from the ordinance's more expansive reach. Though sweeping on its face,

the Contract Clause features built-in textual and contextual limits to its scope. The indeterminacy

of these limitations, however, set the stage for early American courts to exercise judicial review

in full force." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of*

*Covid-19",* 136 Harv. L. Rev. 2130; https://harvardlawreview.org/print/vol-136/the-contract-

clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

989.    "… Judicial Expansion: The entrenchment of a natural right to contract began with early

judicial interpretations of the Contract Clause, creating a legacy of natural economic freedom

that many courts cite today to justify expanding the Contract Clause's modern reach. The federal

Contract Clause was the weapon of choice for state and federal courts alike to strike down laws

as unconstitutional in the nineteenth century. From land grants to corporate charters to

insolvency laws, the Supreme Court construed a limitation on state power as a wellspring of the

natural right to contract. …  Leveraging the vocabulary of natural law, state high courts and

federal circuit courts struck down legislation deemed inimical to the freedom of contract. These

courts faulted state laws not for contravening the text, as it were, but rather for violating the

principle of contractual freedom that the clause enshrined. Riding circuit, Justice Paterson

declared in 1795 that "the right of acquiring, possessing, and protecting property is natural,

inherent, and unalienable" when he found a Pennsylvania statute unconstitutional for quieting

title to settlers' land claims. State high courts soon followed suit, including those of

Massachusetts and Virginia. And even the Supreme Court, albeit in seriatim opinions, engaged in

such natural lawmaking in conversation with the Contract Clause. This natural law tradition first

articulated the freedom of contract that gained momentum in early Supreme Court jurisprudence and that would reappear in the infamous *Lochner* era. Such principles informed the Supreme Court's first examination of the Contract Clause's text. In 1795, Georgia sold public lands in present-day Alabama and Mississippi, but allegations of bribery led the state legislature to later rescind the grants. In *Fletcher v. Peck*, the Court determined that the Contract Clause rendered the law rescinding these land grants void, allowing the sale to remain binding. Like the Federalist Framers, **Chief Justice Marshall employed the language of rights to describe the Contract Clause's function, concluding that "when absolute rights have vested under that contract, a repeal of the law cannot devest those rights**." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19", 136 Harv. L. Rev. 2130;*

https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

990.    In the instant case, absolute rights have vested in the Plaintiff under the Express Bilateral contract terminating the doctor-patient relationship, and as such, state judicial proceedings by DALA or BORIM cannot devest those rights.

991.    "Considering whether a public grant qualified as a contract, Chief Justice Marshall again relied on how rights inured similarly between grants and contract: "A grant, in its own nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right." Declaring that the clause was "applicable to contract of every description," public and private, the Chief Justice filled the gap the Framers had left in drafting the Contract Clause. In doing so, he deferred to "a power applicable to the case of every individual in the community" to enforce such rights in defense of the freedom to contract. *Fletcher* thus employed a natural

rights–based perspective to distill from the Contract Clause an economic right to contract, free from retrospective impairment. …" *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19", 136 Harv. L. Rev. 2130;*

https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

992.    "… In addition to state grants, the Supreme Court included corporate charters and bankruptcy laws within its interpretive scope, again relying on a natural rights–based perspective of the Contract Clause's reach. In *Trustees of Dartmouth College v. Woodward*, the New Hampshire act at issue would have made the college a public institution, even though it was originally chartered to private trustees by King George III. While *Fletcher* featured wholesale voidance of land grants, *Dartmouth College* involved a (perhaps drastic) change to a corporate charter. But because the case featured retrospective contractual impairment, the Chief Justice concluded that the act violated the Contract Clause. He seemed to "interpret the word 'impair' in the Contract Clause as equivalent to 'alter'" by rejecting the argument that the state legislature's alteration of the charter did not impair it, despite the clause's drafting history. In doing so, Chief Justice Marshall again relied on a natural rights–based framework, this time distinguishing a corporation as an artificial instrument from its trustees enjoying contracting rights as "natural person[s]." By invoking this natural law tradition in tandem with a broad textual interpretation, the Marshall Court further entrenched an individualized freedom to contract within a structural state limitation. Yet Chief Justice Marshall did not always succeed in his efforts to expand the clause's meaning. When he did not, debate on the limits of the natural right to contract erupted. In *Ogden v. Saunders*, a debtor used an 1801 New York bankruptcy law as a defense against an action in assumpsit for a contract drawn up in 1806. The majority concluded that a law

prospectively affecting contract — that is, a statute impacting those contract formed after it goes into effect — did not violate the Constitution. Justice Johnson curbed what had been the trend of granting vast constitutional protections to contract, concluding that "to assign to contract, universally, a literal purport, and to exact for them a rigid literal fulfilment, could not have been the intent of the constitution." He even discussed how slavery once fit into the rights-based perspective Chief Justice Marshall had employed in previous Contract Clause cases, stating: "There was a time when a different idea prevailed, and then it was supposed that the rights of the creditor required the sale of the debtor, and his family."  Dissenting, Chief Justice Marshall asserted that the clause, "taken in [its] natural and obvious sense, admit[s] of a prospective, as well as of a retrospective operation." He thus resisted the idea that states could enact such legislation by simply specifying prospective application, which in time, he believed, would "make this provision of the [C]onstitution so far useless." And as in previous cases, the Chief Justice emphasized the right to contract, which "do[es] not derive from government" but rather "is intrinsic, and is conferred by the act of the parties." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*


*"Weinberg law" was quasi-legislated de facto in 2002 in Massachusetts by DALA & BORIM*

993.    The "Weinberg law" was not a law prospectively affecting contracts in general — that is, a statute impacting those contract formed after it goes into effect — which would not violate the Constitution, but the Weinberg law was *de facto*, retrospectively affecting the express bilateral contract terminating the doctor-patient relationship.

994.    The Weinberg law was fashioned by BORIM to punish the Plaintiff as it was enacted to

retrospectively punish the Plaintiff when it was applied *ex post facto* to void the Plaintiff's

bilateral express contract terminating the doctor-patient relationship, and as such, is an affront to

the Contract clause of the U.S. Constitution.

995.    Furthermore, BORIM's actions violated the Plaintiff's right to procedural Due Process as

those actions substantially deprived the Plaintiff of his right to contract as well as depriving the

Plaintiff of his property rights in his medical license.

996.    The Weinberg law violates the Plaintiff's right to Due Process of Law because the

Plaintiff was never provided NOTICE of the Weinberg law to guide his conduct prior to its

enactment and therefore it violated the essential requirement of Due Process that citizens be

provided with notice of prohibited conduct prior to enforcement.

997.    The *de facto* "Weinberg law" quasi-legislated by BORIM is comprised of forty-three (43)

distinct elements as adjudicated by DALA & BORIM, and is individualized legislative action

whose purpose is to punish the Plaintiff for past conduct without the benefit of a fair trial where

the Plaintiff would be able to present evidence of the termination of the doctor-patient

relationship by the 1992 memorialized handwritten Express Bilateral Contract.

998.    "... These cases showcase the entrenchment of the right to contract within the Marshall

Court's interpretation of the Contract Clause. Courts converted a structural limitation on state

power into a source of a natural and individual right to contract. This fusion presaged what the

*Lochner* Court would term "freedom of contract": "The doctrine that people have the right to

enter into binding private agreements with others; a judicial concept that contract are based on

mutual agreement and free choice, and thus should not be hampered by undue external control

such as governmental interference." And the tension between the Contract Clause as a source of

individual rights and as an allocation of authority between federal and state sovereignties typifies the current circuit split on federal private rights of action under the clause. Though the Contract Clause's bright-line language provided textualist support for the Marshall Court's interpretation, the Court's natural law reasoning connects the clause to the lessons of the *Lochner* era and to its potential revitalization today…" *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

999.    Through the *de facto* Weinberg law, the State actor defendants did violate the Plaintiff's constitutionally-protected Freedom of Contract under the Contract clause, retrospectively-looking with *ex post facto* application; furthermore as discussed more fully below BORIM also violated the Plaintiff's right to Equal Protection under the law.

1000.   Furthermore, Defendant Alice Oliff stated, during the October 2002 hearing at BORIM, that the retroactive application of a BORIM precedent set in 1998 by BORIM to the Plaintiff's conduct in 1992-3 would not offend the rule of law.

1001.   However, such retroactive applications of rules or precedents are only acceptable when they do not substantially increase the liability of persons affected – which was not true in the present case.

1002.   The Weinberg law attempts unconstitutionally to render null and void the Plaintiff's 1992 bilateral express contract terminating the doctor-patient relationship, and its subsequent modification to provide for the clinical-nonclinical binary classification of time and place; which contracts were otherwise lawful and enforceable and not contrary to any other state or federal law.

1003.   " … Despite its ambitious beginnings, Contract Clause jurisprudence would eventually decline from its once-lofty status. While employing the same rights-based language that the Marshall Court used in describing the value of the Contract Clause, the Taney Court began limiting the reach of the clause, which nevertheless remained broad until the Gilded Age. The Court soon recognized that "the legislature cannot bargain away the police power of a State." But the emergence of economic due process carried on the principle of the freedom to contract, which — like the Contract Clause — fell to a renewed understanding of state police power." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

1004.   However, the *de facto* enactment of a Bill of Attainder, such as the Weinberg law, which was applied to the Plaintiff *ex post facto* without prior notice does not inure or impair the police power of the state, as it is a retroactive law applying to only one person – the Plaintiff – as it retrospectively looks back in history to the actions and conduct of the Plaintiff after-the-fact, and is not prospectively looking forward to restricting any police powers of the state.

1005.   "The Lochner-era Court's articulation of the freedom to contract under the Fourteenth Amendment's Due Process Clause mirrored that of the Marshall Court under the Contract Clause. In 1897, the Supreme Court first articulated that the due process guarantee to "liberty" included "enter[ing] into all contract which may be proper, necessary, and essential" to enjoy "all [a citizen's] faculties." In 1905, the Court issued its infamous Lochner decision, striking down a New York law establishing a maximum sixty-hour workweek for bakers. Despite the Contract Clause's prominence over the past century, it never came up once in the Lochner decision, due to

Ogden's restriction to only retrospective claims. Rather, the natural rights of contracting articulated in Lochner depended on a prospective view of the freedom to contract.

Like the Ogden majority, Justices Holmes's and Harlan's dissents in Lochner rebelled against a natural rights–driven conception of a limitless freedom to contract. With special significance in today's context, Justice Holmes referred to the Court's earlier decision upholding Massachusetts's compulsory vaccine law as proof that states are able to implement certain restrictions to liberty for the common good without violating the Constitution. And Justice Harlan catalogued a variety of previous Supreme Court cases standing for the proposition that "the right of contract was not 'absolute . . . but may be subjected to the restraints demanded by the safety and welfare of the State.'" The Lochner Court's language of economic rights in majority and dissent mirrored that of early Contract Clause jurisprudence, confirming the common basis behind the jurisprudence of the two clauses." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

1006.   The *de facto* Weinberg law did not depend on a prospective view of the freedom to contract nor was the Weinberg law implemented as a restriction to the liberty to contract for the common good because the Weinberg law was enacted to punish the Plaintiff.

1007.   Although the BORIM decision and order states that the revocation of Weinberg's medical license was done to protect the health, safety and welfare of the people under the state's police power, this was an obvious pretext.

1008.  BORIM had the emergency power to revoke the Plaintiff's license immediately in November 1996 when it first learned all the relevant facts concerning the sexual activity of the Plaintiff if there were a true concern about the danger he posed to the community, but BORIM waited six (6) years until it revoked the Plaintiff's license in October 2002.

1009.  During these six years, the Plaintiff was medically treating between 20 – 30 patient-visits daily, or 100 – 150 patient-visits weekly, which amounts to 5,000 – 7,500 patient-visits yearly, or a total of 30,000 – 45,000 patient-visits over the six years, who were being treated at the Boston Evening Medical Center, Parkhill Family Practice in Fitchburg, Whidden Memorial Hospital ED, Haverhill Hale Hospital, Anna Jaques Hospital, Malden Hospital ED and Jones Memorial Hospital in Wellsville, NY.

1010.  If BORIM were truly concerned about the safety and danger that the Plaintiff posed to the community, then it was grossly negligent in not taking any action on that concern for six years.

1011.  Although licensing boards have the power and authority to regulate physicians to ensure that their practice of medicine comports with good medical practice and does not cause harm to patients, licensing boards do not have the authority to enforce criminal actions and punish its licensees by seizing their licenses to punish them, which would represent criminal prosecution and procedure and require a different set of procedures to punish doctors penally to dish out criminal sentences and seizure of assets and physician property rights in their medical licenses.

1012.  The actions of BORIM, following six years of inactive discipline, are tantamount to the *ultra vires* criminal prosecution of the Plaintiff and the unconstitutional seizure of the Plaintiff's property rights in his medical license without Due Process of Law because such criminal proceedings would require and ensure that the Plaintiff have a complete trial by jury, comply

with the Massachusetts Rules of Criminal Procedure, provide the Plaintiff with the right to cross-examine the witnesses confronting him, find biased hearsay inadmissible at trial, maintain a chain of evidence, provide the Plaintiff with the right to subpoena such witnesses as Lisa Wolfe and Stanley Spero, impose the penalty of perjury for any false testimony and tightly comply with the Rules of Evidence, and mandate that the jury find the Plaintiff guilty beyond a reasonable doubt.

1013.   "… Like the *Ogden* majority, Justices Holmes's and Harlan's dissents in *Lochner* rebelled against a natural rights–driven conception of a limitless freedom to contract. With special significance in today's context, Justice Holmes referred to the Court's earlier decision upholding Massachusetts's compulsory vaccine law as proof that states are able to implement certain restrictions to liberty for the common good without violating the Constitution. And Justice Harlan catalogued a variety of previous Supreme Court cases standing for the proposition that "the right of contract was not 'absolute . . . but may be subjected to the restraints demanded by the safety and welfare of the State.'" The *Lochner* Court's language of economic rights in majority and dissent mirrored that of early Contract Clause jurisprudence, confirming the common basis behind the jurisprudence of the two clauses.

Just as the Contract Clause and the Lochner era shared a nexus of laissez-faire economic rights, they also experienced a shared decline based on the notion of the states' police power. The Supreme Court decided *Home Building & Loan Association v. Blaisdell* and *West Coast Hotel Co. v. Parrish* within three years of each other, … [reducing] … the expansive interpretation of the Contract Clause and economic due process, respectively. As states sought to alleviate the

immense economic distress incurred during the Great Depression, the pedestal upon which the Contract Clause rested soon toppled.

First in 1934, the Supreme Court implemented a balancing test in *Blaisdell* that defanged the Contract Clause, in a now-complete reversal of its nineteenth-century sharpness. In *Blaisdell*, the Court rejected a Contract Clause challenge to a Great Depression–era Minnesota law suspending foreclosures. Writing for the majority, Chief Justice Hughes recognized "a growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare." While acknowledging that existing laws were read into contract to define obligations between parties, so too were "the pre-ëxisting and higher authority of the laws of nature, of nations or of the community to which the parties belong." Such a move was equal yet opposite to the Marshallian tradition. Whereas Chief Justice Marshall relied upon the natural rights of individuals to contract to broaden the Contract Clause's reach, Chief Justice Hughes deferred to the natural powers of the state to regulate health, safety, and welfare to narrow it. He established five criteria that demonstrated the validity of the state's mortgage moratorium to impair contract, including adequate basis, legitimate end, appropriate relation to the emergency, reasonability, and temporariness.

The Court would repeat this process to undo Lochner in *West Coast Hotel*, further demonstrating the doctrines' shared paths. In distinguishing the "qualified" rather than "absolute" freedom of contract, the *West Coast Hotel Court* underscored how "[t]he guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contract, or deny to government the power to provide restrictive safeguards." Both *Blaisdell* and *West Coast Hotel* thus relied on an understanding of the importance of state police

power to alleviate economic distress, regardless of precedent advocating for nonimpairment of contract or economic due process. As Professor Cass Sunstein notes, "the [Blaisdell] Court read the police power very broadly — thus replicating the outcome in *West Coast Hotel* and rendering the contract clause functionally identical to the due process clause."

The last Supreme Court case striking down a state law under the Contract Clause was *Allied Structural Steel Co. v. Spannaus*, a 1978 case in which the Court declared that the Contract Clause "is not a dead letter" and struck down a Minnesota pension law. But the *Spannaus* Court's reformulation of the *Blaisdell* factors only "assigned different weights to the factors to be balanced," and did little to rejuvenate the Contract Clause. And the Court's most recent consideration in *Sveen v. Melin* straightforwardly applied *Spannaus* to reject a Contract Clause challenge, with Justice Gorsuch's lone dissent advocating for "a thoughtful reply" to critics of the provision's decline.

These doctrines are, of course, different. Scholars have made a sharp distinction between Contract Clause and economic due process jurisprudence, rightly distinguishing the Contract Clause's retrospectivity from economic due process's prospectivity. While the Contract Clause "was concerned with the stability of existing agreements and barred retroactive abridgment of contract[,] . . . the liberty of contract doctrine was concerned with the right to make future contract without state oversight." But the doctrines are two sides of the same coin. If Chief Justice Marshall had his way in *Ogden*, the Contract Clause and the economic due process of the Lochner era would achieve precisely the same outcome. The prospective-retrospective distinction between the Contract Clause and the Due Process Clause is no doubt important, but the upshot of the clauses' twin histories is that judges could (and with the former, perhaps still

can) secure a laissez-faire vision of contractual rights by striking down state legislation they deem inimical to it.

To sequester the Contract Clause's historical development from the brief but groundbreaking *Lochner* era thus artificially hides one judicial expression of economic liberty from the other. What was foreclosed from the Contract Clause in *Ogden* — proactivity — was rediscovered in the Due Process Clause in *Lochner*, and both doctrines met similar ends in *Blaisdell* and *West Coast Hotel*. The fundamental idea of freedom of contract underlies both doctrines, which matters a great deal when one epitomizes anticanonical judicial interventionism and the other survives, albeit sidelined, in the text of the Constitution.

And although *Lochner* has been relegated to the anticanon, the Contract Clause remains waiting in the rafters. Though it applies only retrospectively, the Contract Clause "offers a plausible textual basis for judicial intervention that apparently reconciles economic rights with principles of judicial restraint." Despite the provision's spotty drafting history, the Contract Clause "had been construed almost from the beginning as a potent limitation on state economic regulation." As Professor Richard E. Levy notes, the Supreme Court has followed a "pattern of reinvigoration and retreat" with regard to championing economic rights in its Contract Clause jurisprudence. With the clause remaining "absolute in its field" as sanctified constitutional text, reinvigoration may be near." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

1014.  "Other lower courts have taken an alternate approach to the Ninth Circuit in deciding substantial impairment before public purpose, yet the result remains the same. In *Johnson v.*

*Murphy*, New Jersey Governor Phil Murphy's executive order allowing security deposits to apply to past-due rents resisted a Contract Clause challenge in the U.S. District Court for the District of New Jersey, which concluded that the residential landlord challengers failed to state a claim. Citing Third Circuit precedent, the district court emphasized that the extent to which an industry is regulated is "[a]n important factor in determining the substantiality of any contractual impairment." Because the executive order modifying a statutory scheme "should have come as . . . no surprise" to the already heavily regulated plaintiffs, resulting in no substantial impairment, the court did not address the public-purpose prong of the test. Challengers had no luck in state court either — the New Jersey Superior Court adopted much of the same reasoning as in *Johnson* to reject a challenge to the same executive order under the state constitution's contract clause. In these cases, the pandemic seems peripheral; heavily regulated industries seem incapable of making even a prima facie showing of a Contract Clause claim." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

1015.   Although medicine is a heavily-regulated industry, the chief distinction here is that the *Murphy* case involved Governor Murphy's executive order which applies to a group of New Jersey renters/landlords and does not single out one specific person for its application, whereas the Weinberg law was enacted *de facto* to only apply to the Plaintiff, and the Plaintiff alone, not to a group of physicians and therefore the Weinberg law – a Bill of Attainder – is quite dissimilar to the *Murphy* challenge on a Contract claim cause.

1016. "Successful Pandemic Suits: Yet not all Contract Clause litigation in the pandemic has

failed. In *Melendez v. City of New York*, the Second Circuit reversed the dismissal of landlords'

Contract Clause challenge to the state's "Guaranty Law." The law "render[ed] permanently

unenforceable personal liability guaranties on certain commercial leases for any rent obligations

arising during a specified pandemic period." Judge Raggi extensively surveyed the history of the

Contract Clause and first concluded that, under the "initial strict textual understanding" of the

clause, the Guaranty Law would be unconstitutional. But even under the more deferential

modern standard, Judge Raggi came to a similar conclusion, as the law substantially impaired

landlords' guaranty rights and was not "reasonable and appropriate." Judge Raggi listed five

reasons for her latter conclusion: that the law was not temporary, was not appropriately crafted to

achieve its purpose, allocated economic burden solely to commercial landlords, was not

conditioned on need, and did not compensate landlords' losses.

In another demonstration of the laissez-faire link between the Contract Clause and economic due

process, Judge Carney, dissenting in part, warned of the Lochnerian overtone of the majority's

heightened standard of review. She stated that the majority failed to accord the "substantial

deference" legislatures traditionally receive under the modern interpretation of the Contract

Clause. Judge Carney suggested that "'heightened scrutiny under the Contract Clause [is a]

backdoor to *Lochner*-type jurisprudence' that 'has long since been discarded.'" The majority's

approach was all the more concerning, according to Judge Carney, because the legislature's

police power "is at its apex" during a pandemic. She thus asserted that the majority essentially

adopted a strict scrutiny standard for the Contract Clause.

The Eighth Circuit's approach in *Heights Apartments, LLC v. Walz* mirrored *Melendez* in reversing a dismissal of a Contract Clause challenge to Minnesota's eviction moratorium. When Governor Tim Walz issued various executive orders that permitted evictions only for safety concerns or illicit activity, apartment associations challenged the orders as repugnant to the Contract Clause among other federal and state constitutional provisions. In reversing the lower court's dismissal, the Eighth Circuit found that the moratorium's indefinite end date and non-pandemic-related block on evictions strained reasonability. The court explicitly parted from the Ninth Circuit, citing intervening Supreme Court precedent and differing procedural posture.

The *Melendez* and *Heights* decisions thus provide a glimmer of what the pandemic could imply for the police-power balancing test outlined in *Blaisdell*. While most federal and state courts have found the public purpose of legislative interferences with contract more than sufficient, the Second Circuit emphasized "centuries-old case law" to rebalance the scales of the *Blaisdell* test. The Eighth Circuit came to the same result, even though it cited modern Contract Clause jurisprudence. The thrust of the Marshall Court's natural law understanding of the Contract Clause, even in the face of the most pressing government concerns in the twenty-first century, persists today. *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130, p.    ; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

1017.  "Procedural Stopgap: The Contract Clause and § 1983

Even outside of the substance of such claims, procedural issues in litigating the Contract Clause remain unresolved. One that directly implicates the economic rights rooted in the Contract Clause's history is whether 42 U.S.C. § 1983 furnishes a cause of action for Contract Clause

violations. Resolving this question would alter the incentives of litigating Contract Clause claims, as § 1983 allows for the collection of attorneys' fees, the availability of federal court jurisdiction, and the avoidance of state law obstacles. Federal courts of appeals are split on this issue, and the Supreme Court's potential resolution of it may shed further light on the enforceability of a constitutional right to contract.

A. The Legislative History of §1983

Like the Contract Clause, § 1983 has a murky yet pertinent history. It originated from the Civil Rights Act of 1866, which criminalized the deprivation of various rights secured by the Act. Among them (indeed, the first listed) is the right "to make and enforce contract." The Civil Rights Act of 1871 expanded this legislation to provide a private cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution." Upon Congress's reorganization of provisions of federal law in 1874, the Act expanded to include rights "secured by the Constitution and laws," becoming substantially identical to the § 1983 of today.

First "languish[ing] in relative obscurity until 1961," § 1983 has expanded to include a compendium of constitutional claims. Initially, the Supreme Court construed the Act to exclude conduct that transgressed officials' authority. But nearly a century later, the Court reversed course. After reexamining the Act's legislative history, the Court concluded that § 1983 "afford[ed] a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced." Time and again, the Court has emphasized that § 1983 is to be construed liberally due to its broad language and remedial purpose.

Now, claims of constitutional and statutory violations are subject to a two-part test to qualify under § 1983's private right of action. First, "the plaintiff must assert the violation of a federal right," one in which the provision at issue creates binding obligations upon the government rather than express a congressional preference. And second, "the defendant may show that Congress 'specifically foreclosed a remedy under § 1983' by providing a 'comprehensive enforcement mechanis[m] for protection of a federal right.'"

B. Section 1983 Claims of Contract Clause Violations: Resolving the Tension Between Carter and Dennis

Yet even before the Court reinvigorated the Civil Rights Act, a Reconstruction-era case seemed to foreclose Contract Clause claims under § 1983. The trouble began with taxes. In *Carter v. Greenhow*, a Virginia property owner attempted to pay his real estate taxes with "coupons cut from bonds issued by the state of Virginia." But Virginia forbade payment via coupon, levying the owner's property to collect his tax debts. When the property owner invoked the Civil Rights Act of 1871 (the predecessor statute of § 1983) to challenge the Virginia law, the Court denied his challenge. Suggesting that the lone potential source of federal law to support the challenge was the Contract Clause, the Carter Court explained that the clause, "so far as it can be said to confer upon, or secure to, any person, any individual rights, does so only indirectly and incidentally." Rather than secure a private cause of action, the Contract Clause functions only to nullify state laws that would impair contractual enforcement in judicial proceedings." *[Contract Clause – Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130; https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

1018.  As with the instant case of the Plaintiff's express bilateral contract terminating the doctor-patient relationship, the Contract clause should function to nullify the *de facto* Weinberg law by which DALA and BORIM have impaired contractual enforcement in judicial administrative proceedings pursuant to M.G.L. c. 30A.

1019.  "A similarly situated Commerce Clause case would cast doubt on Carter a century later. *Dennis v. Higgins* featured a successful § 1983 challenge to "retaliatory" taxes on motor vehicles operated in Nebraska but registered in other states. The Court recognized its common practice of describing the right to participate in interstate commerce throughout its Commerce Clause jurisprudence, finding such a claim captured under § 1983. In dissent, Justice Kennedy emphasized Carter to suggest that the limitations placed on states in Article I grant no individual rights cognizable under § 1983. In a footnote, the majority responded that Carter had been interpreted to be a deficiency in pleading rather than an assessment of whether § 1983 could provide redress for Contract Clause violations.

From this footnote followed an as-of-yet unresolved circuit split. Whereas the Ninth Circuit pointed to the *Dennis* Court's narrow reading of *Carter* to recognize Contract Clause claims under § 1983, other circuits have parted company. The Fourth Circuit understood *Dennis* to only distinguish Carter from the Commerce Clause framework, not to overrule it in its precise context. More recently, the Sixth Circuit has agreed, adding that only the Supreme Court could overrule its precedent to resolve such tension. Other circuits have punted on the question, but often due to litigants failing to raise the issue.

The rights-based jurisprudence of the Contract Clause in its heyday might suggest a similar result as in *Dennis* should the Supreme Court reconsider *Carter*. Just as the Court "often described the Commerce Clause as conferring a 'right' to engage in interstate trade free from restrictive state regulation," it has also frequently invoked the right to contract in its Contract Clause jurisprudence. As discussed above, Chief Justice Marshall spared little ink in championing the individual rights that the Contract Clause secured. And even after the clause declined in force, the Court has continued to enshrine the individual right to contract within its tempered Contract Clause jurisprudence.

Yet given the limited remedial landscape of constitutional contract law, *Carter* may retain vitality. Despite Elbridge Gerry's best efforts, the Contract Clause limits only state power, exempting the federal government from its strictures. And so far as state government contract are concerned, the remedies available are slim to (likely) none. Courts have refused to equate a state government's breach of contract with a Contract Clause violation. Specific performance and payments from state treasuries are forbidden remedies as well. Even for private contract impairments, a § 1983 cause of action may be unnecessary — plaintiffs in breach of contract suits may always invoke the Contract Clause to rebut statutory defenses. The lack of constitutional remedies for breaches of public contract, coupled with the availability of constitutional replies against breaches of private contract, leaves little room for Contract Clause claims under § 1983. On this understanding, *Carter* remains correct.

The right of action that § 1983 secures is far from the only mechanism in which Contract Clause claims may arise. For instance, breach of contract suits between private parties may feature Contract Clause claims as a reply to defenses that state laws have altered contractual obligations.

Yet the successful pandemic suits discussed above have arisen uniformly through § 1983.

Determining whether § 1983 furnishes a private right of action for Contract Clause claims thus

directly impacts the future doctrinal development of the Contract Clause." *[Contract Clause –*

*Note – "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130;

https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

1020.   "Though probably the most textually linked to economic liberty, the Contract Clause is

certainly not the only constitutional provision capable of resurrecting Lochnerism. Litigants have

employed other provisions of the Constitution to attempt to thwart government responses to the

pandemic, such as the Commerce Clause, the Free Exercise Clause, and the Due Process Clause.

Similarly, the Supreme Court and lower federal courts are not the only judicial institutions

capable of executing the Contract Clause. State courts may take more expansive interpretations

of parallel state constitutional contract clauses.

But if state governments, in the course of navigating a debilitating pandemic, cannot sideline

other provisions of the Constitution, *Blaisdell*'s justification for state impairments of contractual

obligations suggests the opposite for the Contract Clause. Such a "boundless" police power could

substantiate claims that the Contract Clause really is a dead letter that ought to return to its

former laissez-faire glory.

As state government mandates wane with the pandemic's severity, mootness doctrine may

prevent these issues from metamorphosing into full-blown challenges to the *Blaisdell* test, as in

*Johnson*. But the exigency of the pandemic resulted in an already permissive grant of police

power to the states expanding even further beyond the ambit of the Contract Clause,
exacerbating the criticism that the clause's modern jurisprudence has faced. Additionally, the
recent emergence of coronavirus variants, insofar as they inspire a revival of state government
mandates and moratoria, could encourage a new wave of lawsuits. Though Justice Gorsuch is the
only current Supreme Court Justice on record to advocate for a more expansionist interpretation
of the Contract Clause, federal courts of appeals and state supreme courts wield the power to
return, albeit incrementally, to the Marshallian view of the provision.

For the past fifty years, as it pertains to the Contract Clause, "the law hath not been dead, but it
hath slept." Yet so long as the provision's broad language remains enshrined within Article I,
along with a patchy (and thus malleable) drafting history and an ambitious (if abandoned)
jurisprudence, it remains capable of awakening. Understanding the clause's text, history, and
development — especially in its relation to the *Lochner* era — is thus vital to comprehending a
potential reinvigoration in the midst of unprecedented emergencies." . *[Contract Clause – Note
– "The Contract Clause: Reawakened in the Age of Covid-19",* 136 Harv. L. Rev. 2130;
https://harvardlawreview.org/print/vol-136/the-contract-clause-reawakened-in-the-age-of-covid-19/#footnotes-container *]*

*Violating Plaintiff's Liberty to Contract*

1021.  The *de facto* quasi-legislated *Weinberg law* implemented by BORIM in 2002 violated the
Plaintiff's constitutional rights under the contracts clause of the U.S. Constitution by abridging
the Plaintiff's freedom of contract.  *Lochner v. New York*, 198 U.S. 45, 25 S. Ct. 539; 49 L.Ed.
937 (1905)*; Allgeyer v. Louisiana* (1897); *Slaughterhouse Cases*, 83 U.S. 36 (1873); *Munn v.
Illinois*, 94 U.S. 113 (1876); *Mugler v. Kansas*, 123 U.S. 623 (1887); *Allgeyer v.
Louisiana*, 165 U.S. 578 (1897); *Adkins v. Children's Hospital*, 261 U.S. 525 (1923).

1022.    The Plaintiff has a fundamental constitutional right to freedom of contract as a basic right

covered by the protections for "life, liberty, and property" in the Fourteenth Amendment's Due

Process Clause.

1023.    The general right to make a contract in relation to his business is part of the liberty of the

individual protected by the Fourteenth Amendment to the Federal Constitution.

1024.    Under that provision, no State can deprive any person of life, liberty or property without

due process of law. " ... Court explained that by "circumstances which exclude the right", it

meant when states passed laws under the "police power"—the inherent authority of U.S.

state governments to pass laws governing "health, safety, and morals". The Court said that

because the Due Process Clause protected freedom of contract, state laws could only interfere

with it if they were valid exercises of the police power. To guarantee this freedom, the Court said

that American courts had to scrutinize state laws regulating economic freedom, such as New

York's bakery law, to ensure they served valid police-power purposes."

1025.    "...Lastly, the Court said that state laws ostensibly enacted for police-power purposes

were often really intended to redistribute wealth or help a certain group at the expense of others.

It is impossible for us to shut our eyes to the fact that many laws of this character, while passed

under what is claimed to be the police power for the purpose of protecting the public health or

welfare, are, in reality, passed for other motives." *Lochner, 198 U.S. at 64.*

1026.    The Plaintiff's liberty to contract and freedom to contract are protected by the contracts

clause of the U.S. Constitution. *Coppage v. Kansas* (1915) [Court struck down statutes

forbidding "yellow-dog contract."]; *Adkins v. Children's Hospital* (1923) [Supreme Court held

that minimum wage laws violated the due process clause]; ["… The Supreme uses the Due

Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business

and industrial conditions, because they may be unwise, improvident, or out of harmony with a

particular school of thought."]

1027.   Modern substantive due process: A higher standard is used in reviewing legislation

infringing on personal liberties. *Meyer v. Nebraska* (1923) which cited Lochner as establishing

limits on the police power, has established a privacy right under substantive due process. *Roe v.

Wade* (1973), the Supreme Court held that women have a privacy right to determine whether or

not to have an abortion. In *Planned Parenthood v. Casey* (1992), the Supreme Court reaffirmed

that right but no longer used the term "privacy" to describe it. The abortion right was later

overruled in *Dobbs v. Jackson Women's Health Organization* (2022).

1028.   Scholars have noted that when the Fourteenth Amendment was adopted in 1868, twenty-

seven (27) of the thirty-seven (37) state constitutions had adopted references to Locke's labor

theory of property, which typically said: "All men are by nature free and independent, and have

certain inalienable rights, among which are those of enjoying and defending life and liberty,

acquiring and possessing and protecting property: and pursuing and obtaining safety and

happiness." As such clauses were "deeply rooted in American history and tradition," they likely

informed the original meaning of the scope and nature of the fundamental rights protected by the

Fourteenth Amendment in the eyes of Lochner-era justices.

1029.   "According to Barnett, the liberty of contract is properly found in the Privileges or

Immunities Clause, not in the Due Process Clause of the Fourteenth Amendment. … David

Bernstein, in *Rehabilitating Lochner: Defending Individual Rights Against Progressive Reform,*

has argued that Lochner was well grounded in Supreme Court precedent and that its emphasis on limits to the states' police powers informed the Supreme Court's early civil liberties and civil rights cases.

1030.   Thus BORIM violated the Plaintiff's liberty to contract under the U.S. Constitution.


*State Actor defendants violated Plaintiff's right to Equal Protection of the Laws and burdened the Plaintiff's fundamental constitutional right to Marry*

1031.   The Equal Protection Clause, Section 1, Fourteenth Amendment:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law."

*The right to marry is a Fundamental Constitutional Right*

1032.   The right to marry is a fundamental constitutional right of American citizens and any state law which burdens that right shall be subject to strict scrutiny analysis.

1033.   The fundamental constitutional right to marry includes the right not to marry.

1034.   BORIM regulations and actions do burden the Plaintiff's fundamental constitutional right to marry in a discriminatory way which punishes some physicians but not others, thus violating Equal Protection of the Law for all physicians.

*Violation of the Equal Protection clause*

*BORIM regulations burden physicians' fundamental right to Marry*

1035.  BORIM regulations discriminate among the physicians who have sexual relations with their patients, treating them differentially, where some physicians are left alone while other physicians are subject to revocation of their medical licenses, as was done with the Plaintiff.

1036.  BORIM regulations classify physicians having sexual relations with their patients into two (2) distinct groups: (1) those physicians who have sexual relations with their patients, during an active non-terminated doctor-patient relationship, who then go on to marry their patients; and (2) those physicians who have sexual relations with their patients, during an active non-terminated doctor-patient relationship, who do not go on to marry their patients.

1037.  There are hundreds of physicians in the Commonwealth of Massachusetts in the first group who have dated, courted and had premarital sex with then-current patients and then married their patients; BORIM does not and never has prosecuted any licensed physician who married a patient with whom they had sexual relations while still acting as their medical doctor.

1038.  The Plaintiff personally knows several doctors in this first group who met their wives when they were only patients, and then went on to marry them.

1039.  BORIM has no strict regulation which prohibits its licensed physicians from marrying former patients, whom they had sexual relations with while they were still patients.

1040.  However, the story for the second group is dramatically different: some simply end the relationship without marriage, but other patients may sue their doctor-lover and/or file a complaint with BORIM.

1041.   After the second group of physicians are sued by the patients, BORIM may initiate disciplinary proceedings against those physicians and subsequently may suspend or revoke the medical license of those physicians.

1042.   These BORIM regulations severely hamper and burden the physicians' fundamental constitutional right to marry in a discriminatory way violating Equal Protection of the Law.

1043.   Ignoring the fact that the doctor-patient relationship between Colon and the Plaintiff was terminated by the 1992 memorialized handwritten Express Bilateral Contract, these regulations which preferentially reward physicians for marrying their patients after sexual involvement violate the Plaintiff's right to Equal Protection of the Law and his fundamental constitutional right to marry, and as such, must be judicially reviewed under Strict Scrutiny analysis.

1044.   Basically, when looking at the entire group of physicians who are sexually active with their patients, the BORIM regulations provide a strict choice: MARRY THE PATIENT OR LOSE YOUR LICENSE.

1045.   During the relevant times 1992 – 2003, BORIM did not have a regulation which prohibited all doctors from becoming sexually involved with any patient whom they ever treated; in fact numerous physicians have married their patients whom they became sexually involved with during the doctor-patient relationship.

1046.   Licensed doctors who dated their patients and had sexual relations with their patients were not sanctioned or disciplined by BORIM, unless the patient filed a Complaint with BORIM or filed a lawsuit against the doctor.

1047.   BORIM has acted in a discriminatory manner in regards to physicians' fundamental constitutional right to marry because BORIM only prosecuted and disciplined the physicians

who did not marry their patients but did not prosecute the physicians who married their patients –

thus the rule of law was – marry your patient or have your license revoked.

1048.  Numerous doctors have dated their patients, then married their patients, had sexual

relations with their patients, who were never sanctioned nor disciplined by BORIM, unless the

patient filed a Complaint with BORIM or filed a lawsuit against the doctor.

1049.  This discriminated against one of two groups of doctors who were similarly situated –  (1)

those doctors who were sexually involved with their patients who did marry the patient, and (2)

those doctors who were sexually involved with their patients who did not marry the patient – the

discriminatory and dispositive fact involved the physicians' fundamental constitutional right to

marry.

1050.  In the instant action, BORIM initiated an investigation, disciplinary proceedings and

proceeded to revoke the Plaintiff's medical license, in spite of the fact that a 1992 Express

Bilateral Contract terminated the doctor-patient relationship, because defendant Lourdes Colon

filed a lawsuit against the Plaintiff in Middlesex Superior Court, but BORIM did not investigate

or initiate disciplinary proceedings against any of the doctors specified above who were similarly

situated as the Plaintiff (even ignoring the relevant termination of the doctor-patient relationship

by an Express Bilateral Contract).

1051.  This BORIM regulation substantially and purposefully interferes with the physicians'

fundamental constitutional right to marry – which as such, must undergo judicial review using

the Strict Scrutiny standard.

1052.  The Equal Protection Clause, first section, Fourteenth Amendment to the United States

Constitution. "…took effect in 1868, provides "nor shall any State ... deny to any person within

its jurisdiction the equal protection of the laws." It mandates that individuals in similar situations

be treated equally by the law;" it now focuses on persons who are similarly situated but are punished by the law in a discriminatory manner.

1053.   A primary motivation for this Equal Protectioin clause was to validate the equality provisions contained in the Civil Rights Act of 1866, which guaranteed that all citizens would have the guaranteed right to equal protection by law.

1054.   Equal Protection Clause equals "Equal Justice Under Law"

1055.   Equal Protection clause was the basis for *Brown v. Board of Education* (1954) (helped to dismantle racial segregation in the schools); *Obergefell v. Hodges* (legalized same-sex marriages, and other decisions rejecting discrimination against, and bigotry towards, people belonging to various groups).

1056.   The Equal Protection Clause itself applies only to state and local governments, and this would include the defendants BORIM and DALA as state agencies.

1057.   Supreme Court held in *Bolling v. Sharpe* (1954) that the Due Process Clause of the Fifth Amendment nonetheless requires equal protection under the laws of the federal government via reverse incorporation.

1058.   Fourteenth Amendment "...no State may deny to any person the equal protection of the laws, including all the limitations for personal protection of every article and section of the Constitution ..."

1059.   Early Equal Protection cases involved the Civil Rights Cases (1883) regarding the constitutionality of the Civil Rights Act of 1875. The Act provided that all persons should have

"full and equal enjoyment of ... inns, public conveyances on land or water, theatres, and other places of public amusement."

1060.   The Court explicated the "state action doctrine", according to which the guarantees of the Equal Protection Clause apply only to acts done or otherwise "sanctioned in some way" by the state.

1061.   The Equal Protections clause applies not only to statutes and laws, but also applies to state acts or conduct which is sanctioned in some way by the state.

1062.   BORIM's conduct and procedures used during the formulation of the *Weinberg law* - which singled out the Plaintiff for punitive revocation of his medical license with Due Process based on the false factual record resulting from the defendants' spoliation of exculpatory evidence concealing the 1992 Express Bilateral Contract which terminated the doctor-patient relationship -comprise such state acts or conduct officially sanctioned by the Commonwealth of Massachusetts.

*Fundamental Constitutional Rights – Equal Protection of the Law*
*Judicial Standard is Strict Scrutiny analysis*

1063.   The right to marry is a fundamental constitutional right, and any state law or regulation interfering with that right must meet the Strict Scrutiny test of being a necessary law, narrowly tailored to meet a compelling state interest.

1064.   The right to marry subsumes the right not to marry.

1065.   Regarding their right to marry, there are two (2) groups of physicians who are involved with sexual relations with their then-current patients: (1) one group of physicians court, have sex,

295

then get married to their patients and live happily ever after, and (2) the second group of

physicians court, have sex, get sued, are reported to BORIM by the patients, lose their medical

license and do not live happily ever after.

1066.   This is discriminatory action by BORIM for the two groups of physicians who are

similarly situated – both groups of physicians are sexually involved with their patients – on the

basis of whether the physicians marry or don't marry their patients.

1067.   BORIM only takes disciplinary action and revokes the licenses of those physicians who

do not marry their patients – an interference with the fundamental right to marry.

1068.   The Plaintiff will call to the stand to testify ten (10) physicians who married their patients,

after having sexual relations while still serving as their physician, but BORIM never took any

disciplinary action nor will it ever take any disciplinary action against those married physicians.

1069.   BORIM will only revoke the medical licenses of those physicians who do not marry their

patients after having sexual relations with then-active patients.

1070.   This sort of discriminatory action by BORIM on the basis of marriage violates the

Plaintiff's right to equal protection of the law regarding his fundamental constitutional right to

marry someone like the defendant Lourdes Colon.

1071.   The BORIM regulation effectively and constructively reads as follows:

"Any physician who engages in sexual activity with a current patient, but does not marry

that patient, will be subject to disciplinary action and/or revocation of their medical

license. However, a physician who engages in sexual activity with a current patient but does marry that patient will not be subject to any disciplinary action."

1072.   This is the type of disparate and discriminatory action by the State for the two groups of physicians who are similarly situated, each group engaging in consensual sexual relations with their patients, but do not receive Equal Protection of the law because the group who subsequently marries their patients are not punished or disciplined by BORIM but the group which does not marry their patients, whose patients may file a lawsuit or a complaint with BORIM, are the ones who are punished and disciplined for the sexual conduct with patients; thus these BORIM regulations discriminate among the two doctor groups and disproportionately burden the fundamental right to marry in violation of the Equal Protection clause of the Constitution.

1073.   This BORIM regulations violates the Plaintiff's right to Equal Protection of the Law in regards to his fundamental constitutional right to marry.

1074.   BORIM must meet the judicial standard of strict scrutiny for such a discriminatory regulation affecting the Plaintiff's fundamental right to marry versus their discriminatory treatment of doctors who marry or don't marry their sexual-partner patients, thus placing an inordinate burden upon the fundamental right and liberty to marry.

1075.   In 2015, the Supreme Court held in *Obergefell v. Hodges* that the fundamental right to marry is guaranteed to same-sex couples by both the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and required all states to issue marriage licenses to same-sex couples and to recognize same-sex marriages validly performed in other jurisdictions. Failinger, Marie (2009). "Equal protection of the laws".

In Schultz, David Andrew (ed.). The Encyclopedia of American Law. Infobase. pp. 152–53. ISBN 978-1-4381-0991-6. Archived from the original on July 24, 2020.

1076.   The equal protection clause guarantees the right of "similarly situated" people to be treated the same way by the law; in the Plaintiff's case, BORIM should equally discipline all physicians who engage in sexual relations with their patients, regardless of whether or not the physicians eventually marry their patients.

*Fundamental constitutional rights utilize Strict Scrutiny -
other suspect groups only receive Rational basis scrutiny*

1077.   In 1971, the U.S. Supreme Court decided *Reed v. Reed,* extending the Equal Protection Clause of the Fourteenth Amendment to protect women from sex discrimination, in situations where there is no rational basis for the discrimination. That level of scrutiny was boosted to an intermediate level in *Craig v. Boren* (1976).

1078.   In *City of Cleburne v. Cleburne Living Center, Inc*. (1985), the Court refused to make the developmentally disabled a suspect class. Many commentators have noted, however—and Justice Thurgood Marshall so notes in his partial concurrence—that the Court did appear to examine the City of Cleburne's denial of a permit to a group home for intellectually disabled people with a significantly higher degree of scrutiny than is typically associated with the rational-basis test.

1079.   The Court's decision in *Romer v. Evans* (1996) struck down a Colorado constitutional amendment aimed at denying homosexuals "minority status, quota preferences, protected status or [a] claim of discrimination." The Court rejected as "implausible" the dissent's argument that

the amendment would not deprive homosexuals of general protections provided to everyone else but rather would merely prevent "special treatment of homosexuals."

1080.   Much as in City of Cleburne, the Romer decision seemed to employ a markedly higher level of scrutiny than the nominally applied rational-basis test.

*Fundamental constitutional Right to Privacy – Strict Scrutiny*
*Lawrence v. Texas (2003)*

1081.   In *Lawrence v. Texas,* 539 U.S. 558 (2003), the Court struck down a Texas statute prohibiting homosexual sodomy on substantive due process grounds.

1082.   In Justice Sandra Day O'Connor's opinion concurring in the judgment, however, she argued that by prohibiting only homosexual sodomy, and not heterosexual sodomy as well, Texas's statute did not meet rational-basis review under the Equal Protection Clause; her opinion prominently cited *City of Cleburne*, and also relied in part on *Romer*.

1083.   Notably, O'Connor's opinion did not claim to apply a higher level of scrutiny than mere rational basis, and the Court has not extended suspect-class status to sexual orientation.

1084.   While in the nonclinical world, classified by the modified Express Bilateral Contract terminating the doctor-patient relationship, the Plaintiff was not engaged in the practice of medicine, nor was he holding himself out to the public as a physician, nor did he meet with any patients, nor did the nonclinical world apply to any locations where patients typically seek medical care such as hospitals, clinics or doctors' offices.

1085.   While in the nonclinical world, the Plaintiff was entitled to the same level of privacy to be free from state interference for engaging in intimate behavior in a private residential setting as was defined by the Supreme Court in *Lawrence v. Texas.*

*State actors violated the Plaintiff's fundamental constitutional right to Privacy*

*Plaintiff's fundamental constitutional right to Privacy requires Strict Scrutiny analysis*

1086.   *Lawrence v. Texas*, 539 U.S. 558 (2003):   "...Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home. And there are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence. Freedom extends beyond spatial bounds. Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct. The instant case involves liberty of the person both in its spatial and more transcendent dimensions... ... whether Lawrence and Garner were free as adults to engage in the private conduct in the exercise of their liberty under the Due Process Clause. 'Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without the intervention of the government ...'" *Lawrence v. Texas*, 539 U.S. 558 (2003).

1087.   Under the constitutional standard for privacy of sexual conduct in the privacy of one's home, the Plaintiff was entitled "to engage in the private conduct" with Lourdes Colon "in the exercise of his liberty under the Due Process Clause without the intervention of the government." *Lawrence v. Texas*, 539 U.S. 558 (2003).

1088.    As BORIM's regulation attempting to regulate one of the Plaintiff's fundamental constitutional rights to engage in consensual sexual activity in the privacy of his home, the BORIM regulations must be subject to strict scrutiny analysis. *Lawrence v. Texas*, 539 U.S. 558 (2003).

1089.    *Lawrence v. Texas*, 539 U.S. 558 (2003)- " Kennedy: We conclude the case should be resolved by determining whether the petitioners were free as adults to engage in the private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution. For this inquiry we deem it necessary to reconsider the Court's holding in *Bowers*." *Lawrence v. Texas*, 539 U.S. 558 (2003).

1090.    "There are broad statements of the substantive reach of liberty under the Due Process Clause in earlier cases, including *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), and *Meyer v. Nebraska*, 262 U.S. 390 (1923); but the most pertinent beginning point is our decision in *Griswold v. Connecticut*, 381 U.S. 479 (1965). In *Griswold* the Court invalidated a state law prohibiting the use of drugs or devices of contraception and counseling or aiding and abetting the use of contraceptives. The Court described the protected interest as a right to privacy and placed emphasis on the marriage relation and the protected space of the marital bedroom. *Id.*, at 485." *Lawrence v. Texas*, 539 U.S. 558 (2003).

1091.    After *Griswold* it was established that the right to make certain decisions regarding sexual conduct extends beyond the marital relationship.

1092.    In *Eisenstadt v. Baird*, 405 U.S. 438 (1972), the Court invalidated a law prohibiting the distribution of contraceptives to unmarried persons. The case was decided under the Equal Protection Clause, *id.*, at 454; but with respect to unmarried persons, the Court went on to state

the fundamental proposition that the law impaired the exercise of their personal rights, *ibid.* It quoted from the statement of the Court of Appeals finding the law to be in conflict with fundamental human rights, and it followed with this statement of its own:

1093.  "It is true that in *Griswold* the right of privacy in question inhered in the marital relationship. . . . If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id.*, at 453." *Lawrence v. Texas*, 539 U.S. 558 (2003).

1094.  The opinions in *Griswold* and *Eisenstadt* were part of the background for the decision in *Roe v. Wade*, 410 U.S. 113 (1973).

1095.  As is well known, the case involved a challenge to the Texas law prohibiting abortions, but the laws of other States were affected as well. Although the Court held the woman's rights were not absolute, her right to elect an abortion did have real and substantial protection as an exercise of her liberty under the Due Process Clause. The Court cited cases that protect spatial freedom and cases that go well beyond it. *Roe* recognized the right of a woman to make certain fundamental decisions affecting her destiny and confirmed once more that the protection of liberty under the Due Process Clause has a substantive dimension of fundamental significance in defining the rights of the person. *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003).

1096.  In *Carey v. Population Services Int'l*, 431 U.S. 678 (1977), the Court confronted a New York law forbidding sale or distribution of contraceptive devices to persons under 16 years of age. Although there was no single opinion for the Court, the law was invalidated.

1097.   Both *Eisenstadt* and *Carey*, as well as the holding and rationale in *Roe*, confirmed that

the reasoning of *Griswold* could not be confined to the protection of rights of married adults.

This was the state of the law with respect to some of the most relevant cases when the Court

considered *Bowers v. Hardwick. Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S.

558 (2003).

1098.   "The facts in *Bowers* had some similarities to the instant case. A police officer, whose

right to enter seems not to have been in question, observed Hardwick, in his own bedroom,

engaging in intimate sexual conduct with another adult male. The conduct was in violation of a

Georgia statute making it a criminal offense to engage in sodomy. One difference between the

two cases is that the Georgia statute prohibited the conduct whether or not the participants were

of the same sex, while the Texas statute, as we have seen, applies only to participants of the same

sex. Hardwick was not prosecuted, but he brought an action in federal court to declare the state

statute invalid. He alleged he was a practicing homosexual and that the criminal prohibition

violated rights guaranteed to him by the Constitution. The Court, in an opinion by Justice White,

sustained the Georgia law. Chief Justice Burger and Justice Powell joined the opinion of the

Court and filed separate, concurring opinions. Four Justices dissented. 478 U.S., at 199 (opinion

of Blackmun, J., joined by Brennan, Marshall, and Stevens, JJ.); *id.*, at 214 (opinion of Stevens,

J., joined by Brennan and Marshall, JJ.). *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*,

539 U.S. 558 (2003).

1099.   "The Court began its substantive discussion in *Bowers* as follows: "The issue presented is

whether the Federal Constitution confers a fundamental right upon homosexuals to engage in

sodomy and hence invalidates the laws of the many States that still make such conduct illegal

and have done so for a very long time." *Id.*, at 190. That statement, we now conclude, discloses

the Court's own failure to appreciate the extent of the liberty at stake. To say that the issue in *Bowers* was simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse. The laws involved in *Bowers* and here are, to be sure, statutes that purport to do no more than prohibit a particular sexual act. Their penalties and purposes, though, have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home. The statutes do seek to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals."

1100.   This, as a general rule, should counsel against attempts by the State, or a court, to define the meaning of the relationship or to set its boundaries absent injury to a person or abuse of an institution the law protects.

1101.   Likewise, in the instant case, *Weinberg v. Mangal et al.* the Plaintiff asserts that in the nonclinical world, the Plaintiff is free to engage in intimate behavior free of the state's interference or attempt to set boundaries on such intimate behavior.

1102.   "It suffices for us to acknowledge that adults may choose to enter upon this relationship in the confines of their homes and their own private lives and still retain their dignity as free persons. When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring. The liberty protected by the Constitution allows homosexual persons the right to make this choice." *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003).

1103.   "Having misapprehended the claim of liberty there presented to it, and thus stating the

claim to be whether there is a fundamental right to engage in consensual sodomy, the *Bowers*

Court said: "Proscriptions against that conduct have ancient roots." *Id.*, at 192. In academic

writings, and in many of the scholarly *amicus* briefs filed to assist the Court in this case, there are

fundamental criticisms of the historical premises relied upon by the majority and concurring

opinions in *Bowers*. Brief for Cato Institute as *Amicus Curiae* 16-17; Brief for American Civil

Liberties Union etal. as *Amici Curiae* 15-21; Brief for Professors of History et al. as *Amici*

*Curiae* 3-10. We need not enter this debate in the attempt to reach a definitive historical

judgment, but the following considerations counsel against adopting the definitive conclusions

upon which *Bowers* placed such reliance.

At the outset it should be noted that there is no longstanding history in this country of laws

directed at homosexual conduct as a distinct matter. Beginning in colonial times there were

prohibitions of sodomy derived from the English criminal laws passed in the first instance by the

Reformation Parliament of 1533. The English prohibition was understood to include relations

between men and women as well as relations between men and men. See, *e.g.*, *King v. Wiseman*,

92 Eng. Rep. 774, 775 (K.B. 1718) (interpreting "mankind" in Act of 1533 as including women

and girls). Nineteenth-century commentators similarly read American sodomy, buggery, and

crime-against-nature statutes as criminalizing certain relations between men and women and

between men and men. See, *e.g.*, 2 J. Bishop, Criminal Law § 1028 (1858); 2 J. Chitty, Criminal

Law 47-50 (5th Am. ed. 1847); R. Desty, A Compendium of American Criminal Law 143 (1882);

J. May, The Law of Crimes § 203 (2d ed. 1893). The absence of legal prohibitions focusing on

homosexual conduct may be explained in part by noting that according to some scholars the

concept of the homosexual as a distinct category of person did not emerge until the late 19th

century. See, *e.g.*, J. Katz, The Invention of Heterosexuality 10 (1995); J. D'Emilio & E. Freedman, Intimate Matters: A History of Sexuality in America 121 (2d ed. 1997) ("The modern terms *homosexuality* and *heterosexuality* do not apply to an era that had not yet articulated these distinctions")." *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003).

1104. "Thus early American sodomy laws were not directed at homosexuals as such but instead sought to prohibit nonprocreative sexual activity more generally. This does not suggest approval of homosexual conduct. It does tend to show that this particular form of conduct was not thought of as a separate category from like conduct between heterosexual persons.

Laws prohibiting sodomy do not seem to have been enforced against consenting adults acting in private. A substantial number of sodomy prosecutions and convictions for which there are surviving records were for predatory acts against those who could not or did not consent, as in the case of a minor or the victim of an assault. As to these, one purpose for the prohibitions was to ensure there would be no lack of coverage if a predator committed a sexual assault that did not constitute rape as defined by the criminal law. Thus the model sodomy indictments presented in a 19th-century treatise, see 2 Chitty, *supra*, at 49, addressed the predatory acts of an adult man against a minor girl or minor boy. Instead of targeting relations between consenting adults in private, 19th-century sodomy prosecutions typically involved relations between men and minor girls or minor boys, relations between adults involving force, relations between adults implicating disparity in status, or relations between men and animals.

To the extent that there were any prosecutions for the acts in question, 19th-century evidence rules imposed a burden that would make a conviction more difficult to obtain even taking into account the problems always inherent in prosecuting consensual acts committed in private.

Under then-prevailing standards, a man could not be convicted of sodomy based upon testimony of a consenting partner, because the partner was considered an accomplice. A partner's testimony, however, was admissible if he or she had not consented to the act or was a minor, and therefore incapable of consent. See, *e.g.*, F. Wharton, Criminal Law 443 (2d ed. 1852); 1 F. Wharton, Criminal Law 512 (8th ed. 1880). The rule may explain in part the infrequency of these prosecutions. In all events that infrequency makes it difficult to say that society approved of a rigorous and systematic punishment of the consensual acts committed in private and by adults. The longstanding criminal prohibition of homosexual sodomy upon which the *Bowers* decision placed such reliance is as consistent with a general condemnation of nonprocreative sex as it is with an established tradition of prosecuting acts because of their homosexual character." *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003).

1105.   "The policy of punishing consenting adults for private acts was not much discussed in the early legal literature. We can infer that one reason for this was the very private nature of the conduct. Despite the absence of prosecutions, there may have been periods in which there was public criticism of homosexuals as such and an insistence that the criminal laws be enforced to discourage their practices. But far from possessing "ancient roots," *Bowers*, 478 U.S., at 192, American laws targeting same-sex couples did not develop until the last third of the 20th century. The reported decisions concerning the prosecution of consensual, homosexual sodomy between adults for the years 1880-1995 are not always clear in the details, but a significant number involved conduct in a public place. See Brief for American Civil Liberties Union etal. as *Amici Curiae* 14-15, and n.18.

It was not until the 1970's that any State singled out same-sex relations for criminal prosecution, and only nine States have done so. See 1977 Ark. Gen. Acts no. 828; 1983 Kan. Sess. Laws p.652; 1974 Ky. Acts p.847; 1977 Mo. Laws p.687; 1973 Mont. Laws p.1339; 1977 Nev. Stats. p.1632; 1989 Tenn. Pub. Acts ch.591; 1973 Tex. Gen. Laws ch. 399; see also *Post* v. *State*, 715 P.2d 1105 (Okla. Crim. App. 1986) (sodomy law invalidated as applied to different-sex couples). Post-*Bowers* even some of these States did not adhere to the policy of suppressing homosexual conduct. Over the course of the last decades, States with same-sex prohibitions have moved toward abolishing them. See, *e.g., Jegley* v. *Picado*, 349 Ark. 600, 80 S.W.3d 332 (2002); *Gryczan v. State*, 283 Mont. 433, 942 P.2d 112 (1997); *Campbell* v. *Sundquist*, 926 S.W. 2d 250 (Tenn. App. 1996); *Commonwealth* v. *Wasson*, 842 S.W.2d 487 (Ky. 1992); see also 1993 Nev. Stats. p. 518 (repealing Nev. Rev. Stat. § 201.193)." *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003).

1106.    "In summary, the historical grounds relied upon in *Bowers* are more complex than the majority opinion and the concurring opinion by Chief Justice Burger indicate. Their historical premises are not without doubt and, at the very least, are overstated. It must be acknowledged, of course, that the Court in *Bowers* was making the broader point that for centuries there have been powerful voices to condemn homosexual conduct as immoral. The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives. These considerations do not answer the question before us, however. The issue is whether the majority may use the power of the State to enforce these views on the whole society through operation of the criminal law. "Our obligation is to define the

liberty of all, not to mandate our own moral code." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 850 (1992)." *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003).

1107.   "Chief Justice Burger joined the opinion for the Court in *Bowers* and further explained his views as follows: "Decisions of individuals relating to homosexual conduct have been subject to state intervention throughout the history of Western civilization. Condemnation of those practices is firmly rooted in Judeao-Christian moral and ethical standards." 478 U.S., at 196. As with Justice White's assumptions about history, scholarship casts some doubt on the sweeping nature of the statement by Chief Justice Burger as it pertains to private homosexual conduct between consenting adults. See, *e.g.*, Eskridge, Hardwick and Historiography, 1999 U. Ill. L.Rev. 631, 656. In all events we think that our laws and traditions in the past half century are of most relevance here. These references show an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex. "[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry." *County of Sacramento* v. *Lewis*, 523 U.S. 833, 857 (1998) (Kennedy, J., concurring)." *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003).

1108.   This emerging recognition should have been apparent when *Bowers* was decided.

1109.   "In 1955 the American Law Institute promulgated the Model Penal Code and made clear that it did not recommend or provide for "criminal penalties for consensual sexual relations conducted in private." ALI, Model Penal Code § 213.2, Comment 2, p.372 (1980).

1110.   It justified its decision on three grounds: (1) The prohibitions undermined respect for the law by penalizing conduct many people engaged in; (2) the statutes regulated private conduct not harmful to others; and (3) the laws were arbitrarily enforced and thus invited the danger of blackmail. ALI, Model Penal Code, Commentary 277-280 (Tent. Draft No. 4, 1955).

1111.   In 1961 Illinois changed its laws to conform to the Model Penal Code. Other States soon followed. Brief for Cato Institute as *Amicus Curiae* 15-16.

1112.   In *Bowers* the Court referred to the fact that before 1961 all 50 States had outlawed sodomy, and that at the time of the Court's decision 24 States and the District of Columbia had sodomy laws. 478 U.S., at 192-193. Justice Powell pointed out that these prohibitions often were being ignored, however. Georgia, for instance, had not sought to enforce its law for decades. *Id.*, at 197-198, n.2 ("The history of nonenforcement suggests the moribund character today of laws criminalizing this type of private, consensual conduct").

1113.   The sweeping references by Chief Justice Burger to the history of Western civilization and to Judeo-Christian moral and ethical standards did not take account of other authorities pointing in an opposite direction. A committee advising the British Parliament recommended in 1957 repeal of laws punishing homosexual conduct. The Wolfenden Report: Report of the Committee on Homosexual Offenses and Prostitution (1963). Parliament enacted the substance of those recommendations 10 years later. Sexual Offences Act 1967, § 1.

1114.   Of even more importance, almost five years before *Bowers* was decided the European Court of Human Rights considered a case with parallels to *Bowers* and to today's case. An adult male resident in Northern Ireland alleged he was a practicing homosexual who desired to engage in consensual homosexual conduct. The laws of Northern Ireland forbade him that right. He

alleged that he had been questioned, his home had been searched, and he feared criminal prosecution. The court held that the laws proscribing the conduct were invalid under the European Convention on Human Rights. *Dudgeon v. United Kingdom*, 45 Eur. Ct. H.R. (1981) ¶ 52. Authoritative in all countries that are members of the Council of Europe (21 nations then, 45 nations now), the decision is at odds with the premise in *Bowers* that the claim put forward was insubstantial in our Western civilization.

1115.   In our own constitutional system the deficiencies in *Bowers* became even more apparent in the years following its announcement. The 25 States with laws prohibiting the relevant conduct referenced in the *Bowers* decision are reduced now to 13, of which 4 enforce their laws only against homosexual conduct. In those States where sodomy is still proscribed, whether for same-sex or heterosexual conduct, there is a pattern of nonenforcement with respect to consenting adults acting in private. The State of Texas admitted in 1994 that as of that date it had not prosecuted anyone under those circumstances. *State* v. *Morales*, 869 S.W.2d 941, 943.

1116.   Two principal cases decided after *Bowers* cast its holding into even more doubt. In *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992), the Court reaffirmed the substantive force of the liberty protected by the Due Process Clause. The *Casey* decision again confirmed that our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. *Id.*, at 851. In explaining the respect the Constitution demands for the autonomy of the person in making these choices, we stated as follows:

**"These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty**

**protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State."** Ibid.

1117.    "Persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do. The decision in *Bowers* would deny them this right. The second post-*Bowers* case of principal relevance is *Romer v. Evans*, 517 U.S. 620 (1996). There the Court struck down class-based legislation directed at homosexuals as a violation of the Equal Protection Clause. *Romer* invalidated an amendment to Colorado's constitution which named as a solitary class persons who were homosexuals, lesbians, or bisexual either by "orientation, conduct, practices or relationships," *id.*, at 624 (internal quotation marks omitted), and deprived them of protection under state antidiscrimination laws. We concluded that the provision was "born of animosity toward the class of persons affected" and further that it had no rational relation to a legitimate governmental purpose. *Id.*, at 634." *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003).

1118.    As an alternative argument in this case, counsel for the petitioners and some *amici* contend that *Romer* provides the basis for declaring the Texas statute invalid under the Equal Protection Clause. That is a tenable argument, but we conclude the instant case requires us to address whether *Bowers* itself has continuing validity. Were we to hold the statute invalid under the Equal Protection Clause some might question whether a prohibition would be valid if drawn differently, say, to prohibit the conduct both between same-sex and different-sex participants.

1119.   Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests. If protected conduct is made criminal and the law which does so remains unexamined for its substantive validity, its stigma might remain even if it were not enforceable as drawn for equal protection reasons. When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres. The central holding of *Bowers* has been brought in question by this case, and it should be addressed. Its continuance as precedent demeans the lives of homosexual persons. *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003).

1120.   "The stigma this criminal statute imposes, moreover, is not trivial. The offense, to be sure, is but a class C misdemeanor, a minor offense in the Texas legal system. Still, it remains a criminal offense with all that imports for the dignity of the persons charged. The petitioners will bear on their record the history of their criminal convictions. Just this Term we rejected various challenges to state laws requiring the registration of sex offenders. *Smith* v. *Doe*, 538 U.S. 84 (2003); *Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1 (2003). We are advised that if Texas convicted an adult for private, consensual homosexual conduct under the statute here in question the convicted person would come within the registration laws of a least four States were he or she to be subject to their jurisdiction. Pet. for Cert. 13, and n.12 (citing Idaho Code §§ 18-8301 to 18-8326 (Cum. Supp. 2002); La. Code Crim. Proc. Ann., §§ 15:540-15:549 (West 2003); Miss. Code Ann. §§ 45-33-21 to 45-33-57 (Lexis 2003); S.C. Code Ann. §§ 23-3-400 to 23-3-490 (West 2002)). This underscores the consequential nature of the punishment and the state-sponsored condemnation attendant to the criminal prohibition. Furthermore, the Texas criminal

conviction carries with it the other collateral consequences always following a conviction, such

as notations on job application forms, to mention but one example." *Roe v. Wade*, 410 U.S.

113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003).

1121.   "The foundations of *Bowers* have sustained serious erosion from our recent decisions

in *Casey* and *Romer*. When our precedent has been thus weakened, criticism from other sources

is of greater significance. In the United States criticism of *Bowers* has been substantial and

continuing, disapproving of its reasoning in all respects, not just as to its historical assumptions.

See, *e.g.*, C. Fried, *Order and Law: Arguing the Reagan Revolution--A Firsthand Account* 81-84

(1991); R. Posner, *Sex and Reason* 341-350 (1992). The courts of five different States have

declined to follow it in interpreting provisions in their own state constitutions parallel to the Due

Process Clause of the Fourteenth Amendment, see *Jegley* v. *Picado*, 349 Ark. 600, 80 S.W.3d

332 (2002); *Powell v. State*, 270 Ga. 327, 510 S.E.2d 18, 24 (1998); *Gryczan v. State*, 283 Mont.

433, 942 P.2d 112 (1997); *Campbell* v. *Sundquist*, 926 S.W.2d 250 (Tenn. App. 1996);

*Commonwealth v. Wasson,* 842 S.W.2d 487 (Ky. 1992)." *Roe v. Wade*, 410 U.S. 113 (1973);

*Lawrence v. Texas*, 539 U.S. 558 (2003)." *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539

U.S. 558 (2003).

1122.   "To the extent *Bowers* relied on values we share with a wider civilization, it should be

noted that the reasoning and holding in *Bowers* have been rejected elsewhere. The European

Court of Human Rights has followed not *Bowers* but its own decision in *Dudgeon* v. *United

Kingdom*. See *P.G. & J.H. v. United Kingdom*, App. No. 00044787/98, ¶ 56 (Eur. Ct. H.R., Sept.

25, 2001); *Modinos v. Cyprus*, 259 Eur. Ct. H.R. (1993); *Norris v. Ireland*, 142 Eur. Ct. H.R.

(1988). Other nations, too, have taken action consistent with an affirmation of the protected right

314

of homosexual adults to engage in intimate, consensual conduct. See Brief for Mary Robinson et al. as *Amici Curiae* 11-12. The right the petitioners seek in this case has been accepted as an integral part of human freedom in many other countries. There has been no showing that in this country the governmental interest in circumscribing personal choice is somehow more legitimate or urgent." *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003).

1123.   "The doctrine of *stare decisis* is essential to the respect accorded to the judgments of the Court and to the stability of the law. It is not, however, an inexorable command. *Payne v. Tennessee*, 501 U.S. 808, 828 (1991) ("*Stare decisis* is not an inexorable command; rather, it 'is a principle of policy and not a mechanical formula of adherence to the latest decision'") (quoting *Helvering v. Hallock*, 309 U.S. 106, 119 (1940))). In *Casey* we noted that when a Court is asked to overrule a precedent recognizing a constitutional liberty interest, individual or societal reliance on the existence of that liberty cautions with particular strength against reversing course. 505 U.S., at 855-856; see also *id.*, at 844 ("Liberty finds no refuge in a jurisprudence of doubt"). The holding in *Bowers*, however, has not induced detrimental reliance comparable to some instances where recognized individual rights are involved. Indeed, there has been no individual or societal reliance on *Bowers* of the sort that could counsel against overturning its holding once there are compelling reasons to do so. *Bowers* itself causes uncertainty, for the precedents before and after its issuance contradict its central holding. The rationale of *Bowers* does not withstand careful analysis." *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003).

1124.   "In his dissenting opinion in *Bowers* JUSTICE STEVENS came to these conclusions:

"Our prior cases make two propositions abundantly clear. First, the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient

reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack. Second, **individual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of "liberty" protected by the Due Process Clause of the Fourteenth Amendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons.**" 478 U.S., at 216." *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003).

1125.  "JUSTICE STEVENS' analysis, in our view, should have been controlling in *Bowers* and should control here. *Bowers* was not correct when it was decided, and it is not correct today. It ought not to remain binding precedent. *Bowers* v. *Hardwick* should be and now is overruled. The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The **case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle. The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime**.

1126.  "**Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. "It is a promise of the Constitution that there is a realm of personal liberty which the government may not**

enter." *Casey, supra*, at 847. The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.

1127.   "Had those who drew and ratified the Due Process Clauses of the Fifth Amendment or the Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume to have this insight. They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom. The judgment of the Court of Appeals for the Texas Fourteenth District is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.   *It is so ordered."*

1128.   "JUSTICE O'CONNOR, concurring in the judgment. The Court today overrules *Bowers v. Hardwick*, 478 U.S. 186 (1986). I joined *Bowers*, and do not join the Court in overruling it. Nevertheless, I agree with the Court that Texas' statute banning same-sex sodomy is unconstitutional. See Tex. Penal Code Ann. § 21.06 (2003). Rather than relying on the substantive component of the Fourteenth Amendment's Due Process Clause, as the Court does, I **base my conclusion on the Fourteenth Amendment's Equal Protection Clause**." *Lawrence v. Texas*, 539 U.S. 558 (2003).

1129.   "The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985); see also *Plyler v. Doe*, 457 U.S. 202, 216 (1982). Under our rational basis standard of review, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne v.*

*Cleburne Living Center, supra*, at 440; see also *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973); *Romer v. Evans*, 517 U.S. 620, 632-633 (1996); *Nordlinger v. Hahn*, 505 U.S. 1, 11-12 (1992)."

1130.   Laws such as economic or tax legislation that are scrutinized under rational basis review normally pass constitutional muster, since "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Cleburne v. Cleburne Living Center, supra*, at 440; see also *Fitzgerald v. Racing Assn. of Central Iowa, ante,* p. 103; *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955). We have consistently held, however, that some objectives, such as "a bare . . . desire to harm a politically unpopular group," are not legitimate state interests. *Department of Agriculture v. Moreno, supra*, at 534. See also *Cleburne v. Cleburne Living Center, supra*, at 446-447; *Romer v. Evans, supra*, at 632. When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause.  We have been most likely to apply rational basis review to hold a law unconstitutional under the Equal Protection Clause where, as here, the challenged legislation inhibits personal relationships. In *Department of Agriculture v. Moreno*, for example, we held that a law preventing those households containing an individual unrelated to any other member of the household from receiving food stamps violated equal protection because the purpose of the law was to "'discriminate against hippies.'" 413 U.S., at 534. The asserted governmental interest in preventing food stamp fraud was not deemed sufficient to satisfy rational basis review. *Id.*, at 535-538. In *Eisenstadt v. Baird*, 405 U.S. 438, 447-455 (1972), we refused to sanction a law that discriminated between married and unmarried persons by prohibiting the distribution of contraceptives to single persons. Likewise, in *Cleburne v. Cleburne Living Center, supra*, we

held that it was irrational for a State to require a home for the mentally disabled to obtain a special use permit when other residences--like fraternity houses and apartment buildings--did not have to obtain such a permit. And in *Romer v. Evans,* we disallowed a state statute that "impos[ed] a broad and undifferentiated disability on a single named group"--specifically, homosexuals. 517 U.S., at 632.  The dissent apparently agrees that if these cases have *stare decisis* effect, Texas' sodomy law would not pass scrutiny under the Equal Protection Clause, regardless of the type of rational basis review that we apply. See *post*, at 17-18 (opinion of Scalia, J.)." *Lawrence v. Texas*, 539 U.S. 558 (2003).

1131.  "The statute at issue here makes sodomy a crime only if a person "engages in deviate sexual intercourse with another individual of the same sex." Tex. Penal Code Ann. § 21.06(a) (2003). Sodomy between opposite-sex partners, however, is not a crime in Texas. That is, Texas treats the same conduct differently based solely on the participants. Those harmed by this law are people who have a same-sex sexual orientation and thus are more likely to engage in behavior prohibited by § 21.06.

The Texas statute makes homosexuals unequal in the eyes of the law by making particular conduct--and only that conduct--subject to criminal sanction. It appears that prosecutions under Texas' sodomy law are rare. See *State v. Morales*, 869 S.W. 2d 941, 943 (Tex. 1994) (noting in 1994 that § 21.06 "has not been, and in all probability will not be, enforced against private consensual conduct between adults"). This case shows, however, that prosecutions under § 21.06 *do* occur. And while the penalty imposed on petitioners in this case was relatively minor, the consequences of conviction are not. As the Court notes, see *ante*, at 15, petitioners' convictions, if upheld, would disqualify them from or restrict their ability to engage in a variety

of professions, including medicine, athletic training, and interior design. See, *e.g.*, Tex. Occ. Code Ann. § 164.051(a)(2)(B) (2003 Pamphlet) (physician); § 451.251 (a)(1) (athletic trainer); § 1053.252(2) (interior designer). Indeed, were petitioners to move to one of four States, their convictions would require them to register as sex offenders to local law enforcement. See, *e.g.*, Idaho Code § 18-8304 (Cum. Supp. 2002); La. Stat. Ann. § 15:542 (West Cum. Supp. 2003); Miss. Code Ann. § 45-33-25 (West 2003); S.C. Code Ann. § 23-3-430 (West Cum. Supp. 2002); cf. *ante*, at 15.

And the effect of Texas' sodomy law is not just limited to the threat of prosecution or consequence of conviction. Texas' sodomy law brands all homosexuals as criminals, thereby making it more difficult for homosexuals to be treated in the same manner as everyone else. Indeed, Texas itself has previously acknowledged the collateral effects of the law, stipulating in a prior challenge to this action that the law "legally sanctions discrimination against [homosexuals] in a variety of ways unrelated to the criminal law," including in the areas of "employment, family issues, and housing." *State v. Morales*, 826 S.W. 2d 201, 203 (Tex. App. 1992).

Texas attempts to justify its law, and the effects of the law, by arguing that the statute satisfies rational basis review because it furthers the legitimate governmental interest of the promotion of morality. In *Bowers*, we held that a state law criminalizing sodomy as applied to homosexual couples did not violate substantive due process. We rejected the argument that no rational basis existed to justify the law, pointing to the government's interest in promoting morality. 478 U.S., at 196. The only question in front of the Court in *Bowers* was whether the substantive component of the Due Process Clause protected a right to engage in homosexual sodomy. *Id.*, at 188, n.2. *Bowers* did not hold that moral disapproval of a group is a rational basis under the Equal

Protection Clause to criminalize homosexual sodomy when heterosexual sodomy is not punished." *Lawrence v. Texas*, 539 U.S. 558 (2003).

1132. "This case raises a different issue than *Bowers:* whether, under the Equal Protection Clause, moral disapproval is a legitimate state interest to justify by itself a statute that bans homosexual sodomy, but not heterosexual sodomy. It is not. Moral disapproval of this group, like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause. See, *e.g.*, *Department of Agriculture v. Moreno, supra*, at 534; *Romer v. Evans*, 517 U.S., at 634-635. Indeed, we have never held that moral disapproval, without any other asserted state interest, is a sufficient rationale under the Equal Protection Clause to justify a law that discriminates among groups of persons.

Moral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause because legal classifications must not be "drawn for the purpose of disadvantaging the group burdened by the law." *Id.*, at 633. Texas' invocation of moral disapproval as a legitimate state interest proves nothing more than Texas' desire to criminalize homosexual sodomy. But the Equal Protection Clause prevents a State from creating "a classification of persons undertaken for its own sake." *Id.*, at 635. And because Texas so rarely enforces its sodomy law as applied to private, consensual acts, the law serves more as a statement of dislike and disapproval against homosexuals than as a tool to stop criminal behavior. The Texas sodomy law "raise[s] the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Id.*, at 634.

Texas argues, however, that the sodomy law does not discriminate against homosexual persons. Instead, the State maintains that the law discriminates only against homosexual conduct. While it

is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, Texas' sodomy law is targeted at more than conduct. It is instead directed toward gay persons as a class. "After all, there can hardly be more palpable discrimination against a class than making the conduct that defines the class criminal." *Id.*, at 641 (Scalia, J., dissenting) (internal quotation marks omitted). When a State makes homosexual conduct criminal, and not "deviate sexual intercourse" committed by persons of different sexes, "that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres." *Ante*, at 14.

Indeed, Texas law confirms that the sodomy statute is directed toward homosexuals as a class. In Texas, calling a person a homosexual is slander *per se* because the word "homosexual" "impute[s] the commission of a crime." *Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308, 310 (CA5 1997) (applying Texas law); see also *Head v. Newton*, 596 S.W. 2d 209, 210 (Tex. App. 1980). The State has admitted that because of the sodomy law, *being* homosexual carries the presumption of being a criminal. See *State v. Morales*, 826 S.W. 2d, at 202-203 ("[T]he statute brands lesbians and gay men as criminals and thereby legally sanctions discrimination against them in a variety of ways unrelated to the criminal law"). Texas' sodomy law therefore results in discrimination against homosexuals as a class in an array of areas outside the criminal law.

See *ibid.* In *Romer* v. *Evans*, we refused to sanction a law that singled out homosexuals "for disfavored legal status." 517 U.S., at 633. The same is true here. The Equal Protection Clause "'neither knows nor tolerates classes among citizens.'" *Id.*, at 623 (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J. dissenting)).

322

A State can of course assign certain consequences to a violation of its criminal law. But the State cannot single out one identifiable class of citizens for punishment that does not apply to everyone else, with moral disapproval as the only asserted state interest for the law. The Texas sodomy statute subjects homosexuals to "a lifelong penalty and stigma. A legislative classification that threatens the creation of an underclass . . . cannot be reconciled with" the Equal Protection Clause. *Plyler v. Doe*, 457 U.S., at 239 (Powell, J., concurring).

Whether a sodomy law that is neutral both in effect and application, see *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), would violate the substantive component of the Due Process Clause is an issue that need not be decided today. I am confident, however, that so long as the Equal Protection Clause requires a sodomy law to apply equally to the private consensual conduct of homosexuals and heterosexuals alike, such a law would not long stand in our democratic society. In the words of Justice Jackson:

"The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected." *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 112-113 (1949) (concurring opinion).

That this law as applied to private, consensual conduct is unconstitutional under the Equal Protection Clause does not mean that other laws distinguishing between heterosexuals and homosexuals would similarly fail under rational basis review. Texas cannot assert any legitimate

state interest here, such as national security or preserving the traditional institution of marriage. Unlike the moral disapproval of same-sex relations--the asserted state interest in this case--other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group.

A law branding one class of persons as criminal solely based on the State's moral disapproval of that class and the conduct associated with that class runs contrary to the values of the Constitution and the Equal Protection Clause, under any standard of review. I therefore concur in the Court's judgment that Texas' sodomy law banning "deviate sexual intercourse" between consenting adults of the same sex, but not between consenting adults of different sexes, is unconstitutional." *Lawrence v. Texas*, 539 U.S. 558 (2003).

1133.  Furthermore, as asserted elsewhere in the instant action Complaint *Weinberg v. Mangal et al.*, the Plaintiff also asserts a claim of discriminatory unequal protection of the law in violation of the constitutional mandate for Equal Protection of the law because BORIM allows some physicians to have sexual relations with their patients but has punished the Plaintiff for engaging in sexual relations with a former patient by revoking his medical license.

1134.  The modified 1992 Express Bilateral Contract, terminating the doctor-patient relationship, provided for the clinical-nonclinical binary classification of time and place; thus all times and all places were classified into either the "Clinical World" or the "nonclinical World."

1135.  While the Plaintiff was in those places at those times which were classified as NonClinical, he was not acting as a physician, he did not hold himself out to the world as a physician, and he expressly REFUSED to do any physician work or duties and no one would come to this nonclinical world with any subjective expectation of receiving medical treatment.

1136.   Forcing the Plaintiff to act as and be a physician while in the nonclinical World, where he has taken off his "doctor hat" and refuses to see patients or practice medicine within the nonclinical world – where no patient has any subjective expectation of receiving medical treatment and where the Plaintiff does not hold himself out to the public as a physician, comprises an invasion of the constitutionally-protect fundamental right to privacy of the Plaintiff.

1137.   The fundamental constitutional right to privacy is well enunciated in *Lawrence v. Texas,* 539 U.S. 558 (2003). As a fundamental constitutional right, any state law or regulations which purposefully burdens such as right is subject to judicial review using the standard of Strict Scrutiny.

1138.   The clinical-nonclinical binary classification of time and place, established by the 1992 contract modification between the Plaintiff and Lourdes Colon, basically differentiates between the Plaintiff's professional life and his personal life; to deny the Plaintiff this binary classification of time and place would be tantamount to enslaving the Plaintiff to being a doctor at all times and all places on earth, a government-sanctioned form of Involuntary Servitude.

1139.   *Lawrence v. Texas*, 539 U.S. 558 (2003), is a landmark decision of the U.S. Supreme Court in which the Court ruled[a] that sanctions including any form of criminal punishment to all forms of private, consensual non-procreative adult sexual activities between two individuals (commonly referred to as sodomy laws) are unconstitutional. *Lawrence v. Texas,* 539 U.S. 558 (2003).

1140.   In *Lawrence v. Texas,* the Court reaffirmed the concept of a "right to privacy" that earlier cases had found the U.S. Constitution provides, even though it is not explicitly enumerated.

1141.   It based its ruling on the notions of personal autonomy to define one's own relationships and of American traditions of non-interference with any or all forms of private sexual activities between consenting adults. *Lawrence v. Texas,* 539 U.S. 558 (2003)

1142.   In the instant case, *Weinberg v. Mangal et al.* any BORIM regulations which purposefully burden the Plaintiff's freedom of sexual conduct while he is in the nonclinical world – and therefore not working nor acting as a physician - would comprise state sanctions against private, consensual non-procreative adult sexual activities between two individuals and such BORIM regulations would be unconstitutional under *Lawrence v. Texas* (2003).

1143.   In *Lawrence v. Texas,* the Supreme Court struck down the sodomy law in Texas in a 6–3 decision, and by extension invalidated sodomy laws in 13 other states, making all forms of private, consensual non-procreative sexual activities between two consenting individuals of either sex (especially of the same sex) legal in every U.S. state and territory; such constitutional license of private consensual non-procreative sexual activity should extend to professionals such as the Plaintiff. *Lawrence v. Texas,* 539 U.S. 558 (2003)

1144.   The Court, with a five-justice majority, overturned its previous ruling on the same issue in the 1986 case *Bowers v. Hardwick,* where it upheld a challenged Georgia statute and did not find a constitutional protection of sexual privacy. *Lawrence v. Texas,* 539 U.S. 558 (2003)

1145.   It explicitly overruled Bowers, holding that it had **viewed the liberty interest too narrowly.** *Lawrence v. Texas,* 539 U.S. 558 (2003)

1146.   **The Court held that intimate consensual sexual conduct was part of the liberty protected by substantive due process under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.** *Lawrence v. Texas,* 539 U.S. 558 (2003)'

1147.   Lawrence invalidated similar laws throughout the United States that criminalized sodomy between consenting adults acting in private, whatever the sex of the participants. *Lawrence v. Texas,* 539 U.S. 558 (2003)

1148.   Thus revitalizing the reconsideration of standing law, including the landmark cases of *United States v. Windsor* (2013), which invalidated Section 3 of the Defense of Marriage Act, and *Obergefell v. Hodges* (2015), which recognized same-sex marriage as a fundamental right under the United States Constitution. *Lawrence v. Texas,* 539 U.S. 558 (2003)

1149.   Legal punishments for sodomy often included heavy fines, prison sentences, or both, with some states, beginning with Illinois in 1827, denying other rights, such as suffrage, to anyone convicted of the crime of sodomy. *Lawrence v. Texas,* 539 U.S. 558 (2003). In the late 19th and early 20th centuries, several states imposed various eugenics laws against anyone deemed to be a "sexual pervert". *Lawrence v. Texas,* 539 U.S. 558 (2003). As late as 1970, Connecticut denied a driver's license to a man for being an "admitted homosexual". As of 1960, every state had an anti-sodomy law. In 1961, the American Law Institute's Model Penal Code advocated the repeal of sodomy laws as they applied to private, adult, consensual behavior.

1150.   Two years later the American Civil Liberties Union (ACLU) took its first major case in opposition to these laws:   In *Griswold v. Connecticut* (1965), the Supreme Court struck down a law barring the use of contraceptives by married couples.

1151.  In Griswold, the Supreme Court recognized for the first time that couples, at least married couples, had a **right to privacy, drawing on the Fourth Amendment's protection of private homes from searches and seizures without a warrant based on probable cause, the Fourteenth Amendment's guarantee of due process of law in the states, and the Ninth Amendment's assurance that rights not specified in the Constitution are "retained by the people".**

1152.  *Eisenstadt v. Baird* (1972) expanded the scope of sexual privacy rights to unmarried persons.

1153.  In 1973, in *Roe v. Wade* the US Supreme court extended that right to privacy to protect a woman's right to have an abortion, although the extent to which that might be regulated by the government varied, with almost absolute protection in the first trimester, and allowing for increasing regulation as the pregnancy progressed. Roe v. Wade was overturned in 2023.

1154.  In *Bowers v. Hardwick* (1986), the Supreme Court heard a constitutional challenge to sodomy laws brought by a man who had been arrested, but was not prosecuted, for engaging in oral sex with another man in his home. The Court rejected this challenge in a 5 to 4 decision. Justice Byron White's majority opinion emphasized that Eisenstadt and Roe had only recognized a right to engage in procreative sexual activity, and that long-standing moral antipathy toward homosexual sodomy was enough to argue against the notion of a right to sodomy.

1155.  Justice Blackmun, writing in dissent, argued that Eisenstadt held that the **Constitution protects people as individuals,** not as family units. He then reasoned that because **state intrusions are equally burdensome on an individual's personal life regardless of his marital**

**status or sexual orientation**, there is no reason to treat the rights of citizens in same-sex couples any differently.

1156.   *Lawrence* asserted a right to privacy and that the Supreme Court's decision in *Bowers v. Hardwic*k that found no privacy protection for consensual sex between homosexuals was "wrongly decided". In a petition for certiorari filed in the U.S. Supreme Court on July 16, 2002, Lambda Legal attorneys asked the Court to consider:

> [1] Whether the petitioners' criminal convictions under the Texas "Homosexual Conduct" law—which criminalizes sexual intimacy by same-sex couples, but not identical behavior by different-sex couples—violate the Fourteenth Amendment guarantee of equal protection of the laws;

> [2] Whether the petitioners' criminal convictions for adult consensual sexual intimacy in their home violate their vital interests in liberty and privacy protected by the Due Process Clause of the Fourteenth Amendment;

> [3] Whether Bowers v. Hardwick should be overruled.

1157.   On June 26, 2003, the Supreme Court issued a 6–3 decision in favor of Lawrence that struck down Texas's statute. **Five justices held it violated the Due Process Clause, while a sixth, Sandra Day O'Connor, held it violated the Equal Protection Clause.**

1158.   Opinion of the Court: Justice Anthony Kennedy authored the Court's opinion in Lawrence v. Texas. Five justices formed the majority and joined an opinion written by Justice Anthony Kennedy. The Court ruled that **Texas's law prohibiting private homosexual activity between consenting adults violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution**. Court reiterated why the Court's decision in Bowers v.

Hardwick was wrong.

1159.   First, the Court stated that its decision in Bowers went against its statements in cases

involving child-rearing (*Pierce v. Society of Sisters and Meyer v. Nebraska*), contraception

(*Griswold v. Connecticut* and *Eisenstadt v. Baird*), and abortion (*Roe v. Wade*) that the

**Constitution protects a right to privacy and personal autonomy**.

1160.   Next, Kennedy wrote that in Bowers the Court had misread the historical record

regarding laws criminalizing homosexual relations. ... the Court had found that historical

American anti-sodomy laws had been directed at "nonprocreative sexual activity more

generally," rather than specifically at homosexual acts, contrary to the Court's conclusions

in Bowers. Combined with the fact that these laws were often unenforced, the Court saw this as

**constituting a tradition of avoiding interference with private sexual activity between**

**consenting adults.**

1161.   Lastly, Kennedy noted that Bowers's jurisprudential foundation had been weakened by

two subsequent cases involving sexuality (*Planned Parenthood v. Casey* and *Romer v. Evans*),

and that the reasoning of Bowers had been criticized in the United States and rejected by most

other developed Western countries. For this reason, Kennedy stated that there was a

**jurisprudential basis to think that it should be "an integral part of human freedom" for**

**consenting adults to choose to privately engage in sexual activity.**

1162.   The instant case, *Weinberg v. Mangal et al.,* is strongly rooted in the Plaintiff's

fundamental constitutional right to privacy subject to judicial review under the Strict Scrutiny

standard.

1163.   As in *Lawrence v. Texas,* in the instant action *Weinberg v. Mangal et al.* the Plaintiff

under protection of his liberty interests and the fundamental constitutional right to privacy, the Plaintiff had a constitutionally-protected right to engage in intimate behavior with Colon in the privacy of his residential premises without interference from state action.

*Discriminatory state action burdening Plaintiff's fundamental right to marry*

1164.  BORIM regulations concerning sexual relations between doctors and patients purposefully burdens and interferes with the Plaintiff's fundamental constitutional right to marry, especially in a discriminatory manner in violation of the Equal Protection clause because it also allows physicians to have sexual relations with current patients if they do marry those patients.

1165.  BORIM regulations concerning the Plaintiff's relationship with Lourdes Colon purposefully burdens and interferes with the Plaintiff's fundamental constitutional right to privacy because the Plaintiff enters an inviolate private space when he is in the nonclinical world, which was established by the modification of the 1992 Bilateral Express Contract terminating the doctor-patient relationship which provided for the clinical-nonclinical binary classification of time and place, and the Plaintiff is not a doctor in the nonclinical world.

1166.  The sexual freedom exercised by the Plaintiff in the nonclinical world does not involve minors, nor does it involve persons who might be injured or coerced into sexual relations, nor are the consensual partners situated in relationships where consent might not easily be refused, nor does it involve public conduct or prostitution.

1167.  The Plaintiff's conduct in the nonclinical world only involves two consenting adults who, with full and mutual consent from each other, engaged in sexual practices which are otherwise not criminal; while in the nonclinical world the Plaintiff had no duties or obligations as a physician.

1168.   In the nonclinical world, the Plaintiff and Lourdes Colon were entitled to respect for their private lives.

1169.   The State cannot demean the Plaintiff's existence or desire for privacy in the nonclinical world, nor control his destiny by making his private sexual conduct a breach of ethics or a crime.

1170.   **"Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. 'It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter.'**

1171.   "The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual." *Lawrence v. Texas, 539 U.S.* at 578.

1172.   "...Justice O'Connor, argued the **statute was unconstitutional under the Equal Protection Clause** rather than due process and would have kept Bowers intact." Under the Equal Protection clause the Plaintiff's sexual conduct with Colon in the nonclinical world would likewise be constitutional and lawful. *Lawrence v. Texas, 539 U.S.* at 578.

1173.   Justice Sandra Day O'Connor only concurred in the judgment and wrote a concurring opinion in which she offered a different rationale for invalidating the Texas sodomy statute. ... she would strike down the law as violating the equal protection clause because it criminalized male–male but not male–female sodomy. O'Connor maintained that a sodomy law that was neutral both in effect and application might be constitutional, but that there was little to fear because "democratic society" would not tolerate it for long. O'Connor noted that a law limiting marriage to heterosexual couples would pass rational scrutiny as long as it was designed to "preserv[e] the traditional institution of marriage" and not simply based on the state's dislike of homosexual persons. *Lawrence v. Texas, 539 U.S.* at 578.

1174.  In the instant action, the Plaintiff's fundamental constitutional right to privacy was invaded when BORIM violated the inviolate space of the Plaintiff's nonclinical world, where the Plaintiff was not acting as a doctor, not providing medical care, not meeting patients, not holding himself out to the public as a physician, not wearing his "doctor's hat", not expecting to see any patients, no patients were coming to the nonclinical world nor did any persons in the nonclinical world have any subjective expectations of receiving medical treatment or advice, not engaged in the practice of medicine, was engaged in a relaxation/recreational mode where he refused to treat or see any patients whatsoever, and had no reasonable expectation to see or treat any patients.

*Qualified Immunity*

1175.  Some defendant state actors are entitled to Qualified Immunity for their actions, if committed within their official public capacity without malice or derogation, but these state actors are not entitled to the Absolute Immunity enjoyed by Judges. Such immunity afforded some state actors may be limited to acts and actions committed within their judicial or prosecutorial capacity but may not apply to acts committed within an investigative or ministerial capacity. *Doctrine of Qualified Immunity*

1176.  The instant case also involves issues concerning the Constitutionality of specific state action, statutes, policies and doctrines (States of Massachusetts and Maine) and also whether sections of the U.S. Internal Revenue Code are constitutional as they were applied to the Plaintiff.

*State actor defendants' violation of the Contract Clause*

1177.  "… To constitute a Contract Clause violation this Court must determine three issues: (1) whether there is a contractual relationship; (2) whether the change in the law impairs that contractual relationship; and (3) whether the impairment is substantial. See *General Motors Corp.*

*v. Romein,* 503 U.S. 181, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992). Finally, "[f]or a law to survive scrutiny under the Contract Clause when the law substantially impairs a contract, it must be reasonable and necessary to accomplish a legitimate public purpose." *Ken Moorhead Oil Co. v. Federated Mutual Ins. Co.,* 323 S.C. 532, 542, 476 S.E.2d 481, 486 (1996)." *Hodges v. Rainey,* 533 S.E.2d 578, 341 S.C. 79 (2000).

1178.   "A. Contractual Relationship: "When bonds are issued, there arises a contract between the purchaser and seller, the obligation of which cannot be impaired, as it would be in violation of article 1, § 10, Const. U.S., and of article 1, § 8, Const. S.C." *Welch v. Getzen,* 85 S.C. 156, 67 S.E. 294 (1910); see also *South Carolina Pub. Serv. Auth. v. Summers,* 282 S.C. 148, 318 S.E.2d 113 (1984) (holding municipal tax assessment impaired rights of holders of bonds issued by Santee Cooper in violation of the United States and State Constitutions). Santee Cooper is the seller of its bonds. The contract exists between the bondholders and Santee Cooper, not its Board of Directors..." *Hodges v. Rainey,* 533 S.E.2d 578, 341 S.C. 79 (2000).

1179.   "B. Substantial Impairment: "For purposes of Contract Clause analysis, a statute can be said to substantially impair a contract when it alters the reasonable expectations of the contracting parties." *Ken Moorhead Oil,* 323 S.C. at 542, 476 S.E.2d at 486." *Hodges v. Rainey,* 533 S.E.2d 578, 341 S.C. 79 (2000).

  *Bills of Attainder and Ex Post Facto Laws also prohibited by the U.S. Constitution*
1180.   Regulatory agencies, such as medical licensing boards, represent the "fourth branch" of government with both legislative, judicial and executive functions like the three branches of federal or state governments.

1181.  The regulations established by these regulatory agencies have the same effect and force of law as do the statutes enacted by Congress or state legislatures, with adjudicative and executive departments to investigate compliance with those regulations and an enforcement branch to enforce those regulations - such as physician license revocation actions.

1182.  As such, the regulations of these regulatory agencies comprise the law, same as do Congressional or state statutes, and thus may also comprise Bills of Attainder analogously, in spite of the fact that traditionally it was state statutes which were examined as potential Bills of Attainder.

1183.  Accordingly, the regulations and actions of BORIM may comprise Bills of Attainder under the law - the *Weinberg law* -which singled out the Plaintiff for punitive revocation of his medical license with Due Process based on the false factual record resulting from the defendants' spoliation of exculpatory evidence concealing the 1992 Express Bilateral Contract which terminated the doctor-patient relationship

1184.  As described above, the State of Massachusetts did violate the constitutional mandates prohibiting states from creating Bills of Attainder, Ex Post Facto laws or impairing the obligations of contract - - the *Weinberg law* -which singled out the Plaintiff for punitive revocation of his medical license with Due Process based on the false factual record resulting from the defendants' spoliation of exculpatory evidence concealing the 1992 Express Bilateral Contract which terminated the doctor-patient relationship

1185.  "The right to practice medicine is a valuable property right. To deprive a man of it is in the nature of punishment, ..." *Hawker v. New York*, 170 U.S. 189 (1898).

1186.  "...The unconstitutionality asserted consists in its alleged conflict with the clause of the Fourteenth Amendment, which declares that no State shall deprive any person of life, liberty, or

property without due process of law; the denial to the defendant of the right to practise his profession without the certificate required constituting the deprivation of his vested right and estate in his profession, which he had previously acquired." *Dent v. West Virginia,* 129 U.S. 114 (1889).

1187.   "It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest, or, as it is sometimes termed, the estate acquired in them, that is, the right to continue their prosecution, is often of great value to the possessors, and cannot be arbitrarily taken from them, any more than their real or personal property can be thus taken." *Dent v. West Virginia,* 129 U.S. 114 (1889).

1188.   "Few professions require more careful preparation by one who seeks to enter it than that of medicine. It has to deal with all those subtle and mysterious influences upon which health and life depend, and requires not only a knowledge of the properties of vegetable and mineral substances, but of the human body in all its complicated parts, and their relation to each other, as well as their influence upon the mind. The physician must be able to detect readily the presence of disease, and prescribe appropriate remedies for its removal. Every one may have occasion to consult him, but comparatively few can judge of the qualifications of learning and skill which he possesses. Reliance must be placed upon the assurance given by his license, issued by an authority competent to judge in that respect, that he possesses the requisite qualifications. Due consideration, therefore, for the protection of society may well induce the State to exclude from

practice those who have not such a license, or who are found upon examination not to be fully qualified. The same reasons which control in imposing conditions, upon compliance with which the physician is allowed to practice in the first instance, may call for further conditions as new modes of treating disease are discovered, or a more thorough acquaintance is obtained of the remedial properties of vegetable and mineral substances, or a more accurate knowledge is acquired of the human system and of the agencies by which it is affected. It would not be deemed a matter for serious discussion that a knowledge of the new acquisitions of the profession, as it from time to time advances in its attainments for the relief of the sick and suffering, should be required for continuance in its practice, but for the earnestness with which the plaintiff in error insists that, by being compelled to obtain the certificate required, and prevented from continuing in his practice without it, he is deprived of his right and estate in his profession without due process of law." *Dent v. West Virginia,* 129 U.S. 114 (1889).

1189.  "As we have said on more than one occasion, it may be difficult, if not impossible, to give to the terms "due process of law" a definition which will embrace every permissible exertion of power affecting private rights and exclude such as are forbidden. They come to us from the law of England, from which country our jurisprudence is to a great extent derived, and their requirement was there designed to secure the subject against the arbitrary action of the crown and place him under the protection of the law. They were deemed to be equivalent to "the law of the land." In this country, the requirement is intended to have a similar effect against legislative power, that is, to secure the citizen against any arbitrary deprivation of his rights, whether relating to his life, his liberty, or his property. Legislation must necessarily vary with the different objects upon which it is designed to operate. It is sufficient, for the purposes of this case, to say that legislation is not open to the charge of depriving one of his rights without due process

of law, if it be general in its operation upon the subjects to which it relates, and is enforceable in the usual modes established in the administration of government with respect to kindred matters: that is, by process or proceedings adapted to the nature of the case. The great purpose of the requirement is to exclude everything that is arbitrary and capricious in legislation affecting the rights of the citizen. As said by this court in Yick Wo v. Hopkins, speaking by Mr. Justice Matthews: "When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power." See, also, *Pennoyer v. Neff,* 95 U.S. 714, 733; *Davidson v. New Orleans,* 96 U.S. 97, 104, 107; *Hurtado v. California,* 110 U.S. 516; *Missouri Pacific Railway Co. v. Humes,* 115 U.S. 512, 519; *Dent v. West Virginia,* 129 U.S. 114 (1889); 118 U.S. 356, 369.

1190.  "...are bills of attainder violative of article I, § 10 of the Constitution. Article I's prohibition on bills of attainder[12] is directed at "[t]he evil of government deciding to inflict burdens on identified persons without their participation in an adversary hearing...." L. Tribe, American Constitutional Law 484 (1978). Bills of attainder within the meaning of Article I are "legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." *United States v. Lovett,* 328 U.S. 303, 315, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252 (1946). Subsumed within this definition are both common law bills of attainder, which carried with them the penalty of death, and common law bills of pains and penalties, which carried lesser punishments. *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 323, 18 L.Ed. 356 (1866); *Fletcher v. Peck,* 10 U.S. (6 Cranch.) 87, 132, 3 L.Ed. 162 (1810). At its essence, the Constitution's

prohibition of bills of attainder is inseparably tied to the structural separation of powers among the various branches and levels of government motivated by the perception that "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 324 (J. Madison) (J. Cooke ed. 1961); see *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 960-62, 103 S.Ct. 2764, 2788-89, 77 L.Ed.2d 317 (1983) (Powell, J., concurring); *Linnas v. Immigration and Naturalization Service,* 790 F.2d 1024, 1028 (2d Cir.), cert. denied, ___ U.S. ___, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986). Such bills represent a legislative encroachment on powers more properly assumed by the judiciary, thus creating "the danger of subjecting the determination of the rights of one person to the `tyranny of shifting majorities.'" *INS v. Chadha,* 462 U.S. at 961, 103 S.Ct. at 89 (Powell, J., concurring)." *Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370 - Dist. Court, ND New York (1987).

1191.  "Of course, all modern legislation regulating the economic activities of specific groups might be considered "punishments," and the bill of attainder clause, if read too broadly, could be used to cripple the ability of legislatures to respond to some perceived social or economic problem by imposing restrictions or limitations on individuals, corporations, or industries which are deemed responsible for the problem. Consequently, the bill of attainder clause has been used sparingly in invalidating legislation. It has been applied only to legislation closely paralleling the historical characteristics of common law bills of attainder and bills of pains and penalties, the most important of which is a design to "inflict[] its deprivation upon the members of a political group thought to present a threat to national security." *United States v. Brown,* 381 U.S. 437, 453, 85 S.Ct. 1707, 1717, 14 L.Ed.2d 484 (1965). ...In determining whether a legislative

enactment is an unlawful bill of attainder, the court must determine whether the challenged law inflicts punishment on specifically designated individuals or groups without the benefit of a judicial trial. *Brown,* 381 U.S. at 447-49, 85 S.Ct. at 1714-15 (1965). The specificity element is present if the challenged act singles out a person or identifiable group either by name or by describing those affected by the act "in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Communist Party of United States v. Subversive Activities Control Board,* 367 U.S. 1, 86, 81 S.Ct. 1357, 1405, 6 L.Ed.2d 625 (1961). In determining whether a particular act inflicts "punishment," three inquiries must be made: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, `viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record `evinces a [legislative] intent to punish.'" *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 852, 104 S.Ct. 3348, 3355, 82 L.Ed.2d 632 (1984) (quoting *Nixon v. Administrator of General Service*s, 404 U.S. 425, 473, 475-478, 97 S.Ct. 2777, 2805, 2806-08, 53 L.Ed.2d 867 (1977)." *Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370 - Dist. Court, ND New York (1987)

1192.  "… inflicts "punishment" within the meaning of the bill of attainder clause. Turning to the first factor identified by the Supreme Court in Selective Service as relevant to whether a legislative act imposes "punishment," … impose burdens historically associated with the type of "punishments" that inspired the Framers to draft the prohibition against bills of attainder. As noted above, at common law bills of attainder carried with them the death penalty, while bills of pains and penalties usually involved imprisonment, banishment, or the punitive confiscation of property. Selective Service, 468 U.S. at 852, 104 S.Ct. at 3355. In the post-Revolutionary War

period, an additional punishment acquired the status of those legislative punishments and has been found to violate the bill of attainder clause: the erection of bars to participation by individuals or groups in specific employments or professions. See, e.g., *Brown,* 381 U.S. 437, 85 S.Ct. 1707; *Lovett,* 328 U.S. 303; *Cummings,* 71 U.S. (4 Wall.) 277, 18 L.Ed. 356; *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366." *Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370 - Dist. Court, ND New York (1987).

1193.   "The court's analysis cannot stop here, however. In recognition of the ability of innovative and resourceful legislators to devise new methods for penalizing unpopular individuals or groups, the Supreme Court mandates that "[t]o ensure that the [l]egislature has not created an impermissible penalty not previously held to be within the proscription against bills of attainder, [the court] must determine whether the challenged statute[s] can be reasonably said to further nonpunitive goals." *Selective Service,* 468 U.S. at 853-54, 104 S.Ct. at 3356." *Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370 - Dist. Court, ND New York (1987)

1194.   "The distinguishing feature of a bill of attainder is the substitution of a legislative for a judicial determination of guilt." *DeVeau v. Braisted,* supra, 363 U.S. at 160, 80 S.Ct. at 1154, 4 L.Ed.2d at 1120. Other elements are that it is directed at named persons or members of a readily ascertainable group and also constitutes punishment without a judicial trial. *United States v. Brown,* 381 U.S. 437, 447-449, 85 S.Ct. 1707, 1714-1715, 14 L.Ed.2d 484, 491-492 (1965)." *In Re Disciplinary Proceedings against Schmidt & Sons, Inc.,* 399 A.2d 637, 79 N.J. 344 (1979).

1195.   "Deciding whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the

construction of the two statutes and then determining the constitutional question whether they are

in conflict." *Perez v. Campbell,* 402 U.S. 637 (1971).

1196.   The Federalist papers and other historical documents reveal that the intent or the framers

of the U.S. Constitution, when they drafted the Bills of Attainder clause, was to prohibit

leglislative state action which focused on a specific and individual person, which is penal or

punitive in nature, and for which the targeted person is not given the right to a trial or fair

hearing.

1197.   Thus, there are three (3) essential elements to a Bill of Attainder:

(a) It must be enacted/drafted by the state actor, whether federal or state;

(b) It must target a single person, and not generally proscribe conduct for a group of

persons, in a general sense as many statutes usually do; and

(c) There must be state action comprising punishment or other penal action which does

not provide the targeted person with the right to a fair trial, right to confront witnesses

and permit cross examination, or allow the usual discovery procedures which are

specified in the Rules of Criminal Procedure.

1198.   The "Weinberg law" which was enacted quasi-legislatively *de facto* in 2002 by BORIM,

comprising forty-three (43) separate, independent and distinguishable elements, was enacted *de

facto* by BORIM, targeted the Plaintiff as there is no general statute or BORIM regulation with

the same 43 elements directed against a group of physicians who sign an Express Bilateral

Contract terminating the doctor-patient relationship under the guidance, drafting and dictation by

a mental health profession overseeing the termination, for which the punishment is revocation of their medical license without the right to a fair trial.

1199.   In accordance with the intent of the drafters of the U.S. Constitution, Bills of Attainder may be comprised by federal or state statutes, regulations of federal or state agencies, ordinances of cities, towns or counties, and may be enacted legislatively through the operation of a legislative federal or state congress, or quasi-legislatively through the rule-making procedures of the federal Administrative Procedure Act or the state, city, town or county equivalent for rule-making.

1200.   Although most of the actions and jurisprudence concerning the Bills of Attainder clause have examined legislative statutes and considered other regulations or ordinances as not covered, the Plaintiff will prove that all commands and mandates of state action, whether statutes, bills, acts, regulations or ordinances, comprise Bills of Attainder prohibited by the U.S. Constitution if the 3 essential elements are met: (a) It must be enacted/drafted by the state actor, whether federal or state; (b) It must target a single person, and not generally proscribe conduct for a group of persons, in a general sense as many statutes usually do; and (c)there must be state action comprising punishment or other penal action which does not provide the targeted person with the right to a fair trial, right to confront witnesses and permit cross examination, or allow the usual discovery procedures which are specified in the Rules of Criminal Procedure.

1201.   The Plaintiff intends to show that the Supreme Court has gotten it wrong when they judged that official quasi-legislative acts, which are not statutes, cannot comprise Bills of Attainder.

1202.   In the instant action, the "Weinberg law" is such a Bill of Attainder quasi-legislated by

BORIM in violation of the Bills of Attainder clause of the U.S. Constitution, in the original

intent of the Framers of the U.S. Constitution to prohibit such individualized penal state action

without a fair trial or Due Process of Law.

### *The Bill of Attainder Clause*
*[LSB10567 https://crsreports.congress.gov ]*

1203.   "Article I, Section 9, of the Constitution provides that Congress shall pass "No Bill of

Attainder or ex post facto Law." Article I, Section 10, likewise prohibits the states from enacting

bills of attainder. (Thus, there are two Bill of Attainder Clauses; this Sidebar uses the singular

"Bill of Attainder Clause" to refer to the clause that binds Congress.)"Joanna R. Lampe,

Congressional Research Service:Legal Sidebar,"Capitol Unrest, Legislative Response, and the

Bill of Attainder Clause," January 22, 2021

https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1204.   "The Supreme Court has described a bill of attainder as "a law that legislatively

determines guilt and inflicts punishment upon an identifiable individual without provision of the

protections of a judicial trial." Joanna R. Lampe, Congressional Research Service:Legal

Sidebar,"Capitol Unrest, Legislative Response, and the Bill of Attainder Clause," January 22,

2021 https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1205.   "Bills of attainder were common in England before the Founding, primarily targeting

individuals accused of disloyalty to the government. Bills of attainder were also used in the

American colonies." Joanna R. Lampe, Congressional Research Service:Legal Sidebar,"Capitol

Unrest, Legislative Response, and the Bill of Attainder Clause," January 22, 2021

https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1206.   "However the Framers of the U.S. Constitution chose to depart from that historical practice. The Supreme Court has explained that the constitutional prohibitions on bills of Congressional attainder "reflect[] the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons."Joanna R. Lampe, Congressional Research Service:Legal Sidebar,"Capitol Unrest, Legislative Response, and the Bill of Attainder Clause," January 22, 2021 https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1207.   "Individuals who believe they are subject to a bill of attainder may challenge the relevant legislation in court. If a court finds that the legislation is a bill of attainder, it can declare the law unconstitutional." Joanna R. Lampe, Congressional Research Service:Legal Sidebar,"Capitol Unrest, Legislative Response, and the Bill of Attainder Clause," January 22, 2021 https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1208.   "Judicial decisions invalidating laws as bills of attainder are relatively rare, but key cases dating back to the Reconstruction Era provide a framework for evaluating bill of attainder claims. The Supreme Court outlined the current test for bill of attainder claims in the 1977 case *Nixon v. Administrator of General Services*. In that case, the Court held that legislation constitutes a bill of attainder if it both (1) applies with specificity and (2) imposes punishment without trial." Joanna R. Lampe, Congressional Research Service:Legal Sidebar,"Capitol Unrest, Legislative

Response, and the Bill of Attainder Clause," January 22, 2021

https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1209.   "Specificity:   A law that singles out one or more individuals by name satisfies the

specificity requirement. For instance, in *United States v. Lovett*, the Supreme Court struck down

as a bill of attainder "an Act specifically cutting off the pay of certain named individuals [federal

employees] found guilty of disloyalty." Likewise, a provision of the legislation at issue in *Nixon*

applied only to former President Richard M. Nixon. Known as the Presidential Recordings and

Materials Preservation Act, that statute directed the Administrator of General Services to take

custody of Nixon's presidential papers and tape recordings and promulgate regulations to govern

the processing and preservation of those materials. The Supreme Court acknowledged "the Act's

specificity—the fact that it refer[red] to [Nixon] by name."Joanna R. Lampe, Congressional

Research Service:Legal Sidebar,"Capitol Unrest, Legislative Response, and the Bill of Attainder

Clause," January 22, 2021 https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1210.   "Legislation that does not identify a targeted individual by name may satisfy the

specificity requirement as well. In *Foretich v. United States*, the U.S. Court of Appeals for the

D.C. Circuit considered a federal statute that responded to a high-profile child custody dispute by

limiting the visitation rights of a father accused of sexually abusing his daughter. The D.C.

Circuit ruled that the legislation applied with specificity because, "[a]lthough Congress stopped

short of including the names" of the parents or child "in the text of the statute, the applicability

of the Act depend[ed] on such a narrow set of circumstances that it applie[d] to no known cases

other than" the custody dispute that prompted the legislation."Joanna R. Lampe, Congressional

Research Service:Legal Sidebar,"Capitol Unrest, Legislative Response, and the Bill of Attainder

Clause," January 22, 2021 https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1211.   In the *de facto* quasi-legislative enactment of the Weinberg law by BORIM, Weinberg is

specifically named in multiple court documents and filings with DALA, but it is the 43 essential

elements of the Weinberg law which "depended on such a narrow set of circumstances that it

applied to no known cases other than" the Plaintiff's case of first impression.

1212.   "A law may also apply with specificity if it targets members of an identifiable group. For

example, in the Reconstruction-era case *Cummings v. Missouri*, the Supreme Court struck down

as a bill of attainder a provision of the Missouri state constitution that effectively barred former

Confederate sympathizers from engaging in certain vocations. Likewise, in the 1965 case *United*

*States v. Brown*, the Court held that a statute making it a crime for any member of the

Communist Party to serve as an officer of a labor union was a bill of attainder."Joanna R. Lampe,

Congressional Research Service:Legal Sidebar,"Capitol Unrest, Legislative Response, and the

Bill of Attainder Clause," January 22, 2021

https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1213.   "Legislation that targets a specific corporation may also satisfy the specificity

requirement. While the Supreme Court has not decided whether the Bill of Attainder Clause

protects entities such as corporations, several lower federal courts have either held or assumed

that it does."Joanna R. Lampe, Congressional Research Service:Legal Sidebar,"Capitol Unrest,

Legislative Response, and the Bill of Attainder Clause," January 22, 2021

https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1214.  "Punishment:  Specificity standing alone is never sufficient to support a finding that a law is a bill of attainder. The *Nixon* Court rejected the proposition that an individual or defined group is subject to a bill of attainder "whenever he or it is compelled to bear burdens which the individual or group dislikes." Congress is not limited to "the choice of legislating for the universe, or legislating only benefits, or not legislating at all." Joanna R. Lampe, Congressional Research Service:Legal Sidebar,"Capitol Unrest, Legislative Response, and the Bill of Attainder Clause," January 22, 2021 https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1215.  "Instead, the Nixon Court explained, Congress may in some circumstances create "a legitimate class of one." Thus, if a law applies with specificity but does not impose punishment, it will not be struck down as a bill of attainder." Joanna R. Lampe, Congressional Research Service:Legal Sidebar,"Capitol Unrest, Legislative Response, and the Bill of Attainder Clause," January 22, 2021 https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1216.  "The test for whether a law imposes punishment is complex and fact-based. In *Nixon*, the Supreme Court laid out three tests for assessing whether a law imposes punishment: (1) historical, (2) functional, and (3) motivational. Federal appeals courts have stated that none of the three tests is decisive, and not all three tests need to be satisfied for a law to be punitive." Joanna R. Lampe, Congressional Research Service:Legal Sidebar,"Capitol Unrest, Legislative Response, and the Bill of Attainder Clause," January 22, 2021 https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1217.  "The Historical Test:  The first authority courts consult in considering whether a law imposes punishment is "[t]he infamous history of bills of attainder." This historical test for

punishment deems a statute to be punitive if it is one of a limited set of legislative actions that were found to be bills of attainder from before the Founding through the mid-20th century. At English common law, a bill of attainder was legislation imposing the death penalty without a judicial trial. That definition later expanded to include "bills of pains and penalties" that imposed other forms of criminal punishment such as banishment, imprisonment, or confiscation of property without trial. American courts further expanded the historical definition of punishment to include employment bans that prevent specific individuals or members of discrete classes from holding certain types of jobs. The vocational restrictions for Confederate sympathizers at issue in *Cummings*, the criminal prohibition of Communists serving as union officers in *Brown*, and the legislation that prevented named individuals accused of being "subversives" from drawing a federal salary in Lovett are all examples of employment bans that are considered "punishment" under the historical test." Joanna R. Lampe, Congressional Research Service:Legal Sidebar,"Capitol Unrest, Legislative Response, and the Bill of Attainder Clause," January 22, 2021 https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1218.   "However, courts have generally declined to extend historic jurisprudence related to employment bans to include restrictions on corporations. As an example, in *Kaspersky Lab, Inc. v. Department of Homeland Security*, Russia-based cybersecurity company Kaspersky Lab brought a bill of attainder challenge to a provision of the National Defense Authorization Act for Fiscal Year 2017 that barred the U.S. government from using any Kaspersky Lab products or services. The D.C. Circuit rejected the challenge, holding that none of the three tests for punishment was satisfied. With respect to the historical test, the court rejected the company's argument that the ban on federal contracting with Kaspersky Lab was analogous to prior cases

involving individual employment bans. The court explained that "although we assume that the Bill of Attainder Clause protects corporations as well as natural persons, we have no basis for likewise assuming that corporate entities feel burdens in the same way as living, breathing human beings." In *ACORN v. United States*, the Second Circuit similarly held that withholding federal appropriations from a named company "does not constitute a traditional form of punishment," noting, "There may well be actions that would be considered punitive if taken against an individual, but not if taken against a corporation." Joanna R. Lampe, Congressional Research Service:Legal Sidebar,"Capitol Unrest, Legislative Response, and the Bill of Attainder Clause," January 22, 2021 https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1219. "The Functional Test:  The functional test is generally the most important of the three tests for punishment. This test considers "whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." The functional test serves to prevent formalistic evasion of the Bill of Attainder Clause, recognizing that there may be measures that were not historically recognized as punishments that are nonetheless impermissibly punitive. But at the same time, the U.S. Court of Appeals for the Fifth Circuit has stated that even some laws imposing penalties that were historically considered punishments may not violate the Bill of Attainder Clause if the "legislation has a legitimately nonpunitive function, purpose, and structure." The functional test is fact-specific. It first considers whether the statute has a non-punitive purpose. Courts apply a level of scrutiny somewhat more stringent than the most deferential rational basis review, requiring what the D.C. Circuit has called "not some conceivable nonpunitive purpose, but rather an actual nonpunitive purpose." If such a purpose exists and the challenged law reasonably

serves that purpose, courts generally find that the law is not punitive. For instance, in *Nixon*, the

Supreme Court held that the Presidential Recordings and Materials Preservation Act did not

function as punishment because it served the nonpunitive purposes of retaining materials relevant

to the prosecution of the Watergate break-in and preserving records with historical significance.

In *Kaspersky*, the D.C. Circuit held that a statute prohibiting the U.S. government from using

products or services from Kaspersky Lab served a nonpunitive interest in promoting "the

security of the federal government's information systems." In *SBC Communications, Inc. v.*

*Federal Communications Commission*, the Fifth Circuit held that a statute barring specific

telecommunications companies from engaging in certain business activities served the

nonpunitive purpose of "attempting to ensure fair competition in the [telecommunications]

markets."

If a nonpunitive purpose is evident, the court considers whether the challenged legislation is

over- or underinclusive in view of its aims and whether less burdensome alternatives could have

accomplished the same goals. "A grave imbalance or disproportion between the burden and the

purported nonpunitive purpose suggests punitiveness, even where the statute bears some minimal

relation to nonpunitive ends."

Thus, in *Foretich*, the D.C. Circuit held that a statute altering the visitation rights of a father

accused of sexually abusing his child constituted a bill of attainder, in part because of the

imbalance between the burden the statute imposed and the statute's "implausible nonpunitive

purposes." And in *Consolidated Edison Co. v. Pataki*, the Second Circuit concluded that

legislation barring a company from recovering certain costs from customers, on the stated basis

that the company had "failed to exercise reasonable care" in its business, functioned as

punishment because the court could "discern no wholly non-punitive purpose to justify" the

law." Joanna R. Lampe, Congressional Research Service:Legal Sidebar,"Capitol Unrest,

Legislative Response, and the Bill of Attainder Clause," January 22, 2021

https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1220. "The Motivational Test:  The third and final test for punishment considers whether the

legislature that enacted a challenged law was motivated by an intent to punish the targeted

person(s). Courts applying this test examine the bill's text and legislative history to determine

whether lawmakers expressed punitive intent. The motivational test is not usually dispositive.

The Nixon Court opined that a law may qualify as a bill of attainder even without a "formal

legislative announcement of moral blameworthiness or punishment." Moreover, if the historical

and functional tests are not satisfied, the motivational test standing alone does not compel a

finding that a law is punitive unless the reviewing court finds "unmistakable evidence of punitive

intent." However, a significant amount of punitive language in congressional documents or

legislative debate may support a finding that a law imposes punishment. For instance, committee

reports on the legislation at issue in Lovett characterized the affected individuals as "guilty of

having engaged in 'subversive activity'" and "unfit" for government service. In Foretich, the D.C.

Circuit cited statements of multiple legislators characterizing the child at the center of the

custody dispute as a "victim" and the legislation as "deal[ing] with the inadequacies of the court

system" and "bringing justice" to her family.

By contrast, isolated statements by a few lawmakers generally do not suffice to show a

legislative intent to punish. In *Kaspersky*, the D.C. Circuit considered one Senator's statements

that the "case against *Kaspersky Lab* [wa]s ovePlaintiff Robert Weinberghelming" and that

"strong ties between Kaspersky Lab and the Kremlin [we]re alarming and well-documented."

The court concluded that "even if [the Senator's] statements did reveal a personal desire to

punish Kaspersky, the company cite[d] no corroborating evidence indicating that other members

of Congress shared her supposedly punitive motivations." In *ACORN*, an organization that had

been excluded from receiving federal funding cited statements of "nearly ten members of the

House of Representatives" labeling the organization as corrupt and accusing it of specific

offenses. The Second Circuit concluded, "Despite the evidence of punitive intent on the part of

some members of Congress, unlike in Lovett, there is no congressional finding of guilt in this

case." The court thus held that the statements were "insufficient to establish—by themselves—

the clearest proof of punitive intent necessary for a bill of attainder." Joanna R. Lampe,

Congressional Research Service:Legal Sidebar,"Capitol Unrest, Legislative Response, and the

Bill of Attainder Clause," January 22, 2021

https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1221.   The *Weinberg law* whose purpose was to revoke the medical license of the Plaintiff was

clearly punitive, as it deprived the Plaintiff of his ability to earn a livelihood, deprived the

Plaintiff of his property rights in his medical license, and proximately caused the financial

collapse and insolvency of the Plaintiff culminating in his filing for bankruptcy.

1222.   "The Bill of Attainder Clause applies only to punishments imposed without a judicial

trial, so prosecuting individuals involved in the unrest at the Capitol under existing laws would

not raise bill of attainder concerns. (However, amending criminal laws to criminalize past

conduct or increase criminal penalties for existing offenses might implicate the related

constitutional prohibition on ex post facto laws. Thus, while the incident at the Capitol has

prompted some calls for new domestic terrorism laws, any new penal laws could apply only on a prospective basis.) By contrast, if Congress enacted legislation specifically identifying one or more individuals or groups allegedly involved in the unrest at the Capitol and imposing legal consequences on them, those people might challenge such laws as bills of attainder. Congress could seek to mitigate any bill of attainder concerns by ensuring that proposed legislation does not fit within the historical categories of punishment subject to the Bill of Attainder Clause, that it reasonably serves a nonpunitive purpose, and that the statutory text and legislative history do not reflect an intent to punish. As with any bill of attainder litigation, however, the outcome of such a challenge would depend on the specific facts of the case." Joanna R. Lampe, Congressional Research Service:Legal Sidebar,"Capitol Unrest, Legislative Response, and the Bill of Attainder Clause," January 22, 2021

https://crsreports.congress.gov/product/pdf/LSB/LSB10567

1223.  The challenge for the Plaintiff, in the instant action, is to eloquently prove before the Supreme Court that the quasi-legislative acts of a state agency is the same type of state action as Congressionally-enacted statutes and therefore the intended prohibition of the Founding Fathers.

1224.  The Weinberg law is narrowly quasi-legislated to punish the Plaintiff uniquely - the Weinberg law -which singled out the Plaintiff for punitive revocation of his medical license with Due Process based on the false factual record resulting from the defendants' spoliation of exculpatory evidence concealing the 1992 Express Bilateral Contract which terminated the doctor-patient relationship

1225.  "...On occasion, Congress exercises its legislative authority regarding a specified individual, entity, or identifiable group in such a way as to raise constitutional concerns. In particular, the United States Constitution expressly prohibits the federal government from enacting bills of attainder, defined by the Supreme Court as a "law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." The basis for the prohibition arises from the separation of powers concern that the enforcement of a bill of attainder would allow Congress to usurp the power of the judicial branch..." Kenneth R. Thomas, Congressional Research Service,"Bills of Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1226.  "The two main criteria that the courts use to determine whether legislation is a bill of attainder are (1) whether "specific" individuals, groups, or entities are affected by the statute, and (2) whether the legislation inflicts a "punishment" on those individuals. The U.S. Supreme Court has also identified three types of legislation that would fulfill the "punishment" prong of the test: (1) where the burden is such as has "traditionally" been found to be punitive (historical test); (2) where the type and severity of burdens imposed are the "functional equivalent" of punishment because they cannot reasonably be said to further "non-punitive legislative purposes" (functional test); and (3) where the legislative record evinces a "congressional intent to punish (motivational test)." Kenneth R. Thomas, Congressional Research Service,"Bills of Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1227.  "The Court has suggested that each bill of attainder case turns on its own highly particularized facts, and notably, since the signing of the Constitution, the Bill of Attainder Clause has been successfully invoked only five times in the Supreme Court. Nevertheless, there remain potential constitutional concerns when Congress proposes or passes legislation that

imposes a burden on a specified individual, entity, or identifiable group." Kenneth R. Thomas,

Congressional Research Service,"Bills of Attainder: The Constitutional Implications of Congress

legislating narrowly," August 26, 2014

1228.   "Congress has various legislative authorities under which it can regulate the behavior of

persons and businesses, and it has significant discretion as regards the breadth and scope of such

regulation. On occasion, however, Congress exercises its authority regarding a specified

individual, entity, or identifiable group in such a way as to give rise to constitutional concerns. In

particular, the United States Constitution expressly prohibits the federal government from

enacting bills of attainder, defined by the Supreme Court as a "law that legislatively determines

guilt and inflicts punishment upon an identifiable individual without provision of the protections

of a judicial trial."  Kenneth R. Thomas, Congressional Research Service,"Bills of Attainder:

The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1229.   "The basis for the prohibition arises from the separation of powers concern that

the enforcement of a bill of attainder would allow Congress to usurp the power of the judicial

branch. For instance, there was, for a time, significant controversy about bonuses paid to

employees of entities that had received Troubled Asset Relief Program (TARP) funds from the

federal government under the Emergency Economic Stabilization Act of 2008. In response to

this concern, various proposals were made to impose taxes on such bonuses. One such bill,

which passed the House, would have taxed bonuses as income to the employee at a rate of 90%,

while another, introduced in the Senate, would have imposed an excise tax equal to 35% of the

bonus on both the employee and entity. Significantly, both bills would have applied retroactively

to tax bonuses awarded before the legislation was passed. Concerns were expressed that, because

these bills targeted the bonuses of employees of specific companies that had received funds, they

could be seen as bills of attainder." Kenneth R. Thomas, Congressional Research Service,"Bills of

Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1230.   "A similar situation arose in response to allegations of election law and other legal

violations by the Association of Community Organizations for Reform Now (ACORN), a public

interest group. Here, Congress passed several appropriations bills that limited the provision of

federal funds to ACORN and its affiliates. For instance, § 163 of the 2010 Continuing

Appropriation Resolution provided that:

> [n]one of the funds made available by this joint resolution or any prior Act may be
>
> provided to the Association of Community Organization[s] for Reform Now (ACORN)
>
> or any of its affiliates, subsidiaries, or allied organizations.

Further, the 2010 Consolidated Appropriations Act provided in various places that none of the

funds made available under various divisions of the act or any prior act could be provided to

ACORN or any of its affiliates, subsidiaries, or allied organizations. This legislation was

challenged in federal court as a bill of attainder, but was ultimately upheld by the United States

Court of Appeals for the Second Circuit." Kenneth R. Thomas, Congressional Research Service,"Bills

of Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1231.   "Generally, a court will have reservations in declaring a provision of law unconstitutional

because "legislative decisions enjoy a high presumption of legitimacy."13 Further, the Supreme

Court has suggested that each bill of attainder case "turn[s] on its own highly particularized

context." Kenneth R. Thomas, Congressional Research Service,"Bills of Attainder: The Constitutional

Implications of Congress legislating narrowly," August 26, 2014

1232.   "Notably, since the signing of the Constitution, the Bill of Attainder Clause has been

successfully invoked only five times in the Supreme Court. Nevertheless, constitutional concerns

may arise in this context when Congress proposes or passes legislation that burdens specified

individuals or a defined class of persons or entities." Kenneth R. Thomas, Congressional Research

Service,"Bills of Attainder: The Constitutional Implications of Congress legislating narrowly," August 26,

2014

1233.   "As noted, the prohibition on bills of attainder is based on separation of powers concerns.

By passing a bill of attainder, the legislature assumes judicial magistracy, pronouncing upon the

guilt of the party without any of the common forms and guards of trial, and satisfying itself with

proofs, when such proofs are within its reach, whether they are conformable to the rules of

evidence, or not. In short, in all such cases, the legislature exercises the highest power of

sovereignty, and what may be properly deemed an irresponsible despotic discretion, being

governed solely by what it deems political necessity or expediency, and too often under the

influence of unreasonable fears, or unfounded suspicions." Kenneth R. Thomas, Congressional

Research Service,"Bills of Attainder: The Constitutional Implications of Congress legislating narrowly,"

August 26, 2014

1234.   "At common law, a bill of attainder was a parliamentary act that sentenced a named

individual or identifiable member of a group to death.17 It was most often used to punish

political activities that Parliament or the sovereign found threatening or treasonous.18 A bill of

pains and penalties was identical to a bill of attainder, except that it prescribed a punishment

short of death such as banishment, deprivation of the right to vote, exclusion of the designated

individual's sons from Parliament, or the punitive confiscation of property.19 The prohibition on

bills of pains and penalties has been subsumed into the prohibitions of the Bill of Attainder

Clause, so that a variety of penalties less severe than death may trigger its provisions." Kenneth R.

Thomas, Congressional Research Service,"Bills of Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1235.   "The two main criteria that the courts look to in order to determine whether legislation is a bill of attainder are (1) whether specific or identifiable individuals are affected by the statute (specificity prong), and (2) whether the legislation inflicts a punishment on those individuals (punishment prong)" Kenneth R. Thomas, Congressional Research Service,"Bills of Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1236.   "Specificity:   The Supreme Court has held that legislation meets the criteria of specificity if it either specifically identifies a person, a group of people,21 or readily ascertainable members of a group, or if it applies to a person or group based on past conduct. For example, where a court determines that a statute referencing a specific group of persons is based on past conduct, this legislation may in some cases be treated as a per se violation of the specificity prong. In United States v. Lovett,  Congress passed Section 304 of the Urgent Deficiency Appropriation Act of 1943, which named three government employees, labeled them as subversive, and then provided that no salary should be paid to them. The employees brought suit, and the Supreme Court ruled in their favor, holding that Section 304 was a punishment of named individuals without a judicial trial." Kenneth R. Thomas, Congressional Research Service,"Bills of Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1237.   "… it is a defense to a bill of attainder challenge to establish that a statute is not intended to punish, but rather to implement a legitimate regulatory scheme. Although this analysis is generally considered under the second prong of the test (whether the law is punitive), it may have implications for the specificity prong. For instance, in the case of Nixon v.

Administrator of General Services, the Court evaluated the Presidential Recordings and

Materials Preservation Act, which required that former President Richard Nixon, whose papers

and tape recordings were specifically named in the act, turn those papers and tape recordings

over to an official of the executive branch. The former President challenged the constitutionality

of the act as a bill of attainder, arguing that it was based on a congressional determination of the

former President's blameworthiness and represented a desire to punish him. It would appear that

the identification of papers and recordings under the control of a named person (the former

President) would meet the per se requirement. The Court in Nixon, however, found that the

statute was constitutional despite this specificity. In Nixon, the Court found that the bill failed

the second prong (punishment) of the test for a bill of attainder, since the act fulfilled the valid

regulatory purpose of preserving information which was needed to prosecute Watergate-related

crimes and was of historical interest. As part of this analysis, however, the Court even questioned

whether the statute in question met the specificity prong of the two-part test, finding that naming

an individual could be "fairly and rationally understood" as designating a "legitimate class of

one." Thus, it has been suggested that Nixon stands for the proposition that any level of

specificity is acceptable, even the naming of individuals, as long as a rational, non-punitive basis

for the legislation can be established." Kenneth R. Thomas, Congressional Research Service,"Bills of

Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1238.  *Retroactive versus prospective enforcement:* "A different question arises as to whether

legislation that applies both retroactively and prospectively, and thus includes persons not yet

identified, can violate the prohibition on bills of attainder. It does not appear to be fatal to a bill

of attainder challenge that the statute in question applies to both past and future behavior. In one

of the relatively few cases in which a successful bill of attainder challenge was made, the Court

in United States v. Brown invalidated Section 504 of the Labor-Management Reporting and Disclosure Act, which made it a crime for anyone "who is or has been a member of the Communist Party to serve as an officer or employee of a labor union ... during or for five years after the termination of his membership in the Communist Party." In Brown, the Court did not find it significant that future members of the Communist Party would be included in the group affected. Rather, the Court focused on the fact that once a person had entered the Communist Party, his or her withdrawal did not relieve the disability for five years. So, the requirement of specificity is not defeated by the potential of future persons being added to the identified group, as long as the persons or entities identified cannot withdraw from such specified group." Kenneth R. Thomas, Congressional Research Service,"Bills of Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1239. "...However, a per se finding of specificity can still fail to meet the first prong if the group specified by the statute can be justified by a regulatory purpose. This question would require an analysis of the nexus between the specificity and the regulatory purpose that is arguably served by the proposed law. In this regard, the specificity analysis would be similar to the "Functional Test" ..." Kenneth R. Thomas, Congressional Research Service,"Bills of Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1240. "... Punishment: The mere fact that focused legislation imposes burdensome consequences does not require that a court find such legislation to be an unconstitutional bill of attainder. Rather, the Court has identified three tests to determine whether legislation is "punitive": (1) whether the burden is such as has traditionally been found to be punitive (historical test); (2) whether the type and severity of burdens imposed cannot reasonably be said

to further non-punitive legislative purposes (functional test); and (3) whether the legislative

record evinces a congressional intent to punish (motivational test).

## Historical Test of Punishment

The Supreme Court has identified various types of punishments that have historically been

associated with bills of attainder. These traditionally have included capital punishment,

imprisonment, fines, banishment, confiscation of property, and more recently, the barring of

individuals or groups from participation in specified employment or vocations. The courts have

been reluctant, however, to further expand the scope of the historical test. For instance, the

United States Court of Appeals for the Second Circuit has rejected the argument that denial of

federal benefits to specified individuals or organizations was the type of "punishment"

traditionally engaged in by legislatures as a means of punishing individuals for wrongdoing.

## Functional Test of Punishment

1241.  The Supreme Court has also indicated that some legislative burdens not traditionally

associated with bills of attainder might nevertheless "functionally" serve as punishment. The

Court has indicated, however, that in those cases, the type and severity of the legislatively

imposed burden would need to be examined to see whether it could reasonably be said to further

a non-punitive legislative purpose.

1242.  The Court has specified that "legislative acts, no matter what their form, that apply either

to named individuals or to easily ascertainable members of a group in such a way as to inflict

punishment on them without a judicial trial are bills of attainder prohibited by the Constitution."

1243.   These legislative acts may include the quasi-legislative acts of such agencies as BORIM which enact new regulations via the Rule-making process as well as through adjudication of cases of first impression.

1244.   For example, it seems clear that, in some instances, a denial of the ability to engage financially with the United States can fulfill the punishment prong of the test. As touched upon earlier in *United States v. Lovett*, the Court struck down a statute prohibiting specified individuals from being employed by the United States as a bill of attainder.

1245.   In Lovett, the respondents, Robert Lovett, Goodwin Watson, and William Dodd, Jr., were federal government employees in good standing. Congress, however, passed a statute naming those individuals and providing that, after a certain date, no federal salary or compensation could be paid to them. The statute was passed as a result of concerns in the House Committee on Un-American Activities that "subversives" were occupying influential positions in the government and elsewhere, and that Congress had the responsibility to identify and remove those individuals.

1246.   The Court noted that the character of the legislation was informed by both the particulars of the legislation and the context in which it arose. In this case, the Court found that the statute operated to bar the named individuals not only from their current jobs, but also from employment by any branch of the federal government for perpetuity. The Court also noted that the congressional proceedings relevant to the legislation had the elements of judicial process. For instance, the chairman of the House Committee on Un-American Activities, Representative Dies, told the House that the three named individuals, among others, were unfit to "hold a Government position," and other statements made during the debate included discussion of "charges" against the individuals and of having sufficient proof of "guilt."

1247.   A special counsel for the House noted that the legislation in question was within the

discretion of Congress's power under the Spending Clause. However, the Court in Lovett

remarked that other Supreme Court decisions have invalidated legislation barring specified

persons or groups from pursuing various professions where the employment bans were imposed

as a brand of disloyalty.

1248.   For instance, the Court has found that a ban on lawyers practicing before the Supreme

Court was punishment for purposes of bill of attainder analysis, as was a ban on persons holding

positions of trust related to legal proceedings. Consequently, the Court in Lovett held that the

denial of the contractual right to federal employment fell squarely into the type of punishment

susceptible to bill of attainder analysis."Kenneth R. Thomas, Congressional Research Service,"Bills

of Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1249.   "...The situation can arise, however, where the burdens imposed by legislation on

specified or identifiable persons or entities may be justified by a valid regulatory (non-punitive)

purpose. In such a case, a court would be likely to find that such legislation is not intended to be

punitive. For instance, in Flemming v. Nestor, 51 the Court upheld termination of Social Security

benefits to persons deported for events occurring before the passage of the legislation

terminating benefits, reasoning that Congress was within its authority to find that the purposes of

Social Security were not served by providing benefits to persons living overseas. In reaching this

conclusion, the Court noted that:

[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on [bill

of attainder grounds]. Judicial inquiries into Congressional motives are at best a hazardous

matter, and when that inquiry seeks to go behind objective manifestations it becomes a

dubious affair indeed. Moreover, the presumption of constitutionality with which this

enactment, like any other, comes to us forbids us lightly to choose that reading of the statute's setting which will invalidate it over that which will save it. 'It is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void.' *Fletcher v. Peck*, 6 Cranch 87, 128." However, it should be noted that the legislation in question in *Flemming* was but a small part of a larger regulatory scheme—the Social Security program—making any punitive intent less apparent." Kenneth R. Thomas, Congressional Research Service,"Bills of Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1250.   "Another factor that may be relevant to a bill of attainder analysis is the duration of the burden imposed by legislation. For instance, if the burden imposed by legislation is of short duration, one might argue that Congress had to act quickly to address a particular situation, with an understanding that more general legislation would be forthcoming in the future. For instance, in the case of *SeaRiver Maritime Financial Holdings, Inc. v. Mineta*,  the United States Court of Appeals for the Ninth Circuit (Ninth Circuit) suggested that the need for quick resolution of a particular regulatory concern might require a degree of specificity that would not otherwise be acceptable. The *SeaRiver* case is closely related to an oil spill that occurred in 1989, when the Exxon Valdez ran aground onto Bligh Reef in Alaska, spilling nearly 11 million gallons of oil into the Prince William Sound. The following year, Congress passed the Oil Pollution Act of 1990, which, among other things, excluded from the waters of Prince William Sound any vessel that had spilled more than 1 million gallons of oil into the marine environment after March 22, 1989. The act effectively barred the Exxon Valdez from operating in Prince William Sound. The owner of the Exxon Valdez brought suit, arguing that the exclusion of the Exxon Valdez under the Oil Pollution Act constituted an unconstitutional bill of attainder. While the Ninth

Circuit held that the legislation in question did meet the specificity prong of the bill of attainder analysis, it found that the legislation was not intended to punish the owners of the Exxon Valdez, and thus did not violate the punishment prong of the bill of attainder test. Rather, the Ninth Circuit found that the legislation furthered a rational, non-punitive regulatory purpose.

In the Oil Pollution Act, Congress recognized Prince William Sound as an "environmentally sensitive area," and included various provisions designed to protect the Sound's environment and reduce the likelihood of future oil spills. The act established the Prince William Sound Oil Spill Recovery Institute and an Oil Terminal and Oil Tanker Environmental Oversight and Monitoring Demonstration Program for Prince William Sound; provided for a Bligh Reef navigation light and a vessel tracking and alarm system; and increased equipment and requirements for oil spill response.

1251.   The Ninth Circuit found that the exclusion of the Exxon Valdez from the Prince William Sound was consistent with this legislative purpose, and Congress could legitimately conclude that a vessel that spilled over 1 million gallons of oil posed a greater risk to Prince William Sound than other tank vessels, because of a pre-existing defect, damage incurred as a result of the spill, or because the spill calls into question the practices of its operators. The court found this case similar to the Supreme Court case of Nixon, which held that the Presidential Recordings and Materials Preservation Act, which only applied to the preservation of documentary materials relating to the presidency of Richard Nixon, was not a bill of attainder.

1252.   In both of these cases, the reasoning was that there was a specific need for quick legislative action regarding specific situations. Regarding the Exxon Valdez, legislative action was needed to avoid another oil spill, while legislation specifically affecting President Nixon was deemed necessary to avoid the possible loss of important historical documents. In both cases, the

need for Congress to "proceed with dispatch" allowed Congress to pass legislation that established "a legitimate class of one." The holdings in both of these cases appeared to assume that further regulation which applied to persons or entities outside of these "legitimate class[es] of one" would be forthcoming.

## Motivational Test for Punishment

1253.   A court will also consider the legislative history of a provision in evaluating whether or not legislation is intended to be punitive. The Court, however, has been reluctant to ascribe too much significance to legislative history alone, and will generally require more than just a few statements by individual Members to find such motivation. Further, it seems to be unsettled what information aside from that directly found within the legislative history of a law should be considered by a court." Kenneth R. Thomas, Congressional Research Service,"Bills of Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

1254.   "…In some cases, extensive legislative history may suggest punitive intent. For instance, when the proposal to tax employee bonuses of TARP recipients was considered and passed by the House, a variety of remarks were made on the floor concerning the bill. While a small number of remarks addressed the issue of the regulatory purpose of prospective applications of the bill, many remarks were made that seemed to indicate that the application of these bills retrospectively was based on concern with the morality of having paid the bonuses in question, and a desire that the person receiving the bonuses not be able to enjoy their benefit. Some of these comments might have been interpreted as indicating a punitive intent on the passage of the legislation. In other situations, however, there may be less direct evidence of the motivational basis for such legislation. For instance, in the bills to limit the provision of federal monies to

ACORN, there was some discussion of alleged misdeeds of ACORN during consideration of the bills.

1255.   The United States Court of Appeals for the Second Circuit, however, found that a "smattering" of Members' remarks suggesting a punitive intent was not sufficient to show that the legislation was motivated by punitive intent. Consequently, it may be difficult to predict in particular cases when evidence of punitive intent in legislative history would be sufficient to establish that a bill was an unconstitutional bill of attainder." Kenneth R. Thomas, Congressional Research Service,"Bills of Attainder: The Constitutional Implications of Congress legislating narrowly," August 26, 2014

*Equal Protection clause under Fifth and Fourteenth Amendments*

1256.   "The equal protection clause directly implicates the fundamental principle that "all persons similarly situated should be treated alike." " *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920).

1257.   The Supreme Court has struggled to give force to this guiding principle while minimizing the danger that the judiciary would chill legislative innovation in dealing with perceived social, political and economic problems. The development of a coherent and consistent doctrinal approach to equal protection jurisprudence has proved elusive." *Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370 - Dist. Court, ND New York (1987).

1258.   "Between the constitutional revolution of the 1930s until the 1960s, the use of the equal protection clause to strike down legislative acts was fairly limited to cases involving racial discrimination. See Gunther, FoPlaintiff Robert Weinbergard: *In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv.L. Rev. 1, 8 (1972)

(hereinafter Newer Equal Protection). During the Warren Court era, the now familiar "two-tier" approach to equal protection analysis, which was foreshadowed in Justice Stone's famous footnote in *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n. 4, 58, 411 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938), was honed and refined. Under this approach, "suspect" classifications — for example, those discriminating against "discrete and insular minorities" or directly hindering the enjoyment of some "fundamental right" — were subjected to "strict scrutiny." In such cases, the burden was placed on the government to demonstrate that the classification was necessary to serve a compelling state interest. *McLaughlin v. Florida*, 379 U.S. 184, 192, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964). All other classifications were upheld if they were rationally related to valid governmental purposes (the "rational basis" test), and the burden was placed on the party challenging the classification to prove that the classification was not reasonably related to any conceivably legitimate legislative purpose, stated or unstated. *McGowan v. Maryland*, 366 U.S. 420, 425, 81 S.Ct. 1101, 1104, 6 L.Ed.2d 393 (1961); see also *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 527, 79 S.Ct. 437, 440, 3 L.Ed.2d 480 (1959)." *Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370 - Dist. Court, ND New York (1987).

1259.   "As was true of the application of the rational basis test in the substantive due process context, determination that a classification was not "suspect" and thus need only have a "rational basis" was not the beginning but the end of any effective analysis:

> [The equal protection clause] permits the States a wide scope of discretion in enacting
> laws which affect some groups of citizens differently than others. The constitutional

safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective.

1260.  State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. *McGowan*, 366 U.S. at 425-26, 81 S.Ct. at 1105. The justification for a classification need not be articulated by the legislature itself; after-the-fact rationalizations of statutory classifications by lawyers or judges was not only allowed but encouraged. See *McDonald v. Board of Election*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969).

1261.  The Supreme Court took the view that legislatures must be given wide latitude in drawing lines as a means of remedying perceived social and economic problems. The legislature was allowed to act "one step at a time, addressing itself to the phase of the problem which seem[ed] most acute to the legislative mind"; the states were allowed to "select one phase of one field and apply a remedy there, neglecting the others"; the Court felt that "[t]he prohibition of the [e]qual [p]rotection [c]lause goes no further than the invidious discrimination." *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955)." *Long Island Lighting Co. v. Cuomo*, 666 F.Supp. 370 - Dist. Court, ND New York (1987).

1262.  "Until the early 1970s, the application of the rational basis test in the equal protection context paralleled the application of that test under the substantive due process doctrine. In only one case between 1937 and 1970 was a legislative action deemed to have failed to satisfy the rational basis standard, and that case was subsequently overruled. *Morey v. Doud*, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), overruled, *New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

1263.   The Warren Court era did see, however, expansive use of the equal protection clause in striking down classifications that burdened judicially-identified fundamental personal rights under the "strict scrutiny" standard of review. Thus, statutes and regulations drawing classifications that impinged on the exercise of the right to vote by the individuals affected by the legislation, *Harper v. Virginia Board of Election*s, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), or the right of affected individuals to travel interstate, *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), were found violative of equal protection. Further, there were indications that the Court might be more willing to find classifications not wholly based on race "suspect." For instance, there were suggestions that classifications based on wealth or illegitimacy warranted closer judicial scrutiny. See, e.g., *Glona v. American Guarantee Co.*, 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968) (wrongful death statute distinguishing between legitimate and illegitimate children declared unconstitutional); *Levy v. Louisiana*, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) (same); *Harper v. Virginia Board of Elections*, 383 U.S. at 668, 86 S.Ct. at 1082 ("Lines drawn on the basis of wealth or property, like those of race, ... are traditionally disfavored." (citations omitted)). In an early Burger Court decision, a classification drawn on the basis of alienage was subjected to strict scrutiny. *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). The Court's willingness to give greater constitutional dimension to the value of equality in these cases eventually affected the Court's application of the rational basis test in the 1970s. In the words of Archibald Cox, "[o]nce loosed, the idea of Equality is not easily cabined." Cox, Foard: Constitutional Adjudication and the Promotion of Human Rights, 80 Harv.L.Rev. 91, 91 (1966)." *Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370 - Dist. Court, ND New York (1987).

1264. "In the early 1970s, the Supreme Court was confronted with a number of cases involving statutory discriminations which did not seem to warrant strict judicial scrutiny, but nonetheless seemed to offend the notions of fundamental fairness which ultimately inform judicial understanding of the requirements of equal protection. In many of these cases the Court would purport to apply the rationality standard but in fact conducted a more searching inquiry into the legitimacy of the legislative goals underlying the legislative classifications and the means chosen to further those goals. Thus, in *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), a provision of a state's probate code giving preference to male applicants over female applicants for appointment as administrators of the estates of the recently deceased was found not to bear a rational relationship to a concededly legitimate state purpose. Id. at 76-77, 92 S.Ct. at 254. *In James v. Strange*, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972*)*, a state statute governing the recoupment of legal defense fees expended by the state for indigent defendants which deprived the indigent defendants of exemptions from wage garnishments available to other civil judgment debtors failed to meet the equal protection clause's requirement of "some rationality." Id. at 140, 92 S.Ct. at 2034. In *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972), a statute denying death benefits to the class of unacknowledged illegitimate children was struck down under the rational basis test. In *Department of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), the Court found that a subsection of the Food Stamp Act of 1964, 7 U.S.C. § 2011 et seq., which limited receipt of food stamps to households of related individuals while excluding households containing an individual who is unrelated to any other household member, was not rationally related to the stated purpose of the Food Stamp Act, and found that the subsection's "true" purpose of discouraging 413*413 hippie communes was illegitimate. In *Weinberger v.*

372

*Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), the Court found provisions of the Social Security Act, 42 U.S.C. § 301 et seq., that allowed the spouse of a deceased husband and father to obtain survivors' benefits but denied the same to the spouse of a deceased wife and mother "entirely irrational" and violative of the equal protection clause. 420 U.S. at 651." *Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370 - Dist. Court, ND New York (1987).

1265.   "These cases demonstrated a greater willingness to examine the relationship of classifications to the concededly legitimate purpose that they were supposed to serve than was evident in cases like *Allied Stores of Ohio or Williamson v. Lee Optical*. They have since been explained away as aberrations antedating the development of "middle-tier" or "heightened" scrutiny in the mid-1970s. The Supreme Court expressly adopted this intermediate scrutiny for "quasi-suspect" classifications such as gender in *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), in which the Court required the state to demonstrate that such classifications "serve important governmental objectives and [are] substantially related to achievement of those objectives." Id. at 197, 97 S.Ct. at 457. As this "middle tier" became more firmly entrenched in equal protection doctrine, the Court moved back toward the extreme deference to legislative line-drawing that characterized the leading Warren Court decisions when statutory classifications were assessed under the rational basis test. See Note, Still Newer Equal Protection: Impermissible Purpose Review in the 1984 Term, 53 U.Chi.L.Rev. 1454, 1459 (1986)." *Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370 - Dist. Court, ND New York (1987).

1266.   The Plaintiff can prove that hundreds, if not thousands, of physicians engage in romantic and sexual relationships with their patients, sometimes resulting in marriage with their patients. However, the vast majority of these physicians are never disciplined unless the patient partner

makes some complaint to a medical board. Thus, only those physicians, whose partner makes some complaint, are subject to discipline and the medical boards will not prosecute, adjudicate, punish or revoke the licenses of those physicians happily married to their former patients. This double standard violates the Equal Protections clause of the U.S. Constitution. The Heart Balm statutes in Massachusetts prohibit seeking money damages in court for failed or unsuccessful romances.

1267. "… Both the Equal Protection Clause and the APA prohibit agencies from treating similarly situated petitioners differently without providing a sufficiently reasoned justification for the disparate treatment." *Muwekma Ohlone Tribe v. Kempthorne*, 452 F.Supp.2d 105, 115 (D.D.C. 2006) (citing *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1102-03 (D.C. Cir. 2005) ("To prevail on [its] equal protection claim, [a plaintiff must] demonstrate that [it] was treated differently than similarly situated [parties] and that the [agency's] explanation does not satisfy the relevant level of scrutiny.")." *Black Dog Outfitters, Inc. v. State of Idaho Outfitters and Guides Licensing Board,* Dist. Court, D. Idaho (2011).

*BORIM's Bill of Attainder against the Plaintiff enacted in 2002*

1268. The Bill of Attainder (also known as Act of Attainder, Writ of Attainder, or Bill of Penalties) typically declares a person, or group of persons, guilty of some crime and will punish the target, often without a trial. Bills of Attainder usually serve to nullify the targeted person's civil rights, most notably the right to own property, the right to a title of nobility, and rarely, the right to life itself.

1269.   At least five federal Congressional statutes have been struck down by the U.S. Supreme Court and invalidated under the Attainder clause including, but not limited to: *Ex parte Garland*, 71 U.S. 333 (1866); *Cummings v. Missouri*, 71 U.S. 277 (1867); *Hawker v. New York*, 170 U.S. 189 (1898); *Dent v. West Virginia,* 129 U.S. 114 (1889); *United States v. Lovett*, 328 U.S. 303 (1946).

1270.   The Lovett court defined a 3-prong test for a Bill of Attainder: (1) it must specifically identify the people to be punished, (2) it must impose punishment; and (3) it must do so without the benefit of a judicial trial. The *Weinberg law* fabricated *de facto* and *de novo* by DALA and BORIM satisfies all 3 prongs of the Lovett test standard.

1271.   In *United States v. Brown*, 381 U.S. 437 (1965), the Court invalidated the section of the statute that criminalized a former communist serving on a union's executive board. We see here the Act focused on past behavior and had specified a specific class of persons to be punished, but abandoned the punishment prong. In *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) the Supreme Court emphasized the narrowness and rationality of Bills of Attainder.

1272.   "The Supreme Court has recognized the right of a court in interpreting a statute, even though it be unambiguous on its terms, to so construe any section thereof so as not to defeat the true purpose of the enactment as a whole." *United States v. Barsky,* 72 F.Supp. 165 (Dist.Ct. Dist.of Columbia, 1947).

1273.   "... the Supreme Court clearly stated an elementary principle of statutory construction: '...All laws should receive a sensible construction. General terms should be so limited in their

application as not to lead to injustice, oppression, or absurd consequence..." *United States v. Kirby,* 74 U.S. 482, 486, 7 Wall. 482, 486, 19 L.Ed. 278.

1274.  "...The basic concept of the American system, both historically and philosophically, is that government is an instrumentality created by the people, who alone are the original possessors of rights and who alone have the power to create government... The prime function of government, in the American concept, is to preserve and protect the rights of the people." *Barsky v. United States,* 167 F.2d 241 (Ct.App., Dist of Columbia Cir.1948).

1275.  "...Punishment is harm intentionally inflicted because of conduct. Intentionally inflicted loss of employment is punishment, as the Court held in the Lovett case. Sometimes ... the Committee intentionally inflicts dismissal from employment. It intentionally and directly inflicts publicity and opprobrium. That these may be damaging is both obvious and recognized by law, including the law of libel. Publicity and opprobrium that are intended as an 'effective weapon' against activities than cannot be reached by legislation are intended to inflict damage. They are damaging in fact as well as intention." *Barsky v. United States,* 167 F.2d 241 (Ct.App., Dist of Columbia Cir.1948).

1276.  "... Statutes defining crimes may fail of their purpose if they do not provide some reasonable standards of guilt. Legislation may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused." *Barsky v. United States,* 167 F.2d 241 (Ct.App., Dist of Columbia Cir.1948).

*Sexual relations with a former patient does not comprise Medical Malpractice nor Misconduct see Korper v. Weinstein*

1277.  The Plaintiff had practiced medicine between 1986 – 2003 as an Emergency Room physician and as a Family Practice physician, but had never held himself out to be a psychologist, psychiatrist or any other type of mental health professional, and had never received any training or education in psychotherapy or the processes of transference or counter-transference.

1278.  The Plaintiff had never purported that any sexual encounters with the defendant Lourdes Colon was part of any medical treatment or therapy, nor did Colon ever claim or understand the Plaintiff's services to do so.

1279.  **"It is settled law in Massachusetts that consensual sexual conduct between a medical practitioner and a patient does not constitute medical malpractice."** *Roe v. Federal Ins. Co.,* 412 Mass. 43, 49-51, 587 N.E.2d 214 (1992) (sexual contact by dentist during treatment, whether consensual or not, was not rendering of professional services so as to be covered by malpractice insurance). *Korper v. Weinstein*, 57 Mass. App.Ct. 433 (Mass.App.Ct. 2003), 783 N.E.2d 877.

1280.  **"There are two exceptions to this rule: mishandling of the "transference phenomenon" by a psychiatrist with a patient; and sexual conduct purporting to be medical treatment."** See ibid.; *Palermo v. Brennan,* 41 Mass.App.Ct. 503, 509 n.10, 672 N.E.2d 540 (1996).  See also *Atienza v. Taub,* 194 Cal.App.3d 388, 393-394, 239 Cal.Rptr. 454 (1987); *Mindt v. Winchester,* 151 Or.App. 340, 343-345, 948 P.2d 334 (1997). *Korper v. Weinstein*, 57 Mass. App.Ct. 433 (Mass.App.Ct. 2003), 783 N.E.2d 877.

1281.   "The plaintiff in a civil action failed as a matter of law to establish that a consensual

sexual affair that began when the defendant was the plaintiff's physician constituted an

actionable claim for medical malpractice, or that the defendant had a fiduciary duty to avoid a

sexual relationship with the plaintiff; moreover, the plaintiff failed as a matter of law to establish

that the defendant  acted with an intent to harm the plaintiff, or that the purely personal conduct

of which the plaintiff complained constituted a business or consumer transaction that would

support a claim under G.L.c. 93A." *Korper v. Weinstein*, 57 Mass. App.Ct. 433 (Mass.App.Ct.

2003), 783 N.E.2d 877.

1282.   The Plaintiff terminated the doctor-patient relationship with Lourdes Colon in September

1992 with a memorialized Express Bilateral Contract handwritten and drafted/dictated by Dr.

Lisa Wolfe at the Arbour Human Resource Institute which was recommended/proposed/

encouraged by defendant Dr. Lisa Wolfe

1283.   There was a subsequent mutual bilateral modification of that 1992 termination contract

which provided a clinical-nonclinical binary classification of time and location as described in

greater detail in this Complaint.

1284.   As with Korper v. Weinstein, the Plaintiff was sexually involved with a former patient,

where the doctor-patient relationship was terminated in 1992 by an Express Bilateral Contract,

and this termination took place prior to the sexual relationship.

1285.   The Plaintiff also claims/alleges that BORIM has also violated the Involuntary Servitude

clause of the Thirteenth Amendment through regulations which require that a physician practice

medicine at all times of the day and in all locations on the earth regardless of their desire to leave work, hang up their "doctor hat" and not be a doctor while not at work.

1286.   The modified Express Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon established two distinct worlds for the Plaintiff to function in on a daily basis: the clinical world - where the Plaintiff wore his "doctor" hat and treated patients within the usual doctrines of the practice of medicine; and the nonclinical world where the Plaintiff had taken off his "doctor" hat, did not meet patients in clinical settings to diagnose and treat their illnesses, nor did he hold himself out as a doctor in the nonclinical world and the people the Plaintiff met in the nonclinical world did not know that he was a physician, and the Plaintiff did not want and never wanted to practice medicine in the nonclinical world.

1287.   BORIM maintains that its medical license "forces" the licensee to practice medicine in all places, at all times, wherever and whenever the licensee is present there.  Forcing the Plaintiff to be a doctor and to practice medicine in all places and at all times, in spite of his wanting not to be a physician, in some places and at some times, is tantamount to a form of professional slavery - so BORIM maintains that

1288.   Involuntary servitude or involuntary slavery is a legal and constitutional term for a person laboring against that person's will to benefit another, under some form of coercion, to which it may constitute slavery.

1289.   While laboring to benefit another occurs also in the condition of slavery, involuntary servitude does not necessarily connote the complete lack of freedom experienced in chattel slavery; involuntary servitude may also refer to other forms of unfree labor.

1290.  Involuntary servitude is not dependent upon compensation or its amount – it is basically "forced labor" against the laborer's will.

1291.  Prison labor is often referred to as involuntary servitude. Prisoners are forced to work for free or for very little money while they carry out their time in the system. *see* U.S. Department of Justice Circular No. 3591 Re: Involuntary Servitude, Slavery, and Peonage.

1292.  The Thirteenth Amendment to the United States Constitution makes involuntary servitude illegal under any U.S. jurisdiction whether at the hands of the government or in the private sphere, except as punishment for a crime:

> "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

1293.  The Supreme Court has held, in *Butler v. Perry* (1916), that the Thirteenth Amendment does not prohibit "enforcement of those duties which individuals owe to the state, such as services in the army, militia, on the jury, etc."

1294.  Onerous long term alimony and spousal support orders, premised on a proprietary interest retained by former marital partners in one another's persons, have also been allowed in many states, though they may in practice embody features of involuntary servitude.

1295.  Military conscription:  The Libertarian Party of the United States and other libertarians consider military conscription to be involuntary servitude in the sense of the Thirteenth Amendment. The U.S. Supreme Court disagreed with that interpretation in *Arver v. United States*, relying on text of Article I and the prerequisites of sovereignty.

1296.   Compulsory schooling: Some libertarians consider compulsory schooling involuntary servitude. John Taylor Gatto, a retired schoolteacher and libertarian activist critical of compulsory schooling writes of what he terms "The Cult Of Forced Schooling". Many libertarians consider income taxation a form of involuntary servitude. Republican Congressman servitude. Republican Congressman Ron Paul has described income tax as "a form of involuntary servitude", and has written, "... things like Selective Service and the income tax make me wonder how serious we really are in defending just basic freedoms.

1297.   Abortion rights: Some have also argued that, should *Roe v. Wade,* 410 U.S. 113 (1973), be overturned by the United States Supreme Court, a constitutional right to abortion could still be sustained on the basis that denying it would subject women to involuntary servitude contrary to the Thirteenth Amendment. That decision was overturned in June of 2022, but it is unclear whether forced pregnancy and child-bearing are within the scope of the term "servitude".

1298.   Law and economics: In contract theory, researchers have studied whether workers should be allowed to waive their right to quit work, or whether the right to quit should be inalienable. Suppose that at date [1] a worker voluntarily signs a labor contract according to which the worker has to perform a task at date [2]. At date [2], the worker no longer wants to perform the task (see the English contract law case Lumley v Wagner for a classic example). Would it be a form of involuntary servitude if the worker were forced by the courts to fulfill the contractual duties? Müller and Schmitz (2021) have shown that from an economic efficiency point-of-view, in a static setting it can indeed be desirable to restrict the freedom of contract by making the right to quit inalienable. However, they also show that in a dynamic setting even the worker can be strictly better off when it is possible to contractually waive the right to quit.

*Plaintiff punished for misconduct of defendant Attorneys*

1299.   "... In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that a

defendant is denied the effective assistance of counsel when his attorney's representation falls

below an objective standard of reasonableness. The test for determining ineffective assistance is

twofold; namely, whether the "counsel's performance was deficient," and if so, whether the

"deficient performance prejudiced the defense." Id. at 687.

1300.   An attorney's performance is considered to be deficient if it falls below an objective

standard of reasonableness under prevailing professional norms. Id. at 688. A defendant is

deemed to have been prejudiced if "there is a reasonable probability that, but for counsel's error,

the result of the proceeding would have been different." Id. at 694. In the context of a guilty plea,

to demonstrate prejudice, the defendant must show that, but for counsel's ineffective assistance,

he would not have decided to plead guilty, but instead would have insisted on proceeding to

trial. *Hill v. Lockhar*t, 474 U.S. 52, 58-59 (1985)." *U.S. v. Cooper,* Dist. Court, E.D. Michigan

(2012).

1301.   As asserted elsewhere in this Complaint, several legal tactics were employed by

defendant Vincent DiCianni – because he emphatically asserted that he must meet with Lourdes

Colon (a.k.a. "Patient A") in order to ascertain her credibility – so first he motioned DALA for

this meeting and that was denied, then he motioned the Superior Court for a meeting/deposition

in *Colon v. Weinberg, Wesselhoeft, Boston Evening Medical Center, et al.* and his motion there

was denied, so finally he insisted that an action be filed in Court – *Weinberg v. Colon* – so that

he would be able to depose Colon. The Plaintiff had no part in the motivation, planning, drafting

or signing any of these motions or lawsuits, and was only following the legal advice provided by

Attorney DiCianni. The Plaintiff should not have been punished nor admonished in multiple

legal proceedings because of his attorney's errors, which is why DiCianni is now a defendant to

have him provide the necessary sworn testimony.

*Violation of Plaintiff's right to Due Process of Law*

1302.   Under the Fifth and Fourteenth Amendments of the United States Constitution, U.S.

citizens enjoy the guarantees and protections for Due Process of Law and Equal Protection under

the laws, where these rights and privileges may be deficient in state statutes, regulations,

ordinances or judicial proceedings.

1303.   The Plaintiff is guaranteed specific legal protections for Due Process of Law and Equal

Protection of the Laws under the Fifth and Fourteenth Amendments of the U.S. Constitution.

1304.   "...The first is that the Due Process Clause of the Fourteenth Amendment and § 1983

make actionable many wrongs inflicted by government employees which had heretofore been

thought to give rise only to state-law tort claims. The second premise is that the infliction by

state officials of a "stigma" to one's reputation is somehow different in kind from the infliction

by the same official of harm or injury to other interests protected by state law, so that an injury to

reputation is actionable under § 1983 and the Fourteenth Amendment even if other such harms

are not.." *Paul v. Davis,* 424 U.S. 693 - Supreme Court (1976).

1305.   "It is apparent from our decisions that there exists a variety of interests which are difficult

of definition but are nevertheless comprehended within the meaning of either "liberty" or

"property" as meant in the Due Process Clause. These interests attain this constitutional status by

virtue of the fact that they have been initially recognized and protected by state law, and we have

repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever

the State seeks to remove or significantly alter that protected status. In *Bell v. Burson*, 402 U. S.
535 (1971), for example, the State by issuing drivers' licenses recognized in its citizens a right to
operate a vehicle on the highways of the State. The Court held that the State could not withdraw
this right without giving petitioner due process. In *Morrissey v. Brewer*, 408 U. S. 471
(1972), the State afforded parolees the right to remain at liberty as long as the conditions of their
parole were not violated. Before the State could alter the status of a parolee because of alleged
violations of these conditions, we held that the Fourteenth Amendment's guarantee of due
process of law required certain procedural safeguards.

1306.   In each of these cases, as a result of the state action complained of, a right or status
previously recognized by state law was distinctly altered or extinguished. It was this alteration,
officially removing the interest from the recognition and protection previously afforded by the
State, which we found sufficient to invoke the procedural guarantees contained in the Due
Process Clause of the Fourteenth Amendment." *Paul v. Davis*, 424 U.S. 693 - Supreme Court
(1976).

1307.   Regarding those state actors who may enjoy some privilege of relative immunity from
monetary damages under the Eleventh Amendment, the Plaintiff seeks equitable declaratory and
injunctive relief when monetary damages are not possible or available.

1308.   Sections of the Internal Revenue Code as applied and/or interpreted by the defendant
Commissioner of Internal Revenue are unconstitutional as they have been applied to the Plaintiff.

1309.   There are related cases involving the Plaintiff and the Commissioner of Internal Revenue
Service currently being litigated in U.S. Tax Court, but legal issues addressed herein exceed the
statutory authority of the U.S. Tax Court.

1310.   The Plaintiff is a disabled American as defined by the U.S. Americans with Disabilities

Act. The Plaintiff's medical records document and substantiate these disabilities which include

brain damage from neonatal asphyxia, post-traumatic brain injury (subdural hematoma),

post-concussion syndrome, ADD, hypothyroidism, central and peripheral apnea with hypoxia.

Federal anti-discrimination statutes are also applicable to some of the defendants' wrongdoings.

1311.   State actors including, but not limited to specific federal agencies, may have violated

sections of the Sherman Anti-Trust Act and their actions comprise the restraint of free trade.

1312.   State actor Defendants have also violated provisions of the Commerce clause of the U.S.

Constitution, and these Defendant state actors acted ultra vires beyond the limits of their

authority.


*Standing*
*Injury in Fact:  Economic damages of $ 6,275,000.00*

1313.   The actions and/or omissions of multiple defendants are the direct and proximate cause of

multiple damages to the Plaintiff and have resulted in substantial economic and monetary

injuries to the Plaintiff in the approximate aggregate amount of Six million two hundred seventy-

five thousand dollars  (US$ 6,275,000.00), for which the Plaintiff is seeking monetary remedies

along with potential punitive damages where such Defendants' conduct warrants such punitive

damages under federal or state laws, when same is not in contravention to the Eleventh

Amendment involving defendant state actors, except where such damages are assessed against

the employee or agent of a state actor who is acting in her/his personal capacity and those

damages are not assessed against the state coffers.

1314.  Over $ 275,000.00 were paid by the Plaintiff out-of-pocket to Defendants Vincent

DiCianni and Robert Stolzberg, in multiple retainers of $5,000 - $8,000 per retainer as requested

and billed fees for their legal services, which were also double-billed because of billing to junior

partners who allegedly did research and/or writing which would then be reviewed and re-billed

by the senior attorney.

1315.  At his annual salary as an Emergency Medicine Physician and Family Medicine

Physician, often working multiple jobs simultaneously between 1988 – 2002, of approximately

$165,000.00 per annum, the Plaintiff lost over $3,465,000.00 of income not earned during the 21

years from 2002 – 2023.

1316.  The unlawful, improper and unconstitutional actions of agencies of the Commonwealth

of Massachusetts were the proximate cause of the Plaintiff's loss of income of approximately

$3,465,000.00 (21 years x $165K per annum).

1317.  The tortious acts of co-defendants in this suit also contributed substantially to the

damages and injuries in the approximate amount of $2,500,000.00 caused to the Plaintiff

proximately caused by those tortious acts.

1318.  The unlawful, improper and unconstitutional actions of agencies of the Commonwealth

of Massachusetts also resulted in automatic federal Medicare exclusion for a period of

approximately 15 years, along with loss of the Plaintiff's DEA registration number and

Massachusetts controlled substances number.

1319.  The Medicare exclusion prevented the Plaintiff from working for any hospital or clinic in

any capacity, from performing any clinical laboratory work for which Medicare was a reimburser,

from engaging in any research position at any university or hospital which receives Medicare

funding, and from working for any medical device, medical supplies, pharmaceutical companies which received Medicare funding from the U.S. government. The marked and substantial loss of employment opportunities quickly accelerated the Plaintiff's descent into poverty, pennilessness, bankruptcy, homelessness, divorce, severe and extreme depression, social isolation and frequent community ostracism and humiliation.

### Felonious criminal acts by Defendant Colon's father/step-father
### Violent criminal assaults, rapes and Incest

1320.   Defendant Colon has alleged that her step-father was a Boston Police Officer.

1321.   Defendant Colon has also alleged that her father or step-father had committed multiple rapes of defendant Lourdes Colon as well as rapes of her sisters over a period of several years, including her older sister Yvonne, who later succumbed to HIV infection and AIDS.

1322.   Defendant Colon alleges that her step-father committed these incestual rapes while holding a loaded gun to her head, often while he was intoxicated.

1323.   Defendant Colon was crying and appeared quite upset when disclosing the information concerning these rapes at gun-point by her step-father.

### Plaintiff not trained to do psychotherapy nor does he hold himself out to the Public as such

1324.   The Plaintiff was not trained in psychology nor psychotherapy, and depended on the knowledge that Defendant Colon was seeing multiple psychologists and psychiatrists for her mental health care, so Plaintiff saw no need to refer Colon to any other mental health professionals who might undermine her then-current psychological treatment.

1325.   The psychologists treating Lourdes Colon included Dr. Paula Lazar, Dr. Lisa Wolfe and Dr. Amy Banks.

1326.   The Plaintiff had not received any training about transference or counter-transference –
techniques used by psychotherapists.

1327.   The Plaintiff never engaged in psychotherapy with defendant Lourdes Colon.

1328.   The Plaintiff had no knowledge of whether any transference or counter-transference was
or could have been occurring between himself and Colon; the plaintiff was not educated nor
trained in how to handle transference or counter-transference.

1329.   It was reasonable for the Plaintiff to rely upon the reassurances, warranties and
guarantees provided by Defendant Lisa Wolfe, when she advised, encouraged, approved and
dictated verbatim the terms of the Express Bilateral Contract terminating the doctor-patient
relationship.

1330.   The Plaintiff had no duty nor obligation to learn, ascertain or determine whether
defendant Colon had significant psychopathology in 1992.

1331.   Prior to 1997, the Plaintiff did not know that Colon suffered from Dissociative Identity
Disorder or Multiple Personality Disorder.

*Accelerated mental deterioration of defendant Lourdes Colon between 1995 – 1996*

1332.   Following the formation of the express bilateral contract between the Plaintiff and the
defendant Lourdes Colon, which terminated the doctor-patient relationship and was guided and
dictated by defendant Lisa Wolfe, the Plaintiff began to meet weekly with Colon at his MIT
office while he was a fellow in the Advanced Study Program.

1333.   These regular weekly meetings continued from September 1992 to the spring of 1994.

1334.   Between 1992 – 1994, defendant Colon seemed relatively healthy psychologically – able

to maintain regular work hours as an EMT, and planning her study for the MCAT exam because she wanted to become a doctor.

1335.  In July 1994, the Plaintiff began a Family Practice postgraduate residency program at the Greater Lawrence Family Medicine Residency based out of Lawrence General Hospital in Lawrence, MA.

1336.  Due to the long residency hours, often requiring training and patient care during evenings and weekends, the Plaintiff was not able to meet weekly with defendant Colon, and the frequency of meetings between the Plaintiff and Colon reduced to once every 6 weeks to 3 months during 1994 - 1996. During these later couple of years, Colon seemed more depressed.

1337.  In 1995, there were two unplanned serendipitous meetings between the Plaintiff and Colon in downtown Lexington, MA, where Colon was meeting regularly with her psychologist Lisa Wolfe and where the Plaintiff was meeting regularly with his psychologist Andrea Celenza.

1338.  From 1991 through 1996, Defendant Lourdes Colon was continuously under the care of psychologists including but not limited to Dr Paula Lazar, Dr Lisa Wolfe and Dr. Amy Banks - to the best of the Plaintiff's knowledge.

1339.  There was no period of time between 1991 - 1996 when the Plaintiff was concerned that defendant Colon was not receiving mental health care from one psychologist or another.

1340.  The Plaintiff never believed that he was acting as a psychologist for Colon, nor that he was providing psychotherapy for Colon, nor that there was any need for him to do so because of his knowledge of the psychological care being provided by Dr. Paula Lazar, Dr. Lisa Wolfe and Dr. Amy Banks during the years 1989 – 2002.

1341.   Since the Plaintiff first signed the express bilateral contract terminating the doctor-patient, he did not know or suspect of any mental health problem of Colon - and Dr Wolfe's reassurances and promises while guiding the termination further reassured the Plaintiff that Colon was doing well and was mentally and psychologically stable.

1342.   Until late in 1995, Colon appeared to be in reasonably good spirits, functioning well in her work as an EMT and in coursework as well.

*Hysterical cries from Colon stating that "they are making me do this"*

1343.   During the summer of 1996 (or 1997?), as the Plaintiff was walking down the street in Lexington, MA – on his way to see Dr Celenza - he heard a car repeatedly beeping its horn.

1344.   When he turned around the Plaintiff saw that Defendant Lourdes Colon was the driver of the vehicle which was repeatedly beeping its horn and the Plaintiff realized that Colon was attempting to get his attention so the Plaintiff went over to the driver's side of the vehicle to speak with Colon.

1345    As the Plaintiff drew closer, Colon rolled down her window and began crying hysterically expressing how "they" were forcing her to do things she did not want to do involving the courts and the medical board.

1346.   The Plaintiff was quite surprised to see how emotional she was, and was caught off guard by hearing about the courts and the medical board (this was sometime before the Plaintiff received any letter from BORIM or summons/complaint from Superior Court).

1347.   While crying hysterically, Colon was apologizing prolifically that she did not want to take those aggressive legal actions against the Plaintiff and that she was very sorry that it was happening.

1348.   The Plaintiff could see that Colon was in great distress and that she was feeling very sorry about what she was doing, against her will, to harm the Plaintiff because of the adamant coercion of Dr Lisa Wolfe, Stanley Spero and her sister Yvette.

1349.   The Plaintiff did believe that Colon was speaking in earnest and truly did not want to cause any harm or injuries to the Plaintiff.

1350.   The Plaintiff believed that third parties (such as her sister Yvette, defendant Lisa Wolfe and her attorney Stanley Spero) were strongly coercing Colon into taking actions which were very upsetting to her and not something which she wanted to do voluntarily.

1351.   Following this, during another week in August 1996 (or 1997?), the Plaintiff went into a CVS Pharmacy in downtown Lexington and was looking at some magazines on a rack, when he saw Colon had entered the store and was standing about 8 feet from the Plaintiff watching him.

1352.   As his attorney had advised him not to speak to Colon because of the litigation *Colon v. Weinberg, Wesselhoeft, Boston Evening Medical Center, et al.*, he simply left the CVS when he saw Colon there.

1353.   On or about November-December 1996, Colon (represented by defendant Attorney Stanley Spero) filed a civil lawsuit against the Plaintiff, the director of the medical center Robert Wesselhoeft, III and the Boston Evening Medical Center in Middlesex Superior Court entitled *Lourdes Colon v. Robert Weinberg, Robert Wesselhoeft, Boston Evening Medical Center, et al.*

*Downhill descent of Colon's mental health during 1996 - 2000*

1354.   Following the filing of the suit against the Plaintiff in 1996, defendant Colon began her

downhill descent and spiral into severe mental health difficulties, dissociative personality

changes, and psychotic decompensation with formation of a Multiple Personality Disorder

probably due to the severe psychological stresses caused by the combined coercion by her sister

Yvette, Dr Lisa Wolfe and defendant attorney Stanley Spero.

1355.   Prior to the legal proceedings, the Plaintiff believes that his support provided needed

mental health pillars protecting Colon from any marked deterioration of her mental health, and

when Yvette, Wolfe and Spero coerced Colon into separating from the Plaintiff, Colon quickly

deteriorated into a downward spiral in her mental health.

1356.   Although the Plaintiff had little personal contact with Colon following the filing of the

lawsuit in December 1996, he was able to read the medical records from more than 15 doctors

who were treating Colon which were obtained during the judicial discovery process - which

allowed the release of medical records and psychiatric records from all plaintiffs who state

mental health problems as part of their Complaint filed in any lawsuit (except for the records of

Dr Paula Lazar which were never released in spite of multiple requests during discovery).

1357.   The Plaintiff believes that defendant Attorney Stanley Spero purposefully concealed the

medical records of Dr Paula Lazar during the discovery process in order to interfere with the

judicial proceedings and obstruct the administration of justice because he did not want the

Plaintiff or Plaintiff's counsel to learn what was contained in the records of Dr Paula Lazar.

1358.   On or about February 1997, the Complaint and summons for the suit *Colon v. Weinberg,*

*Wesselhoeft, Boston Evening Medical Center, et al.* was served upon the Plaintiff while he was

working at the Boston Evening Medical Center, where he was treating patients and the same

clinic where the Plaintiff first began treatment of Colon.

1359.   The receipt of this lawsuit caused the Medical Director Robert Wesselhoeft, III, to ask the

Plaintiff to take a leave of absence.

1360.   Initially upon his receiving the Summons and Complaint in 1997 for the action *Lourdes*

*Colon v. Robert Weinberg, Robert Wesselhoeft, Boston Evening Medical Center, et al.* in Suffolk

Superior Court, the Plaintiff notified his malpractice insurer Defendant ProMutual, which

assigned to the Plaintiff the Defendant attorney Claudia Hunter to handle the medical

malpractice proceedings in Superior Court.

1361.   The legal costs of Defendant Claudia Hunter were paid by the malpractice insurer

ProMutual, which introduced an inherent conflict of interest – while Atty Hunter was defending

the Plaintiff, she also had the duty of protecting the pecuniary interests of ProMutual.

1362.   The Plaintiff had to pay for his three subsequent attorneys out-of-pocket: Vincent

DiCianni (1998-99), Robert Stolzberg (1999-2000) and John Flym (2000-2005) – with legal fees

topping $250,000.00

1363.   Attorneys DiCianni and Stolzberg are both co-defendants in the instant action.

1364.   John Flym passed away on or about 2017 in Paris, but he would not have been a co-

defendant had he still been alive.

1365.   On average, the three attorneys cost the Plaintiff approximately $75,000 each out-of-

pocket resulting in retainers and legal bills in the approximate amount of $225,000.00 which the

Plaintiff paid out of his savings.

*Conflict of Interest between the insured and the insurer*

1366.   However, Defendant Claudia Hunter had an inherent conflict of interest which she never discussed with the Plaintiff: on the one hand, Defendant Claudia Hunter had a legal duty to defend the Plaintiff in the judicial proceedings, and on the other hand, she had a legal duty to also to protect the interests of the insurance company ProMutual.

1367.   Sometimes the legal and economic interests of the insured and the insurer coincide, except that the insurer usually must pay some amount out for damages or injuries.

1368.   The largest conflict of interest occurs when the insured wants to fight and have their day in court, but the attorney perceives a potential large financial risk for the insurer because most trials are like a crap-shoot and you can never be sure of the outcome, so the attorney may advise against going to court to try to minimize the financial risk to the insurer.

1369.   In the instant case, Defendant Hunter decided that it would be best to settle out of court for $ 150,000 rather than risk a trial which might result in a much greater financial loss for Defendant ProMutual in a jury trial – which many litigators often refer to as a "crap shoot" where the issuing judgment is often unpredictable. The Plaintiff believes that this out-of-court settlement was greatly detrimental to his interests and favored the med-mal insurer ProMutual because this settlement impeded the revelation and discovery of the 1992 Express bilateral contract terminating the doctor-patient relationship along with its subsequent modification and

authorizing the Plaintiff to engage in sexual relations with Colon, which would otherwise have been unethical.

1370.   Defendant Hunter never explained to the Plaintiff the consequences of settling out of court and likelihood of the matter going to the medical board potentially resulting in the Plaintiff losing his medical license.

1371.   Protecting the financial interests of Defendant ProMutual, by advising the Plaintiff to settle7 out of court - thus minimizing the financial exposure of ProMutual by avoiding a trial, Defendant Hunter threw the Plaintiff under the bus.

1372.   Claudia Hunter had both a legal and ethical duty to advise the Plaintiff of the legal consequences of settling the suit out-of-court, advise the Plaintiff of the likelihood that such settlement would lead to action by the state medical board and to inform the Plaintiff regarding the conflict of interest she had in representing both the Plaintiff and the medical malpractice insurer ProMutual.

1373.   Thus, in this conflict of interest, Defendant ProMutual benefitted and won, and the Plaintiff lost - resulting in his losing his medical license, his livelihood and only way he knew to earn an income, his wife divorcing him, financial bankruptcy and ruin, Medicare exclusion which prevented him from doing any sort of work, lab work, research, clerical work for any hospital, clinic, or other entity that receives Medicare funding, community ostracism, shame and humiliation, severe emotional distress and suicidal ideation, and existential wandering without purpose.

1374.   Prior to September 1992, the Plaintiff had never had any inappropriate nor any sexual contact with Defendant Lourdes Colon

1375.   Following the express bilateral contract made between the Plaintiff and the Defendant Lourdes Colon in September 1992 at HRI under the guidance of Defendant Lisa Wolfe, which terminated the doctor-patient relationship, the Plaintiff earnestly believed that defendant Lourdes Colon was no longer his patient as was explained by Defendant Lisa Wolfe.

1376.   The consideration for this bilateral express contract comprised the Plaintiff's waiver of his prior fiduciary duties, which would otherwise have invited professional discipline and professional censure without such a termination contract.

1377.   By mutual agreement between the Plaintiff and Lourdes Colon, this 1992 Express Bilateral Contract was modified to provide a clinical-nonclinical binary classification scheme for classifying time and place according to either a clinical one or a nonclinical one.

1378.   The Plaintiff continued to act in reliance upon this express bilateral contract to his detriment.

1379.   With the Plaintiff's assistance, the Defendant Colon arranged to switch her primary care physician at the Boston Evening Medical Center from the Plaintiff to Dr David Fringer, and began to have regular appointments with Dr Fringer when she had a medical problem.

1380.   Prior to September 1992, the Defendant Colon had the Plaintiff designated as her primary care physician and the Plaintiff provided all her medical care prior to the contractual termination of the doctor-patient relationship.

1381.   Following September 1992, Defendant Colon began to see numerous physicians – approximately ten different physicians to provide her medical care; the psychological care of Colon appeared to alternate between Dr Paul Lazar, Dr Lisa Wolfe and Dr. Amy Banks.

1382.   When defendant attorney Vincent DiCianni stopped his representation of the Plaintiff on or about 1999, all the medical records he had in his possession were transferred first to defendant attorney Robert Stolzberg and then to Professor John Flym at Northeastern University where he was a professor of law.

1383.   Following this transfer of medical records, the Plaintiff had the opportunity to read most of the medical records which were in the possession and control of John Flym; the records of defendant Paula Lazar were never provided to the Plaintiff or his counsel despite multiple requests for such records during discovery.

1384.   During the drafting of the Stipulations in 2001, John Flym had asked the Plaintiff to read over these medical records of Lourdes Colon, to help Flym find specific pieces of information in the medical records – thus the Plaintiff had the opportunity to read over several hundred pages of clinical information on defendant Lourdes Colon, from most of her medical/clinical providers except the records of Dr Paula Lazar.

1385.   Defendant attorney Stanley Spero did conceal and withhold the medical records of Paula Lazar, despite multiple requests by the Plaintiff and his counsel, in order to conceal evidence from the Court and from the Plaintiff.

1386.   The concealment and withholding of the medical records of Paula Lazar, by defendant Stanley Spero, does comprise obstruction of justice and comprised intentional tortious acts against the Plaintiff in depriving him of his constitutional right to Due Process of law, and also comprised acts intended to deprive the Plaintiff of his civil rights and civil liberties while acting under the color of law which is covered by 42 U.S.C. § 1983.

*Substantial deterioration of the mental state of Colon*

397

1387.  During the period of time 1996 – 1997, the mental state of defendant Lourdes Colon did undergo substantial deterioration, with splintering of her personality under the process of dissociative changes with the formation of multiple personalities.

1388.  The marked psychological and psychiatric changes in Colon were coincident with the commencement of legal proceedings against the Plaintiff and in view of the emphatic declarations of Colon in Lexington, MA, that "they are making me do things I don't want to do" and "they are forcing me to do these things with the medical board and court" while hysterically crying revealed the enormous psychological stresses and strains being placed upon her.

*Control and management of Court cases and communications*
*Liability for legal actions initiated by attorneys*

1389.  Feeling desperate and cornered because of Defendant Colon's refusal to admit the termination contract , the Plaintiff wrote an angry letter in December 1999 to BORIM informing them that if they proceeded to elicit perjury concerning the non-existence of the termination contract, that the Plaintiff would guarantee the prosecution of all those who perjured or suborned perjury to the full extent of the law.

1390.  The exact words and expressions have been bastardized by state agencies including the Massachusetts Supreme Judicial Court and the Maine Supreme Judicial Court - so a copy of that letter is attached to this complaint as an appendix; this bastardization of the intent and words of the letter were meant to portray the Plaintiff in a bad light and portray him as a "bad actor."

1391.  This letter was construed by BORIM, Magistrate Sarah Luick and the Massachusetts Supreme Judicial Court as an attempt by the Plaintiff to intimidate defendant Colon and obstruct judicial proceedings in spite of the fact that the letter was never sent to defendant Colon but only

to BORIM – in an attempt to emphasize the importance of all parties to tell the truth about the 1992 termination contract.

1392.   After the Defendant Colon spent five years denying the existence of the termination contract, much to the consternation and distress of the Plaintiff, Magistrate Sarah Luick made a finding of fact that an agreement terminating the doctor-patient relationship was made at HRI in September 1992 based on the available evidence and medical records.

> *Defendant Lisa Wolfe's deceptive and fraudulent conduct*
> *Couples therapy for the Plaintiff and Lourdes Colon*

1393.   On or about 1995-96, Dr Lisa Wolfe did arrange for a joint session with the Plaintiff and Colon in her Lexington, MA office where she regularly met with her patients.

1394.   This joint meeting was entered and recorded in Dr Wolfe's medical records in Lexington, MA.

1395.   Dr Wolfe told the Plaintiff that she considered him to be her patient as well because she was providing psychological care to Colon.

1396.   At this meeting, Dr Wolfe told the Plaintiff that he may be financially responsible for joint therapy sessions involving Colon and the Plaintiff.

1397.   At this meeting, Colon was encouraged to express her feelings and she turned toward the Plaintiff with an angry and furious face and began screaming very loudly how she was repeatedly raped by her step-father, allegedly a Boston police officer, while he held a gun pointed at her head.

1398.   The Plaintiff felt as if he were being blamed for these violent atrocious incestual rapes allegedly committed by her step-father.

1399.   Colon had alleged on multiple occasions that her step-father was a Boston police officer who thus had a permit for carrying a firearm because of his law enforcement duties.

1400.   Colon had also alleged in the past that her sisters were also raped by their police officer step-father.

1401.   On or about 2000, the Plaintiff drafted and sent a 93A Demand Letter to Dr Wolfe alleging unfair and deceptive trade practices in violation of M.G.L. c.93A because Dr Wolfe did not fully acknowledge and admit her role in terminating the doctor-patient relationship.

1402.   Defendant Wolfe provided this 93A Demand Letter to her attorney.

1403.   When BORIM contacted Dr Wolfe, her counsel stated that she could not respond to them pending the 93A action initiated by the Plaintiff.

1404.   Wolfe also had to refuse the request to disclose any clinical information or release any medical records under the doctor-patient privilege without the consent of both Colon and the Plaintiff, who was previously informed that he too was a patient of Dr Wolfe's.

*Plaintiff's representation by Professor John Flym*

1405.   At that time, Professor John Flym had agreed to represent the Plaintiff in the DALA

proceedings *In the matter of Robert P. Weinberg, D.O.* and Professor Flym and BORIM counsel

Alice Oliff had agreed to submit Joint Stipulated Findings of Fact to Magistrate Sarah Luick.

1406.   Professor Flym asked the Plaintiff to release defendant Wolfe from the 93A allegations,

to allow her to interact with BORIM, and the Plaintiff signed a written release which released Dr

Wolfe from the allegations of false and deceptive trade practices and other professional

misconduct engaged in by Dr Wolfe prior to the date of the release.

1407.   BORIM asked defendant Lisa Wolfe about the meeting and termination of the doctor-

patient relationship, and in an untruthful and deceitful manner attempting to protect her license

and cover her ass, Defendant Wolfe responded "That is not the sort of thing that I usually do,"

basically avoiding answering the question fully or completely about her knowledge that she

dictated the agreement which the Plaintiff and defendant Colon wrote out.

1408.   However, defendant Wolfe's continued silence and concealment of her role in

terminating the doctor-patient relationship has caused additional harms and legal injury to the

Plaintiff, substantially contributing to the loss of his medical license and economic damages

partially accounted for through the loss of income of $3,465,000.00, and these additional harms

and injuries are not released by the waiver and release signed in 2000, which only relieved

liability on tortious acts and injuries produced by Dr Wolfe PRIOR to the signing of the release.

1409.   This signed release could not possibly provide protection from liability for her continued

and persistent deception and concealment of her role in terminating the doctor-patient

relationship.

*BORIM claims that Plaintiff filed "Robert Weinberg v. Lourdes Colon" for improper purposes of intimidating Colon and obstructing judicial proceedings*

1410.  This suit was drafted, signed & filed by defendant DiCianni under Rule 11.

1411.  Incompetent and negligent legal advice by these attorney defendants did result in the filing of the suit *Robert Weinberg v. Lourdes Colon* because Attorney DiCianni insisted and demanded that it would be the only way that he could ascertain her credibility as a witness and DiCianni insisted upon the importance of meeting with Colon and interviewing her.

1412.  The Plaintiff never thought of nor wanted to file the suit *Robert Weinberg v. Lourdes Colon* because he had no interest in causing harm or obtaining any sort of revenge upon the Defendant Lourdes Colon.

1413.  The filing of *Robert Weinberg v. Lourdes Colon* in Suffolk Superior Court represented Defendant DiCianni's third attempt to obtain testimony from Defendant Colon, which he wanted to assess her credibility as a witness.

1414.  Defendant DiCianni's first attempt to meet and interview Colon was an oral telephone request to Defendant Colon's counsel – Stanley Spero, and this was denied immediately.

1415.  Defendant DiCianni's second attempt to interview Colon comprised his filing a motion in Suffolk Superior Court in the case *Lourdes Colon v. Robert Weinberg, Robert Wesselhoeft, Boston Evening Medical Center, et al.* to depose Colon, which the Court denied.

1416.  Finally, Defendant DiCianni informed the Plaintiff that his final and third attempt to interview Colon would comprise filing a suit against her in Superior Court, again insisting on the importance of ascertaining her credibility.

1417.   When Defendant DiCianni informed the Plaintiff that he wanted to file suit against Colon, he did not explain to the Plaintiff the serious and disastrous consequences that such action could later have on the judicial considerations and potential misconstruing of such action by the BORIM and the Massachusetts Supreme Judicial Court and that the filing of such suit might be a substantial factor leading to the revocation of the Plaintiff's medical license.

1418.   Also DiCianni's lawsuit *Weinberg v. Colon* was subsequently dismissed by the Court under the anti-SLAPP statute.

1419.   Defendant BORIM and Defendant Massachusetts Supreme Judicial Court both construed the filing of *Robert Weinberg v. Lourdes Colon* as an attempt by the Plaintiff to intimidate defendant Colon and obstruct the judicial proceedings.

1420.   The filing of *Robert Weinberg v. Lourdes Colon*, based on the incompetent and negligent legal advice of Attorney DiCianni, caused substantial harm and injury to the Plaintiff when the Defendants BORIM and Massachusetts Board of Registration in Medicine assessed severe penalties against the Plaintiff and considered the filing of *Robert Weinberg v. Lourdes Colon* as a substantial factor in the decision to revoke the Plaintiff's medical license.

1421.   The Massachusetts Supreme Judicial Court and Maine Supreme Judicial Court made prejudicial findings and rulings which were not supported nor corroborated by valid evidence, nor were they supported by any stipulated findings of fact but were based on hearsay.

1422.   Such judicial findings and rulings, unsupported by substantial or valid evidence, violates the Plaintiff's right to Due Process of Law and violates the Plaintiff's civil rights.

1423.   The Plaintiff will produce evidence which proves that those judicial findings and rulings are not supported by valid evidence and are tantamount to abuse of discretion by the court, which will be proved using the law firm records and testimony to be obtained from defendants DiCianni and law firm Ferriter Scobbo, to be proved by a preponderance of the evidence.

1424.   The Plaintiff will prove that those judicial findings, rulings, holdings and decisions are without foundation, not supported by substantial evidence, not stipulated to, but were consequent to the acceptance of biased hearsay without providing the Plaintiff with a hearing in violation of his Due Process rights.

1425.   The Plaintiff will obtain the relevant testimony, records and documents through the discovery phase of the instant litigation.

1426.   Such judicial abuse of discretion violates the constitutional rights of the Plaintiff, but the Plaintiff does not seek monetary damages for such abuse of discretion but only seeks equitable relief from this Court.

1427.   These legal issues regarding the constitutionality of state statutes and regulations and this instant litigation do not violate the federal abstention doctrine.

1428.   Sovereign immunity does not justify the violation of the Plaintiff's civil rights or constitutional rights and such sovereign immunity does not immunize the respective court against Declaratory Judgment that the specific findings or rulings in question are unsupported by evidence, based on hearsay, and comprise Abuse of Discretion by the court.

*Live Case and Controversy*

1429.   These specific federal subject matter issues involving the named defendants are being presented to this Court for the first time in the judicial system and have not been fully litigated nor prosecuted in any other competent Court of Law, and as such res judicata does not apply to the questions of fact and issues of law being presented to this Court ab initio.

1430.   The state action issues are not subject to the Statute of Limitations because these state policies, statutes and regulations are ongoing, continuing and capable of being repeated in the present time – capable of repetition yet evading review -, thus rendering the Statute of Limitations moot in light of Equitable Relief sought. *Roe v. Wade*

1431.   The Maine Board of Bar Examiners refused to admit the Plaintiff to the practice of law under the pretext that the Plaintiff was not able to prove his good character and was therefore not fit for the practice of law.

*Charitable and Humanitarian Activities of the Plaintiff*
*(evidence of the Plaintff's good character)*
*Bridge over Troubled Waters, Boston, MA*

1432.   Due to his desire to help less fortunate persons, the Plaintiff volunteered his time at approximately 2 – 4 shifts per month to the humanitarian organization "Bridge over Troubled Waters"   https://bridgeotw.org/

1433.   The mission of the Boston organization Bridge over Troubled Waters is stated on its website: "Bridge is Boston's foremost agency providing life-changing services for homeless, runaway and at-risk youth."

1434.   After obtaining his Massachusetts full license to practice medicine in 1988, the Plaintiff volunteered providing free medical services at the Bridge over Troubled Waters during the years 1990 – 1996 (during this time Tracy Rollins was the coordinator for medical volunteers).

1435.   According to a public health research study published in 2008 entitled "Community volunteerism of U.S. Physicians" authored by David Grande and Katrina Armstrong, data analysis of the 2003 Current Population Survey Volunteer Supplement, a cross-sectional, nationally -representative, in-person and telephone survey of 84,077 adult citizens, including 316 physicians, "According to the survey, 39% of physicians had volunteered in their community in the past 12 months compared to 30% of the general public (=0.002) and 57% of lawyers (<0.0001)." (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2596493/ ).

*Flights for Humanity - a 501(c)(3) non-profit organization*

1436.   On or about 1995 the Plaintiff garnered his Private Pilot license having completed all the requirements set by the Federal Aviation Administration ("FAA") which he had been studying for and taking flying lessons for a couple of years, then most-recently at the Bedford-based Executive Flyers Aviation (https://generalaviationnews.com/2014/03/05/executive-flyers-aviation-celebrates-50-years/ ) and having taken his final flight exam with Michael Goulian, Sr.

1437.   On or about 1996, the Plaintiff purchased a single-engine Piper PA-32-300 Cherokee Six with the tail number N7073R (

https://registry.faa.gov/aircraftinquiry/Search/NNumberResult?NNumberTxt=4073R ).

1438.   Wanting to combine his passion for flying and desire to provide humanitarian medical care to indigent persons in third-world countries, the Plaintiff filed for and obtained 501(c)(3) non-profit status from the Internal Revenue Service in 1997 for his new non-profit organization called "Flights for Humanity" which was partially inspired by President Jimmy Carter's "Habitat for Humanity." (Flights For Humanity Incorporated | Littleton Common, Massachusetts | Robert

Weinberg (allbiz.com); FLIGHTS FOR HUMANITY, INCORPORATED :: Massachusetts (US) ::

OpenCorporates ).



1439.   The Plaintiff invested over $24,000 of his personal funds into Flights for Humanity's charitable and humanitarian medical missions.

1440.   The first significant humanitarian mission took place in 1998, when the Plaintiff flew with his co-pilot to Atlanta, Georgia to pick up numerous medical supplies which had been donated to Flights to Humanity to transport those medical supplies in his Piper Cherokee Six N4073R to Chiappas, Mexico.

1441.   In 1998, there was civil strife and paramilitary actions in Chiappas, Mexico which had displaced over 30,000 Chiappas citizens from their homes during violent paramilitary actions against indigenous peoples' movement and these displaced persons were living in tent camps without medical care or supplies. ( Chiapas conflict - Wikipedia )

1442.   Plaintiff had read about the dire situation of the Chiappas citizens and decided that this would be an important and humanitarian mission for Flights for Humanity; so the Plaintiff contacted several medical and public health officers in Chiappas, Mexico and began planning a humanitarian mission to transport much needed medical supplies to the tent camp there.

1443.   At that time in 1998, there was considerable violence accompanying the paramilitary actions of the Zapatista troops fighting with the Mexican federal military, so coming into Chiappas, Mexico into the tent refugee camps did present a considerable risk of bodily harm and even some risk of death from the raging war.

1444.   With his 6-year old son Joshua and wife anxiously waiting at home, the Plaintiff hoped to reduced this risk of bodily harm or death, by obtaining some U.S. government protection for this mission.

1445.   After writing to Senator Edward Kennedy for his support, Senator Kennedy did write a letter in support of this humanitarian mission and the Plaintiff brought this letter from Senator Kennedy which had the official seal of the United States Senate on it.

1446.   The Plaintiff later learned that some of the Mexican army and generals were waiting for him to land in Chiappas, in order to interdict and prevent the reception of medical supplies to the displaced refugees.

1447.   However, due to inclement weather, the original itinerary for the date of arrival into Chiappas airport was delayed by 2 days while the Plaintiff and co-pilot waited out the storms in St. Charles Parish, Louisiana.

1448.   The letter of support from Senator Edward Kennedy was useful for the Plaintiff and did provide some measure of protection in the milieu of the violent paramilitary-military war.

1449.   When the Plaintiff finally arrived 2 days late, the army had left and a phone call brought the Chiappas medical team to the airport to meet the Plaintiff.

1450.   Plaintiff advertised on Craigslist for a co-pilot to assist with this mission and found a co-pilot from Maine who was interested in volunteering his time and efforts for this humanitarian mission.

1451.   When the turbulent storm let up, the Plaintiff flew with his co-pilot to Atlanta, GA in his Piper PA-32-300 Cherokee Six, which Mark Scott - an aircraft mechanic from Falcon Air in Lawrence, MA - had removed several seats, converting the Plaintiff's single-engine plane into a cargo plane.

1452.   Articles were published about the Plantiff's mission with Flights for Humanity, Inc. to deliver medical supplies to the refugee camp in Chiappas, Mexico, in the Fitchburg Sentinel - a daily newspaper, MIT journal "Technology Review", and Tufts Medical School "Tufts Medicine" describing the humanitarian medical missions conducted by Flights for Humanity.


*National Disaster Medical System ("NDMS") - DMAT-1*

*https://aspr.hhs.gov/NDMS/Pages/dmat.aspx*

1453.   Between 1989 – 2002, the Plaintiff was an Emergency Medicine Attending Physician at several Massachusetts community hospitals including: Hale Haverill Municipal Hospital, Anna Jaques Hospital, Nantucket Cottage Hospital, Winthrop Hospital, Somerville Hospital, Lawrence Memorial Hospital of Medford, Lawrence General Hospital, Whidden Memorial Hospital, Melrose-Wakefield Hospital, Baystate Medical Center and a New York hospital – Jones Memorial Hospital in Wellsville, NY.

1454.  Since 1990, the Plaintiff has been a member of the American College of Emergency Physicians ("ACEP"). ( https://www.acep.org/ ).

1455.  The Plaintiff continues to serve in a voluntary capacity as a member of the ACEP Disaster Preparedness and Response Committee. (https://www.acep.org/how-we-serve/committee/committees-list/disaster-preparedness--response-committee2 ).

1456.  The Plaintiff was appointed as a U.S. federal Medical Officer in the United States National Disaster Medical System ("NDMS") - a subdivision of the U.S. Department of Health and Human Services, under the U.S. Public Health Service  (see appointment document from U.S. D.H.H.S., Appendix D)  (https://aspr.hhs.gov/NDMS/Pages/default.aspx)

1457.  During the period of time 1999 – 2002, the Plaintiff was team captain of the Boston-based Disaster Medical Assistance Team 1 (DMAT-1) under the command of Dr Susan Briggs, Trauma  Surgeon, Massachusetts General Hospital, Boston, MA (https://www.hsph.harvard.edu/news/features/following-hurricane-ian-mass-medical-team-brings-ed-to-hospital-parking-lot/dmat-1-portrait_1200x800/ ).

*U.S. Congressional Letter of Commendation*

1458.  At a State of the Union address on or about the year 2000 - 2001 given by the President and attended by Congress, the Plaintiff was deployed under the NDMS and situated in a federal building adjacent where his DMAT team was prepared for a potential evacuation of Congress if a bio-terrorist attack were to occur, and the Plaintiff's DMAT team would detoxify the President and congressional members and administer the relevant anti-toxin if needed.

1459.  For his service to the United States government, as a member of the DMAT team deployed during the State of the Union Address, the Plaintiff received a U.S. Congressional

Letter of Commendation naming him personally for his national service with the gold seal of the United States Congress embossed on the letterhea.

Case:    *Robert P. Weinberg v. Maine Board of Bar Examiners*

1460.  The Plaintiff earned his Juris Doctor degree cum laude from the New England School of Law in Boston in 2006.

1461.  Following 8 years of law study and preparation for the Bar exam, the Plaintiff passed the Bar examination in Maine on or about 2010, but the Maine Board of Bar Examiners declined to admit the Plaintiff to the Maine Bar based on documentation that the Plaintiff provided in his Bar application concerning the revocation of his medical license and prior litigation where the Plaintiff was a party.

1462.  The Plaintiff moved for a hearing before the Maine Supreme Judicial Court to challenge the Bar Examiners determination that the Plaintiff had not proved his good character and thus his fitness to practice law.

1463.  The Maine regulations provide Bar applicants with an opportunity to challenge decisions when they are not admitted to the Bar, and under the regulations the Bar applicant files a case with the Maine Supreme Judicial Court – in this case, entitled "Robert P Weinberg v. Maine Board of Bar Examiners", which by regulation is a *de novo* hearing where the Bar applicant is permitted to introduce new evidence which may not have been considered previously.

1464.  This is not an appellate proceeding where only issues of law may be addressed, but is a completely new trial governed by the Maine Rules of Civil Procedure.

1465.  The Maine Rules of Evidence has Rule 201 providing for Judicial Notice of Adjudicative Fact.

1466.   The following text on Rule 201 is copied and pasted from

https://casetext.com/rule/maine-court-rules/maine-rules-of-evidence/article-ii-judicial-

notice/rule-201-judicial-notice-of-adjudicative-

facts#:~:text=In%20Maine%20there%20is%20no%20distinction%20between%20civil,has%20b

een%20carried%20over%20into%20the%20restyled%20Rule :

> Rule 201 - Judicial Notice of Adjudicative Facts **(a) Scope.** This rule governs judicial
> notice of an adjudicative fact only, not a legislative fact. **(b) Kinds of facts that may be
> judicially noticed.** The court may judicially notice a fact that is not subject to reasonable
> dispute because it: **(1)** Is generally known within the trial court's territorial jurisdiction; or
> **(2)** Can be accurately and readily determined from sources whose accuracy cannot
> reasonably be questioned.**(c) Taking notice.** The court:**(1)** May take judicial notice on its
> own; or**(2)** Must take judicial notice if a party requests it and the court is supplied with
> the necessary information.**(d) Timing.** The court may take judicial notice at any stage of
> the proceeding.**(e) Opportunity to be heard.** On timely request, a party is entitled to be
> heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If
> the court takes judicial notice before notifying a party, the party, on request, is still
> entitled to be heard.**(f) Instructing the jury.** The court must instruct the jury to accept
> the noticed fact as conclusive.
> *Me. R. Evid. 201*
>
> Adopted effective 1/1/2015.
> ***Maine Restyling Note [November 2014]***
>
> *Maine Rule 201 is similar, but not identical to Federal Rule 201. In Maine there is no
> distinction between civil and criminal cases in the effect of judicial notice. In both cases
> the court instructs the jury that the fact noticed should be accepted as conclusive. This
> policy choice has been carried over into the restyled Rule. See also 16 M.R.S. §§401 -
> 406 (addressing judicial notice of laws of other jurisdictions).*
>
> ***Federal Advisory Committee Note***
>
> *The language of Rule 201 has been amended as part of the restyling of the Evidence
> Rules to make them more easily understood and to make style and terminology consistent
> throughout the rules. These changes are intended to be stylistic only. There is no intent to
> change any result in any ruling on evidence admissibility.*

1467.   The Plaintiff prepared several copies of his Motion for the Court to take Judicial Notice

of Adjudicative Facts in compliance with Rule 201 of the Maine Rules of Evidence so that he

might deliver one copy to the Court, one copy to adverse party Maine Board of Bar Examiners,

and keep one for himself.

1468.  The following legal facts describe the scope and purpose of Rule 201 of the Maine Rules

of Evidence:

> Scope:
> (a) It applies to adjudicative facts, which are facts that are directly relevant to the specific case at hand, as opposed to legislative facts, which are broader generalizations about social, economic, or scientific matters.
> Kinds of Facts That May Be Judicially Noticed:
> (a) Facts that are generally known within the trial court's territorial jurisdiction (e.g., the location of a well-known landmark).
> (b) Facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned (e.g., official government records, scientific publications).
> Taking Notice:
> (a) The court may take judicial notice on its own initiative.
> (b) The court must take judicial notice if a party requests it and provides the necessary information.
> Timing:
> (a) Judicial notice can be taken at any stage of the proceeding, including during trial.
> Opportunity to be Heard:
> (a) Parties have the right to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed.
> Instructing the Jury [applies to the Bench – Judge as well]:
> (a) In both civil and criminal cases, the court must instruct the jury [or factfinder] to accept the noticed fact as conclusive.
> Key Points:
> (a) Although Rule 201 is in the Maine Rules of Evidence, it applies to both civil and criminal cases.
> (b) It covers only adjudicative facts, not legislative facts.
> (c) The court can take judicial notice on its own or upon a party's request.
> (d) Parties have the right to be heard before judicial notice is taken.
> (e) The jury [or factfinder] must accept judicially noticed facts as conclusive.

1469.  The Plaintiff planned to admit the following documentary evidence of his character under

Rule 201 of the Maine Rules of Evidence:

> (a) Congressional Letter of Commendation for his national service during the State of the
>
> Union Address (Appendix  attached);

(b) Public Health Service DHHS employment record from the U.S. Department of Health and Human Services documenting his appointment as a U.S. federal medical officer in DMAT-1 of the National Disaster Medical System (Appendix attached );

(c) 501(c)(3) declaration from the Internal Revenue Service granting non-profit status to the Plaintiff's humanitarian charitable organization "Flights for Humanity, Inc." (Appendix attached)

(d) official letter from the CEO of Bridge over Troubled Waters, Inc in Boston where the Plaintiff had regularly volunteered his medical services to runaway teenagers, the indigent and homeless persons of Boston during the years 1990 – 1995 (Appendix attached);

(e) copy of Senator Edward Kennedy's endorsement of the medical mission to Chiappas, Mexico, carried out under the auspices of Flights for Humanity, Inc. in order to provide medical supplies to displaced refugees living in Chiappas (Appendix attached)

(f) character letters of recommendation from several physicians who worked with the Plaintiff acknowledging his excellent character and that they knew about the revocation of the Plaintiff's medical license, which they attributed to an error in judgement but which did not change their opinion of the Plaintiff's character based on years of working together treating patients in the same hospital, clinic or Emergency Room (Appendix x

(g) character letters of recommendation from several law professors who had taught the Plaintiff in law school acknowledging his excellent character and that they knew about the revocation of the Plaintiff's medical license, which they attributed to an error in judgement but which did not change their opinion of the Plaintiff's character (appendix

1470.   Although this hearing before the single justice was a *de novo* hearing where new

evidence may be admitted, Justice Ellen Gorman denied the Plaintiff's motion to admit into

evidence the documents described above in paragraph 245, which normally should be admissible

under Rule 201.

1471.   Rule 201 of the Maine Rules of Evidence state that: (a) it applies to adjudicative

facts, which are facts that are directly relevant to the specific case at hand; (b) these are facts that

are generally known within the trial court's territorial jurisdiction; (c) these are facts that can be

accurately and readily determined from sources whose accuracy cannot reasonably be

questioned; (d) the court must take judicial notice if a party requests it and provides the

necessary information; (e) Judicial notice can be taken at any stage of the proceeding, including

during trial; (f) parties have the right to be heard on the propriety of taking judicial notice and the

nature of the fact to be noticed; (g) in both civil and criminal cases, the court must accept the

noticed fact as conclusive; (h) it applies to both civil and criminal cases; (i) it covers adjudicative

facts; (j) the court can take judicial notice on its own or upon a party's request; (k) the Factfinder

must accept the judicially noticed facts as conclusive.

1472.   The Maine Justice Ellen Gorman refused to allow the Plaintiff to introduce evidence of

his federal medical appointment, Congressional letter of commendation, published articles about

Flights for Humanity, Inc - 501(c)(3), and other official documents, partially listed in paragraph

above, which are admissible evidence under the Maine Rules of Evidence, Rule 201. During

hearings before the Maine Supreme Judicial Court, the Plaintiff may move to admit into

evidence these matters pursuant to Maine Rule of Evidence, Rule 201. Although the Maine Rules

of Civil Procedure, Rule 201, provides for a party admitting into evidence certain documents

whose authenticity was self-authenticating and could not be susceptible to doubt.

1473.   Maine Justice Gorman asked the Plaintiff why these humanitarian and federal appointments were not part of the Massachusetts proceedings, to which the Plaintiff responded that his prior attorneys – Claudia Hunter, Vincent DiCianni, Robert Stolzberg and John Flym – had never asked the Plaintiff regarding his charitable or humanitarian efforts.

1474.   Maine justice refusal to admit such evidence under the Rule for the Court to take Judicial Notice of events/documents certain, violated the Maine Rules of Civil Procedure and the Plaintiff's constitutional right to Due Process of Law.

*Plaintiff became homeless and jobless*

1475.   As a result of the revocation of his medical license, the Plaintiff lost his only job, his livelihood and the only way he knew to earn income and the Plaintiff could not find any work or job for over 3 years.

1476.   Defendant Stanley Spero left a copy of the Summons and Complaint at the front door of the Plaintiff's marital residence with his wife in Littleton, MA on or about February 1997.

1477.   The Plaintiff's wife read the Complaint in *Colon v. Weinberg, Wesselhoeft, the Boston Evening Medical Center et al.* before the Plaintiff knew about it.

1478.   When the Plaintiff returned home from work, his wife was furious with him and would not speak to him for several hours.

1479.   The Plaintiff's wife filed for divorce the following week.

1480.   The Medical Director Robert Wesselhoeft, III, who was also a personal friend of the Plaintiff's informed the Plaintiff that he must leave his medical practice and he would not be able to continue as a Primary Care physician at the Boston Evening Medical Center after learning of the lawsuit where Wesselhoeft was also a named defendant.

1481.   Without a job or other means of making a salary because medicine was the only occupation the Plaintiff knew,

1482.   Subsequently the Plaintiff undePlaintiff Robert Weinbergent divorce from his wife, revocation of his medical license, foreclosure on his residential home, and bankruptcy. Plaintiff lost his job and lost his livelihood, become homeless and was unable to pay his bills or other debts.

1483.   Maine justice faults Plaintiff for not paying debts – when Plaintiff had no income. Homeless and jobless, Maine SJC punishes Plaintiff for not paying debts

Policy behind bankruptcy law,

1484.   When he declared bankruptcy in U.S. Bankruptcy Court in 2005, the Plaintiff had approximately $375,000 of debt including $75,000 owed to John Flym for his appellate work on *Robert Weinberg v Board of Registration in Medicine* filed with the Massachusetts Supreme Judicial Court.

1485.   De novo proceeding, violated Maine Rules of Civil Procedure – refusing to admit new evidence

1486.   Proximately caused by the unlawful and unconstitutional state actions described herein, the Plaintiff lost his medical license, lost his marriage, lost his ability to earn and income, lost the only jobs which he was educated and trained to do, and was thus thrown into a deep depression.

*Relative versus absolute Immunity: Limits on prosecutorial and judicial immunity*

1487.   "Attorneys as State Actors: A state action model and argument for holding SLAPP-Plaintiffs' attorneys liable under 42 U.S.C. 1983", James W. Harper, Hastings Constitutional Law Quarterly, Vol. 21, No. 2, Winter 1994. Available at:

https://repository.uchastings.edu/hastings_constitutional_law_quaterly/vol21/iss2/5

1488.   Defendant Vincent DiCianni knew or should have known that the filing of *Robert Weinberg v. Lourdes Colon* in Suffolk Superior Court potentially might be viewed as SLAPP litigation, which the Plaintiff had no knowledge about.

1489.   With over 2 decades of legal experience, including prior work as counsel for the Board of Registration in Medicine, Defendant DiCianni had the education, training, knowledge and experience to know and understand the implications of SLAPP litigation.

1490.   Rule 11 sanctions and attorney disciplinary proceedings should have been an appropriate deterrent to prevent Defendant DiCianni from filing that suit.

1491.   The instant civil action was brought under 42 U. S. C. §§ 1983 and 1988 to redress the deprivation of the Plaintiff's federal constitutional rights. The Plaintiff and "others similarly situated, are denied the equal protection of the laws accorded them by the Fourteenth Amendment to the Constitution of the United States" by virtue of the unlawful and unconstitutional ruling by Defendant Sarah Luick.

1492.   The facts and injury alleged herein, the legal bases invoked as creating the rights and duties relied upon, and the relief sought, come within that language of Article III of the Constitution and of the jurisdictional statutes which define those matters concerning which United States District Courts are empowered to act.

1493.   The matter is cognizable and facts as alleged establish infringement of the Plaintiff's rights as a result of state judicial action departing from a federal constitutional standard, so the court can proceed because the matter considered is suited to judicial inquiry or adjustment.

1494.   This District Court (a) possesses jurisdiction of the subject matter; (b) justiciable causes of action are stated upon which the Plaintiff would be entitled to appropriate relief; and (c) the Plaintiff raises the relevant federal issues before this Court.

1495.   This Court's inquiry proceeds to deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded. In the instance of lack of jurisdiction the cause either does not "arise under" the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III, § 2), or is not a "case or controversy" within the meaning of that section; or the cause is not one described by any jurisdictional statute.

1496.   "... The complaint in the instant case does arise under the Constitution and is within 28 U. S. C. § 1343. Article III, § 2, of the Federal Constitution provides that "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ."

1497.   It is clear that causes of action in the instant case are those which "arise under" the Federal Constitution.

1498.   This complaint deprives the Plaintiff of the equal protection of the laws in violation of the Fourteenth Amendment.

1499.   Since the complaint plainly sets forth a case arising under the Constitution, the subject matter is within the federal judicial power defined in Art. III, § 2, and so within the power of Congress to assign to the jurisdiction of the District Courts. Congress has exercised that power in 28 U. S. C. § 1343 (3): "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person . . . [t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States . . . ." An unbroken line of our precedents sustains the federal courts' jurisdiction of the subject matter of federal constitutional claims of this nature.

*Conflict of State and Federal Law - the Supremacy Clause*

1500.   Where state law or action conflicts with federal law, the federal law is pre-eminent and supercedes state law under the Supremacy clause.

1501.   Where the state's highest appellate court in the Commonwealth of Massachusetts or the State of Maine makes a ruling, decision, holding, order or other judicial action which deprives the Plaintiff of his civil rights while acting under the color of law, that appellate court is subject to the provisions of 42 U.S.C. § 1983.

1502.   The decision of the Defendant Massachusetts Supreme Judicial Court in *Robert P. Weinberg, D.O. v. Board of Registration in Medicine* is subject to 42 U.S.C. § 1983 if the Plaintiff proves that such decision deprived him of his rights and privileges which are guaranteed to all American citizens along with their civil rights by a preponderance of the evidence.

1503.   State action by the Massachusetts Board of Registration in Medicine comprises state interference with a contract between two private parties, an area of private law – not public law, which is  prohibited by Section 10 of Article I of the U.S. Constitution: " ...**Section 10: Powers Denied to the States:**  No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contract, or grant any Title of Nobility." *United States Constitutioin*

1504.   State action by the Maine Board of Bar Examiners comprises state interference with a contract between two private parties, an area of private law – not public law, which is prohibited by    Section 10 of Article I of the U.S. Constitution: " ...**Section 10: Powers Denied to the States:**  No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contract, or grant any Title of Nobility." *United States Constitutioin*

1505.   The decision of the Defendant Maine Supreme Judicial Court in *Robert P. Weinberg, D.O. v. Board of Bar Examiners* is subject to 42 U.S.C. § 1983 if the Plaintiff proves that such

decision deprived him of his rights and privileges which are guaranteed to all American citizens along with civil rights by a preponderance of the evidence.

1506.   The decision of Defendant Magistrate Sarah Luick presiding in the Massachusetts Division of Administrative Law Appeals in *In the matter of Robert P. Weinberg, D.O.* is subject to 42 U.S.C. § 1983 if the Plaintiff proves that such decision deprived him of his rights and privileges which are guaranteed to all American citizens along with civil rights by a preponderance of the evidence.

1507.   The decision of Defendant Massachusetts Board of Registration in Medicine in *In the matter of Robert P. Weinberg, D.O.* is subject to 42 U.S.C. § 1983 if the Plaintiff proves that such decision deprived him of his civil rights by a preponderance of the evidence.

*Actions of attorneys which deprived the Plaintiff of his civil Rights*

1508.   Defendant Alice Oliff is subject to 42 U.S.C. § 1983 if the Plaintiff proves that her actions while acting under the color of law deprived him of his rights and privileges which are guaranteed to all American citizens along withs civil rights by a preponderance of the evidence.

1509.   Defendant Robert Stolzberg is subject to 42 U.S.C. § 1983 if the Plaintiff proves that his actions while acting under the color of law deprived him of his civil rights by a preponderance of the evidence.

1510.   Defendant William Fisher is subject to 42 U.S.C. § 1983 if the Plaintiff proves that her actions while acting under the color of law deprived him of his civil rights by a preponderance of the evidence.

1511.   Defendant Claudia Hunter is subject to the sanctions of 42 U.S.C. § 1983 if the Plaintiff proves that her actions while acting under the color of law deprived him of his civil rights by a preponderance of the evidence.

1512.    Defendant Federal National Mortgage Association ("Fannie Mae") is a federally chartered corporation that participates in the secondary mortgage market and whose federal charter was enacted by the United States Congress.

*Proof of Good Character - defendant Board of Bar Examimers of Maine*

1513.    "...comparable to that in many States, that an applicant for admission to the bar bears the burden of proof of "good moral character" requirement whose validity is not, nor could well be, drawn in question here. Under such a rule an applicant must initially furnish enough evidence of good character to make a prima facie case." *Konigsberg v. State Bar of Cal.,* 366 U.S. 36 - Supreme Court (1961).

1514.    During Plaintiff's *de novo* hearing before Maine Justice Ellen Gorman, Gorman denied the Plaintiff's motion to introduce evidence of his good character.

1515.    "... The examining Committee then has the opportunity to rebut that showing with evidence of bad character. Such evidence may result from the Committee's own independent investigation, from an applicant's responses to questions on his application form, or from Committee interrogation of the applicant himself. This interrogation may well be of decisive importance for, as all familiar with bar admission proceedings know, exclusion of unworthy candidates frequently depends upon the thoroughness of the Committee's questioning, revealing as it may infirmities in an otherwise satisfactory showing on his part. This is especially so where a bar committee, as is not infrequently the case, has no means of conducting an independent investigation of its own into an applicant's qualifications. If at the conclusion of the proceedings the evidence of good character and that of bad character are found in even balance, the State may

refuse admission to the applicant, just as in an ordinary suit a plaintiff may fail in his case because he has not met his burden of proof." *Konigsberg v. State Bar of Cal.,* 366 U.S. 36 - Supreme Court (1961).

1516.  "In the first Konigsberg case this Court was concerned solely with the question whether the balance between the favorable and unfavorable evidence as to Konigsberg's qualifications had been struck in accordance with the requirements of due process. It was there held, first, that Konigsberg had made out a prima facie case of good character and of nonadvocacy of violent overthrow, and, second, that the other evidence in the record could not, even with the aid of all reasonable inferences flowing therefrom, cast such doubts upon petitioner's prima facie case as to justify any finding other than that these two California qualification requirements had been satisfied.[6] In assessing the significance of Konigsberg's refusal to answer questions as to Communist Party membership, the Court dealt only with the fact that this refusal could not provide any reasonable indication of a character not meeting these two standards for admission. The Court did not consider, but reserved for later decision, all questions as to the permissibility of the State treating Konigsberg's refusal to answer as a ground for exclusion, not because it was evidence from which substantive conclusions might be drawn, but because the refusal had thwarted a full investigation into his qualifications. See 353 U. S., at 259-262. The State now asserts that ground for exclusion, an issue that is not foreclosed by anything in this Court's earlier opinion which decided a quite different question." *Konigsberg v. State Bar of Cal.,* 366 U.S. 36 - Supreme Court (1961).

1517.  "It is equally clear that the State's ordering of the rehearing which led to petitioner's exclusion manifested no disrespect of the effect of the mandate in that case, which expressly left

the matter open for further state proceedings "not inconsistent with" the Court's opinion. There is

no basis for any suggestion that the State in so proceeding has adopted unusual or discriminatory

procedures to avoid the normal consequences of this Court's earlier determination. In its earlier

proceeding, the California Bar Committee may have found further investigation and questioning

of petitioner unnecessary when, in its view, the applicant's prima facie case of qualifications had

been sufficiently rebutted by evidence already in the record. While in its former opinion this

Court held that the State could not constitutionally so conclude, it did not undertake to preclude

the state agency from asking any questions or from conducting any investigation that it might

have thought necessary had it known that the basis of its then decision would be overturned. In

recalling Konigsberg for further testimony, the Committee did only what this Court has

consistently held that federal administrative tribunals may do on remand after a reviewing court

has set aside agency orders as unsupported by requisite findings of fact. *Federal*

*Communications Comm'n v. Pottsville Broadcasting Co.,* 309 U. S.

1504; *Fly v. Heitmeyer,* 309 U. S. 146.


1518. "In the absence of the slightest indication of any purpose on the part of the State to evade

the Court's prior decision, principles of finality protecting the parties to this state litigation are,

within broad limits of fundamental fairness, solely the concern of California law. Such limits are

broad even in a criminal case, see *Bryan v. United States,* 338 U. S. 552; *Hoag v. New*

*Jersey,* 356 U. S. 464; cf. *Palko v. Connecticut,* 302 U. S. 319, 328." *Konigsberg v. State Bar*

*of Cal.,* 366 U.S. 36 - Supreme Court (1961).


*Consensual sexual conduct between Physician and Patient does not constitute Malpractice*

*Korper v. Weinstein*, 57 Mass. App.Ct. 433 (Mass. App.Ct. 2003), 783 N.E.2d 877

1519.  "1. <u>Medical malpractice</u>. It is settled that consensual sexual conduct between a medical

practitioner and a patient does not constitute medical malpractice. *Roe v. Federal Ins. Co.*, 412

Mass. 43, 49-51 (1992) (sexual contact by a  dentist during treatment, whether consensual or not,

is not the rendering of professional services so as to be covered by malpractice insurance). There

are two exceptions to this rule: mishandling of the "transference phenomenon" by a psychiatrist

with  a patient; and sexual conduct purporting to be medical treatment. See *ibid.*; *Palermo v.*

*Brennan*, 41 Mass. App. Ct. 503, 509 n. 10 (1996). See also *Atienza v. Taub*, 194 Cal. App.3d

388, 393-394 (1987); *Mindt v. Winchester*, 151 Or. App. 340, 343-345 (1997).

1520.  The Plaintiff Weinberg is not a psychiatrist, psychologist nor psychotherapist.

1521.  The Plaintiff Weinberg does not and never had practiced psychotherapy nor psychiatry.

1522.  The Plaintiff Weinberg never received any training in psychotherapy and never receiving

teaching nor training in the handling of the "transference phenomenon."

1523.  The Plaintiff Weinberg never purported nor ever represented that any sexual conduct

between the Plaintiff and Lourdes Colon comprised any type of medical treatment.

1524.  "The plaintiff [Korper] argues that a kind of transference phenomenon occurs in the

ordinary patient-physician  relationship  by  virtue  of  the relationship. This view has been

identified and rejected. *Roe v. Federal Ins. Co.*, 412 Mass. at 50-51. The plaintiffs proposed

exception would swallow the rule. This rule is supported by the great weight of authority in other

jurisdictions. See *Gunter v. Huddle*, 724 So.2d 544, 546 (Ala.Civ.App. 1998); *Atienza v. Taub*,

194 Cal.App.3d 388, 393-394 (1987); *Mindt v. Winchester*, 151 Or. App. 340, 343-345 (1997).

"[C]ourts do not routinely impose liability upon physicians in general for sexual contact with

patients." *Simmons v. United States*, 805 F.2d 1363, 1366 (9th Cir. 1986)." *Korper v. Weinstein*, 57 Mass. App.Ct. 433 (Mass. App.Ct. 2003).

1525.  "An expert opinion is required and permitted in medical malpractice cases to inform the question of whether the professional services rendered by the physician deviated from the standard of care owed by the physician to the patient, thereby causing damage to the patient. See, e.g., *Collins v. Baron*, 392 Mass. 565, 569 (1984)." *Korper v. Weinstein*, 57 Mass. App.Ct. 433 (Mass. App.Ct. 2003)

1526.  In the instant action, the Expert Opinion rendered by Dr. James Beck is tainted by his lack of any knowledge of the 1992 memorialized handwritten Express Bilateral Contract, which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon and defendants' concealing this exculpatory evidence which exonerates the Plaintiff of all wrongdoing from the tribunal.

1527.  Dr. James Beck did not have knowledge of this 1992 Express Bilateral Contract which terminated the doctor-patient relationship because defendants Lisa Wolfe, Lourdes Colon and Stanley Spero engaged in spoliation of that material evidence by concealing this exculpatory evidence which exonerates the Plaintiff of all wrongdoing from the tribunal.

1528.  The 1992 Express Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon was essential exculpatory evidence, which exonerates the Plaintiff of all wrongdoing, for both the fact-finder and the Expert Witness in determining whether the Plaintiff had engaged in sexual misconduct, but defendants Lisa Wolfe, Lourdes Colon and Stanley Spero engaged in spoliation of that material exculpatory evidence by concealing it from the tribunal.

1529.  The 1992 Express Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon was essential exculpatory evidence for both the fact-finder and the Expert Witness in determining whether the Plaintiff had deviated from the standard of care, an essential element of medical malpractice.

1530.  The 1992 Express Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon was essential exculpatory evidence for both the fact-finder and the Expert Witness in determining whether the Plaintiff had the legal and ethical right to engage in sexual conduct with a former patient.

1531.  The modified Express Bilateral Contract classified time and location into clinical or nonclinical worlds, which determined when the Plaintiff was acting as a doctor and when he was not acting as a doctor.

1532.  The modified Express Bilateral Contract classified time and location into clinical or nonclinical worlds, which determined at which times and which locations the Plaintiff had a duty to Lourdes Colon as her physician and at which times and which locations the Plaintiff did not have any duty as a doctor to Lourdes Colon.

1533.  Several causes of action in this instant suit are being brought, in part, against specific defendants pursuant to 42 U.S.C. § 1983, in addition to other causes of action as documented in this Complaint below. When the highest appellate courts of the State of Maine and the Commonwealth of Massachusetts act to deprive the Plaintiff of his civil rights, while acting under the color of law, those courts are subject to the remediation, rehabilitation and restorative actions imposed under 42 U.S.C. § 1983, without any imposition of monetary damages which would othePlaintiff Robert Weinbergise be in contravention of the Eleventh Amendment.

1534.   The Court has jurisdiction over this action pursuant to 28 U.S.C §§ 1331, 1343(3) and (4) and 2201. All Defendants have such substantial contacts with the forum to underlie the basis for Personal Jurisdiction over all those defendants.

*Supplemental jurisdiction*

1535.   Section 1367 allows the Court to hear state law claims when they are "so related" to the federal claims "that they form part of the same case or controversy under *Article III of the United States Constitution.*" 28 U.S.C. § 1367.

1536.   This supplemental jurisdiction is the authority of the United States federal courts to hear additional claims substantially related to the original claim and when those claims arise from a common nucleus of operative facts. *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365 (1978); *United Mine Workers of America v. Gibbs,* 383 U.S. 715 (1966); *Finley v. United States,* 490 U.S. 545 (1989).

1537.   In other words, the supplemental jurisdiction power extends to all state and federal claims a person would ordinarily expect to be tried in a single judicial proceeding. *Penobscot Indian Nation v. Key Bank of Maine,* 112 F.3d 538, 563-64 (1st Cir. 1997); *Exxon Mobil Corp. v. Allapattah Services, Inc.,* 545 U.S. 546 (2005); *Moore v. New York Cotton Exchange,* 270 U.S. 593 (1926); *Williams Elecs. Games, Inc. v. Garrity,* 366 F.3d 569 (7th Cir.2004).

*Regulations and Adjudicatory Decisions of BORIM/DALA carry Force of Law*

1538.   Historically when the U.S. Constitution was drafted, the Administrative Law – fourth branch of government – was non-existent and the Rule of Law was determined by statutes and common law.

1539.   Over the past 250 years since the founding of the American Republic, Administrative Law has flourished and blossomed enormously so that currently in 2024 more than 90% of the

government's laws, policies and police power to protect the health, safety and welfare of the people, are quasi-legislatively, quasi-judicially enforced by state and federal agencies usually via the Administrative Procedure Act (or similar state "APA") whereby the rules generated by their rule-making powers are now substitutes for statutes and their adjudicatory proceedings are substitutes for the judicial system.

1540.  Thus, the agency rules and adjudicatory decisions carry the full force of the Law analogous to similar mandates of the statutes.

1541.  Looking into the historical roots, the Federalist papers (Alexander Hamilton) and the drafting of the Constitution, it is clear that when the founding fathers drafted the prohibition against Bills of Attainder, they intended to prohibit all state action which might be focused against a single citizen, and not just limit this prohibition against statutes.

1542.  The "Weinberg law" which was quasi-legislatively and quasi-judicially enacted de facto in 2002 by the proceedings in BORIM and DALA under M.G.L. c. 30A, and characterized by forty-three (43) distinct criteria and elements, is just the sort of state action that the original drafters of the Constitution intended to bar.

1543.    The Plaintiff will seek equitable relief through Declaratory Judgments which state:

(a) BORIM and DALA enacted the Weinberg law de facto in 2002, which is characterized and defined by 43 distinct criteria and elements;

(b) the Weinberg law was enacted/fabricated by BORIM and DALA for the express purpose of punishing the Plaintiff for his sexual conduct in the 1990s;

(c) the Weinberg law constitutes a Bill of Attainder as prohibited by the Constitution;

(d) the Weinberg law was applied ex post facto to punish the Plaintiff for conduct which occurred ten (10) years prior to its enactment (2002 – 1992);

(e) using a pretext that BORIM was protecting the health, safety and welfare of the people, BORIM revoked the Plaintiff's medical license in spite of the fact that BORIM knew about the Plaintiff's sexual conduct more than 5 years before they revoked the Plaintiff's medical license and allowed the Plaintiff to treat more than 30,000 patient-visits when they had the emergency power to immediately revoke the Plaintiff's license if they were truly concerned about any danger to the public by the Plaintiff.

*Violations of Title IX of the Civil Rights Act of 1964*

*Sexual Discrimination & Harassment in Violation of Title IX by Defendants Nagina Mangal, Ann Graybiel and Sally Kornbluth*

1544.    In the beginning of July 2023, Defendant Nagina Mangal did inform Defendant Ann Graybiel about specific sexual acts, sexual preferences, sexual conduct of the Plaintiff based on reports which she discovered from the 1990s and this information about the Plaintiff's sexual acts, sexual preferences and sexual conduct did form the basis of significant sexual discrimination on the part of defendants Ann Graybiel and the Massachusetts Institute of Technology (MIT).

1545.    In July 2023, Defendant Ann Graybiel removed the Plaintiff from the CellReadr project he had been developing over the prior 9 months on the basis of information concerning his sexuality, sexual practices, sexual preferences in gross sexual discrimination against the Plaintiff.

1546.    In July 2023, Defendant Nagina Mangal informed Ann Graybiel of the Plaintiff's sexuality, sexual practices, sexual preferences in gross sexual discrimination against the Plaintiff in order to steal control and lead of the CellReadr project which she was successful in doing.

1547.    In July 2023, based on Plaintiff's sexuality, sexual practices, sexual preferences in gross sexual discrimination against the Plaintiff, Defendant Massachusetts Institute of Technology

(MIT) did revoke all Plaintiff's privileges as a Visiting Student which he had since September 2022.

1548.   In July 2023, based on Plaintiff's sexuality, sexual practices, sexual preferences in gross sexual discrimination against the Plaintiff, Defendant Massachusetts Institute of Technology (MIT) did prohibit Plaintiff from coming on the campus of MIT.

1549.   In July 2023, based on Plaintiff's sexuality, sexual practices, sexual preferences in gross sexual discrimination against the Plaintiff, Defendant Massachusetts Institute of Technology (MIT) did prevent Plaintiff from downloading and securing private and confidential intellectual property which he had saved on his PC in his office in the McGovern building.

1550.   In July 2023, based on Plaintiff's sexuality, sexual practices, sexual preferences in gross sexual discrimination against the Plaintiff, Defendant Massachusetts Institute of Technology (MIT) did block Plaintiff from all access to his emails including important medical emails, job opportunities, communications with colleagues, friends, family and other relatives.

1551.   In July 2023, based on Plaintiff's sexuality, sexual practices, sexual preferences in gross sexual discrimination against the Plaintiff, Defendant Massachusetts Institute of Technology (MIT) did cause substantial emotional harm and intentional infliction of severe emotional distress upon the Plaintiff causing him to seek mental health counseling.

1552.   In July 2023, based on Plaintiff's sexuality, sexual practices, sexual preferences in gross sexual discrimination against the Plaintiff, Defendant Massachusetts Institute of Technology (MIT) did cause substantial emotional harm and intentional infliction of severe emotional distress upon the Plaintiff causing him to have suicidal thoughts and ideation and lose all self-worth and self-esteem.

1553.    Defendant Nagina Mangal did substantially interfere with the contractual agreement which the Plaintiff had with MIT and Ann Graybiel.

1554.    Defendant Nagina Mangal did cause substantial disruption in the educational plan and research plan designed and being carried out by the Plaintiff.

1555.    Defendant Nagina Mangal did cause the Plaintiff a one-year setback in his PhD progress and ability to complete his PhD dissertation on time as scheduled.

1556.    The actions by Defendant Nagina Mangal did result in the intentional infliction of severe emotional distress on the Plaintiff with medical consequences causing him to require additional medical care and mental health care.

1557.    These actions and consequences meet the requirements of the Stigma Plus test for remedies for intentional infliction of severe emotional distress.

*Earlier life background of Plaintiff and Medical Disabilities*

1558.    The Plaintiff was born on October 27, 1953 in Brooklyn, New York following a prolonged and difficult labor and delivery. This is substantiated by medical records.

1559.    The Plaintiff's Apgar scores were low and he was diagnosed with anoxic brain injury and termed a "blue baby." This is substantiated by medical records.

1560.    The Plaintiff experienced neurodevelopmental delays, delayed milestones and marked delays in the development of speech and talking which caused significant ridicule from his peers during his childhood. This is substantiated by medical records.

1561.    Throughout elementary school, the Plaintiff was in speech therapy to assist with correction of his speech problems. This is substantiated by academic records.

1562.    Several teachers believed that the Plaintiff suffered from intellectual retardation so he was removed from a couple of classes and placed in "slow learners" classes. This is substantiated by academic records.

1563.    On or about May 1964, at the age of 10 years, the Plaintiff suffered a bicycle accident where he fell off his bicycle striking his head against the asphalt pavement suffering a skull fracture and subdural hematoma. This is substantiated by medical records.

1564.    As a result of the increased intracranial pressure from the subdural hematoma, the Plaintiff began experiencing diplopia, headaches and fundoscopic exam revealed papilledema and blurring of the optic disc. This is substantiated by medical records.

1565.    On or about June 1964, the Plaintiff was transferred to Flower and Fifth Avenue Hospital in New York City, where he underwent neurosurgical evacuation of the subdural hematoma by surgeon Dr Tarlov. This is substantiated by medical records.

1566.    The Plaintiff began Junior High School in 1965 and for most of the years 1965 – 1968 his academic performance was poor with many grades of "D" and "F" in most of his courses. This is substantiated by academic records.

1567.    Experiencing marked somnolence, need for daytime naps, inability to focus or do homework along with muscular weakness, the Plaintiff was diagnosed with hypothyroidism in 1968, a medical condition shared with both of his parents. This is substantiated by medical records.

1568.    After starting on thyroid replacement therapy, the Plaintiff's academic performance skyrocketed and the Plaintiff became a straight "A" student, excelling and loving the sciences and mathematics especially. This is substantiated by academic records.

1569.    Later in life, the Plaintiff underwent neuropsychological testing at the Hallowell Center in Concord, Massachusetts where he was diagnosed with Attention Deficit Disorder (ADD) and was begun on CNS stimulants including methylphenidate and amphetamine which he continues to take daily at the present time. This is substantiated by medical records.

1570.    Except for some intermittent struggles with depression, which caused some periods of academic withdrawal, the Plaintiff demonstrated academic prowess for most of his subsequent years. This is substantiated by academic records.

1571.    The Plaintiff earned a BS in Biology from MIT, a Doctor of Osteopathic Medicine (DO) degree from the New York College of Osteopathic Medicine, a Juris Doctor degree cum laude from the New England School of Law, an MMSc in Immunology from Harvard Medical School, and is currently enrolled as a PhD candidate in Pharmacology at the Massachusetts College of Pharmacy and Health Sciences (expected graduation date of August 2024). This is substantiated by academic records including diplomas and transcripts.

1572.    In 1988, the Plaintiff scored high on the FLEX examination for physicians and was granted a license to practice medicine and surgery in the Commonwealth of Massachusetts (License # 60232). This is substantiated by Massachusetts government records.

1573.    In 1988 - 89, the Massachusetts Board of Registration in Medicine issued two (2) licenses to the Plaintiff granting the privileges and license to practice medicine in the Commonwealth of Massachusetts.

1574.    In 1989, the Plaintiff began working as a Family Physician at the Boston Evening

Medical Center at 388 Commonwealth Avenue, Boston, MA.

1575.    In 1990, the Plaintiff began to provide medical care to Defendant Lourdes Colon –

referred to as "Patient A" in documents originating at the Massachusetts Board of Registration in

Medicine, which licenses physicians in Massachusetts. This fact was corroborated as a Finding

of Fact made by Magistrate Sarah Luick during adjudicatory proceedings in the Massachusetts

Division of Administrative Law Appeals (DALA) during 1997-2002 disciplinary proceedings in

"Massachusetts Board of Registration in Medicine v. Robert P. Weinberg" and is readily

available as a public document.

1576.    In 1992, at the request of Defendant Lourdes Colon, the Plaintiff met with Defendant

Colon and Dr Lisa Wolfe at the Human Resource Institute in Brookline Massachusetts, a

psychiatric facility specializing in the treatment of young women with eating disorders and

depression. This fact was corroborated as a Finding of Fact made by Magistrate Sarah Luick

during adjudicatory proceedings in the Massachusetts Division of Administrative Law Appeals

(DALA) during 1997-2002 disciplinary proceedings in "In the matter of Robert P. Weinberg,

D.O." and is readily available as a public document.

1577.    During about 45 minutes of discussion, Defendant Colon expressed her desire to assist

the Plaintiff with some research project at MIT which she had read about in a brochure lying in

the clinic waiting room. This fact was corroborated as a Finding of Fact made by Magistrate

Sarah Luick during adjudicatory proceedings in the Massachusetts Division of Administrative

Law Appeals (DALA) during 1997-2002 disciplinary proceedings in "In the matter of Robert P.

Weinberg" and is readily available as a public document.

1578.    Dr Wolfe explained that for Defendant Colon to assist the Plaintiff, they must formally terminate the doctor-patient relationship. This fact was corroborated as a Finding of Fact made by Magistrate Sarah Luick during adjudicatory proceedings in the Massachusetts Division of Administrative Law Appeals (DALA) during 1997-2002 disciplinary proceedings in "In the matter of Robert P. Weinberg" and is readily available as a public document.

1579.    During his one year of Anatomic Pathology training at Brown University and his one year of Internal Medicine training at St. Vincent Hospital in Worcester, MA, the Plaintiff had never received any training concerning dual relationships nor transference.

1580.    During medical school and post-graduate residency training, the Plaintiff had received no training nor education in the realm of psychoanalytic theory or psychotherapy, so the Plaintiff never learned about transference or counter-transference.

1581.    Following his passing the FLEX examination in 1988, and receiving full licensure to practice medicine in September 1988, the Plaintiff has only held himself out to the public as a physician competent, trained and skilled in Internal Medicine, Family Medicine and Emergency Medicine.

1582.    The Plaintiff had never claimed to be a psychotherapist, psychologist, psychoanalyst or other mental health specialist, and never held himself out to the public as any type of mental health professional capable of providing psychotherapy.

1583.    Since filing her lawsuit in 1996, Defendant Colon lied and concealed the fact that she had agreed to terminate the doctor-patient relationship in 1992 at HRI with Defendant Wolfe present and dictating the termination agreement, until the present time.

1584.   Based on the evidence and medical records, in 2001 Magistrate Sarah Luick was able to make a finding of fact that the Plaintiff and Defendant Colon did terminate the doctor-patient relationship in 1992.

1585.   However, for those 6 years from 1996 – 2001 when Defendant Colon was being untruthful about the termination, it placed the Plaintiff in the awkward position of feeling he must fight to prove the truth of that termination.

1586.   When asked about her role in terminating the doctor-patient relationship, Defendant Lisa Wolfe answered in a half-truthful manner – "It is not the sort of thing that I usually do" thus concealing her own liability and fault for the situation, attempting to protect her own license and her own backside.

*Sexual discrimination by M.I.T. in violation of Title VII and Title IX*

1587.   During the years 1971 - 2023, the Plaintiff has had roles as a full-time enrolled student at MIT and also as a full-time employed Research Scientist at MIT, and some years the Plaintiff had dual roles as both a student and as an employee at MIT.

1588.   Hereafter the prior paragraphs describing the Plaintiff's sexual conduct will be referred to as "the record." Most of the episodes and commissions of sexual discrimination and sexual harassment referred to in this Personal Statement were proximately caused by the discovery of the record and subsequent actions taken by the respective parties, persons or entities.

1589.   In 2010, the Plaintiff obtained the position of Research Scientist at MIT in the Department of Biology working for Professor ChoKyun Rha, where he would continue to work through January 2020 on bioactive properties of oil palm phenolics under the sponsorship of the

Malaysian Palm Oil Board, and where he published multiple papers in peer-reviewed journals and presented scientific findings at international conferences.

1590.  In 2011 or 2012, the Biology Department learned of the record from an "anonymous informant" in the Department of Chemistry who alerted the Biology headquarters about the Plaintiff's past and loss of medical license.

1591.  The Biology Department began an investigation, which included asking the Plaintiff to come to a meeting in the headquarters with 3 Biology headquarters staff to answer questions about the record.

1592.  During this time period, the Plaintiff had obtained two important new opportunities for personal and professional growth at MIT while he was a student and also employed as a Research Scientist: (1) the Plaintiff was selected as a Mentor for a freshman seminar series, which the Plaintiff applied to teach on the applications of biotechnology in medicine and industry; (2) assistant teacher of physics in the Experimental Studies Group.

1593.  The Plaintiff had begun designing the freshman seminar series that summer and also met with the co-mentor for the seminar to discuss the curriculum.

1594.  Since the Plaintiff had developed a passion for teaching since he began tutoring science and mathematics during high school, this was a natural stepping stone toward a career in teaching.

1595.  The Plaintiff has also taught several courses at MIT through the ESP program which met on weekends for high school students.

1596.   The Plaintiff also attended a meeting of the Experimental Studies Group in preparation for assisting with teaching physics to that group of freshmen.

1597.   The Biology headquarters staff concluded their investigation and communicated their intentions with the Plaintiff.

1598.   MIT insisted that the Plaintiff write a letter of resignation from both educational opportunities – both the freshman seminar series and the Experimental Studies Group.

1599.   MIT stated that although the Plaintiff had done nothing wrong at MIT, they felt he presented a risk for some sexual misconduct with the students.

1600.   Regardless of not having committed any wrong at MIT, the staff expressed concerns that there would be the appearance of accepting his prior misconduct and not protecting the students adequately.

1601.   The Plaintiff was devastated by the loss of these educational teaching opportunities, which he believed would open up career possibilities and help him develop as a teacher.

1602.   The Plaintiff began working on his MMSc in Immunology at Harvard Medical School in 2014.

1603.   The MMSc program was a 2-year program: the first year consisted of didactic work on courses in immunology and the second year consisted of supervised immunology research leading to the writing of a thesis

*Violation of Title IX:  Sexual Discrimination and Sexual Harassment*
*by Defendant Dana-Farber Cancer Institute*

1604.  In 2015 the Plaintiff began research at the Dana Farber Cancer Research Institute with the mentor Stephanie Dougan, who was on the faculty of his MMSc in Immunology program.

1605.  It was a very exciting project in collaboration with Harvey Cantor, with whom the Plaintiff had wanted to work for many years.

1606.  Stephanie Dougan was very encouraging and discussed with the Plaintiff the possibility of applying for some grants which the Plaintiff was eligible for as a mid-life professional changing careers.

1607.  After several meetings and experimental planning, paperwork was processed at the Dana Farber Cancer Research Institute ("DFCI") including a comprehensive background check which revealed the loss of the Plaintiff's medical license in 2002.

1608.  DFCI terminated the Plaintiff because of the record from the background check about the Plaintiff's prior sexual conduct, while the Plaintiff was enrolled in the MMSc Immunology program as a full-time graduate student.

1609.  DFCI had a contractual arrangement with Harvard Medical School ("HMS") for providing internship opportunities for the graduate students at HMS.

1610.  Harvard Medical School conducted an investigation concerning the facts underlying this termination by DFCI.

*Violation of Title IX:  Sexual Discrimination and Sexual Harassment*
*by Defendant Boston Children's Medical Center*

1611.  The Plaintiff then began a research project with Professor Ann Goldfeld in the Program in Cellular and Molecular Medicine of Boston Children's Hospital where he began working on a

*440*

project involving the immunogenetics of the T-cell response, as a Graduate Student as part of the research component of the MMSc in Immunology program at HMS.

1612.   The Plaintiff had been working in the Goldfeld lab for about 8 weeks, when Professor Goldfeld offered to pay the Plaintiff as an intern which required him to complete paperwork for Boston Children's Hospital to come onto the payroll.

1613.   The paperwork included a background check which disclosed the Plaintiff's prior record, and the Plaintiff was summarily terminated based on his prior sexual conduct.

1614.   Harvard Medical School conducted an investigation concerning the facts underlying this termination.

*Sexual discrimination by MIT while Plaintiff was Visiting Graduate Student*

*Violation of Title IX of the Civil Rights Act*

1615.   In 2019 the Plaintiff began working toward his PhD in Pharmacology at the Massachusetts College of Pharmacy and Health Sciences in Boston, Massachusetts.

1616.   During the summer of 2022, the Plaintiff began collaborating with Dr Emily Hueske in the McGovern Institute for Brain Research at the Massachusetts Institute of Technology (MIT) in Cambridge, MA.

1617.   During discussions with Professor Ann Graybiel, it became clear that the Plaintiff could combine his PhD dissertation research on the neurophysiology and pathology of the basal ganglia with ongoing research efforts in the Graybiel lab which would be mutually beneficial to both parties.

1618.  In September 2022, the Plaintiff began a 1-year Visiting Student fellowship in the laboratory of Professor Ann Graybiel in the McGovern Institute, as a Visiting Graduate Student from the doctoral program at the Massachusetts College of Pharmacy and Health Sciences.

1619.  The Plaintiff received the letter of invitation from Graybiel for a 1-year appointment in the Graybiel lab.

1620.  For enrollment as a Visiting Graduate Student at MIT, the Plaintiff was required to pay MIT tuition in the approximate amount of $5,000.00.

1621.  From September 2022 through June 2023, the Plaintiff's efforts were greatly appreciated and rewarded by Graybiel as evident through numerous emails.

1622.  In May 2023, a postdoctoral fellow Nagina Mangal arrived in the Graybiel lab from London, UK, where she had completed her Ph.D.

1623.  Defendant Nagina Mangal is an Afghanistan national who has a U.S. VISA to study at MIT as a postdoctoral fellow.

1624.  The Plaintiff made special efforts to make her feel at home in Boston, bringing her over to the ATLAS center to pick up her MIT ID when it was ready and also providing her with a tour of the MIT campus.

1625.  The Plaintiff and Mangal shared a couple of meals together at the Stata Center while they discussed their ongoing research.

1626.  The McGovern Institute held its annual retreat on Cape Cod in early June 2023 and many members of the Graybiel lab attended the retreat.

1627.   The McGovern Institute did provide buses for many but in addition, the Plaintiff had volunteered to drive down to the retreat and brought with him 5 members of McGovern, including Mangal, Gun, Georgios, Fred, and Michael.

1628.   Defendant Mangal was happy to get the front-seat passenger view on the way down and back.

1629.   In order to share some American culture with her, the Plaintiff invited Mangal to a Red Sox baseball game in the Fenway Stadium in Boston, MA.

1630.   Since both Mangal and the Plaintiff shared a research interest in cannabinoid receptors and the effects of their signaling on modulation of CNS functions, Mangal had suggested that the two of them collaborate together and co-author a literature review on the CNS modulation by the cannabinoid system.

1631.   Defendant Mangal and the Plaintiff exchanged several emails and prior published papers towards this literature review which they began to work on during meetings in the McGovern Institute Atrium on the Third Floor.

1632.   The Plaintiff prepared an outline of their review - focusing on the role of the cannabinoid receptors on astrocyte signaling in the basal ganglia.

1633.   The Plaintiff and defendant Mangal met a couple of times to discuss the literature review.

1634.   A friend had given the Plaintiff a couple of extra tickets to a Red Sox game in Fenway Park, and the Plaintiff invited Mangal to the baseball game, which she excitedly attended.

1635.   During the week of June 18, 2023, Mangal abruptly stopped responding to the Plaintiff's emails and her final email stated that she probably could not work on the literature review with the Plaintiff.

1636.   Defendant Mangal's attitude and demeanor markedly changed during this time, whereby she became quite cold, distant and avoided any communication with the Plaintiff.

1637.   The Plaintiff began to suspect that Mangal had read about his prior record, which is readily accessible on the internet through a Google search.

1638.   Professor Graybiel was away in Europe attending meetings in Sweden and Ireland for 2 weeks, and was scheduled to return on Monday, June 26, 2023.

1639.   The Plaintiff saw Professor Graybiel in the morning of June 26, 2023, around 9 am, when Graybiel ran up to him smiling and laughing, and sharing her joy with him about the Plaintiff's continued success with weight loss on his current diet regimen.

1640.   As was characteristic of her demeanor toward him, Professor Graybiel had always smiled and maintained good eye-to-eye contact with the Plaintiff from September 2022 until June 26, 2023.

1641.   That morning of June 26, 2023 was the last time that Professor Graybiel would smile or look at the Plaintiff in the eyes.

1642.   The sexual harassment and sexual discriminatory acts by Professor Graybiel began at 11:00 am on June 26, 2023, at about the time that she met with Defendant Mangal privately in her office.

1643.   Professor Graybiel was very careful about what she said or emailed to the Plaintiff over the next 11 days, until she terminated abruptly the Plaintiff, for want not to leave any incriminating evidence of her knowledge of the Plaintiff's sexual conduct which she learned from a conversation with Mangal.

1644.   The Plaintiff saw Mangal in the hallway around 11:30 am that morning - June 26, 2023 -, and Mangal confirmed that she had just met with Professor Graybiel.

1645.   At a joint meeting with several labs that Friday, June 30, 2023, Professor Graybiel proceeded to remove the Plaintiff from the CellREADR project which the Plaintiff had been working on full-time since November 2022, spending long nights and weekends in the laboratory to overcome challenges and get the method to work properly.

1646.   There was an important collaboration meeting on Friday, June 30, 2023, with 10 members of the Graybiel and Agooti labs present so there were 10 witnesses to the following words and actions.

1647.   At this Friday morning meeting, Professor Graybiel introduced Mangal as the leader of the CellREADR project, introduced other members of the Graybiel lab, but did not introduce the Plaintiff, nor did she look at the Plaintiff nor acknowledge his presence.

1648.   It became clear from this collaboration meeting and subsequent Graybiel lab meeting in her office, that the Plaintiff was removed from the CellREADR project.

1649.   Although Graybiel was very careful to conceal her discriminatory and harassing intent, there are more than fifteen (15) witnesses who are lab members who can testify to her actions and words which underlie these discriminatory and harassing intents and actions.

1650.   Instigated by the Plaintiff's sexual conduct record, Graybiel's acts of sexual

discrimination and sexual harassment started at 11:00 am on June 26, 2023 and culminated with

her letter of termination of the Plaintiff on July 7, 2023.

1651.   These eleven (11) days of sexual discrimination and harassment by Professor Graybiel

and Nagina Mangal comprised actions which violated the Plaintiff's rights under Title IX of the

Civil Rights Act.

1652.   These acts of sexual discrimination and sexual harassment originate in Graybiel's belief

that the Plaintiff's prior record of sexual acts/misconduct and/or loss of medical license

necessitate that he cannot operate as a productive member of the research team in the Graybiel

lab in spite of the fact that he said or did nothing wrong during his entire time working in the lab.

*MIT and Graybiel violated the Plaintiff's rights protected by Title IX*

1653.   MIT and Graybiel violated Title IX by imposing a punishment on the Plaintiff "infected

by sex bias." See *John Doe v. Purdue University et al.*, 928 F.3d 652 (2019).

1654.   MIT and Graybiel discriminated against the Plaintiff on the basis of sex, sexual acts,

sexual conduct, and sexual preferences in violation of Title IX.

1655.   Title IX provides that "[n]o person in the United States shall, on the basis of sex, be

excluded from participating in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a);

see also *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281, 118 S.Ct. 1989, 141 L.Ed.2d

277 (1998) (explaining that Title IX is enforceable through an implied private right of action).

1656.   It is undisputed that MIT and Professor Graybiel receive federal funding.

1657.   The Plaintiff was "excluded from participation in [or] denied the benefits of ... [an] education program" when MIT terminated him. 20 U.S.C. § 1681(a).

1658.   The Plaintiff also had a property right in his Visiting Student status as established by the contract entered into with Graybiel pursuant to her letter of invitation which he accepted with consideration paid of over $4,000.

1659.   Furthermore this academic contract was breached by Graybiel's letter of termination.

1660.    Furthermore, although MIT does have extensive policies regarding hearings and Due Process, and the Plaintiff was in frequent contact with the MIT General Counsel, the Plaintiff was never afforded the opportunity for a fair hearing to present his side and be heard by an impartial decision-maker in spite of the fact that the Plaintiff requested such a hearing on multiple occasions.

1661.   This not only violates MIT policies for Due Process and hearings, but it also violates State and federal mandates for Due Process before terminating fundamental property and liberty rights of the Plaintiff. *Goss*, 419 U.S. at 574, 95 S.Ct. 729; *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86, 98 S.Ct. 498, 55 L.Ed.2d 124 (1978); P*ugel v. Bd. Of Trs. of Univ. of Ill.*, 378 F.3d 659, 663-64 (7th Cir. 2004); *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 629 (7th Cir.2016).

*Fraud on the Court committed by Defendant Fannie Mae  in foreclosure proceedings*

*Fraud committed by Defendants John Ney, Schechtman, Halperin and Savage*

1662.    The Plaintiff is at immediate risk of losing his house in Dixfield, Maine.

1663.   In December 2023, the Defendant Federal National Mortgage Association ("FNMA")

filed a petition for the 60-day Notice by publication of a foreclosure sale of the Plaintiff's house.

1664.   The foreclosure judgment issued by the Oxford County Superior Court is defective and is

based upon fraud committed against the Court by Defendant Fannie Mae, and that fraud will be

described with particularity below.

1665.    One purpose of this litigation is to adjudicate that the foreclosure judgment obtained by

the Defendant FNMA was based on defective and inadequate procedural process; did not comply

with Maine statutes regulating judicial foreclosure; these judicial proceedings did not comply

with the Maine Rules of Civil Procedure; and violated the Plaintiff's civil and constitutional

rights under the Due Process clauses of the Fifth and Fourteenth Amendments to the United

States Constitution, while Defendant Fannie Mae was acting under the color of law.

1666.    The foreclosure judgment obtained by the Defendant FNMA in May 2019 in civil

proceedings at the Oxford County Superior Court in Paris, Maine, violated the requirements of

the Maine statutes regulating judicial foreclosure and therefore denied the Plaintiff Due Process

of Law in violation of the Plaintiff's civil and constitutional rights.

1667.   In those proceedings, Defendants Fannie Mae, John Ney, Seterus Inc, and Shechtman,

Halperin and Savage did act unlawfully to deprive the Plaintiff of his fundamental civil and

constitutional rights while acting under the color of law.

1668.    False statements and false representations to the Court during judicial proceedings do

comprise fraud upon the Court.

1669.   The material facts stated within this Complaint document with particularity and specificity the fraud committed against the Court by Defendants Fannie Mae, John Ney, Seterus Inc, and Shechtman, Halperin and Savage in Oxford County Superior Court civil proceedings – "Federal National Mortgage Association v. Robert P. Weienberg."

1670.    Among other unlawful actions, the Defendants did not conduct the civil judicial foreclosure proceedings at Oxford County Superior Court in compliance with the  Maine foreclosure statutes or the Maine Rules of Civil Procedure.

1671.   **More specifically** Defendants Fannie Mae, John Ney, Seterus Inc, and Shechtman, Halperin and Savage did not comply with Maine statute Title 14: Court Procedure – Civil, Part 7: Particular Proceedings, Chapter 713: Miscellaneous Provisions relating to Foreclosure of Real Property Mortgages, Subchapter 6: Foreclosure Proceedings by Civil Action, § 6321 entitled "Commencement of foreclosure by civil action."


1672.    The literal statutory text of section 6321 reads:

"§ 6321. Commencement of foreclosure by civil action: has the following statutory requirements:

a) "After breach of condition in a mortgage of first priority, the mortgagee or any person claiming under the mortgagee may proceed for the purpose of foreclosure by a civil action against all parties in interest in either the Superior Court or the District Court in the division in which the mortgaged premises or any part of the mortgaged premises is located, regardless of the amount of the mortgage claim. [PL 2007, c. 391, §9 (AMD).]"

b) "The foreclosure must be commenced in accordance with the Maine Rules of Civil
Procedure, and the mortgagee shall within 60 days of commencing the foreclosure also
record a copy of the complaint or a clerk's certificate of the filing of the complaint in
each registry of deeds in which the mortgage deed is or by law ought to be recorded and
such a recording thereafter constitutes record notice of commencement of foreclosure."

1673.   The Defendants Fannie Mae, John Ney, Seterus Inc, and Shechtman, Halperin and

Savage significantly breached and violated the Maine Rules of Civil Procedure and Maine

foreclosure statutes in the foreclosure proceedings which unlawfully issued a defective

foreclosure judgment against the Plaintiff in 2019.

1674.   The Maine state procedural judicial process was unconstitutionally applied and denied

the Plaintiff Procedural Due Process in depriving the Plaintiff of fundamental liberty interests

guaranteed by the U.S. Constitution.

1675.   § 6321. Commencement of foreclosure by civil action – requires that "The foreclosure

must be commenced in accordance with the Maine Rules of Civil Procedure ..."

1676.   This requirement, that the judicial foreclosure proceeding *must* be commenced in

accordance with the Maine Rules of Civil Procedure, is a mandatory requirement and not a

permissive requirement which may be waived under any circumstances.

1677.   In those judicial proceedings in Oxford County Superior Court, the Plaintiff was denied

his right to civil discovery, including his right to depose the Defendant FNMA, as provided by

the Maine Rules of Civil Procedure. The civil rules of discovery are essential to just and fair

adjudication in judicial proceedings, as without those rights to discovery, the deprived party is

denied access to important facts essential for a just and fair adjudication.

1678.   Under Rule 30 of the Maine Rules of Civil Procedure, the Plaintiff is guaranteed the right of discovery via Deposition upon oral examination.

1679.   Discovery is one of those cornerstones of the judicial process which is essential for providing the Court with the necessary material facts needed for a fair and just trial, without which a defective judgment will result based on inaccurate and false information.

1680.   Among other breaches and violations, the Defendants Fannie Mae, John Ney, Seterus Inc, and Shechtman, Halperin and Savage prevented the Plaintiff from deposing Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION despite over thirty requests by the Plaintiff to conduct such deposition as documented in the Plaintiff's Motion to Compel Discovery (see Appendix C of original motion).

1681.   The Defendants denied the Plaintiff his right to depose Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION despite the Defendant John Ney's express verbal promise to provide the Defendant available for deposition in open Court at a hearing in July 2018, which comprised a false representation to the Court and was tantamount to fraud upon the Court.

1682.   After Defendant John Ney made false representations to the Court at a hearing in July 2018 that Defendant Fannie Mae would be produced for oral deposition, Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION was never produced nor did she ever appear for a scheduled deposition in September 2018, Defendants only produced Enan del Rio for deposition in 2018.

1683.   Enan del Rio was not an employee of Fannie Mae, and he did not have personal knowledge of such vital documents as the mortgage note, mortgage loan or the promissory note.

1684.  Enan del Rio was an employee, agent or contractor for Defendant Seterus, Inc., a mortgage servicing company contracted by Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION.

1685.  At deposition in September 2018, Seterus employee/contractor Enan del Rio was unable to answer numerous questions about vital documents as the mortgage note, mortgage loan or the promissory note, posed by the Plaintiff, which would have been known by the relevant officers of Defendant Fannie Mae, and **Enan del Rio's ignorance of and lack of knowledge of these documents substantially impaired the Plaintiff in his ability to prosecute his case in Court, by depriving the Plaintiff of vital and essential facts** concerning his Real Property in Dixfield, Maine.

1686.  Defendant's denial of providing Fannie Mae for deposition substantially impaired the Plaintiff's ability to glean essential information and facts needed for the prosecution of his case.

1687.  Deponent Enan del Rio's lack of personal knowledge of mortgage-related documents and non-employment by defendant Federal National Mortgage Association did cause substantial injury to the Plaintiff by depriving the Plaintiff of testimony essential for his case, which defendant FNMA othePlaintiff Robert Weinbergise did have control and possession of such material and relevant facts needed by the Plaintiff to prosecute his case.

1688.  Enan del Rio is or has been a professional witness for Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION, appearing in Court at multiple litigations across the United States. Enan del Rio has been sanctioned by the Courts for his conduct and actions in some of those cases involving the Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION (see Appendix D [original court filing]).

1689.  By denying to make Fannie Mae available for deposition, Defendants John Ney, Fannie Mae, Shechtman, Halperin and Savage did:

A) make false representations to the Court;

B) commit fraud upon the Court;

C) Impair the Plaintiff's ability to prosecute his case;

D) Fail to comply with the Maine Rules of Civil Procedure;

E) Fail to satisfy the requirements of § 6321. Commencement of foreclosure by civil action;

F) Deny the Plaintiff Due Process of Law;

G) Deny the Plaintiff his civil and constitutional rights while acting under the color of law;

H) Generate a defective foreclosure judgment, which is null and void, for the foregoing reasons.

1690.  For equitable relief, the Plaintiff will seek Declaratory Judgments stating the facts of paragraphs 76(A) - 76(H) and declaring that the foreclosure judgment is defective, null, void, unlawful and legally unenforceable.

1691.  Had the Plaintiff been provided with Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION for deposition in 2018 as promised by Defendants John Ney and the FEDERAL NATIONAL MORTGAGE ASSOCIATION in open court at the June 2018 hearing, the Plaintiff

would have been able to prove legal defects in the mortgage contract and this would have substantially produced a different outcome in the foreclosure trial on or about May 2019.

1692.    During the foreclosure trial at Oxford County Superior Court on or about May 2019, Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION did prevent the Plaintiff from laying the foundation for introducing evidence of the mortgage defects while the Plaintiff was cross-examining the witness for Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION.

### Lack of Mootness: Live case and controversy

1693.    The imminent loss of the Plaintiff's house as described in the preceding paragraphs above shows that this case and controversy is live, with flesh on its bones, and is not moot.

1694.    On or about March 2022, the Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION did petition the Maine Court for the right to publish a date for the foreclosure sale of the Plaintiff's house in Dixfield, Maine, based on the unlawfully-obtained and defective foreclosure judgment.

1695.    By an order issued by the Maine court in April 2022, the Court granted Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION the right to publish a date for the foreclosure sale of the Plaintiff's house in Dixfield, Maine, at sixty (60) days from the date of the Maine court order.

1696.    That date for publishing the date of the foreclosure sale is coming up within the next couple of weeks, at which point the Plaintiff will suffer irreparable harm if his house is sold, conditional upon an unlawful foreclosure judgment.

*Amount in Controversy / Damages*

1697.   The Plaintiff has suffered $ 187,685.00 (One hundred eighty-seven thousand six hundred eighty-five U.S. dollars) in economic damages and injuries resulting from the legally defective foreclosure action. This amount is aggregated over the several defendants, and does not include punitive damages sought for those Defendants lacking Qualified Immunity for their bad acts.

## *AMERICANS WITH DISABILITIES ACT (ADA)*

1698.   Title II of the ADA applies to a "qualified individual with a disability who with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

1699.   A "disability" must fit one of three definitions under 42 U.S.C. § 12102(2) to be actionable under the ADA: there must be "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; [or] (B) a record of such an impairment; or (C) being regarded as having such an impairment."

1700.   Title II of the ADA applies to persons who are deprived of the benefits of participation in governmental programs, services, or activities because of a physical disability. *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 211(1998).

1701.   In the instant litigation, the Plaintiff alleges facts, based on medical records and diagnostic testing, showing he is a "qualified individual with a disability" and that he is a member of the statutorily-protected class. 42 U.S.C. §12112(a).

1702.   Some of the named Defendants have denied the Plaintiff of the benefits of its services for which he is entitled and/or discriminated against the Plaintiff solely by reason of his disability.

*Weinriech v. Los Angeles County Metropolitan Transportation Authority*, 114 F.3d 976, 978 (9th Cir. 1997).

1703.   The record shows intentional discrimination by some of the named Defendants on the basis of the Plaintiff's disability *Memmer v. Marin County Courts*, 169 F.3d 630, 633 (9th Cir. 1999).

1704.   Governmental entities are the proper defendants in Title II ADA claims, and Eleventh Amendment immunity does not apply.

1705.   This lawsuit, is also brought under the Due Process Clause of the Fifth Amendment and Fourteenth Amendments to the United States Constitution; the Equal Protection clause; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

*Defendants' violation of Plaintiff's rights under the Americans with Disabilities Act*

*Plaintiff's neurological disability*

1706.   Plaintiff was born on October 27, 1953 at Crown Heights Hospital, in Brooklyn, New York, with low Apgar scores after a prolonged and complicated labor and delivery in G1P0 24 y/o female.

1707.   At birth, Plaintiff was diagnosed as a "blue baby" due to neonatal asphyxia probably secondary to a compressed umbilical cord and/or prolonged time in the birth canal.

1708.   Subsequently Plaintiff was found to have multiple neurologic injuries from this perinatal asphyxia, which was further compounded by his traumatic brain injury in 1964 when he fractured his skull and developed a subdural hematoma requiring surgical evacuation in a neurosurgical procedure performed by Dr Tarlov at Flower and Fifth Avenue Hospital in New York City.

1709.  As documented in his medical records, the neurologic injuries and conditions have had a substantial impact on the Plaintiff's life, schooling, socio-economic status, social and personal life, and economic opportunities.

1710.  The Plaintiff has been diagnosed and treated for: speech/developmental delays and problems due to perinatal asphyxia, Attention Deficit Disorder, Post-traumatic Stress Disorder, depression, anxiety disorder, specific neuro-behavioral deficits caused, in part, by these perinatal neurologic injuries and traumatic brain injury and subdural hematoma.

1711.  These neurologic disabilities have caused the Plaintiff to suffer multiple setbacks in his schooling and education, necessitating multiple academic leaves of absence for medical reasons.

1712.  Currently the Plaintiff is under the regular medical care by a Neurologist, Internist, Cardiologist, Endocrinologist, and Psychiatrist.

1713.  Plaintiff is a disabled American, and a member of the statutorily protected class under the federal Americans with Disabilities Act of 1990 ("ADA").  42 U.S.C. § 12101.

1714.  Multiple defendants have not complied with the mandates of the federal Americans with Disabilities Act and have not provided the proper or required accommodations as specifically requested by the Plaintiff as mandated by that federal act.

1715.  Furthermore multiple defendants have denied the Plaintiff his civil and constitutional rights and privileges while acting under the color of law in violation of 42 U.S.C. § 1983.

1716.  U.S. Congress subpoened MIT President Sally Kornbluth to appear at a Congressional hearing in Washington, DC in December 2023 because of allegations that MIT failed to comply with federal mandates.

1717.   At this December 2023 Congressional hearing, Sally Kornbluth refused to acknowledge that Palestinian students appearing at protests at MIT, who called for death to all Jewish persons, comprised a violation of MIT Policy and ethics codes.

1718.   When asked whether a call for genocide and the murder of all Jewish persons comprised a violation of the MIT policies and codes, Kornbluth only answered that "it depends upon the context" and refused to assert that calls for genocide violate MIT policies.

1719.   Plaintiff sent over 20 emails to Kornbluth regarding his allegations of violations of Title IX, sexual harassment and discrimination, while he was a Visiting Student at MIT during the 2022-23 academic year.

1720.   Kornbluth ignored these emails and refused to answer any of the Plaintiff's 20+ emails.

1721.   The Plaintiff was born on October 27, 1953 in Brooklyn, New York following a prolonged and difficult labor and delivery. This is substantiated by medical records.

1722.   The Plaintiff's Apgar scores were low and he was diagnosed with anoxic brain injury and termed a "blue baby." This is substantiated by medical records.

1723.   The Plaintiff experienced neurodevelopmental delays, delayed milestones and marked delays in the development of speech and talking which caused significant ridicule from his peers during his childhood. This is substantiated by medical records.

1724.   Throughout elementary school, the Plaintiff was in speech therapy to assist with correction of his speech problems. This is substantiated by academic records.

1725.  Several teachers believed that the Plaintiff suffered from intellectual retardation so he was removed from a couple of classes and placed in "slow learners" classes. This is substantiated by academic records.

1726.  On or about May 1964, at the age of 10 years, the Plaintiff suffered a bicycle accident where he fell off his bicycle striking his head against the asphalt pavement suffering a skull fracture and subdural hematoma. This is substantiated by medical records.

1727.  As a result of the increased intracranial pressure from the subdural hematoma, the Plaintiff began experiencing diplopia, headaches and fundoscopic exam revealed papilledema and blurring of the optic disc. This is substantiated by medical records.

1728.  On or about June 1964, the Plaintiff was transferred to Flower and Fifth Avenue Hospital in New York City, where he underwent neurosurgical evacuation of the subdural hematoma by surgeon Dr Tarlov. This is substantiated by medical records.

1729.  The Plaintiff began Junior High School in 1965 and for most of the years 1965 – 1968 his academic performance was poor with many grades of "D" and "F" in most of his courses. This is substantiated by academic records.

1730.  Experiencing marked somnolence, need for daytime naps, inability to focus or do homework along with muscular weakness, the Plaintiff was diagnosed with hypothyroidism in 1968, a medical condition shared with both of his parents. This is substantiated by medical records.

1731.  After starting on thyroid replacement therapy, the Plaintiff's academic performance skyrocketed and the Plaintiff became a straight "A" student, excelling and loving the sciences and mathematics especially. This is substantiated by academic records.

1732.  Later the Plaintiff underwent neuropsychological testing at the Hallowell Center in Concord, Massachusetts where he was diagnosed with Attention Deficit Disorder (ADD) and was begun on CNS stimulants including methylphenidate and amphetamine which he continues to take daily at the present time. This is substantiated by medical records.

1733.  Except for some intermittent struggles with depression, which caused some periods of academic withdrawal, the Plaintiff has demonstrated academic prowess for most of his subsequent years. This is substantiated by academic records.

1734.  The Plaintiff earned a BS in Biology from MIT, a Doctor of Osteopathic Medicine (DO) degree from the New York College of Osteopathic Medicine, a Juris Doctor degree cum laude from the New England School of Law, an MMSc in Immunology from Harvard Medical School, and was enrolled as a PhD candidate in Pharmacology at the Massachusetts College of Pharmacy and Health Sciences. This is substantiated by academic records including diplomas and transcripts.

1735.  In 1988, the Plaintiff scored high on the FLEX examination for physicians and was granted a license to practice medicine and surgery in the Commonwealth of Massachusetts. This is substantiated by Massachusetts government records.

1736.  In 1990, Weinberg began working as a Family Physician at the Boston Evening Medical Center at 388 Commonwealth Avenue, Boston, MA.

1737.  In 1991, the Plaintiff began to provide medical care to Lourdes Colon – referred to as "Patient A" in documents originating at the Massachusetts Board of Registration in Medicine, which licenses physicians in Massachusetts.

1738.  After reading a brochure in the waiting room, Colon became interested in some of the research being conducted by the Plaintiff at MIT, developing new medical instrumentation.

1739.  Colon expressed this interest to the Plaintiff, asking whether she might be able to assist the Plaintiff with this research.

1740.  The Plaintiff discussed this situation with the medical director Dr. Robert Wesselhoeft, III, the clinic director Ruth Taylor and the clinic co-director Ella Smith.

1741.  Dr. Wesselhoeft approved this request by Colon to become a Research Assistant for the Plaintiff.

1742.  In 1992, at the request of Lourdes Colon, Weinberg met with Colon and Dr Lisa Wolfe at the Human Resource Institute in Brookline Massachusetts, a psychiatric facility specializing in the treatment of young women with eating disorders and depression. This fact was corroborated as a Finding of Fact made by Magistrate Sarah Luick during adjudicatory proceedings in the Massachusetts Division of Administrative Law Appeals (DALA) during 1997-2002 disciplinary proceedings in "Massachusetts Board of Registration in Medicine v. Robert P. Weinberg" and is readily available as a public document.

1743.  In a first-floor consultation room at HRI, the Plaintiff met with Dr. Lisa Wolfe and Colon.

1744.  During about 45 minutes of discussion, Colon expressed her desire to assist the Plaintiff with some research project at MIT which she had read about.

1745.  Dr Wolfe discussed with the Plaintiff and Colon the process for terminating the doctor-patient relationship and transition to Colon assisting the Plaintiff with his research.

1746.  Dr. Wolfe never discussed nor revealed any of Colon's diagnoses with the Plaintiff.

1747.  Dr. Wolfe never shared the information she wrote in Colon's admission note that Colon was probably suffering from a Dissociative disorder.

1748.  Dr. Wolfe never warned the Plaintiff nor explained any of the risks or dangers that might occur in the new relationship, after the termination of the doctor-patient relationship.

1749.  The Plaintiff agreed to this new relationship, and Dr Wolfe orally dictated the words for a contract terminating the doctor-patient relationship which both Colon and Weinberg wrote out in their own handwriting.

1750.  Both the Plaintiff and Colon signed each other's handwritten contract terminating the doctor-patient relationship.

1751.  Following this, Colon began making appointments with other doctors at the Boston Evening Medical Center – including changing her official PCP to the primary care physicians Dr David Fringer and Dr William Reichel.

1752.  Colon began meeting with the Plaintiff weekly at MIT while he participated in the Advanced Study Program through MIT for developing a medical instrument which would utilize acoustic signals from the chest to diagnose several medical conditions.

1753.  After several months, Colon explained that she was also serving as a model for photographers and began to show the Plaintiff some nude photographs including photos where she was lying on her back in a death-like pose holding a white lily.

1754.   Weinberg and Colon began a sexual relationship.

1755.   In subsequent disciplinary proceedings and legal proceedings, there were never any allegations that the commencement of such sexual relationship was wrong, immoral, unlawful or unethical because officially the doctor-patient relationship had been terminated under the supervision of Dr Wolfe.

1756.   Under specific canons of ethics issued by the American Medical Association, a specific statement was issued by the AMA stating that a sexual relationship between a doctor and a patient could only take place after the doctor-patient relationship was ended.

1757.   From the web site of the American Medical Association's Code of Ethics, Opinion 8.14 https://journalofethics.ama-assn.org/sites/journalofethics.ama-assn.org/files/2018-05/coet1-1505.pdf#:~:text=Issued%20December%201998%20based%20on%20the%20report%20%E2%80%9CSexual.concurrent%20with%20the%20patient-physician%20relationship%20constitutes%20sexual%20misconduct.

**Opinion 8.14 - Sexual Misconduct in the Practice of Medicine**

Sexual contact that occurs concurrent with the patient-physician relationship constitutes sexual misconduct. Sexual or romantic interactions between physicians and patients detract from the goals of the physician-patient relationship, may exploit the vulnerability of the patient, may obscure the physician's objective judgment concerning the patient's health care, and ultimately may be detrimental to the patient's well-being.

If a physician has reason to believe that non-sexual contact with a patient may be perceived as or may lead to sexual contact, then he or she should avoid the non-sexual contact. At a minimum, a physician's ethical duties include terminating the physician-patient relationship before initiating a dating, romantic, or sexual relationship with a patient.

Sexual or romantic relationships between a physician and a former patient may be unduly influenced by the previous physician-patient relationship. Sexual or romantic relationships with former patients are unethical if the physician uses or exploits trust, knowledge, emotions, or influence derived from the previous professional relationship.

Issued December 1989; updated March 1992 based on the report "Sexual Misconduct in the Practice of Medicine," adopted December 1990.

1758.   Opinion 8.14 states in part that " … At a minimum, a physician's ethical duties include terminating the physician-patient relationship before initiating a dating, romantic, or sexual relationship. "

1759.   In 1992 when the Plaintiff met with Lourdes Colon and Dr. Wolfe to terminate the doctor-patient relationship, opinion 8.14 was in effect and the Plaintiff complied with the requirement of opinion 8.14 by terminating the relationship before any sexual relationship began.

1760.   The termination of the doctor-patient relationship under the guidance of Dr. Lisa Wolfe released the Plaintiff from any fiduciary duties or physician duties regarding not becoming sexually involved. Thus the sexual involvement in 1993 began after the termination and was proper, lawful and ethical.

1761.  In 1996, Colon filed a lawsuit "Colon v. Weinberg, et al." for sexual misconduct.

1762.  In this suit, Colon engaged in spoliation of the exculpatory evidence of the 1992 Express Bilateral Agreement terminating the doctor-patient relationship.

1763.  In 1997, the Massachusetts Board of Registration in Medicine initiated disciplinary proceedings against Weinberg in the Massachusetts Division of Administrative Law Appeals, the usual avenue for medical licensure disciplinary proceedings.

1764.  In October 2002, the Board of Registration in Medicine revoked Weinberg's license to practice medicine for 3 years although the usual period of revocation was 5 years because of mitigating circumstances. Weinberg was eligible to apply for reinstatement of his license in October 2005.

1765.  There were never any criminal charges filed, neither misdemeanor nor felony against Weinberg, because the relationship was a consensual sexual relationship between 2 adults, so the CORI record of Weinberg has been clean.

1766.  Caselaw and Massachusetts precedents reveal in *Korper v. Weinstein* that sexual relations between a physician and a patient is not sexual misconduct per se, without other exacerbating conditions such as a therapist-patient relationship or abuse of any power differential between the physician and the patient.

1767.  The Plaintiff never acted as a psychiatrist or psychotherapist with Lourdes Colon, nor was the Plaintiff trained in psychotherapy nor did the Plaintiff understand or know how to manage transference or counter-transference following his two (2) years of post-graduate

medical residency training in Anatomic Pathology at Brown University (1 year) and Internal Medicine at St. Vincent Hospital in Worcester, MA (1 year).

*State Action impairing the obligation of Contract between private parties*

*BORIM impaired Plaintiff's freedom to contract with private parties*

### Contract clause - Case of First Impression

1768.   In spite of several neurologic disabilities, caused in part by neonatal asphyxia, neuro-developmental delays, traumatic subdural hematoma with cerebral edema, post-traumatic brain injury (TBI) with effects on impulse control, ADHD and hypothyroidism, the Plaintiff was able to overcome these challenges and complete several academic programs.

1769.   The Plaintiff attended the Massachusetts Institute of Technology ("MIT") between 1971 - 1976, and was awarded the Bachelor of Science degree in Biology in 1976.

1770.   The Plaintiff attended the New York College of Osteopathic Medicine ("NYCOM") between the years 1982 - 1986, and was awarded the Doctor of Osteopathic Medicine degree ("DO") in June 1986.

1771.   The Plaintiff completed a year of post-graduate residency training in Anatomic Pathology at Brown University and Roger Williams General Hospital in Providence, Rhode Island during 1986 - 87

1772.   The Plaintiff completed a year of post-graduate residency training in Internal Medicine at St. Vincent Medical Center in Worcester, MA during 1987 - 88.

1773.   In August 1988, the Plaintiff successfully passed the FLEX examination and was obtain

to become fully licensed to practice medicine in the Commonwealth of Massachusetts, in

September 1988, License #60232.

1774.   Plaintiff was licensed to practice medicine in the Commonwealth of Massachusetts

between 1988 – 2002.

1775.   Below is partial copy of the United States' OPM notice of the Plaintiff's appointment as

a Medical Officer in the Boston Disaster Medical Assistance Unit 1 of the National Disaster

Medical System (NDMS) under the U.S. Department of Public Health, U.S. Department of

Health and Human Services (DHHS):

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

**NOTIFICATION OF PERSONNEL ACTION**

| 1. Name (Last, First, Middle) | | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|---|
| WEINBERG          ROBERT | | | 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 | 10-27-53 | 01-27-00 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 170 | EXC APPT | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| XZM | SCH A 213.31 16(A)(1) | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | MEDICAL OFFICER                    NDMS?? |

| 8 Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12 Total Salary | 13 Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GS | 0602 | 11 | 01 | $49,626.00 | PA |
| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | | | 20A. Basic Pay | 20B. Locality Adj | 20C. Adj. Basic Pay | 20D. Other Pay | | |
| | | | | | | $49,626.00 | $0 | $49,626.00 | $0 | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | US. OFFICE OF PUBLIC HEALTH AND SCIENCE OFFICE OF EMERGENCY PREPAREDNESS |
| | ACK |

467

1776.   The Plaintiff did serve his country, the United States of America, as a Medical Officer in the PHS National Disaster Medical System (NDMS) from 2000 - 2002 (https://aspr.hhs.gov/NDMS/Pages/default.aspx).

1777.   The Plaintiff did receive a Congressional Letter of Commendation for his NDMS service at the National State of the Union address in Washington, DC in 2001, when the Plaintiff was deployed in Washington, DC to protect members of Congress in the event of any bio-terrorism event as a Medical Officer in the NDMS.

1778.   During the period of time 2000 - 2002, the Plaintiff served on over 20 conferences, meetings and active deployments with the NDMS as a national Medical Officer in the U.S. PHS, DHHS.

1779.   Justice Ellen Gorman of the Maine Supreme Judicial Court did deny the Plaintiff's motion to admit the Congressional Letter of commendation as partial evidence of his good character at a hearing on or about 2011 when the Plaintiff appeared at a hearing of a single-justice challenging the board's assertion that he failed to show evidence of his fitness to practice law after passing the Bar exam in Maine in 2010.

1780.   In violation of the Maine Rules of Civil Procedure, Justice Gorman  refused to comply with Maine Rules of Civil Procedure which state that parties in judicial proceedings may motion to take Judicial Notice of  Facts Certain and capable of independent corroboration.

1781.   At the 2011 hearing, Justice Gorman  asked the Plaintiff why his counsel did not introduce into the record the Congressional letter of commendation, to which the Plaintiff answered that he did not know the reason, other than counsel had not requested copies of awards and honors which the Plaintiff had accrued in the past.

*Humanitarian charitable non-profit Flights for Humanity*

1782.   On or about May 1995, the Plaintiff successfully passed the FAA Private Pilot exam, taking the exam with FAA examiner Michael Goulian, Sr. at the Class C Hanscomb airfield in Bedford, MA (https://www.fltplan.com/airport.cgi?KBED) and earning his Private Pilot license to fly single-engine land airplanes.

1783.   In 1997, the Plaintiff obtained 501(c)(3) non-profit status for his brain-child "Flights for Humanity" modeled after "Habitat for Humanity" founded by President Jimmy Carter (https://uia.org/s/or/en/1100047471).

1784.   The mission of Flights for Humanity involved flying indigent patients in third-world countries free-of-charge for medical treatment and also providing flights to transport needed medical equipment in third-world countries.

1785.   The Plaintiff founded Flights for Humanity in order to combine his love of flying airplanes with his humanitarian drive to help indigent peoples around the world.

1786.   Among, other missions, the Plaintiff flew from Bedford to Atlanta to load up his plane with medical supplies, which he then flew down to Chiappas, Mexico in 1998 to a tent community of 10,000 displaced refugees who were rendered homeless during the Chiappas-Mexico civil war   (https://en.wikipedia.org/wiki/Chiapas_conflict).

1787.   This mission was written up in the Tufts Medical School journal "Tufts Medicine" and also in the Fitchburg Sentinel newspaper.

1788.   While working as a Family Medicine physician at the Boston Evening Medical Center, 388 Commonwealth Avenue, Boston, MA,  Plaintiff became the primary care physician for Lourdes Colon, a 28-year-old Hispanic female.

1789.   In 1992, the Plaintiff and defendant Lourdes Colon met with Dr Lisa Wolfe at the psychiatric hospital Human Resources Institute (HRI) in Brookline, MA where the three discussed terminating the doctor-patient relationship and with their unanimous agreement, this termination was memorialized in a writing dictated by Dr. Wolfe and each copy signed by the Plaintiff and defendant Lourdes Colon.

*AMA Code of Ethics -   Opinion 8.14  regarding sexual misconduct*

*https://journalofethics.ama-assn.org/article/ama-code-medical-ethics-opinions-observing-professional-boundaries-and-meeting-professional/2015-05*

6/16/2011                          Opinion 8.14 - Sexual Misconduct in the...



Physician Resources · Medical Ethics · AMA Code of Medical Ethics · Opinion 8.14

## Opinion 8.14 - Sexual Misconduct in the Practice of Medicine

Sexual contact that occurs concurrent with the patient-physician relationship constitutes sexual misconduct. Sexual or romantic interactions betwe physicians and patients detract from the goals of the physician-patient relationship, may exploit the vulnerability of the patient, may obscure the physician's objective judgment concerning the patient's health care, and ultimately may be detrimental to the patient's well-being.

If a physician has reason to believe that non-sexual contact with a patient may be perceived as or may lead to sexual contact, then he or she shoul avoid the non-sexual contact. At a minimum, a physician's ethical duties include terminating the physician-patient relationship before initiating a dating, romantic, or sexual relationship with a patient.

Sexual or romantic relationships between a physician and a former patient may be unduly influenced by the previous physician-patient relationship Sexual or romantic relationships with former patients are unethical if the physician uses or exploits trust, knowledge, emotions, or influence deriv from the previous professional relationship. (I, II, IV)

Report: Issued December 1989; Updated March 1992 based on the report "Sexual Misconduct in the Practice of Medicine," adopted December 1990 (JAMA. 1991; 266: 2741-2745).

1790.   The Plaintiff complied with the AMA Opinion 8.14 through the mutual termination of the doctor-patient relationship under the guidance, formation, formulation, drafting and dictation of the Express Bilateral Contract under the guidance of Dr. Lisa Wolfe.

1791.   Following the formation and execution of the Express Bilateral Contract terminating the doctor-patient relationshipIn September 1992, the Plaintiff and Lourdes Colon began weekly meetings at MIT where Lourdes Colon had volunteered to assist the Plaintiff with some research on an acoustic pulmonary instrument, while the Plaintiff was a Fellow in the MIT Advanced Study Program.

1792.  The Plaintiff sponsored Lourdes Colon was his research assistant for a circulation borrowing library card at the Countway Library of Medicine at Harvard Medical School.

1793.  Subsequently the relationship between the Plaintiff and Lourdes Colon became sexual.

1794.  In 1995, Lourdes Colon filed suit (while in one of her alter-egos of her Multiple Personality Disorder) against the Plaintiff in Middlesex Superior Court where she alleged that the Plaintiff had engaged in sexual misconduct as her physician.

1795.  Upon receiving the Complaint and Summons from Suffolk Superior Court, the Plaintiff notified ProMutual, his medical malpractice insurer, who assigned Claudia Hunter to be his counsel (https://www.linkedin.com/in/claudia-hunter-8274847).

1796.  Claudia Hunter responded to this Complaint with an answer, acting as an agent for ProMutual Malpractice insurance, and as attorney representing the Plaintiff in the action *Lourdes Colon v. Robert P. Weinberg, Boston Evening Medical Center, Robert Wesselhoeft, III et al.*

1797.  In 1996, Lourdes Colon wrote a complaint to the Board of Registration in Medicine ("BORIM") alleging that the Plaintiff had engaged in sexual misconduct, while acting in one of her alter-egos of her Multiple Personality Disorder.

1798.  In 1997, on advice of counsel Claudia Hunter, the Plaintiff settled the suit with Lourdes Colon out-of-court for $100,000 in spite of the fraud which had been committed on the Court through defendants' concealing their knowledge and content of the 1992 memorialized hand-written Express Bilateral Agreement terminating the doctor-patient relationship.

1799.   During the winter of 1997, BORIM requested a written response from the Plaintiff regarding the allegations made by Lourdes Colon in her letter alleging sexual misconduct by the Plaintiff, while acting in one of her alter-egos of her Multiple Personality Disorder.

1800.   Upon the recommendation of Claudia Hunter, the Plaintiff obtained representation with Vincent DiCianni (https://www.affiliatedmonitors.com/vin-dicianni/)  to represent him for the proceedings involving BORIM in DALA.

1801.   Between 1998 - 2002, the Plaintiff paid over $300,000 US dollars to three independent unrelated attorneys - Vincent DiCianni, Robert Stolzberg, and John Flym - out-of-pocket for legal representation in court for proceedings related to the Plaintiff's medical license and allegations of sexual misconduct.

1802.   In 2002, during one of his final clinical positions, working as an Emergency Medicine Attending Physician at Jones Memorial Hospital, in Wellsville, NY, the Plaintiff had a salary of $120K per annum.

1803.   Working several jobs simultaneously, the Plaintiff earned an average of  $150K per annum during the period between 1988 and 2002.

1804.   Since the loss of his medical license in October 2002, the Plaintiff has suffered the loss of realizable income of approximately $3,210,00.00 which represents the average annual income from multiple positions in the Boston Evening Medical Center, Jones Memorial Hospital, multiplied by the twenty-one years that the Plaintiff has been unable to work as a physician.

1805.   Vincent DiCianni advised the Plaintiff that it was important for him to meet with Lourdes Colon and speak with her to assess her credibility as a witness.

1806.  DiCianni contacted counsel representing Lourdes Colon, and requested a meeting to discuss the allegations of sexual misconduct against the Plaintiff, but Colon's counsel denied this request.

1807.  DiCianni then made a motion in Suffolk Superior Court to depose Colon, but after a hearing, the Court denied this motion.

1808.  Finally, DiCianni advised the Plaintiff that it was essential for him to assess Colon's credibility as a witness, and proceeded to file suit in Superior Court *Robert Weinberg v. Lourdes Colon* in order to depose her as a defendant [Joint Stipulated Findings of Fact, DALA *In the matter of Robert P. Weinberg, D.O.,* Magistrate Sarah Luick's "Findings of Fact and Recommended Decision" issued April 2002, DALA *In the matter of Robert P. Weinberg, D.O.,* Factual Finding].

1809.  For four years, defendant Lourdes Colon remained steadfast in her assertion to BORIM that she did not sign nor agree to the termination of the doctor-patient relationship in 1992, possibly due to her distorted memories from her other alter-egos in her Multiple Personality Disorder.

1810.  In evasive and deceitful elocution, attempting to protect her license and livelihood, when BORIM asked Dr Wolfe about the termination of the doctor-patient relationship in 1992 by the Plaintiff and Lourdes Colon, Dr Wolfe only answered that it was not the type of thing that she usually does - thus omitting the full truth about the termination agreement which she herself dictated for both the Plaintiff and Lourdes Colon to memorialize in writing and sign.

1811.  After reviewing the medical records and additional evidence, Magistrate Sarah Luick did make a Finding of Fact that the Plaintiff and Lourdes Colon did meet in September 1992 when

they mutually agreed to terminate the doctor-patient relationship [Joint Stipulated Findings of Fact, DALA *In the matter of Robert P. Weinberg, D.O*; Magistrate Sarah Luick's "Findings of Fact and Recommended Decision" issued April 2002, DALA *In the matter of Robert P. Weinberg, D.O., Factual Finding*].

1812.   Around February 1998, BORIM issued a formal Statement of Allegations initiating adjudicatory proceedings in the Division of Administrative Law Appeals ("DALA) in compliance with 243 CMR 1.00  (https://www.mass.gov/regulations/243-CMR-100-disciplinary-proceedings-for-physicians).

1813.   Magistrate Sarah Luick presided over the adjudicatory proceedings at DALA in the case *Board of Registration in Medicine v. Robert P. Weinberg.*

1814.   DALA adjudicatory proceedings continued from 1998 – 2002.

> *1998-2002 BORIM could not have believed that the Plaintiff's practice of medicine*
> *was a risk to the community*

1815.   During these five years, BORIM continued to allow the Plaintiff to practice medicine in the Commonwealth of Massachusetts, in spite of the fact that all facts relevant to the allegations of sexual misconduct were known to BORIM in 1998.

1816.   During the five years from 1998 - 2002, the Plaintiff provided medical care to approximately 40,000 patient-visits because the Plaintiff treated approximately thirty patients each day that he worked in the clinic or the hospital.

1817.   Under Massachusetts law, BORIM has the authority to emergently revoke the medical license of any physician who appears to present any risk or danger to the health, welfare or safety of the citizens of Massachusetts.

1818. There multiple instances of BORIM revoking the medical license of a physician within 48 - 72 hours of when they receive any credible notification of egregious violations in the practice of medicine, such as when a physician is alleged to be raping patients during medical examination or treatment.

1819.   In 1999, BORIM counsel made an offer of a one-year voluntary suspension of his medical license to the Plaintiff through counsel.

1820.   Allowing the Plaintiff to continue to practice medicine for the five years between 1998-2002 is arguably presumptive evidence that BORIM did not believe that the Plaintiff represented a serious risk or danger to the health, safety or welfare to the people of Massachusetts, when all facts relevant to the allegations of sexual misconduct were known to BORIM in 1998.

1821.   BORIM took the deposition of the Plaintiff in October 1998 regarding allegations of misconduct by defendant Lourdes Colon, while acting in one of her alter-egos of her Multiple Personality Disorder

1822.   In January 1998, BORIM issued formal Statement of Allegations initiating adjudicatory proceedings in the Division of Administrative Law Appeals (DALA) before Magistrate Sarah Luick [Joint Stipulated Findings of Fact, DALA *In the matter of Robert P. Weinberg, D.O.*, Factual Finding #   , page #   ;    Magistrate Sarah Luick's "Findings of Fact and Recommended Decision" issued April 2002, DALA *In the matter of Robert P. Weinberg, D.O.*, Factual Finding #   , page    ].

1823.   With the mutual consent of BORIM and Plaintiff, Magistrate Sarah Luick decided that the two parties to "In the matter of Robert P. Weinberg" could work on a Joint Stipulation of Facts to resolve undisputed issues of fact to be submitted to the Magistrate to assist with the adjudication.

1824.   This Joint Stipulation of Facts was submitted to DALA on or about September 2001, shortly before the 911 terrorist attacks on the World Trade Center, Pentagon and attempted attack on the Capitol building.

*Representation by the late Professor John Flym, Northeastern University School of Law*

1825.   The Plaintiff was enrolled as a full-time law student at the Northeastern University School of Law (NUSL) during 2001-2002 (1L and partial 2L), where he successfully completed courses on: Property, Contract, Torts, Civil Procedure, Constitutional Law, Criminal Procedure and Criminal Law.

1826.   In October 2002, BORIM issued its decision and order revoking the Plaintiff's medical license.

1827.   On hearing this distressing news, the Plaintiff sent out a group email on a NUSL law student mailing list in October 2002 received by fellow law student classmates and NUSL law faculty, stating that unfortunately due to distressing legal news, the Plaintiff would be immediately withdrawing from the Northeastern University School of Law.

1828.   Upon reading this email, Professor of Law John Flym asked the Plaintiff if he would like to meet to discuss his legal situation.

1829.   After discussion of the Plaintiff's plight and misfortune, John Flym agreed to undertake representation of the Plaintiff and entered his appearance as Counsel of Record with the BORIM.

1830.   John Flym continued to legally represent the Plaintiff in judicial legal proceedings for a period of nine years from October 2002 through the Plaintiff's appeal at the Massachusetts Supreme Judicial Court in 2011.

1831.   BORIM made an offer of one-year voluntary suspension of medical license if PLAINTIFF ROBERT WEINBERG agreed.

<u>1998 – 2002 Adjudicatory proceedings at Mass Division of Administrative Law Appeals (DALA)</u>

1832.   Sarah Luick was the magistrate overseeing the adjudicatory proceedings at DALA for Commonwealth *Board of Registration in Medicine v. Robert P. Weinberg* during the years 1998 – 2002.

1833.   PLAINTIFF ROBERT WEINBERG and BORIM both agreed to submit proposed stipulated Findings of Fact, mutually agreed upon, on the undisputed issues of fact to DALA.

1834.   In 2001, PLAINTIFF ROBERT WEINBERG and BORIM submitted their final stipulated Proposed Findings of Fact to DALA.

*Stipulated Findings of Fact accepted by Magistrate Sarah Luick*

1835.   In April 2002, Magistrate Luick issued her Findings of Fact and Recommended Decision.

1836. Among the multiple Findings of Fact made by Magistrate Sarah Luick were the following findings:

i. PLAINTIFF ROBERT WEINBERG and LC met with Dr Wolf in 1992 and signed an agreement terminating the doctor-patient relationship;

ii. held that when PLAINTIFF ROBERT WEINBERG resumed medical treatment of LC, that act rescinded the  contractual termination of the doctor-patient;

iii. following the resumption of medical treatment, the sexual relationship between PLAINTIFF ROBERT WEINBERG and LC comprised sexual misconduct;

iv. in violation of the AMA Code of Ethics which prohibits sexual conduct between physicians and patients, PLAINTIFF ROBERT WEINBERG did engage in misconduct and unethical behavior.

1837. Magistrate Luick in her Recommended Decision recommended some disciplinary action for PLAINTIFF ROBERT WEINBERG comprising license suspension/revocation.

1838.  In October 2002, there was a hearing at BORIM where PLAINTIFF ROBERT WEINBERG admitted making some errors of judgment, apologized to LC for any harms it caused her, Board members asked PLAINTIFF ROBERT WEINBERG several questions, and LC made a Victim's statement.

1839.  Board counsel Alice Oliff falsely stated during the hearing, that the retroactive application of a BORIM ruling made in 1998 to the conduct of PLAINTIFF ROBERT WEINBERG committed in 1993 was consistent with the rules of law, ignoring the exception that such retroactive application does not apply when it substantially increases the liability of the subject.

1840. October 30, 2002 BORIM revoked the medical license of PLAINTIFF ROBERT WEINBERG, granting him the right to apply for reinstatement after 3 years, although the usual period of license revocation was 5 years.

1841. Following the revocation of his license, PLAINTIFF ROBERT WEINBERG also was excluded from Medicare under its regulations, and this exclusion prevented him from performing any work for any hospital, clinic or university which receives Medicare funding.

1842. The revocation of his medical license caused irreparable harm and injuries to the Plaintiff, including but not limited to extreme ostracism and social isolation, humiliation, personal bankruptcy, divorce, mental health issues, loss of his DEA Controlled Substances Registration, Medicare exclusion and the loss of multiple jobs due to the Medicare exclusion, in addition to substantial disruption of subsequent academic programs when the license revocation was incidentally discovered by co-workers surfing the internet.

1843.   The total aggregate of economic injuries to the Plaintiff amount to over US $6,000,000.00 (six million U.S. dollars) over a 21-year period of time.

1844. Some of the relevant legal issues raised by this case of First Impression without precedent in Massachusetts nor in the United States where no case of a psychologist-mediated termination of the doctor-patient relationship with formation and execution of an Express Bilateral Contract can be found in any legal database:

(a). The *contracts clause* of the U.S. Constitution

The doctor-patient relationship is a contractual relationship with fiduciary responsibilities on the part of the physician who has greater power in the power imbalance between the two parties.

Magistrate Luick did make a finding of fact that PLAINTIFF ROBERT WEINBERG and LC made a mutual agreement to terminate the doctor-patient relationship at HRI in September 1992 memorialized by a writing dictated by Dr Wolf. Such termination comprised an express bilateral contract between PLAINTIFF ROBERT WEINBERG and LC. Magistrate Luick's ruling that PLAINTIFF ROBERT WEINBERG rescinded the contractual termination, by resuming medical treatment, comprised state action interfering with the freedom to contract between private parties guaranteed by the U.S. Constitution.

(b). The *ex post facto* clause of the U.S. Constitution

In spite of Alice Oliff's representation to BORIM that the retroactive application of a 1998 rule to conduct in 1993 was lawful and proper. Since such retroactive application imposed substantial liability on PLAINTIFF ROBERT WEINBERG, such state action did comprise a violation of the U.S. Constitution's clause prohibiting *ex post facto* legislation of new law, resulting in substantial liability for PLAINTIFF ROBERT WEINBERG and was the proximate cause for his license revocation.

(c). Procedural Due Process guarantees of the Fifth Amendment, incorporated to the States by Selective incorporation through the Fourteenth Amendment.

Because PLAINTIFF ROBERT WEINBERG did not know in 1993 that his conduct would be prohibited by a rule promulgated by BORIM in 1998, he did not have adequate Notice of such and  by BORIM in 1998, he did not have adequate Notice of such and the subsequent revocation of his medical license violated his right to Due Process of law because no notice was provided prior to his conduct. Furthermore, the Plaintiff was denied his right to a FAIR HEARING with

an opportunity to be heard and present exculpatory evidence which exonerates the Plaintiff of all wrongdoing.

(d). The *Bills of Attainder* prohibition of the U.S. Constitution

In this case of first impression, without any precedent in the Commonwealth of Massachusetts nor in any of the fifty states of the USA, where a physician and patient mutually terminated the doctor-patient relationship under the guidance of a psychologist via a memorialized hand-written Express Bilateral Contract, followed by a sexual relationship, and then subsequently with resumption of medical care, the harsh application and treatment of PLAINTIFF ROBERT WEINBERG by BORIM was tantamount to a Bill of Attainder, punishing PLAINTIFF ROBERT WEINBERG for conduct for which he had no Notice, unprecedented, and comprised state action/law uniquely applied to his situation, and not to any other cases, but was the unique application of law to a single citizen.

(e). The American Medical Association's Code of Ethics, regarding the prohibition of sexual interaction between physicians and patients, does provide that such interactions may be permissible if the physician first terminates the physician-patient relationship prior to beginning any sexual relationship.

(f).     Violation of the Equal Protection clause

Physicians involved sexually with their patients may be divided into two groups: those thas subsequently marry their patients and those that do not. BORIM never disciplines nor revokes the licenses of those physicians who marry their patients. BORIM will only discipline those physicians who do not marry their patients. This comprises a discriminatory treatment of

the two groups of physicians which violates the Equal Protection clause of the Constitution and must be judicially analyzed by the Strict Scrutiny standards.

(g).    Burden on the fundamental right and liberty to marry

As described above in paragraph (g), BORIM will only discipline physicians who do not marry their patients and will not discipline physicians who marry their patients. These regulations place an undue burden on the fundamental right and liberty to marry. The BORIM regulations thereby coerce the physicians into deciding - either marry the patient or lose your license to practice medicine.

(h)    Impairing the fundamental right to engage in gainful employment

BORIM's actions deprived the Plaintiff of the right to engage in gainful employment because he could no longer practice medicine and numerous employers have refused to allow the Plaintiff to work for them because of the posting on BORIM's web site alleging that the Plaintiff engaged in sexual misconduct.

1845.   Alice Oliff's misrepresentation to BORIM during the October 2002 hearing was unlawful and improper in that she neglected to inform the board that such retroactive application was not proper when it results in the creation of substantial liability.

*Lourdes Colon has Dissociative Identity Disorder with Multiple Personality Disorder*

1846.   The medical records and Expert Witnesss testimony shows that the defendant Lourdes Colon suffers from Dissociative Identity Disorder along with Multiple Personality disorder.

1847.  Below is the DSM-V criteria for Dissociative Identity Disorder, which Lourdes Colon suffers from or did suffer from:

---

Box 10-6.  DSM-5 Diagnostic Criteria for Dissociative Identity Disorder

---

A. Disruption of identity characterized by two or more distinct personality states, which may be described in some cultures as an experience of possession. The disruption in identity involves marked discontinuity in sense of self and sense of agency, accompanied by related alterations in affect, behavior, consciousness, memory, perception, cognition, and/or sensory-motor functioning. These signs and symptoms may be observed by others or reported by the individual.

B. Recurrent gaps in the recall of everyday events, important personal information, and/or traumatic events that are inconsistent with ordinary forgetting.

C. The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

D. The disturbance is not a normal part of a broadly accepted cultural or religious practice.
   **Note:** In children, the symptoms are not better explained by imaginary playmates or other fantasy play.

E. The symptoms are not attributable to the physiological effects of a substance (e.g., blackouts or chaotic behavior during alcohol intoxication) or another medical condition (e.g., complex partial seizures).

---

*1848.*  Psychiatrist Expert Witness will present her Expert Opinion that defendant Lourdes Colon suffers from a Dissociative Identity Disorder with Multiple Personality Disorder

*Defendants MIT, Ann Graybiel, Nagina Mangal*

*Title IX & hostile learning environment arising from Defendants' defamatory communications about Plaintiff's sexual conduct, sexual behavior & sexual preferences*

1849.  Severe, substantial and devastating sexual discrimination against the Plaintiff began on June 26, 2023, arising from communications and discussions regarding my prior sexual acts, aspects of my sexuality, sexual behavior and/or sexual conduct.

1850.   This devastating discrimination has caused a crisis in the Plaintiff's life, and he is currently receiving mental health counseling to deal with this crisis and suicidal thoughts.

1851.   There are 2 threshold questions to determine the validity of the Plaintiff's Title IX complaint against MIT and Professor Ann Graybiel.

(a) At the morning June 26, 2023 private meeting between Professor Ann Graybiel and Postdoc Nagina Mangal,  which of the Plaintiff's sexual acts, aspects of my sexuality, sexual behavior and/or sexual conduct were discussed, which led to the precipitous, calamitous and catastrophic changes in Graybiel's attitude and beliefs toward the Plaintiff resulting in: his exclusion from laboratory participation; removal from the CellREADR project; failure to introduce the Plaintiff at the Friday June 30, 2023 collaborative meeting with the Agouti lab; shunning and refusal to answer the Plaintiff's request for a face-to-face meeting to discuss the precipitous change in Graybiel's behavior; Graybiel's refusal to answer the Plaintiff's email about sponsoring a grad fellowship which he qualified for which would bring in sorely-needed research funding into the laboratory; Graybiel's refusal to look at the Plaintiff in the eyes or to speak with the Plaintiff ever again; refusal to answer the Plaintiff's emails; sudden and total exclusion of the Plaintiff from the laboratory; refusal to have any communication or contact with the Plaintiff; leading to the termination letter sent by Graybiel to the Plaintiff during the week of July 3, 2023, breaching the academic contract which the Plaintiff had with MIT and aborting the letter of invitation which Graybiel sent to the Plaintiff in August 2022; and what specific information was communicated to Graybiel from Mangal the morning of June 26, 2023, specifically relating to the Plaintiff's prior sexual acts, sexuality, sexual behavior or sexual conduct?

(b) After joyously greeting the Plaintiff around 9 am on the morning of June 26, 2023, having just returned from her European trip to Sweden and Ireland, happy to see the Plaintiff and smiling with a glitter in her eyes and sharing with the Plaintiff his happiness over his continued weight loss on his new diet, what information was conveyed by Mangal at the subsequent meeting at approximately 10 am which led to a dramatic and cataclysmic change in Graybiel's attitude and beliefs toward the Plaintiff such that she would never look at the Plaintiff in the eyes again, never smile at the Plaintiff again, and wanted to have no contact nor communication with the Plaintiff ever again, and apparently decided to exclude the Plaintiff from all lab participation or research, and how that change in her attitude and beliefs toward the Plaintiff related to the Plaintiff's prior sexual acts, aspects of his sexuality, sexual behavior or sexual conduct?

1852.  It was so ironic and bewildering that the Plaintiff found himself writing a detailed Personal Statement documenting the Sexual Discrimination which he began to experience from Anne Graybiel, Nagina Mangal and the Massachusetts Institute of Technology (MIT) beginning on June 26, 2023, which was totally inapposite and contrary to the attitudes and beliefs which he experienced between June 2022 until June 26, 2023.

1853.  Actually the Plaintiff did experience some of this discriminatory attitude from Nagina Mangal the week prior to June 26, 2023, when she apparently learned specific information about the Plaintiff's prior sexual acts, aspects of my sexuality, sexual behavior or sexual conduct.

1854.  Anne Graybiel is a professor of neuroscience at MIT, and a world-reknown researcher on the neuroscience of the basal ganglia and its functioning in cognition, learning, mood disorders, addictions, obsessive-compulsive disorder and Huntington's disease.

1855.   Nagina Mangal had just completed her PhD in cancer biochemistry at the University of London and was beginning her first postdoc position at MIT in May 2023 when she joined the laboratory of Ann Graybiel.

1856.   From June 2022, when the Plaintiff made his first powerpoint presentation to the Graybiel lab, until the morning of June 26, 2023, the Plaintiff felt warm, friendly, responsive, encouraging and respectful attitudes from Professor Ann Graybiel.

1857.   In September 2022, Graybiel had excitedly and exuberantly expressed to the Plaintiff that she was so glad that the Plaintiff decided to join the Graybiel lab.

1858.   For most of the 12 months from June 2022 to May 2023, there were warm, friendly and cordial relations between Ann Graybiel and the Plaintiff.

1859.   The Plaintiff was very happy to be part of the Graybiel lab and really enjoyed the research he was doing there as well as his relationships with the other students and Research Scientists in the lab.

1860.   Prior to June 26, 2023, the Plaintiff never felt any animosity, anger, nor any type of discrimination in the lab.

1861.   All this changed dramatically on June 26, 2023.

1862.   On the morning of June 26, 2023, after returning from a trip to Europe, around 9 am in the morning Graybiel ran up to the Plaintiff smiling and sharing the joy about his successful diet and weight loss where he lost 35 lbs since January 2023.

1863.   The Plaintiff spoke briefly with Ann that morning about the ongoing research, and she specifically asked how Nagina Mangal, the new postdoc, was doing and adjusting to the lab.

1864.    This (9 am) was about one hour before Graybiel was to meet with Nagina Mangal in her office, and was also the last time that Graybiel would look at the Plaintiff in the eyes, smile at the Plaintiff, speak to the Plaintiff or respectfully include the Plaintiff as part of the laboratory.

1865.    The Plaintiff correctly surmised that when Graybiel would meet with Mangal at about 10 am the morning of June 26, 2023, Mangal would communicate to Graybiel information concerning the Plaintiff's specific prior sexual acts, his sexuality, sexual conduct and sexual preferences, which was available for access on the Internet.

1866.    Apparently Mangal had learned this information about the Plaintiff's prior sexual acts, his sexuality, sexual conduct and sexual preferences during the previous week, when she dramatically changed her attitudes and beliefs toward the Plaintiff, terminated a joint project we were working on - drafting a literature review on the role of cannabinoids on the brain in the CNS, and began to actively shun the Plaintiff.

1867.    These prior sexual acts, the Plaintiff's sexuality, sexual conduct and sexual preferences dating back to 1992-93, some 30 years prior to the present time, were documented on the internet.

1868.    It was never alleged nor was the Plaintiff ever convicted of any crime involving his prior sexual acts, his sexuality, sexual conduct and/or sexual preferences.

1869.    However, due to a perceived conflict of interest in the doctor-patient relationship, which the board considered a question of unethical conduct (but not criminal conduct), the Massachusetts Board of Registration in Medicine revoked the Plaintiff's medical license in 2002, granting him the right to petition for reinstatement of his license after three (3) years in 2005 - in spite of the fact that most medical license revocations were for a period of five (5) years.

1870.    No one in the Graybiel lab had ever seen or experienced the Plaintiff engaging in any of those sexual acts, my sexuality, sexual conduct and/or sexual preferences.

1871.    The Plaintiff had always maintained friendly and respectful relations with all the students, postdocs and Research Scientists in the Graybiel lab and around MIT in general.

1872.    There was never any complaint (which the Plaintiff knew of) from any of the students, postdocs or faculty associated with the Graybiel lab - until June 26, 2023.

1873.    The Plaintiff's life has been devastated since June 26, 2023.

1874.    All the Plaintiff's career and professional goals have been derailed by these events.

1875.    During the week following June 26, the Plaintiff went into a "melt-down" and sent a number of irrational and extreme emails to Graybiel, when it became evident to him that Graybiel would never look at him in the eyes again, nor smile at him, nor speak to him or respectfully include him as part of the laboratory.

1876.    The Plaintiff fell again into a deep depression, with some suicidal ideation.

1877.    The Plaintiff is now in counseling to attempt to stabilize his mental health, trying to find a reason to live.

1878.    Since the Plaintiff first met Anne Graybiel in June 2022, he believed her to be a good, honest, caring and non-discriminating person, until she returned from a recent trip to Europe and sat down to discuss specific facts with Nagina Mangal about the Plaintiff's prior sexual acts, sexuality, sexual conduct, sexual behavior and/or sexual preferences, which were only known to a handful of individuals at MIT between 2010 and 2019, but which could be discovered online by Googling the Plaintiff's name.

1879.    During the week prior to her return from Europe, the new postdoc in the Graybiel lab, Nagina Mangal, showed a dramatic and drastic change in her attitude toward the Plaintiff, shunning him, and also unexpectedly terminating a project she had started together with the Plaintiff on writing a literature review on the cannabinoid receptors in the brain and their role in modulating the behavior and cognition regulated by the Basal Ganglia.

1880.    Near the end of May 2023, a new postdoc Nagina Mangal joined the Graybiel lab and became good friends with the Plaintiff.

1881.    Nagina was delighted during her first week at MIT when the Plaintiff brought her over to the MIT Atlas center where she was able to pick up her new MIT ID card, followed by the Plaintiff providing Nagina with a personal tour of the MIT campus which is relatively large, and she learned where the Athletics center, Student Center, library and other academic buildings are located.

1882.     The first week of June 2023, the Brain and Cognitive Sciences department held their annual research symposium on Cape Cod.

1883.    Some lab members traveled by a departmental bus to the Cape Cod location, but the Plaintiff offered to drive several lab members in his car, as he decided to drive there and have the flexibility of having his car accessible.

1884.    The Plaintiff filled up his car - a Toyota Sequoia - with 6 lab colleagues, including Nagina, Georgios, Gun, Michael, Fred and the Plaintiff himself.

1885.    Nagina was delighted to ride in the front passenger seat, and thie Plaintiff pointed out Massachusetts landmarks while the group drove to the Cape.

490

1886.    Another friend of the Plaintiff had extra tickets to the Red Sox baseball game the week after the research symposium, so the Plaintiff invited Nagina to her first baseball game in America and Nagina and the Plaintiff went to the Red Sox game together.

1887.    Prior to the game, Nagina and the Plaintiff walked around the Kenmore Square neighborhood and Nagina shared some knowledge about some specific restaurants she ate at earlier in June.

1888.    The Plaintiff shared much information and knowledge about the Boston neighborhoods with Nagina, and when she learned that she needed to find a new place to live, the Plaintiff helped her find a new home and also some furniture.

1889.    The sharing of information, disclosing specific facts about Student Weinberg's prior sexual acts, sexuality, sexual behavior, sexual conduct and sexual preferences in 1992-2002, precipitated an immediate and drastic change in Graybiel's attitude toward the Plaintiff, changing the Plaintiff's role and status in the laboratory, substantially curtailing his educational plans and options.

1890.    Prior to June 2023, no one in the Graybiel lab suspected anything about the Plaintiff's prior sexual acts, sexuality, sexual conduct and sexual preferences (to the best of his knowledge).

1891.    However, while working as a Research Scientist in the Dept of Biology from 2010 through 2019, the Biology Dept initiated an investigation into the Plaintiff's prior sexual acts, sexuality, sexual conduct and sexual preferences.

1891.    In the MIT Policies is listed policy 9.5 on Sexual Harassment and gender-based harassment which is also available online:

491

"MIT Policy 9.5:  Sexual Harassment and Gender-based Harassment

[From:  https://policies.mit.edu]

1892.    9.5 Harassment (*This policy was last updated December 20, 2021. See the update history page for more information.)*

1893.    In order to create a respectful, welcoming and productive community, the Institute is committed to providing a living, working and learning environment that is free from harassment.

1894.    Harassment is defined as unwelcome conduct of a verbal, nonverbal or physical nature that is sufficiently severe or pervasive to create a work or academic environment that a reasonable person would consider intimidating, hostile or abusive and that adversely affects an individual's educational, work, or living environment.

1895.    In determining whether unwelcome conduct is harassing, the Institute will examine the totality of the circumstances surrounding the conduct, including its frequency, nature and severity, the relationship between the parties and the context in which the conduct occurred.

2874.    Below is a partial list of examples of conduct that would likely be considered harassing, followed by a partial list of examples that would likely not constitute harassment:

1896.    Examples of possibly harassing conduct: Public and personal tirades; deliberate and repeated humiliation; deliberate interference with the life or work of another person; the use of certain racial epithets; deliberate desecration of religious articles or places; repeated insults about loss of personal and professional competence based on age.

1897.    Examples of conduct that is likely not harassment: Administrative actions like performance reviews (including negative performance reviews) and making work assignments;

other work-related decisions like moving work areas or changing work colleagues; and isolated incidents (unless, as noted above, they are very severe, such as the use of certain racial epithets).

1898.   Information on different ways to raise concerns about harassment can be found on the Complaint Process and Resolution website.

1899.   Conduct that does not rise to the level of harassment may still violate Section 9.2.

1900.   Even conduct that does not violate an MIT policy may be inappropriate and any inappropriate conduct should be addressed by the supervisor or department head.

1901.   While MIT's harassment policy is not limited to harassment based on the protected categories listed in Section 9.3, the Institute is particularly committed to eliminating harassment based on those categories.

1902.   Harassment that is based on an individual's race, color, sex, sexual orientation, gender identity, pregnancy, religion, disability, age, genetic information, veteran status, or national or ethnic origin is not only a violation of MIT policy but may also violate federal and state law, including Title IX of the Education Amendments of 1972, Title VII of the Civil Rights Act of 1964, and Mass. General Laws Chapter 151B.  [For information on how to file complaints of violation of law with governmental agencies see Section 9.8.5.9 Legal Information.]

1903.   9.5.1 Sexual Harassment, Sexual Misconduct, Gender-Based Harassment, Title IX Sexual Harassment

1904.   2879.   The Institute's policy against harassment specifically includes a prohibition against sexual harassment, sexual misconduct, and gender-based harassment if the conduct meets

the standards of harassment set forth above and has a connection to MIT as described in Section 9.1.

1905.  2880.  Additional guidance is set forth on the Institute Discrimination &  Harassment Response Office website.

1906.  2881.  In addition, special procedures apply to formal complaints of sexual harassment covered under Title IX Sexual Harassment as defined in Section 9.5.1.4.

1907.  9.5.1.1 Sexual Harassment

1908.  2882.  Sexual harassment is unwelcome conduct of a sexual nature, such as unwelcome sexual advances, requests for sexual favors, or other verbal, nonverbal, or physical conduct of a sexual nature, when:

1909.  Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or academic standing; or

1910.  Submission to or rejection of such conduct by an individual is used as the basis for significant employment decisions (such as advancement, performance evaluation, or work schedule) or academic decisions (such as grading or letters of recommendation) affecting that individual; or

1911.  The conduct is sufficiently severe or pervasive that a reasonable person would consider it intimidating, hostile or abusive and it adversely affects an individual's educational, work, or living environment.

1912.  A partial list of examples of conduct that might be deemed to constitute sexual harassment if sufficiently severe or pervasive include:

494

1913.  Examples of verbal sexual harassment may include unwelcome conduct such as sexual flirtation, advances or propositions or requests for sexual activity or dates; asking about someone else's sexual activities, fantasies, preferences, or history; discussing one's own sexual activities, fantasies, preferences, or history; verbal abuse of a sexual nature; suggestive comments; sexually explicit jokes; turning discussions at work or in the academic environment to sexual topics; and making offensive sounds such as "wolf whistles.

1914.  Examples of nonverbal sexual harassment may include unwelcome conduct such as displaying sexual objects, pictures or other images; invading a person's personal body space, such as standing closer than appropriate or necessary or hovering; displaying or wearing objects or items of clothing which express sexually offensive content; making sexual gestures with hands or body movements; looking at a person in a sexually suggestive or intimidating manner; or delivering unwanted letters, gifts, or other items of a sexual nature.

1915.  MIT Policy - 9.5.1.2   Sexual Misconduct

1916.   Sexual misconduct is a broad term that includes sexual assault (rape, sexual fondling, incest or statutory rape) as well sexual exploitation and sexual harassment.

1917.   Further definitions can be found on the Institute Discrimination &  Harassment Response Office website.

1918.   Domestic violence and dating violence by an MIT faculty, staff or other community member also violate this policy.

1919.    Domestic violence and dating violence are defined on the Institute Discrimination & Harassment Response Office website.

1920.    MIT Policy - 9.5.1.3 Gender-Based Harassment

1921.    Gender-based harassment is unwelcome verbal or nonverbal conduct based on gender, sex, sex-stereotyping, sexual orientation, gender identity, or pregnancy that meets the definitions above of harassment.

1922.    Gender-based harassment may also involve conduct of a sexual nature.

1923.    MIT Policy - 9.5.1.4 Title IX Sexual Harassment

1924.    Although MIT broadly prohibits sexual harassment and other forms of sexual misconduct, federal Title IX regulations require MIT to follow specific processes when the Institute has actual knowledge of a report of certain categories of sexual misconduct, referred to as "Title IX Sexual Harassment."

1925.    Title IX Sexual Harassment means: Conduct on the basis of sex that satisfies one or more of the following:

1926.    An employee of MIT conditioning the provision of an aid, benefit, or service of MIT on an individual's participation in unwelcome sexual conduct;

1927.    Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to MIT's education program or activity; or

1928.    "Sexual assault," "dating violence," "domestic violence," or "stalking," as defined by federal law and set out on the Institute Discrimination and Harassment Response (IDHR) website.

1929. MIT must follow the specific processes cited below when it receives a formal complaint of Title IX Sexual Harassment and where all of the following apply:

1930. At the time of filing a formal complaint, the Complainant was/is participating in or attempting to participate in the education program or activity at MIT;

1931. The alleged conduct occurred in an education program or activity controlled by MIT; and

1932. The alleged conduct occurred against a person in the United States.

1933. Information about MIT's processes for responding to reports of Title IX Sexual Harassment is available here.

1934. Formal Complaints of Title IX Sexual Harassment are investigated in accordance with the IDHR Investigation Guide and hearings are held in accordance with the process available here  for complaints against a faculty member, staff member, or postdoctoral scholar (fellow or associate) and in the Title IX Sexual Harassment Hearing Procedures in the Committee on Discipline Rules for complaints against students.

1935.  Formal Complaints of sexual harassment and sexual misconduct that do not meet the definition of Title IX Sexual Harassment are addressed under the complaint resolution process described in Section 9.8 for complaints against a faculty member, staff member, or postdoctoral scholar (fellow or associate) and in the Sexual Misconduct Hearing Procedures (Non-Title IX Sexual Harassment) in the Committee on Discipline Rules for complaints against students.

1936.  MIT prohibits retaliation as set forth in Section 9.7 and the Mind and Handbook.

1937. In the context of Title IX Sexual Harassment, this means that: No person may intimidate, threaten, coerce, or discriminate against any individual:

1938.  for the purpose of interfering with any right or privilege secured by Title IX, or

1939.  because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in a Title IX Sexual Harassment investigation, proceeding, or hearing.

1940.  In addition, retaliation also includes intimidation, threats, coercion, or discrimination, including charges against an individual for policy violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or formal complaint of Title IX Sexual 2899.

1941.  Harassment, for the purpose of interfering with any right or privilege secured by Title IX.

1942.  Click here for additional definitions relevant to this Title IX Sexual Harassment policy.

1943.  MIT Policy 9.5.1.5 Notification of Allegations of Sexual Misconduct and Sexual Harassment of Students

1944.  Any MIT employee (including faculty and staff) who is informed of an allegation of sexual harassment or sexual misconduct involving an MIT student must promptly notify the Institute Discrimination and Harassment Response Office (IDHR) of the allegation. Graduate resident advisors, teaching assistants, and other students with advising or teaching responsibilities have this obligation to disclose when they are informed of an allegation due to their respective role, by notifying IDHR.

1945.  Note that, as defined above, sexual harassment and sexual misconduct are broad terms and include dating and domestic violence as well as stalking.

1946.  Staff who are designated as Confidential Resources do not have this obligation to disclose.

1947.  See Section 7.3.1 about responsibilities of supervisors to report certain allegations made against employees.

1948.  Conversation and discussion about specific facts about the Plaintiff's prior sexual acts, sexuality, sexual conduct and sexual preferences, resulted in obvious and substantial sexual discrimination against the Plaintiff causing significant humiliation and deprivation of educational opportunities.

1949.  Conversation and discussion about specific facts about the Plaintiff's prior sexual acts, sexuality, sexual conduct and sexual preferences, resulted in obvious and substantial sexual discrimination against the Plaintiff resulting in his immediate removal from the CellREADR chimeric RNA project which he led and spearheaded from November 2022 through June 2023.

1950.  Conversation and discussion about specific facts about the Plaintiff's prior sexual acts, sexuality, sexual conduct and sexual preferences, resulted in obvious and substantial sexual discrimination against the Plaintiff resulting in his humiliation, along with exclusion and isolation from laboratory activities which he had been participating in during the prior 12 months.

1951.  Conversation and discussion about specific facts about the Plaintiff's prior sexual acts, sexuality, sexual conduct and sexual preferences, resulted in obvious and substantial sexual discrimination against the Plaintiff resulting in Graybiel shunning and excluding the Plaintiff from day-to-day activities.

1952.   The Plaintiff began to experience a severely hostile learning environment which was unbearable to put up with.

1953.   Conversation and discussion about specific facts about the Plaintiff's prior sexual acts, sexuality, sexual conduct and sexual preferences, resulted in obvious and substantial sexual discrimination against the Plaintiff with Graybiel refusing to answer common questions and emails which she routinely answered during the prior 12 months.

1954.   Conversation and discussion about specific facts about the Plaintiff's prior sexual acts, sexuality, sexual conduct and sexual preferences, resulted in obvious and substantial sexual discrimination against the Plaintiff with Graybiel refusing to acknowledge and refusal to look at the Plaintiff in the eyes during lab meetings.

1955.   Conversation and discussion about specific facts about the Plaintiff's prior sexual acts, sexuality, sexual conduct and sexual preferences, resulted in obvious and substantial sexual discrimination against the Plaintiff with Graybiel breaching a 1-year academic contract which the Plaintiff had with MIT terminating the Plaintiff's expectations regarding obtaining data and completing his thesis in the Graybiel lab.

1956.   This severely disrupted the Plaintiff's plans to write his thesis in the Graybiel lab on astrocyte-neuronal interactions in the Basal Ganglia during Maternal Immune Activation, which the Plaintiff spent over 350 hours working on, drafting research proposals and making 4 different hour-long presentations in the Graybiel lab over the prior year.

1957.   These proposals and talks were communicated with his Graduate Advisor at the Massachusetts College of Pharmacy and Health Sciences.

1958.   Conversation and discussion about specific facts about the Plaintiff's prior sexual acts, sexuality, sexual conduct and sexual preferences, resulted in obvious and substantial sexual discrimination against the Plaintiff with Graybiel retaliating against the Plaintiff by drafting a letter of termination from the Graybiel lab.

1959.   In spite of the repeated expression from Graybiel that the lab needed additional funding to continue its research, when the Plaintiff emailed Graybiel about a Graduate fellowship he was eligible for which would provide additional research funding, asking whether Graybiel would serve as PI on the fellowship research funding, Graybiel never replied to this request because of her Sexual Discrimination against the Plaintiff resulting from Conversation and discussion about specific facts about the Plaintiff's prior sexual acts, sexuality, sexual conduct and sexual preferences.

1960.   Conversation and discussion about specific facts about the Plaintiff's prior sexual acts, sexuality, sexual conduct and sexual preferences, resulted in obvious and substantial sexual discrimination against the Plaintiff with Graybiel terminating Plaintiff's role in the CellREADR project, and placing Nagina Mangal in charge of the CellREADR project.

1961.   Since the Plaintiff's childhood neurodevelopmental problems following cerebral ischemia during birth resulting in significant developmental delays and a speech impediment for which the Plaintifff received speech therapy in Elementary School for 5 years to assist him in becoming able to communicate with others so that they could understand me, the Plaintiff became strongly attracted to the field of neuroscience.

1962.   The neonatal cerebral ischemia with its resulting brain damage, placed the Plaintiff on the path toward wanting to understand more about how the brain functions and what went wrong in Plaintiff's case.

1963.   A head trauma in 1964 resulted in an intracranial bleed in the Plaintiff's head, bringing him to the brink of death, but neurosurgery by the surgeon Dr Tarlov at the Flower and Fifth Avenue Hospital in New York City saved the Plaintiff.

1964.   In 1964, the neurosurgeons drilled a hole in Plaintiff's skull (craniotomy), evacuated the hemorrhage from his head, and placed a celluloid patch over the bleeding vessel to stop the hemorrhage.

1965.   Plaintiff's head injury resulted in post-concussion syndrome possibly along with some impulse control disorder.

1966.   Prior physicians have also diagnosed the Plaintiff with Concussive Head Trauma syndrome.

1967.   These head and brain injuries instilled in the Plaintiff a life-long interest in the brain and neuroscience.

1968.   Subsequent personal challenges with endogenous depression and Attention Deficit Disorder (ADD) further piqued the Plaintiff's interest in the workings of the brain.

1969.   Throughout college, medical school and graduate school, the Plaintiff has taken multiple courses in the neurosciences, and decided while working on his PhD in Pharmacology to focus on specific neuronal pathways in the basal ganglia important for learning, cognition, mood disorders, drug addictions, and Huntington's disease.

1970.  The Plaintiff has been extremely interested in neuroscience over his entire life, taking multiple courses, seminars and workshops to learn more about the human brain and neuroscience.

1971.  When applying to Harvard Medical School in 2013, the Plaintiff was torn between getting a master's in neuroscience or in immunology, and finally decided on Immunology.

1972.  More recently when applying to graduate school in 2018, the Plaintiff was again faced with the dilemma of getting a PhD in Neuroscience or in Pharmacology, and finally decided to go for Pharmacology as a wider more general area which would later provide him with more career and research opportunities in a wider field of knowledge.

1973.  MIT has a well-documented policy against sexual discrimination or harassment which can be accessed on the MIT web site:  https://policies.mit.edu/policies-procedures/90-relations-and-responsibilities-within-mit-community/93-nondiscrimination  and https://policies.mit.edu/policies-procedures/90-relations-and-responsibilities-within-mit-community/95-harassment#9.5.1

1974.  MIT POLICY AGAINST DISCRIMINATION, HARASSMENT, SEXUAL HARASSMENT, AND RETALIATION (2021)

1975.  •Harvard university and all its schools are committed to provide a safe and respectful work environment for every member of our community.

1976.  •Each member and affiliate to Harvard T. H Chan School of Public Health is expected to treat their colleagues and members of the community with respect and dignity.

1977.  Any form of discrimination and/or harassment based on race, sex, religion, creed, color, national or ethnic origin, age, disability, military status, marital status, sexual orientation, gender,

gender identity or expression, genetic information, pregnancy or a condition related to pregnancy or any other characteristic protected by law is not acceptable.

1978.   Conversation and discussion about specific facts about the Plaintiff's prior sexual acts, sexuality, sexual conduct and sexual preferences between Ann Graybiel and Nagina Mangal, resulted in obvious and substantial sexual discrimination and sexual harassment against the Plaintiff.

1979.   SEXUAL AND GENDER-BASED HARASSMENT POLICY AND PROCEDURES FOR THE FACULTY OF ARTS AND SCIENCES AT HARVARD UNIVERSITY

1980.   "Harvard is committed to fostering an open and supportive community that promotes learning, teaching, research, and discovery. This commitment includes maintaining a safe and healthy educational and work environment in which no member of the community is excluded from participation in, denied the benefits of, or subjected to discrimination in any University program or activity on the basis of sex, sexual orientation, or gender identity. Because sexual and gender-based harassment – including, but not limited to, sexual violence – interfere with an individual's ability to participate fully in or benefit fully from University programs or activities, they constitute unacceptable forms of discrimination." (SEXUAL AND GENDER-BASED HARASSMENT POLICY AND PROCEDURES FOR THE FACULTY OF ARTS AND SCIENCES AT HARVARD UNIVERSITY, 2015).

1981.   Discrimination Policy at Harvard University

1982.   Definition: "Subjecting someone to unequal terms of employment/benefits based on an individual's protected characteristic(s)".

1983.  It is unlawful and will not be tolerated.

1984.  An employer (Faculty, staff, or any affiliated positions) may not discriminate against an individual on the basis of race, sex, religion, creed, color, national or ethnic origin, age, disability, military status, marital status, sexual orientation, gender, gender identity or expression, genetic information, pregnancy or a condition related to pregnancy, or any other characteristic that is protected by law with respect to hiring, discharge, compensation, promotion, classification, training, assignments, or other terms, conditions and privileges of employment.

1985.  Harassment policy at Harvard University

1986.  •Any conduct that denigrates or shows hostility or aversion to a person because of race, sex, religion, creed, color, national or ethnic origin, age, disability, military status, marital status, sexual orientation, gender, gender identity or expression, genetic information, pregnancy or a condition related to pregnancy or any other characteristic protected by law.

1987.  •Such behavior has the purpose or effect of:

1) Creating an intimidating, hostile, or offensive work environment.

2) Unreasonably interfering with an individual's learning/work performance or adversely affecting an individual's learning/employment opportunities.

1988.  Examples of Sexual Harassment

• Using racial epithets, slurs, or other negative stereotyping

• Jokes or pranks that focus on a protected characteristic

• Circulating or displaying written or graphic material – whether placed on walls, bulletin boards, or elsewhere on the students/employers premises, circulated in the university/workplace, or sent through electronic transmission, including but not limited to email, social networking sites, text messaging, fax, internet, or voice mail systems – that denigrates or shows hostility or aversion toward a person or a group because of a protected characteristic

1989.    •Threatening, intimidating or hostile acts towards an individual because of a protected characteristic.

1990.    •Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and any conduct of a sexual nature.

1991.    •Requests or conduct is made either explicitly or implicitly as a term or condition of grades, employment or as a basis for employment decisions, such as promotions, assignments, salary, or scheduling; or similar.

1992.    •This conduct can have the purpose or effect of unreasonably interfering with an individual's learning/ work performance by creating an intimidating, hostile, humiliating or offensive work environment.

1993.    Sexual harassment may occur regardless of the intention of the person engaging in the conduct.

1994.    More Sexual Harassment examples

1995.    The following conduct/acts, which, if unwelcome, may constitute sexual harassment, depending upon the totality of the circumstances, including the severity of the conduct and its pervasiveness

• Sexual advances, whether or not they involve physical touching

• Requests for sexual favors in exchange for, or to prevent the denial or withholding of, actual or promised job benefits such as favorable reviews, salary increases, promotions, increased benefits, or continued employment;

• Sexual jokes;

• Use of sexual epithets, written or oral references to sexual conduct, gossip regarding one's sex life, comments on an individual's body;

• Comments about an individual's sexual activity, deficiencies or prowess;

• Displaying sexually suggestive objects, pictures, cartoons;

• Leering, whistling, brushing against the body, sexual gestures, suggestive or insulting comments; Inquiries into one's sexual experiences;

• Discussions of one's sexual activities; and

• Assault or coerced sexual acts.

• Stalking

•Commenting about or inappropriately touching an individual's body

1996.   Sexual Harassment policy at Harvard University

1997.   Sexual harassment is particularly serious when someone is perceived to be in a position to exercise professional power and directs the inappropriate behavior towards a subordinate such as subordinate staff, student or trainee.

1998. •Sexual harassment can be perpetrated by any gender against any gender.

1999. Sexual and gender-based harassment

2000. It can take many different forms and encompass a range of behaviors including (but not limited to:

- Unwelcome sexual conduct, such as sexual advances,

- Persuaded to do something by using force or threats/coerced sexual activity

- Dating violence

- Criticism based on sex, sexual orientation, or gender identity.

2001. Sexual harassment can take the form of speech

2002. It is important to reiterate the Free Speech Guidelines, adopted in May 15th 1990

2003. They are designed to safeguard freedom of speech and inquiry for all members of our community.

2004. It is therefore imperative that freedom of expression, including unpopular and even obnoxious speech, be protected.

2005. At the same time, however, the guidelines note, "There are obligations of civility and respect for others that underlie rational discourse.

2006. Racial, sexual, and intense personal harassment not only show grave disrespect for the dignity of others, but also prevent rational discourse

2007. Sexual Harassment

2008.  Other verbal, nonverbal, graphic, or physical conduct may create a hostile environment if the conduct is sufficiently persistent, pervasive, or severe so as to deny a person equal access to the University's programs or activities

2009.  Unwelcome conduct

2010.  Unwelcome conduct is defined as:

2011.  Conduct is unwelcome if a person

(1) did not request or invite it and

(2) regarded the unrequested or uninvited conduct as undesirable or offensive. That a person welcomes some sexual contact does not necessarily mean that person welcomes other sexual contact.

(3) Similarly, that a person willingly participates in conduct on one occasion does not necessarily mean that the same conduct is welcome on a subsequent occasion.

(4) "In addition, when a person is so impaired or incapacitated as to be incapable of requesting or inviting the conduct, conduct of a sexual nature is deemed unwelcome, provided that the Respondent knew or reasonably should have known of the person's impairment or incapacity.

2012.  The person may be impaired or incapacitated as a result of drugs or alcohol or for some other reason, such as sleep or unconsciousness.

2013.   A Respondent's impairment at the time of the incident as a result of drugs or alcohol does not, however, diminish the Respondent's responsibility for sexual or gender-based harassment under this Policy

2014.  Gender-Based Harassment

"•Gender-based harassment is verbal, nonverbal, graphic, or physical aggression, intimidation, or hostile conduct based on sex, sex-stereotyping, sexual orientation or gender identity, but not involving conduct of a sexual nature,

•When such conduct is sufficiently severe, persistent, or pervasive that it interferes with or limits a person's ability to participate in or benefit from the University's education or work programs or activities.

•For example, persistent criticism of, or unkind remarks of a person based on a perceived lack of stereotypical masculinity or femininity or exclusion from an activity based on sexual orientation or gender identity also may violate this Policy

2012.  Retaliation

2013.  •Retaliation occurs when an student/ employee is punished for making a good faith report of known or suspected inappropriate conduct or activities non-compliant with state or federal law or institutional policy.

2014.  Retaliation can include, but is not limited to:

-Any negative feedback/grade,

- Remove/change of groups/ remove leader positions in learning activities.

- Threats with low grades

- Lies about bad performance

- Threats to remove student from the program

-Job action such as demotion, discipline, firing, salary reduction, job or shift reassignment

2015.  RELATIONSHIP AT THE WORKPLACE - POLICY

2016.  The purpose of this policy is to provide guidelines to all employees, contractors and visitors at Harvard University.

2017.  Employing Family or Household Members Working

• Employment of family members in situations where one family member has direct influence over the other's conditions of employment (i.e., salary, hours worked, shifts, etc.), and a supervisor/subordinate relationship exists, is prohibited

• In the event that an employee is unsure about a potential conflict, they should fully disclose the circumstances to their supervisor in consultation with HR and await a determination.

2018.  Relationships at Work

2019.  Employees are encouraged to socialize and develop professional relationships within the workplace provided that these relationships do not interfere with the work performance of either individual or with the effective functioning of the work group.

2020.  Employees who engage in personal relationships (including romantic or sexual relationships) should be aware of their professional responsibilities and will be responsible for ensuring that the relationship does not create discomfort or raise concerns about favoritism, bias, ethics and conflict of interest. In cases of doubt, advice and counsel should be sought from the employee's supervisor or Human Resources.

2021.  RELATIONSHIP AT THE WORKPLACE - POLICY

2022.   Romantic or sexual relationships or conduct is inappropriate between employees in which one individual supervises, evaluates, teaches, mentors, advises, counsels, coaches or otherwise has influence or authority over the other employee, and such asymmetric relationships will be immediately addressed upon disclosure. These relationships, even if consensual, may ultimately result in conflict or difficulties in the workplace, and the more senior person will be held accountable for any policy violation.

2023.   •When employees interact with students/patient, employees are in a position of trust and power. In relationships with students/patients, the employee is expected to be aware of his/her professional responsibilities and to avoid apparent or actual conflict of interest, favoritism or bias. Romantic and/or sexual relationships are prohibited between a student/patient and an employee. Efforts by employees to initiate these relationships or respond to an overture by a student/patient are also prohibited."

2024.   Harvard University policies:

# Student Handbook: Policy on Consensua Romantic Relationships

HGSE affirms the value of close, caring relationships between members of the HGSE community. At the same time, consensual romantic relationships that might be appropriate in other circumstances have inherent dangers when one person has direct professional responsibility for another — as a faculty member or Teaching Fellow does for a student they teach or advise, a supervisor has for a supervisee, or administrators or faculty members may have for one another. In this situation, any romantic relationship is inherently asymmetrical because it involves one person who, by virtue of his or her role within the HGSE community, holds formal power over the other. Because of this power imbalance, such relationships hold potential for exploitation. Such a relationship may create an impression within the Harvard community of inappropriate or inequitable academic or professional advantage or favoritism that can be destructive of the learning or working environment. Such assumptions can have detrimental effects even if they are untrue.

https://www.gse.harvard.edu/students/handbook/consensual-relationship-policy

Accordingly, where one person's present role involves grading or otherwise evaluating the work of another, or puts the person in a position to affect the other's present performance or professional future, sexual overtures and sexual relationships, even if consensual, are inappropriate and may be grounds for disciplinary action. Responsibility for preventing and/or ending the relationship lies with the senior person. Moreover, all members of the HGSE community should be aware that romantic relationships between persons of different levels of authority within HGSE can create problems even if neither currently has professional responsibility for the other. One person may unexpectedly become responsible for instructing or evaluating the other. One person may fear adverse consequences if they act to end the relationship. One person's feelings may change, making unwelcome advances that were once welcomed and leading to a possible complaint of harassment. As noted above, such a relationship may also have detrimental effects on others in the HGSE community. It is incumbent upon those with authority neither to abuse nor seem to abuse the power with which they are entrusted.

2025.   Monitoring and Confidentiality

*A variety of resources are available at the University and in the area to assist those who have experienced gender-based or sexual harassment, including sexual violence.*

*"Individuals considering making a disclosure to University resources should make sure they have informed expectations concerning privacy and confidentiality.*

*The University is committed to providing all possible assistance in understanding these issues and helping individuals to make an informed decision.*

*It is important to understand that, while the University will treat information it has received with appropriate sensitivity, University personnel may nonetheless need to share certain information with those at the University responsible for stopping or preventing sexual or gender-based harassment*

2026.   Other Important Resources

•Policy Against Discrimination, Harassment, Sexual Harassment, and Retaliation

•Non-Retaliation

•Corrective Action

•Violence in the Workplace

•Code of Conduct

•Standards of Behavior

2027.

# General Standards of Conduct

It is the expectation of the Harvard Graduate School of Education that its students, whether or not they are on campus or are currently enrolled as degree candidates, will behave in a mature and responsible manner, in accordance with HGSE's standards of personal and professional conduct and accountability. In doing so, students help create a dynamic and inspiring atmosphere for learning and growth and demonstrate the core principles effective educators instill in their professional work and uphold in their daily lives. This expectation for mature and responsible conduct also encompasses accountability for one's own well-being, including responsible decision-making regarding physical and mental health.

All HGSE students are expected to adhere to these overarching values:

- Respect for the rights, differences, and dignity of others
- Honest and ethical preparation and submission of all academic work
- Honesty and integrity in dealing with all members of the community
- Accountability for personal and professional behavior

2028.

# Conduct in the HGSE Virtual Community

The HGSE virtual community is a space in which students communicate, collaborate, and connect with one another, and with faculty, staff, alumni, and affiliates, in a manner that is consistent with the School's values. Maintaining professional and respectful behavior in the HGSE online environment is critical to ensuring that all students are able to fully participate in the learning experience and opportunities, and to achieve their educational goals. Whether participating in courses (toward a degree, as a special student, or as an auditor), community events, or other HGSE online forums (including but not limited to platforms like The Hub, Slack, YellowDig, Canvas, and HGSE Facebook pages), all students are expected to adhere to the Standards of Conduct in the Harvard Community outlined above.

While HGSE faculty and administrators will monitor our virtual platforms, students remain agents of their own actions. Postings or comments that disrupt the learning experience or compromise the academic environment for other students will be removed. Violations of these Standards of Conduct in the Harvard/HGSE Virtual Community may result in disciplinary action by the HGSE Committee on Rights and Responsibilities. Students are asked to report any violations to the Office of Student Affairs.

Note: non-HGSE students who are enrolled in HGSE courses are expected to uphold the policies set forth in the HGSE Student Handbook, including without limitation those related to academic integrity and the Standards of Conduct. Non-HGSE students include, for example, TAP students, cross-registrants, and voucher holders. HGSE may take any and all actions it deems necessary upon the discovery of a policy violation, including without limitation immediately requiring the non-HGSE student to withdraw from the course and notifying the non-HGSE student's home institution, if applicable. Additionally, HGSE may preclude a non-HGSE student who has previously violated HGSE policy from registering in any future HGSE course.

2029.

- 1979: Supreme Court created a private right of action under Title IX.
  - *Cannon v. U. of Chicago*, 441 U.S. 677 (1979).

517

## CANNON v. UNIVERSITY OF CHICAGO
### 441 U.S. 677 (1979)



- Basic Facts:
  - In 1975, Geraldine Cannon (age 39) was denied admission to Univ. of Chicago and Northwestern Univ. medical schools.
  - Schools had policy of not admitting candidates older than 30 unless they already had an advanced degree.
  - Cannon argued that the policy was more likely to discriminate against women due to interruptions related to pregnancy and raising families.
  - Filed a Title IX complaint with HEW.
  - Also filed a lawsuit while waiting for HEW to respond to her complaint.

## CANNON v. UNIVERSITY OF CHICAGO
### 441 U.S. 677 (1979)



- Filed sex discrimination lawsuit in federal court, arguing violation of the 14th Amendment, Civil Rights Act of 1871, and Title IX.
  - District and Seventh Circuit dismissed the Title IX claim, holding that Title IX had neither an express nor implied private right of action.
  - Appealed to Supreme Court.

- Supreme Court reverses, and holds that there is an implied private right of action under Title IX.
  - Plain language: Individuals can bring a lawsuit under Title IX.
  - Court relied on legislative history, modeling of Title IX after Title VI of the Civil Rights Act of 1964, the underlying purposes of Title IX, and federal interest in preventing discrimination in education.

- Prevention and remediation of:
  - Gender Discrimination
  - Sexual Harassment
  - Sexual Assault
  - Retaliation
  - When gender-based:
    - Bullying and Cyberbullying
    - Stalking
    - Intimate Partner/Relationship Violence

1980: U.S. Department of Education was created.
– Title IX oversight transferred to Dept. of Ed.'s Office for Civil Rights (OCR).
• 1982: Supreme Court holds "Employment discrimination comes within Title IX's prohibition," *North Haven Bd. of Education v. Bell*, 452 U.S. 512.

## TITLE IX

*20 U.S.C. § 1681 & 34 C.F.R. Part 106 (1972)*

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance."

## NORTH HAVEN BOARD OF EDUCATION v. BELL
## 456 U.S. 512 (1982)



- Trumbull Board of Education

    - In Oct. 1977, Linda Potz, a former guidance counselor in Trumbull school district, filed a complaint with HEW alleging sex discrimination "with respect to job assignments, working conditions, and failure to renew her contract."

    - HEW determined Trumbull had violated Title IX and required Trumbull to engage in a number of corrective actions, including reinstating Potz to her position.

    - Trumbull filed a lawsuit in federal court seeking to invalidate the decision and HEW's authority to address employment under Title IX.

    - Same District Court cited its decision in *North Haven* and held in favor of Trumbull.

## NORTH HAVEN BOARD OF EDUCATION v. BELL
## 456 U.S. 512 (1982)



- Cases consolidated on appeal and Second Circuit reversed.

- Decides that HEW has authority under Title IX to address employment discrimination.

    - Court did not render a decision as to whether HEW could terminate funding under Title IX for employment cases.

- Appealed to the Supreme Court.

- Supreme Court agreed that Title IX's "broad directive that 'no person' may be discriminated against on the basis of gender on its face, includes employees as well as students."

    - Also looked at Title IX's legislative history and post-enactment history.

## NORTH HAVEN BOARD OF EDUCATION v. BELL
## 456 U.S. 512 (1982)



- Involved two cases: North Haven Board of Education and Trumbull Board of Education (both in Connecticut).

- North Haven Board of Education
  - Elaine Dove, a tenured teacher in North Haven public school system took a one-year maternity leave. North Haven refused to rehire Dove. In Jan. 1978, Dove filed a complaint with HEW for violation of Title IX.
  - HEW began an investigation, but North Haven refused to cooperate, "Asserting that HEW lacked authority to regulate employment practices under Title IX."
  - HEW notifies North Haven that it is considering enforcement proceedings, which could result in loss of federal funding.
  - District Court held in favor of North Haven in summary judgment.

## TITLE IX



- Title IX of the Education Amendments of 1972 is a federal law intended to end sex discrimination in all areas of education
  - Applies to non-discrimination based on sex/gender to all recipients of federal funds, both public and private institutions
  - Applies to issues of program equity, such as in athletics, and also to sexual harassment and sexual assault.

- In addition to the implementing regulations, compliance guidelines are issued by the U.S. Department of Education, Office for Civil Rights from time to time:
  - www2.ed.gov/about/offices/list/ocr/docs/shguide.html

## TITLE IX





## SIGNIFICANT CASES

- *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60 (1992).
- *Gebser v. Lago Vista Independent School District,* 524 U.S. 274 (1998).
- *Davis v. Monroe County Bd. of Education,*
- 526 U.S. 629 (1999).

## FRANKLIN v. GWINNETT PUBLIC SCHOOLS
### 503 U.S. 60 (1992)



- Christine Franklin alleged that during her junior year (1986), an economics teacher, Andrew Hill, engaged her in sexually explicit conversations, forced kissing, and coercive sexual intercourse on school grounds.
  - Hill allegedly pulled her out of class on three occasions and engaged in sexual intercourse with her in a private office.
  - School learned of the harassment against Franklin and other students, investigated; however, it took no action and discouraged her from pressing charges against Hill.
  - Hill eventually resigned in exchange for school district closing the investigation.
- Franklin filed suit against the school district alleging:
  - Sexual harassment under Title IX; and
  - Failure to take appropriate action upon learning of the harassment.

## FRANKLIN v. GWINNETT PUBLIC SCHOOLS
### 503 U.S. 60 (1992)



- District and Eleventh Circuit dismissed the case, indicating that Title IX does not allow for award of monetary damages.

- Supreme Court held:
  - Sexual harassment constituted sex discrimination under Title IX.
  - Private right for recovery of monetary damages under Title IX.

- *Gwinnett* did not address issues concerning the educational institution's liability.

- What about a statute of limitations?

## GEBSER v. LAGO VISTA INDEP. SCHOOL
### 524 U.S. 274 (1998)



- Basic Facts – Faculty/student sexual harassment:
  - In spring of 1991, Alida Star Gebser, 8th grade student in Lago Vista Independent School District (TX), joined a book discussion group led by Frank Waldrup, a teacher.
  - During book group, Waldrup made a number of sexually suggestive comments to the students.
  - In Fall 1991, Gebser (9th grade) was assigned to two of Waldrup's courses. Waldrup also began tutoring Gebser at her home.

## GEBSER v. LAGO VISTA INDEP. SCHOOL
**524 U.S. 274 (1998)**



- Basic Facts (cont.)

  - In Spring 1992, Waldrup and Gebser began a sexual relationship that continued until spring 1993, when a police officer discovered them having sex in the woods. They often engaged in sex during school hours, though not on school property.

  - No one at the school or in the district knew of the relationship.

  - Upon his arrest, district fired Waldrup and the state revoked his teaching license.

## GEBSER v. LAGO VISTA INDEP. SCHOOL
**524 U.S. 274 (1998)**



- Gebser and her mother sued Lago Vista and Waldrup, making a number of state and federal claims, including seeking monetary damages for violation of Title IX.

- Supreme Court created a high standard that a student must meet in order to prevail on a sexual harassment claim against the institution when an employee-student relationship is the basis of the claim.

- The court said you cannot recover monetary damages against the school unless the behavior has been reported to someone with the power to alter the situation ("**actual notice**") and a "**deliberate indifference**" has been demonstrated by the school.

## GEBSER v. LAGO VISTA INDEP. SCHOOL
### 524 U.S. 274 (1998)



- Three-part standard:
    1. An official of the educational institution must have had "actual notice" of harassment;
    2. The official must have authority to "institute corrective measures" to resolve the harassment problem; AND
    3. The official must have "failed to adequately respond" to the harassment and, in failing to respond, must have acted with "deliberate indifference."

## DAVIS v. MONROE COUNTY BD. OF ED.
### 526 U.S. 629 (1999)



- Facts:
    - In December 1992, a fifth-grade boy attempted to touch LaShonda Davis's breasts and genitals and made statements such as "I want to get in bed with you," and "I want to feel your boobs." Similar conduct occurred on January 4 and 20, 1993.
    - Each time Davis reported the conduct to her teacher, Davis's mother also contacted the teacher and was allegedly told the principal was aware of the situation.
    - No disciplinary action was taken.

## DAVIS v. MONROE COUNTY BD. OF ED.
### 526 U.S. 629 (1999)



- Facts (cont.):
  - Additional incidents in February-May 1993 in P.E. and other classes, E.g.:
    - The same male student stuck a doorstop in his pants and acted in sexually suggestive manner towards Davis;
    - He rubbed up against her in suggestive manner;
    - Touched her breasts and genitals.
  - Davis or her mother continued to report incidents to teachers; no disciplinary action was taken.
  - Davis's assigned seat was next to the male student throughout the harassing behavior; not allowed to change seats for over three months.

## DAVIS v. MONROE COUNTY BD. OF ED.
### 526 U.S. 629 (1999)



- Facts (cont.):
  - Davis's grades declined and her father found a suicide note his daughter had written; Davis told her mother she "didn't know how much longer she could keep [the male student] off her."
  - Others in class also faced harassment; group of students tried to complain to the principal, but were allegedly prevented from doing so and told, "If [the principal] wants you, he'll call you."
  - Parents had complained to three teachers and the principal; student had also complained to three teachers.

## DAVIS v. MONROE COUNTY BD. OF ED.
### 526 U.S. 629 (1999)



- Facts (cont.):
  - In May 1993, principal told Davis's mother, "I guess I'll have to threaten him a little harder"; male student not disciplined.
  - Davis's parents finally reported the harassment to the local sheriff; male student charged with and plead guilty to sexual battery.
  - The abuse finally stopped; male student ultimately moved away.
  - Davis's mother filed a Title IX action, alleged that persistent harassment and deliberate indifference resulted in her daughter's inability to attend school and participate in activities.

## DAVIS v. MONROE COUNTY BD. OF ED.
### 526 U.S. 629 (1999)



- Finding in favor of Davis, the Supreme Court applied same standards to find the institution liable for damages as in the *Gebser* case:
  - The institution must have "actual notice" of the harassment; and the institution must have responded to the harassment with "deliberate indifference." Additionally, court held:
    - Harassment must be "severe, pervasive, and objectively offensive," and the indifference "systemic," to the extent that the victim is deprived of educational opportunities or services.
    - Justice O'Connor added a framework to determine deliberate indifference – stating that deliberate indifference constitutes a response that is "clearly unreasonable in light of the known circumstances."

## THE CLERY ACT & APPLICABILITY



- The Clery Act applies only to Post-Secondary Schools, Colleges, and Universities.
  - There is, however, is increasing traction within Congress to developing a similar mechanism within PreK-12.
- Most of the principles of The Clery Act/VAWA Sec. 304, are universal and instructive for all educational institutions, such as:
  - Policy best practices
  - Reporting
  - Transparency
  - Equitable resolution mechanisms
  - Due process
  - Support for victims, etc.

## A BRIEF HISTORY OF TITLE IX
## PRE-1972



- Title VI of the Civil Rights Act of 1964
  - "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."
- Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e-3(a))
  - Prohibits discrimination in the terms, conditions or privileges of employment on the basis of an employee's race, sex, color, religion, and national origin.

2030.          **Harvard University Policies**

"The Faculty of Arts and Sciences (FAS) is committed to fostering an open and supportive community that promotes learning, teaching, research, and discovery.

This commitment includes maintaining a safe and healthy educational and work environment in which no member of the community is excluded from participation in, denied the benefits of, or

subjected to discrimination in any University program or activity on the basis of sex, sexual orientation, or gender identity.

Because sexual and gender-based harassment – including, but not limited to, sexual violence – interfere with an individual's ability to participate fully in or benefit fully from University programs or activities, they constitute unacceptable forms of discrimination. This FAS Sexual and Gender Based Harassment Policy and Procedures ("Policy" and "Procedures") forms one part of a range of measures within the FAS designed to prevent discrimination or harassment based on any protected class, including race, religion, national origin, ethnicity, citizenship, age, sex, veteran status, or disability. While this Policy focuses on sexual and gender-based harassment, it is important to recognize the ways in which all forms of discrimination reduce our potential as a community of learners and teachers.

Sexual and gender-based harassment can take many different forms and encompass a range of behaviors including (but not limited to) unwelcome sexual conduct, such as sexual advances, coerced sexual activity, and dating violence, and persistent disparagement based on sex, sexual orientation, or gender identity. What links all forms of sexual and gender-based harassment is the fundamental undermining of a person's ability to enjoy the programs or resources provided by our University. To tolerate restrictions of any individual's access to the University's programs or resources because of sex, sexual orientation or gender identity is to diminish the vitality of our entire community and is contrary to the values of inclusiveness and open inquiry that undergird true learning.

Sometimes a person may make incorrect assumptions about another person's sex, sexual orientation, or gender identity. Harassment based on incorrect assumptions about sex, sexual orientation, or gender identity is prohibited under this Policy. For example, the FAS does not allow harassment based on the belief that someone is gay whether or not that person is actually gay.

Because some sexual harassment can take the form of speech, it is important to reiterate the Free Speech Guidelines ("Guidelines") adopted by the Faculty of Arts and Sciences on February 13 and May 15, 1990. These Guidelines pertain not only to "speakers, protestors, and audience," but also to our interactions with one another inside and outside of the classroom. They are designed to safeguard freedom of speech and inquiry for all members of our community, including those whose participation could othePlaintiff Robert Weinbergise be marginalized by ostracism or harassment. As the Guidelines note,

"free speech is uniquely important to the University because we are a community committed to reason and rational discourse." It is therefore imperative that freedom of expression, including unpopular and even obnoxious speech, be protected. At the same time, however, the guidelines note, "There are obligations of civility and respect for others that underlie rational discourse. Racial, sexual, and intense personal harassment not only show grave disrespect for the dignity of others, but also prevent rational discourse. Behavior evidently intended to dishonor [a person because of] such characteristics as race, gender, ethnic group, religious belief, or sexual orientation is contrary to the pursuit of inquiry and education. Such grave disrespect for the dignity of others can be punished under existing procedures because it violates a balance of rights on which the University is based. It is expected that when there is a need to weigh the right of freedom of expression against other rights, the balance will be struck after a careful review of all relevant facts and will be consistent with

established First Amendment standards." Within a university, to be discriminated against can itself be a curtailment of freedom of expression.

An individual's freedom of expression relies on both freedom from censorship and freedom from discrimination – including harassing speech – based on sex, sexual orientation, or gender identity. The FAS is committed to maintaining this balance: it is difficult to achieve, but it is a goal we all embrace. This Policy is intended to safeguard members of our community from invidious discrimination, not to regulate the content of protected speech.

The University Procedures govern allegations of sexual harassment or gender-based harassment involving Harvard students, including undergraduate students in the College, graduate students in the Graduate School.

## 2031.  FAS SEXUAL AND GENDER-BASED HARASSMENT POLICY

The FAS Sexual and Gender-Based Harassment Policy ("Policy") adopts the University Policy and incorporates the University Procedures, including for purposes of student discipline. The University Policy is reproduced in its entirety below.

2032.    "Policy Statement

"Harvard University is committed to maintaining a safe and healthy educational and work environment in which no member of the University community is, on the basis of sex, sexual orientation, or gender identity, excluded from participation in, denied the benefits of, or subjected to discrimination in any University program or activity. Gender-based and sexual harassment, including sexual violence, are forms of sex discrimination in that they deny or limit an individual's ability to participate in or benefit from University programs or activities.

"This Policy is designed to ensure a safe and non-discriminatory educational and work environment and to meet legal requirements, including: Title IX of the Education Amendments of 1972, which prohibits discrimination on the basis of sex in the University's programs or activities; relevant sections of the Violence Against Women Reauthorization Act; Title VII of the Civil Rights Act of 1964, which prohibits discrimination on the basis of sex in employment; and Massachusetts laws that prohibit discrimination on the basis of sex, sexual orientation, and gender identity. It does not preclude application or enforcement of other University or School policies.

"It is the policy of the University to provide educational, preventative and training programs regarding sexual or gender-based harassment; to encourage reporting of incidents; to prevent incidents of sexual and gender-based harassment from denying or limiting an individual's ability to participate in or benefit from the University's programs; to make available timely services for those who have been affected by discrimination; and to provide prompt and equitable methods of investigation and resolution to stop discrimination, remedy any harm, and prevent its recurrence. Violations of this Policy may result in the imposition of sanctions up to, and including, termination, dismissal, or expulsion, as determined by the appropriate officials at the School or unit. 4

"Retaliation against an individual for raising an allegation of sexual or gender-based harassment, for cooperating in an investigation of such a complaint, or for opposing discriminatory practices is prohibited. Submitting a complaint that is not in good faith or providing false or misleading information in any investigation of complaints is also prohibited.

"Nothing in this Policy shall be construed to abridge academic freedom and inquiry, principles of

free speech, or the University's educational mission.

**"Definitions**

"Sexual Harassment

"Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, graphic, or physical conduct of a sexual nature, when: (1) submission to or rejection of such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing or is used as the basis for employment decisions or for academic evaluation, grades, or advancement (quid pro quo); or (2) such conduct is sufficiently severe, persistent, or pervasive that it interferes with or limits a person's ability to participate in or benefit from the University's education or work programs or activities (hostile environment).

"Quid pro quo sexual harassment can occur whether a person resists and suffers the threatened harm, or the person submits and avoids the threatened harm. Both situations could constitute discrimination on the basis of sex.

"A hostile environment can be created by persistent or pervasive conduct or by a single severe episode. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment. Sexual violence, including rape, sexual assault, and domestic and dating violence, is a form of sexual harassment. In addition, the following conduct may violate this Policy:

"Observing, photographing, videotaping, or making other visual or auditory records of sexual activity or nudity, where there is a reasonable expectation of privacy, without the knowledge and consent of all parties

"Sharing visual or auditory records of sexual activity or nudity without the knowledge and consent of all recorded parties and recipient(s)

"Sexual advances, whether or not they involve physical touching

"Commenting about or inappropriately touching an individual's body

"Requests for sexual favors in exchange for actual or promised job benefits, such as favorable reviews, salary increases, promotions, increased benefits, or continued employment

"Lewd or sexually suggestive comments, jokes, innuendoes, or gestures5

"Stalking

"Other verbal, nonverbal, graphic, or physical conduct may create a hostile environment if the conduct is sufficiently persistent, pervasive, or severe so as to deny a person equal access to the University's programs or activities. Whether the conduct creates a hostile environment may depend on a variety of factors, including: the degree to which the conduct affected one or more person's education or employment; the type, frequency, and duration of the conduct; the relationship between the parties; the number of people involved; and the context in which the conduct occurred.

"Unwelcome Conduct

"Conduct is unwelcome if a person (1) did not request or invite it and (2) regarded the unrequested or uninvited conduct as undesirable or offensive. That a person welcomes some sexual contact does not necessarily mean that person welcomes other sexual contact. Similarly, that a person willingly participates in conduct on one occasion does not necessarily mean that the same conduct is welcome on a subsequent occasion.

"Whether conduct is unwelcome is determined based on the totality of the circumstances, including various objective and subjective factors. The following types of information may be helpful in making that determination: statements by any witnesses to the alleged incident; information about the relative credibility of the parties and witnesses; the detail and consistency of each person's account; the absence of corroborating information where it should logically exist; information that the Respondent has been found to have harassed others; information that the Complainant has been found to have made false allegations against others; information about the Complainant's reaction or behavior after the alleged incident; and information about any actions the parties took immediately following the incident, including reporting the matter to others.

"In addition, when a person is so impaired or incapacitated as to be incapable of requesting or inviting the conduct, conduct of a sexual nature is deemed unwelcome, provided that the Respondent knew or reasonably should have known of the person's impairment or incapacity. The person may be impaired or incapacitated as a result of drugs or alcohol or for some other reason, such as sleep or unconsciousness. A Respondent's impairment at the time of the incident as a result of drugs or alcohol does not, however, diminish the Respondent's responsibility for sexual or gender-based harassment under this Policy.

"Gender-Based Harassment

"Gender-based harassment is verbal, nonverbal, graphic, or physical aggression, intimidation, or hostile conduct based on sex, sex-stereotyping, sexual orientation or gender identity, but not involving conduct of a sexual nature, when such conduct is sufficiently severe, persistent, or pervasive that it interferes with or limits a person's ability to participate in or benefit from the University's education or work programs or activities. For example, persistent disparagement of a person based on a perceived lack of stereotypical masculinity or femininity or exclusion from an activity based on sexual orientation or gender identity also may violate this Policy.

## 2033.   OTHER SEXUAL AND GENDER-BASED MISCONDUCT

The University Policy defines sexual and gender-based harassment within the context of preventing discrimination within our community. The Faculty of Arts and Sciences, including the College and the Graduate School of Arts and Sciences, shares an additional commitment to training our students to be citizens and citizen leaders within a larger community beyond the borders of our campus. For this reason, it is the expectation of the Faculty of Arts and Sciences that all students, whether or not they are on campus or are currently enrolled in a degree program, will behave in a mature and responsible manner. Consistent with this principle, sexual and gender-based misconduct are not tolerated by the FAS even when, because they do not have the effect of creating a hostile environment for a member of the University community, they fall outside the jurisdiction of the University Policy. Because sexual and gender-based misconduct are in direct opposition to our community values, cases involving such conduct may be referred by the relevant Administrative

Board ("Ad Board") to the Harvard University Office for Sexual and Gender-Based Dispute Resolution ("ODR") for investigation in accordance with the University Procedures and the jurisdictional guidelines described in this Policy.

Sexual harassment within student organizations and clubs is covered by the University Policy under its jurisdictional language both because it is conduct in connection with a "University-recognized program or activity" and because "the conduct may have the effect of creating a hostile environment for a member of the University community." The University Policy prohibits *quid pro quo* harassment when "submission to or rejection of such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing or is used as the basis for employment decisions or for academic evaluation, grades, or advancement." The FAS explicitly includes in its prohibition of quid pro quo sexual misconduct unwelcome conduct of a sexual nature when submission to or rejection of such conduct is made either explicitly or implicitly a condition of an individual's acceptance into or standing within a student organization or club. The FAS considers the ability to participate in student clubs and organizations to be an important part of access to the resources and programs available for Harvard students.

Sexual and gender-based misconduct, as defined by this FAS Policy, go beyond the University Policy to encompass behaviors that are in direct opposition to our educational and community values. That is, these behaviors constitute a failure to meet FAS's expectations of its students as citizens and citizen leaders within a larger community beyond the borders of our campus and therefore may be subject to discipline. These provisions indicate our commitment to expecting behavior consistent with our values in our interactions with members of our broader community, as well as in our non academic activities on campus.

The above provisions are necessary because there are instances when we must demonstrate – to the broader world as well as to our own community – that sexual and gender-based misconduct are not consistent with the values we expect all members of FAS to uphold. ODR will evaluate such allegations upon referral consistent with the guidelines provided by the FAS, and may consult with an Ad Board Liaison in the process. ODR retains the right to close a case if, among other reasons, it determines in its discretion that it cannot conduct a prompt, fair, and thorough investigation. FAS retains responsibility for investigating violations of other policies that may come to light during an ODR investigation.

2034. **IV. CONDUCT IN RELATIONSHIPS BETWEEN INDIVIDUALS OF DIFFERENT  UNIVERSITY STATUS**

In the academic context, sexual harassment often involves the inappropriate personal attention by an instructor or other officer who is in a position to exercise professional power over another individual. This could include an instructor who determines a student's grade or who can othePlaintiff Robert Weinbergise

affect the student's academic performance or professional future; or a tenured professor whose evaluation of a junior colleague can affect the latter's professional life. Sexual harassment can also occur between persons of the same University status. An example would be persistent personal attention from one colleague to another in the face of repeated rejection of such attention. Both types of harassment are unacceptable. They seriously undermine the atmosphere of trust essential to the academic enterprise.

Amorous relationships that might be appropriate in other circumstances have inherent dangers

when they occur between an instructor or other officer of the University and a person for whom he or she has a professional responsibility (i.e., as instructor, advisor, evaluator, supervisor). Implicit in the idea of professionalism is the recognition by those in positions of authority that in their relationships with students or staff there is an element of power. It is incumbent upon those with authority not to abuse, nor to seem to abuse, the power with which they are entrusted.

The consequences of asymmetries can be felt in many different contexts and types of relationships. What constitutes "power" varies according to context and individual. For example, although the university may not recognize a student in an extracurricular organization to have power over a student who would like to join that organization, one or both of the students in question may perceive their relationship to be affected by a power dynamic. As members of a community characterized by multiple formal and informal hierarchies, it is incumbent upon each of us to be aware of and sensitive to the ways in which we exercise power and influence and to be judicious in our relationships with others.

## 2035.  A. Prohibited Sexual Relations With Students

No FAS Faculty member shall request or accept sexual favors from, or initiate or engage in a romantic or sexual relationship with, any undergraduate student at Harvard College. Faculty members are defined as ladder, non-ladder, and visiting faculty.

Furthermore, no FAS Faculty member, instructor, teaching assistant, teaching fellow, researcher, tutor, graduate student, or undergraduate course assistant, shall request or accept sexual favors from, or initiate or engage in a romantic or sexual relationship with, any student, including a graduate student or DCE student, who is enrolled in a course taught by that individual or othePlaintiff Robert Weinbergise subject to

that individual's academic supervision before the supervision has concluded and, if applicable, a final grade on the student's supervised academic performance has been submitted to the Registrar. Academic supervision includes teaching, advising a thesis or dissertation, supervising research, supervising teaching, grading, or serving as Director of Undergraduate or Graduate Studies of the student's academic program. 9

## 2036.  B. Relationships Between Individuals of Different University Status

Amorous relationships between individuals of different University status that occur outside the instructional context can also lead to difficulties. In a personal relationship between an instructor or other officer and an individual for whom the instructor or other officer has no current professional responsibility, the instructor or other officer should be sensitive to the possibility that he or she may unexpectedly be placed in a position of responsibility for that individual's instruction or evaluation. This could involve being called upon to write a letter of recommendation or to serve on an admissions or selection committee involving the individual. In addition, one should be aware that others may speculate that a specific power relationship exists even when there is none, giving rise to assumptions of inequitable academic or professional advantage for the student involved. Although graduate students, teaching fellows, tutors, researchers, and undergraduate course assistants may be less accustomed than Faculty members to thinking of themselves as being in a position of greater authority by virtue of their professional responsibilities, they should recognize that they might be viewed as more powerful than they perceive themselves to be.

Even when both parties have consented at the outset to the development of a romantic or sexual relationship between individuals of different University status, it is the person in the position of

greater authority who, by virtue of his or her special responsibility and the core educational mission of the FAS, will be held accountable for unprofessional behavior.

2037.  **C. Relationships Between Staff**

In cases where a consensual relationship exists between members of the staff who occupy inherently unequal positions of authority, it is important that the person in the position of greater authority does not exercise any supervisory or evaluative function over the other person in the relationship. Accordingly, in circumstances where such a supervisory or evaluative function may occur, the person in the position of greater authority must notify his or her local human resource officer to evaluate the situation and ensure that alternate supervisory or evaluative arrangements are put in place. More information can be found in the Staff Personnel Manual: http://harvie.harvard.edu/Policies_Contract/Staff_Personnel_Manual.

2038.  **Introduction**

Harvard students, faculty, staff, other Harvard appointees, or third parties (collectively, "Initiating Parties") wishing to report a violation of this Policy should begin by contacting the Harvard 11 University Office for Sexual and Gender-Based Dispute Resolution ("ODR") or the relevant FAS Title IX Coordinator. In the event that the first FAS officer contacted by an Initiating Party is not the appropriate Title IX Coordinator, it is that FAS officer's responsibility to forward the matter either to ODR or to the appropriate Title IX Coordinator.

FAS Title IX Coordinators will receive diversity and implicit bias training. They will be sensitive to cultural factors that may affect the way members of our community may experience interactions with representatives of the University – whether those cultural factors involve sexual orientation, gender identity, race, ethnicity, nationality, socio-economic status, or citizenship.

Section C, below, sets out procedures pertaining to allegations of sexual or gender-based harassment committed by a student, including a student at Harvard College, GSAS, and both the Extension School and the Summer School within DCE. Sections D and E, below, set out procedures pertaining to allegations of sexual or gender-based harassment committed by Faculty and staff.

As set forth below and in the University Procedures, interim measures designed to support and protect the Initiating Party or the University community may be considered or implemented at any time, including during a request for information or advice, informal resolution, or a formal complaint proceeding. Consistent with FAS policy, interim measures might include, among others: restrictions on contact; course-schedule or work-schedule alteration; changes in housing; leaves of absence; or increased monitoring of certain areas of the campus. Interim measures are subject to review and revision throughout the processes described below.

Based on data supplied by the appropriate FAS Title IX Coordinators, an annual report will be prepared for the Faculty Council and the Faculty on the number and type of complaints. Every fifth year a summary will be prepared for the Faculty Council and the Faculty on the disposition of complaints filed over the preceding five years." [Harvard University policies copied and pasted from original sources]

*Plaintiff's Medical and Neurologic Disabilities*

*Defendants' violations of the Americans with Disabilities Act*

2039.  Robert Weinberg was born on October 27, 1953 in Brooklyn, New York following a prolonged and difficult labor and delivery. This is substantiated by medical records.

2040.  Weinberg's Apgar scores were low and he was diagnosed with anoxic brain injury and termed a "blue baby." This is substantiated by medical records.

2041.  Weinberg experienced neurodevelopmental delays, delayed milestones and marked delays in the development of speech and talking which caused significant ridicule from his peers during his childhood. This is substantiated by medical records.

2042.  Throughout elementary school, Weinberg was in speech therapy to assist with correction of his speech problems. This is substantiated by academic records.

2043.  Several teachers believed that Weinberg suffered from intellectual retardation so he was removed from a couple of classes and placed in "slow learners" classes. This is substantiated by academic records.

2044.  On or about May 1964, at the age of 10 years, Weinberg suffered a bicycle accident where he fell off his bicycle striking his head against the asphalt pavement suffering a skull fracture and subdural hematoma. This is substantiated by medical records.

2045.  As a result of the increased intracranial pressure from the subdural hematoma, Weinberg began experiencing diplopia, headaches and fundoscopic exam revealed papilledema and blurring of the optic disc. This is substantiated by medical records.

2046.   On or about June 1964, Weinberg was transferred to Flower and Fifth Avenue Hospital in New York City, where he undePlaintiff Robert Weinbergent neurosurgical evacuation of the subdural hematoma by surgeon Dr Tarlov. This is substantiated by medical records.

2047.   Weinberg began Junior High School in 1965 and for most of the years 1965 – 1968 his academic performance was poor with many grades of "D" and "F" in most of his courses. This is substantiated by academic records.

2048.   Experiencing marked somnolence, need for daytime naps, inability to focus or do homework along with muscular weakness, severe fatigue and weakness, and hypersomnolence, Weinberg was diagnosed with hypothyroidism in 1968, a medical condition shared with both of his parents. This is substantiated by medical records.

2049.   After starting on thyroid replacement therapy, Weinberg's academic performance skyrocketed and Weinberg became a straight "A" student, excelling and loving the sciences and mathematics especially. This is substantiated by academic records.

2050.   Later Weinberg underwent neuropsychological testing at the Hallowell Center in Concord, Massachusetts where he was diagnosed with Attention Deficit Disorder (ADD) and was begun on CNS stimulants including methylphenidate and amphetamine which he continues to take daily at the present time. This is substantiated by medical records.

2051.   Except for some intermittent struggles with depression, which caused some periods of academic withdrawal, Weinberg demonstrated academic prowess for most of his subsequent years. This is substantiated by academic records.

2052.   Weinberg earned a BS in Biology from MIT, a Doctor of Osteopathic Medicine (DO) degree from the New York College of Osteopathic Medicine, a Juris Doctor degree cum laude from the New England School of Law, an MMSc in Immunology from Harvard Medical School, and is currently enrolled as a PhD candidate in Pharmacology at the Massachusetts College of Pharmacy and Health Sciences (expected graduation date of April 2024). This is substantiated by academic records including diplomas and transcripts.

2053.   After passing the FLEX exam, the Plaintiff applied for a medical license with the Massachusetts Board of Registration in Medicine ("BORIM") and was issued two (2) medical licenses - one of which was medical license # 60232.

2054.   In 1990, Weinberg began working as a Family Physician at the Boston Evening Medical Center at 388 Commonwealth Avenue, Boston, MA.

2055.   In 1991, Weinberg began to provide medical care to Lourdes Colon – referred to as "Patient A" in documents originating at the Massachusetts Board of Registration in Medicine, which licenses physicians in Massachusetts.

2056.   In 1992, Dr Lisa Wolfe conceived, drafted and dictated the 1992 Express Bilateral Contract which terminated the doctor-patient relationship, which was memorialized by the Plaintiff and Lourdes Colon handwriting down the words of this termination contract verbatim, and the Plaintiff and Colon then signed each other's copy of the handwritten memorialized Express Bilateral Contract terminating the doctor-patient relationship.

2057.   Subsequent modification of this termination contract by mutual agreement created the classification of time and place into the clinical and nonclinical worlds.

2058.   In 2010, Weinberg obtained the position of Research Scientist at MIT in the Department of Biology working for Professor ChoKyun Rha, where he would continue to work through January 2020 on bioactive properties of oil palm phenolics under the sponsorship of the Malaysian Palm Oil Board, and where he published multiple papers in peer-reviewed journals and presented scientific findings at international conferences.

2059.   In 2011 or 2012, the Biology Department learned of the record from an "anonymous informant" in the Department of Chemistry who alerted the Biology headquarters about Weinberg's past and loss of medical license.

2060.   The Biology Department began an investigation, which included asking Weinberg to come to a meeting in the headquarters with 3 Biology headquarters staff to answer questions about the record.

*Defendant M.I.T. violated Plaintiff's rights under Title VII and Title IX of the Civil Rights Act*

2061.   During this time period, Weinberg had obtained two important new opportunities for personal and professional growth at MIT while he was a student and also employed as a Research Scientist:

(1) Weinberg was selected as a Mentor for a freshman seminar series, which Weinberg applied to teach on the applications of biotechnology in medicine and industry;

(2) assistant teacher of physics in the Experimental Studies Group.

2062.   Weinberg had begun designing the freshman seminar series that summer and also met with the co-mentor for the seminar to discuss the curriculum.

2063.   Since Weinberg had developed a passion for teaching since he began tutoring science and

mathematics during high school, this was a natural stepping stone toward a career in teaching.

2064.   Weinberg has also taught several courses at MIT through the ESP program which meets

on weekends for high school students.

2065.   Weinberg also attended a meeting of the Experimental Studies Group in preparation for

assisting with teaching physics to that group of freshmen.

2066.   The Biology headquarters staff concluded their investigation and communicated their

intentions with Weinberg. MIT insisted that Weinberg write a letter of resignation from both

educational opportunities – both the freshman seminar series and the Experimental Studies

Group.

2067.   MIT stated that although Weinberg had done nothing wrong at MIT, they felt he

presented a risk for some sexual misconduct with the students.

2068.   Regardless of not having committed any wrong at MIT, the staff expressed concerns that

there would be the appearance of accepting his prior misconduct and not protecting the students

adequately.

2069.   Weinberg was devastated by the loss of these educational teaching opportunities, which

he believed would open up career possibilities and help him develop as a teacher.

2070.   Weinberg began working on his MMSc in Immunology at Harvard Medical School in

2014.

2071.   The MMSc program was a 2-year program: the first year consisted of didactic work on courses in immunology and the second year consisted of supervised immunology research leading to the writing of a thesis.

*Defendant Dana Farber Cancer Institute violated Plaintiff's rights under Title IX*

2072.   In 2015 I began my research at the Dana Farber Cancer Research Institute with the mentor Stephanie Dougan.

2073.   It was a very exciting project in collaboration with Harvey Cantor, with whom I had wanted to work for many years.

2074.   Stephanie was very encouraging and discussed with me the possibility of applying for some grants

2075.   I was eligible for as a mid-life professional changing careers.

2076.   After several meetings and experimental planning, paperwork was processed at the Dana Farber Cancer Research Institute (DFCI) including a comprehensive background check which revealed the loss of Weinberg's medical license in 2002.

2077.   DFCI terminated Weinberg because of the record. Harvard Medical School conducted an investigation concerning the facts underlying this termination.

*Defendant Boston Children's Medical Center violated Plaintiff's rights under Title IX*

2078.   Weinberg then began a research project with Professor Ann Goldfeld in the Program in Cellular and Molecular Medicine of Boston Children's Hospital where I began working on a project involving the immunogenetics of the T-cell response.

2079.   I was working in the Goldfeld lab for about 8 weeks, when Goldfeld wanted to pay me as an intern which required the Plaintiff to complete paperwork for Boston Children's Hospital to come onto the payroll.

2080.   The paperwork included a background check which disclosed Weinberg's prior record, and Weinberg was terminated. Harvard Medical School conducted an investigation concerning the facts underlying this termination.

2081.   This termination of the Plaintiff's Harvard-sponsored internship at DFCI substantially interfered with the Plaintiff's progress toward his PhD in pharmacology and was a substantial factor in the Plaintiff's eventual resignation from the PhD program and acceptance of the M.S. in pharmacology as recognition of his five (5) years of academic performance on multiple pharmacology exams, passing his written and oral qualifying exams, and beginning his PhD dissertation.

2082.   In 2019 Weinberg began working toward his PhD in Pharmacology at the Massachusetts College of Pharmacy and Health Sciences in Boston, Massachusetts.

*Defendants Mangal, Graybiel and MIT violated Plaintiff's rights under Title IX*

2083.   During the summer of 2022, Weinberg began collaborating with Dr Emily Hueske in the McGovern Institute for Brain Research at the Massachusetts Institute of Technology (MIT) in Cambridge, MA.

2084.   During discussions with Professor Ann Graybiel, it became clear that Weinberg could combine his PhD dissertation research on the neurophysiology and pathology of the basal ganglia with ongoing research efforts in the Graybiel lab which would be mutually beneficial to both parties.

2085.   In September 2022, Weinberg began a 1-year Visiting Student fellowship in the laboratory of Professor Ann Graybiel in the McGovern Institute.

2086.   Weinberg received the letter of invitation from Graybiel for a 1-year appointment in the Graybiel lab.

2087.   From September 2022 through June 2023, Weinberg's efforts were greatly appreciated and rewarded by Graybiel as evident through numerous emails.

2088.   In May 2023, a postdoc Nagina Mangal arrived in the Graybiel lab from London, UK.

2089.   Weinberg made special efforts to make her feel at home in Boston, bringing her over to the ATLAS center to pick up her MIT ID when it was ready and also providing her with a tour of the MIT campus.

2090.   Weinberg and Mangal shared a couple of meals together at the Stata Center while discussed the ongoing research.

2091.   The McGovern Institute held its annual retreat on Cape Cod in early June 2023 and many members of the Graybiel lab attended the retreat.

2092.   The McGovern Institute did provide buses for many but in addition, Weinberg volunteered to drive down to the retreat and brought with him 5 members of McGovern, including Mangal, Gun, Georgios, Fred, and Michael.

2093.   Mangal was happy to get the front-seat passenger view on the way down and back.

2094.   Since both Mangal and Weinberg shared a research interest in cannabinoid receptors and the effects of their signaling on modulation of CNS functions, Mangal had suggested that the two of them collaborate together and co-author a literature review on the CNS modulation by the cannabinoid system.

2095.   Mangal and Weinberg exchanged several emails and published papers towards this literature review they began to work on.

2096.   Weinberg prepared an outline of their review - focusing on the role of the cannabinoid receptors on astrocyte signaling in the basal ganglia.

2097.   Weinberg and Mangal met a couple of times to discuss the literature review.

2098.   A friend gave Weinberg a couple of extra tickets to a Red Sox game in Fenway Park, and Weinberg invited Mangal to the baseball game, which she excitedly attended.

2099.   During the week of June 18, 2023, Mangal stopped responding to Weinberg's emails and her final email stated that she probably could not work on the literature review at that time.

2100.   Mangal's attitude and demeanor markedly changed during this time, whereby she became quite cold, distant and avoided any communication with Weinberg.

2101.   Weinberg began to suspect that Mangal had read about his prior record, which is readily accessible on the internet through a Google search.

2102.   Graybiel was away in Europe attending meetings in Sweden and Ireland for 2 weeks, and was scheduled to return on Monday, June 26, 2023.

2103.   Weinberg saw Graybiel in the morning of June 26, 2023, around 9 am, when Graybiel ran up to him smiling and laughing, and sharing her joy with him about Weinberg's continued success with weight loss on his current diet regimen.

2104.   As was characteristic of her demeanor toward him, Graybiel had always smiled and maintained good eye-to-eye contact with Weinberg from September 2022 until June 26, 2023. That morning was the last time that Graybiel would smile or look at Weinberg in the eyes.

2105.   The sexual harassment and sexual discriminatory acts by Graybiel began at 11:00 am on June 26, 2023, at the time that she met with Mangal privately in her office. Graybiel was very careful about what she said or emailed over the next 11 days until she terminated Weinberg for want not to leave any incriminating evidence.

2106.   Weinberg saw Mangal in the hallway around 11:30 am that morning, and Mangal confirmed that she had just met with Graybiel.

2107.   Graybiel proceeded to remove Weinberg from the CellREADR project which Weinberg had been working on full-time since November 2022, spending long nights and weekends in the laboratory to overcome challenges and get the method to work properly.

2108.   There was an important collaboration meeting on Friday, June 30, 2023, with 10 members of the Graybiel and Agooti labs present so there were 10 witnesses to the following words and actions.

2109.   Graybiel introduced Mangal as the leader of the CellREADR project, introduced other members of the Graybiel lab, but did not introduce Weinberg, nor did she look at Weinberg nor acknowledge his presence.

2110.  It was clear from this collaboration meeting and subsequent Graybiel lab meeting in her office, that Weinberg was removed from the CellREADR project.

2111.  Although Graybiel was very careful to conceal her discriminatory and harassing intent, there are more than 15 witnesses who are lab members who can testify to her actions and words which underlie these discriminatory and harassing intents and actions.

2112.  Instigated by the sexual misconduct record, Graybiel's acts of sexual discrimination and sexual harassment started at 11:00 am on June 26, 2023 and culminated with her letter of termination of Weinberg on July 7, 2023. These 11 days comprised actions which violated Weinberg's rights under Title IX.

2113.  These acts of sexual discrimination and sexual harassment originate in Graybiel's belief that Weinberg's prior record of sexual acts/misconduct and/or loss of medical license necessitate that he cannot operate as a productive member of the research team in the Graybiel lab in spite of the fact that he said or did nothing wrong during his entire time working in the lab.

*Defendants' violation of Title IX of the Civil Rights Act*

2114.  MIT and Graybiel violated Title IX by imposing a punishment on Weinberg infected by sex bias. See *John Doe v. Purdue University et al.*, 928 F.3d 652 (2019).

2115.  MIT and Graybiel discriminated against Weinberg on the basis of sex in violation of Title IX.

2116.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); see also *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 281, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (explaining that Title IX is enforceable through an implied private right of action).

2117.    It is undisputed that MIT receives federal funding.

2118.        The Plaintiff was "excluded from participation in [or] denied the benefits of ... [an] education program" when MIT terminated him. 20 U.S.C. § 1681(a).

2119.    The Plaintiff also had a property right in his Visiting Student status as established by the contract entered into with Graybiel pursuant to her letter of invitation which he accepted with consideration paid of over $4,000.

2120.    This contract was breached by Graybiel's letter of termination.

2121.    Furthermore, although MIT does have extensive policies regarding hearings and Due Process, and Weinberg was in frequent contact with the MIT General Counsel, Weinberg was never afforded the opportunity for a fair hearing to present his side and be heard by an impartial decision-maker.

2122.    This not only violates MIT policies for Due Process and hearings, but it also violates State and federal mandates for Due Process before terminating fundamental property and liberty rights of Weinberg. *Goss,* 419 U.S. at 574, 95 S.Ct. 729; *Bd. of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 86, 98 S.Ct. 498, 55 L.Ed.2d 124 (1978); *Pugel v. Bd. Of Trs. of Univ. of*

*Ill.,* 378 F.3d 659, 663-64 (7th Cir. 2004); *Dietchweiler by Dietchweiler v. Lucas,* 827 F.3d 622, 629 (7th Cir.2016).

2123.    This termination of the Plaintiff's MIT-sponsored Visiting Studnetinternship in the Dept of Neurosciences substantially interfered with the Plaintiff's progress toward his PhD in pharmacology and was a substantial factor in the Plaintiff's eventual resignation from the PhD program and acceptance of the M.S. in pharmacology as recognition of his five (5) years of academic performance on multiple pharmacology exams, passing his written and oral qualifying exams, and beginning his PhD dissertation.

> *After passing the Bar Exam, Plaintiff applied for admission to the Maine Bar*
>
> *[Plaintiff referred to as "The Respondent" in these statements]*

2124.    The Plaintiff provided the following Statement of Facts probative of Good Moral Character and/ or Rehabilitation under Rule 9(d)6(b).

2125.    The Plaintiff accepts responsibility for his conduct in 1993-1994 when BORIM alleges that he committed sexual misconduct in 1993-1994, some thirty (30) years ago.

2126.    Following the alleged "sexual misconduct with Patient A" (defendant Lourdes Colon) in 1993-1994, the Plaintiff/Respondent continued to practice medicine for an additional ten (10) years in Massachusetts prior to the revocation of his medical license in Massachusetts in October 2002, and there were no additional complaints, allegations or cases of sexual misconduct during those eight (8) years besides the one case involving Lourdes Colon.

2127.    Shortly after receiving his license to practice medicine in Massachusetts, the Plaintiff/Respondent served as Medical Director and Primary Care Physician from 1990 – 1992

in a medical clinic in Lowell, Massachusetts, serving a large Cambodian refugee community at lower-than-average compensation in order to help the Cambodian refugees there.

2128.    The Plaintiff has charitably provided free medical services as a volunteer physician in several instances as detailed below which shows the respondent's good will and desire to help others without the need for compensation.

2129.    During the years 1990 – 1993, the Plaintiff/Respondent acted as volunteer physician on the medical van of the Bridge over Troubled Waters, which daily made visitations to several sites around the Boston and Cambridge area to provide free medical care to homeless and indigent persons, as well as to runaway teenagers.

2130.    During the years 1990 – 1997, the Plaintiff/Respondent served as a Volunteer Instructor in the Department of Community Medicine at Tufts University School of Medicine, teaching first and second year medical students courses including:  Introduction to Clinical Examination Skills, Problem-Based Learning Approach to Differential Diagnosis, "Patient, Society and Medicine" and Medical Ethics.

2131.    On or about 1997-1998, the Plaintiff/Respondent founded a 501(c)(3) non-profit foundation entitled "Flights for Humanity", in which the respondent provided airplane flights for the medical assistance of indigent persons in other countries, including Mexico.

2132.    During the years 1999 – 2001, the Plaintiff/Respondent was a member of the National Disaster Medical System, a federal emergency assistance agency under Health and Human Services, and was awarded a Commendation from Congress for his efforts.

2133.    In 1997, the Plaintiff/Respondent sought medical attention for perceived psychological problems, and was diagnosed with ADHD and a mood disorder, and he has been receiving psychological treatment for these problems since 1997 to the current time.

2134.    During the years 2000 – 2002, the Plaintiff/Respondent served as Attending Emergency Medicine Physician at Jones Memorial Hospital in Wellsville, New York, an underserved rural region in western New York with federal certification of physician shortage.

2135.    During the years 2004 – 2006, the Plaintiff/Respondent successfully completed all law school requirements at the New England School of Law, from which he graduated with the J.D. degree cum laude in May 2006.

2136.    From 2004 until the current time, the Plaintiff/Respondent has provided consultant services to several Boston-area attorneys under the proprietory firm of Medico-Legal Consultants, which specializes in medical malpractice litigation in support of plaintiffs' attorneys and the Respondent reviewed medical records for deviation from the standard of care and proximate causation.

2137.    During the years 2007-2009, the Plaintiff/Respondent provided tutoring services for high school and college students in the sciences and mathematics through employment with Red Key Tutors.

2138.    During the years 2007-2009, the Plaintiff/Respondent worked as an Adjunct Instructor in the Department of Mathematics at Newbury College in Brookline, Massachusetts, where he taught college students the courses of: algebra, pre-algebra, and consumer mathematics.

2139.    During the year 2009-2010, the Plaintiff/Respondent worked as an Adjunct Instructor in the Department of Physics at Eastern Nazarene College in Quincy, Massachusetts, where the Respondent taught college level courses including:  Physical Sciences for Education majors for K-12 teaching, College Algebra, and Introduction to Astronomy.

2140.    From September 2010 through January 2021, the Plaintiff/Respondent worked as a Research Scientist at the Biomaterials Science and Engineering Laboratory at the Massachusetts Institute of Technology (M.I.T.) where the Plaintiff/Respondent is investigating potential new drugs for the treatment of neurodegenerative diseases such as Alzheimer's disease and Parkinson's disease.

2141.    During the years 2010-2011, the Plaintiff/Respondent has been working part-time per diem as a Tutor for high school students teaching physics, biology, chemistry, geometry and calculus for the tutoring firms of Chyten Educational Services and Tangilearning Center.

2142.    In 2009, the Plaintiff/Respondent volunteered for the agency "Reading for the Blind and Dyslexic Persons", in Cambridge, Massachusetts, where he dictated volumes of medical textbooks into a computer-audio system which provided such audio works for the visually challenged and impaired.

*Plaintiff provided Proof of his Good Character - to defendant Board of Bar Examimers of Maine*

2143.    "…comparable to that in many States, that an applicant for admission to the bar bears the burden of proof of "good moral character" requirement whose validity is not, nor could well be, drawn in question here. Under such a rule an applicant must initially furnish enough evidence of good character to make a prima facie case." *Konigsberg v. State Bar of Cal.,* 366 U.S. 36 - Supreme Court (1961).

2144.    During Plaintiff's *de novo* hearing before Maine Justice Ellen Gorman, Gorman denied the Plaintiff's motion to introduce evidence of his good character.

2145.    "… The examining Committee then has the opportunity to rebut that showing with evidence of bad character. Such evidence may result from the Committee's own independent investigation, from an applicant's responses to questions on his application form, or from Committee interrogation of the applicant himself. This interrogation may well be of decisive importance for, as all familiar with bar admission proceedings know, exclusion of unworthy candidates frequently depends upon the thoroughness of the Committee's questioning, revealing as it may infirmities in an otherwise satisfactory showing on his part. This is especially so where a bar committee, as is not infrequently the case, has no means of conducting an independent investigation of its own into an applicant's qualifications. If at the conclusion of the proceedings the evidence of good character and that of bad character are found in even balance, the State may refuse admission to the applicant, just as in an ordinary suit a plaintiff may fail in his case because he has not met his burden of proof." *Konigsberg v. State Bar of Cal.,* 366 U.S. 36 - Supreme Court (1961).

2146.    "In the first Konigsberg case this Court was concerned solely with the question whether the balance between the favorable and unfavorable evidence as to Konigsberg's qualifications had been struck in accordance with the requirements of due process. It was there held, first, that Konigsberg had made out a prima facie case of good character and of nonadvocacy of violent overthrow, and, second, that the other evidence in the record could not, even with the aid of all reasonable inferences flowing therefrom, cast such doubts upon petitioner's prima facie case as to justify any finding other than that these two California qualification requirements had been satisfied. In assessing the significance of Konigsberg's refusal to answer questions as to Communist Party membership, the Court dealt only with the fact that this refusal could not provide any reasonable indication of a character not meeting these two standards for admission. The Court did not consider, but reserved for later decision, all questions as to the permissibility of the

State treating Konigsberg's refusal to answer as a ground for exclusion, not because it was evidence from which substantive conclusions might be drawn, but because the refusal had thwarted a full investigation into his qualifications. See 353 U. S., at 259-262. The State now asserts that ground for exclusion, an issue that is not foreclosed by anything in this Court's earlier opinion which decided a quite different question." *Konigsberg v. State Bar of Cal.*, 366 U.S. 36 - Supreme Court (1961).

2147.    "It is equally clear that the State's ordering of the rehearing which led to petitioner's exclusion manifested no disrespect of the effect of the mandate in that case, which expressly left the matter open for further state proceedings "not inconsistent with" the Court's opinion. There is no basis for any suggestion that the State in so proceeding has adopted unusual or discriminatory procedures to avoid the normal consequences of this Court's earlier determination. In its earlier proceeding, the California Bar Committee may have found further investigation and questioning of petitioner unnecessary when, in its view, the applicant's prima facie case of qualifications had been sufficiently rebutted by evidence already in the record. While in its former opinion this Court held that the State could not constitutionally so conclude, it did not undertake to preclude the state agency from asking any questions or from conducting any investigation that it might have thought necessary had it known that the basis of its then decision would be overturned. In recalling Konigsberg for further testimony, the Committee did only what this Court has consistently held that federal administrative tribunals may do on remand after a reviewing court has set aside agency orders as unsupported by requisite findings of fact. *Federal Communications Comm'n v. Pottsville Broadcasting Co.*, 309 U. S. 134; *Fly v. Heitmeyer*, 309 U. S. 146.

2148.    xxxx146"In the absence of the slightest indication of any purpose on the part of the State to evade the Court's prior decision, principles of finality protecting the parties to this state litigation are, within broad limits of fundamental fairness, solely the concern of California law. Such limits are broad even in a criminal case, see *Bryan v. United States*, 338 U. S. 552; *Hoag v. New Jersey*, 356 U. S. 464;

cf. *Palko v. Connecticut*, 302 U. S. 319, 328." *Konigsberg v. State Bar of Cal.,* 366 U.S. 36 - Supreme Court (1961).

*After passing Bar exam, Maine Board of Bar Examiners denies Plaintiff's admission to the Bar*

2149.    The Plaintiff petitioned the MAINE SUPREME JUDICIAL COURT in the case "*ROBERT P. WEINBERG v. MAINE BOARD OF BAR EXAMINERS*", a Petition for Admission to the Maine Bar.

2150.    Pursuant to the Maine Bar Admissions Rule 9(d)(6), the Bar Applicant Robert P. Weinberg filed his Petition for Admission to the Maine Bar for a hearing to be heard  de novo before a Single Justice of the Supreme Judicial Court for resolution of key issues related to the Bar applicant's fitness to practice law in Maine and related to a determination of the Bar applicant's good moral character.

2151.    Regarding his admission to the Bar, the following statements recount the Procedural History of his case.

2152.    The Bar applicant Robert P. Weinberg filed a petition for admission to the Maine Bar in May 2010.

2153.    The Bar applicant had passed the Bar exam in Maine in July 2010.

2154.    Around October 2010, the Board of Bar Examiners sent the applicant two letters in one envelope: (1) a congratulatory letter stating that the applicant had passed the July Bar exam in Maine; (2) a letter stating that information in the Bar applicant's application had raised some questions and that a hearing would be scheduled pursuant to M.Bar.Adm.R. 9(d) to determine whether the Bar applicant had the necessary good moral character.

2155.   A hearing was convened on July 25, 2011 in Portland before the Board of Bar Examiners.

2156.   On August 23, 2011, the Bar applicant received notice that the Board determined that the applicant had failed to produce the necessary burden of proof of his good moral character.

2157.   This Petition for Admission to the Maine Bar was filed in a timely manner, seeking a *de novo* hearing before a Single Justice of the Supreme Judicial Court.

2158.   The Bar applicant has the requisite good moral character for admission to the Bar.

2159.   The Bar applicant is a Disabled American, entitled to the protections of the federal Americans with Disabilities Act as well as Maine statutes enacted for the protection of disabled persons, and that the Board of Bar Examiners had adequate notice of this disability.

2160.   The Board of Bar Examiners did discriminate against the Bar applicant on the basis of his well-documented disability and thereby violate some of the plaintiff's civil and constitutional rights through violations of the Equal Protection clause and Procedural Due Process clause of the Fourteenth Amendment to the U.S. Constitution, as applied to the States through the Selective Incorporation Doctrine via the Due Process clause.

2161.   The Board of Bar Examiners did confuse specific acts and conduct, which resulted involuntarily as the direct result of the Bar applicant's disability, erroneously with conscious volitional acts of free will, and thereby acted punitively toward the Bar applicant because of his disabling medical conditions.

2162.   Although the Bar applicant did commit some misconduct, during the prior nine (9) years the Bar applicant has shown rehabilitation from this during 2002 – 2011.

2163.   The Bar applicant had made extraordinary contributions to the community through his volunteer work, national service earning him Congressional commendation, and through the humanitarian efforts of Flights for Humanity, a 501(c)(3) non-profit foundation founded by the Bar applicant.

2164.   Character witnesses testified for the plaintiff, and provided affidavits and other letters and documentation attesting to the Bar applicant's good moral character.

2165.   The Assistant Attorney General William R. Fisher did make false, misleading and deceptive statements about the Bar applicant in communications with the Board and continued this pattern during the hearing on July 25, 2011, so as to disparage and derogate the Bar applicant's character before the Board of Bar Examiners.

2166.   The Assistant Attorney General William R. Fisher did withhold exculpatory and exonerating evidence from the Board of Bar Examiners.

2167.   The Bar applicant is fit to practice law, in spite of his disability.

2168.   The Bar applicant incorporates by reference all exhibits previously produced for the Board of Bar Examiners for the July 25, 2011 hearing.

2169.   The Bar applicant reserved the right to obtain a transcript of that July 25, 2011 hearing, which was recorded, from the Office of the Attorney General.

2170.   The Bar applicant reserved the right to subpoena all documents and records relevant to this petition, which is not otherwise protected by some specific privilege, from the Board of Bar Examiners and the Attorney General.

2171.    The Bar applicant requests that the Attorney General produce all exculpatory and exonerating evidence favorable to the plaintiff, and make available for photocopying all records and documents within his custody, possession or control.

2172.    The Petition included the following sections as listed in the Table of Contents: Basis of Petition for Admission to the Bar; Prior Voluntary Bad Acts by Bar applicant; Bar applicant's rehabilitation following sexual misconduct; It would be unfair, unjust and unlawful to hold the Bar applicant liable for the legal mistakes and malpractice of his former attorney, prior to his studying any law courses or obtaining any other type of legal training - *Weinberg v. Colon v. DiCianni and Ferriter Scobbo;* Errors and misunderstandings in the Board's August 23, 2011 decision; "In re Robert P. Weinberg"; Bar applicant's Disability: Documentation of Medical Conditions; Board of Bar Examiners had notice of this disability; Potential discrimination against the Bar applicant on the basis of his disability; Financial collapse and Bankruptcy following the revocation of plaintiff's medical license, and ensuing litigation when the plaintiff could not find gainful employment to pay his debts; debt alone is not evidence of lack of good character; Criminal Allegations and Acquittals at Trial: *Commonwealth of Massachusetts v. Weinberg,* (Zhou); *Commonwealth of Massachusetts v. Weinberg* (Koledova); Litigation by former landlady Jian Zhou - *Zhou v. Weinberg, Koledova*; False, misleading and deceptive communications by Mr. William R. Fisher; Nicholson factors as applied to the Bar applicant; Defendant's violation of the plaintiff's civil and constitutional rights through their violation of Procedural Due Process and the Equal Protection clauses of the Fourteenth Amendment; Bar applicant's fitness to practice law; Bar applicant's national service with National Disaster Medical System (NDMS) and subsequent Congressional recognition; Flights for Humanity, 501(c)(3) non-profit organization, founded by Bar applicant; Stellar academic record: New England School of Law

(graduated with Juris Doctor cum laude); Volunteer work with national "Recording for the Blind and Dyslexic" organization; Character witnesses and references; volunteer assistance with pro buono federal case under Attorney Kenneth Augen; Stellar Employment History from 2005 – 2011; MIT Research on Alzheimer's Disease - Abstract to be presented at American Society for Clinical Pathology; MIT Invention Disclosures; Paper on OPP inhibiting Alzheimer's disease, being submitted to peer-reviewed journals; Bar applicant's rehabilitative efforts and Proof that he is a person of good moral character; Prior Voluntary Bad Acts by Bar applicant.

2173.    The plaintiff made full disclosure of the following bad acts in his application for admission to the Maine Bar submitted to the Board of Bar Examiners in May 2010.

2174.    The Bar applicant admitted the following prior voluntary alleged bad acts:

A.    In 1993, the Bar applicant was a licensed physician in the Commonwealth of Massachusetts when he allegedly became sexually involved with a current patient. As a result of alleged misconduct, the Massachusetts Board of Registration in Medicine revoked the Bar applicant's medical license in October 2002.

B.    In 1999, when the suit drafted, signed under Mass.R.Civ.P. Rule 11 and filed by his attorney Vincent DiCianni, *Weinberg v. Colon v. DiCianni, Ferriter Scobbo* was dismissed as frivolous by Judge Xifaras, the plaintiff fired Mr. DiCianni and sent a memo to the Board of Registration in Medicine warning them that specific testimony may comprise perjury and that the Board may be involved in a criminal conspiracy.

C.    Following the revocation of the plaintiff's medical license in Massachusetts, a reciprocal action took place in New York, where the plaintiff's medical license was revoked in June 2003 because of the alleged sexual misconduct in Massachusetts and the plaintiff's

misrepresentation concerning disciplinary proceedings during the employment process in New York in 2000.

D.     Since first becoming licensed to drive an automobile, the Bar applicant has been charged with exceeding the posted speed limit on several occasions.

E.     Bar applicant declared 19 counterclaims against Jian Zhou in 2007 *Zhou v. Weinberg* suit; although this is not necessarily a "bad act", the plaintiff admits that he may have gone overboard but was fueled by the applicants anger over Zhou's deception, lies and tortious act of allowing Bar applicant's 5-month old child to live in an apartment at 49 Channing Road, Belmont, MA, knowing that there was significant and dangerous levels of lead paint in the apartment which did injure the plaintiff's 5-month old son, in violation of state and federal law. The Belmont Board of Health did issue a citation to Ms. Zhou regarding these violations and an order for immediate de-leading of the apartment. Evidence of these violations of the lead paint law will be presented in evidence to show the Bar applicant's state of mind at the time and whether he acted reasonably considering the totality of the circumstances.

2175.   The Bar applicant made full disclosure concerning these aforementioned prior voluntary alleged bad acts in his May 2010 Petition for Admission to the Bar.

2176.   On the Bar application, the plaintiff listed the action *Zhou v. Weinberg* which had been filed in Superior Court in 2008, seeking a restraining order against the plaintiff.  However when the plaintiff moved from his prior residence, mail and notices from the court were not forwarded to his new residence. When he learned from the Court around April 2011 that a hearing had been scheduled and matters decided in 2009, without notice to the Bar applicant because he had moved his address from prior location and court notices were not forwarded, the Bar applicant

failed to update this matter "Zhou v. Weinberg" in his application, although he did disclose this action originally in his Bar application in 2010, but thought that Zhou was not actively prosecuting the case. This was not an intentional nor purposeful attempt to conceal any facts from the Board, but simply inadvertent neglect due to other commitments and compounded by the Bar applicant's disability.

*Bar applicant's Rehabilitation following alleged Sexual Misconduct*

2177. Following the alleged sexual misconduct in 1993, the Bar applicant continued to practice medicine for an additional ten (10) years until the revocation of his medical license in 2003 (license was revoked in Massachusetts in October 2002 and in New York in June 2003).

2178. During these 10 years, the Bar applicant treated an average of 100 patients per week (5000 patient-visits per year), therefore treating a total of approximately 500,000 patient-visits between 1993-2003.

2179. Over this 10-year period of time and 500,000 patient encounters, there were no incidents, allegations, charges that the Bar applicant ever engaged in any sexual misconduct with any other patient other than "Patient A" (Lourdes Colon) in 1993.

2180. During the 18-year period of time since 1993, there was no incidents, allegations, charges nor complaints that the Bar applicant was ever again involved with any type of alleged sexual misconduct.

2181. During multiple tribunals between 1997 - 2002, defendants Lourdes Colon, Lisa Wolfe and Stanley Spero continued their pattern of spoliation of the exculpatory evidence of the 1992

Express Bilateral Contract which terminated the doctor-patient relationship and exonerated the Plaintiff of wrongdoing.

2182.    Furthermore, Magistrate Sarah Luick made the following factual findings concerning the Bar applicant in her Recommended Decision issued on or about April 2002:

(a) Dr. Weinberg provided the appropriate medical care of Patient A throughout all relevant years;

(b) No sexual misconduct ever occurred in any professional setting such as clinic, office, hospital or Emergency Department [the clinical world classifed by the termination contract];

(c) Dr. Weinberg did meet with Patient A and her psychologist, Dr. Lisa Wolfe, in August 1993 for the express purpose of terminating the doctor-patient relationship, which was not  prohibited by any law, regulation, custom or ethics;

(d) When he resumed his medical treatment of Patient A in 1994, with whom he had become sexually involved, Magistrate Sarah Luick concluded that he rescinded the agreement terminating the doctor-patient relationship and thereby committed sexual misconduct because "sexual relations with a current patient" comprises sexual misconduct according to the standard.

2183.    This judicial "rescission" of the termination contract violated the Contract clause of the U.S. Constitution, was beyond the authority of Sarah Luick, and comprised DALA and Sarah Luick acting *ultra vires* violating the U.S. Constitution and lacking the authority to make such as judicial rescission.

2184.    Multiple physician colleagues wrote reference letters and affidavits in support of the Bar applicant's good character, excellent medical care and concern for his patients, in spite of his having made an error in becoming sexually involved with Patient A.

2185.    The Bar applicant had stellar academic performance at the New England School of Law from 2004-2006, making the Dean's List most semesters, graduating with Juris Doctor degree cum laude, and being named a "New England School of Law Scholar".

2186.    The Bar applicant had a stellar employment record from 2005-2011: providing medical consulting to attorneys involved with medical malpractice litigation; teaching college-level science and mathematics courses at Newbury College, Bay State College and Eastern Nazarene College; investigating PCT patent applications for the U.S. Patent and Trademark Office through subcontractor Cardinal Intellectual Property; and conducting medical research at MIT into potential new drugs for the treatment of Alzheimer's disease.

2187.    The Bar applicant's research findings at MIT lead to his selection to present a poster session at the annual meeting of the American Society of Clinical Pathology in Las Vegas in October 2011 on novel antifibrillogenic agents as potential drugs to treat Alzheimer's disease.

2188.    The Bar applicant's research findings at MIT lead to the filing of an Invention Disclosure concerning specific chemical agents which impede the aggregation of beta-amyloid and therby represent potential new drugs for the treatment of Alzheimer's disease. This is the first step toward obtaining a patent from the U.S. Patent and Trademark Office.

2189.    A paper on the Bar applicant's important and exciting research findings on the antifibrillogenic properties of certain novel phytochemical polyphenols is being sent to top-notch peer-reviewed biomedical journal for review toward eventual publication (was published).

2190.    It is unfair, unjust and unlawful to hold the Bar applicant liable for his former licensed attorney's legal mistakes or malpractice, prior to any law courses or training - *Weinberg v. Colon v. DiCianni, Ferriter Scobbo.*

2191.    In Board Counsel's Rule 9(d)(5) Summary of Evidence by Board Counsel, dated June 30, 2011, Mr. William R. Fisher devotes 4 pages out of a total 12 pages on the case *Weinberg v. Colon v. DiCianni, Ferriter Scobbo*, representing 33% of the evidence presented in this document.

2192.    Mr. Fisher fails to note the Third-party defendants in the case, the plaintiff's former Attorney Vincent DiCianni and his prior law firm of Ferriter Scobbo.

2193.    It would be reasonable to infer that this case was a substantial factor in Mr. Fisher's summary because he devoted 33% of the content of his summary of evidence to this one case.

2194.    The suit "Weinberg v. Colon v. DiCianni, Ferriter Scobbo" was filed in June 1999, before the Bar applicant had ever taken a law course or had any legal training.

2195.    The Bar applicant was represented by counsel, licensed attorneys, at all times prior to December 1999, involving any lawsuit or Board proceeding and reasonably relied upon the advice and recommendations of his counsel.

2196.    Until December 1999, the plaintiff had not acted pro se in any of the Board's proceedings and always followed and relied upon the advice of his legal counsel.

2197.    It is reasonable to state that a layperson, without any law school or legal training, cannot be expected to understand the intricacies of litigation tactics and strategy and furthermore should not be expected to "know better" than their legal counsel concerning these matters.

2198.   It is also reasonable to state that such a layperson, without any law school or legal training, may reasonably rely on the advice and recommendations of their counsel, and should not be liable personally for any gross legal mistakes, ethical errors or gross legal malpractice which may be committed by their counsel.

2199.   In regards to the suit *Weinberg v. Colon v. DiCianni, Ferriter Scobbo*, the Bar applicant was such a layperson in June 1999 when the suit was conceived, drafted, signed and filed by his attorney of record, Vincent DiCianni, who was hired as legal counsel by the Bar applicant, when the Bar applicant had never previously studied law, taken any law courses, or received any type of legal training.

2200.   During the time period June 1998 through December 1999, Mr. Vincent DiCianni was counsel of record for the Bar applicant and Mr. DiCianni was working at that time for the law firm of Ferriter Scobbo.

2202.   The following provides the background to the suit *Weinberg v. Colon v. DiCianni, Ferriter Scobbo*.

2203.   The Bar applicant had a license to practice medicine in the Commonwealth of Massachusetts from September 1988 through October 2002.

2204.   The Bar applicant became sexually involved with "Patient A".

2205.   In November 1996, Patient A filed a suit against the Bar applicant entitled *Colon v. Weinberg, Wesselhoeft and Boston Evening Medical Center* stating that he had committed medical malpractice and also sexual misconduct.

2206.    Through his medical malpractice insurance carrier, ProMutual, Attorney Claudia Hunter was hired to represent the Bar applicant in these proceedings.

2207.    On or upon May 1998, this suit was settled out-of-court for $150,000, without any admission of liability or culpability.

2208.    On or about June 1998, the Bar applicant received a letter from the Massachusetts Board of Registration in Medicine inquiring whether the Bar applicant had engaged in sexual misconduct with a patient.

2209.    Attorney Claudia Hunter referred the Bar applicant to Attorney Vincent DiCianni, a licensed attorney in the Commonwealth of Massachusetts, who had experience with Board proceedings from his prior position as Assistant Attorney General.

2210.    From July 1998 through December 1999, Attorney Vincent DiCianni was the Counsel of Record for the Bar applicant in the proceedings "Board of Registration in Medicine v. Robert P. Weinberg".

2211.    From the first week of representation, Attorney DiCianni repeatedly told the Bar applicant that it was essential that Mr. DiCianni meet with Patient A so that he could determine her credibility.

2212.    Prior to June 1999, the Bar applicant had no legal training, never had taken any law courses, and always believed that he should put his full faith and trust in the advice and recommendations of a licensed attorney, and that he should not double-guess the attorney's tactics or advice, nor attempt to do any sort of independent legal research of which he was quite naïve.

2213.   Since the Bar applicant first met with Attorney DiCianni in the summer of 1998, Mr.

DiCianni repeatedly informed the plaintiff that it was essential for him to meet with Patient A in

order to "ascertain her credibility."

2214.   Attorney DiCianni made 5 unsuccessful attempts to meet with Patient A in order to

"determine her credibility" between July 1998 and December 1999, which was vital as Mr.

DiCianni explained to the Bar applicant, who had never previously taken any law courses nor

received any legal training, thus making him a legal layperson who reasonably would rely on

advice of counsel.

2215.   In his first attempt, Mr. DiCianni requested a meeting with Patient A, off-the-record and

not under oath, with Patient A's former counsel Stanley Spero, on or about August-September

1998.

2216.   Mr. Spero refused to arrange any meeting.

2217.   In his second attempt, Mr. DiCianni requested to the Board of Registration in Medicine

that he meet with Patient A, off-the-record and not under oath, on or about November-December

1998.

2218.   The Board of Registration in Medicine refused.

2219.   In his third attempt, Mr. DiCianni made a motion to verbally examine Patient A to

Magistrate Sarah Luick in the Division of Administrative Law Appeals (DALA), on or about

January-February 1999.

2220.   Magistrate Sarah Luick denied this motion.

2221.  In his fourth attempt, Mr. DiCianni made a motion in Superior Court to depose Patient A, on or about April-May 1999.

2222.  The Superior Court judge denied this motion.

2223.  In his fifth and final attempt, Mr. DiCianni informed the Bar applicant that Patient A had violated some of the terms of her settlement release agreement, and this would be a cause of action to sue.

2224.  In June 1999,  Mr. DiCianni continued to persist in telling the Bar applicant that he must meet with Patient A to determine her credibility.

2225.  Mr. DiCianni further told the Bar applicant that based upon her breach of the terms of the insurance settlement release, a suit should be filed  against Patient A and this suit would allow Mr. DiCianni to depose Patient A during discovery.

2226.  Based upon these recommendations and advice of Attorney DiCianni, the Bar applicant agreed to the suit as proposed.

2227.  In June 1999, Mr. DiCianni drafted the Complaint which he had conceived in order to depose Lourdes Colon.

2228.  In June 1999, Mr. DiCianni signed the Complaint under Rule 11 and possible sanctions.

2229.  In June 1999, Mr. DiCianni filed this suit *Weinberg v. Colon* in Suffolk Superior Court in Boston, MA.

2230.  In summary, the suit "Weinberg v. Colon" was conceived, drafted, signed and filed by Mr. DiCianni because of his stated need "to determine the credibility of the witness."

2231.   The tenacity of Mr. DiCianni's belief that he must meet Patient A to determine her credibility was born out by his 5 attempts to meet with her, from August 1998 through December 1999.

2232.   Prior to December 1999, the Bar applicant had full faith and trust in the legal advice and recommendations of his attorney Mr. DiCianni.

2233.   Prior to December 1999, the Bar applicant had no reason to doubt or disbelieve any of the legal advice and recommendations of his attorney Mr. DiCianni.

2234.   Prior to Mr. DiCianni's filing the suit *Weinberg v. Colon* in June 1999, the Bar applicant had never taken any law course, studied the law, nor had any type of legal training.

2235.   Prior to December 1999, the Bar applicant had never submitted any pro se filings, pleadings, motions nor any other documents without the advice, approval and signature of his attorney.

2236.   It was reasonable for the Bar applicant to rely on his attorney's advice because the Bar applicant was a layperson during this time period.

2237.   In December 1999, Judge Xifaras of the Suffolk Superior Court dismissed the suit "Weinberg v. Colon" as frivolous and without merit.

2238.   In December 1999, Mr. DiCianni telephoned the Bar applicant, beginning the conversation with "I have very bad news for you."

2239.   In this phone conversation, Mr. DiCianni informed the Bar applicant that: (1) the suit was dismissed as frivolous; (2) the Board of Registration in Medicine motioned to add additional

allegations against the Bar applicant, based upon the dismissal of this suit including intimidation of a witness and obstruction of justice.

2240.    By the following day, the Bar applicant fired his attorney Mr. DiCianni because he lost all faith and confidence in an attorney who apparently committed legal malpractice by filing a frivolous complaint and also failed to protect his client's interests by subjecting the Bar applicant to further allegations.

2241.    A hearing had been scheduled before Magistrate Sarah Luick in the Massachusetts Division of Administrative Appeals for January 2000.

2242.    Following his firing of Mr. DiCianni, the Bar applicant was facing this hearing in January 2000, a legal proceeding in the Massachusetts Division of Administrative Appeals, without any attorney.

2243.    1999 was a terrible year for the Bar applicant:  (1) his father, whom he loved very much, died from a metastatic brain tumor; (2) he was unemployed from April 1999 through June 2000 and his savings dropped to zero; (3) his wife was threatening him with filing for divorce; (4) the legal errors and possible malpractice of Mr. DiCianni was adding additional problems; and (5) the Bar applicant felt defenseless and unprepared without legal counsel for the first time in his life before a hearing scheduled for early January 2000.

2244.    These multiple adverse events bearing down on the Bar applicant, combined with his disability and loss of competent legal counsel, pushed the Bar applicant into a desperate frame of mind.

2245.   The Bar applicant was concerned that Patient A was going to lie at the hearing [perjury] and state that the meeting to terminate the doctor-patient relationship with Dr. Lisa Wolfe, patient A and the Bar applicant, which occurred at the Human Resources Institute in Brookline, MA, in August 1992 never took place.

2246.   If the hearing had occurred, and patient A denied the termination agreement, then patient A would have been guilty of perjury.

2247.   In her factual findings issued in April 2002, Magistrate Sarah Luick did find that patient A and the Bar applicant had met for the purpose of terminating the doctor-patient relationship in August 1992.

2248.   Without legal counsel, and stressed out by the imminent hearing, the Bar applicant did send a memo to the Board of Registration in Medicine in December 1999 warning them that a witness was about to perjure himself/herself and the Board may be liable in a criminal conspiracy if they knowingly allowed perjury to be committed.

2249.   Until June 1999, the Bar applicant was a legal layperson, without any law courses or legal training.

2250.   One of the reasons that boards license attorneys is to assure the public and laypersons that such a licensed attorney is competent and skillful with legal knowledge and practice so that the layperson may trust her/his attorney to take care of legal matters in a competent fashion.

2251.   Laypersons are not expected to read law books, familiarize themselves with procedure or tactics, to doubt the competence or ethics of her/his attorney, or to know the difference between a frivolous lawsuit and a meritorious one.

2252.   The Bar applicant was such a legal layperson in June 1999, when Mr. DiCianni informed him that the best road to take was to file the lawsuit "Weinberg v. Colon" so that Mr. DiCianni would have the opportunity to depose Patient A and determine her credibility.

2253.   The Maine Board of Bar Examiners apparently is taking the position that the Bar applicant should have known better than to file such a suit in June 1999 as conceived, drafted, signed and filed by Mr. Dicianni.

2254.   Although the Bar applicant was a legal layperson at the time, the Board of Bar Examiners apparently is stating that the applicant should not have trusted his attorney, should not have followed the advice and recommendations of his attorney, and should not have believed that Mr. DiCianni's licensure by the state should reassure the Bar applicant that he may trust, follow and believe in the recommendations made by Mr. DiCianni.

2255.   In her Recommended Decision issued in April 2002, Magistrate Sarah Luick concluded that she did not hold the Bar applicant at fault for the filing of this suit, signed by Mr. DiCianni, and Magistrate Luick denied the Board's motion to add an additional formal allegation against the Bar applicant based on the filing of this suit.

2256.   In their decision denying the Bar applicant admission to the Maine Bar, the Board of Bar Examiners appear to hold the Bar applicant accountable, responsible and liable for the legal mistakes or legal malpractice committed by Mr. DiCianni in conceiving, drafting, signing and filing the suit "Weinberg v. Colon" in June 1999, as epitomized in the 33% of total evidence presented by AAG Mr. William R. Fisher in his Summary of Evidence filed in June 2011.

2257.   This is most decidedly unreasonable, unfair and unjust to hold the Bar applicant accountable, responsible and liable for the legal mistakes or potential legal malpractice

committed by Mr. DiCianni, while the Bar applicant reasonably relied upon Mr. DiCianni's advice, and at a time when the plaintiff was a legal layperson with no legal training.

2258.  The Board's action in holding the Bar applicant accountable and liable for Mr. DiCianni's suit also goes against the river of extensive precedent which allows a client to sue her/his attorney for legal malpractice, breaking the "unity of attorney-client" when the attorney seriously errs.

2259.  The "unity" of attorney and client is most definitely broken when the attorney knowingly and purposely commits legal malpractice or unethical transactions, without the client's knowledge of such wrongdoing or unethical stance.

2260.  Although the circumstances are such as to provide a good cause of action for the Bar applicant to sue his former counsel, Mr. DiCianni, for such legal malpractice in filing a frivolous suit, the Board of Bar Examiners is apparently of the belief that a layperson such as the Bar applicant was in June 1999, should have known better than his licensed attorney and seems to be suggesting that clients do not follow the advice or counsel of their attorney, but rather carry out some independent investigation or research to see if their attorney's advice is sound.

2261.  In light of these circumstances, and evidence to be presented at the hearing, the Court must find that the conceiving, drafting, signing and filing of the lawsuit "Weinberg v. Colon" was the sole responsibility and liability of Attorney DiCianni, and not any evidence of an adverse nature on the Bar applicant's good moral character.

2262.  The Court must find that the Bar applicant acted in good faith, and belief and trust in Mr. DiCianni, when he agreed to such a lawsuit being filed.

2263.  Furthermore, the Court must find that the filing of the suit "Weinberg v. Colon" is not evidence of any bad character or lack of principles on the part of the Bar applicant.

2264.  The Bar applicant should not and cannot be found accountable or liable for the legal mistakes of his former attorney, when the applicant was a layperson in June 1999 and trusted in the legal advice of Mr. DiCianni, without any former law courses or legal training up until that time.

2265.  Although the lawsuit "Weinberg v. Colon" was dismissed as frivolous in December 1999, the counterclaims of the defendant Colon persisted until their dismissal on or about 2005.

2266.  In January 2001, Professor John Flym, a law professor at the Northeastern University School of Law, became counsel of record for the Bar applicant.

2267.  It was obvious to Professor Flym, as well as to the defendant Colon's co-counsel Philip Cohen, that the Bar applicant was not to blame for the filing of the suit "Weinberg v. Colon" because the suit was conceived, drafted, signed and filed by Attorney DiCianni.

2268.  Based upon this mutual understanding, both Flym and Cohen agreed that a Third party complaint should be filed against Mr. DiCianni and there was mutual consent for the joint filing of a Third Party complaint against Mr. Vincent DiCianni.

2269.  Mr. Cohen, defendant Colon's co-counsel, agreed to draft the third-party complaint.

2270.  Sometime between October-November 2001, the Court accepted this third-party complaint against Mr. DiCianni, and the suit became "Weinberg v. Colon v. DiCianni, Ferriter and Scobbo."

2271.  In part, the third party complaint alleged that Mr. DiCianni was liable for any and all of the damages alleged by defendant Colon in her counterclaims because of alleged injuries arising from the filing of the suit.

2272.  Following the loss of his medical license in October 2002, the Bar applicant was unemployed but continued to have financial obligations of approximately $10,000 per month.

2273.  Due to insolvency and unemployment, the Bar applicant was unable to pay his rent and was evicted from his apartment in October 2003.

2274.  Due to insolvency and unemployment, the Bar applicant was unable to pay his monthly auto loan costs, and he lost his car in 2004.

2275.  Finally, in March 2005, the Bar applicant filed for Chapter 13 bankruptcy in the Maine Bankruptcy Court.

2276.  With over $ 65,000 owing to Professor John Flym, counterclaims by Colon for $ 300,000, and total unsecured debt of over $ 315,000, the Bankruptcy trustee converted the chapter 13 case to a chapter 7 case.

2277.  With the filing of the bankruptcy in March 2005, all outstanding legal claims for damages became property of the bankruptcy estate under the administration of the bankruptcy trustee John Turner.

2278.  Mr. Turner hired counsel, and pursued negotiations with the ProMutual Insurance Carrier, settling the lawsuit "Weinberg v. ProMutual Insurance et al." filed pro se  for approximately $ 7,500 in an out-of-court settlement.

2279.   Mr. Turner's counsel evaluated the claims and counterclaims in the 1999 lawsuit "Weinberg v. Colon v. DiCianni, and Ferriter Scobbo" and decided not to pursue the litigation. This suit was dismissed when the plaintiff and defendant failed to appear for a status conference, for failure to prosecute, although the Court was given notice that the claims of Weinberg were the property of the bankruptcy estate and thus were represented by the bankruptcy trustee, Mr. Turner.

2280.   All the evidence and the totality of the circumstances point to the fact that Mr. DiCianni conceived, drafted, signed and filed the suit "Weinberg v. Colon v. DiCianni, and Ferriter Scobbo" and must be held accountable and liable for this mistake and possible legal malpractice.

2281.   In light of all this, it is unreasonable, unfair and unjust for the Maine Board of Bar Examiners to hold the Bar applicant accountable or liable for the suit "Weinberg v. Colon v. DiCianni, and Ferriter Scobbo" and the Court must find that this suit in itself does not reflect upon the Bar applicant's good moral character nor his fitness to practice law in Maine.

2282.   Legal malpractice by an attorney must breach the "unity of attorney-client."

2283.   The client is allowed by law to sue her/his former attorney for such legal malpractice and the client is not presumed to be guilty or liable for such legal malpractice, unless the client was himself an attorney or had sufficient legal training to have realized at the time of commission that legal malpractice was underfoot.

2284.   The subsequent Third Party Complaint against his former attorney Vincent DiCianni, which was consented to by the defendant Lourdes Colon and allowed by the Court is per se evidence of the breach of attorney-client unity between the Bar applicant and Mr. DiCianni on the basis of legal malpractice.

2285. The following documents the errors and misunderstandings in the Board's August 23, 2011 Decision.

2286. Error # 1: On page 2, the Board states "By final decision and order dated October 30, 2002, the Board of Medicine revoked Weinberg's license to practice medicine in the Commonwealth of Massachusetts for a period of five years ...."

2287. However, although the usual statutory period to wait following revocation of a medical license before which the physician may not petition for reinstatement is five years, the Massachusetts Board specifically granted the Bar applicant the right to petition for reinstatement of his medical license after only 3 years, which is two years shorter than the statutory time period usually mandated.

2288. The Maine Board of Bar Examiners properly notes that "Weinberg has been eligible to seek reinstatement of his Massachusetts medical license since 2005" [ 3 years following the October 30, 2002 order of revocation].

2289. Error # 2: On page 4, the Board states "Weinberg was also charged criminally for allegedly assaulting his wife in December 2007. As his criminal defense attorney explained, the 'problem with the case was that [Weinberg's wife] refused to testify for the prosecution.' A finding of not guilty was then entered by the Massachusetts court.

2290. Although this was poorly explained by the letter submitted by Attorney Jay Hook, there was substantial evidence presented to the Board that a simple unintentional accident escalated to allegations of criminal assault even though:

(a) Vera Koledova, the Bar applicant's wife, testified at the hearing that her injury resulted from an accident;

(b) Medical records signed by the Emergency Physician at Mt. Auburn Hospital stated that Vera believed that only an accident occurred;

(c) Vera Koledova provided a notarized Affidavit to the Board that it was only an accident.

2291.  At the de novo hearing, Attorney Jay Hook is expected to testify that Vera's injury resulted from an accident, which was mistaken for an assault when she tried to telephone for an ambulance  to transport the Bar applicant to the hospital.

2292.  All this testimony is against any finding of purposeful, intentional or criminal assault, although the Board suggests that it was a criminal assault which could not be prosecuted without Vera Koledova's testimony.

2293.  Eyewitnesses to this incident will be testifying at the de novo hearing before a Single Justice of the Maine Supreme Judicial Court, and will prove that the judge's decision to acquit the Bar applicant of all criminal charges was both fair and just.

2294.  Documentation of the Bar applicant's Disability.

2295.  A key issue in this Petition for Admission to the Bar is whether (1) the Bar applicant is disabled as defined by the federal Americans with Disabilities Act (or Maine statutes enacted to protect the disabled) and therefore entitled to the rights, protections and privileges of that Act; and (2) did the Board of Bar Examiners discriminate against the Bar applicant on the basis of his disability?

2296.  As is well known, prejudice and bias need not be facially evident in the Board's decision, but may be inferred from the Board's conduct and actions in reaching this decision.

2297.  It is not uncommon for state or government agencies to provide a pretextual reason for performing some otherwise unlawful activity in an effort to avoid the disclosure for the real and true reason for their actions, when such activity is prohibited by law.

2298.  During the July 25, 2011 hearing, there was abundant evidence in specific questions asked to the Bar applicant, questions asked to Dr. Donald Meyer and facial expressions made by the Board members during the hearing, which show the prejudice and bias which the Board exhibited toward the Bar applicant because of his disability leading to their decision to deny Bar admission on a pretextual basis.

2299.  The Bar applicant will ask for a copy of the transcript of this July 25, 2011 hearing and such transcript will be introduced into evidence at the de novo hearing before the Single Justice in order to prove by a preponderance of the evidence that several Board members are clearly prejudiced and biased against the Bar applicant on the basis of his disability.

2300.  Furthermore, the Bar applicant intends to call expert witnesses who will testify about the Bar applicant's disability.

2301.  Since AAG Mr. William Fisher's initial request for psychological records in an email on or about March 2011, the plaintiff had submitted multiple reports from physicians, psychologists and psychiatrists, as well as forensic reports, documenting the Bar applicant's disability and the Board had adequate notice of the Bar applicant's disability from these reports as well as live testimony of Dr. Donald Meyer during a conference call at the July 25, 2011 hearing.

2302. Medical records, psychological evaluations and psychiatric diagnoses and assessments were submitted by eight of the Bar applicant's treating physicians, psychologists, psychiatrists and forensic psychiatric examiner as part of the Bar applicant's exhibits.

2303. These included reports, testing, assessments and diagnoses by: (1) Dr. Donald Meyer; (2) Dr. Sarah Hoffschmidt; (3) Dr. Laurence Bart; (4) Dr. Andrea Celenza; (5) Dr. Sten Lofgren; (6) Dr. Evgeniy Filin; (7) Dr. Rita Teusch; (8) Dr. Carolyn Conklyn.

2304. Because of difficulties with concentration and focusing in his academic and research activities, the Bar applicant was referred to Dr. Sara Hoffschmidt, Instructor in Neurology, Beth Israel Deaconess Medical Center, Harvard Medical School.

2305. Dr. Hoffschmidt performed about five hours of neuropsychological testing on the Bar applicant both in 2006 and 2010.

2306. On both sets of testing, the Bar applicant showed specific, distinct and identifiable neurologic deficits in spite of his overall superior intelligence performance.

2307. Dr. Hoffschmidt has suggested that using his overall superior intelligence, the Bar applicant was able to compensate for his deficits and mask those deficiencies in everyday life.

2308. Following are excerpts from the report by Dr. Hoffschmidt, dated January 14, 2010, which detail some of the Bar applicant's medical and neurologic deficiencies and strengths, which underlie the Bar applicant's disability:

---------- [Hoffschmidt report quoted within the dotted lines] ------------------------------

1. "EVALUATION PROCEDURES AND TESTS ADMINISTERED: Clinical diagnostic interview; Review of patient records; Intellectual Functioning: Wechsler Adult Intelligence

Scale-Fourth Edition; Attention/Working Memory/Executive: Working Memory and Processing Speed Indices (WAIS IV); Trail Making Test A & B; Stroop Test; Conners' Continuous Performance Test; Tower of London; Memory/Learning: California Verbal Learning Test-Second Edition; Taylor Complex Figure; Language: Word Generation Test (FAS, Animal Generation); Visual-Spatial: Rey-Osterrieth Complex Figure; Block Design (WAIS IV); Self-Report Measures: Executive Functions Checklist; Beck Depression Inventory-Second Edition."

2. "INTELLECTUAL ABILITIES  Results of previous testing indicated overall verbal and nonverbal intellectual abilities in the superior range."

3. "RELATIVE NEUROCOGNITIVE WEAKNESSES WERE EVIDENT IN THE FOLLOWING AREAS:

4. 1.    MILD IMPULSIVITY AND DIFFICULTY REGULATING ATTENTION. On a visual continuous performance task, Dr. Weinberg did not make a large number of errors of omission or commission. His response time was unusually fast, however, and he had greater variability in response time according to the speed of stimulus presentation than is typical. Mild impulsivity/difficulties with inhibition were seen in his three errors on a measure in which he rapidly named the color of ink used to print words. He similarly made attentional errors on a scanning task, and generally was quick to respond.

5. 2.    VARIABILITY IN AUDITORY WORKING MEMORY. Though Dr. Weinberg excelled at solving math problems in his head (see Strengths, above), greater difficulty was evident in other working memory tasks. He repeated 7 digits in foPlaintiff Robert Weinbergard sequence, but just 4 in reverse (2006 = 6). He mentally re-sequenced 4 digits. On another measure, he struggled to mentally re-order numbers and letters (25th %ile; 2006 = 63rd %ile).

6. 3.    FRAGMENTED APPROACH TO A VISUAL COPYING TASK.  Dr. Weinberg's copy
of a complex figure was accurate (see Strengths, above), but he approached the task in a
methodical but fragmented manner.

7. CONCLUSIONS by Dr. Hoffscmidt

8. ...  Evaluation findings were consistent with intact, stable performance across a majority of
neurocognitive measures, including verbal intellect, visual processing speed and attention,
mental math, verbal fluency, planning and problem solving, verbal learning and memory, visual-
spatial abilities, and visual memory. Continued relative difficulties were evident in aspects of
attention and executive functioning, including auditory working memory (which was slightly
lower), impulsivity and regulation of attention, and organization....

9. Evaluation findings likely relate to a confluence of factors, including lifelong developmental
and acquired frontal/executive vulnerabilities (i.e. possible ADHD and sequelae of head injury);
untreated sleep apnea and generally inadequate sleep; and stress and depression.

10. ... DIAGNOSIS:

11. 1.  294.9 Cognitive disorder NOS:  Deficits in attention and executive functioning in the
context of untreated obstructive sleep apnea, hypertension, hypothyroidism, and head injury

        2.  311.  Depressive disorder NOS; rule out bipolar spectrum disorder

        3.Sleep apnea

    4. Hypertension

    5. Hypothyroidism"

--------------------------- (end of excerpts from Hoffschmidt's report) ----------------------------------

2309.   Dr. Evgeniy Filin, M.D. is a physician in the Cognitive Neurology Department at Beth Israel Deaconess Medical Center, and an Instructor at Harvard Medical School, who has been prescribing medications for the Bar applicant's neurologic disability from 2007 – 2011.

2310.   Dr. Evgeniy Filin wrote a letter on January 10, 2011 concerning the Bar applicant in which he describes the following:

"….. It is to confirm that you have been seen in this clinic since 03/01/2007.  Your

condition was diagnosed as Major Depressive Disorder ( currently in remission) and

Cognitive Disorder, Not Otherwise Specified with attention and executive problems in

the context of Sleep Apnea, hypothyroidism, hypertension, history of head injury and possible

attention deficit disorder."

2311.   Dr. Donald Meyer, M.D.,  is a licensed physician in the Commonwealth of Massachusetts who serves as the Associate Director of Forensic Psychiatry at Beth Israel Deaconess Medical Center and also serves as an Assistant Clinical Professor of Psychiatry on the faculty of Harvard Medical School, and is a graduate of the Tufts University School of Medicine and is board-certified as a Diplomate in Psychiatry of the American Board of Psychiatry and Neurology and also board-certified in Forensic Psychiatry by the American Board of Psychiatry and Neurology.

2312.    Among his other accomplishments, Dr. Meyer is also a Distinguished Fellow of the American Psychiatric Association.

2313.   The Bar applicant was referred to Dr. Donald Meyer for a forensic psychiatric examination because of the applicant's neurologic, cognitive and executive disability resulting

from underlying neurologic/neuropsychiatric impairments/deficits/conditions, in part to determine the Bar applicant's fitness to practice law in Maine.

2314.    In his Confidential Report on the Bar applicant dated July 22, 2011, provided to the Maine Board of Bar Examiners, Dr. Meyer states that he utilized the following sources of information: (1) Interviews with the examinee totaling 7 ½ hours; (2) the Minnesota Multiphasic Personality Inventory – Second Edition (MMPI-2); (3) the State of Maine Board of Bar Examiners Rule 9d5 Summary of Evidence by Board Counsel dated June 30, 2011; (4) Commonwealth of Massachusetts Division of Administrative Law Appeals, BORIM [Board of Registration in Medicine] dated April 9, 2002 [erroneously written as 2001] referring to Magsitrate Sarah Luick's "Recommended Decision" issued on 04/09/2002; (5) Affidavit of Dr. Robert Weinberg, January 18, 2000; (6) Affidavit of Dr. Robert Weinberg, 10/2/2002 to BORIM; (7) Outpatient Psychiatric record Beth Israel Deaconess Medical Center, 3/1/07-present, Dr. Evgeniy Filin; (8) Outpatient medical records from Greg Lipshutz, MD, the examinee's neurologist; (9) Outpatient medical record (July 2005) from EJ Wasserman, MD, Neurologist; (10) Neuropsychological retesting 1/14/2010 performed at Beth Israel Hospital by Sara Hoffschmidt, Ph.D.; (11) Outpatient medical record from Sleep Disorders unit, Beth Israel Deaconess Medical Center; (12) Incomplete draft report of IME of the examinee by Laurence Bart, Ph.D., 12/10/10; (13) Medical Record 12/11/2007 EW [Emergency Ward] visit of Vera Koledova, the wife of the examinee; (14) Affidavit, 2002 of Andrea Celenza, Ph.D., former therapist of the examinee; (15) Letter 2/12/01 from Sten Lofgren, M.D., the examinee's treating psychopharmacologist from 1997-2006; (16) Affidavit (July 14 2011 [mistakenly written as 2001]) of Rita Teusch, Ph.D., the examinee's psychologist since May 2009; (17) Letter of reference 1/16/11 from Michael Rothman, M.D., former medical director of mental health

services at the BEMC [Boston Evening Medical Center, where the Bar applicant worked as a Family Practice physician from 1989 – 1997; and (18) Telephone interviews with health care providers including: Andrea Celenza, Ph.D., examinee's psychotherapist from 1997 – 2007; Sten Lofgren,MD, examinee's former psychopharmacologist 1997 – 2006; Rita Teusch, Ph.D. examinee's psychotherapist from 2009 – present; Evgeniy Filin, MD, examinee's current psychopharmacologist, 2007 – present; Carolyn Conklin, Ph.D., the examinee's former couple's therapist 3/9/2007 – 10/3/2007; and (19) Affidavit to the Maine Bar Examiners in the matter of bar applicant Robert Weinberg by Attorney Jay G Hook, the examinee's former criminal defense counsel.

2315.    Based upon these 23 sources of information (including the 5 telephone interviews), Dr. Meyer's report  must be considered comprehensive, detailed and thorough in its' evaluation of the Bar applicant's neurologic, mental and psychological assessment of the applicant's fitness to practice law in face of his neurologic and neuropsychological disability.

2316.    Further evidence of the Bar applicant's fitness to practice law will be found in the evidence presented by Dr. Sara Hoffschmidt,  Dr. Rita Teusch and Law Professor Robert Coulthard, later in this petition, in spite of the Bar applicant's disability.

2317.    During the July 25, 2011 hearing, a conference telephone call was made to Dr. Donald Meyer, who spent over an hour explaining to the Board of Bar Examiners the Bar applicant's conditions, psychological difficulties, mental impairments and disability. Dr. David Meyer also answered several dozen questions posed by the Board members.

2318.    From this comprehensive forensic assessment of the Bar applicant, Dr. Donald Meyer concluded that the plaintiff suffers from several neurological and neuropsychological conditions

including: (1) Major depressive disorder, recurrent in remission; (2) ADHD childhood inattentive type, possible adult residual; (3) Cognitive Disorder, not othePlaintiff Robert Weinbergise specified; (4) Obstructive and central sleep apnea; (5) Personality disorder, not otherwise specified.

2319.    Although any one of the Bar applicant's serious medical and neurological disorders may cause a person to be disabled, the Bar applicant's disability is the result of the confluence and concurrent effects of his multiple disorders and not from any single disorder.

2320.    The Bar applicant intended to call expert witnesses to testify about his disability at the de novo hearing before the Single Justice of the Maine Supreme Judicial Court.

2321.    In Applicant's Exhibit 16 "Supplemental Report of Dr. Rita Teusch", Dr. Teusch referred to the significant depression and life-adjustment issues resulting in part from the Bar applicant's disability.

2322.    Additional substantial evidence of the Bar applicant's disability was presented by other physicians, psychologists and psychiatrists, as well as the effects of the disability on the Bar applicant's conduct and behavior, which might otherwise be interpreted in a malevolent way.

2323.    In spite of the substantial amount of medical and forensic evidence of the Bar applicant's disability, the glaring hole, screaming silence and marked deficiency in the Board's decision concerned its failure to address the Bar applicant's mental/psychiatric disability/ conditions/impairments in any way whatsoever.

2324.    This silence by the Board of Bar Examiners concerning the Bar applicant's disability was, in part, revealing about the Board's prejudice and bias against the Bar applicant because of his disabling medical, psychological and psychiatric conditions.

2325.    Based upon this cumulative evidence of over eight (8) medical professionals totaling over 14 years of treatment and assessment of the Bar applicant, this Court was not able to find that the Bar applicant is a disabled person as defined by the federal Americans with Disabilities Act.

2326.    The Bar applicant's disability is not the result of any single medical condition, but is the result of the aggregate effects of the Bar applicant's prior Traumatic Brain Injury, neonatal cerebral ischemia, Cognitive Disorder NOS, executive function disorder, ADHD, failure of executive functions, Personality Disorder NOS, and Obstructive Sleep Apnea.

2327.    The next key issue to be decided on the evidence is whether the denial of Bar admission was the result of the Board of Bar Examiners' discrimination against the Bar applicant because of his disability, with the pretextual finding that the Bar applicant failed to meet his burden of proof of his good character.

2328.    If this is the case, then the Board of Bar Examiners may have violated the civil rights and constitutional rights of the Bar applicant on the basis of discrimination against a frank and obvious disability in violation of both federal and state law.

2329.    The one negative opinion in Dr. Meyer's report relates the unprofessional and disparaging remarks of Dr. Sten Lofgren, whom the Bar applicant saw for prescription of ADHD and depression medications from 1997-2004. All of the Bar applicant's other treating physicians and psychologists had positive remarks in the report.

2330.    Dr. Lofgren stated unprofessionally that he considers the plaintiff to be a "slippery

fellow" and that he personally disliked the plaintiff because of an extramarital affair disclosed

during treatment.

2331.    In spite of the multiple positive opinions of the Bar applicant expressed by the other

psychiatrists, psychologists and physicians, it was the opinion of Dr. Lofgren that the Board

apparently decided to hang its hat upon.

2332.    The Bar applicant has specific rights as a Disabled American under both state and

federal law.

2333.    It was imperative for this tribunal to determine whether the Maine Board of Bar

Examiners discriminated against this Bar applicant on the basis of his disability.

2334.    A key issue is whether the Maine Board of Bar Examiners confused or misunderstood

conduct or behavior which was the direct involuntary result of the Bar applicant's disability,

made without free choice or free will, with the erroneous assumption that all such conduct or

behavior was due to a lack of good character or malfeasant motives.

2335.    Based upon Dr. Meyer's recommendations, the Bar applicant was seeking a conditional

admission to the Bar, subject to a monitoring agreement with the Maine Assistance Program, as

drafted by Mr. William Nugent, as well as continued medical/psychological treatment under

supervision, and a condition of a supervising attorney who would review the Bar applicant's

cases on a regular basis, as well as specific continuing legal education requirements above and

beyond the regular CLE required for Maine attorneys.

2336.    Mr. William Nugent testified at the hearing, and recommended that the Bar applicant be conditionally admitted to the Maine Bar subject to the conditions enumerated in paragraph above.

2337.    It is clear from the Bar applicant's medical records, psychological evaluations and psychiatric diagnoses and assessments, that the Bar applicant is a disabled person as defined by the federal Americans with Disabilities Act, as well as ancillary Maine statutes addressing disabled persons.

2338.    Although the Bar applicant submitted more than 100 pages of medical records and assessments, and the Board questioned Dr. Meyer for over an hour during the conference telephone call, the Board failed to make a single remark or comment on these disabling conditions of the Bar applicant in their final decision.

2339.    In their decision denying Bar admission to the Bar applicant, the Board failed to make a single statement, averment or declaration relating to the Bar applicant's medical, psychological and psychiatric conditions.

2340.    The transcript of the July 25, 2011 hearing provided evidence of the Board's prejudice and bias against the Bar applicant on the basis of his disability.

2341.    Furthermore, the Bar applicant provided additional evidence of that bias and prejudice against the Bar applicant on the basis of his disability through additional materials to be subpoenaed from the Board during the discovery process.

2342.    The plaintiff attempted to prove that the Board's prejudice and bias on the basis of the applicant's disability was a substantial factor, if not dispositive factor, in the Board's decision to deny the plaintiff admission to the Bar in Maine.